## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ANDREA FRISCHHERTZ, wife of/and BRAD FRISCHHERTZ, individually and on behalf of the minor child, E.F.** | : : : | |
| **Plaintiffs,** | : : | **Civil Action No.: 10-2125** |
| **vs.** | : : | **JUDGE BERRIGAN** |
| **SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE** | : : : : | **MAGISTRATE ROBY** |
| **Defendant.** | : : | **JURY TRIAL DEMANDED** |

## DEFENDANT GLAXOSMITHKLINE LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' EXPERT SUSAN R. ANDREWS, Ph.D.

Defendant GlaxoSmithKline LLC ("GSK") files this memorandum of law in support of

its motion to exclude the opinion testimony of Susan R. Andrews, Ph.D., pursuant to *Daubert v.*

*Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) and Federal Rules of Evidence 104, 702,

and 703.

## I.    INTRODUCTION

E.F. was born in 2005 with a hand abnormality.  (E.F.'s fingers on his right hand are

smaller than his left.)  Plaintiffs allege that E.F.'s limb abnormality was caused by his *in utero*

exposure to Paxil CR® ("Paxil"), a prescription antidepressant manufactured by GSK, that E.F.'s

mother, plaintiff Andrea Frischhertz, allegedly took while pregnant with him.

Plaintiffs designated Susan R. Andrews, Ph.D., a psychologist, as an expert witness who

intends to testify regarding the "future potential psychological and emotional problems that

[E.F.] may confront as a result of being born with a congenitally deformed hand."  (Andrews

Rept., at 4) (attached as Ex. A).  Dr. Andrews has never seen or treated E.F. as a patient.  Rather,

Dr. Andrews was retained by Plaintiffs solely for purposes of testifying in this case, and she bases her opinions on an approximately one hour interview of E.F.'s parents and 30-45 minutes talking with E.F., as opposed to a review of E.F.'s medical records or a scientific analysis of studies or literature addressing bullying in children born with congenital birth defects.  (*See* Andrews Depo., at 22, 34-35, 56, 102) (attached as Ex. B).  Dr. Andrews opines that E.F. *may* experience teasing or bullying as the result of his hand abnormality and that this *may* cause E.F. to develop "emotional scars that extend into his adult years" or, "in the worse [*sic*] case, [E.F.] may grow up with an Anxiety Disorder or a Depression."  (Andrews Rept., at 4.)

Dr. Andrews' proffered opinion falls far short of the admissibility requirements of *Daubert* and its progeny.  Her proposed testimony should be excluded for each of the following independent reasons:

- Dr. Andrews' general qualifications as a psychologist do not qualify her to testify regarding the specific issues she proposes to address: whether E.F. will suffer teasing and bullying, and resulting psychological injury, because of his hand defect.  Child psychology is a very limited portion of Dr. Andrews' practice; she has no experience treating children with congenital defects like E.F.'s; and she does not claim expertise or specialized knowledge regarding risk factors for, or effects of, teasing or bullying.  *See* Argument, Point IV.A, pp. 10-12.

- By her own admission, Dr. Andrews' opinion is entirely speculative because there are simply too many variables for Dr. Andrews (or anyone) to predict whether E.F. will likely experience the psychological effects she posits.  *See* Argument, Point IV.B, pp. 12-15.

- Dr. Andrews' opinion with respect to the possible psychological effects of E.F.'s hand abnormality is not relevant to the issues of damages and causation in this case because she has addressed only the "worst case scenario".  By Dr. Andrews' own admission, that scenario is neither the only possible, nor the most likely, outcome for E.F.  *See* Argument, Point IV.C, pp. 16-18.

- Dr. Andrews' opinion is not supported by scientifically reliable evidence.  She proffers no scientific support for her assumption that E.F. will be teased or bullied because of his hand, and the scientific literature on which she relies does not

support her opinion regarding the long-term effects of childhood teasing or bullying.  *See* Argument, Point IV.D, pp. 18-21.

- In reaching her speculative opinions, Dr. Andrews failed to follow the methodology she follows in treating patients, a methodology that she testified is the accepted psychological methodology regarding the future psychological effects that may arise as a result of E.F.'s hand abnormality.  In particular, Dr. Andrews did not factor E.F.'s strong family history of mental health disorders into her analysis, nor did she obtain the information regarding E.F. that she would normally obtain if he were her patient.  *See* Argument, Point IV.E, pp. 21-24.

For these reasons, Dr. Andrews' guess-work and unreliable opinions should be excluded and she should be prohibited from offering any opinions at trial.

## II.   **DR. ANDREWS AND HER OPINIONS**

### A.   **DR. ANDREWS' BACKGROUND**

Dr. Andrews is a psychologist in private practice in Metairie, Louisiana.  Her clinical practice primarily involves testing for brain dysfunction and treating geriatric patients; only approximately 10% of her current practice involves treating children.  (Andrews Depo., at 47-48, 50.)  She devotes approximately 20 to 30% of her time to litigation consulting, and she has previously been retained as an expert in 250-300 cases.  (*Id.* at 20-21, 29-30.)  Prior to this case, Dr. Andrews had never been retained to opine on the issue of bullying.  (*Id.* at 28.)

While the core foundation of Dr. Andrews' opinion in this case centers on the bullying a child with a congenital disfigurement may experience and its potential psychological impact, Dr. Andrews disclaims any expertise or specialized knowledge regarding bullying.  (*Id.* at 63.)  In fact, she readily admits that she has never:

- conducted research relating to bullying, including the risk factors for being bullied or teased (*id.* at 53, 63);

- conducted research relating to depression or disfigurement (*id.* at 53-55);

- conducted research, presented, or published on the psychosocial issues related to disfigurement in children or adolescents (*id.* at 55, 77); or

- comprehensively reviewed the scientific literature relating to a relationship between congenital defects and teasing or bullying (*id.* at 56).

