# EXHIBIT B

Susan R. Andrews, Ph.D.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

ANDREA FRISCHHERTZ, wife
of/and BRAD FRISCHHERTZ,
individually and on behalf
of the minor child, EVAN
FRISCHHERTZ,

    Plaintiffs,

                                 CIVIL ACTION

vs.                              NO.: 10-2125

SMITHKLINE BEECHAM CORPORATION
d/b/a GLAXOSMITHKLINE

    Defendant.

AUGUST 16, 2012

— — —

    Videotaped deposition of SUSAN R.
ANDREWS, Ph.D. held at the offices of Susan R.
Andrews, Ph.D. 2626 N. Arnoult Road, Suite 220,
Metairie, Louisiana, commencing at 1:02 p.m., on
the above date, before Leslie B. Doyle, Certified
Court Reporter (LA), Registered Professional
Reporter, Certified LiveNote Reporter.

— — —

GOLKOW TECHNOLOGIES, INC.

877.370.3377 ph|917.591.5672 fax

deps@golkow.com

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 2

```
 1  A P P E A R A N C E S :
 2
 3  COUNSEL FOR THE PLAINTIFFS:
 4     SPENCER R. DOODY, ESQ.
          Email: Sdoody@mbfirm.com
 5        Phone:  (504) 581-9065
       MARTZELL & BICKFORD
 6     338 LAFAYETTE STREET
       NEW ORLEANS, LOUISIANA  70130
 7
 8  COUNSEL FOR THE DEFENDANT:
 9     LISA L. SMITH, ESQ.
          Email: Lsmith@phillipslytle.com
10     PETER D. BRAUN, ESQ.
          Email: Pbraun@phillipslytle.com
11        Phone:  (716) 847-8336
       PHILLIPS LYTLE, LLP
12     3400 HSBC CENTER
       BUFFALO, NY  14203-2887
13
14     BETHANY L. SCHNEIDER, ESQ.
          Email: Bschneider@kslaw.com
15        Phone:  (404) 572-4601
       KING & SPALDING, LLP
16     1180 PEACHTREE STREET, N.E.
       ATLANTA, GEORGIA  30309-3521
17
18
19  VIDEOGRAPHER:
20     HANK COBB
          Golkow Technologies, Inc.
21
22            ---
23
24
25
```

Page 3

```
 1        INDEX OF EXAMINATIONS
 2  EXAMINATION
 3     BY MS. SMITH............................6
 4  CERTIFICATE.............................197
 5  ERRATA..................................198
 6  ACKNOWLEDGMENT OF DEPONENT................199
 7  LAWYER'S NOTES..........................200
 8            * * *
 9
10
11        INDEX OF EXHIBITS
12  EXHIBIT 1..................................8
13     THIRD AMENDED NOTICE OF VIDEOTAPED
14     DEPOSITION OF SUSAN ANDREWS, PH.D.
15  EXHIBIT 2.................................12
16     STATEMENT
17  EXHIBIT 3.................................16
18     FEE SCHEDULE
19  EXHIBIT 4.................................13
20     STATEMENT
21  EXHIBIT 5.................................23
22     LIST OF TRIAL TESTIMONY
23  EXHIBIT 7.................................34
24     REPORT
25
```

Page 4

```
 1  EXHIBITS (CONTINUED):
 2
 3  EXHIBIT 8.................................35
 4     CURRICULUM VITA
 5  EXHIBIT 9.................................41
 6     EXCERPT OF DEPOSITION OF DR. HIRSCH
 7  EXHIBIT 10................................81
 8     COPY OF PHONE MESSAGES
 9  EXHIBIT 11................................85
10     HANDWRITTEN NOTES
11  EXHIBIT 12................................97
12     PARENT-CHILD QUESTIONNAIRE
13  EXHIBIT 13...............................108
14     HANDWRITTEN NOTES
15  EXHIBIT 17...............................184
16     HANDWRITTEN NOTES
17  EXHIBIT 69................................66
18     WESTLAW CITATION
19  EXHIBIT 78................................24
20     LIST OF TRIAL AND DEPOSITION TESTIMONY
21  EXHIBIT 79................................60
22     UPDATED CURRICULUM VITA
23            * * *
24
25
```

Page 5

```
 1        PROCEEDINGS
 2        THE VIDEOGRAPHER:  We are now on the
 3  record.  My name is Henry Cobb.  I'm the
 4  videographer for Golkow Technologies.
 5  Today's date is August 16th, 2012.  The
 6  time now is 1:02 p.m.  This video
 7  deposition is being held in New Orleans,
 8  Louisiana, in the matter of Evan
 9  Frischhertz versus GSK for the East -- or
10  for the United States District Court,
11  Eastern District of Louisiana.  The
12  deponent is Dr. Susan Andrews.
13        Would counsel please identify
14  themselves for the record?
15        MR. DOODY:  Spencer Doody for the
16  plaintiffs.
17        MS. SMITH:  Lisa Smith for
18  GlaxoSmithKline.
19        MR. BRAUN:  Peter Braun for
20  GlaxoSmithKline.
21        MS. SCHNEIDER:  Bethany Schneider for
22  GlaxoSmithKline.
23        THE VIDEOGRAPHER:  The court reporter
24  is Leslie Doyle and will now swear in the
25  witness.
```

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 6

1           * * *
2       SUSAN R. ANDREWS, PH.D.
3     having been first duly sworn, was examined
4         and testified as follows:
5           * * *
6           EXAMINATION
7   BY MS. SMITH:
8     Q.  Good afternoon, Dr. Andrews.  My name is
9   Lisa Smith and I represent the defendant,
10  GlaxoSmithKline.
11        Could you please state your name and
12  address for the record?
13    A.  It's Susan R. Andrews, 2626 North Arnoult
14  Road, Suite 220, Metairie, Louisiana, 70002.
15    Q.  And, Dr. Andrews, you've been retained by
16  the plaintiffs, Andrea and Brad Frischhertz, to act
17  as an expert in this cases; is that correct?
18    A.  Yes.
19    Q.  Let me ask if we could agree to a few
20  simple ground rules.  First, if you could let me
21  complete my question before you answer, that would
22  help the court reporter.  Is that okay?
23    A.  Sure.
24    Q.  And I'll try to do the same.  I'll allow
25  you to complete your answer before I move on to the

Page 7

1   next question.  And we'll assume that you understood
2   my question unless you state otherwise.  Is that
3   also agreed?
4     A.  Yes.
5     Q.  And I understand you have a hard stop at
6   5:00 o'clock today; is that right?
7     A.  Yes.
8     Q.  We will honor that 5:00 o'clock hard stop,
9   but, as you know, we're entitled to seven hours of
10  deposition time, and I've asked the videographer to
11  keep track of that time.  So for the record, we'll
12  want to keep those seven hours preserved, and if we
13  need to come back and finish this on another day, we
14  will.  Is that agreed?
15        MR. DOODY:  Objection.  We -- the
16        doctor can answer however she wants.  We
17        reserve our right to discuss this with the
18        judge.
19        MS. SMITH:  Are you taking the
20        position that we're not entitled to a
21        seven-hour deposition under the Federal
22        Rules?
23        MR. DOODY:  I'm taking the position
24        that we can seek a protective order and
25        that it's not a proper question for the

Page 8

1   witness.
2   BY MS. SMITH:
3     Q.  Can we agree that when we refer to Evan
4   Frischhertz's hand today, that we mean his right
5   hand unless we specifically denote his left hand?
6     A.  Yes.
7         MS. SMITH:  And just for the record,
8         we're reserving our rights and we are
9         taking the position that under the Federal
10        Rules of Civil Procedure and Rule 26,
11        we're entitled to seven hours with
12        Dr. Andrews today.
13  BY MS. SMITH:
14    Q.  Okay.  Dr. Andrews, I'd like to start by
15  showing you the third amended notice of your
16  deposition.  It's been premarked as Exhibit No. 1.
17  Have you seen it before today?
18       (Deposition Exhibit 1 was marked for
19           identification.)
20    A.  Yes.
21    Q.  When did you first see it?
22    A.  I don't know.  Whenever it was sent.
23    Q.  Okay.  And attached to the notice as
24  Exhibit A is a document request with 14 numbered
25  paragraphs; is that correct?

Page 9

1     A.  Yes.
2     Q.  There were also eight categories of
3   documents requested in the body of the notice; is
4   that also correct?
5     A.  I believe so, yes.
6     Q.  And have you searched your files and
7   identified all responsive documents?
8     A.  Yes.  I believe we've responded as well as
9   we can to this.  We don't have much.
10    Q.  Have you brought any documents with you
11  today that are responsive to the deposition notice?
12    A.  I have my entire file with me today and
13  that's, you know, got everything in it that I have
14  used or that I have relied upon.
15    Q.  Okay.  Where is that file?
16    A.  In front of me.
17    Q.  Okay.  Can I take a look at the file?
18    A.  Of course you may.
19    Q.  So the file you've just handed me is all
20  the documents you're producing in response to the
21  deposition notice; is that correct?
22    A.  Yes.
23    Q.  Have you identified any responsive
24  documents that you are not producing today?
25    A.  No.  Are you going to keep my file?

3 (Pages 6 to 9)

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 10

1    Q.  We'll -- I'll take a look at it, and we'll
2  probably mark it as an exhibit.
3    A.  Okay.
4    Q.  So you haven't identified any other
5  documents that were responsive to the deposition
6  notice?
7    A.  As far as I read and understand the
8  legalese, I don't believe that there's anything else
9  that you've asked for that I actually have.
10   Q.  Okay.
11   A.  I mean, I don't know.  Maybe I'm
12  misunderstanding something.
13   Q.  Did you interview any members of the
14  Frischhertz family in connection with this case?
15   A.  Yes.
16   Q.  And did you record those interviews?
17   A.  You mean like with a video or audio
18  recording?
19   Q.  Exactly.
20   A.  No.
21   Q.  Okay.  Did you take notes --
22   A.  Yes.
23   Q.  -- during those interviews?
24       And have you -- are those -- all of your
25  notes contained in the file you just handed to me?

Page 11

1    A.  Yes.
2    Q.  Okay.  Did you perform any research in
3  connection with your role in this case?
4    A.  Research in the sense of looking up a
5  couple of articles that would be good examples for
6  you.  I also included those as attachments to my
7  report.
8    Q.  Okay.  And that was the only research that
9  you performed in connection with the case?
10   A.  Yes.
11   Q.  You've provided to us all the -- all the
12  articles you found during your research?
13   A.  I just located two very good recent
14  articles that were appropriate.
15   Q.  Okay.  Those are the Storch and McCabe
16  articles, correct?
17   A.  That's correct.
18   Q.  Did you rely on any unpublished data or
19  literature in formulating the opinions you're
20  offering in this case?
21   A.  No.
22   Q.  Okay.  You were also asked to bring your
23  billing statements, time records, things like that,
24  so we could figure out how much time you spent on
25  this case.  Did you produce those?

Page 12

1    A.  Yes.  Your hand is actually on them if you
2  open that right there.
3    Q.  Okay.
4       We were provided a copy of your billing
5  statement or statement of charges, which is marked
6  as Exhibit 2.  I'm going to hand that to you.
7       (Deposition Exhibit 2 was marked for
8         identification.)
9       Can you please take a look at that and
10  tell us if that memorializes your initial work on
11  the case?
12   A.  Yes.  That was an initial clinical
13  interview on 1/31/12.
14   Q.  How much have you been paid for your work
15  on this case?
16   A.  Can I see my file?
17   Q.  Yes.
18   A.  Or you can just leave it open there.  It
19  looks like, according to this, and I'm assuming that
20  it's correct, I've been paid $250.
21   Q.  Okay.
22   A.  That was as of the statement date of
23  6/30/2012.
24   Q.  Okay.  Now, you mentioned that you did a
25  clinical interview.  Is that synonymous with a

Page 13

1  diagnostic interview?
2    A.  It could be called that, yes.
3    Q.  Okay.  Would that --
4    A.  That particular clinical interview was
5  with Evan's parents.  Evan was not present.
6    Q.  Okay.  What does your diagnostic interview
7  usually entail?
8    A.  The clinical interview that we're talking
9  about in this case -- I wasn't asked to diagnose
10  this young man, so there was no real diagnostic
11  interview with Evan.  The clinical interview in this
12  case was to gather a history from the parents.
13   Q.  Do you charge a flat rate of 250 for --
14  $250 for a diagnostic interview?
15   A.  Yes.
16   Q.  Okay.  You sent a second billing statement
17  to Marc Frischhertz; is that correct?
18   A.  I believe so, yes.
19   Q.  Okay.  And I'll hand you what's been
20  marked as Exhibit 4, Dr. Andrews.  And can you, for
21  the record, tell us what that document is?
22       (Deposition Exhibit 4 was marked for
23         identification.)
24   A.  That's the statement that includes the
25  aforementioned clinical interview.  One -- let's

Golkow Technologies, Inc. - 1.877.370.DEPS

Susan R. Andrews, Ph.D.

Page 14

1  see, report preparation, the time that I spent
2  looking at -- looking up the articles, and one
3  session that I did with Evan and his mother, and
4  then the court testimony, which I was told to
5  anticipate because prepayment was required, they
6  said.
7      Q.  Okay.  And on this statement, Exhibit 4,
8  we see that the -- your original charge of $250 was
9  paid; is that correct?
10     A.  Yes.
11     Q.  Okay.  And the first new charge, the one
12 that's dated February 27th, 2012, the description is
13 individual psychotherapy with a charge of $100; is
14 that correct?
15     A.  Yes.
16     Q.  Okay.  And was -- and you said that was
17 the charge for your session with Evan and his
18 mother?
19     A.  Yes.
20     Q.  Okay.  Did you actually perform
21 psychotherapy on Evan and his mother?
22     A.  It's just the -- it's the term that --
23 that particular CPT code is called psychotherapy.
24 There's no other name for it.  No, there was no real
25 psychotherapy performed.

Page 15

1      Q.  You didn't --
2      A.  Evan is not a patient of mine.
3          THE VIDEOGRAPHER:  I'm sorry, Doc.
4          Could you slide your mic up?  You thumb
5          kind of keeps tapping it.  Sorry.  Thank
6          you.
7  BY MS. SMITH:
8      Q.  Okay.  The next charge on the billing
9  statement that's been marked as Exhibit 4 is dated
10 February 28th, 2012, and the description is research
11 with a charge of $700; is that correct?
12     A.  That's correct.
13     Q.  How many hours of research did you
14 perform?
15     A.  That's probably two.  I don't -- I believe
16 it's -- yeah, that's correct.
17     Q.  Okay.  You charge $350 an hour to do
18 research; is that right?
19     A.  Yes.
20     Q.  The next charge on the billing statement
21 that's been marked as Exhibit 4 is report
22 preparation with a charge of $1,050; is that right?
23     A.  Yes.
24     Q.  How much time did you spend preparing your
25 report in this case?

Page 16

1      A.  I don't actually recall.  It was probably
2  three or four hours.
3      Q.  We have your fee schedule, which has been
4  marked as Exhibit 3.
5          (Deposition Exhibit 3 was marked for
6              identification.)
7      A.  Yes.
8      Q.  On your fee schedule, is there an hourly
9  rate for preparing a report?
10     A.  It looks like it's 350.  Record review,
11 report charges per hour, 350.
12         So if I divide that by 350, what is that?
13 That's about right.
14     Q.  Right.
15     A.  Three hours.
16     Q.  Okay.  The last charge on your billing
17 statement is dated June 25th, 2012, and the
18 description is court testimony, three hours
19 anticipated, prepayment required; is that correct?
20     A.  Yes.
21     Q.  What's the reason for the perspective date
22 of June 25th?  Or maybe I should ask you, is there a
23 reason for the date of June 25th?
24     A.  I think that when my secretary prepared
25 this, she prepared it on June 25th.  That's probably

Page 17

1  when she put that entry in.  That's what that shows
2  you, is the entry that it was --
3      Q.  So --
4      A.  I don't know if there's a perspective date
5  for the trial.  I'm sure she doesn't either.
6      Q.  Okay.
7      A.  She just probably used that date.
8      Q.  Is the 1,650 charge on the billing
9  statement for today's testimony?
10     A.  No.
11     Q.  Is it for trial testimony?
12     A.  I'm assuming so.  It says, court
13 testimony.
14     Q.  Okay.  And you differentiate between court
15 and deposition testimony?
16     A.  Actually, I don't prepare the bill at all
17 and I rarely look at them, so I'm assuming that
18 that's correct.
19     Q.  Okay.  So your --
20     A.  But I don't know.  Maybe that -- maybe
21 that does refer to today.  I really don't know.
22     Q.  When you --
23     A.  Today is not 6/25, though, and so it
24 wouldn't be -- and you wouldn't have known it to be
25 1,650 because I believe that it's really -- it was

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

1  four hours was required.  So I think this refers to
2  court.
3      Q.  Okay.  So it's your understanding that
4  that 1,650 is not for today's testimony, it's for
5  some testimony in the future in the courtroom --
6      A.  Yes.
7      Q.  -- presumably at trial?
8      A.  Yes.
9      Q.  Now, you charged some fees for testifying
10 today at the -- today's deposition; is that right?
11     A.  Yes.
12     Q.  Okay.  And how much have you charged for
13 testifying today?
14     A.  I believe that it's 1,650.  Is that
15 correct?  I believe that it's really -- normally, we
16 charge -- I think for four hours, it would have been
17 2,200, and you requested a percentage off, if
18 possible, and we gave you 25 percent off of that, I
19 think is 1,650, but I'm not actually sure, again.
20     Q.  I can tell you, I did not request
21 25 percent off.
22     A.  Somebody did.
23     Q.  Okay.  It's your understanding that
24 someone on the defense side requested it?
25     A.  Somebody did.  They contacted my office.

1  of testimony today?
2      A.  Actually, I would have been paid --
3          MR. DOODY:  Objection.
4      A.  -- 2,200 had it been done the day it was
5  scheduled.  So yes.
6  BY MS. SMITH:
7      Q.  Looking back at your fee schedule, which
8  is Exhibit 3, that fee schedule has a separate
9  section for legal services; is that right?
10     A.  Yes, I think so.
11     Q.  And is that because you're regularly
12 involved in legal matters?
13     A.  I am periodically involved in legal
14 matters, yes.
15     Q.  You've testified under oath that 20 to
16 30 percent of your time is spent doing legal
17 consulting; is that right?
18     A.  I would say that that's true, yes.
19     Q.  Okay.  So --
20     A.  It changes from week to week and month to
21 month.
22     Q.  But looking at it on, say, an annual
23 basis, is that an accurate assessment of how much of
24 your professional time is spent doing litigation
25 consulting work?

1  My office contacted me and asked if that was okay,
2  and I said yes.
3      Q.  Your deposition was originally scheduled
4  for May of this year; is that right?
5      A.  I believe.
6      Q.  And you were paid $2,200 back in May in
7  anticipation of your testifying at a deposition in
8  this case; is that right?
9      A.  Yes.
10     Q.  Okay.  And have you charged additional
11 fees for your deposition today?
12     A.  Yes.  That deposition was canceled less
13 than 24 hours before it was supposed to happen.  The
14 office has a policy of not returning fees once it's
15 24 hours, before 24 hours.  I'm not sure I'm saying
16 that right, but you understand what I'm saying.  In
17 other words, that is a policy in the office, that if
18 someone cancels something of this sort less than 24
19 hours or 24 hours before it's supposed to happen,
20 that that is not returned.
21     Q.  So in terms of today's deposition, you've
22 been paid the $2,200 plus the 1,650 you were most
23 recently paid; is that right?
24     A.  Yes.
25     Q.  So that's a total of $3,850 for four hours

1      A.  About 20 to 30 percent, yes.
2      Q.  In the last year, what percentage of your
3  professional time has been spent doing litigation
4  consulting?
5      A.  I would have to just give an estimate.  In
6  the last year, I would say it's probably more 20 to
7  25.
8      Q.  And in the last year, how much have you
9  earned as a litigation consultant or expert?
10     A.  I don't know that.
11     Q.  In the last five years, what percentage of
12 your professional time has been spent doing
13 litigation consulting?
14     A.  In the last five years?
15     Q.  Yes.
16     A.  It's about the same.  It hasn't really
17 changed.
18     Q.  And in the last five years, how much have
19 you earned as a litigation consultant or expert?
20     A.  I don't know.
21     Q.  Do you know what percentage of your earned
22 income has been derived from your work as a
23 litigation consultant?
24     A.  I'm sorry.  I don't.
25     Q.  Is it a quarter of your income?

Golkow Technologies, Inc. - 1.877.370.DEPS

Susan R. Andrews, Ph.D.

Page 22

1    A.  I really don't know.  I do an awful lot of
2  hospital consultation and private evaluation,
3  medical evaluation.  I really don't split it out
4  that way.
5    Q.  For your testimony in connection with
6  legal services, your fee schedule says, portal to
7  portal.  Does that mean you charge your clients from
8  the time you leave your home to the time you return
9  to your home?
10   A.  If I have to go someplace else to testify,
11 yes.
12   Q.  Did plaintiff's counsel send you any
13 records before you interviewed the Frischhertzes?
14   A.  No.
15   Q.  Have you reviewed any medical records
16 relating to Evan Frischhertz?
17   A.  No.
18   Q.  Have you reviewed any medical records
19 relating to Andrea Frischhertz?
20   A.  No.
21   Q.  Have you reviewed any pharmacy records
22 relating to Andrea Frischhertz?
23   A.  No.
24   Q.  You understand that having been designated
25 as an expert witness in this case, you were required

Page 23

1  to provide a list of cases in which you testified at
2  trial or deposition in the last four years?
3    A.  Yes.
4    Q.  You provided a list of your previous
5  testimony in this case; is that right?  Or for this
6  case; is that right?
7    A.  My previous testimony for this case?  No.
8        MR. DOODY:  Before this case.
9    A.  Before this case?
10 BY MS. SMITH:
11   Q.  Yeah.  In connection --
12   A.  Yes, I did.
13   Q.  Okay.  I'm handing you what's been marked
14 as Exhibit 5.  Is that the list of your testimony
15 that you provided in this case?
16       (Deposition Exhibit 5 was marked for
17            identification.)
18   A.  I believe so, yes.
19   Q.  Exhibit 5 is not a complete list of the
20 cases in which you've given trial or deposition
21 testimony in the last four years, is it?
22   A.  Actually, what I was asked for was the
23 court appearances, and that is a complete list, yes.
24   Q.  Who asked you for the court appearances?
25   A.  I don't know.  I didn't actually respond

Page 24

1  to that.  Again, my secretary in my office did, but
2  I believe that that's what we were required to do.
3  If you want something else, I'm sure we can do that.
4    Q.  Do you have a complete list of both your
5  deposition testimony and trial testimony --
6    A.  Yes.
7    Q.  -- for the last four years?  Can your
8  office administrator get that for us today?
9    A.  She's actually out of town, but I think I
10 may have a copy of it without too much difficulty.
11       MS. SMITH:  Why don't we go off the
12       record while Dr. Andrews looks for the
13       list.
14       THE VIDEOGRAPHER:  The time now is
15       1:23 p.m.  We're now off the record.
16 (Recess.)
17       THE VIDEOGRAPHER:  The time now is
18       1:26 p.m.  We are now back on the record.
19 BY MS. SMITH:
20   Q.  Dr. Andrews, you just produced to us a
21 document that's been marked as Exhibit 78.  Does
22 this document reflect all of the occasions on which
23 you testified at deposition or trial in the last
24 four years?
25       (Deposition Exhibit 78 was marked for

Page 25

1            identification.)
2    A.  I believe that I gave you the 29 -- 28,
3  29, 210 and 211.
4    Q.  Have you testified in 2012?
5    A.  I have.
6    Q.  Do you have a list of that testimony?
7    A.  I do not.  It's -- it doesn't look as if
8  it's been typed.  I saw it in the file, but it looks
9  like she hasn't caught up to that yet.  I can have
10 her type that and get it to you.
11   Q.  That would be great.  We would ask that
12 you do that, please.
13   A.  Sure.
14   Q.  How many times have you testified so far
15 this year in either deposition or trial?
16   A.  I don't -- I didn't actually count the
17 number.  It looked like it was about six when I
18 scanned the page.
19   Q.  As we look at Exhibit 78, this doesn't
20 have case names on it.  Do you keep any records that
21 reflect case names?
22   A.  Sorry.  That's what we keep.
23   Q.  And under attorney, is that the attorney
24 who retained you, for whom you were working?
25   A.  For whom I testified.  So I would assume,

Susan R. Andrews, Ph.D.

