IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ANDREA FRISCHHERTZ, wife of/and BRAD FRISCHHERTZ, individually and on behalf of the minor child, E.F.<br><br>Plaintiffs,<br><br>vs.<br><br>SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE<br><br>Defendant. | Civil Action No.: 10-2125<br><br>JUDGE BERRIGAN<br><br>MAGISTRATE ROBY<br><br>JURY TRIAL DEMANDED |

**DEFENDANT GLAXOSMITHKLINE LLC'S MEMORANDUM OF
LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT JOSEPH A. HIRSCH, Ph.D.**

Defendant GlaxoSmithKline LLC ("GSK") files this memorandum of law in support of its motion to exclude the opinion testimony of Joseph A. Hirsch, Ph.D., pursuant to *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993) and Rules 104 and 702 of the Federal Rules of Evidence.

**I.   INTRODUCTION**

Plaintiffs Andrea and Brad Frischhertz, individually and on behalf of their minor son E.F., claim that Mrs. Frischhertz's alleged ingestion of Paxil CR® ("Paxil"), manufactured by GSK, caused their son's birth defect, specifically a hand abnormality.[1]  Plaintiffs propose to offer Joseph A. Hirsch, Ph.D. as an expert witness, not to testify about the cause of E.F.'s birth defect

---

[1] Although Plaintiffs also assert that Paxil caused E.F.'s purported "cardiac defects," their only specific causation expert -- Dr. Paul Goldstein -- retracted that opinion at his deposition, acknowledging that E.F. has never had a cardiac defect.  (*See e.g.,* Goldstein Depo., at 131-32 (attached as Ex. A) ("I've changed my opinion since then. . . . My opinion now is that after reading all these new materials, I don't see -- and after reading all the reports, I don't -- I don't have an opinion that he had any kind of heart defect at all."; "I no longer hold that view.").

or any medical treatment, but, rather, to testify about what GSK supposedly knew in 2004; what it told the medical community; and whether it was "honest" with the public about Paxil's alleged risks if taken during pregnancy. Nothing Dr. Hirsch can offer is proper for expert testimony. He admits that he is not an expert in any area relevant to this litigation. (He is not a medical doctor, teratologist, epidemiologist, or even a regulatory expert who can offer testimony about the adequacy of Paxil's labeling or warnings to prescribers.) With no relevant expertise, it appears that Dr. Hirsch's role is to act only as a talking head for Plaintiffs, given his intention to read a few documents to the jury and offer his personal criticisms of GSK's alleged behavior and intentions.

Dr. Hirsch's testimony should be excluded in its entirety because: (i) he is not qualified to render any of his "opinions"; (ii) his "opinions" are not derived through any reliable methodology; (iii) his "opinions" are not based on any reliable factual basis; (iv) his "opinions" are not relevant to the issues in this case; and (v) his "opinions" are not the proper subject of expert testimony.

## II.   BACKGROUND

Dr. Hirsch claims expertise in the fields of pharmacology, psychopharmacology, neuropsychology, and pharmacy. (Hirsch Rept., at 10) (attached as Ex. B). He is not a medical doctor and is not qualified or legally permitted to diagnose or treat any birth defects. Nor is he permitted to prescribe any type of medication. (Hirsch Depo., at 55) (attached as Ex. C).

Dr. Hirsch has no relevant purpose in this case as he does not proffer a general or a specific causation opinion:

> Q. Do you, Dr. Hirsch, have an opinion to a reasonable degree of scientific certainty whether Paxil causes limb defects?
>
> A. I do not.

Q. Do you have an opinion to a reasonable degree of scientific certainty that Paxil causes all heart defects?

A. I do not.

Q. Do you have an opinion to a reasonable degree of scientific certainty that Paxil causes any specific type of heart defect?

A. I do not.

\* \* \*

Q. In formulating your opinions in this case, did you come to an opinion to a reasonable degree of scientific certainty that Paxil exposure during the first trimester of pregnancy is what caused [E.F.'s] hand defect?

A. I do [sic] not.

\* \* \*

Q. Okay. Have you reached an opinion to a reasonable degree of scientific certainty that it was exposure to Paxil during the first trimester that caused [E.F.'s] heart defects?

