**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| ANDREA FRISCHHERTZ, wife of/and BRAD FRISCHHERTZ, individually and on behalf of the minor child, E.F. | : : : | |
| | : | Civil Action No.: 10-2125 |
| Plaintiffs, | : | |
| | : | JUDGE BERRIGAN |
| vs. | : | |
| | : | MAGISTRATE ROBY |
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE | : : : | |
| | : | JURY TRIAL DEMANDED |
| Defendant. | : : | |

**DEFENDANT GLAXOSMITHKLINE LLC'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO**
**EXCLUDE THE TESTIMONY OF PAUL GOLDSTEIN Ph.D.**

Defendant GlaxoSmithKline LLC ("GSK") files this memorandum of law in support of

its motion to exclude the opinion testimony of Paul Goldstein, Ph.D., pursuant to *Daubert v.*

*Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) and Rules 104, 702 and 703 of the Federal

Rules of Evidence.

**I.     INTRODUCTION**

E.F. is the son of Plaintiffs Andrea and Brad Frischhertz ("Plaintiffs").  E.F. was born in

2005 with a hand abnormality (E.F.'s fingers on his right hand are smaller than his left).

Plaintiffs allege that E.F.'s limb abnormality was caused by his *in utero* exposure to Paxil CR®

("Paxil"), a prescription antidepressant manufactured by GSK, that Andrea Frischhertz allegedly

took while pregnant with E.F.  GSK refutes the claim that Paxil played any role in E.F.'s hand

abnormality.  Plaintiffs proffer Paul Goldstein, Ph.D., as an expert who will testify on general

causation, *i.e.*, whether Paxil can cause limb defects, and specific causation, *i.e.*, whether Paxil did cause E.F.'s limb defect.[1]  Dr. Goldstein is Plaintiffs' sole specific causation expert.

At his deposition, Dr. Goldstein admitted unequivocally that there isn't "***any evidence*** that [he] can point to in either humans or animals that demonstrates that Paxil is a limb teratogen"[2] or that it can "adversely affect the development of limbs."  Dr. Goldstein further admitted that there is no ***"evidence"*** that Paxil caused E.F.'s limb defect.  These admissions alone provide ample grounds to exclude Dr. Goldstein's general and specific causation opinions.  Yet, Dr. Goldstein provided a host of other admissions at his deposition that establish his opinions should be excluded for other reasons as well.

Specifically, the following independent reasons establish that Dr. Goldstein's *general* causation opinion should be excluded:

- Dr. Goldstein made a litany of critical admissions establishing that he lacks the necessary expertise and qualifications to offer general causation opinions in this case.

- With no scientific data to establish that Paxil can cause E.F.'s limb defect or limb defects in general, Dr. Goldstein makes unreliable, unproven, and unscientific extrapolations from either (1) data combining all congenital defects together; or (2) data for other types of congenital malformations.  An extrapolation methodology that lumps together different types of broad diseases and medical conditions is refuted by birth defect researchers; courts examining causation in teratology-related litigation[3]; and Fifth Circuit law as an unreliable methodology to establish causation.

- After recognizing that the Bradford-Hill criteria is the methodology that needs to be followed, Dr. Goldstein applied those criteria without first identifying any valid association.  This unreliable methodology has been rejected by courts in assessing whether an expert's opinions are reliable under *Daubert*.

---

[1] Although Dr. Goldstein also claimed in his expert report that Paxil caused E.F.'s "cardiac defects," (Ex. 1) he retracted that opinion at his deposition and conceded  that E.F. has never had a cardiac defect.  *See, e.g.,* Goldstein Dep. (Ex.2) at 131-32 ("I've changed my opinion since then. . . . My opinion now is that after reading all these new materials, I don't see -- and after reading all the reports, I don't -- I don't have an opinion that he had any kind of heart defect at all."; "I no longer hold that view.").

[2] A "teratogen" is any substance capable of causing birth defects.

[3] "Teratology" is the field of science that studies the causes and prevention of birth defects.

- Dr. Goldstein admitted that his general causation opinion is not generally accepted and has not been subjected to peer review.

- Dr. Goldstein candidly admitted that he applied a lower standard for causation in this case than he applies in his professional work, which "starkly contravenes the Supreme Court's requirement that 'an expert . . . employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"[4]

Similarly, Dr. Goldstein's *specific causation* opinion should also be excluded for a number of independent reasons, including:

- Dr. Goldstein, who is not a medical doctor, is not qualified to testify on specific causation in this case.  Indeed, at least three other courts have barred Dr. Goldstein from offering specific causation opinions for this very reason.

- Dr. Goldstein violated fundamental and accepted scientific principles by attempting to use the Bradford-Hill criteria to establish opinions about *specific* causation.

- Dr. Goldstein did not even purport to exclude other potential causes of E.F.'s hand abnormality, even though he acknowledged the high probability that the cause of E.F.'s malformation is either (i) genetic or (ii) unknown.

- Dr. Goldstein reached his specific causation opinion based solely on his belief that Paxil is a teratogen and that E.F. was exposed to Paxil during the relevant period of limb formation.

In the words of another court that excluded Dr. Goldstein's causation opinion under *Daubert:* "[w]ith no basis or methodology for his opinions, [Dr. Goldstein's] conclusion is no more than a 'subjective belief or unsupported speculation.'"[5]  This assessment applies in this case as well.  For these and other reasons discussed below, Dr. Goldstein's general and specific causation opinions should be excluded.

---

[4] *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 639 (S.D. Tex. 2005) (alterations in original).

[5] *Mause v. Global Household Brands, Inc.*, No. Civ. A. 01-4313, 2003 WL 22416000, at *2 (E.D. Pa. Oct. 20, 2003) (Ex. 3).

DMSLIBRARY01-19576997.1

## II.   THERE IS NO SCIENTIFIC EVIDENCE THAT PAXIL CAUSES LIMB DEFECTS

Dr. Goldstein's admission that there is no evidence showing that Paxil[6] causes limb defects of any kind, much less E.F.'s hand defect, is not surprising since the two epidemiological studies that reported data on Paxil and limb defects did not find *any* increased risk -- much less a statistically-significant increased risk of limb defects with Paxil use during pregnancy.  The Louik study (2007) reported an odds ratio ("OR") of 1.0 (CI 0.1-8.3) for Paxil and limb-reduction defects, consistent with no increased risk.[7]   Similarly, the Davis study (2007) reported an OR of 0.72 (CI 0.1.8, 2.83), consistent with a non-statistically significant decreased risk.[8]

Lastly, although the question whether there is a possible association between Paxil and other types of defects is not before this Court, it is notable that no epidemiological study has concluded that Paxil causes any type of birth defect and the available scientific data fail to support the proposition that Paxil causes any type of birth defect.[9]  As recently explained by the Organization of Teratology Information Specialists ("OTIS"), the balance of the evidence suggests that there is no association (much less causation):  "Overall, the majority of studies show that paroxetine is not associated with an increase in the risk for birth defects over what is

---

[6] Paxil is a "SSRI" or a Selective Serotonin Reuptake Inhibitor.  Zoloft and Prozac are other SSRIs.  Paxil is approved to treat a number of psychiatric disorders, including depression and certain anxiety disorders.

