## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ANDREA FRISCHHERTZ, wife of/and BRAD FRISCHHERTZ, individually and on behalf of the minor child, E.F.** | : : : | |
| | : | **Civil Action No.: 10-2125** |
| **Plaintiffs,** | : | |
| | : | **JUDGE BERRIGAN** |
| **vs.** | : | |
| | : | **MAGISTRATE ROBY** |
| **SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE** | : : : | |
| | : | **JURY TRIAL DEMANDED** |
| **Defendant.** | : : | |

### DEFENDANT GLAXOSMITHKLINE LLC's
### MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO
### EXCLUDE THE TESTIMONY OF SHIRA KRAMER Ph.D.

Defendant GlaxoSmithKline LLC ("GSK") files this memorandum of law in support of

its motion to exclude the opinion testimony of Shira Kramer, Ph.D., pursuant to *Daubert v.*

*Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) and Rules 104, 702 and 703 of the Federal

Rules of Evidence.

## I.   <u>INTRODUCTION</u>

E.F. is the son of Plaintiffs Andrea and Brad Frischhertz ("Plaintiffs").  E.F. was born in

2005 with a hand abnormality (E.F.'s fingers on his right hand are smaller than his left.)

Plaintiffs allege that E.F.'s limb abnormality was caused by his *in utero* exposure to Paxil CR®

("Paxil"), a prescription antidepressant manufactured by GSK, that Andrea Frischhertz allegedly

took while pregnant with E.F.[1]  GSK refutes the claim that Paxil played any role in E.F.'s congenital hand abnormality.  Plaintiffs proffer Shira Kramer, Ph.D., as an expert who will testify on general causation, *i.e.*, whether Paxil can cause the type of hand abnormality that E.F. was born with, a "limb reduction" defect.[2]

Dr. Kramer is an epidemiologist.  She is not a medical doctor and does not offer a specific causation opinion in this case.[3]  Dr. Kramer admits that there are no epidemiological studies finding any association – much less a statistically significant association – between congenital limb defects, such as E.F.'s, and Paxil.  She is not aware of any case report or case series involving Paxil and limb defects.  Nor could she identify any professional organization, textbook, or journal article identifying an association – much less causation – between Paxil and limb defects.

Instead, the lynchpin of Dr. Kramer's general causation opinion is the purported mechanism of action (*i.e.*, *how* Paxil supposedly acts on serotonin levels in the body to affect a developing fetus in a way that supposedly can cause a congenital limb defect).  Specifically, Dr. Kramer opines that Paxil perturbs serotonin (a naturally occurring chemical found in the body) and that perturbation of serotonin then can cause limb defects.  Although Dr. Kramer claims that it is scientifically established that perturbation in serotonin can cause limb defects, Plaintiffs'

---

[1] Although Plaintiffs also assert that Paxil caused E.F.'s purported "cardiac defects," their only specific causation expert – Dr. Goldstein – retracted that opinion at his deposition, acknowledging that E.F. has never had a cardiac defect.  *See*, *e.g.*, Sept. 5, 2012 Deposition of P. Goldstein taken in *Frischhertz v. GSK* ("Goldstein Dep.") (Ex. 1) at 131-132 ("I've changed my opinion since then . . . . My opinion now is that after reading all these new materials, I don't see – and after reading all the reports, I don't – I don't have an opinion that he had any kind of heart defect at all."; "I no longer hold that view").  Dr. Kramer offers no specific causation opinion in this case and cannot do so because she is not a medical doctor, much less a cardiologist.  May 10, 2012 Deposition of S. Kramer taken in *Frischhertz v. GSK* ("Kramer Dep.") (Ex. 2) at 45.  Thus, to the extent that Dr. Kramer's expert report expresses opinions about Paxil and cardiac defects, those opinions are not relevant to any issue in this case, and are not addressed further in this brief.  *See* March 14, 2012 Expert Report of Shira Kramer, Ph.D. ("Kramer Report") (Ex. 3).

[2] Kramer Dep. (Ex. 2) at 34-35.

[3] *Id.* at 45.

expert toxicologist, Dr. Goldstein, repeatedly admitted at his deposition that this is merely a

"hypothesis."  Dr. Goldstein's view about this issue is not surprising since there are no scientific

studies of any kind that show that exposure to Paxil during pregnancy increases the risk of

congenital limb defects.  In any event, Dr. Kramer's causation opinion based on her  unsupported

mechanism theory is unreliable and inadmissible for each of the following reasons:

- Dr. Kramer admitted that there are no data showing any association – much less a
  statistically significant association – of limb defects on Paxil.  Of the two studies that
  have reported data on Paxil and limb defects, one reported no increased risk, while the
  other reported a non-statistically significant decreased risk.

- Dr. Kramer is not qualified to testify regarding a purported mechanism of action based on
  perturbation of serotonin, much less the cause of birth defects in general.  Dr. Kramer
  concedes that she is not an expert in birth defects, pharmacology, molecular biology, or
  any other relevant field; has never studied mechanisms of birth defects; and has never
  done research on serotonin or serotonin receptors.  As Dr. Kramer put it: "***I am not an
  expert, as I've said, in . . . the mechanism of action of serotonin***."

- Both established scientific methodology and case law applying *Daubert* make clear that
  mechanism of action (also sometimes referred to as "biological plausibility") cannot
  establish causation in the absence of evidence of a valid statistically significant
  association in the epidemiological literature.  Experts who – like Dr. Kramer – rely on
  mechanism of action or other Bradford Hill criteria in this manner are routinely excluded
  under *Daubert.*

- To the extent that Dr. Kramer claims to rely in part on epidemiological data for Paxil and
  all congenital malformations combined, this type of "lumping" or extrapolation
  methodology is uniformly recognized as unreliable under Fifth Circuit *Daubert* law.
  Moreover, this extrapolation methodology is particularly unreliable in the field of
  teratology[4] and has been rejected by courts when assessing causation in teratology-related
  litigation.

- Dr. Kramer was unable to identify a single scientific study or published article linking
  perturbation of serotonin with limb defects, much less a study showing that Paxil affects
  serotonin, thereby causing limb defects.

- Dr. Kramer reached her causation opinions through the application of a "weight of the
  evidence" ("WOE") methodology used by regulatory agencies.  The Fifth Circuit has
  unequivocally held that this methodology is unreliable for determining causation in a
  court of law.

---

[4] "Teratology" is the field of science that studies the causes and prevention of birth defects.

- Dr. Kramer admits that the WOE methodology is applied by multidisciplinary panels composed of experts in various fields of expertise. She, on the other hand, applies it as a "panel of one" with only one field of expertise – epidemiology – in a case where she admits that the epidemiological data are "absent."