Dr. Andrews similarly lacks clinical experience with the issues on which she opines in this case. Dr. Andrews rarely treats children. (*See id.* at 49.) And her experience treating children with disfigurement, like E.F., is even more limited. Since beginning her career as a clinical psychologist in 1984, *see* Andrews C.V. (attached as Ex. C), Dr. Andrews has treated at most ten children with disfigurements, Andrews Depo., at 51. In each instance, the child acquired the disfigurement after birth and not as a result of being born with that abnormality, as in E.F's case. Because each patient was "already having [psychological] problems," Dr. Andrews has never been in the position of trying to predict -- as she purports to do with E.F. -- whether the children might develop depression or anxiety disorders. (*Id.* at 52-53.) Dr. Andrews has also worked on "two or three" lawsuits involving adolescents with disfigurements as the result of accidents, but she was not called upon to project whether any of those children would suffer negative effects from being bullied or teased. (*Id.* at 26-27, 32-33.) In other words, Dr. Andrews has never before, whether in a clinical or litigation setting, evaluated or offered the type of opinions she seeks to present in this case.

Dr. Andrews has been the subject of a number of *Daubert* challenges in this Circuit and District. In *Cure v. Marathon Oil Co*., No. Civ. A. 04-0274, 2008 WL 4878674, at *1 (E.D. La. Oct. 27, 2008) (attached as Ex. D), the District Court excluded Dr. Andrews' proposed testimony that the plaintiff's neurocognitive deficits were likely secondary to chemical exposure, finding that the opinions were "beyond her expertise relative to causation and unreliable due to absence of scientific analysis and data to support her conclusory opinions." Similarly, in *United States v.*

*Williams*, 420 F. App'x 384 (5th Cir. 2011), the Fifth Circuit affirmed a decision by the District Court that was based in part on the Court's finding that Dr. Andrews' methodology for reaching her opinion that the defendant could not knowingly waive his *Miranda* rights was "weak and unpersuasive."  *Id*. at 386-87.

> **B.      DR. ANDREWS' ROLE WAS TO DETERMINE ONLY ONE OF MANY POSSIBLE OUTCOMES FOR E.F.**

As Dr. Andrews described, in this case she "had a very simple job, just to ask what could happen psychologically" with E.F.  (Andrews Depo., at 35.)  More specifically, Plaintiffs retained Dr. Andrews to give an opinion regarding the possible "worst case scenario" for E.F. (*Id*. at 92.)  When asked whether she was requested to do anything else, Dr. Andrews responded: "Not a thing."  (*Id*.)  Dr. Andrews admitted, in particular, that she "wasn't asked to diagnose this young man", *id*. at 13, or to address possible outcomes other than the "worst case scenario":

> Q:      . . . in terms of what the possible future outcomes are, your report is limited to the worst case scenario in terms of the future and doesn't give an opinion about other possible outcomes in the future; is that right?
>
> A:      That's true.

(*Id*. at 93.)

The "worst case scenario" about which Dr. Andrews proposes to testify is but one of innumerable, varied and different possible outcomes for E.F.  Significantly, Dr. Andrews cannot even opine that the "worst case scenario" is the most likely outcome because to do so would require "reaching into the crystal ball":

> Q:      Are there potential outcomes for [E.F.] that are not worst case scenario?
>
> A:      Well, wouldn't that be true by the very name, worst case scenario?  I mean, obviously, there are other possibilities. There are a range of other possibilities.

Q:      Did you determine the best case scenario that could occur for [E.F.]? I understand it's not in your report, right?

A:      No, I didn't.

*       *       *

Q:      . . . And did you determine the most likely scenario for [E.F.] in your report?

A:      ***Not really, no. Because there again, you're -- you're reaching into the crystal ball to see what the most likely would be.***

Q:      And you weren't asked to do that in this case; is that right?  You weren't asked to opine on the most likely outcome for [E.F.]; is that right?

A:      No.  And it would be difficult to do, because it would very much depend on where he went to school and, you know, what his friends were like. You would have to be aware of things that I didn't have access to at the time I wrote the report.

Q:      You simply didn't formulate an opinion regarding the best case scenario or most likely scenario for [E.F.]; is that true?

A:      I think I've answered that.

Q:      The answer is yes?

A:      Yes.

(*Id*. at 93-94) (emphasis added); *see also id.* at 142 ("I was just asked to say what could happen to him as a result of being born this way."); 189 (Q. You were not focused on potential future positive outcomes, right?  A. No, I wasn't.").)

## C.      DR. ANDREWS PERFORMED ONLY A CURSORY EVALUATION

Given her very limited "assignment", it is not surprising that Dr. Andrews performed very little in the way of assessment or research before reaching her opinions.  In fact, it is apparent that Dr. Andrews likely would have come up with the same "worst case scenario" opinion regardless of the individual child she was asked to render an opinion about.  She never

reviewed any medical records or depositions.  (Andrews Depo., at 22, 34-35.)  Her entire

assessment consisted of meeting with E.F.'s parents for one hour and with E.F. for 30-45

minutes.  (*Id.* at 102.)  Even those consultations involved little more than a surface evaluation.