Page 26

1  yes, in most cases it's the person that hired me.
2      Q.   And on this list, and I want you to also
3  include your testimony so far in 2012, can you
4  identify a single civil case in which you acted as
5  an expert for the defense?
6      A.   I'm afraid I can't do that.  I don't -- I
7  don't have that kind of information there.  I don't
8  have that kind of memory either.
9      Q.   So you've been retained to act as an
10  expert in a number of cases, correct?
11      A.   Yes.
12      Q.   Did any of those cases -- and I don't want
13  you to limit your answer to four years ago.  I'm
14  talking about your history as a litigation
15  consultant.  Did any of those cases involve birth
16  defects?
17      A.   I don't believe so.
18      Q.   Did any of those cases involve
19  disfigurements?
20      A.   Yes.  I think probably so from accident,
21  yes.
22      Q.   Tell us about those cases.  What was the
23  disfigurement?
24      A.   Usually, what I remember most recently,
25  would be a bad scar from a head injury, from a

Page 27

1  facial scar.  I've seen two or three of those from
2  car accidents.
3      Q.   Any other cases in which you've testified
4  or been retained as an expert that involve
5  disfigurements?
6      A.   I don't think of any right off the top of
7  my head.
8      Q.   And the bad scar cases, you said those
9  were two or three different cases; is that right?
10      A.   Yes.
11      Q.   Did any of those two or three cases
12  involve children, or were they adults?
13      A.   They were -- they were adolescent.
14      Q.   And what were the names of the children?
15      A.   I don't know.
16      Q.   Did you testify in those two or three
17  cases?
18      A.   I don't believe so.
19      Q.   Did you --
20      A.   I don't recall testifying in them.
21      Q.   And did you prepare an expert report in
22  those cases?
23      A.   Usually evaluation report, yes.
24      Q.   Do you recall which attorneys retained you
25  in those cases?

Page 28

1      A.   I'm sorry.  No.
2      Q.   Do you recall the names of the defendants
3  in those cases?
4      A.   No.  That's what you just asked, the names
5  of the children.  No, I don't.
6      Q.   No.  I asked -- that's a different
7  question.  The defendants, meaning who was on the
8  other side of the case.
9      A.   Oh, I don't know.  No.
10      Q.   So you don't have any information about
11  those cases other than that they involved
12  adolescents with scars?
13      A.   Correct.
14      Q.   Did any of the cases in which you've
15  served as a litigation expert involve bullying?
16      A.   Bullying?  There -- there probably have
17  been a number of cases that I've seen as therapy
18  cases, but I don't think that -- I can't recall any
19  that actually were court cases involving bullying.
20      Q.   How many therapy cases?
21      A.   I don't know.  I don't have that kind of
22  numbers in my head.  I can give you some estimate if
23  you want.
24      Q.   Sure.  That would be great.
25      A.   But it's just a guess.  You know, probably

Page 29

1  in the last 20 years, I would say probably somewhere
2  in the neighborhood of 15.
3      Q.   And you've been involved in litigated
4  cases for about 20 years; is that right?
5      A.   Well, these were not necessarily litigated
6  cases, what I just told you.
7      Q.   I know.
8      A.   Okay.  I guess maybe not quite that long.
9  15 years, maybe.
10      Q.   And you've testified under oath that you
11  take on approximately 20 to 3 legal cases a year; is
12  that right?
13      A.   I've testified that I take on 20 to 3?
14      Q.   20 to 30.
15      A.   Oh, 20 to 30.  No, you asked me
16  percentages.  I was giving you a percentage.  You
17  asked me what percentage.
18      Q.   No.  I asked you -- I said, you've
19  testified under oath that you take on approximately
20  20 to 30 legal cases a year; is that right?
21      A.   That's probably about right, yes.
22      Q.   Okay.  So can you tell the jury the number
23  of cases in which you've been retained as an expert?
24      A.   In 20 years you mean?
25      Q.   Yes.

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 30

1    A.  No, I can't.  I'm sorry.
2    Q.  It would be about 400 to 600 cases; is
3 that right?
4    A.  No, it wouldn't.  Because when I first
5 started doing this, I may have seen one or two cases
6 a year.  There's the years around Katrina I don't
7 think I saw anybody to speak of, so it certainly
8 wouldn't be that high a number.  You could probably
9 count up the -- some years, like in 2009, I went to
10 court three times; in '11, four times; in '10,
11 twice.  So it's -- you know, I may give a few more
12 depositions, but it would be rare to go to court
13 more than three or four times in a year, and that's
14 in the last ten years.  And so altogether, I
15 wouldn't say 400 is an accurate estimate.  It would
16 probably be closer to 250 or 300.
17    Q.  Fair enough.
18        In the bulk of the cases in which you act
19 as an expert for the plaintiff, you're retained by
20 plaintiff's counsel, correct?
21    A.  That's correct.
22    Q.  At least 70 percent of your litigation
23 work is for plaintiffs?
24    A.  Yes.
25    Q.  Would you say at least 90 percent of your

Page 31

1 litigation work is for plaintiffs?
2    A.  I don't really know.  It depends on how
3 you make that estimate.  Many things that -- many
4 times the case becomes a legal case but it started
5 off as a medical case that was referred by a
6 physician, so I don't know that I count that
7 necessarily as a plaintiff's case or being hired by
8 the plaintiff's lawyer to see somebody.  In those
9 cases, I was referred a patient by a physician.
10 Then if the person later on became a -- if it became
11 a court case or if they hired an attorney, then
12 obviously my evaluation would have been something
13 that they would look for.
14    Q.  But as you look at Exhibit 78 and you also
15 consider your testimony to date this year, you can't
16 identify a single case on that testimonial list in
17 which you were testifying on behalf of a civil
18 defendant; is that right?  These were --
19    A.  That's true.  And I've already agreed to
20 that.
21    Q.  Okay.
22    A.  I don't often get asked to testify for a
23 defendant.
24    Q.  In the two or three cases you've been
25 involved in where there was a bad facial scar, did

Page 32

1 you offer an opinion as to whether the child or, I
2 guess, adolescent in those cases would be bullied?
3    A.  In -- I think in probably all three of
4 those cases they actually were, yes, bullied.
5    Q.  So they were already experiencing
6 bullying?
7    A.  Yes.
8    Q.  You weren't in the position of having to
9 project whether they would be bullied, correct?
10    A.  Correct.
11    Q.  And in any of those two to three cases
12 involving facial scars, did you offer an opinion as
13 to whether the adolescents would ultimately develop
14 depression?
15    A.  Yes.  They -- in fact, as I recall, at
16 least two of them already were depressed and had
17 fairly significant social anxiety disorder.  One of
18 them didn't want to go back to school because of it.
19    Q.  And that's how they initially presented to
20 you; is that right?
21    A.  Or it developed as a result of time after
22 I had seen them.
23    Q.  But before you submitted your expert
24 report in those matters; is that right?  They were
25 already depressed or had social anxiety disorder

Page 33

1 before --
2    A.  Often, yes.
3    Q.  -- you submitted your report?
4    A.  Sorry.  When they came in -- you know, I
5 don't recall the details clearly of any of the
6 three, but I would imagine that all three of them
7 probably, when they came in, had already been
8 bullied and/or teased and that they were already
9 suffering some of the results of that, which would
10 be depression and anxiety.
11    Q.  So it sounds like they were already
12 encountering some psychosocial negative effects
13 before you were writing your expert report --
14    A.  Yes.
15    Q.  -- in those matters?
16    A.  I wasn't projecting that.
17    Q.  You weren't predicting or projecting?
18    A.  No.  It was already happening.
19    Q.  Okay.  What did you do to prepare for
20 today's deposition, Dr. Andrews?
21    A.  I read my file.
22    Q.  I'll show you what's been marked as
23 Exhibit 7, and for the record, can you tell us
24 whether that's the report you submitted in this
25 case?

9 (Pages 30 to 33)

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 34

1     (Deposition Exhibit 7 was marked for
2          identification.)
3     A.  Yes.
4     Q.  And is everything you reviewed in the
5  preparation of your report listed in your report?
6     A.  Yes.  I didn't have any records to review
7  on this case.
8     Q.  Did you receive any materials from counsel
9  for the Frischhertzes?
10     A.  No.
11     Q.  Did counsel for the Frischhertzes provide
12  you with any literature?
13     A.  No.
14     Q.  And we've already touched on the Storch
15  and McCabe articles that are listed at the end of
16  your report.  Did you first read those articles in
17  connection with preparing your report?
18     A.  Yes.  They weren't already in my file if
19  that's what you mean.  Yes.
20     Q.  And they weren't already in your office
21  somewhere, I take it?
22     A.  No.
23     Q.  I take it you weren't provided with any
24  transcripts of depositions that were taken in this
25  case?

Page 35

1     A.  Correct.  I was not.
2     Q.  So you haven't reviewed any transcripts in
3  this case?
4     A.  I had a very simple job, just to ask what
5  could happen psychologically.  I don't know anything
6  about the physical aspects.
7     Q.  Did you discuss with anyone any of the
8  depositions that were taken in this case?
9     A.  No.  I don't know who's been deposed.
10     Q.  Did you meet with any lawyers in
11  preparation for today's deposition?
12     A.  No, I did not.
13     Q.  Did you review any reports from any expert
14  in this case?
15     A.  No.
16     Q.  Have you been provided with reports of the
17  other experts in this case?
18     A.  No.
19     Q.  We were provided a copy of your CV,
20  Dr. Andrews, and that's been marked as Exhibit 8.
21  I'd like you to please take a look at it and tell us
22  if it's current.
23     (Deposition Exhibit 8 was marked for
24          identification.)
25     A.  No.  It's not the most current.

Page 36

1     Q.  Okay.  Which --
2     A.  This one was dated 1/27/12, and the most
3  current is 5/30/12 if you'd like to have that.
4     Q.  That would be great.  Thank you.  Okay.
5     A.  And I'll give this back to you.
6     Q.  Thank you.  We'll mark this one on a
7  break.
8         What has been changed between what we've
9  marked as Exhibit 7 and what you just handed to me?
10     A.  I don't know.  Let me see.  Usually, it
11  has to do with publication.
12     Q.  Well, is there anything other than a
13  publication that was updated?
14     A.  It looks like it was a publication that
15  was updated.
16     Q.  Okay.  How many publications?
17     A.  A book in May of 2012.
18     Q.  What's the title of the book?
19     A.  "Stress Solutions for Pregnant Moms."
20     Q.  And that's, to your knowledge, the only
21  difference between the two CVs?
22     A.  I haven't checked line by line, but that
23  would be very likely the only thing that would be
24  different.
25     Q.  You know what?  I'll check it on a break.

Page 37

1  We can move on.
2         As I understand it, your 1965
3  undergraduate degree from Newcomb College was in
4  experimental psychology; is that right?
5     A.  That's right.
6     Q.  And then in 1968, you got a master's
7  degree in social psychology from Tulane University?
8     A.  Yes.
9     Q.  And then you obtained your Ph.D. in 1973
10  in developmental psychology from Tulane?
11     A.  Yes.
12     Q.  Neither your master's thesis nor your
13  Ph.D. dissertation involved the impact of teasing or
14  bullying on children or adolescents; is that right?
15     A.  Yeah, that's correct.
16     Q.  You would agree that the studying of
17  teasing and bullying is a relatively new area of
18  psychosocial research, correct?
19     A.  It's become -- sorry -- it's become a much
20  bigger area, I suppose, because of some of the
21  recent crimes that kind of bolstered public interest
22  in the area.  But it's always been an area of
23  interest for child and developmental psychologists.
24     Q.  Did you take any --
25     A.  Social psychology.

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 38

1    Q.  I'm sorry.  I didn't mean to interrupt
2  you.
3         Did you take any courses on teasing or
4  bullying?
5    A.  Specifically that, no.  I don't think any
6  courses specifically on teasing and bullying
7  actually exist at the graduate level.  I mean, I
8  think that's always encompassed as part of topics
9  that would be taught in a class that would be social
10  psychology or developmental psychology.
11    Q.  So is it your position that classes that
12  are focused on teasing and bullying are not taught
13  in the field of psychology or neuropsychology?
14    A.  No.  That's not what I said.  What I said
15  is that it's unlikely.
16    Q.  You're saying it's subsumed?
17    A.  Yeah, it's subsumed in other classes.  I
18  don't think there's -- at least at this point, I
19  don't believe that there are actual three or
20  four-credit college classes that specifically deal
21  just with that one topic.
22    Q.  Teasing or bullying?
23    A.  Yes.
24    Q.  You certainly didn't take any such
25  courses?

Page 39

1    A.  No.
2    Q.  And neither your master's thesis nor your
3  Ph.D. dissertation involved the psychosocial issues
4  relating to congenital disfigurement in children or
5  adolescents; is that right?
6    A.  Correct.
7    Q.  You did post-doc at University of Southern
8  Mississippi in clinical psychology from 1981 to
9  1984; is that right?
10    A.  Yes.
11    Q.  And following that, you did an internship
12  in clinical psychology that took place from 1984 to
13  1985 at the Veterans Administration Medical Center
14  here in New Orleans; is that right?
15    A.  Yes.
16    Q.  And you did not treat children or
17  adolescents at the Veterans Administration Medical
18  Center; is that right?
19    A.  That's pretty clear, yes.
20    Q.  Even I could figure that out.
21    A.  Yes.
22    Q.  You're not board certified in
23  neuropsychology, are you?
24    A.  I am a clinical neuropsychologist, board
25  certified by the Louisiana State Board of Examiners

Page 40

1  of Psychologists.
2    Q.  But you didn't have to take an exam for
3  that; is that right?
4    A.  No, actually we did.
5    Q.  When did you take the exam?
6    A.  That was when it first became part of the
7  Louisiana licensure.
8    Q.  When was that?
9    A.  1994, I think, maybe '93.  It was a late
10  addition to what the board was licensing.
11    Q.  When do you have to take your next exam?
12    A.  I hope never.  I mean, I don't know that
13  I'll have to take another exam as a licensed
14  psychologist.  Is that what you're asking?
15    Q.  Right.  Well, for board certification.
16    A.  If I were to change or to ask for
17  different board certification, then I might.  But at
18  this point, I do not.
19    Q.  On page 2 of your CV, you list your areas
20  of special interest as neuropsychology, cognitive
21  rehabilitation, head injury, learning disability,
22  school problems, geriatric neuropsychology,
23  dementia, parenting, developmental disorders.  Are
24  those the areas in which you hold yourself out as an
25  expert?

Page 41

1    A.  Yes.
2    Q.  And are the areas of special interest on
3  your CV that I just covered basically the areas that
4  comprise your private practice?
5    A.  Yes.
6    Q.  Okay.  Are you aware that the plaintiffs,
7  the Frischhertzes in this case, have retained
8  another neuropsychologist to act as an expert?
9    A.  No.
10    Q.  Well, they have and his name is
11  Dr. Hirsch.  And I'd like to show you what's been
12  marked as Exhibit 9.
13         (Deposition Exhibit 9 was marked for
14           identification.)
15         And I'll direct your attention to his
16  deposition testimony, which is what is in Exhibit 9,
17  but, particularly, look at page 19, Dr. Andrews, if
18  you could.
19         Now, he was asked to define what
20  neuropsychology is, and Dr. Hirsch testified, as
21  you'll see on page 19 of his deposition in
22  Exhibit 9, that neuropsychology is the
23  specialization of psychology that examines,
24  assesses, evaluates and treats, where necessary,
25  individuals with cognitive disorders and sometimes

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 42

1   emotional disorders as a result of some kind of
2   insult to the brain.  It could be a brain injury or
3   it could be something that was acquired in utero or
4   through infection.
5         Do you see that?
6       A.  Yes.
7       Q.  Do you agree with his definition?
8       A.  Basically, yes.
9       Q.  Does Evan Frischhertz --
10      A.  It's pretty standard.
11      Q.  Does Evan Frischhertz have a cognitive
12  disorder?
13      A.  Not that I can determine.
14      Q.  Did Evan Frischhertz suffer an insult to
15  the brain?
16      A.  I don't think so.
17      Q.  Does he have any brain injury?
18      A.  I don't believe so.
19      Q.  Is it fair to say you specialize in the
20  diagnosis and treatment of brain injuries?
21      A.  It's one of the areas that I work in, yes.
22  It's not the only area.  As I indicated earlier, I
23  have a license in child psychology or developmental
24  psychology, as well as clinical psychology and
25  clinical neuropsychology.  So clinical psychology

Page 43

1   and developmental psychology do not actually have
2   anything to do with diagnosing brain-related
3   disorders, just the clinical neuropsychology.
4       Q.  And that's what you've been practicing for
5   the last 20 years, clinical and neuropsychology; is
6   that right?
7       A.  I practiced actually first under the
8   license of developmental, and then added the license
9   of clinical, and then added the license of
10  neuropsychology last.  So I haven't, I don't think,
11  been practicing clinical neuropsychology except
12  since 1985, when I finished my internship, which
13  would be '85, '86 to present.  I'm not sure how many
14  years that is, but...
15      Q.  And we'll get to your clinical practice in
16  just a minute.
17         I should have asked you, does Evan
18  Frischhertz have an emotional disorder?
19      A.  Currently?
20      Q.  Yes.
21      A.  I don't think so.
22      Q.  Do you currently have a full-time academic
23  appointment?
24      A.  Not full-time.  I have a part-time
25  academic appointment.

Page 44

1       Q.  Have you ever had a full-time academic
2   appointment?
3       A.  Yes.
4       Q.  When was the last time?
5       A.  1981, I think, was the -- no, '88.  And
6   actually, currently, I'm at LSU Medical School,
7   so --
8       Q.  But that's not full-time?
9       A.  It's not full-time, no.
10      Q.  What was the last time you had a full-time
11  academic appointment?
12      A.  Full-time academic, I'm not sure that it
13  was ever full-time.  I taught classes --
14      Q.  It's actually a yes or no question,
15  Doctor.
16      A.  No.  I don't think it -- I don't think I
17  ever did --
18      Q.  Okay.  Fair enough.
19      A.  -- have a full-time academic appointment.
20      Q.  Okay.  And you're currently a clinical
21  assistant professor of medicine in the Department of
22  Medicine and Psychiatry at LSU Health Sciences
23  Center; is that correct?
24      A.  Yes.
25      Q.  Is that a part-time position?

Page 45

1       A.  Yes.
2       Q.  How many hours a month are you teaching at
3   LSU Health Sciences Center?
4       A.  I'm actually doing research at LSU Health
5   Science.
6       Q.  You're not teaching, though?
7       A.  I'm not teaching.
8       Q.  Okay.
9       A.  It's a research position.
10      Q.  How many hours a month are you spending
11  researching in connection with your position at LSU
12  Health Sciences?
13      A.  About 20 to 25.
14      Q.  20 to 25 hours a month?
15      A.  Yes.
16      Q.  Okay.  When was the last time you taught a
17  course at the university level?
18      A.  I think that was the 1980 -- was it --
19  1988.
20      Q.  And the research that you're currently
21  involved in -- well, let me ask you this.  How
22  long -- is this one research project you're working
23  on?
24      A.  Yes.  It's a fairly big one.
25      Q.  And is that the research that deals with

12 (Pages 42 to 45)

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 46

1  using hyperbaric oxygen chambers to treat trauma?
2      A.  Brain trauma, yes.
3      Q.  Okay.
4      A.  On returning vets from Iraq and
5  Afghanistan.
6      Q.  And, again, by definition, those are not
7  children or adolescents that are involved; is that
8  correct?
9      A.  That would be correct.
10     Q.  Okay.  Now, let's discuss your clinical
11 practice.  You treated a patient named Christopher
12 Ezel; is that right?  Do you remember him?
13     A.  I do.
14     Q.  And he brought a lawsuit; is that -- is
15 that correct?
16     A.  Yes, he did.
17     Q.  And you testified under oath in his
18 lawsuit that about 30 to 40 percent of your clinical
19 practice involves testing for cognitive or brain
20 dysfunction resulting from head trauma; is that
21 correct?
22     A.  I think so, yes.  About 20 to 30.  Is that
23 what you said?
24     Q.  Oh, I'm sorry.  If I said that, that was
25 my mistake.  What I should have said was you

Page 47

1  testified under oath in his lawsuit that about 30 to
2  40 percent of your practice --
3      A.  Okay.
4      Q.  -- involves testing for cognitive or brain
5  dysfunction resulting from head trauma.  Is that
6  correct?
7      A.  Yes, I think so.
8      Q.  So I --
9      A.  Assuming that -- I mean, those are
10 estimated numbers but, yes.
11     Q.  Understood.  Okay.
12         So it's accurate to say that 30 to
13 40 percent of your clinical work is testing for
14 cognitive or brain dysfunction in people who have
15 suffered head trauma?
16     A.  Yes.
17     Q.  Okay.  And how many of those head trauma
18 patients that you're testing are children?  Can you
19 give us a percentage?
20     A.  I can give you some kind of an estimate.
21 I guess it probably -- probably about 30 percent are
22 children.
23     Q.  And with respect to your work with those
24 children, you are -- your clinical practice is
25 testing them.  In other words, are you --

Page 48

1      A.  Well, that's what we're talking about
2  currently.
3      Q.  Right.
4      A.  Actually, I also see some -- some kids in
5  therapy.
6      Q.  Okay.
7      A.  But you asked me specifically about
8  testing.
9      Q.  Right.  We are talking about testing.
10 Exactly.
11         How much of your professional time is
12 spent treating geriatric patients?
13     A.  About a day a week, maybe sometimes a
14 little bit more.
15     Q.  So that would be --
16     A.  But certainly a day a week.
17     Q.  Reducing that to a percentage, that would
18 be 20 percent?  I'm assuming you work five days a
19 week?
20     A.  At least.
21     Q.  Okay.  So 20 percent is a -- is a fair
22 estimate of how much of your professional time is
23 treating the geriatric population?
24     A.  Yes.
25     Q.  And you've testified under oath that most

Page 49

1  of your clinical practice is adult and the adult --
2  and the therapy is adult oriented; is that right?
3      A.  Yes.  Most of it.
4      Q.  And that testimony was accurate?
5      A.  Pretty much, yes.  I mean, as usual, you
6  know, the usual answer when somebody asks you
7  percentages is usually an estimate.  You know, I
8  don't know actual numbers, but...
9      Q.  But it's your best estimate?
10     A.  It's my best estimate.  I tend to see more
11 adults than children.
12     Q.  So most of your practice does not involve
13 treating children?
14     A.  Yes.  That's correct.
15     Q.  What percentage of your practice would you
16 say is devoted to treating children?
17     A.  And would you define "treating"?  We've
18 already specified evaluation time, so are you
19 asking --
20     Q.  I think we can factor out the time you
21 spent doing testing on children who suffered head
22 trauma.
23     A.  Factor that out?
24     Q.  Yes.  Because that -- I mean, if you
25 factor out the children for whom you're only doing

13 (Pages 46 to 49)

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 50

1  testing and not treating, is that a fair
2  distinction?
3      A.  I think so.  It makes it a little harder
4  to deal with the answer.  Tell me again what the
5  question is.
6      Q.  The question is, what percentage of your
7  practice is devoted to treating children?
8      A.  Probably about 10 at this point.  It used
9  to be quite a bit larger.
10     Q.  And of the time -- of your pediatric
11 clinical work that we've just been talking about,
12 how much of it is the Tomatis program?  Of that
13 10 percent, what percentage --
14     A.  At this point, none.  I don't actually do
15 that at all anymore.
16     Q.  When did you stop doing it?
17     A.  About 10 or 15 years ago.
18     Q.  Okay.
19         THE VIDEOGRAPHER:  About 10 minutes
20     left on the tape.
21         MS. SMITH:  Okay.  Thanks.
22 BY MS. SMITH:
23     Q.  Now, we've talked about the two or three
24 cases involving physical disfigurements in which you
25 were serving as an expert, and I take it you were an

Page 51

1  expert for the plaintiffs in those matters?
2      A.  The person who was damaged, yes.
3      Q.  Okay.  Now, I'd like to step back and look
4  more broadly, not just -- and not talk about your
5  litigation experience, but just talk about your
6  clinical work.
7          Have you treated a child with a physical
8  disfigurement?
9      A.  Yes.
10     Q.  How many have you treated over the course
11 of your career?
12     A.  I don't know.  I'm not -- I'm not sure
13 that I can put a number on it.  Thinking back over
14 it, I don't know, maybe as many as 10.  Maybe a
15 little bit fewer than that.
16     Q.  When was the last time you treated a child
17 with a physical disfigurement?
18     A.  Wow, I don't know.
19     Q.  So of the fewer than 10 or 10 children
20 with disfigurements you've treated over the course
21 of your career, what were the disfigurements?  What
22 can you tell us about those?
23     A.  Well, I think we've already described most
24 of the time there's some kind of injury to the face
25 where the child is embarrassed by their appearance.