A. I did not.

(Hirsch Depo., at 85-87.)

Ultimately, Dr. Hirsch has a very limited role in this case. He was asked only to consider three issues that essentially go to the warnings and labeling associated with Paxil. None are proper areas for expert testimony and Dr. Hirsch is unqualified to offer these purported opinions. Dr. Hirsch is not qualified and did not follow an acceptable methodology, or any methodology at all, in coming to these conclusions — all of which invade the province of the jury. Dr. Hirsch proposes to opine about:

(1) What GSK told the medical community in 2004 about the risks of taking Paxil while pregnant?

(2) GSK's alleged knowledge in 2004, that there were a significant risk of birth defects if taking Paxil in the first trimester of pregnancy?

  (3)  GSK's "honesty" with the public about the risks it knew of [sic] birth defects while taking Paxil in the first trimester of pregnancy?

(Hirsch Rept., at 1.)

  Dr. Hirsch claims that:

  (1)  GSK's pre-clinical animal studies showed Paxil embryotoxicity[2];

  (2)  GSK's internal company documents showed that GSK was "concerned" that Paxil may be teratogenic prior to 2004 and was not honest with the public about these risks; and

  (3)  GSK's 2004 Paxil labeling was inadequate in apprising the medical community of the risks of taking Paxil in the first trimester of pregnancy.

(*See id.* at 3-7; Hirsch Depo., at 84-85, 90-91, 126-27.) None of these claims are supported by the evidence and none of these opinions should be allowed to be presented to the jury.

## III. ARGUMENT AND CITATION OF AUTHORITIES

###  A. THE COURT'S "GATEKEEPER" ROLE UNDER *DAUBERT*

*Daubert* and Rule 702 require that the District Court undertake its "gate-keeping" responsibility and assess "three major requirements":

  (1)  Qualifications -- a witness proffered to testify to specialized knowledge must be an expert;

  (2)  Reliability -- the expert must testify to scientific, technical, or otherwise specialized knowledge that will assist the trier of fact; and

  (3)  Relevance -- the expert's opinion must assist the trier of fact, *i.e.*, there must be a connection between the scientific, technical, or specialized research or results to be presented and the particular factual issues in the case.

*Smith v. Fifthian*, No. Civ. A. 03-2076, 2006 WL 2088126, at *1 (W.D. La. July 26, 2006) (attached as Ex. D). A failure to meet any of the three requirements means that the expert cannot testify. As emphasized by the Fifth Circuit Court of Appeals:

---

  [2] Embryotoxicity is an effect on an embryo resulting in abnormal development or death. A similar term is teratogenicity which will be used throughout this Motion and GSK's other *Daubert* motions.

> [T]he expert's testimony must be reliable at each and every step or else it is inadmissible. The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia.*

*Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (punctuation and citation omitted omitted).

All expert testimony that involves scientific, technical or other specialized knowledge must meet the *Daubert* test for admissibility. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The proponent of expert testimony (here Plaintiffs) bears the burden of demonstrating its admissibility by a preponderance of the evidence. *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 276 (5th Cir. 1998).

**B.    DR. HIRSCH'S OPINION THAT GSK'S PRE-CLINICAL ANIMAL STUDIES SHOWED EVIDENCE OF EMBRYOTOXICITY MUST BE EXCLUDED.**

**1.    Dr. Hirsch Is Not Qualified To Opine On Any Alleged Embryotoxicity Shown In Pre-Clinical Animal Studies.**

The threshold issue presented by proffered expert testimony is whether the witness is sufficiently qualified by "knowledge, skill, experience, training, or education" to testify regarding the specific issue on which the testimony is offered. Fed. R. Evid. 702. "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999). Dr. Hirsch is simply not qualified to testify about the pre-clinical animal studies on Paxil.