[7] Louik C, Lin AE, Werler MM, Hernández-Díaz S, Mitchell AA. First-trimester use of selective serotonin-reuptake inhibitors and the risk of birth defects. *N Engl J Med* 2007;356(26):2675-83. (Ex. 4).

[8] Davis RL, Rubanowice D, McPhillips H, Raebel MA, Andrade SE, Smith D, Yood MU,Platt R; HMO Research Network Center for Education, Research in Therapeutics. Risks of congenital malformations and perinatal events among infants exposed to antidepressant medications during pregnancy. *Pharmacoepidemiol Drug Saf* 2007;16(10):1086-94. (Ex. 5).

[9] *See* expert reports of Edward J. Lammer, M.D. (Ex. 6); Gary M. Shaw, DrPH (Ex. 7); and Anthony R. Scialli, M.D. (Ex. 8).

4

normally seen in the general population."[10]  An updated OTIS statement issued in July 2010

confirms this assessment.[11]

Finally, despite all the advances in science, the causes of birth defects remain largely

unknown.  Indeed, the cause of at least 65% of all birth defects remains unknown, even with the

genetic testing currently available.[12]  Genetic causes account for another 20-25% of birth

defects.[13]  It is against this backdrop of science that Dr. Goldstein seeks to opine that Paxil

caused E.F.'s hand defect.

## III.    ARGUMENT AND CITATION OF AUTHORITIES

### A.    THE COURT'S "GATEKEEPER" ROLE UNDER *DAUBERT*

*Daubert* and Rule 702 require that the District Court undertake its "gate-keeping"

responsibility and assess "three major requirements":

> (1) Qualifications -- a witness proffered to testify to specialized knowledge must
> be an expert; (2) Reliability -- the expert must testify to scientific, technical, or
> otherwise specialized knowledge that will assist the trier of fact; and (3)
> Relevance -- the expert's opinion must assist the trier of fact, *i.e.*, there must be a
> connection between the scientific, technical, or specialized research or results to
> be presented and the particular factual issues in the case.[14]

As emphasized by the Fifth Circuit Court of Appeals:

> [T]he expert's testimony must be reliable at each and every step or else it is
> inadmissible.  "The reliability analysis applies to all aspects of an expert's

---

[10] OTIS, *Paroxetine (Paxil®) and Pregnancy* at 1 (Aug. 2008) (Ex. 9).  *See also* Kimberly A. Yonkers, et al., *The management of depression during pregnancy:  A report from the American Psychiatric Association and the American College of Obstetricians and Gynecologists*, 113 OBSTET. & GYN. 703, 706 (Sept. 2009) (emphasis added) (Ex. 10) ("To summarize, the current data on SSRI exposure show *no consistent information* to support specific morphological teratogenic risks" and "Concurrent medication use or health habits *confound possible associations and create methodological challenges* in this area of investigation.")

[11] OTIS, *Paroxetine (Paxil®) and Pregnancy* at 1 (July 2010) (Ex. 11).

[12] JAMES SCHARDEIN, CHEMICALLY INDUCED BIRTH DEFECTS 2 (3d ed. 2000) (Ex. 12).

[13] *See id.*

[14] *Smith v. Fifthian*, No. Civ. A. 03-2076, 2006 WL 2088126, at *1 (W.D. La. July 26, 2006) (Ex. 13).

DMSLIBRARY01-19576997.1

testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*."[15]

On the issue whether an alleged exposure causes a particular injury, "[c]ausation has two levels, general and specific, and a plaintiff must prove both."[16]  As the Fifth Circuit explained:

> "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury."  Evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general-causation evidence. Thus, there is a two-step process in examining the admissibility of causation evidence in toxic tort cases. First, the district court must determine whether there is general causation. Second, if it concludes that there is admissible general-causation evidence, the district court must determine whether there is admissible specific-causation evidence.[17]

The proponent of expert testimony bears the burden of demonstrating its admissibility by a preponderance of the evidence.[18]

### B.    DR. GOLDSTEIN IS NOT QUALIFIED TO OFFER GENERAL CAUSATION OPINIONS ABOUT THE CAUSES OF BIRTH DEFECTS

Dr. Goldstein fails to satisfy the threshold requirements to offer expert opinions on E.F.'s congenital limb defect: Is he an expert in birth defects?  That answer is a straight-forward and definitive: *No*.  Is he an expert in assessing epidemiological or animal data?  Again, the answer is a clear and decisive: *No.*  Dr. Goldstein's admissions at his deposition prove these points.

Dr. Goldstein concedes that he is not an expert on birth defects generally or limb defects specifically.[19]  Dr. Goldstein has never conducted any research concerning the causes of limb defects; has never published anything about birth defects or limb defects; and is not affiliated

---

[15] *Knight v. Kirby Inland Marine Inc*., 482 F.3d 347, 355 (5th Cir. 2007) (citation omitted).

[16] *Wells v. SmithKline Beecham Corp.,* 601 F.2d 375, 377-78 (5th Cir. 2010).

[17] *Knight*, 482 F.3d at 351 (citations omitted).

[18] *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 276 (5th Cir. 1998).

[19] Goldstein Dep. (Ex. 2) at 116-17; *see also id.* at 47-48 ("Q. And would it be fair to say that you don't hold yourself out to the scientific community as an expert in the causes of either -- of limb defects in humans? A. . . No, I don't.").

DMSLIBRARY01-19576997.1

with any professional organization of teratologists.[20]  He similarly admits that he is not an expert

on SSRIs generally or Paxil specifically.[21]   Nor has Dr. Goldstein ever made a presentation to

his scientific colleagues about Paxil and its possible role in producing birth defects or published

anything about a possible role between Paxil and birth defects.[22]

     Although Dr. Goldstein claims to be an expert in toxicology and genetics, that claimed

expertise is lacking as well.  He acknowledges that he has no formal degree in toxicology,[23] has

never taken a single course in toxicology,[24] and is "self-educated" in that area.[25]  Dr. Goldstein is

not a medical toxicologist.[26]  He has never published any paper or conducted any scientific

research concerning the toxic effects of any substance on humans.[27]  Although he has published

on the toxicity of substances to worms, rats, or mice,[28] he admits that a substance that is toxic or

teratogenic to these species may not be toxic or teratogenic to humans.[29]

     Dr. Goldstein has no training or expertise in epidemiology,[30] pharmacology,[31] or

teratology.[32]  He concedes that he is not qualified to assess the reliability of animal studies[33] or

---

[20] *Id.* at 117; 58.

[21] *Id.* at 117; *see also id.* at 50 (admitting that he is not an expert in pharmacokinetics or pharmacodynamics of SSRIs in general or Paxil in particular.)

[22] *Id.* at 57.

[23] *Id.* at 32.

[24] *Id.*

[25] *Id.* at 37.

[26] *Id.* at 39; *see also* 39 (acknowledging that "medical toxicology is a medical subspecialty focusing on the diagnosis, management, prevention of poisoning and other adverse health effects due to medications or occupational or environmental exposures.")

[27] *Id.* at 40.

[28] *Id.*

[29] *Id.* at 40-41.

[30] *Id.* at 45.

[31] *Id.* at 49.