- Dr. Kramer's WOE methodology varies from case to case, depending on what evidence purportedly supports her opinions. In this case, she claims causation exists notwithstanding the fact that the epidemiological data are, in her words, "really absent." In other cases, however, not only has she testified that epidemiological data are the "most important aspect of [her] causation analysis," but she has also testified that "consistent repeated epidemiological studies that show an increased risk of that health outcome after exposure to the specific chemical or group of chemicals at issue" are ***required*** to reach a causation conclusion. Her shifting opinions are tailor-made for exclusion under *Daubert*'s rigorous analysis.

For these and other reasons delineated below, Dr. Kramer's general causation opinion

should be excluded.

## II.   THERE IS NO SCIENTIFIC EVIDENCE THAT PAXIL CAUSES LIMB DEFECTS

The two epidemiological studies that reported data on Paxil and limb defects did not find

*any* increased risk, much less a statistically-significant increased risk of limb defects with Paxil

use during pregnancy. The Louik study (2007) reported an odds ratio ("OR") of 1.0 (CI 0.1-8.3)

for Paxil and limb-reduction defects, consistent with no increased risk.[5]  Similarly, the Davis

study (2007) reported an OR of 0.72 (CI 0.1.8, 2.83), consistent with a non-statistically

significant decreased risk.[6]

It is thus not surprising that Dr. Kramer described the epidemiological evidence on Paxil

and limb defects as "**more or less noncontributory**" and "really **absent**."[7]  She is not aware of

---

[5] Louik C, et al.  First-trimester use of selective serotonin-reuptake inhibitors and the risk of birth defects. *N Engl J Med* 2007; 356(26):2675-83 ("Louik 2007 Study") (Ex. 4).

[6] Davis RL, et al. Risks of congenital malformations and perinatal events among infants exposed to antidepressant medications during pregnancy.  *Pharmacoepidemiol Drug Saf* 2007; 16:1086-1094 ("Davis 2007 Study") (Ex. 5).

[7] Kramer Dep. (Ex. 2) at 117-118 (emphasis added).

any case report or case series involving Paxil and limb defects.[8]  Nor could she identify any professional organization, textbook, or journal article identifying an association – much less causation – between Paxil and limb defects.[9]  Similarly, Plaintiffs' other general causation expert, Dr. Paul Goldstein, admitted that there is "no evidence" showing that Paxil causes limb defects of any kind.[10]

Lastly, although the question whether there is an association between Paxil and other types of defects is not before this Court, it is notable that no epidemiological study has concluded that Paxil causes any type of birth defect and the available scientific data fail to support the proposition that Paxil causes any type of birth defect.[11]  As recently explained by the Organization of Teratology Information Specialists ("OTIS"), the balance of the evidence suggests there is no association, much less causation:  "Overall, the majority of studies show that paroxetine is not associated with an increase in the risk for birth defects over what is normally seen in the general population."[12]  An updated OTIS statement issued in July 2010 confirms this assessment.[13]

_____

[8] *Id.* at 305.

[9] *Id.* at 144-145.

[10] Goldstein Dep. (Ex. 1) at 114:3-8.

[11] *See* April 17, 2012 Expert Report of Edward J. Lammer, M.D. ("Lammar Report") (Ex. 6); April 2012 Expert Report of Gary M. Shaw, DrPH ("Shaw Report") (Ex. 7); April 30, 2012 Expert Report of Anthony R. Scialli, M.D. ("Scialli Report") (Ex. 8).

[12] OTIS, *Paroxetine (Paxil®) and Pregnancy* (Aug. 2008), at 1 (Ex. 9).  *See also* Kimberly A. Yonkers, et al., *The management of depression during pregnancy:  A report from the American Psychiatric Association and the American College of Obstetricians and Gynecologists*, 113 OBSTET. & GYN. 703, 706 (Sept. 2009) (Ex. 10) ("To summarize, the current data on SSRI exposure show *no consistent information* to support specific morphological teratogenic risks" and "Concurrent medication use or health habits *confound possible associations and create methodological challenges* in this area of investigation.")(emphasis added); O. Diav-Citrin & A. Ornoy, *Selective Serotonin Reuptake Inhibitors in Human Pregnancy: To Treat or Not to Treat*, 2012 OBSTET & GYN. 1 (2012) (Ex. 11) ("In our opinion, ***the current data do not support teratogenicity of SSRIs***.") (emphasis added); Lars Henning Pedersen, et al., *Selective Serotonin Reuptake Inhibitors in Pregnancy and Congenital Malformations:  Population Based Cohort Study*, 339 BRITISH MEDICAL J. 735 (2009) (Ex. 12)("***The teratogenic effects of specific SSRIs are unconfirmed***.") (emphasis added).

[13] OTIS, *Paroxetine (Paxil®) and Pregnancy* (July 2010) at 1 (Ex. 13).

Finally, despite all the advances in science, the causes of birth defects remain largely unknown.  Indeed, the cause of at least 65% of all birth defects remains unknown, even with the genetic testing currently available.[14]  Genetic causes account for another 20-25% of birth defects.[15]  It is against this scientific landscape that Dr. Kramer seeks to opine that Paxil causes congenital limb defects.

## III.   THE GOVERNING *DAUBERT* LAW

### A.   The Court's "Gatekeeper" Role Under *Daubert*

*Daubert* and Rule 702 require that the District Court undertake its "gate-keeping" responsibility and assess  "three major requirements":

> (1) Qualifications – a witness proffered to testify to specialized knowledge must be an expert; (2) Reliability – the expert must testify to scientific, technical, or otherwise specialized knowledge that will assist the trier of fact; and (3) Relevance – the expert's opinion must assist the trier of fact, *i.e.*, there must be a connection between the scientific, technical, or specialized research or results to be presented and the particular factual issues in the case.[16]

As emphasized by the Fifth Circuit Court of Appeals:

> [T]he expert's testimony must be reliable at each and every step or else it is inadmissible.  "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*.".[17]

On the issue whether an alleged exposure causes a particular injury, "[c]ausation has two levels, general and specific, and a plaintiff must prove both."[18]  As the Fifth Circuit Court of Appeals wrote:

---

[14] JAMES SCHARDEIN, CHEMICALLY INDUCED BIRTH DEFECTS 2 (3d ed. 2000) (Ex. 14).

[15] *See id.*

[16] *Smith v. Fifthian*, No. Civ. A. 03-2076, 2006 WL 2088126, at *1 (W.D. La. July 26, 2006) (Ex. 15).

[17] *Knight v. Kirby Inland Marine*, 482 F.3d 347, 355 (5th Cir. 2007) (citation omitted).

[18] *Wells v. SmithKline Beecham Corp.,* 601 F. 2d 375, 377-78 (5th Cir. 2010).