Although Dr. Andrews was aware that E.F.'s mother has a significant anxiety disorder, she did

not explore the family history of anxiety or depression, as she would have done "[n]ot once but

probably many times" if E.F. were her patient.  (*Id*. at 115-16.)  Dr. Andrews did not conduct a

diagnostic or clinical interview with E.F.  Instead, they primarily "talked about school".  (*Id*. at

13, 152-53, 173.)  Never once did Dr. Andrews inquire about the issues involved in this case --

or that form the basis of her opinion.  She did not ask E.F. about his hand or how he felt about

his hand.  (*See id.* at 174-77, 180.)  Nor did she ask E.F. whether he was being teased or bullied,

or about any comments others had made about his hand.  (*Id.* at 177-78, 180-81.)   Dr. Andrews

would, however, have addressed these issues if E.F. were her patient.  (*Id*. at 173-79.)

Based on her meeting with E.F., Dr. Andrews agreed with his parents' assessment that he

is a "very easy-going child who gets along well with others, expects a lot from himself, [is]

always smiling and well-adjusted, [and] very bright".  (*Id*. at 107, 179.)  Although Dr. Andrews

commented that E.F. casually covered his right hand while talking with her, Andrews Rept., at 2,

she has no knowledge as to whether he hides his hand in routine, daily situations, Andrews

Depo., at 182-84.  Notably, Dr. Andrews testified that E.F. has not and is not currently suffering

from any psychological problems:

> Q.    And would you agree that [E.F.] doesn't appear to be experiencing any
>        symptoms of depression or anxiety or any other mental illness; is that
>        right?
>
> A.    At this point, it looks as if he's doing fairly well.  I haven't evaluated him,
>        and his parents don't notice anything that they're particularly concerned
>        about currently.

Q.     And, to your knowledge, has [E.F.] ever experienced any psychological problems?

A.     I don't know.  I don't think so.

(Andrews Depo., at 179; *see also id.* at 43, 107-08.)  As she put it, "nobody said this child has anxiety right now".  (*Id.* at 122.)  Dr. Andrews also determined that E.F. is not currently being bullied or teased.  (*Id.* at 159-60, 177.)

The only other work Dr. Andrews performed in this case was an Internet search to locate "two very good recent articles" regarding the effects of teasing.  This constituted the entirety of her research.  (*Id.* at 13, 187.)  As discussed below, neither article provides the scientific support necessary to reach the opinions Dr. Andrews seeks to offer in this case.

**D.     DR. ANDREWS' OPINIONS**

Dr. Andrews concedes two important points:

1)     E.F. is not being teased or bullied at present; and

2)     E.F. is not suffering and has not suffered from any psychological problems.

Nevertheless, in her report, she opines that teasing or bullying is "very likely to happen" in children with disabilities such as E.F.'s.  (Andrews Rept., at 3.)  Explaining this opinion, Dr. Andrews testified that "being born with a disability that's obvious to other people would ***potentially*** cause you to have teasing and bullying and really the extent of my opinion is pretty much that."  (Andrews Depo., at 142) (emphasis added).  Dr. Andrews proceeded to opine in her report that E.F. is "more likely than not" to suffer psychological harm as the result of teasing or bullying or the problems associated with feeling "different":

No one can say for certain how a youngster will adapt to his environment and his personal challenges.  However, we can say on the basis of years of sound research and attention to the problems associated with teasing and bullying and to the problems associated with feeling "different" or not belonging that it is more likely

> than not that [E.F.] will have some emotional scars that extend into his adult years
> from his dysfunctional and small hand.  And, in the worse [*sic*] case, [E.F.] will
> grow up with an Anxiety Disorder or a Depression.

(Andrews Rept., at 4.)  Dr. Andrews conceded, however, that she ***cannot*** say to a reasonable

degree of scientific certainty that: (1) E.F. will be bullied at any point; or (2) E.F. will develop

depression or any anxiety disorder.  (Andrews Depo, at 83-84.)

## III.   THE COURT'S "GATEKEEPER" ROLE UNDER *DAUBERT*

*Daubert* and Rule 702 require that the District Court undertake its "gate-keeping"

responsibility and assess  "three major requirements":

> (1)    Qualifications -- a witness proffered to testify to specialized knowledge
>        must be an expert;
>
> (2)    Reliability -- the expert must testify to scientific, technical, or otherwise
>        specialized knowledge that will assist the trier of fact; and
>
> (3)    Relevance -- the expert's opinion must assist the trier of fact, *i.e.*, there
>        must be a connection between the scientific, technical, or specialized
>        research or results to be presented and the particular factual issues in the
>        case.

*Smith v. Fifthian*, No. Civ. A. 03-2076, 2006 WL 2088126, at *1 (W. D. La. July 26, 2006)

(attached as Ex. E).  A failure to meet any of the three requirements means that the expert cannot

testify.  As emphasized by the Fifth Circuit Court of Appeals:

> [T]he expert's testimony must be reliable at each and every step or else it is
> inadmissible.  The reliability analysis applies to all aspects of an expert's
> testimony: the methodology, the facts underlying the expert's opinion, the link
> between the facts and the conclusion, *et alia.*

*Knight v. Kirby Inland Marine Inc*., 482 F.3d 347, 355 (5th Cir. 2007) (citation omitted).

All expert testimony that involves scientific, technical or other specialized knowledge

must meet the *Daubert* test for admissibility.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141

(1999).  *Daubert* requires that expert testimony be "ground[ed] in the methods and procedures of

science," *Daubert*, 509 U.S. at 590, and the expert therefore must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.  The proponent of the expert testimony (here Plaintiffs) bears the burden of demonstrating its admissibility by a preponderance of the evidence.  *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

IV.   **ARGUMENT AND CITATION OF AUTHORITIES**

   A.   **DR. ANDREWS' GENERAL QUALIFICATIONS AS A PSYCHOLOGIST FAIL TO QUALIFY HER TO TESTIFY REGARDING THE SPECIFIC ISSUES ON WHICH SHE PROPOSES TO TESTIFY.**

The threshold issue presented by proffered expert testimony is whether the witness is sufficiently qualified by "knowledge, skill, experience, training or education" to testify regarding the specific issue on which the testimony is offered.  Fed. R. Evid. 702; *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject.").