Page 52

1  I don't think I've ever seen a kid that's actually
2  lost a limb.  I know that does happen, but I don't
3  think I've actually seen anyone like that.
4      Q.  Were these injuries to the face congenital
5  or were they acquired?
6      A.  Almost always acquired.
7      Q.  And how old were the kids that you
8  treated?  Were they adolescents; were they children?
9      A.  They were probably adolescents, because
10 that's when it really begins to bother the kids.
11     Q.  And -- and of those children you treated,
12 did you ever tell them or their parents that the
13 child would develop depression because of the
14 disfigurement?
15     A.  Well, usually kids like that are in
16 therapy because they're already having problems.
17     Q.  Okay.
18     A.  That -- I mean --
19     Q.  And that's why they came to you,
20 presumably?
21     A.  Yes.
22     Q.  Okay.  Same thing with anxiety disorder?
23     A.  Same thing with anxiety disorder.
24     Q.  So just as we talked about with the
25 disfigurement cases in which you were a litigation

Page 53

1  expert, for these adolescents with disfigured --
2  acquired disfigurements that you treated, you were
3  not in the position of trying to predict whether
4  these kids were going to develop depression or
5  anxiety disorders, they were already presenting to
6  you with that?
7      A.  Yes.
8      Q.  Is that correct?
9      A.  Yes.
10     Q.  Let's talk about your research for a
11 minute.  Have you been involved in any research
12 regarding Paxil?
13     A.  No.
14     Q.  SSRIs?
15     A.  No.
16     Q.  Bullying?
17     A.  No.
18     Q.  Depression?
19     A.  Not really, no.
20     Q.  Anxiety disorders?
21     A.  Well, yes.  Actually depression, yes, too.
22 I mean, it's -- a lot of the research that we're
23 doing currently involves both depression and
24 anxiety.
25     Q.  This is in the veterans who have suffered

14 (Pages 50 to 53)

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 54

1    traumatic war-related physical injuries?
2        A.   Yes.
3        Q.   Okay.  Have you published that research?
4        A.   Yes.
5        Q.   Where is it published?  Is it on your CV?
6        A.   Yes.
7        Q.   That's the hyperbaric oxygen treatment
8    paper?
9        A.   Published in the Journal of Neurotrauma in
10   2012, actually.  Phase I.
11       Q.   That paper obviously didn't address
12   anxiety or depression in children or adolescents,
13   correct?
14       A.   Obviously, no.
15       Q.   And prior to that paper that you published
16   this year, had you been involved in any research
17   involving depression or anxiety disorders?
18       A.   I don't think so, no.  Nothing comes
19   immediately to mind.
20       Q.   Have you been involved in any research
21   regarding congenital limb defects?
22       A.   No.
23       Q.   Or congenital disfigurements of any kind?
24       A.   No.
25       Q.   Or disfigurements of any kind?

Page 55

1        A.   No.
2        Q.   So you've never published anything on
3    those subjects; is that right?
4        A.   That's correct.
5        Q.   And you've never presented a lecture on
6    those subjects; is that right?
7        A.   Also correct.
8        Q.   So you've not done any research,
9    presenting or publishing, on the psychosocial issues
10   related to disfigurement in children and
11   adolescents; is that right?
12           MR. DOODY:  Object to the form of the
13       question.
14       A.   I think that's a summary of what you have
15   been asking me.  Yes, that's correct.
16   BY MS. SMITH:
17       Q.   Would it be fair to say that prior to your
18   retention in this case, you had not comprehensively
19   reviewed the scientific literature to analyze
20   whether there was a relationship between congenital
21   hand defects and teasing and bullying?
22       A.   Could you repeat that question?
23       Q.   Sure.
24           Would it be fair to say that prior to your
25   retention in this case, you had not comprehensively

Page 56

1    reviewed the scientific literature to analyze
2    whether there was a relationship between congenital
3    hand defects and teasing or bullying?
4        A.   I think that's probably a fair statement,
5    yes.
6        Q.   And is it also fair to say that prior to
7    being retained in this case, you had not
8    comprehensively reviewed the scientific literature
9    to analyze whether there's a relationship between
10   congenital hand defects and anxiety disorders or
11   depression?
12       A.   Yes.  There's -- there's not a huge
13   literature on the specifics of congenital hand
14   defects as the prompting event for anxiety or
15   depression.  So, no, I haven't --
16       Q.   I guess --
17       A.   -- reviewed such a literature.
18       Q.   Okay.  You didn't look for it?
19       A.   No.
20       Q.   What you're telling me is, in your view,
21   there's no --
22       A.   Nor did I look for it today.
23       Q.   Okay.
24       A.   I mean, it was not part of -- I would not
25   have looked for that because it's too specific an

Page 57

1    instance.  Usually, when you do a review, you
2    wouldn't be that specific in what you're looking
3    for.
4        Q.   In terms of the research you have
5    published regarding children, is it fair to say that
6    that research was published in the late 1970s
7    through the early 1980s?
8        A.   On children?
9        Q.   Yes.  And I'm really focused on the Parent
10   Child Development Center's research you've done.
11       A.   Well, that was a very large 12-year
12   project.  And I think the final paper on that was in
13   1982.
14       Q.   Right.  That's my understanding.
15       A.   Uh-huh.
16       Q.   And since then, have you published
17   research regarding children?
18       A.   Not really, no.  I'm more in clinical
19   practice for the most part, and my association with
20   the medical school is the primary reason that I do
21   research.  Otherwise, it's kind of difficult to do
22   research while you're doing a clinical practice.
23       Q.   And focusing on the Parent Child
24   Development Center's research you did back in the
25   '70s, that research did not address bullying or

15 (Pages 54 to 57)

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 58

1  teasing; is that right?
2      A.  Not specifically, no.  It was research
3  aimed at the disadvantaged populations as an
4  offshoot to Head Start.
5      Q.  It really focused on families that were
6  living in poverty; is that right?
7      A.  Yes.  Well, it focused on children who
8  were born into that situation, the educational
9  advantages that the program that we designed gave
10  them and whether it made a difference in terms of
11  their long-term growth.
12      Q.  And it didn't address the psychosocial
13  issues relating to congenital disfigurements or
14  disfigurements of any kind, obviously; is that
15  right?
16      A.  No.  Obviously.  I mean, some of the kids
17  may have had those problems, but that's not the
18  nature of the research.  It was --
19      Q.  You weren't doing any analysis based on or
20  directed to disfigurement?
21      A.  Not specifically, no.
22      Q.  And your research in that -- on Parent
23  Child Development Centers didn't address depression
24  in children; is that right?
25      A.  That's correct.

Page 59

1      Q.  And it didn't address anxiety in children;
2  is that right?  I should say anxiety disorders in
3  children.
4      A.  Anxiety disorders?  Not really, no.
5      Q.  Okay.
6      A.  It was more cognitively based.
7          THE VIDEOGRAPHER:  There's like 1
8      minute left on the tape.
9  BY MS. SMITH:
10      Q.  In your clinical practice, do you
11  routinely make predictions regarding whether a child
12  will be bullied?
13      A.  Will be bullied?
14      Q.  In other words, a child who is not being
15  bullied, do you predict whether the child will be
16  bullied in your clinical practice?
17      A.  I don't really understand your question.
18      Q.  I'm trying to get a sense of, in your
19  daily clinical work as a psychologist, do you
20  routinely make predictions for your patients as to
21  whether the child is going to be bullied?
22      A.  Typically in your clinical practice, you
23  don't make predictions of bad things happening.
24  That's kind of not necessarily a positive approach
25  to therapy.

Page 60

1          MS. SMITH:  Should we take a short
2      break now?
3          THE WITNESS:  Sure.
4          THE VIDEOGRAPHER:  The time now is
5      2:05 p.m.  We are now off the record.
6  (Recess.)
7      (Deposition Exhibit 79 was marked for
8          identification.)
9          THE VIDEOGRAPHER:  The time now is
10      2:13 p.m.  We are now back on the record.
11      This is the beginning of tape 2.
12  BY MS. SMITH:
13      Q.  Dr. Andrews, along the same lines of what
14  we had just been discussing -- Dr. Andrews, along
15  the same lines of what we had just been discussing,
16  in your clinical practice, do you routinely make
17  predictions about whether a child will ultimately
18  develop depression or an anxiety disorder?
19      A.  It happens a lot.  The thing is, though,
20  it's not like you write the prediction down or you
21  tell it to somebody, but we're doing it all the time
22  in our heads.  I guess that's the best way I can
23  answer that.  It would be wrong to say we don't do
24  it, because we do do it all the time.
25          What we don't do is say something like

Page 61

1  that to a parent or say something like that to the
2  client.  It would be possibly suggesting something
3  that has not yet happened, or it wouldn't
4  necessarily be a good way to proceed
5  therapeutically.  But we do it all the time, you
6  know, certain circumstances, certain conditions,
7  certain --
8      Q.  Certain risk factors?
9      A.  Certain risk factors definitely lead to
10  more likely than not type predictions, but you don't
11  necessarily write it down some place and, you know,
12  bury it and come back ten years later to see if it
13  was correct.
14      Q.  So you -- as a psychologist, you're
15  looking at the risk factors, but you're not making
16  predictions to the clients?
17      A.  Correct.
18      Q.  And you don't typically give medical
19  causation opinions; is that right?
20      A.  That's correct.
21      Q.  And you really can't as a
22  neuropsychologist; is that right?
23      A.  There's some disagreement about that, but
24  I take the position that it's really not -- not my
25  role.

16 (Pages 58 to 61)

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 62

1    Q.   And that's because you're not a medical
2  doctor; is that right?
3    A.   Correct.
4    Q.   You're not a psychiatrist?
5    A.   Right.
6    Q.   And you're not legally permitted to
7  prescribe medications; is that right?
8    A.   Some of my colleagues are in Louisiana,
9  but I did not take that training, and I don't do it,
10 no.
11   Q.   So is it accurate, then, to say that
12 you've never prescribed Paxil?
13   A.   Correct.
14   Q.   And you're not an expert in the field of
15 epidemiology; is that right?
16   A.   Correct.
17   Q.   Have you read any epidemiologic study
18 evaluating the relationship between Paxil or any
19 other SSRI and birth defects?
20   A.   No.
21   Q.   And you don't claim to have specialized
22 knowledge or expertise in addressing disfigurement
23 in children; is that right?
24   A.   That's correct.
25   Q.   You don't hold yourself out to the public

Page 63

1  or the scientific community as an expert in treating
2  children with disfigurements?
3    A.   You're just asking the question in a
4  slightly different way, and the answer --
5    Q.   Yeah.  Like, are you holding yourself
6  out --
7    A.   -- is still no.
8    Q.   Okay.  So the answer is still no, you're
9  not holding yourself out as an expert on that.
10        And you don't claim any expertise or
11 specialized knowledge regarding bullying; is that
12 right?
13   A.   Bullying, no.  Not -- not anything in
14 particular, no.
15   Q.   You've never conducted a study for the
16 purposes of identifying risk factors for being
17 bullied; is that right?
18   A.   No.  I haven't done any research in that
19 area.
20   Q.   And I take it you haven't conducted a
21 study to identify risk factors for being teased; is
22 that right?
23   A.   Right.  I haven't done any research in
24 that area.
25   Q.   You don't hold yourself out to the public

Page 64

1  or the scientific community as an expert in
2  psychological issues of teasing and bullying, do
3  you?
4    A.   It's asked a slightly different way, and,
5  actually, I would say that that falls very much
6  within the purview of clinical psychology and child
7  psychology, both of which I hold myself out to be an
8  expert in.
9    Q.   I think the question is a little more
10 specific, though.  It's do you hold yourself out to
11 the public or the scientific community as an expert
12 in the psychological issues of teasing and bullying?
13   A.   You mean, like, do I advertise that that's
14 what I do?  Is that --
15   Q.   Yeah.  Or do you -- do you tell people
16 that that's your specialty?
17   A.   No, I don't tell people that that's my
18 specialty.
19   Q.   It's not your specialty, is it?
20   A.   Anxiety is actually, but not necessarily
21 the teasing and bullying, no.
22   Q.   And you haven't conducted a study to
23 identify risk factors for the causes -- sorry.  You
24 haven't conducted a study to identify risk factors
25 for or the causes of depression; is that right?

Page 65

1    A.   Correct.
2    Q.   Same is true for anxiety disorders?  You
3  haven't conducted a study to identify the risk
4  factors?
5    A.   The risk factors, no, I don't think so.
6    Q.   Before we turn to your report, can we just
7  clarify what opinions you won't be offering in this
8  case?
9    A.   Sure.
10   Q.   I take it you won't be offering any
11 opinion about whether Paxil is capable of causing
12 any congenital malformation?
13   A.   You're correct.
14   Q.   Will you be offering any opinion regarding
15 the functionality of Evan's -- Evan Frischhertz's
16 right hand?
17   A.   No.
18   Q.   Do you consider yourself qualified to
19 assess the functionality of Evan's hand?
20   A.   No.  I would say that that would be
21 definitely outside of my area of expertise.
22   Q.   Going back for a minute on your testimony
23 in past cases, are you aware that on a number of
24 occasions your ability to testify as an expert
25 witness has been successfully challenged?

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 66

1    A.  No.
2    Q.  Do you recall your litigation work on
3  behalf of your litigation client, Gillis Cure?
4    A.  Not specifically, no.
5    Q.  Okay.  So --
6    A.  The name rings a bell, but I don't know
7  anything about it.
8    Q.  Okay.  Are you aware that in his case,
9  Gillis Cure's case, your testimony was excluded by a
10  federal court, in fact, the same federal court that
11  this case is in, as beyond your expertise and
12  unreliable due to the absence of scientific analysis
13  and data to support your opinion?
14        MR. DOODY:  Objection to form.
15    A.  I don't -- I don't know who Gillis Cure is
16  as I sit here right this moment, so I don't
17  really...
18  BY MS. SMITH:
19    Q.  I'll show you what has been marked as
20  Exhibit 69, Dr. Andrews.  And, for the record, it's
21  a Westlaw case and the case caption, Gillis Cure vs.
22  Marathon Oil Company.  Does that refresh your
23  recollection as to your work on that case?
24      (Deposition Exhibit 69 was marked for
25            identification.)

Page 67

1    A.  I -- no.  I don't -- I don't recall the
2  specifics of Gillis Cure.  Obviously, he was -- I
3  don't know who he was.
4    Q.  Okay.  But you can see that the Court
5  granted a motion to exclude your testimony?
6    A.  I see that, yes.
7    Q.  Okay.
8    A.  I didn't know anything about it.
9        MR. DOODY:  Object to counsel asking
10        the witness to interpret a legal opinion.
11  BY MS. SMITH:
12    Q.  Is it your position that the Court was
13  wrong in concluding that your opinion in Gillis
14  Cure's case was unreliable?
15        MR. DOODY:  Same objection.
16    A.  I have no idea.
17  BY MS. SMITH:
18    Q.  Are you familiar with the opinion of a
19  federal appellate court in the case of United States
20  vs. Earl Williams, in which the Court rejected your
21  opinion because it found your methodology weak and
22  unpersuasive?
23        MR. DOODY:  Objection; assumes facts.
24    A.  Williams, I -- I remember a little bit.  I
25  think he was -- he was in custody.

Page 68

1  BY MS. SMITH:
2    Q.  He was a criminal defendant.
3    A.  Yeah, he was a criminal defendant.  I
4  didn't know that they rejected the testimony, no.
5    Q.  Okay.  To your knowledge, has -- to your
6  knowledge, has your testimony been limited or
7  excluded in cases other than Gillis Cure and Earl
8  Williams?
9    A.  I didn't even know about them, so I'm
10  probably not a very good judge of that.
11    Q.  Okay.  Let's focus briefly on the way you
12  approach your clinical cases as a psychologist or
13  neuropsychologist in terms of methodology, and I'd
14  like you to detail, and I'll ask you some specific
15  questions, the methodology you apply or would apply
16  if you were treating a patient like Evan
17  Frischhertz.  I take it one of the first things you
18  would do would be to take a medical and social
19  history; is that right?
20    A.  If I were treating him?
21    Q.  Yes.
22    A.  Well, sure.
23    Q.  Completely outside the litigation context.
24    A.  Sure.
25    Q.  And you'd take a detailed medical --

Page 69

1    A.  But I probably wouldn't take it from Evan
2  at age 6.
3    Q.  You would get it from his parents?
4    A.  Yes.
5    Q.  Okay.  And would you review any medical
6  records?
7    A.  Sometimes.  It just depends upon the
8  situation.
9    Q.  And would you obtain -- again, this would
10  be from the parents.  Let's assume that this patient
11  is 7 years old like Evan.  Would you obtain a
12  detailed family history from the parents?
13    A.  Usually, that's part of the initial
14  interview session, yes.
15    Q.  And would that include a detailed family
16  history of anxiety disorders and depression?
17    A.  Sometimes, yes.
18    Q.  Why only sometimes?
19    A.  Well, sometimes it's just not relevant.  I
20  mean, it would depend upon what the case was about.
21  I don't just go and gather information from people
22  that really doesn't have any use or relevance.
23    Q.  Okay.
24    A.  For example, if the child was brought in
25  for school learning problems or school behavior

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 70

1  problems, you know, it may be relevant in one
2  situation but not in the other.
3     Q.  Okay.  That's a good point.  Let me,
4  then -- in terms of talking about your methodology,
5  let's assume not only that the patient is just like
6  Evan, is Evan essentially, but also that Evan
7  would -- this patient would be coming to you for --
8  seeking your advice, the parents would be seeking
9  your advice as to any problems he might face.  So in
10 that circumstance, would you take a detailed family
11 history regarding anxiety disorders and depression
12 in the child's relatives?
13    A.  Certainly the immediate family, yes.
14 Whoever he's in contact with.
15    Q.  Would you --
16    A.  Or who he spends -- or who he or she
17 spends a lot of time with, yes.
18    Q.  Would you take a detailed prenatal history
19 of the mother?
20    A.  You're kind of moving outside of my area
21 of expertise.
22    Q.  Okay.
23    A.  I might --
24    Q.  Let me try to bring it back within your
25 expertise.

Page 71

1     A.  Yeah.  A prenatal history is not something
2  that I would know what questions to ask necessarily.
3     Q.  Okay.  Maybe this is more helpful if I ask
4  this:  Would you assess the mother's level of
5  prenatal stress and anxiety?
6     A.  To the best that she's capable of giving
7  me that information, yes.  In retrospect, a lot of
8  times people are not that good at estimating.
9     Q.  Yeah.  I mean, I don't need you to comment
10 on whether people are good historians.  But just in
11 terms of your typical methodology, the one that's
12 accepted in the field of psychology and
13 neuropsychology, that's something you would do; is
14 that right?
15    A.  Sure.
16    Q.  Would you conduct a clinical interview
17 with the parents?
18    A.  Yes.
19    Q.  And would you conduct a clinical interview
20 of the child?
21    A.  And the child is going to be a patient?
22    Q.  Yes.
23    A.  Probably not.
24    Q.  Why not?
25    A.  Well, at 6 --

Page 72

1     Q.  Seven.
2     A.  Okay, 7 -- I don't want to be asking the
3  child questions if they probably -- if they do know,
4  they probably shouldn't, and if so, I would say in
5  that situation, I would ask questions of the child
6  about how he or she is feeling and what their --
7  what they think their issues might be.  I certainly
8  wouldn't do the same level of clinical interview
9  that you might do with an older person.
10    Q.  Would you perform neuropsychological
11 testing on the child?
12    A.  Depends upon the question.  If it was a
13 question of school learning capability, then yes,
14 probably.
15    Q.  But apart from school or academic
16 performance, you wouldn't typically perform
17 neuropsych testing?
18    A.  No, not unless somebody had asked a
19 question that would somehow make that relevant.
20    Q.  And would you analyze the child's risk
21 factors for anxiety disorders or depression?
22    A.  It would always be a part of the mix.
23    Q.  If a child -- if the child that we've been
24 talking about had a family history of anxiety or
25 depression, would you consider that to be a risk

Page 73

1  factor for the child developing anxiety or
2  depression?
3     A.  If the mother had a particular anxiety
4  disorder, then that's certainly going to be a
5  factor, particularly if they had an anxiety disorder
6  during their pregnancy.
7     Q.  And it sounds to me like you think that
8  that's more relevant than if the father had an
9  anxiety disorder.  Is that right?
10    A.  That's correct.
11    Q.  Why is that?
12    A.  Well, because during the nine months of
13 the pregnancy, the child is actually a recipient of
14 the higher levels of cortisol that the mother might
15 have in her bloodstream, which has the effect, we're
16 just now discovering, of making the child less
17 likely to -- less able to cope with stress when they
18 get older, so they come in, if you will, sometimes
19 with already some predisposition to anxiety.
20    Q.  So if the child's mother had prenatal
21 stress or anxiety, as you were just discussing, you
22 would consider that to be a risk factor for the
23 child developing anxiety or depression?
24    A.  Sure.
25    Q.  And would you weigh the risk factors for

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 74

1  anxiety and depression against corrective
2  experiences or protective assets that the child
3  might have?
4      A.  Corrective experiences being what?
5      Q.  Being positive interpersonal
6  relationships, supportive relationship with parents,
7  good interpersonal skills, feelings of
8  self-efficacy, those sorts of things.
9      A.  Would they be weighed into the equation?
10 Yes, of course.
11     Q.  If the child was well-adjusted, would you
12 weigh that in the equation?
13     A.  Sure.
14     Q.  Would you also conduct a thorough search
15 of the scientific literature?
16     A.  With respect to?
17     Q.  Well, let me -- let me be more specific.
18 I think that might be helpful.
19          In this case, we're talking about where
20 Evan Frischhertz comes to you as a patient and not a
21 litigation client.  Would you conduct scientific
22 research on the literature involving limb
23 deformities and psychosocial adjustment?
24     A.  I didn't think that we were dealing with
25 limb deformities here in your hypothetical.  I

Page 75

1  thought this was just somebody I was treating.
2      Q.  Well, I'm sorry.  Maybe I wasn't clear.  I
3  was asking you in the context of a child just like
4  Evan, and, as such, I was --
5      A.  I see.
6      Q.  -- meaning a child with a hand defect like
7  Evan.  Is the -- would that change any of the
8  answers you've just given?  Would you do anything
9  differently?
10     A.  I don't think so.  And, no, I probably
11 wouldn't do some kind of research on the deformed --
12 the particular deformity.  And what was the other
13 question you wanted to do a search on?
14     Q.  Well, not just -- not the deformity, but
15 whether the relationship between having a deformity
16 like that and psychosocial adjustment, you know, is
17 it linked to anxiety or depression, for example?
18     A.  Well, I don't think that that would be
19 necessary to do some kind of research on.  I mean, I
20 think that's a fairly well understood psychological
21 phenomenon, that if somebody is different, if they
22 question whether they're the same as other people,
23 that already sets up a potential in their minds for
24 not feeling as if they're the same or that they
25 belong.

Page 76

1      Q.  Sets up a potential for what?
2      A.  For them to feel a lack of belonging or
3  lack of equality with other peers.  In other words,
4  you're asking me would I -- would I do a -- if I was
5  treating Evan, --
6      Q.  Right.
7      A.  -- would I do some kind of major research
8  into whether or not a child with such a deformity
9  would have the potential for anxiety and depression.
10     Q.  Right.
11     A.  That's your question?
12     Q.  Right.
13     A.  And my answer is no.
14     Q.  Okay.
15     A.  I wouldn't need to.
16     Q.  Okay.  But in this case, in order to do
17 your report, you did research to find two articles,
18 right?
19     A.  I wanted to find some recent more or less
20 review articles on that particular field as, you
21 know, further substantiation of my opinion.
22     Q.  Right.  And I guess my -- I'll ask you
23 this question:  Wouldn't you do the same thing if
24 Evan were your patient and not your litigation
25 client?