Dr. Hirsch admits that he has no specialized knowledge or expertise in embryology, developmental biology, teratology, reproductive toxicology, or causes of birth defects. (Hirsch

Depo., at 61-62.)  Although he holds himself out as an expert in psychopharmacology, he has not done any research in that area since the 1980s.  (*Id.* at 36.)  He has never:

- studied the effects of a drug or any substance on *any aspect of embryonic or fetal development*, *id.* at 29;

- performed any studies or research designed to evaluate the potential teratogenicity of any drug or other substance, *id.* at 57, 60-61;

- performed a study to evaluate whether any drug or other substance crosses the human placenta at any time during pregnancy, *id.* at 58;

- performed research involving mechanism of action of any SSRI, including Paxil, *id.* at 27;

- conducted a study in any human population for the purpose of identifying risk factors for birth defects, *id.* at 63; or

- published anything at all about risk factors or causes of birth defects, *id*.

Dr. Hirsch is therefore patently unqualified to testify about whether GSK's preclinical Paxil animal studies showed any evidence of embryotoxicity.  *See e.g., In re Vioxx Prods. Liab. Litig.,* No. 1657, 05-4046, 2005 WL 3541045, at *3 (E.D. La. Dec. 6, 2005) (attached as Ex. E); *Linsley v. C. R. Bard, Inc.*, No. Civ. A. 98-2007, 2000 WL 343358, at *4-5 (E.D. La. Mar. 30, 2000) (attached as Ex. F).

### 2. Dr. Hirsch's Opinions On Alleged Embryotoxicity Are Not Based On Any Reliable Factual Basis.

To satisfy *Daubert's* reliability requirement, an expert witness' opinions must be "based on sufficient facts or data."  *Jacob v. Caesars Entm't, Inc.*, No. Civ. A. 05-0805, 2007 WL 594714, at *4 (E.D. La. Feb. 21, 2007) (attached as Ex. G), *aff'd*, *sub nom, Jacob v. Grand Casinos of Miss.,* 280 F. App'x 424 (5th Cir. 2006).  "Proposed testimony must be supported by appropriate validation -- *i.e.* 'good grounds,' based on what is known."  *Moore,* 151 F.3d at 275 (quoting *Daubert*, 509 U.S. at 590); *Buxton v. Lil' Drug Store Prods., Inc.,* No. 2:02 CV 178 KS-MTP, 2007 WL 2254492, at *10 (S.D. Miss. Aug. 1, 2007) (attached as Ex. H) ("numerous

6

courts have rejected expert opinions on the basis that they are inconsistent with the underlying facts and data, not supported by sufficient facts or data, and/or are conclusory." (listing cases)), *aff'd*, 294 F. App'x 92 (5th Cir. 2008); *Lassiegne v. Taco Bell Corp.*, 202 F. Supp. 2d 512, 517 (E.D. La. 2002) (excluding expert who presented "no scientific basis, no 'specific train of medical evidence'" supporting her causation opinion).

Even if Dr. Hirsch were qualified to opine regarding the alleged embryotoxicity of Paxil animal studies (which he is not), his opinion should still be excluded because it is not based on any reliable factual basis. First, Dr. Hirsch's report cites only two pre-clinical animal studies – one in the rat and one in the rabbit. (Many more were performed.) At his deposition, he conceded that the rabbit study actually "did not raise a concern" that Paxil may be teratogenic. (Hirsch Depo., at 92-96.)

> Q. So there is nothing in this rabbit study that suggests that paroxetine is teratogenic to rabbits, does it?
>
> A. I would conclude no.

(*Id.* at 94.)

Second, Dr. Hirsch admitted that, although he was aware that other preclinical animal studies were done for the submission of the Paxil NDA that looked at reproductive effects of *in utero* Paxil exposure, he did not review them. (*Id.* at 123-24.) Despite knowing more data exist, he did not ask for them or review them.

Third, with respect to his claim that the rat study showed evidence of embryotoxicity, Dr. Hirsch pointed to (i) an increase in rat pup deaths and (ii) "minor skeletal anomalies" associated with delayed ossification. (Hirsch Rept., at 4.) However, Dr. Hirsch admitted repeatedly that an increase in pup deaths was not evidence of teratogenicity. (Hirsch Depo., at 101-02 (". . . the increase in pup deaths could have been caused by some malformation. We don't

know. They weren't specifically looked at."); 102-03 ("I'm saying it's open to question."; "We can't conclude for or against."; "I cannot conclude.").) Similarly, Dr. Hirsch admitted that (i) he does not know whether the finding of retarded ossification is indicative of a teratogenic effect, *id.* at 103-04; and (ii) he has no basis to disagree with the conclusion of an article[3] he cites that states that "delayed ossification . . . does not seem to have general predictive value for teratogenesis." (*Id.* at 104-05.)