[32] *Id.* at 57-58.  As Dr. Goldstein acknowledged, teratology is "the science involving cause and prevention of birth defects."  *Id.* at 57.

[33] *Id.* at 42 ("Whether [animal studies] are reliable or not is not my area.  You'd have to talk to an epidemiologist about that.").

the extent to which one can extrapolate from animal to human data.[34]  Similarly, with respect to epidemiological (human) studies, Dr. Goldstein testified that he is not qualified to assess whether they are properly designed and executed[35]; whether their results are explainable by bias and confounding;[36] or even whether the authors concluded that any observed association was causal.[37]

These concessions explain why Dr. Goldstein lacks the necessary scientific expertise to opine on whether Paxil can cause limb defects or any other type of birth defects.  Courts in this District have excluded experts for lack of qualifications under far less compelling circumstances.[38]  For example, in *In re Vioxx Prods. Liab. Litig.,* the District Court excluded the general causation opinion of a cardiologist on the ground that he had little or no experience with

---

[34] *Id.* at 42-43 ("Q. . . . Would you agree that the best you can do is formulate a scientific hypothesis about the potential toxicity or teratogenicity in a substance on human based on, for example, a study of that substance on C. elegans?  A. Well, that's really something you'd have to ask an epidemiologist.  I have no opinion about that.").

[35] *Id.* at 177 ("You're going to have to talk to an epidemiologist if you want to go through the details of one study versus another and why one is better than another in controls.. .  . as far as comparison of one study, did they do the proper controls, that's for an epidemiologist to discuss."); *id.* at 183.

[36] *Id.* at 180 ("Q. You have no way of ruling out confounding or bias as an explanation for the observations they made in the Cole paper; is that correct?  A. That question is addressed to -- is more properly addressed to an epidemiologist."); 220-221.

[37] *See, e.g., id.* at 172 ("You'd have to talk to an epidemiologist about that [whether study authors drew any conclusions about causation]"); *id.* at 222.  *See In re Vioxx Prods. Liab. Litig.,* 2005 WL 3541045, at *3 (E.D. La. Dec. 6, 2005) (Ex. 14) (excluding expert under similar circumstances; "Simply put, [the expert's] reliance on the relevant scientific literature was completely undermined by his inability to firmly understand this literature.").

[38] *See, e.g., In re Vioxx Prods. Liab. Litig.*, 414 F. Supp. 2d 574, 581 (E.D. La. 2006) (excluding general causation opinion of pathologist who admitted that he "has no training in pharmacology; is not qualified to explain how Vioxx could lead to thrombosis; has never done any research on NSAIDs or COX-2 inhibitors prior to becoming an expert for the Plaintiff; is not qualified to analyze and interpret clinical and epidemiological data concerning Vioxx; has never prescribed Vioxx or any other COX-2 inhibitors to a patient; has never determined that Vioxx was a contributing cause of a death; and has never written an article on sudden cardiac death related to plaque rupture."); *Lassiegne v. Taco Bell Corp.*, 202 F. Supp. 2d 512, 518 (E.D. La. 2002) (urologist found to "lack[] the kind of specialized knowledge to testify" whether choking incident caused plaintiff's erectile dysfunction); *In re Vioxx Prods. Liab. Litig.*, 2005 WL 3541045, at *3.

DMSLIBRARY01-19576997.1

Vioxx or other Cox-2 inhibitors.[39]  The District Court noted that "[i]f [expert] is not willing to consider himself an expert on the effect of Cox-2 inhibitors, it would seem quite peculiar for this Court to qualify him as one."[40]  Similarly, Dr. Goldstein admits that he has no expertise whatsoever in birth defects or SSRIs, much less the necessary scientific expertise to assess the epidemiological data.  GSK respectfully submits that this is not a close call.  Dr. Goldstein is not qualified to testify about general causation (*i.e.*, can Paxil cause limb defects and specifically the type of limb defect E.F. had at birth) in this case.

> ### C.      DR. GOLDSTEIN'S GENERAL CAUSATION OPINION IS BASED ON AN UNRELIABLE METHODOLOGY

> #### 1.      Dr. Goldstein Admits That There Is No Evidence That Paxil Can Cause  Limb Defects

Dr. Goldstein testified unequivocally and repeatedly that there are no human or animal data showing an association -- much less causation -- between Paxil and upper limb defects or even limb defects generally:

> **Q.      I think your testimony earlier -- and I don't want to misstate it, so tell me if I am -- is that you're unaware of any human or animal data showing that Paxil or SSRIs can adversely affect the development of limbs.**

> **A.      I said that, yeah.[41]**

* * *

---

[39] 2005 WL 3541045, at *3.

[40] *Id.*

[41] Goldstein Dep. (Ex. 2) at 165 (emphasis added); *see also id.* at 132 ("Q. And we've already talked about upper limb defects, and, as I understand your testimony, you've not identified a single study conducted by any[one], in humans or in animals, demonstrating that Paxil is even associated with upper limb defects, let alone causes them. Is that an accurate statement?  A. That is correct. . . "); 105 ("Q.  And if I understand you, you've not identified any epidemiological association between Paxil exposure prenatally and any -- any upper limb defects of any kind, not just those limited to [E.F.'s] type; is that correct?  A.  That's correct."); 149 ("Q. Have you seen any publication by anyone of an experiment demonstrating that Paxil in particular or SSRIs in general were associated with an increased risk of upper limb defects?  A. No.").

DMSLIBRARY01-19576997.1

**Q.     Well, Doctor, I asked you earlier if there's any evidence that you could point to in either humans or animals that demonstrates that Paxil is a limb teratogen.**

**A.     Well, I actually answered that earlier on.  The answer is no.**[42]

Again, these admissions alone are enough to bar Dr. Goldstein from offering any

opinions in this case.  Yet, there is even more:

Q.     … you just told me it was not your contention that Paxil can cause each and every birth defect, correct?

A.     Right.  But we don't really know which ones they do.

Q.     But you have expressed the opinion that it can cause limb reduction defects.

A.     No.  I have expressed the opinion that -- oh I guess it can cause limb -- okay.  I expressed the opinion quite specifically that because these cells of the limb bud and the hand plate were -- were dividing, there's no question about that, at the time that E.F. was exposed to Paxil, that teratogens, since they don't have to be so specific and there's genetic variability between one person and another, that, yeah, could be.  **I mean, this could have affected his hand plate.  And I don't think there's a person out there that can say, no, it can't be.  I don't think there's a person out there to say that's an impossible thing that could happen, because everybody knows that it could happen.**

Q.     The question –

A.     **Do we have evidence for it?  No.**

Q.     Yeah, that's the question, Doctor.

A.     That's the question.

Q.     Not could it have happened –

A.     **Don't know.**

Q.     -- but did it happen.

A.     **Don't know.**[43]

---

[42] *Id.* at 114 (emphasis added).
[43] Goldstein Dep. (Ex. 2) at 187 (emphasis added).

DMSLIBRARY01-19576997.1

Indeed, GSK is not aware of **any** reported *Daubert* decision allowing an expert to testify that a substance can cause a particular adverse effect where the expert explicitly admits that there is "no evidence" in humans or animals that that substance can cause that adverse effect.  Under "the rigorous standards imposed in this circuit"[44] – which requires evidence of a statistically-significant association between exposure and disease[45] -- Dr. Goldstein's opinion is subject to automatic exclusion.