"General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." Evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general-causation evidence. Thus, there is a two-step process in examining the admissibility of causation evidence in toxic tort cases. First, the district court must determine whether there is general causation. Second, if it concludes that there is admissible general-causation evidence, the district court must determine whether there is admissible specific-causation evidence.[19]

The proponent of expert testimony bears the burden of demonstrating its admissibility by a preponderance of the evidence.[20] Significantly, the Fifth Circuit imposes a rigorous standard for establishing causation under *Daubert*.[21]

**B.     Establishing An Association Between the Exposure and the Disease**

**1.     Epidemiological Studies Are Required.**

"Epidemiological studies can be defined as the branch of medicine that deals with the causes, distribution, and control of disease in humans."[22] Where there is a background rate of the disease in the general population, epidemiological studies are required to establish an association between the exposure and the disease:

The disease from which Mr. Chambers suffers, chronic myelogenous leukemia, develops in the general population. It develops in those that have been exposed to benzene and those that have not. Without a controlled study, there is no way to determine if CML is more common in people who are exposed to benzene than those who are not. Therefore, in a case such as this, the most conclusive type of evidence of causation is epidemiological evidence. ***Epidemiological studies are necessary to determine the cause and effect relationship between an agent, in this case exposure to benzene, and a disease, CML.***[23]

---

[19] *Knight*, 482 F.3d at 351 (citations omitted).

[20] *Moore v. Ashland Chem.,* 151 F.3d 269, 276 (5th Cir. 1998).

[21] *Seaman v. Seacor Marine*, 564 F. Supp. 2d 598, 602 (E.D. La. 2008), *aff'd*, 326 Fed. App'x 721 (5th Cir. 2009) (noting that expert's "opinion cannot withstand attack under the rigorous standards imposed in this circuit.").

[22] *Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 663-64 (M.D. La. 2000), *aff'd*, 247 F.3d 240 (5th Cir. 2001).

[23] *Id.* (emphasis added; citations omitted); *see also Allen v. Pa. Engineering Corp.*, 102 F.3d 194, 197 (5th Cir. 1996) ("Undoubtedly, the most useful and conclusive type of evidence in [toxic tort cases] is epidemiological studies.").

**2.    The Association Must Be Based on Data that Are Statistically Significant.**

Fifth Circuit *Daubert* decisions uniformly reject causation opinions unsupported by statistically significant data.[24]  For example, in *Allen*, the Fifth Circuit stated as follows:

> While appellants' experts acknowledge the lack of statistically significant epidemiological evidence, they rely on certain studies as "suggestive" of a link between EtO exposure and brain cancer. "Suggestiveness" is not by the experts' own admission statistical significance . . . ; this basis for their scientific opinion must be rejected.[25]

**3.    The Association Must Be Based on Data that Are Specific to the Disease Alleged by Plaintiff.**

Fifth Circuit *Daubert* decisions similarly uniformly hold that the association must be based on data that are specific to the disease alleged by plaintiff.  For example, in *Chambers*, plaintiff alleged that exposure to benzene caused him to develop chronic myelogenous leukemia (CML).  Although plaintiff's experts produced evidence that benzene causes acute myelogenous leukemia (AML), the court excluded their opinions for failure to produce data showing a statistically significant association between benzene and CML:

---

[24] *See e.g., Allen*, 102 F.3d at 198 (affirming exclusion of causation opinions unsupported by statistically significant data); *Knight*, 482 F.3d at 347 (same); *Burleson v. Texas Dep't of Criminal Justice,* 393 F.3d 577, 585 (5th Cir. 2004) (affirming the district court's exclusion of the testimony of plaintiff's expert on the ground that he "offers no studies which demonstrate a statistically significant link between thorium dioxide exposure in dust or fumes and [plaintiff's] type of lung or throat cancer"); *Brock v. Merrell Dow Pharms.*, 874 F.2d 307, 312 (5th Cir.), *modified on reh'g*, 884 F.2d 166, 167 (5th Cir. 1989) (finding "failure to present statistically significant epidemiological proof . . . fatal to [plaintiff's] case"); *Wells*, 601 F.3d at 378 ("this court has frowned on causative conclusions bereft of statistically significant epidemiological support."); *Seaman v. Seacor Marine*, 326 Fed. App'x 721, 726 (5th Cir. 2009) ("Without some showing of a 'statistically significant' link between [the chemical] and bladder cancer, [expert's] testimony does not establish general causation for [the chemical]."); *LeBlanc v. Chevron USA, Inc.*, Civil Action No. 05-5485, 2009 WL 3837397, at *3 (E.D. La. Nov. 13, 2009) (Ex. 16), *aff'd*, 396 Fed. App'x 94 (5th Cir. 2010) ("Thus, the court now concludes that neither Dr. Solanky nor Dr. Gardner will be allowed to testify regarding Dr. Solanky's meta-analysis because the underlying studies do not show a statistically significant link between benzene exposure and myelofibrosis."); *Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 664 (M.D. La. 2000), *aff'd*, 247 F.3d 240 (5th Cir. 2001) (excluding "plaintiffs' experts [who] have not offered an epidemiological study that conclusively establishes a statistically significant risk of contracting CML from exposure to benzene.")

[25] *Allen*, 102 F.3d  at 197.

Plaintiffs' experts did produce research that has found that exposure to benzene causes acute myelogenous leukemia (AML). However, plaintiffs' experts were unable to provide any research study that concludes that exposure to benzene causes CML. Several studies mention the possibility, but each one concludes that there was no statistically significant association between CML and exposure to benzene. In other words, plaintiffs' experts have not offered an epidemiological study that conclusively establishes a statistically significant risk of contracting CML from exposure to benzene.[26]

Numerous other Fifth Circuit decisions have excluded expert opinions based on extrapolation from data relating to different diagnoses or outcomes that fall under very broad categories, such as "cancer" or "leukemia" when the plaintiff's expert proffered studies that did not analyze the particular type of cancer at issue.[27]

### C.      From Association to Causation

Identifying a statistically significant association is only the first step in a causation analysis.[28]  After a statistically significant association is identified, the possibility that it is due to bias or confounding must be considered and ruled out.[29]  If bias and confounding are eliminated as possible explanations for the statistically significant association, then it can be concluded that the exposure and the condition are actually associated – *i.e.*, that there is a valid association

---

[26] *Chambers*, 81 F. Supp. 2d at 664.