The premise of Dr. Andrews' proposed testimony is that a child with a hand abnormality *may* experience teasing or bullying and that such teasing or bullying has long-term adverse psychological effects.  Dr. Andrews is not qualified to testify to either of these opinions.  Although Dr. Andrews purports to offer an opinion regarding potential bullying of E.F., she disclaims any expertise or specialized knowledge regarding bullying; has never done any research regarding the risk factors for being teased or bullied; conducted research, presented, or published on the psychosocial issues related to disfigurement in children or adolescents; or comprehensively reviewed the scientific literature relating to a relationship between congenital defects and teasing or bullying.  (Andrews Depo., at 53, 55-56, 63, 77.)

Moreover, Dr. Andrews lacks the appropriate qualifications to address these issues as they relate specifically to E.F.: namely, to testify that E.F. will experience teasing or bullying because of his hand abnormality and that he will suffer psychological injury as a result.  In practice, Dr. Andrews has never once encountered or treated a patient such as E.F., *i.e.*, a child with a congenital abnormality and no current psychological problems.  The issues arguably presented by E.F.'s case are far removed from those Dr. Andrews addressed when treating the very small number of children with acquired disfigurements and active psychological disorders.  In short, Dr. Andrews lacks the specialized education, knowledge, academic or clinical experience necessary to offer an opinion about bullying and any potential psychological repercussions in a child with a congenital defect.

Whatever Dr. Andrews' general qualifications may be in areas of clinical, or even child, psychology, she lacks the specific qualifications that would be necessary for her to address the particular issues she proposes to address in this case.  *See, e.g., Smith v. Rasumssen,* 249 F.3d 755, 758-59 (8th Cir. 2001) (affirming exclusion of expert testimony by psychiatrist who treated patients with sexual disorders, but lacked expertise in the "specialized discipline" of gender identity disorder to which his proposed testimony related); *Lassiegne v. Taco Bell Corp.*, 202 F. Supp. 2d 512, 518 (E.D. La. 2002) (urologist found to "lack[] the kind of specialized knowledge required to testify" whether choking incident caused plaintiff's erectile dysfunction); *Olsen v. Marriott Int'l, Inc.,* 75 F. Supp. 2d 1052, 1057 (D. Ariz. 1999) (excluding for lack of qualification opinion of sexual abuse expert regarding psychological effects of massage on survivors of such abuse); *see also Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 24 (D. Mass. 1995) ("Just as a lawyer is not by general education and experience qualified to give an expert

opinion on every subject of the law, so too a scientist or medical doctor is not presumed to have

expert knowledge about every conceivable scientific principle or disease.").  With no specialized

knowledge or expertise in the issue she seeks to opine about, Dr. Andrews simply lacks the

necessary qualifications to offer an opinion about any possible future psychological outcome for

E.F.

> **B.   DR. ANDREWS ADMITS THAT HER OPINIONS THAT E.F. WILL SUFFER PSYCHOLOGICAL INJURY BECAUSE OF HIS HAND ABNORMALITY ARE ENTIRELY SPECULATIVE.**

Even where testimony is offered by a qualified expert, the court "must determine whether

the evidence is genuinely scientific, as distinct from being unscientific speculation."  *Rosen v.

Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996).  Thus, in *Lassiegne*, *supra*, this Court

rejected the argument that plaintiff's experts should "be allowed to testify as to the '***possibility*** of

causation,'" observing that "[e]xpert testimony is not admissible when it is based merely on

subjective belief or unsupported speculation."  202 F. Supp. 2d at 523 (emphasis added), *citing

Daubert*, 509 U.S. at 590.  That assessment applies with equal force to Dr. Andrews' opinions in

this case given that she readily admits that unsupported speculation is all she has to offer.

Dr. Andrews concedes that E.F. does not currently and has never experienced any

psychological disorder.  (Andrews Depo., at 43, 179.)  Rather, E.F. is an "active, happy child."

(*Id.* at 179.)  Nevertheless, she opines that E.F. may suffer future psychological injury as the

result of his hand abnormality, because of bullying or teasing or otherwise.  In her own words,

this opinion is merely speculation:

> Q.   And would you agree that predicting what psychological issues [E.F.] will face is by its nature speculative?
>
> A.   I guess so, yes.  ***Of course, it is***.  We don't have the actual event in front of us, so ***it has to be speculation***.

(*Id.* at 83) (emphasis added).

> Q.   … it's speculative that E.F. would even develop an anxiety disorder, correct?
>
> A.   ***It is speculative***.

(*Id.* at 123-24) (emphasis added).  In fact, given the innumerable factors that affect an individual's psychological development, it is doubtful that any psychologist could predict, with the degree of scientific reliability *Daubert* requires, whether a seven-year-old child with no current emotional or psychological problems will develop such problems in the future, even if the child has a physical abnormality like E.F.'s -- a fact with which Dr. Andrews agrees:[1]

> Q.   I take it you'd agree that the present state of scientific literature on the development of psychopathology is not sophisticated enough to allow people to predict with a reasonable degree of scientific certainty whether a child will suffer from a psychological illness as he gets older; is that correct?
>
> A.   Well, I disagree with the way that you actually framed that question, that if we get more sophisticated some day, we'll be able to make those kinds of predictions.  ***I don't think that's possible.  I think there's too many possibilities always that exist within a situation for an individual to ever be able to have a crystal ball and look into the future and say, this is for sure going to happen,*** and when you get to be 24, you're going to find the woman that you want to marry.  ***That's just not the way it works.***
>
> Q.   There's simply too many variables; is that what you're saying?
>
> A.   Of course.