Page 77

1      A.  Well, --
2      Q.  Just to get -- I take it you're not
3  steeped in the literature or overly familiar with
4  the literature on hand defects and limb defects and
5  psychosocial adjustment; is that fair?
6      A.  I guess it's fair.  I've -- your questions
7  to me on that were did I do research on that.  My
8  answer has been no, I've never done research on that
9  specific issue.  Would it be fair to say that I'd
10 need to go look at the literature to figure out what
11 to do with a child who came in with such a problem?
12 I don't think so.  I think that those kinds of
13 issues, adjustment issues, are fairly well
14 understood.  And certainly, I wouldn't need to go
15 look it up to find out that it's a possibility that
16 a kid like that might be teased or might be bullied
17 or might feel like they're not as good as other kids
18 in their class in certain ways for sports, let's
19 say, or for other kinds of issues.  It's pretty
20 in-your-face, kind of, you know.
21     Q.  So you consider yourself familiar with the
22 literature --
23     A.  Yes.
24     Q.  -- on children with hand defects and
25 issues of depression and anxiety and whether there's

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 78

1 any association between that?
2 A. Well, when you specifically put in hand
3 defects, then that changes your question, you know.
4 Any kind of defect that a person might have, and it
5 could be, you know, a short leg or it could be a --
6 Q. Some disfigurement.
7 A. Some -- something that would make them
8 feel different, make them feel not the same, not
9 able to cope as well in certain areas as other
10 people that they know, that would kind of fall into
11 the same category. But when you say specifically on
12 hand defects, I haven't specifically looked at that
13 literature even to this day. I don't know that
14 there is a specific literature on that, in fact.
15 Q. Thank you.
16 Okay. In going back to Evan as your
17 patient as opposed to a litigation participant,
18 would you, as -- if you were treating him and
19 advising his parents, would you evaluate all of the
20 potential outcomes for a child like Evan from best
21 case scenario to worst case scenario?
22 A. If I were treating him, of course, I would
23 be hoping for best case scenarios, but you would
24 always have the worst case scenario in your head as
25 things you want to try to find some way of

Page 79

1 inoculating against.
2 Q. And would you convey to the parents the
3 most likely scenario for their child?
4 A. Eventually, and probably in small doses as
5 I got to know the family and developed a better
6 rapport with them.
7 Q. You wouldn't simply tell them the worst --
8 the worst case scenario; is that right? You
9 wouldn't limit your --
10 A. Like, hello, your kid is going to have
11 depression?
12 Q. Right.
13 A. No, I wouldn't.
14 Q. But in terms of your analysis, you
15 wouldn't also just limit your analysis to the worst
16 case scenario; is that right?
17 A. Correct.
18 Q. Would you also communicate to the parents
19 that, as a neuropsychologist, you can't say for
20 certain whether the child will suffer from
21 psychological illness in adulthood or adolescence?
22 A. As a neuropsychologist, as a clinical
23 psychologist, --
24 Q. Right.
25 A. -- as an individual in general, no one can

Page 80

1 say for sure.
2 Q. I take it you'd agree that the present
3 state of scientific literature on the development of
4 psychopathology is not sophisticated enough to allow
5 people to predict with a reasonable degree of
6 scientific certainty whether a child will suffer
7 from a psychological illness as he gets older; is
8 that correct?
9 A. Well, I disagree with the way that you
10 actually framed that question, that if we get more
11 sophisticated some day, we'll be able to make those
12 kinds of predictions. I don't think that's
13 possible. I think there's too many possibilities
14 always that exist within a situation for an
15 individual to ever be able to have a crystal ball
16 and look into the future and say, this is for sure
17 going to happen, and when you get to be 24, you're
18 going to find the woman that you want to marry.
19 That's just not the way it works.
20 Q. There's simply too many variables; is that
21 what you're saying?
22 A. Of course.
23 Q. But no one can predict with certainty --
24 A. You can't predict --
25 Q. -- whether a child is going to grow up and

Page 81

1 have anxiety or depression; is that right?
2 A. Well, you can certainly reach a point
3 where you would say there's -- more likely than not,
4 but you can't say with certainty anything that's
5 going to happen.
6 Q. And this methodology we've been
7 discussing, the methodology you employ as a
8 psychologist and neuropsychologist, I take it that's
9 the accepted methodology in the field?
10 A. I believe it is, yes.
11 Q. Okay. I'd like to show you what's been
12 marked as Exhibit 10, Dr. Andrews. This -- I'll
13 represent to you this is a document we received from
14 plaintiff's counsel, and I believe you produced it,
15 so -- but for the record, if you could just tell us
16 what it is.
17 (Deposition Exhibit 10 was marked for
18 identification.)
19 A. This is from my file. This is when my
20 secretary took a message about Mr. Frischhertz
21 calling on 1/12/12 asking to speak to me. And this
22 is 1/23.
23 Q. Just to make it simple, I take it you're
24 identifying this as phone messages that were created
25 in the ordinary course of business in your office;

21 (Pages 78 to 81)

Susan R. Andrews, Ph.D.

Page 82

1  is that right?
2      A.  That's correct.
3      Q.  Okay.  Do you think January 12th, 2012, or
4  thereabouts, was the date you were first contacted
5  by an attorney in this case?
6      A.  I believe so.
7      Q.  And is that the date your services were
8  retained, that date or thereabouts?
9      A.  A little after that, because I didn't
10 actually talk to him that day.
11     Q.  Okay.  Did you know Marc Frischhertz
12 before he called you --
13     A.  No.
14     Q.  -- on that day?
15         I take it you hadn't been retained by
16 Mr. Frischhertz or his firm, to your knowledge, to
17 serve as an expert in any case?
18     A.  I don't believe so.
19     Q.  Okay.  Now, looking at Exhibit 10,
20 according to the note, Mr. Frischhertz was seeking
21 your testimony on what issues he might face as he
22 gets older, "he" meaning Evan; is that right?
23     A.  That's correct.
24     Q.  Okay.  And that's an appropriate
25 question -- well, let me ask you this:  Do you agree

Page 83

1  that that's an appropriate question because you
2  can't testify with certainty, and no one can testify
3  as to what -- well, let me strike that.
4          This question that Mr. Frischhertz posed,
5  what issues Evan might face as he gets older, do you
6  think that's an appropriate question?
7      A.  Yes.
8      Q.  And would you agree that predicting what
9  psychological issues Evan will face is by its nature
10 speculative?
11     A.  I guess so, yes.  Of course, it is.  We
12 don't have the actual event in front of us, so it
13 has to be speculation.
14     Q.  And you would agree that you can't say to
15 a reasonable degree of scientific certainty what
16 issues Evan will face as he gets older; is that
17 right?
18         MR. DOODY:  Object to the form of the
19         question.
20     A.  I'm not sure that that's true.  Can you
21 repeat your sentence, your question?
22 BY MS. SMITH:
23     Q.  Can you say to a reasonable degree of
24 scientific certainty what issues Evan will face as
25 he gets older?

Page 84

1          MR. DOODY:  Same objection.
2      A.  I think what I've said is that I can only
3  say within a reasonable degree of certainty what he
4  might face.  I can't tell you for sure what he will
5  face.  In other words, I can't say for sure that
6  Evan will sometime in his young years be bullied,
7  for example.  I can say, based upon what his parents
8  have told me, that he already has been teased
9  somewhat, to some extent.
10 BY MS. SMITH:
11     Q.  And just as you can't say for sure that
12 he'll be bullied, is it true that you can't say for
13 sure that he'll develop depression?
14     A.  I can't say that for sure, no.
15     Q.  And same is true for anxiety disorder; you
16 can't say for sure -- for certain whether he'll
17 develop an anxiety disorder?
18     A.  That's true.  And I think I said as much.
19 In fact, I think on the beginning of page 4, I said
20 no one can say for certain, da, da, da, da, da.
21     Q.  The telephone message we've been looking
22 at in Exhibit 10 also says, teasing starting.  Do
23 you see that, Dr. Andrews?
24     A.  Yes.
25     Q.  Did you know what that meant when you

Page 85

1  first got the message?  There was no other
2  information provided to you; is that right?
3      A.  That's correct.
4      Q.  Okay.  I'd like to show you what's been
5  marked as Exhibit 11.  And, again, Dr. Andrews, I'll
6  represent to you that this document was produced to
7  us, and I believe it came from your office, but if
8  you could just say for the record what Exhibit 11
9  is.
10         (Deposition Exhibit 11 was marked for
11         identification.)
12     A.  I think that those are my handwritten
13 notes from a -- my phone conversation with
14 Mr. Frischhertz.
15     Q.  Meaning Marc Frischhertz, the attorney?
16     A.  Yes.  Yes, those are my handwritten notes
17 from when I called him back on --
18     Q.  Okay.
19     A.  -- I think the 17th of --
20     Q.  January?
21     A.  -- January.
22     Q.  Okay.  So these -- these are your
23 handwritten notes memorializing your telephone
24 conference with Mr. Frischhertz?
25     A.  Yes.

22 (Pages 82 to 85)

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 86

1    Q.  Was there anyone other than you and Marc
2  Frischhertz on the call?
3    A.  Not on this end.  I don't know about him.
4    Q.  Okay.  Your notes also indicate that Evan
5  has a very high IQ; is that right?
6    A.  Yes.  That's what I was told.  I'm just
7  taking notes of the conversation.
8    Q.  Okay.  As you sit here today, do you know
9  how high his IQ is?
10   A.  I know how high it was when he was last
11  tested.
12   Q.  Do you have any reason to believe it's
13  less than it was when he was -- than when he was
14  tested initially?
15   A.  No.  But you asked me if I know how high
16  it is right this moment.
17   Q.  Okay.
18   A.  I can't answer that question.  I can only
19  answer based upon what I've seen.
20   Q.  Sure.  Okay.
21       And what you've seen -- based on what
22  you've seen, what's your understanding of Evan's IQ?
23   A.  He scores in the very superior range -- in
24  the superior range, 124, I believe.
25   Q.  There's also a notation that says,

Page 87

1  handwriting class.  Is Evan taking a handwriting
2  class?  I'm still looking at Exhibit 11.
3    A.  Evan did take a handwriting class,
4  according to his parents and also according to, I
5  guess his uncle, Marc.
6    Q.  Did the handwriting class improve his
7  handwriting?
8    A.  I don't know.  He -- I think it was in OT,
9  probably OT sessions, occupational therapy sessions.
10   Q.  And your notes also state, first grade Met
11  Academy.  I take it you're referring to Metairie
12  Academy?
13   A.  That's correct.
14   Q.  And Evan was in first grade at Metairie
15  Academy this past school year; is that right?
16   A.  That's right.
17   Q.  Okay.  Your notes also state, teasing and
18  other psychological problems; is that right?
19   A.  Mr. Frischhertz said he would like for me
20  to look at the damages, including teasing and other
21  psychological problems.
22   Q.  So Mr. Frischhertz asked you specifically
23  to look at issues relating to teasing?
24   A.  Yes.
25   Q.  Did he tell you that Evan had been teased?

Page 88

1    A.  Yes.  It was starting.
2    Q.  What exactly did he tell you about the
3  teasing?
4    A.  Just what I said.
5    Q.  That it was starting?
6    A.  Uh-huh.  It was about a 10-minute
7  conversation, maybe.
8    Q.  Okay.  Is teasing a psychological problem?
9    A.  Well, it leads to psychological problems.
10  I'm sure that Mr. Frischhertz didn't intend that it
11  be considered a psychological problem.
12   Q.  Your notes also state that -- state,
13  someone else addressing vocational issues.  Do you
14  know who that is?
15   A.  I don't, no.
16   Q.  Were you asked to address any vocational
17  issues?
18   A.  No.  I'm just writing down what
19  Mr. Frischhertz said in the conversation.  He said
20  someone else would be addressing vocational issues.
21   Q.  Okay.
22   A.  So I wrote it down.
23   Q.  What else was discussed during this
24  conversation; do you recall?
25   A.  This pretty much is the sum total of the

Page 89

1  conversation.  He said that they live in Lakeview,
2  that the expert report deadline was March the 1st,
3  that he would call my secretary the next day to set
4  up a session.  And the note to myself at the bottom
5  is, I need a session with the parents and then one
6  with the child later.
7    Q.  And a half an hour with the child; is that
8  right?
9    A.  Later, yes.
10   Q.  When you wrote that --
11   A.  Not the same day, --
12   Q.  Right.
13   A.  -- in other words.
14   Q.  Okay.  Did you anticipate meeting with
15  Evan alone at that point or with Evan and a parent?
16   A.  Probably with Evan and a parent.  It was
17  up to the parents and up to Evan, but I would
18  anticipate most of the time with a 6 or 7-year-old,
19  that they wouldn't be coming in by themselves.
20  Sometimes they do.  It depends upon the child.
21   Q.  Okay.  Did you request that any medical
22  records be sent to you?
23   A.  No.  It's not a medical record question.
24   Q.  The notes that we've been looking at in
25  Exhibit 11 indicate that Evan was born with a

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 90

1  hypoplastic right hand and a heart defect; is that
2  right?
3      A.  That's what it says.
4      Q.  Is your understanding of Evan's hand
5  defect based upon what Marc Frischhertz has told
6  you?
7      A.  Well, and what his parents said.  I have
8  not done any special research into what might have
9  happened or how it could have happened or what it
10  might be called.
11      Q.  You don't have any independent knowledge
12  of the precise nature of the defect; is that right?
13      A.  Nope.  I do not.
14      Q.  Okay.  And is your understanding of Evan's
15  cardiac condition based solely upon what his
16  attorneys and his parents have told you?
17      A.  Primarily what his parents told me, yes.
18      Q.  You don't have any independent knowledge
19  of Evan's alleged heart defect; is that right?
20      A.  No, I don't.
21      Q.  So in your report, which is Exhibit 7,
22  where you state, Evan was born with patent ductus
23  arteriosus, atrial septal defect, mild aortic
24  insufficiency, the basis for that statement is what
25  his parents told you?

Page 91

1      A.  Yes.
2      Q.  I take it you're not aware that Evan's
3  pediatric cardiologist testified in this case that
4  Evan does not have an atrial septal defect?
5      A.  Apparently, I'm not.
6      Q.  Would you defer to Dr. Stopa, the
7  pediatric cardiologist who treated Evan, on what
8  cardiac condition Evan actually has?
9      A.  Of course, I would.
10      Q.  And I take it you're not here to offer an
11  opinion about whether Evan was born with a heart
12  defect?
13      A.  No.
14      Q.  Your report states on page 1 that his
15  heart problems are reported by his parents to have
16  resolved.  So is it your understanding that Evan
17  does not currently have a heart problem?
18      A.  All I can tell you about is what his
19  parents said.  They said they were under the
20  impression that his heart problems had resolved.
21  Whether they're right or wrong, I don't know.
22      Q.  Fair enough.
23      Going back to Exhibit 11 for a moment,
24  again, these are the notes from your conversation
25  with Attorney Marc Frischhertz.  Do you see the

Page 92

1  phrase, "looking at worse case scenario damages
2  now"?
3      A.  Looking at damages, in particular, worst
4  case scenario, yes.
5      Q.  Okay.  Was it your understanding that you
6  were being retained to give an opinion regarding
7  what the worst case scenario might be for Evan in
8  terms of psychosocial issues and damages?
9      A.  Yes.
10      Q.  So your understanding was that you were to
11  provide an opinion regarding the worst case scenario
12  of what might possibly occur to Evan?
13      A.  What might possibly happen, yes.
14      Q.  And does your report convey your opinion
15  regarding the worst case scenario that might happen?
16      A.  I believe it does.
17      Q.  Were you asked to do anything else in this
18  case?
19      A.  Not a thing.
20      Q.  You were not -- I take it you weren't
21  asked to opine on other possible outcomes for Evan,
22  apart from worst case scenario; is that right?
23      A.  Well, I mean, I was certainly -- I offered
24  that in my summary statements that we don't really
25  know what could happen.  We certainly -- I very

Page 93

1  clearly said that he's got a good situation
2  currently.  His parents are trying to do the best
3  they can for him.  He's in a good school.  No one
4  knows exactly what could happen in the future, but
5  that he certainly has a good situation now.  I very
6  clearly stated that.
7      Q.  Right.  But in terms of what the possible
8  future outcomes are, your report is limited to the
9  worst case scenario in terms of the future and
10  doesn't give an opinion about other possible
11  outcomes in the future; is that right?
12      A.  That's true.
13      Q.  Are there potential outcomes for Evan that
14  are not worst case scenario?
15      A.  Well, wouldn't that be true by the very
16  name, worst case scenario?  I mean, obviously, there
17  are other possibilities.  There are a range of other
18  possibilities.
19      Q.  Did you determine the best case scenario
20  that could occur for Evan?  I understand it's not in
21  your report, right?
22      A.  No, I didn't.
23      Q.  Okay.  So --
24      A.  That's actually an interesting question.
25  It wouldn't have occurred to me to do that.

24 (Pages 90 to 93)

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 94

1    Q.  Well, you weren't asked to do that in this
2  case, --
3    A.  No.
4    Q.  -- right?
5    And did you determine the most likely
6  scenario for Evan in your report?
7    A.  Not really, no.  Because there again,
8  you're -- you're reaching into the crystal ball to
9  see what the most likely would be.
10    Q.  And you weren't asked to do that in this
11  case; is that right?  You weren't asked to opine on
12  the most likely outcome for Evan; is that right?
13    A.  No.  And it would be difficult to do,
14  because it would very much depend upon where he went
15  to school and, you know, what his friends were like.
16  You would have to be aware of things that I wouldn't
17  have access to at the time I did the report.
18    Q.  You simply didn't formulate an opinion
19  regarding best case scenario or most likely scenario
20  for Evan; is that true?
21    A.  I think I've answered that.
22    Q.  The answer is yes?
23    A.  Yes.
24    Q.  I take it you can't rule out those
25  possible outcomes for Evan -- or let me put -- let

Page 95

1  me -- let me restate the question.
2    If Evan were your patient and not your
3  litigation client, you would consider those other
4  possible outcomes for Evan; is that right?
5    A.  You mean what the best case would be?
6    Q.  Or the most likely case.
7    A.  Well, the most likely, again, will evade
8  us, because that would depend upon circumstances as
9  they happen over his lifetime that we don't know.
10  We don't know what they might be.  The best case we
11  could probably certainly say, you know, we could
12  predict something there, but the most likely to
13  predict it would not be that easy.  And, no, I
14  didn't -- if he were my -- if he were my therapy
15  patient, certainly that would be something that we
16  would be looking at.  In fact, that would be the
17  basis for what we'd be doing.
18    Q.  Do you believe you considered all of the
19  available evidence in terms of reaching your
20  opinion?
21    A.  That I considered all the available
22  evidence?
23    Q.  That you would typically consider in
24  reaching an opinion?
25    A.  In a situation where you have very little

Page 96

1  information, all you can do is look at what is most
2  likely to happen and what are some of the most
3  likely difficult circumstances that someone like
4  that would have to deal with, yes, I do.  There
5  wasn't much else that I needed.  I couldn't use the
6  medical materials.  That didn't really offer any
7  help for a psychological interpretation.
8    Q.  There's also a notation on Exhibit 11,
9  which are your handwritten notes, that Evan's mother
10  was on Paxil during the pregnancy.  It says, mother
11  on Paxil during PG, and I'm assuming PG means
12  pregnancy; is that right?
13    A.  Yes.
14    Q.  Is it your understanding that Andrea
15  Frischhertz was taking Paxil during the pregnancy?
16    A.  I only know that that's what the attorney
17  told me.  I don't know the extent of what she took
18  or how long she took it or how much she took.  I
19  don't know anything about that.
20    Q.  Okay.  And as you've already mentioned at
21  the end of these notes, which are marked as Exhibit
22  11, you indicated you needed to meet with the
23  parents and meet with Evan, and those meetings took
24  place, right?
25    A.  Yes.

Page 97

1    Q.  Okay.  So you initially met with Brad and
2  Andrea Frischhertz together without Evan; is that
3  right?
4    A.  Yes.
5    Q.  And did you meet here at your office?
6    A.  Yes.
7    Q.  Do you know when you met?  I don't know if
8  turning to -- I will give you what's been marked as
9  Exhibit 12.
10    (Deposition Exhibit 12 was marked for
11      identification.)
12    A.  1/31/12.
13    Q.  Okay.  How long did that meeting last?
14    A.  A little over an hour.
15    Q.  Was anyone else present?
16    A.  Just the three of us.
17    Q.  Okay.  I'll show you what's been marked as
18  Exhibit 12.  It's a document on your letterhead that
19  is entitled "Parent-Child Questionnaire."
20    Do you recognize this document,
21  Dr. Andrews?
22    A.  Yes.
23    Q.  Is this a standard questionnaire you use
24  in your practice?

25 (Pages 94 to 97)

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 98

1    A.  Yes.
2    Q.  What's the purpose of the Parent-Child
3  Questionnaire?
4    A.  Put some of the information down on paper
5  so that I don't have to ask each one of those
6  questions of the parent, or to provide me with
7  information that I might like to ask further
8  information about.
9    Q.  So I take it Andrea and Brad Frischhertz
10  completed this document when they came into your
11  office on January 31st, --
12    A.  Yes.
13    Q.  -- 2012?
14    A.  Before I saw them.
15    Q.  Okay.  And did you go over the
16  questionnaire with them --
17    A.  Yes.
18    Q.  -- during that meeting?
19    And in response to the question that's
20  posed, is there any family history of emotional
21  illness -- it's right under No. 6 -- the answer is,
22  mother hyphen anxiety.  So did you take the response
23  to indicate that Andrea, herself, has a history of
24  anxiety?
25    A.  Yes.

Page 99

1    Q.  Okay.  Did you have a conversation with
2  Andrea Frischhertz regarding her history of anxiety?
3    A.  Basically, that that was a fact, that she
4  did have anxiety during the pregnancy.
5    Q.  Okay.  And the Frischhertzs' response to
6  the question of is there a history of conflict in
7  the household was no.
8    A.  That's correct.
9    Q.  Did you have a conversation with the
10  Frischhertzes regarding the family dynamic and
11  whether there was any conflict?
12    A.  Well, they said that they didn't have any
13  particular conflict, that they basically agreed on
14  matters of discipline and they were consistent in
15  their demands, consistent in their discipline
16  methods, and they were both here.
17    Q.  Did they strike you as a happy family?
18    A.  They didn't argue with each other about
19  that.
20    Q.  Right.  Right.
21    Did they strike you as a happy family?
22    A.  Yes.
23    Q.  And did you conclude that they are
24  engaging in appropriate discipline of Evan?
25    A.  It looked like that, yes.

Page 100

1    Q.  Is Evan having any disciplinary problems?
2    A.  I don't think so.  If so, it wasn't
3  mentioned to me.
4    Q.  And, to your knowledge, Evan has not had
5  any developmental delays; is that correct?
6    A.  He crawled, walked, talked on time, which
7  are the standard developmental delays that we look
8  at, milestones.  He has a little bit of a delay in
9  handwriting.  He's had a little difficulty with
10  that, which is why he's had the OT sessions.
11    Q.  That's not a developmental delay, though,
12  is it?
13    A.  Well, I guess, specifically, no.  It does
14  fall in that category.
15    Q.  In what category?
16    A.  In the category of child development.
17    Q.  But it's not what pediatricians and
18  physicians typically consider a developmental delay?
19    A.  I don't know about pediatricians and
20  physicians.  I'm actually a child psychologist.  So
21  I don't know what they would consider a
22  developmental delay.  I would consider it within an
23  area that -- that we look at.  When children reach a
24  certain point, their hands mature to the point
25  usually where they are pretty good at controlling a

Page 101

1  pencil.  Some kids have a little bit of a delay in
2  that, more often boys than girls, and often they are
3  put in a little bit of a therapy session as he was
4  for that.
5    Q.  So it's pretty common in boys; is that
6  correct?
7    A.  It's more common in boys than it is in
8  girls.
9    Q.  And it's -- the boys you've been talking
10  about don't have hand deformities, right?  In other
11  words, it's common in -- it's more common in boys
12  and it's in boys that don't have hand deformities?
13    A.  Yeah.  It doesn't require a hand
14  deformity.  He's writing with his left hand, not his
15  right hand, actually.
16    Q.  Okay.  Now, on page 2 of the Parent-Child
17  Questionnaire that's marked as Exhibit 12 -- I guess
18  I should step back for a minute.  Did you create
19  this questionnaire?  Is this a document you created?
20    A.  Yes.
21    Q.  Okay.  So you asked the question, are
22  there problems in any of the following areas, and
23  there's two columns listing different potential
24  areas of problems.  And consistent with Andrea and
25  Brad Frischhertz's responses to your questionnaire,

26 (Pages 98 to 101)

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 102

1  is it correct that Evan doesn't have any problems in
2  the areas that are listed, which are overactivity,
3  speech, temper tantrums, going to bed, bed wetting,
4  too few friends, attention span, fearful behavior,
5  shyness, nightmares, eating or school work?
6      A.  Well, my answer to that is they don't
7  report any.  This is the parents reporting.
8      Q.  Okay.  And now that you've met with the
9  Frischhertzes, do you think that Evan has problems
10 in any of those areas?
11     A.  We -- to be fair, I've only met with them
12 one time for about an hour and Evan for about a half
13 an hour, 45 minutes.  That's insufficient
14 time to offer my own personal judgment as to whether
15 he has any problems in any of these areas.
16         Taking the parents as being good
17 reporters, and I would say that their estimation is
18 probably correct, he seemed like he was a very
19 social, pleasant, polite young man.  He looked like
20 he was capable of sitting still, certainly for 30
21 minutes, without any difficulty, and he was
22 responsive to questions.  What he does at home with
23 his brother, I don't know.
24     Q.  Well, he gets along well with his brother,
25 doesn't he?