Dr. Hirsch failed to do any meaningful analysis of the studies performed by GSK and cannot offer any opinion that the preclinical animal studies performed by GSK showed any evidence of teratogenicity. Rather, the evidence shows they did not. (*See* Paxil Prescribing Information PX:L3 (effective date December 1992), at PAR004579030 (attached as Ex. J) (noting that pre-clinical animal studies "have revealed no teratogenic effects"); Paxil CR Prescribing Information PC:l3 (effective date April 2002), at PAR004181280 (attached as Ex. K) (same).) Accordingly, "there is simply too great an analytical gap" between the data relied upon by Dr. Hirsch and the opinion proffered, mandating its exclusion under *Daubert. Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997); *see also Knight,* 482 F.3d at 355 (reliability analysis applies to all aspects of an expert's testimony, including the link between the facts and the conclusion).

### 3. Dr. Hirsch's Opinion On Embryotoxicity Is Not Relevant To The Facts Of This Case.

Even if Dr. Hirsch were qualified to opine regarding the alleged embryotoxicity of Paxil animal studies (which he is not), and even if his opinion were based on any reliable factual basis (which it is not), it must still be excluded because it is simply not relevant to the facts of this case. Dr. Hirsch admitted that (i) neither of the two animal studies he cites in his report actually

---

[3] *See* Carney EW, Kimmel CA. Interpretation of skeletal variations for human risk assessment: delayed ossification and wavy ribs. *Birth Defects Res B Dev Reprod Toxicol* 2007;80(6):473-96. (attached as Ex. I; cited at p. 8 of Hirsch Rept.).

demonstrated that one could induce heart defects or limb defects with Paxil; and (ii) "as far as we know, there wasn't a single heart defect or limb defect found in any of the Paxil-exposed fetuses or pups in those studies." (Hirsch Depo., at 143.) Dr. Hirsch admits the lack of relevance of his opinions:

> Q: Do you know of any animal study where it has been demonstrated that Paxil can induce heart defects?
>
> A: No.
>
> Q: Do you know of any animal study that demonstrates that Paxil administered to a pregnant animal can induce limb defects?
>
> A: No.
>
> Q: Doctor, do you know of any human teratogen for which an animal model has not been established?
>
> A: Has not been established, no.

(*Id.* at 143-44.)

Dr. Hirsch's opinions are not based on science and have no relevance to the case. Accordingly, Dr. Hirsch's opinions do not "fit" the issues in this case. *Moore,* 151 F.3d at 276; *see also Daubert,* 509 U.S. at 591-92; *Bocanegra v. Vicmar Servs.,* 320 F.3d 581, 584 (5th Cir. 2003) ("The expert testimony must be relevant, not simply in the sense that all testimony must be relevant, Fed. R. Evid. 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue.").

### C. DR. HIRSCH'S OPINION THAT GSK WAS NOT "HONEST" WITH THE PUBLIC MUST BE EXCLUDED.

Based on the preclinical animal studies discussed *supra* and a small number of internal company documents, Dr. Hirsch next manufactures a claim that GSK was "concerned" that Paxil may be teratogenic prior to 2004 and was not "honest" with the public about these risks. There is absolutely no support for this opinion. As such, this opinion must be excluded because: (1) it

9

is not the proper subject of expert testimony and will not assist the trier of fact; and (2) it has no reliable factual basis.