Significantly, other courts have excluded Dr. Goldstein's opinions for lack of scientific basis, even in cases where he was not as forthcoming about the lack of evidence supporting his opinion.  For example, one District Court excluded Dr. Goldstein's causation opinion in a toxic tort case -- after a *Daubert* hearing at which Dr. Goldstein testified -- finding that "[w]ith no basis nor methodology for his opinions, [Dr. Goldstein's] conclusion is no more than a

---

[44] *Seaman v. Seacor Marine*, 564 F. Supp. 2d 598, 603 (E.D. La. 2008) (noting that expert's "opinion cannot withstand attack under the rigorous standards imposed in this circuit."), *aff'd*, 326 F. App'x 721 (5th Cir. 2009)

[45] *See, e.g., Allen v. Pa. Eng'g Corp*., 102 F.3d 194, 197 (5th Cir. 1996) (While appellants' experts acknowledge the lack of statistically significant epidemiological evidence, they rely on certain studies as "suggestive" of a link between EtO exposure and brain cancer. "'Suggestiveness' is not by the experts' own admission statistical significance . . . ; this basis for their scientific opinion must be rejected."); *Knight v. Kirby Inland Marine*, 482 F.3d 347 (5th Cir. 2007) (same); *Burleson v. Tex. Dep't of Criminal Justice,* 393 F.3d 577, 585 (5th Cir. 2004) (affirming the district court's exclusion of the testimony of plaintiff's expert on the ground that he "offers no studies which demonstrate a statistically significant link between thorium dioxide exposure in dust or fumes and [plaintiff's] type of lung or throat cancer"); *Brock v. Merrell Dow Pharms., Inc*., 874 F.2d 307, 312 (5th Cir.), *modified on reh'g*, 884 F.2d 166, 167 (5th Cir. 1989) (finding "failure to present statistically significant epidemiological proof . . . fatal to [plaintiff's] case"); *Wells v. SmithKline Beecham Corp*., 601 F.3d 375, 380 (5th Cir. 2010) ("this court has frowned on causative conclusions bereft of statistically significant epidemiological support."); *Seaman v. Seacor Marine*, 326 F. App'x 721, 726 (5th Cir. 2009) (unpublished) ("Without some showing of a 'statistically significant' link between [the chemical] and bladder cancer, [expert's] testimony does not establish general causation for [the chemical]."); *LeBlanc v. Chevron USA, Inc*., No. Civ. A. 05-5485, 2009 WL 3837397, at *3 (E.D. La. Nov. 13, 2009) (Ex. 15) ("Thus, the court now concludes that neither Dr. Solanky nor Dr. Gardner will be allowed to testify regarding Dr. Solanky's meta-analysis because the underlying studies do not show a statistically significant link between benzene exposure and myelofibrosis."), *aff'd*, 2010 WL 3824509 (5th Cir. Sept. 23, 2010); *Chambers v. Exxon Corp*., 81 F. Supp. 2d 661 (M.D. La. 2000), *aff'd*, 247 F. 3d 240 (5th Cir. 2001) (excluding "plaintiffs' experts [who] have not offered an epidemiological study that conclusively establishes a statistically significant risk of contracting CML from exposure to benzene.").

DMSLIBRARY01-19576997.1

'subjective belief or unsupported speculation.'"[46]  Similarly, another court excluded Dr.

Goldstein's causation opinion in another toxic tort case, noting that there were "no studies

(epidemiological or otherwise)" supporting his opinion.[47]  For the same reasons, Dr. Goldstein's

opinion should be excluded in this case as well.

> **2.      Dr. Goldstein's Extrapolation From Data For All Congenital Defects
> Combined Or Data For Other Types Of Congenital Defects Is
> Unreliable**

With no evidence to support any claim that exposure to Paxil during pregnancy causes

limb defects, Dr. Goldstein attempts to employ an unscientific and unreliable methodology.

Specifically, Dr. Goldstein attempts to rely on data relating to Paxil and all congenital defects

combined or relating to Paxil and other types of congenital birth defects.  Not only has this type

of methodology been repeatedly rejected as unreliable under Fifth Circuit *Daubert* law, but it is

particularly unreliable in the scientific field of teratology at issue here.

> **a.  Dr. Goldstein's Extrapolation Methodology Is Unreliable Under
> Fifth Circuit Law**

Fifth Circuit *Daubert* decisions uniformly hold that the association must be based on data

that are specific to the disease alleged by plaintiff.  For example, in *Chambers*, plaintiff alleged

that exposure to benzene caused him to develop chronic myelogenous leukemia (CML).

Although plaintiff's experts produced evidence that benzene causes acute myelogenous leukemia

(AML), the court excluded their opinions for failure to produce data showing a statistically

significant association between benzene and CML:

> Plaintiffs' experts did produce research that has found that exposure to benzene
> causes acute myelogenous leukemia (AML). However, plaintiffs' experts were
> unable to provide any research study that concludes that exposure to benzene

---

[46] *Mause v. Global Household Brands*, *Inc*., No. Civ. A. 01-4313, 2003 WL 22416000, at *2 (E.D. Pa. Oct. 20, 2003) (Ex. 3).

[47] *See* Opinion and Order in *Cheryl Reed v. Advanced Delivery & Chemical Systems*, Texas District Ct. -- Burnett County  (June 19, 2000) (Ex. 16) at 2.

DMSLIBRARY01-19576997.1

causes CML. Several studies mention the possibility, but each one concludes that there was no statistically significant association between CML and exposure to benzene. In other words, plaintiffs' experts have not offered an epidemiological study that conclusively establishes a statistically significant risk of contracting CML from exposure to benzene.[48]

Numerous other Fifth Circuit decisions also excluded expert opinions based on extrapolation from data relating to different diagnoses or outcomes.[49]  Accordingly, Dr. Goldstein's reliance on data which relate to (1) Paxil and all congenital defects combined or (2) Paxil and other types of congenital defects is a "methodology" that has been repeatedly rejected as unreliable by Fifth Circuit cases analyzing causation opinions based on data that "lump" together different disease outcomes.

### b.  Dr. Goldstein's Extrapolation Methodology Is Particularly Unreliable In The Field Of Teratology

Not only is the methodology of extrapolation from data relating to different diagnoses or outcomes to reach causation conclusions generally unreliable, but it is *particularly* unreliable in the field of teratology.  As acknowledged by Dr. Goldstein, there is no known human teratogen that increases the risk of each and every birth defect or every category of birth defects:

> Q.     Do you know of any human teratogen that increases the risk of each and every birth defect?