[27] *See, e.g.*, *Knight*, 363 F. Supp. 2d at 864 (epidemiological studies regarding an association between benzene and malignant lymphomas, cancer generally, and hematopoietic malignancies as a class, "cannot reasonably provide a foundation" with respect to an expert's opinion regarding an association between benzene and Hodgkin's lymphoma); *Allen,* 102 F.3d at 198 (evidence exists which suggests a connection between ethylene oxide and human lymphatic and hematopoietic cancers, but such evidence is not probative of the causation of brain cancer); *Burleson v. Texas Dep't of Criminal Justice,* 393 F.3d 577, 586 (5th Cir. 2004) ("Here, as in *Allen*, there are no epidemiological studies supporting a correlation between the suggested causative agent and the type of cancer experienced by the plaintiff."); *Seaman*, 564 F. Supp. 2d at 602-03 ("[I]t is clear from reading [expert's] deposition that her opinion cannot withstand attack under the rigorous standards imposed in this circuit . . . . Even if certain hydrocarbons found in Ferox are known to be human carcinogens, *Allen* and *Knight* make clear that general causation with respect to other cancers is not sufficient proof of causation as to bladder cancer.")

[28] Federal Judicial Center, Reference Manual on Scientific Evidence (3d. ed. 2011) ("*Reference Manual*") (Ex. 17) at 552-53, 566; *Allison v. McGhan Med. Corp*., 184 F.3d 1300, 1315 n.16 (11th Cir. 1999) ("[S]howing association is far removed from proving **causation**.") (emphasis in original).

[29] *Reference Manual* (Ex. 17) at 554, 567-68, 572.

between the exposure and the condition.[30]  Once a valid association is established, the third and

final step in a causation analysis involves applying established criteria to determine whether the

valid association is, in fact, causal.[31]  These criteria, sometimes referred to as the Bradford Hill

criteria, include: (i) temporal relationship; (ii) strength of the association; (iii) dose-response

relationship; (iv) replication of the findings; (v) biological plausibility; (vi) consideration of

alternative explanations; (vii) cessation of exposure; (viii) specificity of the association; and (ix)

consistency with other knowledge.[32]

## IV.   ARGUMENT AND CITATION OF AUTHORS

### A.   Dr. Kramer Admits that There Are No Epidemiological Data Finding an Association between Paxil and Limb Defects.

It is undisputed that there is a background rate of limb defects in the general population.

Accordingly, epidemiological studies are required to establish an association between Paxil and

limb defects.[33]  Yet, in Dr. Kramer's own words, "the human epidemiological literature

evaluating the relationship between Paxil exposure in the first trimester and limb defects is **more

or less noncontributory** and I would say to a great extent – well, it's really **absent** . . . ."[34]  Not

only are there no statistically significant data showing an increased risk of limb defects on Paxil,

but there are not even non-statistically significant data showing an increased risk of limb defects

on Paxil.  Only two epidemiology studies, Louik (2007) and Davis (2007), reported data on Paxil

and limb defects.  Louik (2007) reported an odds ratio ("OR") of 1.0 (CI 0.1-8.3) for Paxil and

---

[30] *Id.* at 598.

[31] *Id.* at 597.

[32] *Wells v. SmithKline Beecham Corp.,* No. A-06-CA-126-LY, 2009 WL 564303, at *6 (W.D. Tex. Feb. 18, 2009), *aff'd,* 601 F. 3d 375 (5th Cir. 2010) (Ex. 18); *Reference Manual* (Ex. 16) at 600.

[33] *See* Part III(B)(1) *supra.*

[34] Kramer Dep. (Ex. 2) at 117-118 (emphasis added).

limb-reduction defects, consistent with no increased risk.[35]   Similarly, Davis (2007) reported an OR of 0.72 (CI 0.1.8, 2.83), also consistent with a non-statistically significant decreased risk.[36]

Dr. Kramer's claim that the epidemiology studies did not have enough power to detect an increased risk of limb defects because these are rare outcomes – even if true – does not help Plaintiffs meet their burden of proof in this case.  In fact, in a decision affirmed by the Fifth Circuit, the District Court for the Middle District of Louisiana rejected an identical argument by the plaintiff in that case:

> Defendants repeatedly argue that there is an absence of statistically significant epidemiological data demonstrating benzene/CML causation. [Plaintiff] explains that this is so because leukemias generally are relatively rare forms of cancer, and that therefore subdividing them into different types of leukemia hinders the ability to analyze cause and effect on statistics alone.[37]

The court excluded plaintiff's experts because they "have not offered an epidemiological study that conclusively establishes a statistically significant risk of contracting CML from exposure to benzene."[38]  Similarly, in this case, the acknowledged absence of epidemiological data showing *any* increased risk – much less a statistically significant increased risk – of limb defects in babies born to mothers who took Paxil, mandates the exclusion of Dr. Kramer's opinions.

**B.     Dr. Kramer's Biological Plausibility Theory
Is an Unreliable Basis for a Causation Opinion.**

Having admitted that the epidemiology on Paxil and limb defects is "absent," Dr. Kramer attempts to end-run that fatal flaw in her methodology by claiming that the lynchpin of her general causation opinion is one of the Bradford Hill criteria, "biological plausibility," or the purported mechanism of action.  (Dr. Kramer also relies upon an alleged temporal relationship.)

---

[35] Louik 2007 Study (Ex. 4).
[36] Davis 2007 Study (Ex. 5).
[37] *Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 664 n.3 (M.D. La. 2000), *aff'd*, 247 F.3d 240 (5th Cir. 2001).
[38] *Id.* at 664.

Dr. Kramer claims that Paxil supposedly perturbs serotonin levels and that perturbation of

serotonin then somehow can cause limb defects:

> Q.    So if a defect listed under 756 [of the International Classification of Diseases] involved, as you say, the perturbation of serotonin levels, would your opinion then be that Paxil can cause it?
>
> A.    That's correct.[39]
>
> \* \* \*
>
> Q.    So is it fair to say the same as your answer to 756 [of the International Classification of Diseases], your answer to my question about the defects in 755, that other than the perturbation of serotonin levels there is nothing else you can articulate for me, as we sit here right now, as a reason for saying Paxil causes these defects?
>
> A.    I just answered that question.  I don't . . .
>
> Q.    I'm sorry?
>
> A.    I don't recall.[40]

Similarly, although in her expert report, she claimed that "[c]ompelling bases for causation in

this case include: consistency of elevated risk ratios across epidemiologic literature, biological

plausibility, and temporality", at her deposition, she admitted that "epi[demiological] literature

really refers primarily to the cardiac defects and my opinion about the cardiac defects.  The

biological plausibility and temporality really supports the limb defects."[41]

---

[39] Kramer Dep. (Ex. 2) at 81-82; *see also id.* at 62-64 (discussing International Classification of Diseases, 9th Revision listing various types of congenital limb anomalies ).