(*Id.* at 80) (emphases added).

Dr. Andrews has admitted the obvious: there are simply too many variables for her or anyone to make a reliable prediction regarding E.F.'s future psychological status.  Even the

---

[1] Indeed, at least one court has held that "[r]etrospective expert testimony regarding the existence or onset of a mental illness is inadmissible speculation," *Goomar v. Centennial Life Ins. Co.*, 855 F. Supp. 319, 326 (S.D. Cal. 1994), *aff'd*, 76 F.3d 1059 (9th Cir. 1996).  It follows that prospective testimony -- *i.e.*, testimony that an individual with no current psychological problems will develop such problems in the future -- would be even more speculative.

underpinnings of Dr. Andrews' opinion -- that E.F. will be bullied or teased in the future -- are

tenuous at best.  According to Dr. Andrews, E.F. is not currently being bullied or teased.  (*Id.* at

159-60, 177.)  Even assuming E.F. were to be bullied or teased in the future, which again would

be pure speculation, Dr. Andrews testified that teasing and bullying are ***not*** established as causes

of anxiety and depression.  "[A]ny number of things or nothing" can happen to a child who is

bullied:

> It could make the child into a bully for example.  That often is one of the things
> that can happen.  There's a number of things that can happen, so what you can say
> essentially is any number of things could happen or nothing.  It could be a
> positive outcome.  If the kid would develop some kind of new way to deal with
> and cope with that kind of thing, which he then passes on to friends.  I mean,
> there's a variety of possibilities.

(*Id.* at 137.)

The speculative nature, and thus inadmissibility, of Dr. Andrews' opinions is summed up

by her admission that she ***cannot*** say with any certainty that E.F. ***will*** be bullied or that he ***will***

develop anxiety or depression as a result of any unknown bullying:

> Q.  Can you say to a reasonable degree of scientific certainty what issues
>     [E.F.] will face as he gets older?
>
> *          *          *
>
> A.  I think what I've said is that I can only say with a reasonable degree of
>     certainty what he ***might*** face.  ***I can't tell you for sure what he will face***.
>     In other words, I ***can't*** say for sure that [E.F.] will sometime in his young
>     years be bullied, for example.  I can say, based upon what his parents have
>     told me, that he already has been teased somewhat, to some extent.[2]
>
> Q.  And just as you can't say for sure that he'll be bullied, is it true that you
>     can't say for sure that he'll develop depression?

---

[2] In direct contrast to this statement, Dr. Andrews testified several times that there is no evidence that E.F. has been teased.  (Andrews Depo., at 160 ("Q. And I think you've said [E.F.] is not currently being teased; is that right?  A. I think I said that, yes."); 177 ("Q. But we know that teasing and bullying aren't occurring?  A. That's correct.").)

A.   *I can't say that for sure, no.*

Q.   And same is true for anxiety disorder; you can't say for sure -- for certain whether he'll develop an anxiety disorder?

A.   *That's true*.  And I think I said as much. In fact, I think on the beginning of page 4 [of my report], *I said no one can say for certain, da, da, da, da, da*.

(*Id.* at 83-84) (emphases added).  Dr. Andrews cannot even opine as to the most likely outcome

for E.F.:

> Well, the most likely again, that will evade us, because *that would depend upon circumstances as they happen over his lifetime that we don't know.  We don't know what they might be*.

(*Id.* at 95) (emphasis added).

Merely opining that something "might" occur in the future "does not reach the necessary

level of [scientific] probability" required under Louisiana law.  *Richard v. Artique*, 87 So. 3d

997, 1005 (La. Ct. App. 2012) (rejecting jury's consideration of expert's testimony that "*perhaps*

an alternate treatment was available to [plaintiff] that *may* offer her some relief" because it was

"mere speculation" that did "not reach the necessary level of a reasonable degree of medical

probability"); *see also Miller v. Universal Services, Div. of Intern. Catering Enterprises, Inc.*,

No. 89-1974, 1990 WL 32947, at *1 (E.D. La. Mar. 21, 1990) (attached as Ex. F) ("When

medical causation is at issue, plaintiff must prove causation to a reasonable degree of medical

certainty.") (citation omitted)).  Dr. Andrews' admission that her opinions are speculative is,

even by itself and apart from the other deficiencies of her opinions, sufficient reason to exclude

her testimony.[3]

---

[3] Even if Dr. Andrews' opinions regarding the potential that E.F. could suffer some psychological condition in the future were to pass muster under *Daubert*, such testimony would not serve to assist the trier of fact, as is required by Federal Rules of Evidence 702.  Plaintiffs offer Dr. Andrews testimony to establish an element of damages.  Louisiana law is clear, however, that "damages must be proved with legal certainty."  *Belle Chase Auto.*

### C.  DR. ANDREWS' OPINIONS ARE NEITHER RELIABLE NOR RELEVANT BECAUSE THEY ARE DEVOTED SOLELY TO THE "WORST CASE SCENARIO".

To be admissible as proof of causation, expert testimony "must not only be reliable, but also must be relevant to the issue of causation." *Pipitone v. Biomatrix, Inc*., 288 F.3d 239, 245 (5th Cir. 2002).  "The expert testimony must be relevant, not simply in the sense that all testimony must be relevant, Fed. R. Evid. 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc*., 320 F.3d 581, 584 (5th Cir. 2003).