Page 103

1      A.  That's what they said.
2      Q.  Not all parents say that, do they?
3      A.  Well, they don't.  But, I mean, you're
4  asking me to say that that is a for sure statement
5  when I -- all I know is that's what the parents
6  said.
7      Q.  Right.
8         I guess I'll ask you a global question,
9  which is, do you have any reason to disagree with
10 the Frischhertzes' answers to anything on this
11 questionnaire?
12     A.  No, I don't.  But I also don't have
13 independent knowledge of the correctness of their
14 statements.
15     Q.  Understood.  But you used their responses
16 and the fact that you don't have a basis to disagree
17 in formulating your opinion; is that right?
18     A.  I had nothing else; that's correct.
19     Q.  Okay.  And the Frischhertzes indicated
20 that Evan responded great to his first school
21 experience; is that right?
22     A.  That's right.
23     Q.  And that he gets along very well with
24 other children; is that right?
25     A.  That's what they said.

Page 104

1      Q.  Okay.  And in response to the question
2  about Evan's special interests, hobbies, types of
3  play, which is on page 3 of the questionnaire, the
4  Frischhertzes wrote, soccer, baseball, basketball,
5  Cub Scouts, correct?
6      A.  Yes.
7      Q.  Did you discuss that with Evan's parents?
8      A.  Not really, no.  I think that these are
9  interests of his, but I don't think that he can
10 particularly participate in sports, and I believe
11 that -- I don't know why they would say that.  I
12 actually didn't ask them that.  That's an
13 interesting juxtaposition of what he would be able
14 to do yet show an interest in.  I understood that he
15 was much more interested in indoor activities.
16     Q.  And what was your understanding based on,
17 in terms of him being more interested in indoor
18 activities?
19     A.  Well, when we were talking, the parents
20 gave the indication that they were really glad that
21 he was smart and that he did well in school,
22 because, you know, his brother was the outgoing
23 child who was tough athletic, likes to do things,
24 and that they were really good friends, but that
25 Ford did those things, and Evan was more sensitive,

Page 105

1  bookish, rather read and fairly intellectual.  That
2  was the conversation, page 3 of my handwritten notes
3  from the interview with the parents.  So I guess I
4  was more focused on what they told me than looking
5  at what they wrote down.
6      Q.  Than the questionnaire?
7      A.  I don't think that I noticed that
8  discrepancy.
9      Q.  So did you discuss those responses in the
10 questionnaire with them, the responses about --
11     A.  No, that's what I said.
12     Q.  Yeah.
13     A.  Even to this -- until you mentioned it, I
14 hadn't actually noticed that there was that kind of
15 odd, soccer, baseball, basketball interests.
16     Q.  And did you assume that Evan can't play
17 soccer, baseball, basketball or do Cub Scouts?
18     A.  No.  Actually, soccer, I would think he
19 probably could play.  I don't know if he does.  It's
20 not a sport usually for 6-year-olds, but...
21         THE VIDEOGRAPHER:  You have about 10
22     minutes.
23 BY MS. SMITH:
24     Q.  So -- okay.  You just -- you did not
25 discuss it with the Frischhertzes, --

27 (Pages 102 to 105)

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 106

1      A.  No.
2      Q.  -- whether he can do those things or
3  whether he does those things?
4      A.  Right.  What I did discuss with them was
5  that the other boy is the more athletic one, and
6  what they said about Evan was he was the more
7  bookish one, as opposed to Ford, who was more
8  athletic.  So that's the extent of what I know about
9  the sports activities.
10     Q.  Did they say Ford is more athletic, the
11  Frischhertzes?
12     A.  Yes.  They did.
13     Q.  Okay.  Going back --
14     A.  Do you have a copy of my notes, my
15  handwritten notes?
16     Q.  Well, why don't you show me what you're
17  looking at, and I'll compare it with what I have.
18     A.  This is page 3 of my interview notes, the
19  top of the page.  They went into some detail
20  comparing and contrasting the two boys.  You've seen
21  that?
22     Q.  Thank you.
23         Okay.  Going back to the questionnaire for
24  a moment, the Frischhertzes answered that there have
25  not been any major changes in Evan's life which

Page 107

1  would upset him, correct?
2      A.  Yes.
3      Q.  And your questionnaire also asks the
4  Frischhertzes to briefly describe Evan's
5  personality, and they described his personality as
6  follows:  Very easy-going child who gets along well
7  with others, expects a lot from himself, always
8  smiling and well-adjusted, very bright.
9          Based on your meeting with Evan, do you
10  agree with the Frischhertzes' assessment of his
11  personality?
12     A.  On my brief meeting with Evan, he seemed
13  to be those things, yes, very verbal.
14     Q.  And is it fair to say that the
15  questionnaire you developed elicits information
16  that's relevant to Evan's psychosocial status, his
17  mental health?  Is that correct?
18     A.  That's the intention of the questionnaire.
19  To also get developmental information.
20     Q.  Okay.  And is there anything on the
21  questionnaire or your -- well, let me limit it to
22  the questionnaire.  Is there anything on the
23  questionnaire in terms of responses that indicates
24  that Evan is experiencing any emotional or
25  psychological problem?

Page 108

1      A.  On the questionnaire, no.  I don't think
2  so.  Except for fighting with his brother and not
3  listening was the only negative things that his
4  mother listed.
5      Q.  Is that pretty normal?
6      A.  I would think.
7      Q.  Okay.  Now, I'm going to hand you what's
8  been marked as Exhibit 13, which are your
9  handwritten notes, Dr. Andrews, and those are the
10  ones you were just referring to a minute ago.
11         (Deposition Exhibit 13 was marked for
12              identification.)
13         Were these the notes you made during your
14  January 31st meeting with Mr. and Mrs. Frischhertz?
15     A.  Yes.
16     Q.  And I think you said before that this was
17  a clinical interview?
18     A.  Yes.
19     Q.  Did you obtain a detailed family history
20  of anxiety and mood disorders?
21     A.  I basically got the information that
22  Andrea, which we already knew, had anxiety.  She has
23  anxiety, she's had anxiety for many years, and that
24  she was on medication during the pregnancy.  In the
25  first trimester, she apparently took Paxil.  It was

Page 109

1  pretty much the extent of -- upon discussion with
2  her about her anxiety.
3      Q.  Did you also obtain a detailed history of
4  prenatal stress and anxiety?
5      A.  I thought that's what I just answered.
6      Q.  Well, I'm sorry.
7      A.  She said that --
8      Q.  Maybe I misunderstood.
9      A.  She had a difficult pregnancy, she said,
10  and she was very anxious during it.
11     Q.  Okay.  Was it your impression that the
12  Frischhertzes are loving parents?
13     A.  Well, that, again, is calling for some
14  kind of a general evaluation that --
15     Q.  Let me make it a little more clinical.  Is
16  it your impression that they're supportive parents,
17  that they're supportive of Evan?
18     A.  They did seem to be very protective and
19  supportive of him, yes.  They appeared to be.
20     Q.  Protective in what sense?
21     A.  Protective in the sense that they don't
22  want to -- they didn't want Evan exposed and they
23  try not to have Evan exposed to anything that would
24  be potentially damaging to him.
25     Q.  Meaning what?

28 (Pages 106 to 109)

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 110

1    A.   Well, meaning if you knew that there was a
2  kid in the class who was a particularly big bully,
3  let's say, and he invited Evan over for a birthday
4  party or for a play date, I would imagine that his
5  mother would say no.
6    Q.   That's just speculation on your part,
7  though, right?
8    A.   Right.
9    Q.   You didn't have that discussion --
10   A.   Most of what you're asking me for is that.
11   Q.   Okay.
12   A.   Yes.  But they definitely appeared to be
13  very loving and protective parents.
14   Q.   You know, on -- well, okay.  And I take it
15  the notes we're looking at are all the notes you
16  made during your meeting with Andrea and Brad
17  Frischhertz?
18   A.   Yes.
19   Q.   The Frischhertzes are college graduates,
20  right?
21   A.   Yes, I believe so.
22   Q.   Okay.  So you already reference the fact
23  that your notes say Andrea has anxiety, on meds
24  during the pregnancy, first trimester, right?
25   A.   Yes.

Page 111

1    Q.   And on page 1 of your report, you state
2  that Andrea was anxious during her pregnancy, and I
3  take it the source of that information is your
4  discussion with the Frischhertzes during this
5  meeting?
6    A.   Yes.
7    Q.   Okay.  What did they tell you about her
8  anxiety during the pregnancy that you haven't
9  already mentioned?
10   A.   Nothing in particular.
11   Q.   Did you make any sort of diagnosis of
12  Andrea Frischhertz?
13   A.   No.  That was not my --
14   Q.   Wasn't your role, correct?
15   A.   Wasn't my role, and I certainly didn't
16  have the kind of interaction with her that would
17  have allowed me to do that.
18   Q.   Okay.  Did you discuss Andrea's history of
19  panic attacks?
20   A.   No.  But a panic attack is just another
21  form of anxiety.
22   Q.   Right.  Panic disorder is an anxiety
23  disorder, correct?
24   A.   Yes.
25   Q.   You didn't administer any tests to Andrea,

Page 112

1  I take it?
2    A.   Correct.
3    Q.   Okay.  Do you know when Andrea began
4  treatment for anxiety?
5    A.   No, I don't, actually.  Or if she did, I
6  don't know.
7    Q.   Well, Andrea testified in this case that
8  she began treatment with a psychiatrist for anxiety
9  in 1999.  Were you aware of that?
10   A.   No.  Andrea's anxiety was not the focus of
11  my interview with them.  My interview with them was
12  primarily to find out about Evan.
13       THE VIDEOGRAPHER:  You have two
14       minutes.
15  BY MS. SMITH:
16   Q.   Do you know when Andrea experienced her
17  first panic attack?
18   A.   No, I don't.
19   Q.   Is it your understanding that Andrea has
20  panic disorder?
21   A.   I don't know.  I haven't seen the
22  psychiatrist's notes or diagnoses.
23   Q.   Did you ask her during the interview
24  whether she experienced panic attacks or had been
25  diagnosed with panic disorder?

Page 113

1    A.   No.
2    Q.   Has Andrea been diagnosed with generalized
3  anxiety disorder?
4    A.   I don't know the answers to those
5  questions.
6    Q.   Okay.
7    A.   All I know is that Andrea said that she
8  has had anxiety, she was in treatment for it, part
9  of the treatment was to offer her Paxil during her
10  pregnancy, and that she did take it.  She indicated
11  that she had had anxiety for some time, and I would
12  imagine that she still has anxiety, because once you
13  have anxiety, you pretty much always will have
14  anxiety.  It's not something that can be actually
15  treated and go away.
16       THE VIDEOGRAPHER:  I need to change
17       the tape.
18       MS. SMITH:  Okay.
19       THE WITNESS:  I would be glad to take
20       a break.
21       MS. SMITH:  We'll take a break and
22       change the tape.
23       THE VIDEOGRAPHER:  The time now is
24       3:12 p.m.  We're now off the record.  This
25       is the end of tape 2.

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 114

1  (Recess.)
2          THE VIDEOGRAPHER:  The time now is
3      3:21 p.m.  We're now back on the record.
4      It's the beginning of tape 3.
5  BY MS. SMITH:
6      Q.  Dr. Andrews, did you ask Mrs. --
7          THE VIDEOGRAPHER:  Microphone.  Sorry.
8          MS. SMITH:  Oh, I'm sorry.
9  BY MS. SMITH:
10     Q.  Dr. Andrews, did you ask Mrs. Frischhertz
11 about any medication she had taken for anxiety other
12 than Paxil?
13     A.  No.
14     Q.  So you don't know whether she took any
15 medications during her pregnancy other than Paxil?
16     A.  No, I really don't.
17     Q.  Did you ask her about specific triggers
18 for anxiety?
19     A.  No.
20     Q.  That wasn't the nature of your interview?
21     A.  Correct.
22     Q.  Okay.  So I take it you're not familiar
23 with her fear of flying?
24     A.  No.
25     Q.  Okay.  And --

Page 115

1      A.  But I wouldn't be surprised.
2      Q.  Okay.  Mrs. Frischhertz testified in this
3  case that she avoids flying and avoids other
4  activities like attending football games, being in
5  elevators and driving distances by herself due to
6  her anxiety.  Does any of that surprise you based on
7  what you know of Mrs. Frischhertz?
8      A.  No, it doesn't surprise me.  The, you
9  know, people that have anxiety disorders that are
10 significant enough to seek medication usually have
11 fairly significant anxiety disorders.  Otherwise,
12 the doctor will -- you know, I guess most doctors
13 would not prescribe medications during pregnancy.
14     Q.  And even though you weren't aware of
15 her -- of Mrs. Frischhertz having been diagnosed
16 with generalized anxiety disorder, you nevertheless
17 understood that she has significant anxiety and a
18 significant anxiety disorder; is that correct?
19     A.  Yes.
20     Q.  Did you evaluate the family history of
21 anxiety or depression?
22     A.  No.
23     Q.  Why not?
24     A.  Well, it doesn't really have anything much
25 to do with what I was asked to do for Evan.  In

Page 116

1  fact, it has nothing to do with that.
2      Q.  Does it have nothing to do with what you
3  were asked to assess, or does it really have nothing
4  to do with Evan?
5      A.  It has nothing to do with what I was asked
6  to do with Evan.
7      Q.  Okay.
8      A.  Again, I --
9      Q.  Which was to identify the --
10     A.  What could happen to Evan.
11     Q.  The worst case scenario, right?
12     A.  Right.
13     Q.  And if Evan were your private clinical
14 patient as opposed to being involved in litigation,
15 would you have explored family history of anxiety or
16 depression?
17     A.  Yes, I would.  Not once but probably many
18 times.
19     Q.  Would you agree that one of the strongest
20 predictors of the development of psychopathology,
21 including anxiety disorders in a child, is the
22 presence of psychopathology in an adult parent?
23     A.  Well, not exactly the way that you stated
24 it, but in general, that's true.  It's not just the
25 fact that the child is born in a household where

Page 117

1  there might be evidence of a parent having
2  psychopathology that causes the child to have
3  psychopathology.  There are all kinds of other
4  triggering events that could be a genetic
5  predisposition or inheritance.  In the case of
6  anxiety, I've already said that there's a definite
7  physiological pathway.
8      Q.  Is the same also true for depression?  In
9  other words, is the child's family history of
10 depression relevant to assessing whether a child may
11 ultimately develop depression?
12     A.  To a lesser extent and with a much less
13 direct pathway.  Anxiety is the most direct pathway.
14 When you have a prenatal anxiety situation in a
15 mother, that's a pretty definite pathway.  When you
16 have a parent or a grandparent or a related relative
17 who has depression, it doesn't necessarily -- it
18 adds to the risk factor, but it certainly does not
19 directly relate to the possibility of the person,
20 the child necessarily having depression.
21     Q.  Did you assess whether Evan has a family
22 history of depression?
23     A.  It was not mentioned in the two or three
24 places in the question that I offered.  It was not
25 mentioned, so I don't know.  It could be that there

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 118

1  is one. I didn't get any information about it. If
2  there is, I didn't know about it.
3      Q.  So it wasn't mentioned on the
4  questionnaire, right?
5      A.  Right. It wasn't, and it wasn't mentioned
6  in my interview with them.
7      Q.  Okay. Did you ask them --
8      A.  Yeah.
9      Q.  -- about the family history of depression?
10     A.  Yeah. It actually asks a more generic
11 question on the questionnaire. It's more like, is
12 there any family history of emotional illness?
13     Q.  Right.
14     A.  So, you know, somebody could say, gee, I
15 didn't consider depression an emotional illness, but
16 I did consider anxiety an emotional illness. But
17 that would be hard to believe in two
18 parents that are fairly well-educated.
19     Q.  So it's correct to say Evan has a family
20 history of anxiety; is that right?
21     A.  Yes, it's correct to say that.
22     Q.  And because of his family history of
23 anxiety, would you be able to rule out his family
24 history as a cause of anxiety if he did ultimately
25 develop an anxiety disorder?

Page 119

1      A.  Would I rule it out?
2      Q.  Right.
3      A.  No. It would certainly be a risk factor.
4  It would increase the risk for him developing it.
5      Q.  Do you believe that panic disorder tends
6  to run in families?
7      A.  Well, that's a little bit trickier
8  question. Panic disorder, if there's a strong
9  history of anxiety, let's say in a mother who
10 continued to have a panic disorder throughout her
11 child's life, it could -- it could cause the child
12 to learn to react in that way. It doesn't have to,
13 but it could. The kid may have anxiety but play out
14 in a different way. There's plenty of other
15 opportunities for anxiety to be manifest.
16     Q.  Okay. So would it be accurate to say
17 panic disorder is a risk factor, but it doesn't
18 guarantee that the child would ultimately develop an
19 anxiety disorder?
20     A.  If the mother had a panic disorder or --
21     Q.  Yes, if it's the mother.
22     A.  -- if the father had a panic disorder?
23     Q.  Right. First-degree relative like that.
24     A.  Yeah. I don't know that the father having
25 a panic disorder would necessarily increase the risk

Page 120

1  that much; but, again, as I said, if the mother had
2  a panic disorder during her pregnancy, the -- it's
3  the anxiety itself and how that would play out
4  physiologically in the womb that would increase the
5  child's risk of having some form of anxiety disorder
6  later on. And if there was enough of a panic
7  disorder in the household, let's say, as the child
8  was anxious, then the child may actually learn to
9  use panic as a form of playing out their own
10 anxiety. It's kind of a contorted answer, but
11 that's the best I can do for a question like that.
12     Q.  Were you aware that Andrea Frischhertz's
13 mother had anxiety?
14     A.  It would make sense, wouldn't it, because
15 what I just said was that she probably had anxiety
16 when she was pregnant for Andrea. It does look like
17 it's going to be recognized as a generational
18 phenomenon. It is not yet so recognized, but I
19 think that that is in the cards.
20     Q.  Okay. Are you aware that Andrea's brother
21 and maternal aunt also suffer from anxiety?
22     A.  I didn't take a family history, I say.
23     Q.  Would that be relevant in your analysis if
24 Evan were your patient as opposed to a litigation
25 client?

Page 121

1      A.  It would if they had anything to do with
2  Evan in the day-to-day child rearing. It would
3  certainly be relevant.
4      Q.  Is it fair to say that in formulating your
5  opinions in this case, you didn't consider or rule
6  out family history as an alternative cause for any
7  anxiety or depression that you say Evan might
8  potentially develop?
9          MR. DOODY: Object to the form of the
10         question.
11     A.  That wasn't my job to say where the
12 possibilities might come from. Looking only at --
13 that's an extrapolation beyond what I would ever
14 have done.
15 BY MS. SMITH:
16     Q.  Okay.
17     A.  That -- that actually is not something
18 that I would have done.
19     Q.  Okay. That wasn't what you understood
20 your job to do in this case; is that right?
21     A.  Well, first of all, we don't know that he
22 has anxiety. Let me start there. He doesn't, and
23 if he did have anxiety, then we might be interested
24 in finding out why he has more of it right now. But
25 he doesn't have anxiety, at least as far as you and

Susan R. Andrews, Ph.D.

Page 122

1  I have been able to determine, looking at the little
2  -- limited time I spent with the child, and the
3  reactions and the interactions I had with his
4  parents and with him, nobody said this child has
5  anxiety right now.
6      Q.  Right.
7      A.  Had he had anxiety right now, I might have
8  gone further into seeing how it manifests, but he
9  doesn't right this moment, as far as anybody knows.
10     Q.  Okay.  If Evan were to develop anxiety,
11 which is speculative, right?
12     A.  Yeah.
13     Q.  If he were, would you be able to rule out
14 family history as a cause of that anxiety?
15     A.  I thought I already answered that
16 question, but I'll answer it again.
17     Q.  It's a yes or no.
18     A.  No.
19     Q.  No.  Okay.
20     A.  You couldn't rule it out as a possible
21 contributor.  That doesn't mean it would be the only
22 contributor, but it's not possible to rule it out
23 since we know that the mother had anxiety.
24     Q.  So if Evan were to potentially develop
25 anxiety or depression, that would not be solely

Page 123

1  attributable to his hand, right?  It could also be
2  attributable to his family history; is that correct?
3      A.  The anxiety, yes.  We really haven't
4  established that at this point with the depression,
5  but with respect to anxiety, if he were to develop
6  anxiety and it were not just a social anxiety but
7  more of a generalized anxiety, then it would be more
8  likely that the mother's anxiety or the family
9  history, as you put it, of anxiety could have
10 contributed to the development of that.
11     Q.  So the family history could be a
12 substantial factor causing any anxiety in Evan in
13 the future; is that right?
14     A.  I didn't say substantial, but it certainly
15 is a factor.
16     Q.  Could it be a substantial factor?
17     A.  I don't know.
18     Q.  Okay.
19     A.  It would depend upon how it looked and
20 what kind of anxiety he had and what his own
21 personal history was that might have triggered it.
22     Q.  In fairness, you can't answer that
23 question because --
24     A.  We don't know enough.
25     Q.  -- we don't know, and it's speculative

Page 124

1  that Evan would even develop an anxiety disorder,
2  correct?
3      A.  It is speculative.
4      Q.  Are you going to tell the jury in this
5  case that, but for his hand, Evan would not develop
6  anxiety or depression?
7      A.  Am I going to tell the jury that, but for
8  his hand, he wouldn't develop anxiety?
9      Q.  Uh-huh.
10     A.  I don't think I will, no.
11     Q.  And if Evan were to develop anxiety or
12 depression in the future, would you be able to
13 differentiate between anxiety or depression caused
14 by family history and any other factor?
15     A.  You can take a fairly good attempt at that
16 by taking a good history of what had happened up to
17 the point that he first developed the anxiety,
18 looking for any triggering events in his lifetime
19 and being aware of the fact that he has a
20 predisposition, if you will, because of his history
21 with his mother to developing anxiety.  It just
22 makes it more likely then if there is some other
23 triggering event.  It doesn't mean that it's not due
24 to something else happening.
25         And with respect to the kind of anxiety,

Page 125

1  then you might have a better idea.  If it's just a
2  generalized anxiety, that's, you know, one kind of
3  situation.  If it's a -- if it's a social anxiety,
4  that's another kind of situation, and usually you'll
5  have something upon which to base that occurrence.
6      Q.  But this is all speculative at this point?
7      A.  I'm just speculating as you asked me to.
8      Q.  Okay.  Now, we've talked a little bit
9  about prenatal anxiety.  In other words, let's focus
10 on the anxiety or stress that Andrea experienced
11 during her pregnancy with Evan.
12         Do you know whether Andrea treated with a
13 psychiatrist during her pregnancy?
14     A.  I believe you just told me that she did
15 when we talked earlier before the break.  You said
16 that she had been treating with a psychiatrist since
17 1998, I believe.
18     Q.  I think it was that she had first treated
19 with a psychiatrist in '99.
20     A.  '99.
21     Q.  I apologize if I wasn't clear, but that
22 was, I think, what I intended to ask in the
23 question.
24         And would you be surprised to know that
25 Andrea Frischhertz testified in this case that she

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 126

1    had a hard time with anxiety during her pregnancy
2    with Evan?
3        A.  No.  She told me the same thing.
4        Q.  Okay.
5        A.  I wouldn't be surprised.
6        Q.  I take it you would agree that Andrea
7    experienced high levels of anxiety and stress during
8    her pregnancy with Evan?
9        A.  I don't know what level of stress and
10   anxiety she experienced.  I only know what she would
11   say.  She indicated that she felt she had a fair
12   amount of anxiety.  I don't know that she actually
13   estimated the level.
14       Q.  Did you ask her to estimate it?
15       A.  No.  It really wasn't relevant to the
16   questions that I was asking.
17       Q.  If --
18       A.  Again, it's just not.  Because I was asked
19   to look at what might happen to Evan, and we know
20   that he's -- I've agreed with you from the beginning
21   that because of his mother's anxiety, he would be
22   more likely to have an anxiety problem.  I can't say
23   any more than that.  And it doesn't matter how much
24   anxiety she actually had.  He would still be to some
25   extent predisposed to anxiety at this point.