### 1. Dr. Hirsch's Opinion About GSK's Honesty Will Not Assist The Trier Of Fact.

It is well established that "[i]f the expert's testimony brings no more to the finder of fact than the lawyers can offer in argument, the expert's opinions should be excluded." *Gautreaux v. Tetra Applied Techs., LLC*, No. Civ. A. 08-4645, 2010 WL 3952260, at *2 (E.D. La. Oct. 6, 2010) (Berrigan, J.) (attached as Ex. L); *see also Denley v. Hartford Ins. Co. of the Midwest*, No. Civ. A. 07-4015, 2008 WL 2951926, at *3 (E.D. La. July 29, 2008) (Berrigan, J.) (attached as Ex. M); *In re Vioxx Prods. Liab. Litig.*, 414 F. Supp. 2d 574, 580-81 (E.D. La. 2006) (expert's testimony that pharmaceutical manufacturer failed to report adverse events to New England Journal of Medicine and journal's editors would have wanted to see that information before deciding to publish an article "will not assist the jury to understand the evidence or to determine a fact in issue."). If the jurors can reach the same conclusions on their own through their "common experience and knowledge," expert testimony is unnecessary. *Denley,* 2008 WL 2951926, at*3.

Dr. Hirsch's proffered testimony about GSK's state of mind (*i.e.*, whether GSK was "concerned" about Paxil teratogenicity) and "honesty" -- based on his interpretation of company documents -- is not a proper subject of expert testimony. The jurors are just as capable as Dr. Hirsch of reviewing and drawing conclusions from internal company documents. Conclusions about the defendant's state of mind or honesty are traditionally the province of the jury. Countless courts around the country have concluded that personal views on corporate ethics, morality, and corporate motives cannot be dressed up as expert opinions. *See, e.g., DePaepe v. Gen. Motors Corp.,* 141 F.3d 715, 720 (7th Cir. 1998) (holding that engineering

expert "could not testify *as an expert* that GM had a particular motive"); *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 729-30 (S.D.N.Y. 2011); *In re Xerox Corp. Sec. Litig.*, 746 F. Supp. 2d 402, 415, 419 (D. Conn. 2010); *In re Trasylol Prods. Liab. Lit.,* 709 F. Supp. 2d 1323, 1338 (S.D. Fla. 2010) ("These opinions are inadmissible: courts have held that the question of (corporate) intent or motive is a classic jury question and not one for experts."); *In re Seroquel Prods. Liab. Litig.,* No. 6:06-md-1769-Drl-22DAB, 2009 U.S. Dist. LEXIS 126995, at *219 (M.D. Fla. July 17, 2009) (attached as Ex. N) ("it is one thing for an expert to . . . explain and compare information in [a prescription medication's] marketing materials to other evidence - and quite another matter for an expert witness to render an opinion concerning what a drug company intended or sought to achieve through the use of those marketing materials. The latter are proper subjects for closing argument, not expert testimony."); *Cvicker v. Meyer*, No. 05-C-0576, 2008 WL 927574, at *7 (E.D. Wis. Apr. 4, 2008) (attached as Ex. O) (plaintiff's expert "cannot testify as an expert that [defendant] had a particular motive"); *In re Baycol Prods. Litig.,* 532 F. Supp. 2d 1029, 1053 (D. Minn. 2007) ("Personal views on corporate ethics and morality are not expert opinions."); *In re Baycol Prods. Litig.*, 495 F. Supp. 2d 977, 1014-15 (D. Minn. 2007) (opinion criticizing the defendant for inadequately evaluating the potential toxicity of Baycol and asserting that defendant ignored warnings about Baycol's safety "does not qualify as expert testimony under Rule 702 . . . . [Defendant's] motives as to how it proceeded with evaluating Baycol's toxicity, and its reactions to its toxicologists's warnings are issues that can be decided by the jury, without expert assistance); *AstraZeneca LP v. TAP Pharm. Prods., Inc.,* 444 F. Supp. 2d 278, 293 (D. Del. 2006) ("Expert witnesses are not `permitted to testify . . . regarding [the defendant's] intent, motive, or state of mind, or evidence by which such state of mind may be inferred.'") (alterations in original); *In re Rezulin Prods. Liab. Litig.,* 309 F. Supp. 2d 531, 545-