---

[48] *Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 664 (M.D. La. 2000), *aff'd*, 247 F.3d 240 (5th Cir. 2001)

[49] *See, e.g., Knight v. Kirby Inland Marine*, 363 F. Supp. 2d 859, 864-65 (N.D. Miss. 2005) (epidemiological studies regarding an association between benzene and malignant lymphomas, cancer generally, and hematopoietic malignancies as a class, "cannot reasonably provide a foundation" with respect to an expert's opinion regarding an association between benzene and Hodgkin's lymphoma), *aff'd*, 482 F.3d 347 (5th Cir. 2007); *Allen*, 102 F.3d at 198 (evidence exists which suggests a connection between ethylene oxide and human lymphatic and hematopoietic cancers, but such evidence is not probative of the causation of brain cancer); *Burleson v. Tex. Dep't of Criminal Justice,* 393 F.3d 577, 586 (5th Cir. 2004) ("Here, as in *Allen*, there are no epidemiological studies supporting a correlation between the suggested causative agent and *the type of cancer experienced by the plaintiff*.") (emphasis added); *Seaman v. Seacor Marine*, 564 F. Supp. 2d 598, 602-03 (E.D. La. 2008), *aff'd*, 326 F. App'x 721 (5th Cir. 2009) ("[I]t is clear from reading [expert's] deposition that her opinion cannot withstand attack under the rigorous standards imposed in this circuit." "Even if certain hydrocarbons found in Ferox are known to be human carcinogens, *Allen* and *Knight* make clear that general causation with respect to other cancers is not sufficient proof of causation as to bladder cancer.").

DMSLIBRARY01-19576997.1

A.       No, there is none.

Q.       Well, every category of birth defects.

A.       It doesn't exist.[50]

Rather, as Dr. Goldstein admitted, human teratogens are typically associated with specific defects or specific related defects.[51]  Thus, Dr. Goldstein concedes that not every teratogen can adversely affect the development of limbs[52] and that it is not his contention that Paxil can cause each and every birth defect.[53]  These concessions demonstrate that it is not reliable to rely upon data which analyze all birth defects combined to (a) assess whether Paxil is associated with a specific type of birth defect or (b) assume that if Paxil is associated with some types of birth defects, it therefore must be associated with other types of defects, such as limb defects.

Similarly, numerous courts examining this specific issue have concluded that (i) teratogens produce specific types of defects and (ii) that it is unreliable to conclude that a claimed teratogen can therefore produce any type of defect.  For example, in a decision affirmed by the Third Circuit, the District Court excluded the causation opinions of multiple experts who ascribed the infant plaintiff's congenital limb deformity to a nasal decongestant the mother had taken while pregnant.  The court summarized the grounds for its decision as follows:

> I conclude that there is a relevant scientific community here – teratologists – and that that community has developed a methodology for investigating and determining whether a particular agent can cause birth malformations in humans. That methodology is generally accepted within the community of teratologists, having gained such acceptance through publication and critical review in peer-reviewed journals, other authoritative publications and scientific community interaction.

---

[50] Goldstein Dep. (Ex. 2) at 162.
[51] *Id.* at 178; *see also id.* at 162 (agreeing that "human teratogens generally increase rates of specific defects or a spectrum of defects."); *see also* expert reports of Edward J. Lammer, M.D. (Ex. 6); Gary M. Shaw, DrPH (Ex. 7); and Anthony R. Scialli, M.D. (Ex. 8).
[52] Goldstein Dep. (Ex. 2) at 168 ("Absolutely").
[53] *Id.* at 186.

14

Although plaintiff's expert witnesses purport to hail from different disciplines, such as toxicology, pharmacology and pediatric pathology, each is offering an opinion with respect to human birth defects and their causes -- *i.e.*, the field of teratology.  Accordingly, the methodologies they employ must be compared with the methodology generally accepted by the community of teratologists.

**Each of plaintiff's expert witnesses is able to draw his or her respective conclusions only by ignoring the basic requirements of the relevant scientific community's methodology. In particular, an essential element of the generally accepted methodology is that exposure during pregnancy should be associated with an increased frequency of a distinctive pattern of birth defects, as shown through repeated, consistent human epidemiological studies. [54]**

Similarly, the Ninth Circuit affirmed the exclusion of the opinion of an expert educated as a pediatrician, pharmacologist, and toxicologist, that the mother's ingestion of a fertility drug caused her child's birth defect.[55]  The court rejected the expert's "premise that a positive association between an agent and a wide variety of birth defects establishes that the agent substantially increases the probability of all types of birth defects," finding that this was neither a reliable nor a generally accepted methodology in the field of teratology.[56]

Thus, both Dr. Goldstein's own concession and *Daubert* decisions examining the principles of causation in the scientific field of teratology demonstrate unequivocally that Dr. Goldstein's extrapolation methodology is scientifically unreliable and inadmissible.

---

[54] *Wade-Greaux v. Whitehall Labs., Inc.*, 874 F. Supp. 1441, 1478  (D.V.I.), *aff'd*, 46 F.3d 1120 (3d Cir. 1994) (emphasis added) (citations omitted).

[55] *Lust v. Merrell Dow Pharms., Inc.,* 89 F.3d 594, 596 (9th Cir. 1996).

[56] *Id.* at 596-98.  Instead, the court accepted the following testimony of one of the defense experts: "[O]ne of the major principles of teratology is that in response to an exposure to an agent in question, there must be a specific pattern of birth defects in the exposed population. Dr. Done believes that you can get an across the board increase in everything. A little Down syndrome, a club foot, a little spina bifida. That's never been shown with the human teratogen at all. Human teratogens cause specific recognizable patterns of anomalies."

DMSLIBRARY01-19576997.1

### 2. Dr. Goldstein's Application Of The Bradford Hill Criteria In The Absence Of An Established Association Is Not Reliable

As demonstrated *supra*, there are absolutely no data showing any association -- much less a statistically significant one -- between Paxil and limb defects.  Despite this undisputed, critical fact, Dr. Goldstein claims that he reached his general causation opinion through the application of the Bradford-Hill criteria.[57]  Not so.  It is well-established that the Bradford-Hill criteria are not applied until **after** a valid statistically significant association has been identified.[58]  Courts, applying *Daubert*, routinely exclude experts who – like Dr. Goldstein – attempt to use the Bradford-Hill criteria to prove causation without first identifying a valid statistically significant association.[59]

### 3. Dr. Goldstein Admits That He Applied A Lower Causation Standard Than That He Applies In His Professional Work Outside the Courtroom

Dr. Goldstein applied a different, and lower, standard to reach his courtroom opinions than that which he applies in his scientific endeavors outside the courtroom.  Dr. Goldstein testified that his general causation opinion in this case is based on his belief that there is at least a 51% probability that Paxil causes limb defects.[60]  When asked how does that standard compare

---

[57] Goldstein Dep. (Ex. 2) at 87.

[58] *See Dunn v. Sandoz Pharms.*, 275 F. Supp. 2d 672, 678 (M.D.N.C. 2003) ("The greater weight of authority supports Sandoz' assertion that the Bradford Hill criteria is a method for determining whether the results of an epidemiological study can be said to demonstrate causation and not a method for testing an unproven hypothesis.  Sir Bradford Hill identified the starting point of his criteria as 'an association between two variables' that is 'perfectly clear-cut and beyond what we would care to attribute to the play of chance.'"); *Soldo v. Sandoz Pharms.,* 244 F. Supp. 2d 434, 569 (W.D. Pa. 2003) ("because plaintiff's experts have not demonstrated any statistically-significant epidemiologic study showing an increased risk . . . application of the Bradford-Hill criteria is unwarranted"); *In re Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1234 n.5 ("The Bradford-Hill criteria start with an association demonstrated by epidemiology and then apply [those] criteria . . . ."); Federal Judicial Center, Reference Manual on Scientific Evidence (3d. ed. 2011) (hereinafter *Reference Manual*) at 597-99 (Ex. 17) ("We emphasize that these guidelines are employed only after a study finds an association . . .").