[40] *Id.* at 90-91; *see also id.* at 132 ("Q.  So is it fair to say that if you believe Paxil perturbs serotonin in the development of a defect, you will be of the view that that defect can be caused by Paxil? A.  That is correct."); *id.* at 77 ("[T]he effect of serotonin on limb development has been very clearly established, and therefore, to a reasonable degree of scientific certainty I believe that Paxil is causally related to limb reduction defects, and phocomelia [absence of limb(s)] would be among them.")

[41] *Id.* at 118-119.

## 1.    Dr. Kramer Is Not Qualified to Opine on the Alleged Biological Mechanism of Action, Much Less the Causes of Birth Defects.

Critically important to the issue of whether Dr. Kramer can advance her serotonin perturbation theory in the courtroom is the question of whether Dr. Kramer is an expert on the mechanism of action of serotonin.  The Court need only look to Dr. Kramer's sworn admissions to answer that crucial question: "***I am not an expert, as I've said, in . . . the mechanism of action of serotonin . . .  I will not specifically be testifying about that issue as an expert in that area***."[42]  Indeed, Dr. Kramer admitted that she has never studied mechanisms of birth defects, has never done research on serotonin or serotonin receptors,[43] and is not an expert in animal testing for purposes of reproductive toxicity.[44]

Equally troubling is Dr. Kramer's admissions that she is not an expert in molecular biology; birth defects; or birth defect epidemiology.[45]  Despite all of these admissions establishing that Dr. Kramer has no expertise in birth defects or the mechanism of serotonin, Dr. Kramer still wishes to pass on her views as scientific opinion.  Dr. Kramer is patently unqualified to testify about these issues[46] and her opinions should be excluded on this basis alone.

---

[42] Nov. 2, 2009 Deposition of S. Kramer in *McMurray v. GSK* ("*McMurray* Kramer Dep.") (Ex. 19) at 81:7-18 (emphasis added); Sept. 21, 2009 Trial Testimony of S. Kramer in *Kilker v. GSK* ("*Kilker* Kramer Test.") (Ex. 20) at 39:14-16 ("Q. You're not an expert in what is called serotonin or serotonin receptors; is that true?  A.  That's correct.")

[43] *McMurray* Kramer Dep. (Ex. 19) at 78:19-21; 79:6-8.

[44] *Id.* at 74:1-5.

[45] *Id.* at 72:11-16; 79:9-11 ("Q.  Have you ever held yourself out as an expert on birth defects?  A. No."); *id.* at 76:12-14 ("Q.  So, you don't call or consider yourself a birth defect epidemiologist? A.  No. That's correct.").

[46] *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, MDL NO. 1657, 05-4046, 2005 WL 3541045, at *3 (E.D. La. Dec. 6, 2005) (Ex. 21) (excluding causation opinion of a cardiologist on the ground that he had little or no experience with Vioxx or other Cox-2 inhibitors; "If Dr. Baldwin is not willing to consider himself an expert on the effect of Cox-2 inhibitors, it would seem quite peculiar for this Court to qualify him as one."); S*mith v. Pfizer*, No. CIV. A. 98-4156-CM, 2001 WL 968369, at *8 (D. Kan. Aug. 14, 2001) (holding that a Harvard-trained psychiatrist was not qualified to testify regarding "the mechanism whereby the drug affects the person (pharmacology).") (Ex. 22).

## 2.   Biological Plausibility Cannot Establish Causation in the Absence of Supporting Epidemiological Data.

Even if Dr. Kramer were qualified to testify regarding a purported mechanism of action based on perturbation of serotonin (which she is not), her opinions must still be excluded because, as noted *supra*, "biological plausibility" is only one of the nine Bradford Hill criteria, which are ***not*** applied until ***after*** a valid statistically significant association has been identified. In other words, biological plausibility can only ***support*** an inference of causation after a valid statistically significant association is established. It alone cannot establish causation. Multiple *Daubert* decision emphasize this point.[47] Experts who attempt to use the Bradford Hill criteria to prove causation, without first identifying a valid statistically significant association, are routinely excluded under *Daubert*.[48] "[A]s the Fifth Circuit stated in *Brock*, theories of toxic causation 'unconfirmed by epidemiological proof cannot form the basis for causation in a court of law.'"[49] As established *supra*, there are no epidemiological data finding any association, much less a statistically significant one, between Paxil and limb defects. In other words, Dr. Kramer attempts to put the cart before the horse when the critical and necessary first step on causation –

---

[47] *See In re Bausch & Lomb Contact Lens Solution Prods. Liab. Litig.*, MDL No. 1785, Civ. No. 2:06-MN-77777-DCN, 2009 WL 2750462, at *12 (D.S.C. Aug. 26, 2009) (Ex. 23) ("These tests' suggestion of biological plausibility is insufficient to demonstrate causation, and [are] unreliable under *Daubert*, absent evidence establishing an association between MoistureLoc and non-Fusarium infections."); *Dunn v. Sandoz Pharms.*, 275 F. Supp. 2d 672, 678 (M.D.N.C. 2003) ("The greater weight of authority supports Sandoz's assertion that the Bradford Hill criteria is a method for determining whether the results of an epidemiological study can be said to demonstrate causation and not a method for testing an unproven hypothesis. Sir Bradford Hill identified the starting point of his criteria as 'an association between two variables' that is 'perfectly clear-cut and beyond what we would care to attribute to the play of chance.'"); *Soldo v. Sandoz Pharms.*, 244 F. Supp. 2d 434, 569 (W.D. Pa. 2003) ("[B]ecause plaintiff's experts have not demonstrated any statistically-significant epidemiologic study showing an increased risk . . . application of the Bradford Hill criteria is unwarranted."); *In re Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1234 n.5 (D. Colo. 1998) ("The Bradford Hill criteria start with an association demonstrated by epidemiology and then apply [those] criteria . . . .").

[48] *Dunn*, 275 F. Supp. 2d at 679 (excluding expert who "developed a hypothesis and has attempted to use the Bradford Hill criteria to prove that assertion"); *Soldo*, 244 F. Supp. 2d at 569-70.

[49] *Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 665 (M.D. La. 2000), *aff'd*, 247 F.3d 240 (5th Cir. 2001).

statistically significant results – cannot be met and do not exist.  This backwards "methodology" has been repeatedly rejected.

Dr. Kramer's theory is not even supported by Plaintiffs' other identified expert, Dr. Paul Goldstein.  Dr. Goldstein repeatedly admitted at his deposition that the theory that perturbation of serotonin can cause limb defects is just a "hypothesis."[50]  A biologically plausible "hypothesis" cannot form the basis for an expert's causation opinion under *Daubert*.[51]  This concession by Plaintiffs' other "expert" reflects just how unreliable and unproven Dr. Kramer's claim truly is in the scientific arena outside the courtroom.