As described above, Dr. Andrews' opinion is offered to prove both damages and causation: that E.F. will experience future psychological injury and that the injury will be the result of his hand abnormality, which other experts (whose opinions GSK is also challenging) will somehow attribute to Paxil.  But Dr. Andrews' opinions are neither reliable nor relevant to these issues and they will not assist the jury in deciding them.  Dr. Andrews admittedly limited

---

*Care, Inc. v. Advanced Auto Parts, Inc.*, No. 08-1568, 2009 WL 799760, at *2 (E.D. La. Mar. 24, 2009) (attached as Ex. G) (citing *F.D.I.C. v. Barton*, 233 F.3d 859, 864 (5th Cir. 2000)).  As a general proposition, "[s]peculative damages may not be recovered."  *Id.* (citing *Barton*, 233 F.3d at 864-65).

Plaintiffs' claim for potential emotional distress damages is akin to a claim for increased risk of future damage.  Under Louisiana law, in order to recover such damages, a plaintiff must show more than a mere possibility that the feared future injury will result.  *See, e.g., Adams v. Johns-Mansville Sales Corp.*, 783 F.2d 589, 591-92 (5th Cir. 1986) (affirming dismissal of claim for damages relating to increased risk of cancer from asbestos exposure where there was no proof of medical probability that plaintiff would develop cancer); *Bonnette v. Conoco, Inc.*, 837 So. 2d 1219, 1230-33 (La. 2003) (overturning award of damages for increased risk of developing asbestos-related cancer because the potential for cancer was only "slight" or possible); *see also Afeman v. Ins. Co. of N. Am.*, 307 So. 2d 399 (La. Ct. App. 1975) (rejecting claim for damages based on possibility that plaintiff might develop arthritis due to damage to his wrists because "awards should not be given based upon speculation that fifty-one year old man *may* develop arthritis in later years").

Moreover, where there is no evidence that E.F. will be bullied or teased -- the condition which allegedly causes the future injury -- a claim for damages is rejected under Louisiana law.  *See Nesom v. Tri Hawk Int'l*, 985 F.2d 208, 211 (5th Cir. 1993) ("To allow someone to recover merely because he fears that he *may* have been exposed to a dangerous substance goes too far.  Such circumstances do not provide a sufficient indicia of reliability.  To sanction the theory of recovery argued here, would open the door to thousands of plaintiffs who claim that they have suffered damages caused by fear of possible exposure to some dangerous substance or another without even proof of actual exposure to that danger."); *Presley v. Nisource, Inc.*, No. 08-2020, 2009 WL 3055328, at *3 (W.D. La. Sept. 21, 2009) (attached as Ex. H) ("[U]nder Louisiana law, fear of future injury is not recoverable - *absent evidence* that plaintiff is exposed to the condition which causes the fear.") (citing *Nesom,* 985 F.2d at 211).

her analysis to the "worst case scenario", which she concedes is only one ***possible*** outcome that

may happen to E.F.

> Q:    Are there potential outcomes for [E.F.] that are not worst case scenario?
>
> A:    Well, wouldn't that be true by the very name, worst case scenario?  I mean, obviously, there are other possibilities. There are a range of other possibilities.
>
> Q:    Did you determine the best case scenario that could occur for [E.F.]? I understand it's not in your report, right?
>
> A:    No, I didn't.
>
> *       *       *
>
> Q:    . . . And did you determine the most likely scenario for [E.F.] in your report?
>
> A:    Not really, no. ***Because there again, you're -- you're reaching into the crystal ball to see what the most likely would be***.

(Andrews Depo., at 93-94) (emphasis added).

Thus, as Dr. Andrews acknowledges, the most she can say about E.F. "within a

reasonable degree of certainty [is] what he ***might*** face."  (*Id.* at 84 (emphasis added); *see also id.*

at 124 ("Am I going to tell the jury that, but for his hand, he wouldn't develop anxiety?  . . . I

don't think I will, no").)  However, "[t]he mere possibility of a causal connection is insufficient

to support any recovery" under Louisiana law.  *Bacon v. Ace Am. Ins. Co*., No. Civ. A. 07-615-

C, 2008 WL 5377998, at *4 (M.D. La. Dec. 23, 2008) (attached as Ex. I).  Nor would it be

probative of causation to allow Dr. Andrews to testify that having a congenital abnormality

"increases the potential", Andrews Depo., at 131-32, or is a "risk factor", *id*. at 136, for

emotional difficulties.  Increased risk means simply that there is an association, and it is

axiomatic that "*an association is not equivalent to causation*."  Reference Manual on Scientific

Evidence ("Reference Manual") at 552 (Federal Judicial Center 3d ed. 2012) (attached as Ex. J).[4]

To summarize, Plaintiffs offer Dr. Andrews' opinions to prove that E.F. will suffer future

psychological injury as the result of his hand abnormality.  But Dr. Andrews' opinions are

neither reliable nor relevant to those issues, however, because the most she can say is that E.F.

*may* develop a psychological injury in the future.  This is a further reason, in addition to the

wholly speculative nature of Dr. Andrews' opinions, to exclude her testimony.

D.     **DR. ANDREWS' OPINIONS ARE NOT SUPPORTED BY SCIENTIFICALLY RELIABLE EVIDENCE REGARDING EITHER THE INCIDENCE OR EFFECTS OF TEASING OR BULLYING.**

Although the primary focus of a court's *Daubert* analysis is the expert's methodology,

"conclusions and methodology are not entirely distinct from one another", and "[a] court may

conclude that there is simply too great an analytical gap between the data and the opinion

proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Dr. Andrews' prediction that

E.F. will suffer future psychological injury is premised on her belief that E.F. may be teased or

bullied because of his hand abnormality and her further belief that such teasing or bullying

causes long-term psychological harm.  (*See* Andrews Rept., at 3.)  Neither of these beliefs is

supported by scientifically reliable evidence, and there is accordingly an "analytical gap"

between Dr. Andrews' opinions and the data on which they are purportedly based.