Page 127

1        Q.  Okay.
2        A.  She could have a lot or a little.  It
3    might not make much difference to the developing
4    fetus.
5        Q.  Okay.  Your report in this case doesn't
6    address the role of prenatal anxiety in terms of it
7    being a risk factor for potential anxiety or
8    depression in Evan; is that correct?
9        A.  That's correct.
10       Q.  But if -- again, if Evan were your
11   clinical patient, you would have included that in
12   your analysis; is that right?
13       A.  Sure.
14       Q.  Okay.
15       A.  It would be very important if you were
16   treating Evan.  You'd probably want to also include
17   some family treatment and treatment of his mother,
18   as well.
19       Q.  Okay.  And would it also be important
20   because it's -- the prenatal anxiety is a risk, is a
21   risk factor in terms of Evan potentially developing
22   anxiety or depression?
23       A.  Yes.  But bear in mind, the prenatal
24   anxiety cannot be changed at this point.
25       Q.  Understood.

Page 128

1        A.  Okay.
2        Q.  But if you were looking at Evan as a
3    clinical patient and trying to analyze, as you do in
4    your daily psychological practice --
5        A.  You would definitely keep it in mind.
6        Q.  Right.
7            Okay.  Now, you mentioned a book that you
8    published this year.  It's called "Stress -- Stress
9    Solutions for Pregnant Moms"?
10       A.  Yes.
11       Q.  Okay.  How breaking free from stress can
12   boost your baby's potential, right?
13       A.  Yes.
14       Q.  Okay.  I just want to talk about some
15   aspects of the book.  They go to the issue of
16   prenatal anxiety and the ramifications for the
17   child, right?
18       A.  The first part of the book is a review of
19   the research in that, yes.
20       Q.  Okay.  And in the book, you say that
21   you've discovered a link between anxious pregnant
22   women and emotional problems that show up in their
23   children; is that right?
24       A.  No.  I haven't discovered it.  It is a
25   link that has been actually discovered by multiple

Page 129

1    different researchers.
2        Q.  Well, I under --
3        A.  What I did was I wrote about it.
4        Q.  Okay.  I understand you didn't do the
5    research, correct?
6        A.  Correct.
7        Q.  But in your book, you say you've
8    discovered an astonishing link between anxious
9    pregnant women and many behavioral and emotional
10   problems that show up in their children; is that
11   correct?
12       A.  Yeah.
13       Q.  Okay.  And, again, understanding that you
14   didn't do the underlying research, your book says
15   that there's a mounting body of evidence that
16   clearly links sustained high levels of stress and
17   anxiety during pregnancy to today's major issues of
18   birth and childhood, such as low birth weight,
19   pre-term birth, difficulty coping in emotional
20   situations, learning disabilities, attention deficit
21   and childhood anxiety; is that right?
22       A.  Yes.
23       Q.  Okay.  So you found this research so
24   compelling that you had to write a book on the issue
25   of the potential dangers that too much stress during

33 (Pages 126 to 129)

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 130

1  a pregnancy can pose for their children down the
2  road; is that right?
3      A.  That's right.
4      Q.  Okay.  Is the book self-published?
5      A.  Yes.
6      Q.  Okay.  And in the book, you wrote that the
7  information in the book is equal to, if not more
8  important, than the well-recognized warnings for
9  expecting mothers to avoid alcohol and stop smoking;
10 is that right?
11     A.  Yes.
12     Q.  Do you think that maternal prenatal
13 anxiety and stress is more dangerous to the child
14 than a mother's prenatal use of alcohol and
15 cigarettes in terms of their mental health?
16     A.  I'm not sure I can answer that question
17 the way that you phrased it.  Would you -- would you
18 ask it again, please?
19     Q.  Maybe I'll just make it more simple.  Do
20 you think that maternal prenatal anxiety and stress
21 is more dangerous to the child than a mother's use
22 of alcohol and cigarettes?
23     A.  No.  I think they're probably -- they're
24 very different.  A mother's use of alcohol and
25 cigarettes, particularly to excess during pregnancy,

Page 131

1  has a different set of consequences, if you will.
2      Q.  Okay.  And what your book is designed to
3  do is to educate people that high levels of prenatal
4  stress can cause developmental and emotional issues
5  in their children; is that right?
6      A.  Yes.  And the next step is to offer
7  solutions for dealing with it while you're pregnant.
8      Q.  Okay.  And you've written in your book
9  that a mother's prenatal anxiety does make it more
10 likely that her child will have problem behavior and
11 reduced emotional adjustment later in life, correct?
12     A.  Right.  It's an increased risk factor.
13     Q.  It's not a guarantee?
14     A.  Absolutely not.
15     Q.  Just like Evan's hand is not a guarantee
16 that he'll encounter mental problems in the future?
17     A.  That's correct.  There are some people --
18 I mean, there was a Saint who had a -- he was a
19 football kicker.  He had a disformed foot, for
20 example, and I met the man on several occasions, and
21 I will tell you that I don't think he has any
22 emotional difficulties.
23     Q.  Okay.
24     A.  It doesn't mean that you will, --
25     Q.  Right.

Page 132

1      A.  -- but it increases the potential.
2      Q.  And your book reports that problems
3  associated with maternal stress and anxiety include
4  anxiety and depression in the children; is that
5  right?
6      A.  Yes.
7      Q.  You've also written, I think, in your book
8  that prenatal stress is associated with low birth
9  weight; is that right?
10     A.  Yes.
11     Q.  Did Evan have a low birth weight?
12     A.  I don't know.
13     Q.  His weight at birth was 5 pounds, 7
14 ounces.  Do you consider that low birth weight for a
15 full-term baby?
16     A.  Yes.  I think that would be, yeah.
17 It's -- the low birth weight is primarily associated
18 with the early birth.  I don't know if Evan was
19 early term or not.
20     Q.  He was full term.
21     A.  Yeah.
22     Q.  Thirty-nine weeks.
23     A.  But the low birth weight, of course, is
24 highly correlated with being born a little bit
25 early.

Page 133

1      Q.  Okay.  You say in your book that many
2  studies report and support the relationship between
3  prenatal stress and childhood anxiety; is that
4  right?
5      A.  Yes.
6      Q.  You didn't cite any of those studies in
7  your report in this case; is that right?
8      A.  Correct.
9      Q.  You say in your book that the children of
10 high-stress pregnancies can also have problems with
11 depression and show exaggerated reactions to stress;
12 is that right?
13     A.  Uh-huh, yes.
14     Q.  Your book also mentions that small babies
15 are more likely to develop depression in later life;
16 is that right?
17     A.  Yes.
18     Q.  Is Evan more likely to develop depression
19 in later life because he was a small baby?
20     A.  Well, again, we're talking about risk
21 factors.  There's not a one-to-one correlation
22 between any of these things.
23         What happens is, if you essentially add up
24 a large column of risk factors, then very often what
25 that does is it tips you over into the problem later

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 134

1  on, and you can't necessarily say that it's this one
2  thing or that one thing, but maybe the accumulated
3  weight, if you will, of several stress factors.
4      Q.  Would you agree that prenatal anxiety is a
5  significantly better predictor of childhood problems
6  than the mother's depression or anxiety after the
7  child is born?
8      A.  Sure.  That's a fact.  That's a fact
9  that's been demonstrated in a number of studies.
10     Q.  Okay.  So you wrote this book about
11  prenatal anxiety and its -- and the likelihood of a
12  child developing anxiety and depression because of
13  it, but you didn't mention anything about it in your
14  report.
15     A.  Correct.
16     Q.  Okay.  Do you believe that Evan's
17  likelihood of developing anxiety or depression is
18  increased by his mother's prenatal anxiety?
19     A.  I think it's certainly an increased --
20  yeah, it's a factor.
21     Q.  And if Evan ultimately developed anxiety,
22  you wouldn't be able to rule out his mother's
23  prenatal anxiety as a cause, correct?
24     A.  We've already discussed that, yes.
25     Q.  If Evan ultimately developed depression,

Page 135

1  would you be able to rule out his mother's prenatal
2  anxiety as a cause?  I think your book links the
3  prenatal anxiety to --
4      A.  I understand.  I understand the question.
5  It's just that you need to be careful with the --
6  with the question and the answer that leads you to
7  saying that there's a direction connection.
8      Q.  Or a cause.
9      A.  And you just can't do that in this
10  situation.  So I'm always hesitant to just answer
11  that question yes, because it's misleading.
12     Q.  Would you be more comfortable with
13  the term "risk factor"?  In other words, --
14     A.  Yes.
15     Q.  -- you would say that if -- you would
16  agree that if Evan ultimately developed depression,
17  you wouldn't be able to rule out his mother's
18  prenatal anxiety as a risk factor?
19     A.  As a cause -- as a potential cause; as a
20  potential contributor, if you will, to what happens,
21  yes.
22     Q.  Do you distinguish between risk factor and
23  cause?  Do you make a --
24     A.  Yes.
25     Q.  Okay.  How do you define them?

Page 136

1      A.  Well, in -- in logic, a cause is a direct
2  one-to-one sort of relationship.  A risk factor in
3  genetics in the kinds of things that we're talking
4  about basically is increasing a probability that
5  something might actually manifest, so you're several
6  steps back from a cause.
7      Q.  With that definition in mind, are you more
8  comfortable categorizing family history of anxiety
9  as a risk factor?
10     A.  Yes.
11     Q.  And are you comfortable -- or would you
12  agree that the prenatal anxiety of the mother is a
13  risk factor for her child developing --
14     A.  Yes.
15     Q.  -- anxiety or depression?
16         And would you agree that having a
17  congenital disfigurement is a risk factor for
18  anxiety --
19     A.  Yes.
20     Q.  -- and depression?
21         You don't consider any of those three
22  causes?
23     A.  That's correct.
24     Q.  Is the same true for teasing and bullying?
25  In other words, do you consider teasing and bullying

Page 137

1  risk factors for development of anxiety and
2  depression?
3      A.  Among other things, yes.
4      Q.  You don't consider them to be established
5  as causes of anxiety and depression?
6      A.  No.  It could make the child into a bully,
7  for example.  That often is one of the things that
8  can happen.  There's a number of things that can
9  happen, and so what you can say essentially is any
10  number of things could happen or nothing.  Or it
11  could be a positive outcome.  If the kid would
12  develop some kind of new way to deal with and cope
13  with that kind of thing, which he then passes on to
14  friends.  I mean, there's a variety of
15  possibilities.
16     Q.  Since you can't rule out prenatal anxiety
17  as a risk factor for anxiety and depression, is it
18  correct that you can't reliably conclude that any
19  future anxiety or depression would be caused by the
20  hand?
21     A.  Well, it's just as much of a risk factor,
22  depending on what the history might be.  If there's
23  a long history, let's say, of several years of being
24  teased about that one particular thing, you
25  certainly would agree with me, I hope, that you

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 138

1  couldn't rule that out as being part of the
2  triggering cause for the anxiety.  So it's still
3  a -- it's a risk factor, and depending upon your
4  history, you can see whether or not that risk factor
5  is going to be played up or played down.
6      Q.  I think you're getting into gradations and
7  strengths of risk factors, perhaps.  So let me ask
8  you this:  Can you say to a reasonable degree of
9  scientific certainty that Evan is more likely to
10  develop anxiety or depression because of his hand
11  than because of his family history of anxiety?
12      A.  No.
13          MR. DOODY:  Object to the form of the
14      question.
15      A.  I would never say because of his hand, in
16  fact.  What I said was, because of his hand, he is
17  more likely than not going to be teased.  In fact,
18  we already know that he shows a great deal of
19  self-consciousness about his hand.  Those are the
20  things that may lead to later -- later difficulties,
21  but it's secondary to the fact that he has the
22  problem that makes him feel different and look
23  different from the other kids.  It's not a direct
24  cause.  It's secondary.
25  BY MS. SMITH:

Page 139

1      Q.  What's secondary?
2      A.  The development of a problem such as
3  anxiety or such as whatever, depression.  Those are
4  the only two that you've really talked about.  There
5  are other things that could be in that category,
6  loss of self-confidence.  There's a large number of
7  things, reduced performance at school.  But we've
8  just talked about anxiety and depression, and
9  certainly, if somebody didn't have any kind of
10  triggering events in the environment during their
11  growing up period that might have caused anxiety,
12  but they do show anxiety, then you would certainly
13  look to the things that you already know, which is
14  the family history of anxiety, as being potentially
15  the main risk factor that caused it to manifest.
16      Q.  But you would rule it out as a main risk
17  factor if the child had a hand abnormality like
18  Evan?
19      A.  I would rule it out if the child had a
20  history of being teased and abused, not the hand.
21  I'm not dealing with the hand.  I'm still not
22  dealing with the hand.
23      Q.  Okay.
24      A.  I'm dealing with the potential of him
25  being teased or bullied as a result of having

Page 140

1  something like the hand.
2      Q.  That has to be an intervening factor to
3  get you to --
4      A.  That has to be.
5      Q.  Okay.  Now, you've already said that you
6  didn't address the family history of anxiety and
7  also, in particular, the prenatal anxiety that
8  Mrs. Frischhertz experienced, and those are not
9  discussed in your report; is that right?
10      A.  Yes.
11      Q.  And I take it you didn't take those into
12  account in formulating your opinion?  I think you've
13  already said yes to that.
14      A.  Yes.
15      Q.  Your report conveys the impression that
16  Evan may develop anxiety or depression because of
17  his hand abnormality and not related to other risk
18  factors, if you will; is that accurate?
19      A.  That's not true.  If you read my report,
20  it says that there's psychological damages from
21  teasing and bullying and that one of the biggest
22  problems that he may face in the future because of a
23  disability that he has is the teasing and the
24  bullying and the heightened awareness of being
25  different and the fact that there's some things in

Page 141

1  his life as he's growing up that he won't be able to
2  do as well as other kids.  Those are the things that
3  I say may be causing a potential for later problems,
4  and those things are listed or talked about because
5  they're a result of him having a problem with his
6  hand.
7      Q.  So your report neither considers nor rules
8  out these alternative risk factors that Evan has,
9  such as family history and the prenatal anxiety; is
10  that accurate?
11      A.  That's still accurate, yes.
12      Q.  Now, although you don't recognize or
13  discuss the family history or the prenatal stress in
14  your report, or being small, being born small, for
15  that matter, you recognize them in your book; is
16  that correct?
17      A.  About Evan?  No.
18      Q.  No.  Just generally, as being risk factors
19  for anxiety and depression.
20      A.  Yes.  Of course, they are.
21      Q.  Okay.  Can you rank family history,
22  maternal prenatal stress, being born small and
23  having a hand deformity in terms of which is more
24  likely to lead to an anxiety disorder or depression?
25  And what would your basis be for doing so?

36 (Pages 138 to 141)

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 142

1      MR. DOODY:  Object to the form of the
2    question.
3 BY MS. SMITH:
4    Q.  It's really two questions.  I apologize.
5    A.  Yeah, two questions and kind of unusual
6 questions at that.
7    Q.  Okay.
8    A.  Can I rank them?
9    Q.  Let me rephrase it.
10    A.  Yeah.
11    Q.  I mean, are some recognized and more
12 established as risk factors than the others?
13    A.  Well, being born with a small hand is not
14 in that category, actually.  I want to go back to
15 that again, and I'm not saying that.  I haven't ever
16 said that.
17    Q.  Okay.
18    A.  What I said is being born with a
19 disability that's obvious to other people would
20 potentially cause you to have teasing and bullying
21 and really the extent of my report is pretty much
22 that.  I'm not trying to go into Evan's birth
23 history.  I wasn't asked to say anything about his
24 family history.  I was just asked to say what could
25 happen to him as a result of being born this way.

Page 143

1    Q.  Okay.  And because --
2    A.  So can I say that having an obvious
3 developmental disability would probably lead you to
4 being bullied or teased if the circumstances were
5 correct?  Yes, that's -- I would say that that's a
6 good possibility.
7    Q.  It would depend on the circumstances?
8    A.  You'd have to find the circumstances or
9 they'd have to find you too.
10    Q.  Okay.  Okay.  Given that you'd -- you're
11 not putting the hand deformity in the same category
12 as family history and maternal prenatal stress,
13 would you agree that family history and prenatal
14 stress and anxiety are more likely to lead to
15 potential anxiety and depression than the existence
16 of a hand abnormality, since you do factor out that
17 hand abnormality?
18    A.  No.  I wouldn't say that we have any way
19 of making that statement.  The hand abnormality is
20 not going to cause people to have anxiety and
21 depression just in and of itself.
22    Q.  Right.  I understand what you're saying.
23 And because of that, isn't it accurate to say that
24 the family history of anxiety disorder and the
25 prenatal anxiety are better predictors of potential

Page 144

1 anxiety and depression than the existence of the
2 hand abnormality, which depends -- the hand
3 abnormality depends on lots of factors, whether
4 there's teasing and bullying, how -- you know, I
5 mean, you can --
6    A.  How different you feel.
7      MR. DOODY:  Object to the form of the
8    question.
9 BY MS. SMITH:
10    Q.  Right.  That's the context of my question.
11 I understand what you're saying about you consider
12 the hand abnormality and it to be in a different
13 category because it's -- the potential for that to
14 cause a problem is dependent on many more factors, I
15 take it, than having a family history of anxiety and
16 having a mom who had anxiety and stress during the
17 pregnancy?
18    A.  Right.  Had I been asked to respond to
19 what would happen to this child if his mother had
20 anxiety when she was pregnant, the question would be
21 answered in a different way.
22    Q.  Understood.
23    A.  But if you're asked to say what would
24 happen because you have a hand abnormality, then you
25 get this set of answers.

Page 145

1    Q.  Right.
2    A.  Which basically says that if you do get
3 teased or bullied, or if you feel like you're
4 different, or if you feel like other people can do
5 things that you wish that you could do and can't and
6 how that might affect you, those are the kinds of
7 things that I was responding to.  So I don't say
8 that one is more than the other likely to do
9 something, because I didn't put the other group, the
10 prenatal anxiety, into the picture at all.
11    Q.  But you would in your clinical work, in
12 your daily non-litigation work as a psychologist,
13 right?
14    A.  If I was trying to help this youngster not
15 be anxious or not be this or not be that, certainly,
16 these other factors would be important, yes.
17    Q.  And if you were just trying to ascertain
18 what the chances are that this child might
19 experience problems in the future, you would have
20 considered the family history and the prenatal
21 stress and anxiety, correct?
22    A.  It would be part of the picture.
23    Q.  Okay.  Now, we've already looked at your
24 note in Exhibit 13 that -- regarding Andrea having
25 anxiety and being on medications.  Correct me if I'm

37 (Pages 142 to 145)

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 146

1  wrong, but I think it's fair to say that you don't
2  have any independent knowledge of the medications
3  that Andrea Frischhertz took?
4      A.  That's correct.
5      Q.  You don't know the dose, duration, amount
6  or timing of any Paxil that she took, right?
7      A.  That's right.
8      Q.  Do you know why she was taking Paxil?
9      A.  All I know is that she said she had
10 anxiety and that she was being treated for it and
11 she was given Paxil.
12     Q.  And you don't know when in the pregnancy
13 she was taking it?
14     A.  I believe it was the first trimester.
15         MR. DOODY:  We've established that,
16     ma'am, time and time again.
17     A.  It was the first trimester, she said, and
18 it's in my notes.  That's all I know.
19 BY MS. SMITH:
20     Q.  So is it your understanding that she only
21 took it in the first trimester?
22     A.  That's what I was told.  I don't know that
23 "only" is the right word.  I know that she took it
24 in the first trimester.  Do I know that she took it
25 before that and after that?  No, I don't.

Page 147

1      Q.  I take it you didn't ask her during the
2  meeting you had with her?
3      A.  Correct, I did not.  I was not asked to
4  try to establish a relationship between Paxil and
5  any of the things that happened to Evan.
6      Q.  I understand.
7          Are Andrea's medications during pregnancy
8  relevant to your opinion?
9      A.  No.  I was not asked to offer any opinion
10 about her medications.
11     Q.  Okay.
12     A.  And it's not really an area that I could
13 say I have any expertise in anyway.
14     Q.  Okay.  Now, going back to your notes that
15 have been marked as Exhibit 13, you have a notation
16 regarding an ultrasound, first ultrasound.  What was
17 your understanding -- or, actually, let me strike
18 that.
19         What was your discussion that is -- with
20 the Frischhertzes that's reflected in these notes on
21 that?
22     A.  Are you reading the fifth sentence, the
23 first ultrasound noticed --
24     Q.  Yeah.
25     A.  -- abnormality on the heart?

Page 148

1      Q.  That's right.
2          Did you have a discussion with the
3  Frischhertzes about that?
4      A.  No.
5      Q.  Okay.
6      A.  Not any more than the fact that the doctor
7  wanted to do an amniocentesis and they did
8  high-level ultrasounds several times, that it was a
9  difficult pregnancy, you know, really basically
10 what's in my notes.
11     Q.  Okay.  And right under that, in your
12 notes, you say, it indicates born PDA, AST, mild
13 aortic insufficiency, right?
14     A.  Yes.
15     Q.  What was the substance of your discussion
16 with the Frischhertzes about Evan's heart?  Did you
17 talk about it much?
18     A.  No.  Only that they also said that the
19 heart condition seemed to resolve itself without
20 surgery.
21     Q.  Now, I take it you also had a discussion
22 about Evan's hand; is that right?
23     A.  Yes.
24     Q.  And your notes say -- correct me if I'm
25 wrong -- right hand abnormality, no specific

Page 149

1  diagnosis, smaller than his left, does not have full
2  bone in middle two fingers, doesn't bend except at
3  palm, can make a claw with it; is that right?
4      A.  Yes.  He had some OT a year or so.
5          COURT REPORTER:  I'm sorry.  Say it
6      again.
7      A.  He had some occupational therapy for about
8  a year, working on handwriting, and that the
9  pediatrician, Dr. Ellen McLean, thought he was
10 dealing with it well enough on his own.
11 BY MS. SMITH:
12     Q.  Do you know Ellen McLean?
13     A.  Yes.
14     Q.  Do you respect her opinion?
15     A.  Yes.  I mean, it depends.  If she offers
16 an opinion on psychology, not necessarily, but
17 certainly I respect her medical opinion.
18     Q.  That's what I was getting at.  Thank you.
19         Did the Frischhertzes tell you or were you
20 aware that Evan has no restrictions from his
21 physicians concerning his hand?
22     A.  Did they tell me?  No.
23     Q.  Did you ask whether he has any
24 restrictions?
25     A.  No, I didn't.  I mean, if it -- if he had

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 150

1  had restrictions, it would have come up in the
2  conversation.
3      Q.  Did the Frischhertzes tell you or were you
4  aware that Evan's hand specialist considers Evan to
5  have excellent function of his hand?
6      A.  I don't have any information about the
7  hand specialist, so I don't know.
8      Q.  Okay.  I take it, then, you're not aware
9  that Evan's hand specialist indicated that Evan is
10 compensating in a remarkable manner and that he's
11 adapted very well with his hand?  Were you aware of
12 that?
13     A.  No.  I don't think that I was not aware of
14 it.  I mean, I -- they didn't specifically quote me
15 those kinds of pieces of information.
16     Q.  Sure.
17     A.  But you can tell by looking at the child
18 that he was adapting to it fairly well.  He did have
19 a problem with the adaptation, however.  He's
20 obviously already becoming self-conscious about it
21 because he hides it when he's talking to you.
22     Q.  Okay.
23     A.  And you wouldn't exactly hide your hand if
24 you weren't a little conscious about it.  That's my
25 interpretation.