47 (S.D.N.Y. 2004) (excluding opinions offered by experts as to intent, motives, or states of mind of corporations, regulatory agencies, and others because the opinions lack any basis in any relevant body of knowledge or expertise; expert's "repetitions of facts and speculative inferences about [a corporation's] intent" is improper "because it describes lay matters which a jury is capable of understanding and deciding without the expert's help"); *In re Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000) (attached as Ex. P) ("If the witnesses' bases for the opinions concerning improper intent come from other evidence such as letters, admissions of AHP officers or employees, or other admissible evidence, that is what the jury should hear and the question of AHP's intent would flow from such evidence to be determined by the jury."). Simply put, "[e]xpert testimony is not relevant if the expert is offering a personal evaluation of the testimony and credibility of others or of the motivations of the parties." *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3,* 313 F. Supp. 2d 213, 226 (S.D.N.Y. 2004). Dr. Hirsch cannot be permitted to put his "spin" on GSK company documents under the guise of expert testimony. His opinion about GSK's "honesty" is not proper expert testimony.

        **2.    Dr. Hirsch's Opinion About GSK's Motives Is Not Based On Any Reliable Methodology.**

Apart from being an improper subject of expert testimony, Dr. Hirsch's opinion that GSK was "concerned" about Paxil teratogenicity prior to 2004 and was not "honest" with the public, should be excluded because it is not based on any reliable methodology or factual basis.

First, the opinion is based only on a few company documents that were handpicked by Plaintiffs' counsel. (Hirsch Depo., at 67.) Dr. Hirsch admitted that he did not try to find out from counsel whether there were other relevant company documents that he should be reviewing. (*Id.*) He acknowledged that he does not know whether other company documents exist that he

12

was not given to review or if the documents he was given are representative of what the company knew at the time.  (*Id.* at 120.)  Dr. Hirsch further admitted that he does not know whether there are other documents from which he would draw an inconsistent or contrary conclusion:

> Q. So you've got -- you're relying on this handful of GSK documents for various propositions about the company conduct; correct?
>
> A. Correct.
>
> Q. And you don't know if there are other documents out there from which you would draw an inconsistent or contrary conclusion; correct?
>
> A. Correct.

(*Id.* at 122.)  This alleged analysis is wholly unreliable.  *See Stinson Air Ctr., LLC v. XL Specialty Ins. Co.,* No. Civ. SA-03-CA-61-FB, 2005 WL 5979095, at *3 (W.D. Tex. July. 8, 2005) (attached as Ex. Q) ("Because [the expert's] proposed opinion . . . was based solely upon representations of a party with an interest in the outcome of this lawsuit . . . this Court finds [the expert's] methodology for formulating this specific expert opinion to be unorthodox and unreliable"); *Rodefer v. Hill's Pet Nutrition, Inc.,*  No. IP 01-123-CH/K, 2003 WL 23096486, at *5 (S.D. Ind. Nov. 7, 2003) (attached as Ex. R) ("[Expert's] conclusion that the door malfunctioned rests solely on his selective review of documents pertaining to the incident.  Even under the most liberal view of *Daubert*, [expert's] methodology is unreliable. His entire report was based on nothing but the documents that plaintiff's counsel supplied him.").

Second, Dr. Hirsch's primary support for his opinion that GSK was not "honest with the public" is his assumption that GSK failed to timely publish an article by John Baldwin, an employee of Beecham Pharmaceuticals (a GSK predeceessor company), regarding the Paxil preclinical animal studies (discussed *supra*).  This opinion is not based on any reliable factual

basis.  The Baldwin article was published in 1989, almost *four years before* Paxil was first marketed in the United States in 1993, and *15 years before* the medication was prescribed to Andrea Frischhertz in 2004.  (*See* Hirsch Depo., at 113-14.)  It makes no sense that an article published 15 years before 2004 and relied on by FDA when approving Paxil for use in the United States can be the basis for an opinion that GSK was not honest with the public.  Any testimony about GSK's "concerns" or honesty must be excluded.