[59] *Dunn*, 275 F. Supp. 2d at 679 (excluding expert who "developed a hypothesis and has attempted to use the Bradford Hill criteria to prove that assertion"); *Soldo,* 244 F. Supp. 2d at 569-70.

[60] Goldstein Dep. (Ex. 2) at 122-23.

DMSLIBRARY01-19576997.1

with the standard he applies in reaching conclusions about causation in the context of his

scientific research and writing, Dr. Goldstein admitted:

> ***It's totally different***. I mean, I've been an editor and I've been on editorial boards and accepted papers and rejected papers. And when I do my own work, if I do any statistics, it's got to be 95 percent or better.[61]

As Dr. Goldstein put it, ***"the two are like apples and oranges, obviously."*** [62] As the U.S.

Supreme Court made clear, "[t]he 'objective' 'of *Daubert*'s gatekeeping requirement' 'is to

make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field.'"[63]  That objective cannot be met

when an expert – like Dr. Goldstein – chooses an "apples and oranges" approach so as to apply a

different and ***lower*** scientific standard when it comes to offering opinions inside the courtroom.

Again, courts analyzing this lack of scientific rigor have excluded such experts' opinions.[64]  This

is yet another independent reason why Dr. Goldstein's causation opinion should be excluded.

---

[61] *Id.* at 123 (emphasis added).

[62] *Id*. at 123-24 (emphasis added).

[63] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  *See, e.g.,  Watkins v. Telsmith, Inc.*, 121 F.3d 984, 990 (5th Cir. 1997) ("Rule 702 demands that experts 'adhere to the same standards of intellectual rigor that are demanded in their professional work.'").

[64] *See, e.g., Wade-Greaux v. Whitehall Labs., Inc*., 874 F. Supp. 1441, 1456 ( (D.V.I.), *aff'd*, 46 F.3d 1120 (3d Cir. 1994) (excluding expert who "[a]lthough [she] disavows in the courtroom the methodology generally accepted by the scientific community, . . . has published articles to the scientific community . . . in which she has recognized *and* adopted that methodology") (emphasis added); *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563 (S.D. Tex. 2005) ("Indeed, the gulf between the methodology Dr. Levy employed for this litigation and the methodology Dr. Levy advocates in his academic work starkly contravenes the Supreme Court's requirement that 'an expert ... employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'") (alterations in original); *Marmo v. IBP, Inc*., 360 F. Supp. 2d 1019, 1021 (D. Neb. 2005) (emphasizing that one of the *Daubert* factors is "whether the expert has employed the same level of care and intellectual rigor in reaching the opinion as the expert would employ when working outside the courtroom in the expert's field of expertise" and excluding expert who "testified that she understood the term 'reasonable degree of scientific certainty' to mean 'more probable than not,'. . . and that it was a much lower standard than 'scientific causation.'"); *Allen v. Pa. Eng'g Corp*., 102 F.3d 194, 198 (5th Cir. 1996) (excluding expert who made a distinction between his "legal opinion" and "scientific study").

DMSLIBRARY01-19576997.1

**4.  Dr. Goldstein Admits That His General Causation Opinion Is Not Generally Accepted And Has Not Been Subjected To Peer Review Or Publication**

General acceptance and peer review are two of the criteria the U.S. Supreme Court directed courts to apply in determining the admissibility of proffered expert testimony.[65]  Dr. Goldstein admits unequivocally that his opinion that Paxil can cause upper limb defects is not generally accepted and has not been subjected to peer review or publication:

Q.     Do you claim that your opinion that Paxil can cause upper limb defects of the type that [E.F.] has is generally accepted in the scientific community?

A.     Well, it's obviously not generally accepted, is it, because there are no papers out there that exactly show that. . . . [66]

Dr. Goldstein also has never made a presentation to his scientific colleagues about Paxil and its possible role in producing birth defects and had never published anything about a possible role between Paxil and birth defects.[67]  Dr. Goldstein's inability to satisfy these *Daubert* factors further underscores why his general causation opinion is inherently unreliable.

**D.     DR. GOLDSTEIN'S SPECIFIC CAUSATION SHOULD BE EXCLUDED**

"Evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general causation evidence."[68]  Since there is no admissible general causation evidence in this case from either Dr. Goldstein or Dr. Kramer, the Court need not reach the specific causation opinion of Dr. Goldstein, Plaintiffs' sole specific causation expert.  In any event, Dr. Goldstein's specific causation opinion is inadmissible in its own right because it violates all three essential requirements (*i.e.*, qualifications, reliability, and relevance).  With no other specific causation expert identified by Plaintiffs, Plaintiffs' case must be dismissed.

---

[65] *See Daubert,* 509 U.S. at 597-98.
[66] Goldstein Dep. (Ex. 2) at 144.
[67] *Id.* at 57.
[68] *Knight*, 482 F.3d at 351.

### 1.  Dr. Goldstein Is Not Qualified To Testify Regarding Specific Causation

Dr. Goldstein lacks the essential qualifications and expertise to render any specific causation opinion (*i.e.*, that Paxil caused E.F.'s hand defect).  Dr. Goldstein is not a medical doctor; does not diagnose or treat patients; and is not legally permitted to diagnose or treat a patient for any condition under any circumstances.[69]  Dr. Goldstein also has never counseled patients regarding genetic problems.[70]  Outside of the litigation context, he has never diagnosed a teratogen-induced limb defect,[71] nor can he recall ever being asked to evaluate whether a congenital limb defect was induced by *in utero* exposure to any substance.[72]

These admissions make clear that Dr. Goldstein is in no way qualified to testify on specific causation.  Indeed, at least three courts excluded his testimony on this ground.  In a 2009 toxic tort case, the court excluded Dr. Goldstein, stating that "Dr. Goldstein, who is not a medical doctor, is not qualified to render a medical opinion as to whether workplace exposure to toxic substances more likely than not caused [plaintiff's] cancer."[73]  Similarly, two other District Courts excluded Dr. Goldstein's attempts to offer specific causation testimony on the ground that he is not a medical doctor.[74]

---

[69] Goldstein Dep. (Ex. 2) at 46.

[70] *Id.* at 46-47.

[71] *Id.* at 47.

[72] *Id.* at 48.

[73] *Leija v. Penn Maritime, Inc.*, No. Civ. A 06-10489, 2009 WL 211723, at *2 (E.D. La. Jan. 23, 2009) (Ex. 18).

[74] *Lewis v. D.A. Stuart Co.,* No. 5:02CV20, 2003 WL 26097791, at *6 (E.D. Tex. Oct. 22, 2003) (Ex. 19) ("The Court agrees with Defendant that Dr. Goldstein is not qualified to testify regarding Mr. Lewis' alleged pericarditis . . . . Dr. Goldstein is not a medical doctor, he is not an expert in pericarditis, and he cannot make a diagnosis of a patient."); *Huerta v. City of Santa Fe*, No. 01-968 (D.N.M. 10/18/2002) (order granting "Defendant's Motion in Limine to Bar the Introduction of Testimony from Paul Goldstein, Ph.D. as to any Permanent Injury Allegedly Suffered by Plaintiff.") (Ex. 20).