### 3.    Dr. Kramer's Extrapolation from Data For Paxil and All Congenital Defects Is an Unreliable Methodology.

Apparently recognizing the fundamental problems of a causation opinion unsupported by epidemiology, Dr. Kramer purports to rely in part on epidemiological data for Paxil and all congenital malformations combined.

First, as noted *supra*, this type of an extrapolation methodology is uniformly recognized as unreliable under Fifth Circuit *Daubert* law.[52]

Second, Dr. Kramer's reliance upon such combined data is especially inappropriate because, as noted *supra* at 4, two studies have examined the relationship between Paxil and limb defects and found **no** increased risk.

---

[50] Goldstein Dep. (Ex. 1) at 152:21-24 ("And that's what it is, it's a hypothesis."; "It's a hypothesis").

[51] *Brock v. Merrell Dow Pharms.*, 874 F.2d 307, 314 (5th Cir.), *modified on reh'g*, 884 F.2d 166 (5th Cir. 1989) (expert's theory of biological plausibility insufficient to support expert's opinion that Bendectin caused child's birth defect); *Hollander v. Sandoz Pharms.*, 95 F. Supp. 2d 1230, 1235-36 (W.D. Okla. 2000) (excluding experts who "could only list 'possible' mechanisms for Parlodel causing hypertension," whose "opinion about the potential mechanism or potential effect was still only a hypothesis, as opposed to scientific knowledge," and who "could not cite any studies or tests that proved [that] hypothesis"), *aff'd*, 289 F.3d 1193, 1207 (10th Cir. 2002); *In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1296 (M.D. Fla. 2007) (excluding expert's causation opinion based on an untested mechanism theory; "While [the expert's] biological theory may be exactly right, at this point it is merely plausible, not proven, and biological possibility is not proof of causation").

[52] *See* Part III(B)(3) *supra*.

Third, this methodology is ***particularly*** unreliable in the field of teratology as discussed in the expert reports of birth defect experts.[53]  For example, Dr. Gary Shaw, a birth defect epidemiologist and Professor of Pediatrics, Division of Neonatal and Developmental Medicine at Stanford University School of Medicine, writes:  "It is widely accepted in the field that birth defect causing agents, known as teratogens, do not tend to increase risks of all birth defects, but rather fairly specific birth defects."[54]  Similarly, Dr. Edward Lammer, a teratologist, clinical geneticist, and expert on the teratogenetic effects of Accutane, writes:

> As discussed below, a cardinal principle of teratology is that teratogenic agents act with specificity, meaning that they produce specific patterns of malformation that are related by shared pathogenesis (mechanism of action). For example, no teratogen is
> known to cause all types of limb defects. For this reason, when conducting epidemiological studies designed to identify potential causes of limb defects, it is generally accepted that defects should be analyzed individually, or grouped together by common pathogenetic groups.[55]

Likewise, Dr. Anthony Scialli, a Reproductive Toxicologist and OBGYN physician, writes: "There are no single exposures that cause all birth defects, all congenital heart defects, or all limb defects; *i.e*., teratogenic exposures produce specific abnormalities."[56]

Lastly, numerous courts examining this specific issue have similarly concluded that (i) teratogens produce specific types of defects and (ii) that it is therefore unreliable to conclude that because a substance is a teratogen, it can therefore produce any type of defect.  For example, in a decision affirmed by the Third Circuit, the District Court excluded the causation opinions of multiple experts who ascribed the infant plaintiff's congenital limb deformity to a nasal decongestant the mother had taken while pregnant.  The court summarized the grounds for its decision as follows:

---

[53] *See* Lammer Report (Ex. 6); Shaw Report (Ex. 7); Scialli Report (Ex. 8).
[54] Shaw Report (Ex. 7) at 5.
[55] Lammer Report (Ex. 6) at 7.
[56] Scialli Report (Ex. 8) at 3.

I conclude that there is a relevant scientific community here – teratologists – and that that community has developed a methodology for investigating and determining whether a particular agent can cause birth malformations in humans. That methodology is generally accepted within the community of teratologists, having gained such acceptance through publication and critical review in peer-reviewed journals, other authoritative publications and scientific community interaction.

Although plaintiff's expert witnesses purport to hail from different disciplines, such as toxicology, pharmacology and pediatric pathology, each is offering an opinion with respect to human birth defects and their causes – *i.e.*, the field of teratology. Accordingly, the methodologies they employ must be compared with the methodology generally accepted by the community of teratologists.

***Each of plaintiff's expert witnesses is able to draw his or her respective conclusions only by ignoring the basic requirements of the relevant scientific community's methodology. In particular, an essential element of the generally accepted methodology is that exposure during pregnancy should be associated with an increased frequency of a distinctive pattern of birth defects, as shown through repeated, consistent human epidemiological studies.*[57]**

Similarly, the Ninth Circuit affirmed the exclusion of the opinion of an expert educated as a pediatrician, pharmacologist, and toxicologist, that the mother's ingestion of a fertility drug caused her child's birth defect.[58]  The court rejected the expert's "premise that a positive association between an agent and a wide variety of birth defects establishes that the agent substantially increases the probability of all types of birth defects," finding that this was neither a reliable nor a generally accepted methodology in the field of teratology.[59]

In sum, Fifth Circuit *Daubert* decisions and *Daubert* decisions assessing causation in teratology-related litigation explain why Dr. Kramer's extrapolation methodology is unreliable.

---

[57] *Wade-Greaux v. Whitehall Labs.*, 874 F. Supp. 1441, 1478 (D.V.I.), *aff'd*, 46 F.3d 1120 (3d Cir. 1994) (emphasis added (citations omitted).

[58] *Lust v. Merrell Dow Pharms.*, 89 F.3d 594 (9th Cir. 1996).

[59] *Id.* at 596-598.  Instead, the court accepted the following testimony of one of the defense experts:  "One of the major principles of teratology is that in response to an exposure to an agent in question, there must be a specific pattern of birth defects in the exposed population.  Dr. Done believes that you can get an across the board increase in everything.  A little Down syndrome, a club foot, a little spina bifida.  That's never been shown with the human teratogen at all.  Human teratogens cause specific recognizable patterns of anomalies."