Dr. Andrews' belief that E.F. may be teased or bullied because of his hand abnormality is

nothing more than an assumption for which she offers no support.  Dr. Andrews has not done

any research, presenting, or publishing on the psychosocial issues related to disfigurement in

---

[4] Dr. Andrews agrees:  "A risk factor . . . is increasing a probability that might actually manifest, so you're several steps back from a cause" (Andrews Depo., at 136).

children.  Even today, she has never made a comprehensive review of the literature to determine whether there is a relationship between congenital hand defects and teasing or bullying.  Instead, she apparently developed her opinions for this litigation.[5]  (Andrews Depo., at 55-56.)  Nowhere in her report does Dr. Andrews offer any scientific evidence regarding the incidence of bullying or teasing to support her opinions about whether E.F. may be teased or bullied.  Indeed, Dr. Andrews has acknowledged that the possibility of teasing and bullying would depend on multiple environmental and other factors, and that "[b]eing able to remain in good schools with a small student-teacher ratio will hopefully reduce the chances of [E.F.] being openly and repeatedly bullied by hostile children."  (Andrews Rept., at 4.)

Even if there were scientifically reliable support for Dr. Andrews' belief that E.F. is "very likely" to be teased or bullied because of his hand abnormality, her proposed testimony would still be inadmissible because she has provided no scientifically reliable support for her further belief that such childhood teasing or bullying has long-term adverse psychological effects.  Because Dr. Andrews is not an expert on this issue, her opinion regarding the long-term effects of teasing or bullying is necessarily based upon what she calls the "vast literature . . . in the past 20+ years that investigates the long-term effects of being teased and even bullied as children."  (*Id.* at 2.)  Such a literature review "is an insufficient basis or methodology on which to render a reliable expert opinion."  *Smith v. Rasmussen*, 57 F. Supp. 2d 736, 766 (N.D. Iowa 1999), *rev'd on other grounds,* 249 F.3d 755 (8th Cir. 2001).  Even if Dr. Andrews' literature

---

[5] Opining on matters solely for the purpose of litigation, without any independent expertise or background, significantly undermines the reliability of the opinion being proffered.  *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying"), *cert. denied*, 516 U.S. 869 (1995).

review could substitute for the professional experience she lacks, the only two studies she cited in her report, both of which she found on the Internet, Andrews Depo., at 187, would not provide scientifically reliable support for her opinion.

The first study Dr. Andrews cited, Storch *et al*., "The measurement and impact of childhood teasing in a sample of young adults," *Journal of Anxiety Disorders* 18 (2004) 681-694 (attached as Ex. K), examined the relationship between recalled childhood teasing and current psychosocial distress in a group of college students. Although the authors concluded that teasing in the performance domain (for example, teasing about being bad at sports) and teasing in the social domain (for example, teasing about being shy) were related to later psychological distress, they found that teasing about appearance "did not seem strongly related to later psychological distress." (Storch at 691.) Moreover, the authors observed that their "findings should be viewed against some methodological limitations," including that study participants who reported anxiety and depression "might have exhibited these characteristics in childhood, and continue to exhibit these characteristics as young adults, independent of childhood teasing" and that "individuals who are currently distressed may have recalled their childhood experiences in an overly negative manner." (*Id.*)

The second study Dr. Andrews cited, McCabe *et al*., "The relationship between anxiety disorders in adults and recalled childhood teasing," *Journal of Anxiety Disorders* 24 (2010) 238-243 (attached as Ex. L), examined the relationship between retrospective accounts of teasing and psychological well-being in a group of patients referred to an outpatient anxiety disorders clinic. The authors found it "plausible to suggest that social anxiety may be the result of exposure to anxiety-provoking peer interactions in childhood," but noted that "research methods used in the

current study preclude us from drawing causal inferences" and that further and different studies are needed "[i]n order to move forward in peer victimization research. . . ." (McCabe at 241-42.)

The most that can be said of the Storch and McCabe studies is that they identify a **possible association** between childhood teasing and later psychological health that **requires further exploration** to determine whether the association is causal and what other factors may account for the observed outcomes. But that conclusion falls far short of the opinions Dr. Andrews seeks to draw from the Storch and McCabe studies: *if* E.F. is teased or bullied because of his hand, he will suffer long-term psychological injury as a result. "It is axiomatic that causation testimony is inadmissible if an expert relies upon studies or publications, the authors of which were themselves unwilling to conclude that causation had been proven." *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009) (collecting cases). That is precisely the situation here, and this is a further reason to exclude Dr. Andrews' proposed testimony.

### E.   DR. ANDREWS DID NOT FOLLOW ACCEPTED PSYCHOLOGICAL METHODOLOGY IN REACHING HER OPINIONS.

In order for an expert's testimony to be admissible, the expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152; *Dart v. Kitchens Bros. Mfg. Co.*, 253 F. App'x 395, 398 (5th Cir. 2007). Dr. Andrews concedes that she did not follow the methodology she follows in treating patients, which she testified is the accepted methodology in her field, in forming her litigation opinion in this case.

In her clinical practice, Dr. Andrews does not typically make "predictions of bad things happening." (Andrews Depo., at 59.) While she may make such a prediction "in her head," she looks at risk factors rather than making predictions to her patients. (*Id.* at 60-61.) Thus, in

treating a child such as E.F., Dr. Andrews would not limit her analysis to the "worst case scenario" as she did in this case, but would instead analyze the child's risk factors and weigh those factors against other, positive factors.  (*Id*. at 73-74, 79.)