Page 151

1      Q.  And going back to Ellen McLean, were you
2  aware that she considers the hand functional and
3  agrees that Evan has excellent function of the hand?
4      A.  I can't argue with -- with that at all.
5  I'm not in a position -- I think I've already
6  stated -- to make any kind of determination of
7  functionality of the hand.
8      Q.  You mentioned before, I think because it's
9  in your notes, about the OT, meaning occupational
10 therapy.  Is it your understanding that Evan is
11 currently undergoing occupational therapy?
12     A.  I don't know.
13     Q.  And the OT that's referenced in your
14 notes, is that the handwriting class that you
15 referenced earlier?  Is it your understanding that
16 he's in additional occupational therapy?
17     A.  I believe that that was a handwriting
18 class.
19     Q.  Okay.  So this note about Dr. Ellen McLean
20 thinking that Evan was dealing with it on his own
21 well, that's in your notes, right?
22     A.  Yes, it is.
23     Q.  That's something the Frischhertzes told
24 you, I take it?
25     A.  Yes, it is.

Page 152

1      Q.  You didn't have a conversation with
2  Dr. McLean about that?
3      A.  No, I didn't.
4      Q.  Okay.  Do you agree that Evan is dealing
5  well with his right hand?
6      A.  Do I agree with Dr. McLean in this
7  instance, you mean?
8      Q.  Yeah.  Yes.
9      A.  Not necessarily, no.
10     Q.  What is your point or points of
11 disagreement?
12     A.  Well, I think that Evan is already -- and
13 I've said this three times.  I hate to keep saying
14 it, but I will say it one more time.  He's
15 developing self-consciousness already with his hand,
16 which bodes badly for the future since he's only
17 6-and-a-half, 7 years old, and he's already
18 beginning to hide it.  He puts it under his coat.
19 He puts it under his leg.  He encloses it in his
20 left hand when he is talking, and if he moves his
21 right hand out to gesture or say something, he
22 immediately puts it back into the other hand.  This
23 was just, you know, obvious little observations that
24 I made in the short time that I spent with Evan.
25     We didn't talk about the hand.  We didn't

Page 153

1  talk about anything except his school, so it wasn't
2  about the hand.  It was just an easy meeting.  I
3  didn't want to bring up anything that would upset
4  him in any way, and his mother was present during
5  the meeting.
6      Q.  Your notes also state that Evan was
7  tested, did well -- I'm at the bottom of that first
8  page, Dr. Andrews.  99th percentile, does that refer
9  to his IQ testing?
10     A.  No, it refers to his reading.  Apparently,
11 Metairie Academy did some testing.
12     Q.  Okay.  Have you produced -- did you review
13 the testing before you met with the Frischhertzes?
14     A.  I never had Metairie Academy's testing.
15     Q.  Okay.  So they're reporting this to you?
16     A.  I had the testing done from the
17 psychologist, I think --
18     Q.  Dr. --
19     A.  -- McGrath or something like that, when
20 she -- she saw him prior to starting school.
21     Q.  Right.  It is Dr. McGrath.
22     That was the only testing you had, you
23 reviewed?
24     A.  Correct.
25     Q.  Is Evan doing well in school?

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 154

1    A.  I don't know.  His mother said that he was
2  when I saw him in January.  I don't know how he
3  finished the year.
4    Q.  Up to the point you had met with the
5  Frischhertzes, had Evan done well in school?
6    A.  Yes.  Up to that point, she indicated that
7  he had.  He was testing well.  He was doing well in
8  reading and about a B level in math.
9    Q.  Okay.  Let's go to the next page of your
10  notes, Exhibit 13, Dr. Andrews.  At the top of that
11  page 2, it says, kids starting to notice his hand,
12  make comments to him, quote, funny hand dash little
13  hand.  He does get upset about it.  He's very
14  well-adjusted, smart kid.
15        Could you tell us the conversation you had
16  with the Frischhertzes about the hand and the
17  comments that Evan is receiving?
18    A.  This basically gives you a good summary of
19  the conversation I had with them.
20    Q.  Okay.
21    A.  You know, basically, his parents said that
22  the kids in the school were beginning to notice it;
23  they were beginning to make comments to him, and he
24  was upset about it.  But, overall, he's
25  well-adjusted, and, overall, he's a smart kid.

Page 155

1  That's basically what they said.
2        The parents were not quick to try to make
3  this boy into some kind of anxious, depressed child.
4  They were clear on the fact that they wanted the
5  best for him and that they saw him in a very
6  positive manner.
7    Q.  Did you also see him in a very positive
8  manner?
9    A.  I think I've said that several times, yes,
10  except for what I've already testified to.
11    Q.  Okay.  And the comments that have been
12  made to him, do you know how many times such
13  comments have been made?
14    A.  I do not.  Nor do they.  That's the kind
15  of thing that, when it happens, kids don't always
16  come home and report to their parents.  They may
17  report it only when it really gets to them badly and
18  it's happened many times, or it may have only
19  happened once, and they reported it.
20    Q.  You just don't know?
21    A.  Nobody really knows.
22    Q.  Okay.  Fair enough.
23    A.  And it's not the kind of thing that you'd
24  want to ask a 6-and-a-half-year-old either, because
25  they won't know the answer to that question.

Page 156

1  They're not good at that kind of history.
2        THE VIDEOGRAPHER:  You have about 10
3    minutes.
4        MS. SMITH:  Thank you.
5  BY MS. SMITH:
6    Q.  What else did you discuss in terms of
7  comments made to Evan about his hand?
8    A.  From his parents, that was pretty much the
9  extent of our conversation about comments made to
10  him about his hand.
11    Q.  Now, I take it you're not aware that
12  Andrea Frischhertz testified that the comments from
13  Evan's schoolmates regarding his hand are all very
14  innocent.  Were you aware of that?
15    A.  No, I think she did say something like
16  that.  She doesn't feel as if the kids were trying
17  to be ugly at that point, but they were small, too,
18  and they're not at the point where they would
19  necessarily do that, but they're saying funny hand
20  or little hand.  They don't mean to -- they're not
21  being ugly or pejorative in that respect.
22    Q.  Okay.  Are the comments observational in
23  nature?
24    A.  They could be.  I don't know.  I wasn't
25  there.

Page 157

1    Q.  Well, I'm -- okay.  What's your
2  understanding of the nature of the comments?
3    A.  Well, I mean, just what I've told you.
4  It's -- I'm not disagreeing with the fact that they
5  might be at this point still fairly innocuous.
6    Q.  Okay.
7    A.  They're not intending -- the kids don't
8  seem to be intending to cause harm.
9    Q.  Okay.  In fact, the comments would be
10  pretty normative behavior for 7-year-old kids; is
11  that right?
12    A.  Pretty much.
13    Q.  Are the comments that have been made to
14  Evan about his hand mean-spirited or taunting in
15  nature?
16    A.  It is still the same answer.  No, not yet.
17  Not so far as we know.
18    Q.  And they might not ever be, correct?
19    A.  It's a possibility.
20    Q.  Would you agree that an important aspect
21  of Evan's psychosocial functioning is his parents'
22  reaction to his hand?
23    A.  Yes.
24    Q.  And did you assess how Andrea and Brad
25  Frischhertz are reacting to the hand?

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 158

1      A.  I think I have really spoken to that.
2  He -- his -- both parents, I think, are very loving.
3  They try to see him as being just a normal kid.
4  They -- they describe him that way.  They try to
5  interact with him that way.
6      Q.  Okay.  Is that reflected in your report,
7  or was that something you didn't consider in
8  formulating your opinion?
9      A.  Actually, I don't know that I said that
10 specifically, but I did say that he has a very good
11 relationship with his brother and with his parents,
12 and that his parents are doing -- I think my words
13 were doing the best that they know how to do to help
14 them -- this child grow up with as few problems as
15 possible.  I think that that is in the summary, and
16 if not, it's a page or two before.
17     Q.  But does --
18     A.  Evan and his parents may be able to reduce
19 the damages of some of the worst problems with good
20 therapists.  Let's see.  It's before that some
21 place.
22     Q.  But does the report recognize that the
23 parents' reaction to the hand and the things you
24 just cited in your report are an important aspect of
25 how he will deal with the hand; in other words, it's

Page 159

1  an important aspect of his psychosocial functioning?
2  Is that indicated in your report?
3      A.  I think it is, yes.
4      Q.  Okay.  Do you equate teasing and bullying?
5      A.  They're really different, but they have
6  much the same consequences.  There -- some teasing
7  is bullying, but they're actually two different
8  kinds of psychological events.
9      Q.  What's your definition of bullying?
10     A.  Well, bullying is usually, as you know
11 from the definition of the word "bully," is designed
12 to get somebody to, you know, to feel like they're
13 less than you basically, push them around, get them
14 to do something you want them to do, get them to
15 look at you as being stronger or smarter, whatever.
16     Q.  There's an element of ostracism to it
17 or --
18     A.  Could be.  Doesn't have to be, but there
19 could be.
20     Q.  And I think you've said Evan is not
21 currently being bullied; is that correct?
22     A.  I think I did say that.
23     Q.  What's your definition of teasing?
24     A.  Well, teasing picks out a characteristic
25 of the individual that people can kind of make fun

Page 160

1  of or taunt you a little bit about, but not
2  necessarily with the same intention always of being
3  negative.  Not necessarily always negative, but it
4  can be -- despite that, it can still be taken by the
5  individual -- even though the people doing the
6  teasing may not intend it to be harmful, the person
7  may take that kind of exception to it.  You don't
8  always know.
9      Q.  And I think you've said Evan is not
10 currently being teased; is that right?
11     A.  I think I said that, yes.
12     Q.  Your notes -- going back to Exhibit 13,
13 page 2, your notes also state, people who don't see
14 him every day do notice it?
15     A.  Are you talking about the hand?
16     Q.  Yes, talking about the hand.
17     A.  Yes, uh-huh.
18     Q.  So what do those -- what does that note
19 reflect?
20     A.  That the parents said that people who
21 don't see him every day do notice it.  I guess the
22 opposite would also be true, that people who see him
23 every day might not continue to notice it as much.
24 And that's typically true for almost anybody that
25 you have a difference -- that would have a

Page 161

1  difference.  After a while, if you see that person
2  all the time, that difference, whatever it might be,
3  begins to fade from your conscious awareness.  It's
4  much more obvious when you first meet someone, and I
5  think that's what that note reflects.
6      Q.  You had mentioned earlier, when we were
7  talking about the facial scarring on some of the
8  litigation adolescents you were addressing, that
9  their facial scarring was obvious, I think is what
10 you said.  Is the obviousness of a physical
11 abnormality a factor in how it might impact a
12 child's psychosocial function?
13     A.  Well, it can be, and then again, it might
14 not be.  There are certain developmental stages and
15 certain kinds of personalities that would take a
16 small scar, let's say, or a small change in
17 hairstyle, which would not be obvious to most
18 observers as being extremely a big deal, and might
19 make much of that; whereas, you know, the parent or
20 the other adults around might say, gee, that's
21 really -- I don't even notice it, and they wouldn't
22 necessarily take that as comfort.
23     Q.  Going back to your notes at page 2, your
24 notes state, he is very well-adjusted, smart kid.
25         Is it your opinion that Evan is very

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 162

1  well-adjusted?
2      A.  Yes.  Right now I think he is.  I think
3  he's well-adjusted.  I don't know about very, but
4  he's certainly well-adjusted to the situation that
5  he's in at this point, as far as I can tell.  Please
6  remember I had 30 minutes with Evan.
7      Q.  Understood.
8      A.  This is his parents talking.
9      Q.  Right.
10      A.  They consider him well-adjusted.
11      Q.  Okay.
12          THE VIDEOGRAPHER:  About 2 minutes.
13  BY MS. SMITH:
14      Q.  Do you relay -- let me strike that.  Do
15  you state in your report that Evan is very
16  well-adjusted?
17      A.  I think so.
18      Q.  Okay.  Where is that addressed in your
19  report?
20      A.  Evan presents as a handsome, smiling
21  youngster.  He relates easily to others and speaks
22  well.  Conversation and questions related almost
23  entirely to his school.  He was at ease, not worried
24  about what he might be asked.  A key observation
25  was, though, about his hand.  In a separate

Page 163

1  interview -- let's see -- his parents --
2      Q.  I was just looking for the term "very
3  well-adjusted."
4      A.  Oh, you just wanted it to be one way?
5      Q.  Well-adjusted.  Well, --
6      A.  I'm sorry.  I may or may not have said
7  very well-adjusted.
8      Q.  Okay.
9      A.  That's a term that doesn't mean much in
10  psychology.  It's kind of a global term that street
11  people use.  You know, so parents might say it and
12  they mean one thing by it; you might say it and mean
13  another thing by it.  So it's not necessarily a term
14  that I would necessarily use.
15      Q.  Okay.
16      A.  I might have reported that the parents
17  said that, but I think I tried to give the
18  impression in the way that I wrote the report in
19  describing Evan that he was well-adjusted.
20      Q.  Okay.  So I had asked you a few minutes
21  ago if you agreed with that, your note that Evan is
22  very well-adjusted, and you said yes right now.  But
23  now I understand you view that as a lay person's
24  term.  So in a clinical term, what would you say
25  about Evan?

Page 164

1      A.  Well, I have --
2      Q.  In terms of his adjustment?
3      A.  -- just said that.  In terms of
4  adjustment?  Well, the thing is, for me to respond
5  to Evan's adjustment would really require for me to
6  know a little bit more about Evan personally.  I
7  mean, it's kind of like the same thing that would
8  happen if somebody came to you for a diagnosis and
9  they spent 10 or 15 or 20 or 30 minutes with you,
10  and then gave you a diagnosis, I would guarantee you
11  that you would feel as if they didn't know very much
12  about you, and that would be a true thing.  I have
13  to rely upon what his parents said, and my initial
14  impression of the child was that he was, you know,
15  certainly appropriate.  He was socially appropriate.
16  He was polite.  He was responsive to questions.  He
17  sat for the period of time that we talked.  Those
18  things would indicate that he doesn't have behavior
19  problems of major proportions.
20      Q.  Or of any proportions, right?
21          THE VIDEOGRAPHER:  I need to change
22      the tape.
23      A.  Yeah.  I mean, I can't keep saying any
24  other way that he was --
25          MS. SMITH:  I think we're out of tape.

Page 165

1  I'm sorry.
2          THE VIDEOGRAPHER:  Yeah, I need to
3      change the tape.  I'm sorry.
4          MS. SMITH:  I'm so sorry.
5          THE WITNESS:  No problem.
6          THE VIDEOGRAPHER:  The time now is
7      4:22 p.m.  We are now off the record.
8      This is the end of tape 3.
9  (Recess.)
10          THE VIDEOGRAPHER:  The time now is
11      4:26 p.m.  We're now back on the record.
12      This is the beginning of tape 4.
13  BY MS. SMITH:
14      Q.  Dr. Andrews, a few moments ago before our
15  brief break, you were mentioning that you didn't
16  have a lot of time with Evan, and so, you know, your
17  observations about him were based on a 30-minute
18  meeting with him; is that right?
19      A.  Yes.
20      Q.  In your clinical practice, do you
21  typically rely on what the parents say without
22  spending much time with the child, or would you
23  spend more time with the child in your clinical
24  practice?
25      A.  Well, typically, what you do in a clinical

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 166

1  situation is you may spend a little bit of time with
2  the parent at the very beginning, and after that,
3  you spend the rest of the time with the child.
4      Q.  Okay.  Let's focus back on Exhibit 13,
5  page 2.  In the middle of the page, I think your
6  notes say, he is becoming aware of things he can't
7  do, and then you have a list there; is that right?
8      A.  Yes.
9      Q.  Okay.  What was the basis for this list
10 that you made?  Is this what the Frischhertzes told
11 you, or did you come to some independent conclusions
12 apart from what they told you in creating this list?
13     A.  These were the things that they mentioned
14 when we were talking.
15     Q.  Okay.  So we talked about baseball before,
16 and I think it's your understanding that Evan
17 doesn't play baseball; is that correct?
18     A.  I said I didn't know.  It was my
19 understanding that he was more bookish, that he
20 liked to stay inside and he was a reader.
21     Q.  Okay.  And that's, in part, because you
22 hadn't focused on their answers, the Frischhertzes'
23 answers to the questionnaire, which indicated that
24 he does play baseball, right?
25     A.  No.  It indicated that was an interest of

Page 167

1  his.  It didn't say he played baseball.
2      Q.  Okay.
3      A.  He may.  It doesn't say that.
4      Q.  You didn't discuss it with them?
5      A.  There you go.  I did not.
6      Q.  I mean, did they tell you he doesn't play
7  baseball?  Is that the source of your notation about
8  baseball?
9      A.  Well, that's why it's sitting there.
10     Q.  They told you he --
11     A.  It's in that list.  What they specifically
12 said about what he can't do with baseball, I'm not
13 sure, but if he does play, I'm not sure in what
14 capacity or how.  The dad, I think, offered that
15 one.
16         The monkey bar thing was another one that
17 they said he had trouble with at school, because he
18 can't hold on to the monkey bars with one hand.
19 Riding a bike is more difficult.  Said that he can't
20 hold big things, like a big cup, or he can't hold
21 more than one thing at the same time.  These were
22 all things that the parents actually offered.  Can't
23 open jars, can't open bottles.
24     Q.  Is it your understanding that he can't
25 ride a bike?

Page 168

1      A.  I think that what I said was riding a bike
2  is more difficult.
3      Q.  But is it your understanding that he does
4  ride a bike?
5      A.  I don't know.  I would assume that he's
6  tried.  I mean, I don't know how much he rides, but
7  I'm not saying that he's unable to ride a bike.  I
8  saw somebody on the Olympics that rode with no
9  hands.  I mean, I guess that's possible.
10     Q.  The Olympics were very educational this
11 year, weren't they --
12     A.  They were.
13     Q.  -- on those issues?
14         Evan isn't having trouble at school, is
15 he?
16     A.  No.
17     Q.  Okay.  Now, near the bottom of your page,
18 there's a notation that says -- well, you can tell
19 me what it says.  It starts with "I" with a slash,
20 or is it "if he has trouble in school"?
21     A.  If he has trouble in school.
22     Q.  Okay.
23     A.  He can't do physical labor type jobs.
24     Q.  Okay.  So what does that note mean?
25 That --

Page 169

1      A.  Well, if you don't do well in school,
2  generally speaking, your options for vocational
3  employment down the road are a little bit more
4  restricted, and often you look at more physical
5  kinds of laboring issues, and the point here was
6  that they said, I think, something like, they're
7  really glad that he's got a good intellect, because
8  if he had trouble in school, he wouldn't be able to
9  do some of the more physical -- physically demanding
10 jobs.
11     Q.  But I take it they're not worried about it
12 because he is doing well in school; is that fair?
13     A.  Currently.  He was in the first grade, I
14 think, when I saw him, which is a long way to go.
15     Q.  But he has a very high IQ, right?
16     A.  He doesn't have a very high IQ.  He has a
17 good IQ.  124 currently was what he was tested.
18 That's certainly a reasonable IQ, but it's not --
19 you know, it's not unusually high.  It's in the
20 superior range.
21     Q.  It's in the 95th percentile, right?
22     A.  Yeah.
23     Q.  So his IQ is higher than 95 percent of the
24 population; is that correct?
25     A.  That's correct.  That's correct.  But in a

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 170

1  world of people who are competing in graduate
2  education, most everybody would have an IQ of that
3  level. I mean, it's not -- it doesn't put somebody
4  up and over the top completely, and it certainly
5  doesn't mean that they won't have trouble in school.
6  I wished it did, but it doesn't.
7      Q. And you don't have any basis for thinking
8  that Evan is going to be relegated to a physical
9  labor type job situation?
10     A. I didn't say that.
11     Q. Right.
12     A. I mean, --
13     Q. And you're not here to talk about
14  vocational issues.
15     A. I didn't say that, and I'm still not
16  saying that.
17     Q. Okay.
18        Okay. Then on the next page -- and we've
19  touched on this. This is the page with the two
20  lists, Evan on the left, Ford on the right. And
21  this was information that Mr. and Mrs. Frischhertz
22  provided, I take it?
23     A. Yes.
24     Q. This wasn't an independent assessment that
25  you made?

Page 171

1      A. I've never met Ford.
2      Q. Okay. And is there anything else about
3  the substance of the discussion that pertains to
4  these notes that you can -- that you recall that you
5  can tell us?
6      A. Yeah. We were talking about how well Ford
7  and Evan get along and how Ford actually has become
8  almost like his big brother's defender and the
9  person who does things for him. He -- he's an
10  active guy who is quick to jump in and be physical;
11  whereas, his brother was really much more
12  intellectual, bookish. And so Ford was kind of
13  like -- in a sense, he was becoming a person that
14  kind of stayed with Evan and helped him with things
15  if he had any difficulties.
16     Q. Do you mean things that would -- tasks
17  that would have to be performed with both hands, for
18  example?
19     A. Yeah, for example.
20     Q. Do you have any specific examples that you
21  recall?
22     A. No.
23     Q. And when you say Ford has taken on a role,
24  so to speak, as his big brother's defender, what do
25  you mean by that?

Page 172

1      A. Well, I think that that's probably an
2  unfortunate choice of words. I think there hasn't,
3  to my knowledge, been a situation where that would
4  have to happen. I think it may have been more that
5  that was the impression that the parents or the
6  father was giving, that Ford was capable of doing
7  that.
8      Q. Okay. Okay. But he hasn't been called
9  upon to do that?
10     A. No.
11     Q. There's been no situation requiring him to
12  do that; is that right?
13     A. I hope not. I don't -- I don't know of
14  any.
15     Q. Not that you're aware of. Okay.
16        Okay. Then you subsequently met with Evan
17  for 30 minutes; is that right?
18     A. Yes.
19     Q. And was -- Mrs. Frischhertz was present
20  for the whole meeting?
21     A. Yes.
22     Q. Was anyone else present?
23     A. No.
24     Q. And what was the purpose of the meeting?
25     A. To get to know Evan, to meet him, to see

Page 173

1  what he looked like, to get a sense of his
2  personality.
3      Q. That's the only time you've seen Evan,
4  right?
5      A. That's correct.
6      Q. Did you conduct a clinical interview of
7  Evan during those 30 minutes?
8      A. No. We talked about school.
9      Q. Okay.
10     A. I told his mother, in fact -- and this is,
11  like, one of the areas where I would say that
12  they're protective. They didn't want anything that
13  would cause Evan any, you know, alarm or discomfort,
14  and so we agreed ahead of time that I would stick
15  pretty much to, you know, how is school and how he
16  likes his teachers, how he likes the kids in the
17  class, and what does he do, how many kids are there.
18  So we stayed pretty general. I told him I hadn't
19  actually been to Metairie Academy and -- since it
20  had been so recently restructured, and, you know,
21  just to tell me a little bit about it, so that was
22  the nature of our conversation.
23     Q. This discussion you had with the parents
24  about what was going to take place at the meeting,
25  was that in your meeting with the Frischhertzes?