      **D.**    **DR. HIRSCH'S OPINION REGARDING ANY ALLEGED INADEQUACY OF THE PAXIL LABELING IN 2004 MUST BE EXCLUDED**

            **1.**    **Dr. Hirsch is Not Qualified to Opine on Labeling of a Prescription Drug.**

Dr. Hirsch is not a medical doctor and is not permitted to prescribe any type of medication.  (Hirsch Depo., at 55.)  He admits that has never been retained to opine about the adequacy of any type of labeling or warnings, *id.* at 48; has never consulted with any pharmaceutical company regarding appropriate safety warnings on any drug, *id.* at 51; has never worked for the FDA or any other regulatory agency, *id.*; and has never consulted with the FDA regarding labeling or warnings for any drug, *id.* at 51-52.  Indeed, Dr. Hirsch admits that he has no expertise in FDA regulations of prescription drug labeling:

> Q.    Is it fair to say that you also have *no particular expertise as it relates in FDA regulations as they relate to the labeling of a prescription medication*?
>
> A.    *That's correct*.

(*Id.* at 52-53) (emphases added).  Moreover, Dr. Hirsch admits that he has no expertise in pregnancy categories in prescription drug labeling.  (*Id.* at 53 ("I would say I don't have expertise.").)  Indeed, Dr. Hirsch does not even know if there is greater risk with pregnancy Category D than with Category C drugs.  (*Id.* at 55.)

Dr. Hirsch's own admissions demonstrate that he is utterly unqualified to testify regarding the adequacy of the Paxil labeling. *Wilson*, 163 F.3d at 937-38 (affirming decision excluding testimony of purported accident reconstruction expert who "had never taught accident reconstruction courses, never experimented or conducted studies in the field, and never published anything on the subject") (citation omitted). Indeed, district courts routinely exclude expert testimony on the adequacy of pharmaceutical warnings under far less compelling circumstances. *See, e.g., Wehling v. Sandoz Pharms. Corp.*, No. 97-2212, 1998 U.S. App. LEXIS 38866, at *9-12 (4th Cir. Aug. 20, 1998) (attached as Ex. S) (affirming order finding pharmacist-toxicologist unqualified to testify as to drug label's adequacy); *DeVito v. SmithKline Beecham Corp.*, No. Civ. A. 02-CV-0745, 2004 U.S. Dist. LEXIS 27374, at *33-34 (N.D.N.Y. Nov. 29, 2004) (attached as Ex. T) (excluding testimony as to drug labeling by pharmacist who "has never been drafter or been asked to draft a warning for any antidepressant" and "has not done any research or written any publications on prescription drug warnings"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 548-49 (S.D.N.Y. 2004) (precluding testimony discussing and evaluating drug company's conduct against FDA standards where witnesses lacked expertise regarding the FDA regulatory process); *In re Diet Drugs Prods. Liab. Litig.*, MDL Docket No. 1203, 2001 U.S. Dist. LEXIS 1174 ,at *26-28, 61-63 (E.D. Pa. Feb. 1, 2001) (attached as Ex. U) (excluding proposed testimony regarding content of drug labeling and compliance with regulations by physician who had "little or no knowledge" of regulations governing pharmaceutical company conduct and other physicians who had only "incidental experience with FDA regulations addressing the approval process for labeling, the requisite content of labels, or any other issues concerning the propriety of labeling as defined by FDA regulations"). Any expert who has: (1) no experience drafting prescription drug warnings; (2) no experience with prescription drug

labeling; and (3) no experience with FDA regulations for prescription medications, cannot be permitted to offer testimony to a jury about any alleged inadequacy of the Paxil labeling.

### 2. Dr. Hirsch Offers No Methodology and No Factual Basis For His Claim That the Paxil Labeling is Inadequate.

Not only is Dr. Hirsch unqualified to even speak to the Paxil labeling, he offers no explanation and no support for any opinion in this area, other than his *ipse dixit*. Dr. Hirsch's "methodology" for reaching his opinion on the adequacy of Paxil's labeling consisted solely of reviewing unnamed psychiatric textbooks and the Physicians Desk Reference ("PDR")[4]. (*See* Hirsch Depo., at 75-79.) Yet, Dr. Hirsch admitted that GSK has no control over what information is published in psychiatric textbooks. (*Id.* at 76.) As such, the information contained in any of the unnamed textbooks reviewed by Dr. Hirsch can have no bearing on what GSK allegedly told the prescribing community about the risks of Paxil or whether those warnings were adequate.