DMSLIBRARY01-19576997.1

These decisions are in line with scores of other *Daubert* decisions excluding specific causation opinions of non-MD toxicologists and other experts who are not medical doctors.[75] For example, in *In re Vioxx*, the District Court excluded the specific causation opinion of the professor of preventive medicine and director of the Pharmacoepidemiology and Master of Public Health program at Vanderbilt University School of Medicine, who had conducted and published studies on the safety of non-steroidal anti-inflammatory drugs (such as Vioxx).[76] The *Vioxx* court emphasized that the expert was "not a medical doctor" and was not "qualified to review the clinical information of [plaintiff]."[77] For the same reasons, Dr. Goldstein's specific causation opinion should be excluded.

   **2.    Dr. Goldstein Utilized An Unreliable Methodology To Reach His
           Specific Causation Opinion**

       **a.    Dr. Goldstein Admits That There Is No
               Evidence That Paxil Caused E.F.'s Defect**

As discussed above, Dr. Goldstein admitted unequivocally that he does not know of any evidence that Paxil caused E.F.'s hand abnormality.  *See supra* at 10.  As with Dr. Goldstein's general causation opinion, GSK is not aware of *any* reported *Daubert* decision allowing an expert to testify that a substance caused a particular adverse effect in a patient when an expert makes this admission.  Similarly, no court in this Circuit has

---

[75] *Conde v. Velsicol Chem. Corp.*, 804 F. Supp. 972, 1026 (S.D. Ohio 1992) (excluding specific causation opinion of toxicologist on the grounds that "he is not a medical doctor, and he is unable to make a differential diagnosis."), *aff'd* 24 F.3d 809 (6th Cir.1994); *Plourde v. Gladstone*, 190 F. Supp. 2d 708, 719 (D. Vt. 2002) (toxicologist, who was not a medical doctor, not qualified to testify on specific causation); *In re Silicone Gel Breasts Implants Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 907 (C. D. Cal. 2004) (toxicologist "not qualified to opine on specific causation"), *aff'd* 69 F. App'x 485 (2d Cir. 2003); *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 960 (D. Minn. 2009) ("Dr. McGwin is an epidemiologist, not a medical doctor. . . . Dr. McGwin is not licensed to diagnose the cause of a patient's vision loss . . . . Dr. McGwin is not qualified to render an opinion about the cause of a specific patient's [disorder]."); *Mascarenas v. Miles, Inc.*, 986 F. Supp. 582, 590 (W.D. Mo. 1997) ("Dr. Cummins, who is not a medical doctor, cannot evaluate or express opinions on actual possible alternate causes of plaintiff's cancer.").

[76] *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565, 587 (E.D. La. 2005).

[77] *Id.*

20

ever allowed an expert to testify to a mere possibility of causation.  Indeed, it is axiomatic

that such an opinion would not assist the trier of fact.[78]  Thus, Dr. Goldstein's opinion

that causation is "not impossible," that Paxil "could have affected [E.F.'s] hand plate,"[79]

that "this is a possible effect,"[80] and his "educated guess"[81] is inadmissible under

*Daubert.*  For these reasons alone, Dr. Goldstein's specific causation opinion must be

excluded.

> **b.    The Bradford Hill Criteria Are Not A Reliable Methodology
> For Reaching Opinions About Specific Causation**

Dr. Goldstein improperly reached his ***specific*** causation opinion through the application

of the Bradford-Hill criteria:

> Q.    Okay.  And is it fair to say that you used the same methodology to reach your
> general causation opinions as you did your specific causation opinions?
>
> A.    Well, used the Bradford Hill.  We used the criteria of causation, as we call it.
>
> Q.    Well, is that a yes?
>
> A.    We use the same methodology.[82]

Dr. Goldstein's specific causation methodology ignores the well-established rule that "the

Bradford Hill criteria are used to establish *general* causation from epidemiological studies – they

are not used to establish *specific* causation."[83]  Thus, courts have excluded experts who -- like

---

[78] *See, e.g., Lassiegne v. Taco Bell Corp.*, 202 F. Supp. 2d 512, 522-23 (E.D. La. 2002) ("The Court rejects the plaintiff's suggestion that [plaintiffs' experts] be allowed to testify as to the 'possibility of causation.'  Expert testimony is not admissible when it is based merely on subjective belief or unsupported speculation.").

[79] Goldstein Dep. (Ex. 2) at 187.

[80] Goldstein Dep. (Ex. 2) at 145.

[81] *Id.* at 82 ("But the truth is of that is that you try to determine if there's been an exposure and if the results are -- have anything to do or are linked to that exposure.  So you can make an educated guess. You can guess.").

[82] *Id.* at 87.

[83] *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 958 (D. Minn. 2009); *Wells v. SmithKline Beecham Corp.*, No. A-06-CA-126-LY, 2009 WL 564303, at *11 (W.D. Tex. Feb. 18, 2009) (Ex. 21) ("GSK responds that [expert] misapplied the criteria by using them to show specific causation, instead of

Dr. Goldstein -- purport to reach specific causation opinions through the application of the Bradford-Hill criteria.[84]  This is yet another reason why Dr. Goldstein's specific causation opinion is unreliable and inadmissible.

> **c.    Dr. Goldstein Did Not Even Purport To Exclude What He Acknowledged To Be Other Potential Causes Of E.F.'s Malformation**

The standard methodology for reaching a specific causation opinion is differential diagnosis (also sometimes referred to as "differential etiology"), *i.e.,* the process by which the expert rules out alternative potential cause of the disease until the most likely cause remains.[85]  "An expert who fails to scientifically rule out or quantify alleged risk factors to arrive at the most likely causes offers a specific causation opinion that is not relevant because it is nothing more than pure speculation."[86]  Significantly, Dr. Goldstein's testimony has previously been excluded on the ground that "[o]ther possible causes were not ruled out or even considered by the expert."[87]  Similarly, in this case, Dr. Goldstein did not even ***attempt*** to rule out any of the other potential causes of E.F.'s malformation.[88]  This failure is particularly egregious in light of the fact that Dr. Goldstein acknowledged the high probability that the cause of E.F.'s malformation is either (i) genetic or (ii) unknown.

---

to determine general causation. The Court agrees with GSK . . . ."), *aff'd,* 601 F.3d 375, 381 (5th Cir. 2010); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 591-92 (D.N.J. 2002), *aff'd*, 68 F. App'x 356 (3d Cir. 2003); Reference Manual at 552, 597-606, 608-9 (Ex. 17).

[84] *In re Viagra*, 658 F. Supp. 2d at 958; *Wells*, 2009 WL 564303, at *11.

[85] *Johnson v. Arkema, Inc.*, 685 F.3d 452, 468 (5th Cir. 2012).

[86] *Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 846 (W.D. Tex. 2005) ("Simply because each of the possible causes preceded the cancer and therefore could have caused the cancer does not mean that they did cause the cancer.").

[87] *See* Opinion and Order in *Cheryl Reed v. Advanced Delivery & Chemical Systems*, Texas District Ct. -- Burnett County  (June 19, 2000) (Ex. 16) at 2.