### 4. There Is No Reliable Scientific Basis for Dr. Kramer's Mechanism Theory.

It is axiomatic that expert opinions must be sufficiently supported by the materials on which they purport to rely.[60] Thus, even a methodology that is "unassailable" "in the abstract" cannot shore up an opinion that is factually unsupported by the underlying studies or data.[61]

At her deposition, despite repeated questioning on this topic, Dr. Kramer was unable to identify a single study or article linking perturbation of serotonin with limb defects, much less a study linking Paxil with limb defects via this alleged mechanism of action:

> Q.  Dr. Kramer, did you find any scientific article on the development of hand and limb defects with regard to the perturbation of serotonin?
>
> * * *
>
> A.  I have, certainly not all of the references – well, actually I do.  I have every single reference with me on flash drive that I relied upon, and those references then go on to list hundreds of other references.  ***There may be, within those references, certain specific hand and limb defects that are named or called out or specified.  I don't recall, but I can look.***  But certainly without any doubt in my mind the scientific literature does clearly draw a link between serotonin levels, normal levels of serotonin during the first trimester and normal development of the limbs including the upper limb.[62]
>
> * * *

---

[60] *Gen. Elec. v. Joiner*, 522 U.S. 136 (1997) (affirming exclusion of experts where the studies on which they relied did not – individually or in combination – support their conclusions).

[61] *Knight v. Kirby Inland Marine*, 482 F.3d 347, 355 (5th Cir. 2007) ("[W]e hold that the district court did not abuse its discretion in excluding Dr. Levy's testimony upon reasonably concluding that the analytical gap between the studies on which he relied and his conclusions was simply too great and that his opinions were thus unreliable."); *see also Black v. Food Lion, Inc.*, 171 F. 3d 308, 314 (5th Cir. 1999) (holding that an expert's "use of a general methodology cannot vindicate a conclusion for which there is no underlying medical support."); *Lassiegne v. Taco Bell Corp.*, 202 F. Supp. 2d 512, 517 (E.D. La. 2002) (excluding expert who presented "no scientific basis, no 'specific train of medical evidence'" supporting her causation opinion); *Buxton v. Lil' Drug Store Prods., Inc.*, Civil Action No. 2:02 CV 178KS-MTP, 2007 WL 2254492, at *10 (S.D. Miss. Aug. 1, 2007) (Ex. 24), *aff'd*, 294 Fed. App'x 92 (5th Cir. 2008) ("[N]umerous courts have rejected expert opinions on the basis that they are inconsistent with the underlying facts and data, not supported by sufficient facts or data, and/or are conclusory." (listing cases)).

[62] Kramer Dep. (Ex. 2) at 103-104 (emphasis added).

Q.      Do you know of any publication of any kind that says there is an association between Paxil and limb defects?

A.      I believe that there are statements that support that in the literature about – that do mention paroxetine in the literature relating to serotonin, the effects of serotonin in limb development.

Q.      What article mentions paroxetine and limb defects in the same article as –

A.      I don't remember which ones off the top of my head.

Q.      *You think there is such an –*

A.      *There may be.*

Q.      *– article?*

A.      *There may be.*

Q.      *Do you think it is cited in your report?*

A.      *If there is an article – if there is such an article it would certainly have been referenced in my report.*[63]

As an initial matter, Dr. Kramer's claim that "there may be" within the references in her expert report – or within "the hundreds" of references to those references – a study or article linking perturbation of serotonin with limb defects, does not constitute an adequate scientific basis for a causation opinion under *Daubert*.  As the Supreme Court explained in *Joiner*: "Trained experts commonly extrapolate from existing data.  But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."[64]

Not surprisingly, Plaintiffs' expert pharmacologist, Dr. Joseph Hirsch, testified that, after a comprehensive review of the literature on this topic,[65] he has not seen anything to indicate that

---

[63] *Id.* at 306 (emphasis added).
[64] 522 U.S. at 146, 118 S. Ct. at 519.
[65] May 16, 2012 Deposition of J. Hirsch ("Hirsch Dep.") (Ex. 25) at 58.

Paxil administered to a pregnant animal disrupts embryonic serotonin.[66]  Finally, GSK's expert Anthony Scialli, M.D. – a teratologist and reproductive toxicologist with specific expertise in the evaluation of scientific literature concerning these issues, – after reviewing Dr. Kramer's deposition, comprehensively evaluated all the articles cited in Dr. Kramer's report and reference list, as well as any articles that she referenced at her deposition.[67]  Dr. Scialli concluded that ***not a single reference*** established that serotonin plays a role in the development of the limbs in an embryo, much less that perturbation of serotonin can cause limb defects, or that Paxil perturbs serotonin in a way that can cause limb defects.[68]   In short, Dr. Kramer's opinion that Paxil can cause limb defects through perturbation of serotonin is nothing more than her *ipse dixit.  Daubert* and Fed. R. Evid. 702 demand much more.

### C.      Dr. Kramer's Weight of the Evidence Methodology Is Unreliable.

Dr. Kramer also claims she used a "weight of the evidence" ("WOE") methodology.[69] According to Dr. Kramer, this methodology is used by regulatory agencies "when a large body of well-conducted, adequately-powered human epidemiologic studies does not exist."[70]  Dr. Kramer acknowledges that she has never served on a WOE panel, has never done a WOE analysis for a regulatory body, and does not know if regulatory agencies have a different standard than that which is required in a court of law to prove causation.[71]

---

[66] Kramer Dep. (Ex. 2) at 60 ("Q.  So you've never – you haven't seen anything in your literature review to indicate that Paxil administered to a pregnant animal disrupts embryonic serotonin?  A. Embryonic serotonin, not that I'm aware of.").

[67] *See* Sept. 6, 2012 Supplemental Statement of Anthony R. Scialli, M.D. ("Scialli Statement") (Ex. 26), at 2.

[68] *Id.* at 3.

[69] Kramer Dep. (Ex. 2) at 343-344.

[70] *McMurray* Kramer Dep. (Ex. 19) at 466.

[71] *Id.* at 473.

###### 1.     The Fifth Circuit Has Rejected the WOE Methodology.

The Fifth Circuit has held unequivocally that the WOE methodology is not reliable for

determining causation in a court of law:

> We are also unpersuaded that the "weight of the evidence" methodology these
> experts use is scientifically acceptable for demonstrating a medical link between
> Allen's EtO exposure and brain cancer. Regulatory and advisory bodies such as
> IARC, OSHA and EPA utilize a "weight of the evidence" method to assess the
> carcinogenicity of various substances in human beings and suggest or make
> prophylactic rules governing human exposure. This methodology results from the
> preventive perspective that the agencies adopt in order to reduce public exposure
> to harmful substances. The agencies' threshold of proof is reasonably lower than
> that appropriate in tort law, which "traditionally make [s] more particularized
> inquiries into cause and effect" and requires a plaintiff to prove "that it is more
> likely than not that another individual has caused him or her harm.[72]

Dr. Kramer's causation opinion, which she claims is based on the same WOE

methodology as that used by IARC,[73] should be excluded on this ground alone.