This risk-factor-based approach, which Dr. Andrews testified is the accepted methodology in her field, *id*. at 81, is not the approach she followed in arriving at her opinion in this case.  Even though Dr. Andrews was aware that E.F.'s mother has a significant anxiety disorder, *id*. at 115, Dr. Andrews did not evaluate the family history of anxiety or depression -- something she would have done "[n]ot once but probably many times" if E.F. were her patient rather than a litigation client, *id*. at 116.  In particular, in assessing risk factors for anxiety in a child she saw as a patient, Dr. Andrews would consider whether the mother had an anxiety disorder during pregnancy.  (*Id*. at 72-73.)  This is a particularly important risk factor because, as Dr. Andrews stated in her 2012 book, <u>Stress Solutions for Pregnant Moms</u> (excerpts attached as Exhibit M), there is "an astonishing link between anxious pregnant women and many behavioral and emotional problems that show up in their children." (<u>Stress Solutions</u>, at 4.)[6]

Although she did not consider parental anxiety as a risk factor in forming her opinion in this case, Andrews Depo., at 127, 140, 145, Dr. Andrews testified that this issue would be "very important" and would have been included in her analysis if she were treating E.F., *id*. at 127, 145.  Despite this acknowledgment, Dr. Andrews made no effort to rule out -- and in fact, could not rule out -- family history as a cause if E.F. were to develop anxiety.  (*See id.* at 121 ("That wasn't my job to say where the possibilities might come from.").)

---

[6] *See also* <u>Stress Solutions</u>, at 4 ("the information in this book is *equal to -- if not more important than -- the well-recognized warnings to expecting mothers to avoid alcohol and stop smoking*"); 7 (referring to "connections between chronically high levels of prenatal stress and childhood developmental and behavioral issues"); 77 ("Many studies report and support the relationship between prenatal stress and childhood anxiety.").

Q.      So it's correct to say [E.F.] has a family history of anxiety; is that right?

A.      Yes, it's correct to say that.

Q.      And because of his family history of anxiety, would you be able to rule out his family history as a cause of anxiety if he did ultimately develop an anxiety disorder?

A.      Would I rule it out?

Q.      Right.

A.      No.  It would certainly be a risk factor.  It would increase the risk for him developing it.

(*Id.* at 118-19.)

Q.      Okay.  If [E.F.] were to develop anxiety, which is speculative, right?

A.      Yeah.

Q.      If he were, would you be able to rule out family history as a cause of that anxiety?

A.      I thought I already answered that question, but I'll answer it again.

Q.      It's a yes or no.

A.      No.

(*Id.* at 122.)  "[I]f an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony."  *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 804 (E.D. La. 2011) (quoting *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir.2001)).

Dr. Andrews also departed from accepted methodology in reaching an opinion based on a single one-hour meeting with E.F.'s parents and a single 30-45 minute conversation with E.F. that was not a "clinical interview".  (Andrews Depo., at 173.)  During her brief conversation with

E.F., Dr. Andrews abided by "ground rules" on which she and E.F.'s parents agreed, that precluded her from asking E.F. about his hand, whether he is being teased or bullied, or about any comments anyone had made regarding his hand.  (*Id*. at 174-75, 177, 181.)  By contrast, if E.F. had been brought to Dr. Andrews as a patient, she "of course" would have addressed each of those issues with him.  (*Id*. at 178.)

Dr. Andrews' failure to follow her usual methodology – the methodology she follows in treating patients as a clinical psychologist – in this case, shows that her opinion lacks the indicia of scientific reliability required under *Daubert*.  *See, e.g.*, *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F. 3d 256, 269 (2d Cir. 2002) (holding expert's opinion properly excluded because expert "fail[ed] to apply his stated methodology reliably to the facts of the case") (citations and punctuation omitted); *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996) ("the district court should be wary that the [expert's] method has not been faithfully applied"); *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106-07 (7th Cir. 1994) (excluding opinion where expert did not follow his own expressed methodology for establishing causation); *Soldo v. Sandoz Pharms. Corp*., 244 F. Supp. 2d 434, 560 (W.D. Pa. 2003) (experts' "significant departures from their own standards render their methodology scientifically unreliable").  Her admitted departure from her own accepted methodology is yet another example of the unreliable methodology she employed to reach her opinions.

## V.     CONCLUSION

For the reasons stated above, GSK requests that this Court exclude the opinions and testimony sought to be offered by Susan R. Andrews, Ph.D.

Dated: September 18, 2012

Respectfully submitted by:

_____
James B. Irwin (La. Bar No. 7172)
Stephanie L. Irwin (La. Bar No. 22493)
Brian P. Quirk (La. Bar No. 19748)
IRWIN FRITCHIE URQUHART & MOORE LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
Facsimile: (504) 310-2101


Tamar Halpern (Admitted Pro Hac Vice)
Eva Canaan (Admitted Pro Hac Vice)
PHILLIPS LYTLE LLP
Suite 3400, One HSBC Center
Buffalo, New York  14203
Telephone:  (716) 847-8400
Facsimile:  (716) 852-6100

Andrew T. Bayman (Admitted Pro Hac Vice)
Halli D. Cohn (Admitted Pro Hac Vice)
Franklin P. Brannen, Jr. (Admitted Pro Hac Vice)
Meredith B. Redwine (Admitted Pro Hac Vice)
Bethany L. Schneider (Admitted Pro Hac Vice)
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

ATTORNEYS FOR DEFENDANT
GLAXOSMITHKLINE LLC

## CERTIFICATE OF SERVICE

I certify that on September 18, 2012, a copy of the foregoing Memorandum was served via ECF filing on all counsel of record.

_____
/s/ Halli D. Cohn