44 (Pages 170 to 173)

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 174

1   Did you talk about the upcoming meeting with Evan?
2       A.  Yes.
3       Q.  Okay.  Was there some agreement that you
4   would not ask him about his hand?
5       A.  Yes.
6       Q.  Was there some agreement that you would
7   not ask him about whether he was teased?
8       A.  Yes.  I agreed to both of those, and I may
9   have even been the one that -- to mention it, that I
10  was not going to bring up anything that would be
11  emotionally upsetting to him.  Evan is not my
12  patient, and I was not going to be able to follow
13  him, nor did he have a therapist currently.  So I
14  certainly did not want to do anything that would
15  cause Evan any discomfort in the short period of
16  time that I was to meet him.  So we set some ground
17  rules about how we would interact with him and what
18  his mother would tell him about what reason it is
19  that he's coming to see me, et cetera.  That's
20  fairly typical.  I do that often in cases with
21  children who I'm evaluating for something that --
22      Q.  For litigation?
23      A.  No.  It could be also for therapy.  If --
24  it just depends.  You know, when the -- when the
25  person is first coming in and you don't have a

Page 175

1   relationship with them, you -- you know, very often
2   it's up to the parent to talk them into coming in,
3   and so you need to give them some idea of how it's
4   going to be structured and what's going to be talked
5   about.  Because a lot of kids, particularly anxious
6   children, for example, they don't want to come some
7   place where they don't know what's going to happen,
8   you know, so it's not unusual.  I do that kind of
9   thing often, but in a case like this, where you know
10  that there's some delicate subjects, I'm certainly
11  not going to stomp all over them in a short period
12  of time where I have no way of following up.
13      Q.  But wouldn't addressing those subjects
14  with Evan have given you the best information
15  regarding the hand?
16      A.  No.  Actually, it wouldn't, and I
17  understand why you might think that it would, but
18  he's a 6-year-old, 7-year-old child --
19      Q.  Seven.
20      A.  -- who is -- you know, essentially,
21  doesn't know me from Adam's all fox, and why would
22  he want to sit there and tell me his innermost
23  feelings about something just because he walks into
24  my office for the very first time.  No, it wouldn't
25  be a good idea.  And, in fact, if you were working

Page 176

1   with Evan, it would take you quite a while before
2   you would actually directly bring that up.  That's
3   not a good way to start.
4       Q.  So the ground rules that you set, was that
5   at your initiation, or did the Frischhertzes --
6       A.  No.  It was --
7       Q.  -- express any concern about how Evan
8   would react to being asked about his hand?
9       A.  Yes, they did express some concern,
10  particularly the mother.  And, yes, they were ground
11  rules that I initiated.  So I initiated a
12  conversation when I saw that the mother was a little
13  bit uncomfortable.
14      Q.  What did she say?
15      A.  I don't know.  I can't tell you that.  Was
16  that six months ago?  I can't give you the exact
17  words.
18      Q.  That was six months ago.
19          Okay.  So you set these ground rules for
20  the meeting, and they were that you were not going
21  to ask him about his hand.  You were not going to
22  explore his feelings about the hand.
23          COURT REPORTER:  I need you to answer
24      out loud, please.
25          MS. SMITH:  Thank you.

Page 177

1           THE WITNESS:  She hasn't finished.
2           MS. SMITH:  Fair enough.
3   BY MS. SMITH:
4       Q.  The ground rules that you established with
5   the Frischhertzes about the -- your 30-minute
6   meeting with Evan, did the ground rules include an
7   agreement that you were not going to ask Evan about
8   his hand?
9       A.  Yes.
10      Q.  And did they include an agreement that you
11  were not going to ask him about his feelings
12  regarding his hand?
13      A.  I don't know that we specifically said
14  that, but if you don't ask someone about the first
15  thing, you can't very well ask them about the
16  second.
17      Q.  Did the ground rules include an agreement
18  to not ask him about any teasing that might be
19  occurring?
20      A.  Yes.
21      Q.  And same for bullying?
22      A.  Yes.
23      Q.  But we know that teasing and bullying
24  aren't occurring?
25      A.  That's correct.

45 (Pages 174 to 177)

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 178

1    Q.   Okay.  So did the ground rules also
2  include an agreement that you would not discuss with
3  Evan any comments, however innocent, that he has
4  received regarding his hand?
5    A.   Yes, all of that.  It goes without saying,
6  really, if you say you're not going to talk about
7  the hand, then, certainly, all the issues that you
8  brought up that relate to it would not be part of
9  the conversation.
10    Q.   Anything else that were -- that was
11  included in the ground rules?
12    A.   No.
13    Q.   And you did not perform any psychological
14  or neuropsychological testing of Evan; is that
15  right?
16    A.   That's right.
17    Q.   You didn't attempt to assess, even on a
18  crude basis or rough basis, the functionality of
19  Evan's hand, did you?
20    A.   No.
21    Q.   And if Evan had been brought to you as a
22  patient for your clinical practice, you would have
23  addressed the topics at some point that were off
24  limits, according to the ground rules; is that
25  correct?

Page 179

1    A.   Of course.
2    Q.   And you would agree that Evan doesn't
3  appear to be experiencing any symptoms of depression
4  or anxiety or any other mental illness; is that
5  right?
6    A.   At this point, it looks as if he's doing
7  fairly well.  I haven't evaluated him, and his
8  parents don't notice anything that they're
9  particularly concerned about currently.
10    Q.   And, to your knowledge, has Evan ever
11  experienced any psychological problems?
12    A.   I don't know.  I don't think so.
13    Q.   To the contrary, to your knowledge, Evan's
14  an active and happy child, correct?
15    A.   I think we've established that a couple of
16  times, yeah.
17    Q.   Okay.  Your notes -- again, we're still on
18  page 3 -- say that he's verbal, smiling and a very
19  pleasant young man, very handsome, not afraid to
20  answer questions, polite.  Those were your
21  impressions of Evan, correct?
22    A.   That's correct.
23    Q.   That wasn't what the Frischhertzes told
24  you; that was your own assessment?
25    A.   My own assessment.

Page 180

1    Q.   And your notes state, observed Evan slid
2  his right hand under his leg while seated, and if
3  used his hands, he often slipped right into the left
4  one, it is not moving; is that correct?
5    A.   That's right.
6    Q.   Okay.  Evan gestured with his right hand
7  during your meeting; is that right?
8    A.   Occasionally, yeah.  Once or twice.
9    Q.   So he didn't keep his right hand covered
10  during the entirety of your meeting; is that right?
11    A.   There was a couple of seconds there, yeah,
12  that he would gesture and then move his hand back
13  under.
14    Q.   Is it your testimony that he kept his hand
15  covered for the entire 30 minutes, except for a few
16  seconds?
17    A.   That's my testimony.
18    Q.   I take it you didn't ask him why he was
19  covering his hand?
20    A.   No.  No.  He was doing it extremely well.
21  He was doing it very casually.
22    Q.   And you didn't discuss with him whether
23  anyone has ever made a comment to him about his
24  hand?
25    A.   No.

Page 181

1    Q.   So you didn't discuss with him any
2  reaction he might have to the comments; is that
3  right?
4    A.   That's right.
5    Q.   Or how he's dealing with any comments?
6    A.   No, I didn't.  I agreed not to bring that
7  up.
8    Q.   Okay.  So you don't know how Evan feels
9  about any such comments about his hand; is that
10  right?
11    A.   Only based on what his parents said, and
12  they did indicate that he was -- he was sensitive to
13  it, and I believe their words were that he does get
14  upset about it.  And then they immediately said how
15  well-adjusted he was.
16    Q.   And I think you mentioned -- well, strike
17  that.
18        What's your understanding about him
19  getting upset?  How does he get upset?
20    A.   I don't know.
21    Q.   Did you ask the Frischhertzes?
22    A.   I did not.
23    Q.   So your understanding of the comments Evan
24  is receiving about his right hand and his reactions
25  to the comments is based on information from Evan's

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 182

1  parents; is that right?
2      A.  Yes, that's correct.  And it's somewhat --
3  you know, when you make an observation, as I did,
4  when I saw Evan, that really is pretty confirmatory
5  that it's already beginning to be a problem for him.
6  Most kids would not go to lengths such as he did to
7  keep one hand completely hidden.  And he did it
8  very, very well, so I might not have even noticed,
9  had I not known, and was trying to observe a little
10  bit about the hand myself.  He was extremely careful
11  with it.
12      Q.  Did you ask the Frischhertzes if Evan
13  hides his hand outside of the meeting he had with
14  you?
15      A.  No, I didn't.  I never talked to them
16  again, so I don't know.
17      Q.  Okay.  So you don't know whether Evan even
18  hides his hand outside of the meeting you had with
19  him?
20      A.  I have no independent knowledge of that,
21  but my best guess is that he does.
22      Q.  But you have no basis for saying that,
23  correct?
24      A.  Other than the psychology of human nature.
25  If you see someone do that, the chances are, if they

Page 183

1  do it that carefully and that smoothly, they've done
2  it before, and they know how to do it; otherwise,
3  they're awkward and somewhat stumbling, usually,
4  doing something like that.  He was extremely good at
5  it.
6      Q.  Is there any scientific literature you can
7  point us to that supports what you just said?
8      A.  I don't know.  I haven't reviewed
9  scientific literature on that particular topic.  I'm
10  not even sure how we would label that topic to go
11  look and see.
12      Q.  Do you know whether he hides his hand in
13  school?
14      A.  No.  But it's certainly something that
15  could be discovered if we were to ask people.
16      Q.  Did you ask Evan's teacher if he hides it
17  at school?
18      A.  I haven't seen Evan's teacher.
19      Q.  Did you ask the Frischhertzes if he hides
20  his hand at school?
21      A.  I didn't know he was going to do that when
22  I saw the Frischhertzes.  I saw Evan afterwards.
23      Q.  You didn't ask them in your interview with
24  them whether he is engaging in any self-conscious or
25  hiding behavior regarding the hand, correct?

Page 184

1      A.  Right.  I'm not sure that they would have
2  even noticed it.
3      Q.  So --
4      A.  I don't know.  Maybe they notice it and
5  they don't make much of it.  It was not mentioned.
6      Q.  Would it be fair to say you don't know how
7  often Evan hides his hand?
8      A.  Yeah.  It would be fair to say I don't
9  know how often he hides his hand.  It was about
10  98 percent of the time when I saw him, but I don't
11  know if it's that way in school, where people know
12  him, where he's --
13      Q.  Or in any other context, correct?
14      A.  Right.  I don't know.  But that really
15  actually isn't relevant to my comment about that.
16  It indicates his self-consciousness.
17      Q.  Okay.  Let's look at another set of what I
18  believe are your handwritten notes that have been
19  marked as Exhibit 17.  If you could take a look at
20  those, Dr. Andrews, and just, for the record, tell
21  us what those documents are.
22          (Deposition Exhibit 17 was marked for
23              identification.)
24      A.  Those are pieces of paper that I scribbled
25  some notes on as I was preparing to write my report.

Page 185

1      Q.  And when did you make the notes?
2      A.  Sometime before I wrote the report while I
3  was writing the report.  I don't know the date.
4      Q.  Okay.  Did you consult any resources like
5  texts or scientific literature in creating these
6  notes?
7      A.  Well, I did actually look at some of the
8  more recent literature, and I gave you two examples
9  of that in the two reports -- I mean two published
10  pieces that I provided.
11      Q.  The McCabe and Storch articles, right?
12      A.  Yes.
13      Q.  Did you look at anything in addition to
14  those two articles?
15      A.  Sure.  But there was just -- you know,
16  this is not a topic that has only one or two
17  recently published articles on it.  It's a topic
18  that has actually become fairly important, and I
19  didn't do a summary of the literature for this
20  report.  It wasn't necessary.
21      Q.  But you understood that you were to
22  identify literature that you reviewed and relied on
23  in connection with the report, correct?
24      A.  I did.
25      Q.  And are the Storch and McCabe articles the

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 186

1   only scientific literature or articles that you
2   relied upon --
3       A.  That I relied upon?  Sure.
4       Q.  -- in forming your opinions?
5       A.  I would say that they have -- they have
6   most of what I relied on in them.  They were chosen
7   to be good summary articles on the particular field
8   in qualified, good, peer-reviewed journals and
9   fairly recently, so...
10      Q.  So you looked at those articles in making
11  the notes that have been marked as Exhibit 17,
12  McCabe and Storch?
13      A.  I had probably read them.  I don't know
14  that I was looking at them while I made the notes,
15  but I was also -- you know, I have a few years of
16  experience in clinical psychology and developmental
17  psychology, and I draw a lot from my own experience.
18  I was trying to organize my thoughts about the best
19  way to write the report.  That's all in the world
20  that is, just my notes.
21      Q.  Did you review any other resources or
22  literature?  I think you indicated you may have in
23  making these notes.
24      A.  If I did, I'm not likely able to tell you
25  what they would be.

Page 188

1   what the most recent articles might be that I would
2   give you.  Because I was going to find something for
3   you, and I wanted to see what would be the more
4   recent, relevant, well-researched, well-respected
5   journal that I could give you an article or two that
6   would summarize the case.
7       Q.  Okay.  Why does it say "work product" and
8   "not released" on these notes?
9       A.  Well, I think it was my work product and I
10  was -- I generally -- that's my secretary's
11  handwriting, and she must not have released them or
12  was not going to release them, and then she changed
13  her mind and scratched through it.
14      Q.  Okay.
15      A.  And I don't know why.
16      Q.  Has your secretary made any other
17  notations on these notes?
18      A.  No.
19      Q.  Again, it says, potential future probs.
20  Does that mean potential future problems?
21      A.  It does.
22      Q.  Okay.  And that's because you were focused
23  on the potential future problems Evan might face,
24  right?
25      A.  Yeah.  That's pretty much the reason,

Page 187

1       Q.  Did you go on the Internet?
2       A.  I'm sure I did, yeah.  That's where I
3   found the McCabe and Storch articles.
4           THE VIDEOGRAPHER:  About 10 minutes
5       till 5:00.
6           MS. SMITH:  Okay.
7   BY MS. SMITH:
8       Q.  And you don't recall what you looked at
9   when you were working on these notes?
10      A.  I just -- think I just told you.
11      Q.  Yeah.  You can't point us to a text --
12      A.  I don't need to do that.  I had it in my
13  head.
14      Q.  Okay.
15      A.  So at that point, I was just making notes
16  to myself about how I would organize the
17  information.
18      Q.  Okay.
19      A.  It's really not -- it's not rocket
20  science.
21      Q.  Right.
22      A.  It was easy.
23      Q.  But if you had it in your head, why did
24  you do the Internet searches and look at literature?
25      A.  See what else might be out there, to see

Page 189

1   yeah.
2       Q.  You were not focused on potential future
3   positive outcomes, right?
4       A.  No, I wasn't.
5       Q.  Okay.  Even though potential future
6   positive outcomes are likely, correct?
7       A.  It's a possibility.  I don't know that
8   "likely" is a word that I would use, but it's a
9   possibility.
10      Q.  Well, are potential future positive
11  outcomes at least as likely for Evan as potential
12  problems in the future?
13      A.  I don't know if it's at least as likely or
14  not.  I -- it depends upon what the potential future
15  positive outcome that we're talking about is.  I --
16      Q.  And you didn't formulate an opinion about
17  the potential --
18      A.  I don't really have an opinion about what
19  the potential future positive aspects of living with
20  and coping with a deformity all of your life is.
21  No, I didn't have a list of those.  I'm sure that
22  there are some things that can happen.
23          For example, a person may be a stronger
24  person as a result of, but that would require, you
25  know, many years before you -- looking back on it,

Golkow Technologies, Inc. - 1.877.370.DEPS

3feed265-bfcc-4a5c-af1f-d1b6d0bac9c0

Susan R. Andrews, Ph.D.

Page 190

1  you might be able to say, wow, because of this, I
2  was able to become a whatever, and, you know, those,
3  I just don't have a list of, frankly.
4      Q.  Well, if Evan was a patient in your
5  clinical practice, you would have considered likely
6  future positive outcomes for him, right?
7      A.  Well, we certainly would try to explore
8  them.  I don't know that I would consider them on my
9  own, because it depends upon what somebody's
10 interests are.
11         What I was recommending for Evan is that
12 he find a therapist that could kind of grow up with
13 him, someone who, as he goes through different
14 developmental stages, he can -- he can talk to about
15 those kind of things, and I would hope that that
16 person would also be looking at the possibility of
17 things that Evan might do that would be, you know, a
18 good potential positive outcome.
19     Q.  On page 2 of the notes, you have Paxil and
20 Depakote, but Depakote is crossed out.  Why is it
21 crossed out?
22     A.  I don't know.  I probably was trying to
23 remember what it was that she took.  I was
24 working -- actually, this was at a hotel some place.
25 I was on a -- at a conference, and I was taking some

Page 191

1  notes to myself while I was taking a break in the
2  room, and I didn't have the file in front of me, and
3  I couldn't remember what she actually took.  And you
4  can see how important Paxil was to me because I
5  couldn't remember.
6      Q.  Okay.  You also have on that page, in the
7  top left corner, congenital hand deformity
8  symbrachydactyly.  What does that note reflect?
9      A.  Reflects that I was looking up what some
10 of the potential congenital hand deformities might
11 be.  I know that he didn't have a diagnosis, but I
12 was just looking to see what the range of possible
13 hand deformities might be, and that was one that I
14 found.  I wasn't thinking that that was something
15 that Evan had.
16     Q.  Okay.  That was going to be my next
17 question.
18     A.  I know it was.
19     Q.  Okay.  Your notes also state that Evan
20 looks, presents well-adjusted, but he has learned
21 ways to hide his hand, in his jacket, under his leg,
22 sitting in his other hand.
23     A.  These are just notes reminding me of what
24 I want to talk about in the report.
25     Q.  Do you consider the hiding of his hand

Page 192

1  during your meeting with him some evidence that Evan
2  is not well-adjusted?
3      A.  I considered it evidence that Evan is at
4  this point -- see, I don't use that term,
5  "well-adjusted."  I think that Evan is overall
6  dealing fairly well with his problems right now, but
7  I do consider that -- the fact that he hid the hand
8  extremely significant, that he is very
9  self-conscious about it already, and that, I don't
10 think, bodes well for what could happen to Evan in
11 the future, particularly if he were to encounter
12 some kids that were giving him some difficulties.
13     Q.  I'd like to go through some questions that
14 Evan's medical providers have observed and reported
15 about him and ask if you agree just based on, again,
16 the limited time you spent with him.
17         They've observed that he's playful,
18 cooperative and actively engaged.  Was that your
19 impression?
20     A.  As far as I can tell, that looked -- he
21 looked like he was smiling, open, polite.  Playful,
22 I didn't see.  I understand from his parents that he
23 and his brother are quite playful together.
24     Q.  He's been described as having a bright
25 affect and motivation.  Do you have any reason to

Page 193

1  disagree with that?
2      A.  No.  I'm not trying to paint this child as
3  having some major problem.  No, I don't disagree
4  with that.
5      Q.  He doesn't have any problems now, does he?
6      A.  I don't know.  I don't think he does.
7  We've established that, I think, a bunch of times.
8  I don't really know.  I didn't do an in-depth
9  psychological on Evan.
10     Q.  Okay.  And do you have any reason to
11 disagree with the characterization of Evan as
12 easygoing and adaptable?
13     A.  Well, easygoing, I don't know.  Adaptable,
14 I don't know.  I don't necessarily disagree with
15 that.  I'm just not sure that would say.
16     Q.  Does Evan have qualities that will enhance
17 his ability to deal with a challenge?
18     A.  I think he does.  I think he's
19 intelligent.  I think he comes from a family that
20 really loves him and is hoping to give him every
21 advantage.  Those are very important things.
22     Q.  Any other aspects of his personality or
23 emotional adjustment that you think will enhance his
24 ability to deal with a challenge?
25     A.  I don't -- I don't know --

Golkow Technologies, Inc. - 1.877.370.DEPS

Susan R. Andrews, Ph.D.

Page 194

1   Q.   You do not have sufficient information --
2   A.   -- his personality well enough to answer
3  that question.
4   Q.   Okay.  So you don't have sufficient
5  information to analyze the qualities he has that
6  will enable him to deal with a challenge; is that
7  fair?
8   A.   Well, I think the two that I gave you are
9  probably two of the most important.
10   Q.   Okay.
11   A.   Whether or not Evan has got a
12  sticktoitiveness and determination to overcome all
13  obstacles, I just don't know that.  Some people do
14  develop that in the course of the kind of life that
15  he's likely to have.
16   Q.   When you observed Evan, was he quiet?
17   A.   Yes.  He sat quietly on the couch where
18  that lady is sitting there, and he didn't -- he
19  didn't babble away.  He answered any question I
20  asked him.  He was very responsive, but he didn't
21  volunteer anything.  I would call that kind of
22  quiet.  A lot of kids would jump up and run over to
23  the doll house, or they would maybe ask you other
24  questions about things that are on the shelves or
25  around.  He didn't do any of that.

Page 195

1   Q.   He wasn't withdrawn, though, was he?
2   A.   I didn't say he was withdrawn, no.
3   Q.   I know, but I'm asking you.
4   A.   No, I didn't, and I certainly wouldn't say
5  that.
6   Q.   And you wouldn't say he's shy, would you?
7   A.   Yeah, you might -- I think you might say
8  he's shy.
9   Q.   Has anyone else said he's shy?
10   A.   You didn't ask me that.
11   Q.   I know, but I'm asking you now.
12   A.   I don't know if anybody else has said that
13  he's shy.  I think that it's likely that he is a
14  little shy in new situations, particularly where he
15  didn't know the person.
16   Q.   Isn't that true for most children?
17   A.   No, not necessarily.
18   Q.   But it can be true?
19   A.   Oh, yeah, but it's not true for most.  It
20  can be true in situations where the child has
21  already encountered something that might be a
22  slightly negative consequence of interaction.  They
23  learn.  They learn quickly to protect themselves
24  appropriately if they're smart.
25       MS. SMITH:  Okay.  I think it's

Page 196

1  5:00 o'clock, according to --
2       THE VIDEOGRAPHER:  It's 5:00 o'clock.
3       MS. SMITH:  -- our officials here, so
4  we will stop.  We're honoring your
5  5:00 o'clock stop, and we'll continue on
6  another day.
7       THE WITNESS:  Okay.
8       MS. SMITH:  Thank you.  Thank you for
9  your time, Dr. Andrews.
10       THE VIDEOGRAPHER:  The time now is
11  5:00 p.m.  We are now off the record.
12  This is the end of tape 4, and this
13  concludes today's videotaped deposition of
14  Mrs. Susan Andrews -- Dr. Susan Andrews.
15       (DEPOSITION ADJOURNED.)
16
17
18
19
20
21
22
23
24
25

Page 197

1       CERTIFICATE
2       I, LESLIE B. DOYLE, Certified Court
3  Reporter (LA), NCRA Registered Professional Reporter
4  and Certified LiveNote™ Reporter, do hereby certify
5  that prior to the commencement of the examination,
6  DR. SUSAN R. ANDREWS was duly sworn by me to testify
7  to the truth, the whole truth and nothing but the
8  truth.
9       I DO FURTHER CERTIFY that the foregoing is
10  a verbatim transcript of the testimony as taken
11  stenographically by and before me at the time, place
12  and on the date hereinbefore set forth, to the best
13  of my ability.
14       I DO FURTHER CERTIFY that I am neither a
15  relative nor employee nor attorney nor counsel of
16  any of the parties to this action, and that I am
17  neither a relative nor employee of such attorney or
18  counsel, and that I am not financially interested in
19  the action.
20
21
22
       _____
23       LESLIE B. DOYLE, RMR, RDR
       Certified Court Reporter (LA)
24       Certified LiveNote™ Reporter
25

Susan R. Andrews, Ph.D.

Page 198

```
 1        - - - - - -
          E R R A T A
 2        - - - - - -
 3
 4   PAGE LINE CHANGE
 5   ____ ____ _____
 6      REASON: _____
 7   ____ ____ _____
 8      REASON: _____
 9   ____ ____ _____
10      REASON: _____
11   ____ ____ _____
12      REASON: _____
13   ____ ____ _____
14      REASON: _____
15   ____ ____ _____
16      REASON: _____
17   ____ ____ _____
18      REASON: _____
19   ____ ____ _____
20      REASON: _____
21   ____ ____ _____
22      REASON: _____
23   ____ ____ _____
24      REASON: _____
25
```

Page 200

```
 1        LAWYER'S NOTES
 2   PAGE LINE
 3   ____ ____ _____
 4   ____ ____ _____
 5   ____ ____ _____
 6   ____ ____ _____
 7   ____ ____ _____
 8   ____ ____ _____
 9   ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____
25   ____ ____ _____
```

Page 199

```
 1
 2       ACKNOWLEDGMENT OF DEPONENT
 3
 4       I,_____, do
 5   hereby certify that I have read the
 6   foregoing pages, and that the same is
 7   a correct transcription of the answers
 8   given by me to the questions therein
 9   propounded, except for the corrections or
10   changes in form or substance, if any,
11   noted in the attached Errata Sheet.
12
13
14   _____
15   SUSAN R. ANDREWS, PH.D.        DATE
16
17
18   Subscribed and sworn
     to before me this
19   _____ day of _____, 20____.
20   My commission expires:_____
21
     _____
22   Notary Public
23
24
25
```