The remainder of Dr. Hirsch's methodology consisted simply of reading the 2004 Paxil labeling printed in the PDR. Dr. Hirsch conceded that he reviewed no other information about what GSK told the medical community about the risks of Paxil in 2004.

> Q. Did you rely on anything…from the GSK website to answer the question of what GSK told the medical community in 2004?
>
> A. That information would no longer be available on their website. …
>
> \* \* \*
>
> Q. … what did you rely on to answer the question of what GSK told the medical community in 2004? Okay. We've identified the PDR. How about literature published by GSK?
>
> A. I don't -- no.

---

[4] The PDR is a commercially published compilation of prescribing information, or labeling, for various prescription drugs. The PDR contains only a reprint of the labeling for a drug issued by the manufacturer.

Q. No, you didn't review that?

A. I don't think I came upon any.

\* \* \*

Q. … Is there some scientific methodology that you applied in order to answer the question of what GSK told the medical community in 2004?

A. Well, scientific or professional, I would say, in terms of reviewing what literature was available. And again, you know, I got this case in 2011. I didn't have available what GSK told people back in 2003 or 2004, except for looking at the PDR.

Q. Okay. So is the PDR then your sole source of information for what the company said in 2004 about Paxil and risk of birth defects?

\* \* \*

A. I believe so.

(Hirsch Depo., at 77-79.) In other words, Dr. Hirsch simply read the Paxil labeling from 2004 -- something the jury is equally capable of doing -- without regard to (1) any scientific literature or data relating to the known risks of Paxil, or (2) FDA regulations concerning labeling requirements. This is no methodology at all.

As the Supreme Court explained: "Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. Dr. Hirsch cannot be permitted to offer an opinion that the Paxil labeling was inadequate when he has no expertise, no factual basis, and no methodology to support that opinion.

## IV. CONCLUSION

For the reasons stated above, the proffered testimony of Joseph A. Hirsch, Ph.D. should be excluded in its entirety. Dr. Hirsch is unqualified to offer an relevant opinions in this case and has not followed any acceptable methodology to reach the "opinions" he purports to offer. Dr.

Hirsch should not be permitted to invade the province of the jury, as he clearly would do by commenting on GSK's conduct and honesty. GSK respectfully requests that Dr. Hirsch's testimony be excluded in its entirety.

Dated: September 18, 2012

Respectfully submitted by:

_____

| | |
|---|---|
| James B. Irwin (La. Bar No. 7172) | Andrew T. Bayman (Admitted Pro Hac Vice) |
| Stephanie L. Irwin (La. Bar No. 22493) | Halli D. Cohn (Admitted Pro Hac Vice) |
| Brian P. Quirk (La. Bar No. 19748) | Franklin P. Brannen, Jr. (Admitted Pro Hac Vice) |
| IRWIN FRITCHIE URQUHART & MOORE LLC | |
| 400 Poydras Street, Suite 2700 | Meredith B. Redwine (Admitted Pro Hac Vice) |
| New Orleans, LA 70130 | Bethany L. Schneider (Admitted Pro Hac Vice) |
| Telephone: (504) 310-2100 | KING & SPALDING LLP |
| Facsimile: (504) 310-2101 | 1180 Peachtree Street, N.E. |
| | Atlanta, GA 30309 |
| Tamar Halpern (Admitted Pro Hac Vice) | Telephone: (404) 572-4600 |
| Eva Canaan (Admitted Pro Hac Vice) | Facsimile: (404) 572-5100 |
| PHILLIPS LYTLE LLP | |
| Suite 3400, One HSBC Center | ATTORNEYS FOR DEFENDANT |
| Buffalo, New York 14203 | GLAXOSMITHKLINE LLC |
| Telephone: (716) 847-8400 | |
| Facsimile: (716) 852-6100 | |

## CERTIFICATE OF SERVICE

  I certify that on September 18, 2012, a copy of the foregoing Memorandum was served via ECF filing on all counsel of record.

                        /s/ Halli D. Cohn