[88] As noted *supra*, Dr. Goldstein is in any event not qualified to perform a differential diagnosis because he is not a physician.

DMSLIBRARY01-19576997.1

Dr. Goldstein admitted that he recommended that Andrea or E.F. undergo genetic testing "in order to at least have some idea what's going on" and "to see, with whatever skills we have today in testing, if anything hit a red light or not."[89]  Dr. Goldstein testified that "… if we get a positive, then that's -- we'll know what the situation is.  If we get a negative, then we may not know what the situation is.  But we don't know.  You can never predict what testing will tell you."[90]

Indeed, according to Dr. Goldstein, new genetic explanations for congenital anomalies are being identified almost on a daily basis.[91]  Yet, as Dr. Goldstein acknowledged, no genetic testing of either Andrea Frischhertz or E.F. has ever been done.[92]  For this reason, as Dr. Goldstein admitted, he cannot rule out a genetic explanation for E.F.'s defects.[93]  This is yet another reason why Dr. Goldstein's specific causation opinion is unreliable and inadmissible under *Daubert*.[94]

Dr. Goldstein also admitted that, for the majority of birth defects -- about 65 percent -- the etiology is unknown.[95]  Indeed, Dr. Goldstein admitted that it is impossible to rule out the possibility that the cause of E.F.'s defect is unknown:

Q.      How do you rule out idiopathic, unknown?

---

[89] Goldstein Dep. (Ex. 2) at 71-72.

[90] Goldstein Dep. (Ex. 2) at 72.

[91] *Id.* at 116.

[92] *Id.* at 71 ("I haven't seen any of the genetic testing on them at all.").

[93] *Id.* at 116 ("Right.  And so you can't exclude -- there is no rational way to exclude a genetic explanation, particularly an unidentified genetic explanation for this condition, right?  A.  Well, the only thing that we know -- well, to answer your question, right, the only thing that we know is that as of now, we haven't seen it yet.  And so we just don't know."); *see also id.* at 72:25-73:4.

[94] *Lassiegne v. Taco Bell Corp.*, 202 F. Supp. 2d 512, 521 (E. D. La. 2002) (excluding expert for failure to reliably rule out other potential causes "of plaintiff's problems in making a differential diagnosis."); *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 617-18 (E.D. La. 2003) (excluding the testimony of plaintiffs' experts for failure to rule out other potential causes of plaintiff's condition).

[95] Goldstein Dep. (Ex. 2) at 161 ("I agree with that."); *see also id.*at 125 ("Q. I take it you agree that the vast majority of cases of upper limb defects of a kind that [E.F.] has are of unknown etiology. A. I wouldn't know that number to be sure, but I wouldn't be surprised.").

DMSLIBRARY01-19576997.1

A.     You don't.

Q.     Okay.

A.     You just really don't. That idiopathic just comes in every time.[96]

Dr. Goldstein's failure to account for the potential that E.F.'s malformation is idiopathic is even more troubling given that he would have put E.F.'s hand defect in the idiopathic category if Paxil had not been allegedly taken during the pregnancy.[97]  These failings provide yet another reason why his specific causation opinion is inadmissible.[98]

> ### d.     Dr. Goldstein Reached His Specific Causation Opinion Solely On The Basis Of Temporal Connection Between Exposure And Injury

Dr. Goldstein testified repeatedly that his specific causation opinion is based solely on his belief that Paxil is a teratogen and that E.F. was exposed to Paxil during the relevant period of limb formation:

Q.     Doctor, as I understand it, your opinion that Paxil caused [E.F.'s] limb defects is based on your belief that Paxil is a teratogen and that [E.F.] was exposed to Paxil during a critical period of limb formation; is that correct?

A.     Yes.[99]

A specific causation opinion based solely on the temporal connection between exposure and injury is unreliable and inadmissible under *Daubert*.[100]  Dr. Goldstein's opinion based on this "prime example of false cause reasoning"[101] should be excluded.

---

[96] *Id.* at 146; *see also id.* at 82 ("Q.  Well, doctor, if you're expressing an opinion about the cause of a condition, would you agree that you cannot rule out unknown causes as an explanation for that condition? A.  Yeah.  That's why they're called idiopathic.").

[97] *Id.* at 124 (stating that "if there weren't any teratogens around and [E.F.] had this hand malformation, one would say this is idiopathic and we just don't know.").

[98] Similarly, in excluding Dr. Goldstein's testimony in *Reed* – where Dr. Goldstein opined that *in utero* exposure to a chemical caused the infant plaintiff's aplastic lymphoblastic leukemia (ALL) -- the court emphasized that "[i]n most cases of ALL, the cause is unknown." (*See* Ex. 16 at 2).

[99] Goldstein Dep. (Ex. 2) at 159; *see also id.* at 124-25.

DMSLIBRARY01-19576997.1

## IV.  __CONCLUSION__

For the reasons stated above, GSK respectfully requests that the Court grant its motion to exclude the proffered testimony of Dr. Goldstein.

Dated: September 18, 2012

Respectfully submitted by:

| | |
|---|---|
| James B. Irwin (La. Bar No. 7172) | Andrew T. Bayman (Admitted Pro Hac Vice) |
| Stephanie L. Irwin (La. Bar No. 22493) | Halli D. Cohn (Admitted Pro Hac Vice) |
| Brian P. Quirk (La. Bar No. 19748) | Franklin P. Brannen, Jr. (Admitted Pro Hac |
| IRWIN FRITCHIE URQUHART & MOORE LLC | Vice) |
| 400 Poydras Street, Suite 2700 | Meredith B. Redwine (Admitted Pro Hac Vice) |
| New Orleans, LA 70130 | Bethany L. Schneider (Admitted Pro Hac Vice) |
| Telephone: (504) 310-2100 | KING & SPALDING LLP |
| Facsimile: (504) 310-2101 | 1180 Peachtree Street, N.E. |
| | Atlanta, GA 30309 |
| Tamar Halpern (Admitted Pro Hac Vice) | Telephone: (404) 572-4600 |
| Eva Canaan (Admitted Pro Hac Vice) | Facsimile: (404) 572-5100 |
| PHILLIPS LYTLE LLP | |
| Suite 3400, One HSBC Center | ATTORNEYS FOR DEFENDANT |
| Buffalo, New York  14203 | GLAXOSMITHKLINE LLC |
| Telephone:  (716) 847-8400 | |
| Facsimile:  (716) 852-6100 | |

## __CERTIFICATE OF SERVICE__

I certify that on September 18, 2012, a copy of the foregoing Memorandum was served via ECF filing on all counsel of record.

/s/ Halli D. Cohn

---

[100] *See, e.g., Black v. Food Lion, Inc.*, 171 F.3d 308, 313-14 (5th Cir. 1999) ("the fallacy of *post-hoc propter-hoc* reasoning . . . is as unacceptable in science as in law"); *Lassiegne*, 202 F. Supp. 2d at 517 (excluding expert whose causation conclusion was "based on temporal proximity alone"); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 277 (5th Cir. 1998).

[101] *Cano*, 362 F. Supp. 2d at 846 ("This is a prime example of false-cause reasoning. Simply because each of the possible causes preceded the cancer and therefore could have caused the cancer does not mean that they did cause the cancer.").

25