###### 2.     Dr. Kramer's Application of the WOE Methodology Is Fundamentally Unreliable

Dr. Kramer admits that when used by regulatory agencies the WOE methodology is

applied by multidisciplinary panels with "no specific bias."[74]  In other words, experts from

different scientific fields sit on the panel and provide input about their particular area of

scientific expertise.  Thus, the threshold problem with Dr. Kramer's application of WOE

methodology in this case is that – unlike the multidisciplinary panels with experts from different

scientific fields – she is a "panel of one."  In the words of Dr. Kramer, "[T]hey utilize a panel of

scientists.  I formulated my opinion ***myself***."[75]  This problem is compounded by the fact that the

expertise that Dr. Kramer would bring to a WOE panel – epidemiology – is precisely what she

---

[72] *Allen,* 102 F.3d at 194, 198 (5th Cir. 1996); *see also Johnson v. Arkema*, 685 F.3d 452 (5th Cir. 2012).

[73] Kramer Dep. (Ex. 2) at 341.

[74] *McMurray* Kramer Dep. (Ex. 19) at 467; 468.

[75] Kramer Dep. (Ex. 2) at 341 (emphasis added).

admits is "absent" in this case.  Thus, Dr. Kramer *is a panel of one with no relevant expertise in the other scientific disciplines*.  This is just another reason for this Court to exclude Dr. Kramer's opinion.

### 3.     Dr. Kramer Applies Her WOE Methodology Inconsistently.

"Because consistency is a hallmark of the scientific method, plaintiff's experts must be required to satisfy their own standards of reliability."[76]  This means that an expert must apply her methodology consistently, both to evidence that does and does not support her conclusion.[77] Indeed, consistency is particularly important where the methodology is, by the expert's own admission, inherently subjective.[78]  This concern applies with particular force here.  In Dr. Kramer's words, "[T]he whole weighting would be very subjective in any case."[79]

Whereas in this case Dr. Kramer unequivocally put the most "weight" on the purported mechanism of action, in other cases, including another Paxil birth defect lawsuit, she claimed that epidemiological data are the most important part of her causation analysis:

Q.     So, . . . how much weight you put on, relative weight you put on the epidemiologic data versus the mechanistic data?

A.     Well, *I always put more weight on the epidemiological data*.[80]

* * *

[76] *Soldo*, 244 F. Supp. 2d at 561.

[77] *Id.* at 557 ("Thus, plaintiff's experts take the inconsistent position that negative results on these tests are *capable* of disproving alternative causes of ICH, but are *incapable* of disproving vasospasm or vasoconstriction as a cause of ICH. This inconsistency is the hallmark of a decidedly *unscientific* approach.").

[78] *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 602, 607 (D.N.J. 2002), *aff'd*, 68 Fed. App'x 356 (3d Cir. 2003) ("In order to ensure that the 'weight-of-the-evidence' methodology is truly a methodology, rather than a mere conclusion-oriented selection process that weighs more heavily those studies that supported an outcome, there must be a scientific method of weighting that is used and explained."; "Importantly, because the weight-of-the-evidence methodology involves substantial judgment on the part of the expert, it is crucial that the expert supply his method for weighting the studies he has chosen to include in order to prevent a mere listing of studies and jumping to a conclusion.")

[79] *McMurray* Kramer Dep. (Ex. 19) at 476.

[80] *Id.* at 272 (emphasis added).

22

Q.      Did you consider some evidence more important than others? Was there any weight given to the different criteria? So, for example, did you give a higher weight to mechanistic information or epidemiologic information?

A.      The basis for, you know, the review was **the epidemiological data**, and that **is the most important aspect of my own review and the most important aspect of my causation analysis**, but then conclusions about causation were informed by all of the other information that I read and that I received.[81]

* * *

". . **there obviously needs to be evidence in the, in studies that have been done that demonstrate an elevation in risk, more than one study,** and, you know, although not necessary, it's very helpful if you see biological plausibility."[82]

* * *

Q.      What are the nice to haves and must haves for you to reach the conclusion that an agent is causally-related to a disease outcome?

A.      ***Well, I think the most important issue is – I would say at the top of my list, is epidemiological – consistent repeated epidemiological studies that show an increased risk of that health outcome after exposure to the specific chemical or group of chemicals at issue.***  In addition . . . exposure must precede the disease.  The nice to haves include biological plausibility . . . dose response . . . repeated elevated risks in studies of different populations over different time periods.[83]

Dr. Kramer's efforts to shift her WOE methodology as she sees fit, from case to case, depending on what evidence purportedly supports her conclusions, is yet another reason why her opinions are unreliable and inadmissible under *Daubert*.

---

[81] *Id.* at 462 (emphasis added); *see also id.* at 466 (". . . you've asked me do I concentrate more heavily on the human epidemiological data compared to some other source of data, and the answer is yes.")

[82] *Id.* at 455 (emphasis added).

[83] Aug. 11, 2012 Deposition of S. Kramer in *Collela v. Monsanto* (Ex. 27) at 106-107 (emphasis added).

## V.   <u>CONCLUSION</u>

Dr. Kramer's general causation opinion, which is unsupported by any relevant expertise, is not derived through any reliable methodology, and is not substantively supported by any epidemiological data or scientific literature, violates every single one of the *Daubert* criteria and should be excluded by this Court.

Dated: September 18, 2012                              Respectfully submitted:

By: /s/ Halli D. Cohn
James B. Irwin (La. Bar No. 7172)
Stephanie L. Irwin (La. Bar No. 22493)
Brian P. Quirk (La. Bar No. 19748)
IRWIN FRITCHIE URQUHART & MOORE LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
Facsimile: (504) 310-2101

Tamar Halpern (Admitted *Pro Hac Vice*)
Eva Canaan (Admitted *Pro Hac Vice*)
PHILLIPS LYTLE LLP
Suite 3400, One HSBC Center
Buffalo, New York  14203
Telephone:  (716) 847-8400
Facsimile:  (716) 852-6100

Andrew T. Bayman (Admitted *Pro Hac Vice*)
Halli D. Cohn (Admitted *Pro Hac Vice*)
Franklin P. Brannen. Jr. (Admitted *Pro Hac Vice*)
Meredith B. Redwine (Admitted *Pro Hac Vice*)
Bethany L. Schneider (Admitted *Pro Hac Vice*)
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

ATTORNEYS FOR DEFENDANT
GLAXOSMITHKLINE LLC

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 18th day of September, 2012, a true and correct copy of the

foregoing **DEFENDANT GLAXOSMITHKLINE LLC'S MEMORANDUM OF LAW IN**

**SUPPORT OF ITS MOTION TO EXCLUDE THE TESTIMO NY OF SHIRA KRAMER,**

**Ph.D.**, was served via ECF filing on all counsel of record.

This 18th day of September, 2012.

<u>/s/ Halli D. Cohn</u>
Counsel for Defendant GlaxoSmithKline
LLC