# Exhibit 19

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2             CIVIL ACTION NO. 08-CV-381-GKF-SAJ
 3
    SHAUNA EVELYN McMURRAY,
 4  individually and as a Natural
    Parent of I.K.M. and M.A.M.,
 5  Minor Children,
                    Plaintiff,
 6
                vs.
 7
    SMITHKLINE BEECHAM CORPORATION d/b/a
 8  GLAXOSMITHKLINE, a Pennsylvania
    Corporation,
 9                  Defendant.
10
                    ------------
11             Monday, November 2, 2009
                    ------------
12
13          Oral sworn videotape deposition of SHIRA KRAMER,
    Ph.D., taken at the law offices of Venable, LLP, 210
14  West Pennsylvania Avenue, Towson, Maryland, on the
    above date, commencing at 8:00 a.m., there being
15  present:
16
                TRACEY LAW FIRM
17              440 Louisiana Street, 16th Floor
                Houston, TX  77002
18              BY:  SHAWN PAUL FOX, ESQ.
                Attorneys for Plaintiffs
19
20
                     - - - - - -
21
22
                    TATE & TATE
23            Certified Court Reporters
              180 Tuckerton Road, Suite 5
24            Medford, New Jersey  08055
             (856) 983-8484 - (800) 636-8283
25                www.tate-tate.com
```

Page 2

1   APPEARANCES CONTINUED:
2
        PHILLIPS LYTLE, LLP
3       3400 HSBC Center
        Buffalo, NY  14203-2887
4       BY: TAMAR P. HALPERN, ESQ.
            ROBERT E. GLANVILLE, ESQ.
5           THOMAS J. SHEEHAN, ESQ.
        Attorneys for Defendant
6
7
    ALSO PRESENT:
8
9       Mr. Adam Zimmerman, Videographer
        Expert Legal Video Productions, Inc.
10      6 Kings Highway East
        Haddonfield, NJ  08033
11      (856) 354-6000
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1            I N D E X
2   WITNESS                        PAGE
3   SHIRA KRAMER, Ph.D.
4       EXAMINATION BY MS. HALPERN...............16
5
6
7            E X H I B I T S
8   EXHIBIT                        PAGE
9   Ex. 1   General Report, 8/6/09..................40
10  Ex. 2   Specific Report, 8/13/09..............45
11  Ex. 5   Declaration of Shira Kramer, Ph.D........55
12  Ex. 6   Commentary on Louik, 8/14/09...........50
13  Ex. 8   Slides, 9/21/09......................166
14  Ex. 9   Trial Transcript, 9/21/09.............413
15  Ex. 11  General Report, 5/29/09................40
16  Ex. 12  Weinstein Transcript, 7/22/09..........177
17  Ex. 13  Medical Records.......................181
18  Ex. 20  Article by Yonkers, et al., 9/09.......304
19  Ex. 21  Article by Meyer, et al., 2004..........96
20  Ex. 24  Article by Levitsky, et al., 1995.......188
21  Ex. 25  AHA Scientific Statement, 6/12/07......259
22  Ex. 26  Article by Wilson, et al., 11/07.......265
23  Ex. 30  Article by Botto, et al., 2007.........313
24  Ex. 33  Article by Louik, et al., 6/28/07......328
25  Ex. 34  Appendix to Louik, 2007...............242

Page 4

1   Ex. 35  Article by Alwan, et al., 6/28/07.......311
2   Ex. 36  Article by Kramer, et al., 1982.........493
3   Ex. 37  Appendix to Alwan, 2007................314
4   Ex. 39  NBDPS Abstractor's Instructions.........312
5   Ex. 41  Article by Brent, 11/4/95..............415
6   Ex. 42  ICD9 (1975)...........................223
7   Ex. 43  CDC ICD9 Revisions....................498
8   Ex. 46  Article by O'Brien, et al., 8/08........491
9   Ex. 48  List of Things Paxil can Cause.........290
10  Ex. 49  Article by Krimsky, 9/1/05.............473
11  Ex. 51  Editorial by Greene, 6/28/07...........348
12  Ex. 52  Article by Wichman, et al., 1/09........383
13  Ex. 56  Article by Kallen, et al., 2007.........346
14  Ex. 57  Article by Davis, et al., 2007.........222
15  Ex. 58  Expert Opinion Review, 2007...........346
16  Ex. 61  Article by Pedersen, et al.............377
17  Ex. 62  Article by Rahimi, et al., 2006.........116
18  Ex. 63  Abstract by Vial, et al................117
19  Ex. 64  Teratology Society Position Paper.......422
20  Ex. 66  Article by Diav-Citrin, et al., 2008....122
21  Ex. 79  Abstract, Zambelli-Weiner, et al........405
22  Ex. 85  Abstract, Zambelli-Weiner, et al........405
23  Ex. 92  Abstract, Zambelli-Weiner, et al........442
24  Ex. 95  Abstract, Diav-Citrin..................391
25  Ex. 96  Abstract, Kramer, et al................443

Page 5

1   Ex. 98   Paxil Label...........................302
2   Ex. 110  Article by Werler, 1997................213
3   Ex. 120  Article by Zambelli-Weiner, et al, 2008.447
4   Ex. 121  Article by Dominici, et al., 2007.......24
5   Ex. 122  Article in Daily Record, 2/17/06........29
6   Ex. 123  Article by Bunin, et al., 1990.........316
7   Ex. 124  Editorial by Chambers, 9/09............420
8   Ex. 128  Article by Frias, et al., 2008.........167
9   Ex. 130  Article by Weed, 2005.................472
10  Ex. 131  Article by Bunin, et al., 1989.........321
11  Ex. 132  Article by Bunin, et al., 1987.........320
12  Ex. 133  Diagrams of the Heart..................44
13  Ex. 134  Article by Hiemke, 1994................94
14  Ex. 150  Binder re Research Papers...............7
15  Ex. 151  Epidemiology: An Introductory Text........7
16  Ex. 152  E-Mail, etc., 13 pages..................8
17  Ex. 153  Notice of Deposition....................8
18  Ex. 154  Modern Epidemiology.....................8
19  Ex. 155  Binder re GSK Expert Reports............9
20  Ex. 156  Binder re GSK Animal Studies re Paxil...9
21  Ex. 157  Binder re Kilker Cross-Examination.......9
22  Ex. 158  Binder re Epi and Tox Studies..........10
23  Ex. 159  Binder re Methodological Articles.......10
24  Ex. 160  Binder re Plaintiff's Expert Reports.....10
25  Ex. 161  Folder containing miscellaneous info.....14

2 (Pages 2 to 5)

USDC, Northern District of OK          McMurray v. GSK                              Monday
No. 08-CV-381-GKF-SAJ          Videotape Deposition of Shira Kramer, Ph.D.     November 2, 2009

---

Page 6

1    Ex. 162  Two-Page Document taken from Ex. 152.....14
2    Ex. 163  Four-Page Document taken from Ex. 152....15
3    Ex. 163  One-Page Document taken from Ex. 158.....15
4    Ex. 164  Documents from Tracey Law Firm..........226
5
6    NOTE: Exhibits 150 through and including 163 were
7    retained by counsel and not included with the
8    transcript.
9
10
11
12
13
14                              .
15
16
17
18
19
20
21
22
23
24
25

---

Page 7

1          MS. HALPERN:  If you just describe it,
2    he'll put it on the record and we'll put a number on
3    it.
4          THE WITNESS:  This a binder with a
5    collection of research papers that have do with
6    various methodological issues relating to the
7    studies that we're going to discuss today, as well
8    as some papers that have to do with the -- with
9    craniofacial abnormalities, and some studies that
10   have to do with the relationship between smoking and
11   congenital malformations, and some studies that have
12   to do with the -- with risk factors for
13   developmental disabilities after open heart surgery.
14   So, that's this binder.
15         MS. HALPERN:  We'll mark that 150.
16         (Exhibit 150, marked for
17   identification.)
18         THE WITNESS:  This is a copy of a
19   textbook called Epidemiology: An Introductory Text,
20   which is a textbook that I coauthored.
21         (Exhibit 151, marked for
22   identification.)
23         THE WITNESS:  This group of documents
24   is a series of -- a subset of e-mails and other
25   information that I received that has to do with the

---

Page 8

1    Louik study and some interchange of information
2    between GSK and -- and the Sloane Epidemiology
3    Center.
4          MS. HALPERN:  Do you want to count the
5    pages so we can have a record of it?
6          MR. FOX:  There's 13 total pages.
7          MS. HALPERN:  Okay.  We'll mark that
8    as Exhibit 152.
9          (Exhibit 152, marked for
10   identification.)
11         THE WITNESS:  This is just simply a
12   notice of today's deposition.
13         MS. HALPERN:  We'll mark that 153.
14         (Exhibit 153, marked for
15   identification.)
16         THE WITNESS:  This is a copy of a
17   textbook called Modern Epidemiology by Rothman and
18   Greenland.
19         MS. HALPERN:  We don't need to mark
20   that.  Oh, I'm sorry.  We do.  I take it back, 154.
21         (Exhibit 154, marked for
22   identification.)
23         THE WITNESS:  This binder contains
24   copies of GSK's expert reports.
25         MS. HALPERN:  155.

---

Page 9

1          (Exhibit 155, marked for
2    identification.)
3          THE WITNESS:  This binder contains
4    copies of studies that were -- animal studies that
5    were conducted by GSK having to do with Paxil.
6          MS. HALPERN:  We'll mark that as 156.
7          (Exhibit 156, marked for
8    identification.)
9          THE WITNESS:  This binder contains
10   information that I received that apparently was
11   assembled by GSK's attorneys in my cross-examination
12   in the Kilker case.  Kilker, K-I-L-K-E-R.
13         MS. HALPERN:  We'll mark that 157.
14         (Exhibit 157, marked for
15   identification.)
16         THE WITNESS:  This binder contains
17   epidemiological and toxicological studies having to
18   do with the relationship between paroxetine and risk
19   of cardiac defect as well as the toxicological
20   studies of paroxetine and SSRIs.  Let me make sure
21   that there's nothing else in here.
22         In addition, in the back of the binder are
23   some additional articles that have to do with
24   genetic and non-genetic factors associated with
25   congenital heart defects.

---

3 (Pages 6 to 9)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 10

1    MS. HALPERN: We'll mark that 158.
2    (Exhibit 158, marked for
3  identification.)
4    THE WITNESS: This binder contains
5  papers and articles that have do with some of the
6  methodological issues that we'll be discussing today
7  relating to the studies of Paxil and congenital
8  malformations.
9    MS. HALPERN: Mark that as 159. The
10  binder reads methodology documentation.
11    (Exhibit 159, marked for
12  identification.)
13    THE WITNESS: This binder contains
14  copies of plaintiff's expert reports, including my
15  own.
16    MS. HALPERN: That will be 160.
17    (Exhibit 160, marked for
18  identification.)
19    MR. FOX: That's the last one.
20    THE WITNESS: And this folder contains
21  some miscellaneous materials including some forest
22  plots or some graphical representations of the
23  studies of Paxil and cardiac birth defects as well
24  as some other materials that were requested of me to
25  be brought to this deposition today.

Page 11

1    MS. HALPERN: And this is 161. And
2  I'll direct these questions, since you're not on
3  record, to you, Shawn. Are there any bills that
4  were produced?
5    MR. FOX: In that folder right there.
6    MS. HALPERN: They're all in 161?
7    MR. FOX: That's right. The total
8  amount billed for the general causation report and
9  the total amount billed or to be billed for work
10  done in McMurray and who did the work is all in
11  there, as well as the hourly rates.
12    MS. HALPERN: Okay. But no bills, for
13  example, for the Kilker matter?
14    MR. FOX: You mean actual bills?
15    MS. HALPERN: Yes, with detailed
16  descriptions of time and --
17    MR. FOX: No. I don't have -- we
18  don't have that.
19    MS. HALPERN: But I mean Kilker, not
20  McMurray, for other cases other than this.
21    MR. FOX: That would be included in
22  this -- the general -- now --
23    MS. HALPERN: Oh, I see. I'm sorry.
24  I see it's broken down for general causation in
25  McMurray.

Page 12

1    MR. FOX: That would include lots of
2  reports.
3    MS. HALPERN: Okay. Got it. And we
4  asked for details of work descriptions.
5    MR. FOX: It would include -- that
6  would not include time billed for, let's say, her
7  work at trial and her testimony. That would not
8  include that.
9    MS. HALPERN: No, this is acceptable
10  to me. The only thing that I'm saying is there's no
11  detail here.
12    MR. FOX: Right.
13    MS. HALPERN: So, we don't have the
14  actual bills.
15    MR. FOX: So, you want actual invoices
16  with it broken down?
17    MS. HALPERN: Absolutely. I believe
18  that's what's requested in our documents so we know
19  who did what work description.
20    MR. FOX: I'll see if my office can
21  get that stuff together.
22    MS. HALPERN: Okay. And then there
23  was another -- can we get that today before the
24  deposition?
25    MR. FOX: Sure.

Page 13

1    MS. HALPERN: It will be faxed here?
2  Okay. The other thing that's missing are the
3  abstracts prepared by EI for Dr. Kramer, which she
4  testified to at the Kilker trial on the articles,
5  all their work product.
6    THE WITNESS: What are you referring
7  to?
8    MS. HALPERN: Anything people at EI
9  prepared for you in preparation of your report.
10  They abstracted articles. I'm just relying on
11  testimony from Kilker.
12    MR. FOX: I've never seen any.
13    THE WITNESS: Well, the testimony that
14  I referred to was information that was inserted into
15  the various reports that have been issued that you
16  have.
17    MS. HALPERN: We'll do this on the
18  record because I have to ask. There's nothing that
19  was brought then from the work product from anybody
20  at EI, other than what's actually in the report
21  itself?
22    THE WITNESS: No, there is. There are
23  some cover pages that are clipped to the actual
24  articles that would satisfy that request as well.
25    MS. HALPERN: Okay. In front of the

4 (Pages 10 to 13)

Page 14

1 article there's an abstract?
2          THE WITNESS:  Yes, like that.
3          MS. HALPERN:  I see.  And what we're
4 looking at is in binder 158, and it looks like they
5 fill it out on a pre-set form that you have?
6          THE WITNESS:  That's correct.
7          MS. HALPERN:  Okay.  We'll have to go
8 into that on the record.
9          All right.  Okay.  If we can just take a
10 break for a minute before we get started so I can
11 take a look at this and see if I need to ask
12 questions about them.  We'll be right back.
13          (Exhibit 161, marked for
14 identification.)
15          (Brief pause.)
16          MS. HALPERN:  I'd like to go back on
17 the record on the documents and just mark a few
18 things separately.  We marked a number of pages
19 before as Exhibit 152, and I would like to take out
20 of that two documents and mark them separately.  The
21 first one is a two-page document which was
22 originally part of 152, and I'd like to mark it
23 whatever the next exhibit is.  162.
24          (Exhibit 162, marked for
25 identification.)

Page 15

1          MS. HALPERN:  And then I'd like to
2 take a four-page document out of what was previously
3 marked as 152.  It's headed The Louik Study, and
4 mark it 163.
5          (Exhibit 163, marked for
6 identification.)
7          MS. HALPERN:  I would like to take a
8 document out of what was previously marked 158.
9 There is a sheet of paper in the left-hand pocket
10 marked control for smoking.  I'd like to mark that
11 independently as 163.
12          (Exhibit 163, marked for
13 identification.)
14          MS. HALPERN:  And that's it.  We'll go
15 with that.  Okay.
16          (Brief pause.)
17          THE VIDEOGRAPHER:  Your Honor and
18 Members of the Jury, the following is a video
19 deposition.  My name is Adam Zimmerman and I
20 represent Expert Legal Video Productions, located at
21 6 East Kings Highway, Haddonfield, New Jersey.
22          This deposition is being taken on November
23 2nd, 2009, at the office of Venable, LLP, located at
24 210 West Pennsylvania Ave, Suite 500, Towson,
25 Maryland.

Page 16

1          It is being taken in the case of Shauna
2 Evelyn McMurray versus SmithKline Beecham, which is
3 filed in the United States District Court for the
4 Northern District of Oklahoma, Case Number
5 08-CV-381-GKF-SAJ.
6          Present for the taking of this video
7 deposition is the witness, Dr. Shira Kramer.  Will
8 counsel now introduce themselves for the record?
9          MR. FOX:  Shawn Fox.  I represent the
10 plaintiffs.
11          MS. HALPERN:  Tamar Halpern for GSK.
12          MR. SHEEHAN:  Tom Sheehan for GSK.
13          MR. GLANVILLE:  Robert Glanville for
14 GSK.
15          THE VIDEOGRAPHER:  The court reporter
16 is Bob Tate with Tate & Tate Reporting.  The court
17 reporter will now swear in the witness.
18          SHIRA KRAMER, Ph.D., having been duly
19 sworn, was examined and testified as follows:
20 BY MS. HALPERN:
21 Q.     Good morning, Dr. Kramer.
22 **A.     Good morning.**
23 Q.     As you know, my name is Tamar Halpern and I
24 represent GSK in this matter.  I understand you've
25 testified before.  So, if we could just establish

Page 17

1 one or two ground rules.
2          If you want to take a break at any time,
3 just let me know, so long as a question isn't
4 pending at the time.
5          I tend to talk very quickly.  If you want
6 me to slow down or if you don't understand my
7 question, I would expect you to tell me; otherwise,
8 I am going to assume that you understood.  Okay?
9 **A.     Yes.**
10 Q.     And also okay with you, I'm going to
11 probably interchange Paxil and paroxetine just
12 because my outline is inconsistent with the use of
13 the word, but they mean the same thing.  Is that
14 acceptable as well?
15 **A.     Yes, it is.**
16 Q.     Okay.  Thank you.  Now, were you in a
17 tenure track position when you were at the
18 University of Pennsylvania School of Medicine?
19 **A.     No, I was not.**
20 Q.     It was a year-to-year contract?
21 **A.     No, it was not.  It was a research track**
22 **position.  I was a research assistant professor of**
23 **epidemiology and pediatrics.**
24 Q.     So, it wasn't a tenure potential position
25 at any point?

Case 2:10-cv-02125-HGB-KWR   Document 188-20   Filed 09/18/12   Page 7 of 166

USDC, Northern District of OK                    McMurray v. GSK                                    Monday
No. 08-CV-381-GKF-SAJ               Videotape Deposition of Shira Kramer, Ph.D.              November 2, 2009

Page 18

1  **A.    I really don't know.  It was so long ago, I**
2  **know that my title at the time was a research**
3  **assistant professor.**
4  Q.    Okay.  So, you never came up for tenure, in
5  other words?
6  **A.    I just left before that was ever an issue.**
7  Q.    All right.  Now, the first business you
8  owned, you started in 1985, I believe, when you left
9  your academic job to become secretary, treasurer and
10 president of RidgeCom; is that right?
11 **A.    That's correct.**
12 Q.    And RidgeCom was involved, among other
13 things, in creating and devising a system for
14 decontaminating chemical warfare agents; is that not
15 true?
16 **A.    Well, there was an involvement between**
17 **RidgeCom and another company that I own that had a**
18 **project that was a joint project between those two**
19 **companies.**
20 Q.    And what was the --
21 **A.    And that was not -- that was not an**
22 **activity that RidgeCom became involved in for many**
23 **years.**
24 Q.    What was the other company that you owned
25 at that time?

Page 19

1  **A.    And I still own.  It's called Sterilex**
2  **Corporation.**
3  Q.    But I had understood Sterilex had not come
4  into existence until much later, 1995?
5  **A.    Well, that's true.  However, the work that**
6  **we did was really precursor work for the technology**
7  **that Sterilex eventually developed and**
8  **commercialized.  So, part of that work gave rise to**
9  **the second company that I own.**
10 Q.    Okay.  But RidgeCom was involved in
11 devising or developing a product for decontaminating
12 chemical warfare agents?
13 **A.    That's correct.**
14 Q.    Okay.  And you're currently the president
15 of a company called Environ -- Epidemiology
16 International, right?
17 **A.    Yes.  And Epidemiology International is the**
18 **same company as RidgeCom, Incorporated.  It just had**
19 **a name change.**
20 Q.    Okay.  And EI, as I understand it,
21 Epidemiology International -- is it all right if I
22 call it EI for short?
23 **A.    Yes, it is.**
24 Q.    Okay.  Advertises that it specializes in
25 litigation support and expert witness testimony on

Page 20

1  the web site, correct?
2  **A.    Well, I wouldn't use the word "advertise."**
3  **We don't -- I don't call that advertising.  We do**
4  **have a web site, and included among other services**
5  **is litigation support, yes.**
6  Q.    Okay.  Well, you do advertise on a database
7  called Trialsmith, don't you?  Actually, it says
8  Experts for Hire, and it lists everybody at EI under
9  -- under that web site.
10 **A.    I really couldn't answer that.**
11 Q.    You're not aware of it?
12 **A.    I'm not aware of it.**
13 Q.    Okay.  In fact, Doctor, have you ever been
14 paid to design and conduct a study for plaintiffs'
15 lawyers, for example, in the Robinette litigation?
16 **A.    Yes, we actually have conducted studies on**
17 **behalf of law firms that have involved, you know,**
18 **work that we've done for litigation, yes.**
19 Q.    And when you conduct a study for a law
20 firm, do they give you complete independence, not
21 only in terms of the design of the work, but the
22 interpretation and the analysis and reporting of the
23 work?
24 **A.    Yes, they do.**
25 Q.    So, you don't send them a preliminary

Page 21

1  report?
2  **A.    We don't send them -- the only reports that**
3  **they might see would be reports that we craft**
4  **entirely on our own, but they have no input**
5  **whatsoever in the content or the conclusions of**
6  **those reports.**
7  Q.    And can they comment on it before you
8  finalize it?  Do they comment on it before you
9  finalize it?
10 **A.    The only comment that ever might occur**
11 **would be in very, very administrative and formatting**
12 **types of manners.  They would never be --**
13 Q.    So, if they found an error, for example, in
14 your report, would you correct it?
15 **A.    What sort of error would you be referring**
16 **to?**
17 Q.    In the reporting of the data, in the adding
18 of the numbers, whatever.
19 **A.    Well, that wouldn't normally involve them.**
20 **I mean, the only error that they might ever know of**
21 **that we wouldn't know of would have maybe to do with**
22 **the facts of a case, but in terms of an**
23 **epidemiological study, we don't ask them to comment**
24 **on the methodologies.**
25 Q.    That wasn't the question.  The question

Page 22

1   was, do they comment before it's final?
2   A.      Not in that manner, no.
3   Q.      In any manner?
4   A.      Well, they may, in the manner that I have
5   already described, they may comment in some sort of
6   clerical manner, in formatting, in that sort of
7   thing, but nothing that has to do with the substance
8   or the conclusions of the reports.
9   Q.      Okay.  Is it fair to say your company EI
10  has annual revenue of over $10 million a year?
11  A.      I don't release information about the
12  revenue of my company.
13  Q.      You have no idea of what your revenues are?
14  A.      I do know what my revenues are, but I don't
15  release that information.
16  Q.      And have you ever testified in litigation
17  on behalf of anyone except plaintiffs?
18  A.      I'm not certain, but I believe the answer
19  to that is yes, but it would have been a long time
20  ago.
21  Q.      And what do you believe the case was where
22  you testified for a defendant?
23  A.      I really -- I couldn't say other than it
24  probably was a pharmaceutical case, but I don't
25  remember.  This would have been a very long time, a

Page 23

1   long time ago.
2   Q.      You've given sworn testimony that you've
3   never testified on behalf of anyone but plaintiffs.
4   A.      Well, actually, let me -- let me correct
5   that.  This would not have been testimony.  This
6   might have been the generation of a report.  This
7   would not have been testimony, that is accurate.
8   Q.      So, let me ask you again.  Have you ever
9   testified in litigation on behalf of anyone except
10  plaintiffs?
11  A.      No, I have not.
12  Q.      Okay.  Now, EI was a silver sponsor for the
13  American Association for Justice at their 2007
14  annual convention, correct?
15  A.      I believe so, yes.
16  Q.      And the sponsorship allowed you to
17  advertise EI's services at the convention, correct?
18  A.      I'm not certain of that.
19  Q.      So, do you know that the American
20  Association for Justice is a consortium of plaintiff
21  trial lawyers?
22  A.      Yes, I do.
23  Q.      All right.  And are you aware that EI also
24  set up an exhibit table advertising litigation
25  services at the South Carolina Trial Lawyers

Page 24

1   Association's annual convention?
2   A.      Yes, I do.
3   Q.      All right.  And they're also an
4   organization limited to plaintiffs' lawyers,
5   correct?
6   A.      That's correct, according to my
7   understanding.
8   Q.      And at the Kilker trial, you testified that
9   the only article you've published in the last --
10  published in the last 19 years is an article about
11  testifying as a paid or expert on behalf of
12  plaintiffs in litigation, correct?
13  A.      Can you repeat that question?
14  Q.      Exhibit 121, please.  Sure.  At the Kilker
15  trial, you testified that the only article you've
16  published in the last 19 years is an article about
17  testifying as a paid expert on behalf of plaintiffs
18  in litigation, correct?  And I'll give you a copy of
19  the article.  We've marked it as Exhibit 121.
20  A.      According to my recollection, I did not
21  testify according to the way you have described it.
22  And I don't have that testimony in front of me.  So,
23  perhaps we -- we might want to take a look at that
24  testimony if you have it here.
25  Q.      Easiest thing to do is to just ask it

Page 25

1   straight up.
2   A.      That's fine.
3   Q.      Is the article that you're looking at,
4   which we've marked as 121, the only article you've
5   published in the last 19 years?
6   A.      It's the, I believe, the only full article.
7   I have published some abstracts.
8   Q.      Okay.
9   A.      But -- and this is also -- let me just
10  correct something.  This is really a, as I testified
11  at the Kilker trial, this article had to do with a
12  biostatistical issue and not about my experience
13  testifying in a trial.
14  Q.      Okay.  Let me ask the questions, if that's
15  okay.  It will go faster.  You were a paid expert in
16  the litigation that was the subject of that article,
17  correct?
18  A.      That's correct.
19  Q.      All right.  And you testified in that trial
20  on behalf of plaintiffs that's the subject of that
21  article, correct?
22  A.      That is correct.
23  Q.      And the article is entitled "The role of
24  epidemiology in the law:  a toxic tort litigation
25  case."  Correct?

7 (Pages 22 to 25)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 26

1  A.    That is correct.
2  Q.    All right.  And it's coauthored by one of
3  your EI employees, true?
4  A.    That is true.
5  Q.    And the article you are holding in your
6  hand is critical of defense lawyers; is that a fair
7  assessment?
8  A.    I don't -- don't know that I would agree
9  with that.
10  Q.    You talk about, on page 31, fifth or sixth
11  line down, "Defense experts more often than not rely
12  on an arsenal of epidemiologic fallacies (i.e., a
13  nonsignificant study proves the null hypothesis),
14  unconventional points of view, (a relative risk must
15  exceed 2 and be statistically significant at the .05
16  level to be meaningful), anecdotal jargon, ("Texas
17  sharpshooter" and "raindancer" fallacy), and
18  hand-waving to dismiss positive findings."
19       You don't think that's critical of defense
20  experts in litigation?
21       MR. FOX:  Objection to form.
22  A.    No, I don't think that that is meant to be
23  an overall or generalized criticism of all defense
24  experts in litigation.  This had to do with
25  experience in this case and in other cases that --

Page 27

1  with which we have been involved.  The principal
2  author of this article is a well-respected
3  biostatistician from Hopkins, now at Harvard, who
4  also testified.  So, this really referred to
5  specific biostatistical arguments and issues, but
6  was not meant to be an overall criticism of all
7  defense experts.
8  Q.    Have you ever written or published anything
9  critical of plaintiff lawyers?
10  A.    I don't recall.
11  Q.    In 1995, you founded another company,
12  Sterilex, correct?
13  A.    That's correct.
14  Q.    And you've been president of this
15  corporation since its inception in 1995?
16  A.    That's correct.
17  Q.    And are you still president today?
18  A.    Yes, I am.
19  Q.    And Sterilex Corporation produces primarily
20  disinfectant and cleaning products; is that correct?
21  A.    Antimicrobial products and technologies.
22  Q.    Okay.  And on May 31st, 2007, Sterilex
23  announced or rolled out one of its new products
24  called Sterilex Ultra Disinfectant Cleaner used for
25  Spas or Cruise Ships; is that right?

Page 28

1  A.    I'd have to check on those dates, so I
2  can't corroborate that.
3  Q.    Well, the product is correct, isn't it?
4  You make a product called Ultra Disinfectant Cleaner
5  used for Spas or Cruise Ships?
6  A.    That's correct.
7  Q.    All right.  And you also make Ultra Powder
8  for Dental Unit Water Lines?
9  A.    That's correct.
10  Q.    And your product is being marketed to beer
11  producers, correct?
12  A.    I believe that is correct.
13  Q.    And it's also being marketed to wineries?
14  A.    That is correct.
15  Q.    And in a newspaper article, you said one of
16  your largest customers is a large carpet company
17  whose manufacturing equipment gets clogged, they use
18  your product to unclog it?
19  A.    I'd need to see that article.
20  Q.    Well, you don't know -- you're not saying
21  that's not correct.  You just don't remember?
22  A.    Well, what I would have to look at is the
23  date of that because it is not our largest customer.
24  Q.    Okay.  Do you have a company that makes
25  carpets manufacturing equipment that gets clogged

Page 29

1  that uses your products?
2  A.    I don't discuss our individual customers.
3  That's -- that's proprietary information.
4  Q.    Now, in 2006, you were quoted as president
5  and co-founder of Sterilex Corporation in the Daily
6  Record that you were poised for a significant growth
7  phase and that a merger or acquisition was being
8  considered to help realize the company's position.
9  Did you ever conduct such a merger?
10  A.    First of all, I'd like to see that quote.
11  I don't recall that article.  So, I'd like to see
12  that quote.
13  Q.    I didn't quote you anything.  I'm just
14  asking you whether you were looking for a merger at
15  the time and whether you are now?
16  A.    No, I'm not.
17  Q.    You stopped looking for a merger?
18  A.    Well, and let me just also clarify that I
19  don't discuss any of the business relationships or
20  strategies of Sterilex with anyone outside the
21  company.
22  Q.    Exhibit 122, please.
23       Well, these are statements you gave to the
24  press, Doctor.  That seems to me there's no
25  privilege there.  I will show you the newspaper

8 (Pages 26 to 29)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 30

1  article.  Okay.  It says in this article, your
2  interest was in marketing and expanding sales.
3  You're quoted as having said, "We're actively
4  looking for a way to expand our sales and
5  distribution channels."  That's what you told the
6  press.
7  **A.      Well, where are you now in this?  Where are**
8  **you reading from?**
9  Q.      Okay.  It says, "Positive reviews and
10  increasing orders are prompting Sterilex to organize
11  a marketing campaign geared towards hurricane and
12  flood-prone areas in the southeastern United States.
13  'We've noted the many opportunities in that area to
14  work with the Federal Emergency Management Agency
15  and municipal governments', said Dr. Shira Kramer,
16  Sterilex's president and co-founder.  'We are now
17  poised for a significant growth phase.  A merger or
18  acquisition is being considered to help realize the
19  potential,' she said."
20      Are you saying that's incorrect or --
21  **A.      No, that's what I said.**
22  Q.      Okay.  Thank you.  Now, is it true that
23  you've tried to develop a chemical warfare drug
24  product?
25  **A.      Drug product?**

Page 31

1  Q.      A chemical warfare drug product.  That's a
2  direct quote out of another newspaper article.
3  **A.      I'd like to see that article, because**
4  **that's not what we're working on.**
5  Q.      Are you working on a chemical warfare
6  product?
7  **A.      We have had applications of our early**
8  **technology in the area of decontamination of**
9  **chemical warfare, never a drug product.**
10  Q.      What about a chemical warfare product, not
11  a decontamination product, but a chemical warfare
12  product?
13  **A.      What sort of product are you referring to?**
14  Q.      I have no idea.
15  **A.      Such as chemical warfare itself?**
16  Q.      That's the question.
17  **A.      No, absolutely not.**
18  Q.      Okay.  Is it fair to say the gross revenues
19  of Sterilex Corporation are over $15 million a year?
20          MR. FOX:  Objection.  Objection to
21  form.
22  **A.      I'm going to decline to answer that**
23  **question.**
24  Q.      So, you don't know?
25  **A.      I know what the revenues of my company are,**

Page 32

1  but I don't disclose that information publicly.
2  Q.      What were your own personal earnings for
3  2008?
4  **A.      I don't disclose that information.**
5  Q.      And for 2009?
6  **A.      Same answer.**
7  Q.      Okay.  How many companies do you currently
8  own or manage?
9  **A.      Two.**
10  Q.      Sterilex and EI?
11  **A.      Correct.**
12  Q.      And no others?
13  **A.      I do not manage any others, that's correct.**
14  Q.      Do you own any other companies?
15  **A.      No, I do not.**
16  Q.      Now, Sterilex has a number of affiliated
17  companies, true?
18  **A.      What are you referring to?**
19  Q.      Butterfly Foods, Inc.?
20  **A.      No, that's not active and hasn't been for**
21  **many years.**
22  Q.      Did you own that company?
23  **A.      My husband was the founder, and I probably**
24  **was listed as a co-owner, but I don't recall.**
25  Q.      But you weren't co-owner?

Page 33

1  **A.      I said I don't recall.  But that -- that**
2  **company has been defunct for probably 15 to 20**
3  **years.**
4  Q.      And what did they make?
5  **A.      Food products.**
6  Q.      Okay.  How about Ridgely Black Rock, LP?
7  **A.      I am an officer.  That is a company that I**
8  **don't own, but it is a company that's owned by my**
9  **mother.**
10  Q.      Your mother, Anne?
11  **A.      Anne Kramer.**
12  Q.      Okay.  And what's your role in Black --
13  Ridgely Black Rock?
14  **A.      I have no role, other than as a family**
15  **member being listed as a, probably as an officer,**
16  **and I don't even really know for sure.**
17  Q.      And that's a real estate company?
18  **A.      Yes, it is.**
19  Q.      Okay.  What about Ridgely Group, Inc.?
20  **A.      That is the same answer, owned by my**
21  **mother, Anne Kramer, and my father.  And again, if I**
22  **am listed as an officer in that company, it's only**
23  **as a family member.  I have no direct role in that**
24  **company.**
25  Q.      Any financial interest in Ridgely Group,

9 (Pages 30 to 33)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 34

1   Inc.?
2   A.      As of now, no, I don't believe so.
3   Q.      Did you ever?
4   A.      No.
5   Q.      How about Ridgely Black Rock, any financial
6   interest?
7   A.      No.
8   Q.      How about Butterfly Foods, Inc.?
9   A.      Well, if I co-owned that, then I would have
10  been -- had a financial interest.
11  Q.      What about Gunpowder Farms Joint Venture?
12  A.      And I don't even know if that -- that's
13  probably defunct.  I believe it is.  Again, that's a
14  real estate project that my mother and father owned.
15  Q.      Did you have any financial interest at any
16  time in Gunpowder Farms Joint Venture?
17  A.      I don't believe so, no.
18  Q.      How about a Center for Reconstructive
19  Surgery, any interest in that?
20  A.      I've never heard of that.
21  Q.      You actually won an award for having the
22  best entrepreneurial spirit, didn't you?
23  A.      Yes, I did.
24  Q.      Okay.  And that was from the Greater
25  Baltimore Business Committee?

Page 35

1   A.      That was from the Greater Baltimore
2   Committee.
3   Q.      Do you consider yourself an entrepreneur?
4   A.      Yes, I do.
5   Q.      How much of your time do you spend managing
6   Sterilex or all of your businesses, both your
7   businesses?
8   A.      I spend 100 percent of my time on both
9   businesses.
10  Q.      Okay.  When you were asked that a number of
11  years ago, you said that it was impossible to say,
12  that it's like asking the president of Pepsi-Cola
13  how much time he spends overseeing all the
14  divisions.  Can you tell me today how much time you
15  spend managing the companies as opposed to doing any
16  other activities?
17  A.      What other activities would you be
18  referring to?
19  Q.      Well, the kind of work you're doing in this
20  case today.
21  A.      It really varies and it all depends on the
22  demands of the projects that I'm working on because
23  I do a combination of management as well as direct
24  involvement in research.
25  Q.      I understand that, but I'm asking you how

Page 36

1   much of your time do you spend managing your
2   businesses?
3   A.      I couldn't answer that.
4   Q.      Okay.  So, it's the same answer you gave
5   last time?
6   A.      It really all depends, that's right.
7   Q.      You said the entire, you know, RidgeCom and
8   Sterilex are my responsibilities, I'm the president
9   of both companies, I manage both companies as they
10  need to be managed.  So, it's the same answer?
11  A.      That's correct.  In addition, though, I do
12  have chief operating officers at both companies that
13  do a lot of the management.
14  Q.      Okay.  And you haven't been a paid employee
15  on the faculty of any institution or higher learning
16  or hospital for the last 24 years; is that correct?
17  A.      That's correct.
18  Q.      All right.  Dr. Kramer, in your opinion, is
19  probability the same or something other than
20  certainty when you use those two words?
21  A.      They are inter -- they're very related,
22  actually.  So, it really all depends on the
23  qualifier.  For instance, you know, there is a
24  phrase, a reasonable degree of scientific certainty.
25  There is a phrase, a reasonable degree of scientific

Page 37

1   probability.  And so --
2   Q.      Is there a difference between those two
3   phrases?
4   A.      There is, yes, I would say, yes, there
5   probably is a difference.
6   Q.      Can you tell me what the difference is to
7   you?
8   A.      Well, to me in terms of my everyday
9   practice, is that what you're asking me?
10  Q.      I'm just asking you what the difference is
11  between those two phrases, no.
12  A.      It's very hard to really put a clear
13  definition as to those two phrases.  I think that --
14  Q.      Well, you use one sometimes and the other
15  sometimes.  When do you choose to use one rather
16  than the other?
17  A.      You know, in our field, it's really almost
18  an interchangeable -- often it's an interchangeable
19  word, because when you talk about causation, in
20  particular, the standard that we apply is, you know,
21  is a very high degree of confidence.  And so that --
22  Q.      I think you're misunderstanding my
23  question.  The only question pending is is there a
24  difference in your mind in the standard that you're
25  describing when you hold an opinion to a reasonable

10 (Pages 34 to 37)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 38

1  degree of probability versus when you hold an
2  opinion to a reasonable degree of certainty?
3  A.     I guess one might say in a qualitative
4  sense that certainty might -- might be a stronger
5  term than probability.  But it's, again, very
6  difficult to exactly and -- and clearly define what
7  is meant by that.
8  Q.     Okay.  So, when you say to a reasonable
9  degree of probability, can you quantify what you're
10 talking about?  Is it more likely than not, greater
11 than 51 percent?  I mean, can you put a number on
12 it?
13 A.     Well, you know, certainly it is a number of
14 things.  A reasonable degree of scientific
15 probability means that it is certainly more probably
16 than not.  It is certainly -- you know, the 51
17 percent issue is really very, very subjective.  I
18 think that, you know, it's a higher level than that.
19 It's a -- it's very hard to put an actual
20 probability number.  It's, you know, I think it's
21 difficult to do that.
22 Q.     But certainty -- but reasonable degree of
23 certainty is something more than whatever a
24 reasonable degree of probability is; is that what
25 you --

Page 39

1  A.     I would say qualitatively, that's true.
2  Q.     Okay.  And if you write something for,
3  let's say, a peer-reviewed journal, what standard
4  for causation would you use, a reasonable --
5  something that's akin to a reasonable degree of
6  probability or a reasonable degree of certainty or
7  some other standard?
8  A.     Well, I think in general you wouldn't see
9  that kind of terminology in an academic journal --
10 Q.     Agreed.
11 A.     -- in a professional journal, that we don't
12 really think along those lines.
13 Q.     You're absolutely right.  Let me rephrase
14 my question.  If you were saying causative in a
15 journal article, which standard would you use, a
16 reasonable -- the same type of standard you apply
17 when you hold a causation opinion to a reasonable
18 degree of probability, the same type of standard you
19 use when you say something in litigation as a
20 reasonable degree of certainty, or some third other
21 standard?
22        MR. FOX:  Objection to form.
23 A.     I think it would be very, very difficult to
24 answer that question because it would really all
25 depend on the context.  And because it's so

Page 40

1  difficult to define, and when we discuss findings in
2  journals and look at the issues of causation,
3  normally we're looking at an accumulation of data
4  and accumulation of results of studies, and draw
5  causal -- make causal decisions and don't normally
6  discuss these kinds of, you know, probability
7  issues.  It's just not relevant.
8  Q.     Well, I guess I'm just trying to
9  understand.  You said there's some difference in
10 your mind between the standard that's used for
11 reasonable degree of probability versus a reasonable
12 degree of certainty.  Which of those standards, if
13 either of them, are what you would use when you
14 decided to say something was causative in a
15 peer-reviewed scientific journal?
16 A.     It could be either/or.
17 Q.     All right.  Can we get Exhibit 1 and
18 Exhibit 11?
19        I'd like to show you what's been premarked
20 as defense Exhibit 1 and ask if that's your -- is
21 that your general report dated August 6?
22 A.     Yes, it is.
23 Q.     Okay.  And I'm now going to show you what's
24 been marked as Exhibit 11, and this is an earlier
25 version, I believe, of the same expert report that

Page 41

1  was served in the Kilker case dated May 29, 2009.
2  Is that a fair statement?
3  A.     Yes, I believe so.
4  Q.     Okay.  Would you agree, Dr. Kramer, that
5  the general report in McMurray with a few minor
6  differences, and I can actually point them to you,
7  is the same as your earlier report served in Kilker?
8  A.     Yes.
9  Q.     All right.  And, in fact, out of, I don't
10 how many pages the McMurray report is, I don't have
11 it in front of me, but only three paragraphs differ.
12 Does that sound about right?
13 A.     I don't know.
14 Q.     Okay.  You testified at the Kilker trial
15 that you did not write the entire report yourself,
16 but rather, that you wrote, the quote, majority of
17 it; is that true?
18 A.     Well, I need to clarify that, which I also
19 went on to clarify during my testimony.  I am
20 responsible for -- for writing, crafting, designing
21 and issuing this report.  All of the opinions in the
22 report are mine and mine alone.  The only assistance
23 I get is as at the research assistant level,
24 completely under my control, direction and
25 instruction, and this report is my report and my

11 (Pages 38 to 41)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 42

1  report alone.
2  Q.    Dr. Kramer, do you know what 5
3  hydroxytryptamine is?
4  A.    Yes. It's serotonin.
5  Q.    Okay. And when you write it, how do you
6  display it? How do you write it? Do you write it
7  as 5HT or do you call it serotonin or do you
8  interchange them?
9  A.    Both, both.
10 Q.    And your team of EI employees, did they
11 read the scientific papers and create an abstract
12 summarizing the content?
13     Do you want me to repeat the question?
14 A.    Yes, please.
15 Q.    Is it fair to say that in some -- now, your
16 team of EI employees read the scientific papers and
17 created abstracts summarizing the contents; is that
18 true?
19 A.    In some cases, yes.
20 Q.    For every article you reference in the
21 general report in Kilker, was that done?
22 A.    Did they prepare abstracts for every
23 article? No.
24 Q.    Okay. So, just certain ones?
25 A.    Yes, certain ones.

Page 43

1  Q.    Have you produced all the abstracts or just
2  some of the abstracts that they prepared for you?
3  A.    I believe I have produced all of the
4  abstracts that they prepared for me, but I'd have to
5  qualify that because there may have been abstracts
6  for my information along the way that I didn't --
7  that I didn't retain because I simply didn't need
8  them any longer.
9  Q.    Is it fair to say in some instances you
10 read the abstracts and not the papers themselves?
11 A.    No, that is not fair to say.
12 Q.    So, every reference, your testimony is
13 every reference that you have in your general report
14 and your supplemental report, you have read?
15 A.    I have seen every reference, yes.
16 Q.    When you say seen, I'm asking have you read
17 the articles?
18 A.    At one time or another, yes.
19 Q.    Okay. So, that's your testimony?
20 A.    Yes, it is.
21 Q.    I'd like to show you this. Have you -- do
22 you know if you've seen this figure before? Does it
23 look familiar?
24 A.    It's possible.
25 Q.    Okay. Can you tell me what it depicts?

Page 44

1  A.    This depicts the heart and developmental
2  processes in the heart.
3  Q.    Okay. Can you tell me if that's a
4  depiction of a heart defect?
5      MR. FOX: Objection to form.
6  A.    Again, I really, I would have to refer back
7  to other factors. This is not my specialty.
8  Q.    It's marked 133. I'm sorry if I didn't say
9  that.
10     So, as you sit here today, you say that you
11 can't tell me which heart defect or which heart
12 defects are depicted in that figure; is that fair?
13     MR. FOX: Objection to form.
14 A.    Well, there -- there are various areas of
15 these figures that are highlighted and bolded and
16 outlined and shown, you know, for each one of these
17 lettered diagrams. And so, I can't tell you whether
18 the intention is to depict heart defects as well as
19 developmental processes, but again, this is not my
20 specialty, so I don't know.
21 Q.    Can you tell me if among those nine
22 pictures there's a normal heart depicted?
23     MR. FOX: Objection to form.
24 A.    I just couldn't answer that. I couldn't
25 answer that.

Page 45

1  Q.    Okay. So -- okay. On page 39 of your
2  general report, if you'd just take a look at it?
3  A.    Which, which --
4  Q.    I'm sorry. From now on I'm only probably
5  going to be asking about McMurray, Exhibit 1. Turn
6  to page 39. If you can tell me, who prepared the
7  first draft of paragraph 118? Did you do that by
8  yourself, did somebody do the first draft of that
9  paragraph?
10 A.    I don't recall. I was responsible for this
11 entire report, but I don't recall.
12 Q.    But somebody else may have done the first
13 draft of that paragraph for you?
14 A.    I honestly don't recall.
15 Q.    Okay.
16 A.    In terms of summarizing these reference
17 numbers.
18 Q.    And on page 10 of your specific report --
19 I'm sorry, I'm sorry. Skip that.
20     Can I have Exhibit 2?
21     And ask you if this is the specific report
22 that you prepared in the McMurray case?
23 A.    Yes, it --
24 Q.    In addition to your general report?
25 A.    Yes, it is.

12 (Pages 42 to 45)

Page 46

1    Q.    Okay.  And on page 10 of your specific
2    report, can you tell me who prepared paragraph 30?
3    A.    Again, I was involved in every aspect of
4    this report. I did have some clerical research
5    assistant support, so it's possible that my team
6    helped to assemble some of these reference numbers
7    for me.
8    Q.    Okay.  And on page 14 of your specific
9    report, can you tell me who prepared Tables 1, 2 and
10   3?
11   A.    Yes.  I have a research assistant that,
12   under my direction, helped to compile these numbers.
13   Q.    Did they prepare the tables for you?
14   A.    We worked on it together.
15   Q.    Okay.  And we have here Exhibit 158, and
16   it's the very first page in the book.  Are those the
17   tables we're talking about?
18   A.    Are these the same tables that you're
19   referring to on this other page?
20   Q.    Yes.  They appear to be Tables 1 and 2.
21   A.    What page was that again, 14?
22   Q.    It's on page 14.
23   A.    Well, there are some differences between
24   this table and the table on page 14.
25   Q.    Okay.  Who prepared that piece of paper in

Page 47

1    your hand from book Exhibit 158, the first page in
2    the book?
3    A.    Again, I had assistance from a research
4    assistant in helping to put this together.
5    Q.    I understand.  I'm asking you who did it?
6    A.    Well, we did it as a group.
7    Q.    Who is the research assistant that prepared
8    that piece of paper?
9    A.    It was probably Zachary Faigen.
10   Q.    Okay.
11   A.    And he, again, I'd have to reiterate that
12   he was working with me on this, on these tables and
13   so on that you're referring to.
14   Q.    Well, did he prepare -- if I test -- if I
15   took Mr. Faigen's deposition and I asked him about
16   this first page in book 158, and I said, Mr. Faigen,
17   did you create that piece of paper and hand it to
18   Dr. Shira Kramer, would he say yes?
19   A.    He would say that he was -- that he
20   certainly had a role in doing this, yes.
21   Q.    That's not my question.  My question is,
22   did he do it and hand it to you?
23   A.    Well, he did have a direct role in
24   preparing this, but I worked with him as well, so he
25   didn't work alone in any aspect.

Page 48

1    Q.    I understand what you're saying.  But my
2    question is very simple.  Did he prepare that sheet
3    of paper and hand it to you?
4    A.    He put it in this binder, yes, he did.
5    Q.    He put it in the binder, but did he --
6    A.    He generated -- I'm answering you the way
7    it happened.
8    Q.    Okay.
9    A.    He generated this in a printer and
10   assembled the binder for me.
11   Q.    Okay.  So, while we're on it, let me show
12   you Exhibit 163.  Who prepared that?
13   A.    I don't know.  I don't recall.  I may have
14   received this from another law firm.
15   Q.    When you say another law firm, not Mr.
16   Fox's, Shawn Fox's law firm?
17   A.    That's correct.
18   Q.    Do you know what law firm?
19   A.    I believe, and again, I don't recall
20   exactly how this was assembled, but -- and I'd have
21   to check whether this is part of our own documents
22   that we brought today, but if I had received it from
23   his firm, it would have been from the Mark Robinson
24   firm.
25   Q.    Okay.  And it just came in the mail with

Page 49

1    nothing else?
2    A.    No, no, it wasn't -- no.  This was
3    discussed -- this was discussed along with a number
4    of other documents, e-mails, correspondence between
5    GSK and the Slone Center, and this was discussed
6    with one of the attorneys from the Robinson firm.
7    Q.    What attorney?
8    A.    Her name is Jennifer Liakos.  And Mark
9    Robinson participated in that meeting by phone as
10   well.
11   Q.    And how did you get that document?
12   A.    She gave it to me.
13   Q.    She was present, Mark Robinson was on the
14   phone?
15   A.    That's correct.  I believe that she gave it
16   to me, but I can't be certain exactly how I got this
17   document.  I don't think --
18   Q.    It's not from EI, then.  It's from a law
19   firm.  No one in your office did it?
20   A.    According to my recollection, that is
21   correct.
22   Q.    Okay.  Did they give you any other material
23   like that that wasn't in the peer-reviewed published
24   literature but prepared?
25   A.    Yes.  And I brought, I believe I brought

13 (Pages 46 to 49)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 50

1   some of that with me today.
2   Q.   Okay.  Is that one of them that's been
3   premarked as 162?
4   **A.   No, I don't believe.  No, this is not.**
5   Q.   What is 162?
6   **A.   This is something that we prepared.**
7   Q.   Who is we?
8   **A.   That our group at Epidemiology**
9   **International prepared.**
10  Q.   Who in particular prepared it?
11  **A.   Again, it would be -- I'm not sure exactly**
12  **who, but among the individuals who were listed on**
13  **the billing statement that we gave you today.  My**
14  **research assistant staff, I asked them to compute**
15  **various sample sizes and power calculations for me.**
16  Q.   Okay.  Now, I've prepared this just for
17  ease of reference because this we're going to keep
18  coming back to all day.  It's your general report
19  and your specific report.  I'd like you to turn to
20  tab 6, and tab 6 is Exhibit 6, and it's a three-page
21  document, unsigned, undated.  It has the
22  Epidemiology International logo on it.  Who prepared
23  this document?
24  **A.   I'm going to have to take a -- first of**
25  **all, let me ask you, where is this from?  Where did**

Page 51

1   **you get this?**
2   Q.   Well, this is my deposition, so I'm asking
3   the question.  The question is, who prepared this
4   document?  And I apologize, it is dated August 14,
5   2009.
6   **A.   Okay.  Well, this is out of context, and in**
7   **order to answer your question, I'd have to know what**
8   **this came out of, what documents it came out of.  I**
9   **have no idea.**
10  Q.   No, Dr. Shira Kramer, that's not how it
11  works.
12      MR. FOX:  Well, Doctor, I don't --
13      MS. HALPERN:  Are you talking to me?
14  My name is Tamar Halpern.
15      MR. FOX:  Ms. Halpern.
16      MS. HALPERN:  Thank you.
17      MR. FOX:  This is not part of the
18  report.  I don't know -- I've never seen this and I
19  don't know where it came from either.
20  Q.   Well, it's a very simple question.  Is this
21  a document created by Epidemiology International?
22  It has your logo on it.
23  **A.   Well, if it has our logo on it and**
24  **obviously it came out of my company.  Any other**
25  **specific questions or information you'd like about**

Page 52

1   **this, I'm going to need to know where this came**
2   **from.**
3   Q.   Unfortunately, Dr. Kramer, that's not the
4   way it works.  My question to you is who prepared
5   this document?
6   **A.   Well, again, I can't say that without**
7   **reading it and knowing where it came from.**
8   Q.   Have you ever seen this document before?
9   **A.   Well, I'd have to read it first.**
10  Q.   Well, go ahead.  And we're going to go off
11  the record, stop the clock.
12      THE VIDEOGRAPHER:  Off the video
13  record, 8:53.
14      (Brief recess.)
15      THE VIDEOGRAPHER:  Back on the video
16  record, 8:59.
17  BY MS. HALPERN:
18  Q.   Dr. Kramer, have you had a chance to take a
19  look at this document we marked as Exhibit 6?
20  **A.   Yes, I have.**
21  Q.   Can you tell me now who wrote this?
22  **A.   I did.**
23  Q.   You wrote it?
24  **A.   Yes, I did.**
25  Q.   Okay.  And you'd forgotten that?

Page 53

1   **A.   I hadn't forgotten it.  I just hadn't had a**
2   **chance to read it.**
3   Q.   Okay.  And what was the purpose of writing
4   this?
5   **A.   I believe I was asked to write a -- write a**
6   **commentary on the -- some of the issues having to do**
7   **with the relationship and influence of GSK and the**
8   **Louik study, the Slone Epidemiology Center study,**
9   **and the way that study was handled and the**
10  **development of the final manuscript.**
11  Q.   Are you aware that this was served,
12  appended to one of your expert reports in another
13  case?
14  **A.   The -- which case are you referring to?**
15  Q.   You know, as we sit here now, I'm not sure
16  I can tell you.  The Fromm case.
17  **A.   I don't know that, as I sit here today.  I**
18  **do know that I was asked to prepare this, and I**
19  **wasn't aware that it was appended to that report.**
20  Q.   Okay.  But you did not intend to append it
21  to any other case, because it hasn't been served in
22  any other case that I'm aware of?
23  **A.   I hadn't been asked to do that.**
24  Q.   Okay.  Now, you marked -- we marked earlier
25  as Exhibit 161 a folder of material.  One of them is

14 (Pages 50 to 53)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 54

1  a bill for the McMurray case and for general
2  causation. Can I assume that the time within
3  general causation went towards the first rendition
4  of your general report that you serve in most of
5  these cases?
6  A.      Yes, that's correct.
7  Q.      And Zachary Faigen, who you've described
8  before as an employee, billed in excess of 470
9  hours?
10  A.      Combined between general causation and the
11  specific McMurray appendix.
12  Q.      Right. What did he do? What were his
13  tasks for 470 hours?
14  A.      His tasks were everything from pulling
15  articles to running additional bibliographic
16  searches to abstracting information for me, to
17  organizing information, to computerizing
18  information, putting together binders, all kinds of
19  research support.
20  Q.      And did he write any of the paragraphs that
21  ultimately appear in your general report? If I took
22  his deposition and asked him that question, what
23  would he say?
24          MR. FOX: Objection to form.
25  A.      He would say -- well, I can't say what he

Page 55

1  would say. I'm just telling you what happened. He
2  worked under -- totally under my direction. We met
3  on a regular basis. I directed him as to what I
4  wanted him to do. He supplied information which,
5  some of which, much of which was in terms of the
6  actual abstracted information and data and so on and
7  references in the report. He had assisted
8  me in assembling the report. But that was his role.
9  It was totally supportive.
10          MS. HALPERN: Mr. Tate, could you
11  please read back the question I asked?
12          (The reporter read the pending
13  question.)
14  Q.      You didn't answer my question.
15          MR. FOX: Same objection.
16  A.      Well, I believe -- I believe I did answer
17  your question. In writing a paragraph, the
18  paragraphs consist of not only words, but they also
19  consist of numbers and abstracted information and
20  descriptions of methodology and confounding factors
21  and all of that. So, he did contribute to that
22  aspect of the writing of the paragraphs.
23          MS. HALPERN: Would you please read
24  back my question again.
25          (The reporter read the pending

Page 56

1  question.)
2          MR. FOX: Same objection.
3  A.      I'd have the same answer for you. There's
4  really no change in my answer, the answer that I
5  just gave you.
6  Q.      Did he write any of the sentences as they
7  appear in your report?
8  A.      He assisted me in terms of the abstracted
9  material and references and numbers and methodology.
10  Q.      Dr. Kramer, if the answer is no, say no.
11  If the answer is yes, say yes. Did he write any of
12  the sentences as they appear in your report?
13  A.      And I've just described the degree to which
14  he assisted me and contributed to the development of
15  this report. I can't give you the answer in your
16  words. I have to give you the answer in my words
17  according to the way we actually carried out this
18  project.
19  Q.      Well, let me ask you this. Did you write
20  any of the abstracts? Did you fill out any of the
21  abstract forms?
22  A.      Some of the -- which abstract forms are you
23  referring to?
24  Q.      The forms that are in your books that
25  abstract the information from an article. Did you

Page 57

1  do any of those abstract forms?
2  A.      I contributed to the abstract forms that
3  are in those binders.
4  Q.      Did you prepare any of the abstract forms?
5  A.      Well, the answer is that we worked on them
6  together.
7  Q.      Are there abstract forms in there that were
8  only prepared by Mr. Faigen and no one else?
9  A.      No. He -- every single thing in that
10  binder has an input directly from me, every single
11  page.
12  Q.      Dr. Kramer, these are straightforward
13  questions. When we look at an abstract form, are
14  there any of them that were prepared solely by
15  people at EI other than you, that you didn't put a
16  word in it? Just filled out --
17  A.      Solely without any input from me?
18  Q.      No, I'm not talking about input from you.
19  I'm asking you who prepared the form.
20  A.      When you say prepared, are you talking
21  about --
22  Q.      Wrote the words.
23  A.      Wrote the words? Well, we wrote the
24  words -- I wrote the -- I wrote the abstracts in the
25  sense that I designed them and I specified what

15 (Pages 54 to 57)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 58

1 information needed to be included in them.
2 Q. Okay.
3 A. I reviewed every single abstract. I added
4 my input. He added the aspects of the abstract such
5 as the actual confounding factors, the numbers, the
6 references and so on that I asked him to do, but
7 this was a joint effort under my direction.
8 Q. Okay. Let's look at one of the abstract
9 forms.
10 MR. SHEEHAN: She's got it in front of
11 her.
12 Q. Thank you. Okay. So, I'm looking at an
13 abstract form here which is from book 158, and it's
14 for -- there aren't a lot of abstract forms in here,
15 are there? Approximately how many abstract forms do
16 you think were prepared for you?
17 A. I have no idea.
18 Q. Well, here's a sheet of paper behind tab 2.
19 It says sample size, calculations based on Pedersen,
20 et al, 2009. Did you prepare this?
21 A. No. In this case, I asked Zachary to
22 extract this information from some of the work that
23 we had done and summarize it on this paper.
24 Q. Okay. So, he wrote that sheet of paper?
25 He wrote the words on that sheet of paper?

Page 59

1 A. No, no, that's not -- he abstracted it from
2 other forms.
3 Q. From other forms. What other forms?
4 A. Well, he extracted the information that's
5 on that page from sample size calculations that we
6 worked on.
7 Q. Okay. And so we have -- here's one. Do
8 people put their initials on them if they prepared
9 them? You created the form. Who filled in the
10 words?
11 A. Well, as I said, the words were filled in
12 by both myself as well as Zachary, and anyone else
13 that I had asked to provide the data, the abstracted
14 information, such as the actual prevalence odds
15 ratios that are listed on here, the 13 studies and
16 so on that are listed. This is information that
17 came off of the reports that we've done and that are
18 just summarized.
19 Q. Looking at Exhibit 1, your general report
20 in this case, can you show me where, what paragraph,
21 if any, in this report you wrote the first draft of,
22 any paragraph, just pick one?
23 A. Oh, all of page 3, all of page 4, all of
24 page 5, all of page 6, all of page 7, 8, 9, 10, 11,
25 12, 13, 14, 15, 16, and when we get to 17, I had

Page 60

1 some assistance in putting together this table, but
2 the rest of this, I wrote. And then getting into
3 the specifics of page 18 --
4 Q. In particular, paragraphs 59 through 67,
5 who wrote the first draft of that?
6 A. I outlined the first draft of the -- of
7 this whole section.
8 Q. Who wrote it, though?
9 A. Well, again, as I said, I outlined this
10 whole -- there were some aspects of it that were
11 added to by my staff where appropriate, but I
12 outlined this entire section.
13 Q. And who in your staff helped with this?
14 A. That would have been the individuals,
15 primarily Zachary, but that would have been
16 Stephanie Moller to a very, very limited degree. It
17 was mostly Zachary.
18 Q. And section 68 through 80, who wrote that?
19 A. Again, same answer.
20 Q. What's the same answer?
21 A. Same answer is that I outlined every single
22 section of this report. I designed the report and
23 asked for assistance from my research assistant
24 staff in filling in certain detailed information
25 from the studies.

Page 61

1 Q. Well, let's look at paragraph 80. Would
2 you read that into the record, on page 22.
3 A. "Anomalous pulmonary venous return is a
4 cardiac defect in which all or part of the veins
5 from the right lung drain directly into the right
6 atrium."
7 Q. Do you think there's an error in that
8 sentence?
9 A. I don't know.
10 Q. Did you write that sentence?
11 A. I outlined this entire report.
12 Q. Well, I don't know what outline means. Did
13 you write this sentence? I know what that means.
14 A. I don't -- I don't recall whether I wrote
15 every single word of this particular sentence, but I
16 outlined this entire report myself.
17 Q. Well, when you say you outlined it, you
18 said, for example, tell me what the different
19 conotruncal defects are, tell me what these -- and
20 fill it in, someone else filled in it?
21 A. Not entirely, no.
22 Q. Did you write the sentence in paragraph 80?
23 A. I don't recall whether I wrote this
24 specific sentence entirely myself, no.
25 Q. And do you know if there's an error in the

16 (Pages 58 to 61)

Page 62

1  sentence?
2  A.      I don't know.  If there is, I don't know of
3  it.
4  Q.      Do you know what anomalous pulmonary venous
5  return is?
6  A.      Well, I have a reference that this must
7  have been drawn from.
8  Q.      Okay.  And are you the one who identified
9  the reference for that sentence?
10 A.      Well, as I said, I had my staff assist me
11 in doing literature searches and pulling relevant
12 literature and articles.  And so, they assisted me
13 in actually identifying these articles that I used.
14 Q.      Well, did you read the abstract of
15 reference 21 or the article itself?
16 A.      I must have read -- as I said, I read every
17 article at one point in time.
18 Q.      So, you would have read that?
19 A.      I would have read that.
20 Q.      Okay.  And with regard to paragraph 76, can
21 you tell me if and how a primum type atrial septal
22 defect is different than an atrial septal defect?
23 Do you know if it's the same?
24         MR. FOX:  Objection to form.
25 A.      Again, I --

Page 63

1  Q.      Can you tell me how it's different?
2          MR. FOX:  Objection to form.
3  A.      Again, I am not a cardiologist and I would
4  have had to have referred to another reference in
5  order to have written this.  So, I can't tell you
6  the answer to that question now.
7  Q.      So, you don't know if that's the same as an
8  endocardial cushion defect or not?
9          MR. FOX:  Objection to form.
10 A.      As I sit here today, I am not a
11 cardiologist, and in answering those types of
12 questions, I would have had to have gone back to a
13 text or have, as I have referenced here, or have
14 access to a cardiologist to answer that question.
15 Q.      Well, let me ask you again.  Who wrote
16 paragraphs 75 through 84 of your report?
17 A.      This, these paragraphs were, again, written
18 by myself with some support by my research assistant
19 staff.
20 Q.      But you don't know what the paragraphs
21 mean?
22         MR. FOX:  Objection to form.
23 A.      Well, that -- I don't -- I don't agree with
24 that statement.  It's not a matter of not knowing
25 what the paragraphs mean.  I am providing in this

Page 64

1  report some background to -- that is relevant to the
2  clinical conditions that are relevant to Isabelle
3  McMurray, as I should in any report like this.  That
4  does not mean that I represent that I'm a
5  cardiologist or a special -- specialist in
6  cardiology.  These are referenced -- these are
7  referenced technical statements that have -- that
8  are covered in the bibliography.
9  Q.      Can you tell me -- in paragraph 79, you
10 state that an example of a left ventricular outflow
11 tract obstruction is coarctation of the aorta.  Now,
12 do you stand by that statement?
13 A.      That's -- again, I'm not a cardiologist,
14 and that is a statement that was pulled out of the
15 reference that's listed in this article.
16 Q.      Okay.  Is that your opinion?
17 A.      Well, it's simply the opinion that is cited
18 from reference number 122.
19 Q.      Well, you don't list coarctation in
20 paragraph 77 where you list all the conotruncal
21 defects, do you?
22 A.      No, coarctation of the aorta is not listed
23 in paragraph 77.
24 Q.      So, are you saying that the proper
25 subgrouping for coarctation of the aorta in

Page 65

1  paragraph 79 is left ventricular outflow tract
2  obstruction; is that what you're saying?
3          MR. FOX:  Objection to form.
4  A.      I'm not -- I'm not saying that I am an
5  expert in classification of coarctation of the -- of
6  the aorta.  I am citing a reference that states, as
7  in 79, that an example of a left ventricular outflow
8  tract obstruction is coarctation of the aorta,
9  according to reference 122.  But this is not
10 something that I am an expert in or can testify to.
11 Q.      Can you give me a list of all the EI --
12 well, strike that.  I think you've answered that.
13         You testified at the Kilker trial that Dr.
14 Zambelli-Weiner was on the team that contributed to
15 the general report served in Kilker.  Can you tell
16 me what she did?
17 A.      She did general project management and
18 basically the -- she is my -- not only a senior
19 epidemiologist, but she is the chief operating
20 officer of EI and, therefore, is responsible for
21 how people spend their time.  So, she worked in a
22 management, project management role.
23 Q.      Could you turn to tab 5 in that binder?
24 It's Exhibit 5.  It's just an easier way to find it.
25         Now, did Dr. Zambelli-Weiner write this

17 (Pages 62 to 65)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 66

1  document, the weight of the evidence methodology
2  document that we marked as Exhibit 5?
3  A.    I'm going to have to spend some time to
4  read this.
5  Q.    Did you write this, Doctor?
6  A.    Well, again, if you want me to comment on
7  the document, I need to have the opportunity to read
8  it.
9  Q.    Doctor, I'm more than happy to have you do
10 that, but my question is, if you wrote it, I would
11 assume you could tell me that right now.
12 A.    Well, without having the benefit of looking
13 at it and reading it, I can't tell you anything.  I
14 need to be able to read it.
15 Q.    Okay.  All right.
16       MS. HALPERN:  Why don't we take a
17 break, and I'm going to get a cup of coffee.  Can I
18 get anyone else a cup of coffee?
19       THE VIDEOGRAPHER:  Off the video
20 record, 9:16.
21       (Brief recess.)
22       THE VIDEOGRAPHER:  The time is now
23 9:23.  This begins tape number 2 of the video
24 deposition of Dr. Shira Kramer.
25 BY MS. HALPERN:

Page 67

1  Q.    Dr. Kramer, Mr. Faigen, is he a master's
2  level public health person?  Does he have an MPH?
3  A.    Yes, he does.
4  Q.    Okay.  And is it correct you hired him
5  right out of school, right?  He's --
6  A.    No, that's not correct.
7  Q.    Oh, okay.  My mistake.  Where did you
8  higher him from?
9  A.    He was working for another firm before he
10 came to us.
11 Q.    Another what type of firm?
12 A.    I believe they did epidemiological
13 research.
14 Q.    So, how many years has he been out of
15 school?
16 A.    I believe three.
17 Q.    Three years.  So, he's fairly new?  Does he
18 consider himself an epidemiologist?
19 A.    Yes, he does.
20 Q.    And Julia Chan, is she an epidemiologist?
21 A.    Yes, she is.
22 Q.    And what did she do in the McMurray report?
23 She billed 48 hours.
24 A.    She, again, had the same role as Zachary
25 Faigen.  She assisted in assembling information as

Page 68

1  requested by me.
2  Q.    Now, other than holding yourself out as an
3  expert in epidemiology, do you claim any other
4  specific expertise where you are an expert, that
5  people turn to you for your professional opinion?
6  A.    What do you mean by that?
7  Q.    Well, as an expert, somebody who people
8  call up and ask for you to do the initial analysis
9  of whatever it is.  You said you're not a
10 cardiologist, for example.  What are you considering
11 yourself as an expert in for the purposes of this
12 litigation?
13 A.    Primarily, an epidemiologist.
14 Q.    Is there any other area you're holding
15 yourself out with a special expertise in?
16 A.    No, that's correct.
17 Q.    Now, on your CV, you don't note that you're
18 an editor or that you've ever done editorial review
19 for any scientific or professional journals.  Is
20 that the case, that you've never done that?
21 A.    That's correct.
22 Q.    All right.  And is it correct, you don't
23 belong to any organizations or hold memberships in
24 any professional societies or sit on any board for
25 organizations dedicated to the study of birth

Page 69

1  defects?
2  A.    Dedicated solely to the study of birth
3  defects, that's correct.
4  Q.    How about dedicated to teratology or
5  reproductive toxicology?
6  A.    Solely to those fields, that's correct.
7  Q.    Okay.  Is it fair to say that you're not
8  trained in the clinical use or interpretation of
9  echocardiograms, ultrasounds or sonograms?
10 A.    That's correct.
11 Q.    All right.  And at the Kilker trial, you
12 were asked about what epidemiologists study.  And
13 you said that you studied public health issues as
14 they impact populations or groups of people.  I
15 think that's in your report as well.  Not
16 individuals, not patient specific; is that correct?
17 A.    Well, I don't diagnose diseases in
18 individuals, that's correct.
19 Q.    Okay.  So, you're not trained to determine
20 what caused any individual's specific medical
21 condition, true?
22 A.    Only as I would -- I would qualify that and
23 say as the expertise in epidemiology and general
24 causation impacts the -- the cause in an individual,
25 I would disagree with that statement.

18 (Pages 66 to 69)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 70

1    Q.    You believe you're trained to determine
2 what caused an individual's specific medical
3 condition?
4    A.    **As I said, the degree to which my expertise**
5 **and opinions in general causation would impact a**
6 **decision about the probable cause of an individual's**
7 **condition, I believe there would be an impact of my**
8 **opinions on general causation in that case.**
9    Q.    I don't understand that answer. So, let me
10 just ask it simpler. You're not qualified to
11 diagnose disease, right?
12   A.    **That's correct.**
13   Q.    You're not qualified to treat disease,
14 correct?
15   A.    **That's correct.**
16   Q.    You're not qualified to prescribe
17 medications, correct?
18   A.    **That's correct.**
19   Q.    You're not qualified to examine a person,
20 correct?
21   A.    **That's correct.**
22   Q.    All right. And you have no special
23 expertise in reading and reviewing medical records,
24 do you? You've not been trained in that, in
25 analyzing --

Page 71

1    A.    **To read -- to read a medical record?**
2    Q.    Right.
3    A.    **You don't need expertise of reading a**
4 **medical record.**
5    Q.    So, do you have the same expertise a
6 physician would have in reading medical records?
7    A.    **In interpreting, no, I do not.**
8    Q.    Okay. And would you agree you're not
9 qualified to do a medical differential diagnosis?
10   A.    **That's correct.**
11   Q.    All right. Have you ever done a
12 differential diagnosis?
13   A.    **No, I have not.**
14   Q.    All right. So, what I think you're saying
15 is you're qualified to talk about risk factors,
16 true, for a particular person?
17   A.    **Risk factors and causation relating**
18 **exposures and disease.**
19   Q.    In the general population, not in a
20 specific individual?
21   A.    **Well, I would -- I would say I agree with**
22 **the general population, but I also would say that**
23 **the medical profession does rely on epidemiologists**
24 **and does take -- take consideration of**
25 **epidemiological causation opinions when they impute**

Page 72

1 **causation for individuals.**
2    Q.    Fair enough. So, I think what you're
3 saying is you provide information to someone else
4 who would do the differential diagnosis?
5    A.    **That's correct.**
6    Q.    You would provide information to someone
7 else who would determine what the specific cause was
8 for an individual? You talk about populations, they
9 talk about individuals?
10   A.    **In general, that's correct.**
11   Q.    You've testified that you don't hold
12 yourself out as an expert in either molecular
13 biology or cardiac embryology, true?
14   A.    **I did state that I have had course work in**
15 **molecular biology. I am not an expert in molecular**
16 **biology.**
17   Q.    And can you tell me the cells or tissues,
18 Doctor, that are common to, and those that are
19 different, in the formation of PAIVS, pulmonary
20 atresia with intact ventricular septum and Tetralogy
21 of Fallot?
22   A.    **No, I cannot.**
23   Q.    Do you know if they are the same?
24        MR. FOX: Objection to form.
25   A.    **I don't know.**

Page 73

1    Q.    Do you know if neural crest cells are
2 involved in the development of PAIVS?
3        MR. FOX: Objection to form.
4    Q.    You can answer.
5    A.    **Can you repeat the question, please.**
6    Q.    Sure. Do you know if neural crest cells
7 are involved in the development of PAIVS?
8    A.    **And can you define PAIVS again for me,**
9 **please?**
10   Q.    Pulmonary atresia with intact ventricular
11 septum.
12   A.    **Okay. It is my understanding that neural**
13 **crest cells are involved in the development of**
14 **heart -- of the heart and related vasculature, so I**
15 **would answer that as a yes answer.**
16   Q.    Okay. So, if I were to ask you about any
17 heart defect under the sun, from looping defects to
18 Ebstein's Anomaly to Tetralogy of Fallot, any one in
19 the world, you would have the same answer, that
20 neural crest cells are involved?
21        MR. FOX: Objection to form.
22   A.    **I don't know that for sure.**
23   Q.    So, you're not a toxicologist or a
24 teratologist, true?
25   A.    **That is correct.**

19 (Pages 70 to 73)

Page 74

1    Q.      And would you agree -- strike that.
2           You don't consider yourself an expert in
3    animal testing for purposes of reproductive
4    toxicity, true?
5    A.      That's correct.
6    Q.      Doctor, would you agree, do you know if
7    birth defect epidemiology is a special area of
8    expertise within epidemiology, like someone that Dr.
9    Anick Berard holds herself out as a birth defect
10   epidemiologist?
11   A.      Well, there are individuals who specialize
12   or who do a lot of research in that area or maybe
13   spend their entire careers doing research in that
14   area. However, there are other epidemiologists who
15   have broad experience across many, many different
16   subject areas and --
17   Q.      More generalists?
18   A.      -- disciplines. They may be more
19   generalists, or they may have expertise and
20   experience across a number of different areas, and
21   it's not unusual that epidemiologists would study,
22   would have research interests and study a number of
23   different issues.
24   Q.      And if you had to say what your primary
25   interest was, is it more cancer epidemiology?

Page 75

1    A.      It's really not just -- cancer epidemiology
2    is one of them, but not the only one.
3    Q.      Do you have any special training or
4    expertise in birth defect epidemiology?
5    A.      Well, I would say that certainly the
6    research that I've done over my career has, much of
7    it, had to do with birth defect epidemiology with
8    chemicals that are both teratogens and pediatric and
9    embryonal carcinogens as well. So, some of my --
10   Q.      But you've never written an article --
11   A.      Excuse me.
12   Q.      -- about birth defect epidemiology, have
13   you?
14   A.      Well, I'd like to finish the prior -- so,
15   could you repeat that question, please?
16   Q.      I think my question was whether you had any
17   special training or expertise in birth defect
18   epidemiology. I think that's what you were
19   answering.
20   A.      Okay. So, would you mind reading back -- I
21   sort of lost my train of thought.
22   Q.      Just finish your answer.
23   A.      Okay. Let's -- let's just ask the question
24   one more time, please.
25   Q.      Fine. You can start right from the

Page 76

1    beginning and do it all over again. Do you have any
2    special training or expertise in birth defect
3    epidemiology?
4    A.      Again, I have certainly spent significant
5    time in my career studying agents, chemicals and
6    pharmaceuticals that have an impact on birth defects
7    as well as other effects on developing embryos, but
8    I am not -- I do not consider myself a single
9    subject specialist, such as in birth defect
10   epidemiology or any other particular sub -- subgroup
11   of epidemiological studies or --
12   Q.      So, you don't call yourself or consider
13   yourself a birth defect epidemiologist?
14   A.      No, that's correct.
15   Q.      All right. Can you tell me what agent,
16   chemical or pharmaceutical, you ever studied with
17   regard to cardiac birth defects?
18   A.      Well, I have studied a number of different
19   drugs and chemicals and looked at their effect on
20   children in a number of the studies that we have
21   done and looked at not only cancer, but other
22   adverse health outcomes, reproductive outcomes and
23   health outcomes.
24   Q.      And my question is, can you tell me --
25   let's do it this way. Have you ever published a

Page 77

1    paper about cardiac defects?
2    A.      Specifically, no.
3    Q.      Have you ever written about classification
4    of cardiac defects for the purpose of doing a
5    causation assessment?
6    A.      No, I have not.
7    Q.      Have you ever received funding to conduct
8    research on cardiac defects?
9    A.      No.
10   Q.      Have you ever gotten a grant from the March
11   of Dimes?
12   A.      No, I have not.
13   Q.      Have you ever taught or lectured about
14   cardiac defects?
15   A.      Not specifically.
16   Q.      Have you received a grant from NIH ever?
17   A.      Yes.
18   Q.      Okay. Was it about birth defects?
19   A.      The grants included not only adverse
20   reproductive outcomes, but also any other outcomes
21   having to do with embryonal exposure, which would
22   have included birth defects.
23   Q.      Okay. But that wasn't the purpose of the
24   grant primarily; that wasn't the focus, birth
25   defects?

20 (Pages 74 to 77)

USDC, Northern District of OK                McMurray v. GSK                                    Monday
No. 08-CV-381-GKF-SAJ        Videotape Deposition of Shira Kramer, Ph.D.            November 2, 2009

Page 78

1  A.      Not solely, that's correct.
2  Q.      Did you ever design a study, specifically,
3  about the cause of cardiac defects?
4  A.      No, I have not.
5  Q.      All right.  Done any animal research on
6  cardiac defects?
7  A.      No.
8  Q.      On birth defects?
9  A.      No.
10  Q.      Have you ever studied mechanisms of cardiac
11  defects?
12  A.      No.
13  Q.      Have you ever done any research on cardiac
14  defects?
15  A.      Again, the same answer that I gave you
16  before about the studies that I've done having to do
17  with adverse reproductive outcomes, adverse outcomes
18  in terms of cancer and birth defects.
19  Q.      Have you ever studied mechanisms of birth
20  defects generally?
21  A.      No.
22  Q.      Have you ever counseled women on birth
23  defects?
24  A.      No.
25  Q.      Have you ever worked for a teratogen

Page 79

1  information service center?
2  A.      No.
3  Q.      Have you ever written a pharmaceutical
4  label?
5  A.      No.
6  Q.      Have you ever done research on serotonin or
7  serotonin receptors?
8  A.      No.
9  Q.      Have you ever held yourself out as an
10  expert on birth defects?
11  A.      No.
12  Q.      Other than the March of Dimes or NIH, what
13  other institutions or organizations in the U.S. do
14  you know of that are primarily dedicated to the
15  study of birth defects; can you name any?
16  A.      Other than NIH and the CDC, which is a
17  subset --
18  Q.      Of the NIH?
19  A.      -- of the NIH, no, I cannot.
20  Q.      Okay.  You testified that if you were asked
21  to look at a particular issue involving reproductive
22  toxicity, you would consult others.  Is it fair to
23  say you're not an expert in reproductive toxicity?
24  A.      That's correct.
25  Q.      Okay.  And you would rely on others to

Page 80

1  understand and synthesize the body of knowledge on
2  specific matters concerning molecular biology or
3  cell biology, true?
4  A.      Can you repeat that question?
5  Q.      Sure.  You would rely on others to
6  understand and synthesize the body of knowledge on
7  specific matters concerning molecular biology or
8  cell biology, true?
9  A.      Well, when you talk about the body of
10  knowledge, are you talking about all, all
11  information?  I mean, that's a -- that question is
12  almost too general to answer.
13  Q.      Well, let me try it this way.  Do you hold
14  yourself out as an expert in cell biology?
15  A.      I have training in cell biology, I have
16  training in genetics, and so understand cell biology
17  and do, you know, review papers that have to do with
18  cell biology as needed.
19  Q.      Okay.  Do you hold yourself out as an
20  expert in neural crest cells?
21  A.      No, I do not.
22  Q.      Are you offering an opinion in this case,
23  to a reasonable degree of scientific certainty, that
24  Paxil disrupts differentiation of neural crest
25  cells?

Page 81

1  A.      I am -- no, I am not.
2  Q.      Okay.  Are you offering an opinion in this
3  case, to a reasonable degree of scientific
4  certainty, that Paxil disrupts migration of neural
5  crest cells?
6  A.      I need to qualify the answer to the last
7  two questions by saying that I am not an expert, as
8  I've said, in neural crest cells or the mechanism of
9  action of serotonin.  However, I have considered the
10  issue of serotonin's effect on neural crest cell
11  migration differentiation as part of my
12  consideration of the biological plausibility of the
13  role of Paxil in causing cardiac birth defects.  So,
14  it's part of my consideration, it's part of my
15  review, and it has informed my -- the formation of
16  my opinion in this case.  But I will not
17  specifically be testifying about that issue as an
18  expert in that area.  I am relying on information.
19  Q.      I understand your answer.  So, let me just
20  ask it for the record.  Are you offering an opinion
21  in this case, to a reasonable degree of scientific
22  certainty, that Paxil disrupts differentiation and
23  migration of neural crest cells?  Other than you've
24  already qualified, can you answer that question?
25  A.      Well, you know, it's confusing, your

21 (Pages 78 to 81)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 82

1  question is confusing me, honestly, because --
2  Q.    It's pretty straightforward.
3  A.    -- I do -- well --
4  Q.    I'm asking if you're going to offer an
5  opinion, to a reasonable degree of scientific
6  certainty, that Paxil disrupts differentiation and
7  migration of neural crest cells?
8  A.    I may be asked whether I believe that that
9  is the case and -- as part of my consideration of
10  biological plausibility, and the answer would be yes
11  to that question.
12  Q.    Okay.
13  A.    So, to the degree to which your pending
14  question influences my answer to that question, it's
15  really very difficult for me to understand what
16  you're getting at.
17  Q.    We're going to have to call the judge on
18  getting more time here.  Let me try it one more
19  time.  Are you offering an expert opinion in this
20  case, to a reasonable degree of scientific
21  certainty, that Paxil disrupts differentiation and
22  migration of neural crest cells?
23  A.    I --
24         MR. FOX:  Ms. Halpern, that's not the
25  standard in this case.

Page 83

1         MS. HALPERN:  Okay.  What do you
2  consider the standard in this case?
3         MR. FOX:  This is a Federal Court
4  case.  We're not in Philly.
5         MS. HALPERN:  Well, what are you
6  saying the standard is?  She wrote her report to a
7  reasonable --
8         MR. FOX:  It doesn't say that in her
9  report.
10  Q.    Let's try it this way, using the standard
11  in your report, in this report.  Are you offering an
12  opinion in this case, to a reasonable degree of
13  scientific probability, that Paxil disrupts
14  differentiation and migration of neural crest cells?
15  Are you offering that expert opinion in this case?
16  A.    I don't believe I will be -- I have been
17  asked to offer that opinion.  So, I will say a
18  qualified no, but must qualify it with the former
19  answer that I gave you about how it informs the
20  issue of biological plausibility.
21  Q.    Do you feel qualified, Dr. Kramer, to offer
22  an opinion on whether Paxil disrupts differentiation
23  and migration of neural crest cells?
24  A.    I feel qualified to read and understand
25  the -- both the literature and expert reports.  I

Page 84

1  feel qualified to form an opinion about the -- the
2  evidence that supports a role of Paxil in disrupting
3  both serotonin levels and neural crest cells and,
4  therefore, I believe I'm qualified to understand
5  that information and to incorporate it in my
6  opinions.
7  Q.    Can you tell me the different types of
8  cells or tissues that are involved in formation of
9  coarctation of the aorta?
10  A.    I can't tell you right now off the top of
11  my head all of the different types of cells, no.
12  Q.    Have you ever done a study examining the
13  impact of a proposed teratogen on neural crest
14  cells?
15  A.    No, I have not.
16  Q.    Have you ever written about it?
17  A.    No.
18  Q.    Have you ever done an in vitro study
19  involving neural crest cells?
20  A.    No, I haven't.
21  Q.    Have you ever done an in vitro study at
22  all?
23  A.    Yes, I have.
24  Q.    On what?
25  A.    I worked on a study of xeroderma

Page 85

1  pigmentosum when I was a graduate student.
2  Q.    Getting your master's degree?
3  A.    Getting my master's degree, yes.
4  Q.    And not since then?
5  A.    That's correct.
6  Q.    Okay.  Have you ever done a whole embryo
7  study?
8  A.    No, I have not.
9  Q.    Have you ever done research on whether a
10  substance can cross the placental barrier?
11  A.    When you say research, do you mean
12  epidemiological research or --
13  Q.    No, any kind, any kind of research.
14  A.    Can you -- can you be more specific?  Are
15  you talking about --
16  Q.    Any research at all, animal, in vitro,
17  epidemiological, any research at all on whether a
18  substance can cross the placental barrier.
19  A.    No, I have not.
20  Q.    Okay.  Is it fair to say, not being a
21  biologist or physician, that you're unfamiliar with
22  the literature on how the placenta in the first
23  trimester differs from the placenta in the second or
24  30 trimester of pregnancy; is that fair?
25  A.    Well, first of all, I wouldn't agree that I

22 (Pages 82 to 85)

Page 86

1  am not a biologist in the sense that I do have both
2  an undergraduate and graduate training in biology.
3  Q.     Dr. Kramer, are you an expert in biology?
4  A.     I have biological training.  I do have
5  expertise in biology.
6  Q.     I'm asking you if you hold yourself out in
7  this litigation as an expert in biology?
8  A.     No, in this litigation, I'm an expert in
9  epidemiology, but that wasn't your question
10 originally.
11 Q.     Well, my question was, are you familiar
12 with the literature on how the placenta in the first
13 trimester differs from the placenta in the second or
14 third trimester of pregnancy?
15 A.     I couldn't give you those details now,
16 although I'm sure I've read it.
17 Q.     Are you familiar and can you tell me how
18 blood flow and oxygen levels differ in the placenta
19 from first trimester to second or third?
20 A.     Again, I couldn't recite that information
21 right now.
22 Q.     Would you agree that a drug or a chemical
23 could act as a teratogen to one type of cell or
24 embryologic tissue, but not act as a teratogen on
25 another type of cell?

Page 87

1          MR. FOX:  Objection to form.
2  A.     Can you repeat that question?
3  Q.     Sure.  Do you know if -- no, strike that.
4          Will you agree that a drug or a chemical
5  could act as a teratogen to one type of cell, but
6  yet not act as a teratogen to a different type of
7  cell?
8  A.     Possibly.
9  Q.     Okay.  Can you tell me what drug was
10 involved when you conducted your only animal
11 toxicology study on birth defects as a master's
12 level student?  What was the drug?
13 A.     First of all, it wasn't a toxicology study.
14 Second of all, this was not a study of a drug.
15 Q.     Okay.  Good enough.  Can you tell me what
16 other specific cardiac defects share the same types
17 of cells and tissues that are involved in
18 coarctation of the aorta?
19 A.     Can you repeat that a little bit more
20 slowly, please?
21 Q.     Yes.  Can you tell me what other specific
22 cardiac defects share the same types of cells and
23 tissues as coarctation of the aorta?
24 A.     Well, there are many, many different
25 structures of the heart that share the same types of

Page 88

1  cells and tissues as the aorta.  Is that what you're
2  asking me?
3  Q.     No, I'm saying certain cells are involved
4  in the formation of coarctation of the aorta.  True?
5  A.     Well, in the formation of the aorta, is
6  that what you're asking me?
7  Q.     No.  No, no.  I'm talking about the
8  formation of the defect coarctation of the aorta.
9  A.     Okay.
10 Q.     Okay.  And I'm asking you what other
11 cardiac defects involve those same cells, in other
12 words --
13 A.     I couldn't name them all.  I just couldn't
14 name them.
15 Q.     Okay.  Fine.  You don't hold yourself out
16 as an expert on the relative pharmacokinetics or
17 pharmacodynamics of Paxil versus other SSRIs, do
18 you?
19 A.     I'm not an expert in that area, no.
20 Q.     Well, is it your opinion that Paxil is
21 unique as the only SSRI in the class that you say
22 causes cardiac birth defects?
23 A.     No, that is not my opinion.
24 Q.     What is your opinion?  Is it class effect?
25 A.     Now, can you repeat the question, please?

Page 89

1  Q.     Sure.  Well, let me ask this instead.  Have
2  you done a PubMed search on the other SSRIs to see
3  what's been published about them and cardiac
4  defects?
5  A.     We have done a partial PubMed research --
6  PubMed search.  We have not done a complete and full
7  PubMed search on -- which covers research on all of
8  the other SSRIs.
9  Q.     Well, you keep saying we.  Who did it, you,
10 someone else?
11 A.     Well, I also had assistance from my
12 research assistance staff in actually running the
13 computerized searches.
14 Q.     Did you --
15 A.     So, under my direction, I did not direct
16 them to search for all studies of all SSRIs and
17 their effect on either congenital malformations or
18 cardiac defects.
19 Q.     Well, is it your opinion that all SSRIs
20 cause cardiac birth defects?
21 A.     It is my opinion from the literature that I
22 have read that other SSRIs are also causally related
23 to cardiac defects in addition to paroxetine.
24 Q.     Is it your opinion that Prozac can cause or
25 is causally related to birth defects?

23 (Pages 86 to 89)

Page 90

1    A.    I can't answer that right now.  I'd have to
2    look at the literature, because I did not
3    specifically focus on that for this -- for this
4    deposition or this trial.
5    Q.    Is it your opinion that Zoloft can cause or
6    is causally related to birth defects?
7    A.    Again, I'd have to go back and really look
8    at that, at that literature specifically.
9    Q.    Is it your opinion that each and every SSRI
10   can cause or is causally related to cardiac birth
11   defects?
12   A.    I can't answer that today.  I haven't
13   focused on that for this deposition.
14   Q.    So, is it fair to say, as you sit here
15   today, you don't know if it's a class effect that
16   every -- each and every SSRI can cause cardiac birth
17   defects?
18   A.    Again, I can't answer that question today.
19   I do know that among the studies that I have brought
20   with me today that looked at Paxil, that a number of
21   them also looked at the effect of other SSRIs and
22   did show an association between those SSRIs and
23   cardiac birth defects.
24   Q.    So, as you sit here today, do you have an
25   opinion as to whether any other SSRI, other than

Page 91

1    Paxil, can cause cardiac birth defects?
2    A.    I am not going to be offering that opinion
3    today because I haven't focused on it.
4    Q.    Well, do you have an opinion?
5    A.    Well, I haven't focused on it, so I don't
6    have an opinion today that I'm ready to discuss
7    because I haven't focused on that in preparing for
8    today's deposition.
9    Q.    So, do you draw any conclusions about Paxil
10   and cardiac defects from studies looking at all
11   SSRIs or any other SSRI?
12   A.    No, I do not.
13   Q.    Do you agree that the SSRIs differ from one
14   another, pharmacokinetically, pharmacodynamically?
15   A.    Yes, they do.
16   Q.    And you would agree that the FDA would
17   never approve Paxil based on studies conducted on
18   Zoloft or Prozac, correct?
19   A.    I don't -- I can't answer that question.
20   Q.    You don't know?
21   A.    The degree to which they may depend on some
22   of those studies, there may be some.  I don't know.
23   Q.    If it's not a class effect, by what
24   mechanism do you think Paxil can operate to cause
25   cardiac defects that's not also common to the other

Page 92

1    SSRIs?
2            MR. FOX:  Objection to form.
3    A.    Well, it's my understanding from the
4    reading that I have done that Paxil is, if not the
5    most, among the most potent SSRIs available.  And
6    so, the actual potency of this drug and the
7    pharmacokinetics of this drug may differ from other
8    drugs in the SSRI class.
9    Q.    Well, when you say potency, you're talking
10   about its affinity for 5HT, the serotonin
11   transporter?
12   A.    I cannot describe all of the aspects that
13   would support the word "potency."  There may be a
14   number of different issues involved in potency from
15   the point of view of receptors and pharmacokinetics
16   and other issues which I am not prepared to opine
17   on.  I don't -- I don't know the mechanisms that
18   underlie the higher potency of Paxil compared to
19   other SSRIs.
20   Q.    So, when you use the word in your report
21   "potency," you don't know what it means?
22   A.    Well, it's not that I don't know what it
23   means.  I just cannot explain all of the mechanistic
24   basis for that word.
25   Q.    Can we look at your report again, which is

Page 93

1    tab 1 in that binder in front of you, and ask you if
2    you wrote the initial drafts of paragraphs 59
3    through 67 of your report?  This is the one we were
4    just talking about before on paroxetine.  It's where
5    we started and you said somebody else had gotten
6    involved.  I think you said Mr. Faigen.  59 through
7    67, the section on paroxetine.
8    A.    Right.  I outlined the content of these
9    paragraphs and I had assistance from Mr. Faigen in
10   filling in some of the details and information.
11   Q.    Well, when you outlined the content, you
12   said generally what you wanted to do, and then he
13   filled in the specifics?
14   A.    In some cases, that's correct.
15   Q.    So, let's look at paragraph 63.  Did you
16   write the words, "Paxil is a selective serotonin
17   reuptake inhibitor, meaning that its efficacy in the
18   treatment of the aforementioned disorders is linked
19   to potentiation of serotonergic activity in the
20   central nervous system resulting from inhibition of
21   neuronal reuptake of 5HT.  Paxil is the most potent
22   inhibitor of 5HT reuptake of all currently available
23   antidepressants and it is 2 to 23 times more potent
24   than other SSRIs."?  Did you write that?
25   A.    Well, I didn't write it.  The authors of

24 (Pages 90 to 93)

Page 94

1  these references wrote it.  This was abstracted from
2  these references 24 and 69.  I would not have known
3  that myself without depending on other references.
4  So, this was taken from the references that are
5  listed in this paragraph.
6  Q.     And did you read the abstracts of those
7  articles or the articles themselves?
8  A.     No, I read the articles themselves.
9  Q.     Okay.  And what are you relying on for the
10  statement that Paxil is 2 to 23 times more potent
11  than the other SSRIs?  Is that footnote 69,
12  reference 69?
13  A.     That is -- it must be, since it's listed
14  there.
15  Q.     All right.  So, your testimony is that you
16  wrote this paragraph 63 in your report and you read
17  the referenced article and that article is what you
18  base your statement on that it's 2 to -- Paxil is 2
19  to 23 times more potent, right?
20         Let's use Exhibit 134, please.  I want to
21  look at the article -- articles.
22         The abstract of the article is in English,
23  but the article is in German, isn't it, Doctor?  Do
24  you read German?  Are you fluent in German?
25  A.     No, I am not.

Page 95

1  Q.     Dr. Kramer, do you speak German?
2  A.     No, I don't.
3  Q.     Do you have a translation of this article?
4  A.     I'm not sure.
5  Q.     You're not sure?
6  A.     I can't recall.  There are literally
7  hundreds of articles that are referenced in here.
8  Q.     So, you can't determine if a reliable
9  methodology was used or, for that matter, what
10  methodology was used because it's not in the
11  abstract, it's in the body of the article, fair
12  enough?  Or you don't know what's in the body of the
13  article because you can't read it?
14  A.     Well, I can't read the body of the article
15  as it's put in front of me here, that's true, it's
16  in German, but other than that, I just can't tell
17  you.
18  Q.     You state in paragraph 61 of your report
19  that the recommended initial dose of Paxil is 20
20  milligrams, correct?  Did you write paragraph 61?
21  A.     Yes.
22  Q.     You wrote that paragraph?
23  A.     As I said, I outlined every paragraph in
24  this section and certain details were filled in with
25  my assistant.

Page 96

1  Q.     Okay.  Do you know what the recommended
2  initial starting dose is for sertraline?
3  A.     No, I don't.
4  Q.     For Prozac?
5  A.     No.
6  Q.     Would you agree, when comparing minimum
7  starting doses across SSRIs, they are equally potent
8  inhibitors of 5HT reuptake?  Do you know that, if
9  that's true or not?
10         MR. FOX:  Objection to form.
11  A.     I can't comment.  I don't know.
12  Q.     Exhibit 21.  I'm going to show you a
13  peer-reviewed published article by a fellow named
14  Meyer, and we marked it as Exhibit 21, and I'd like
15  you to read into the record on page 83 -- 832, I'm
16  sorry -- first of all, look at Figure 6 on page 831.
17  Do you see that?
18  A.     Yes.
19  Q.     All right.  Would you agree with me that
20  when you compare minimum starting doses across
21  SSRIs, they're equally potent inhibitors of the 5HT
22  reuptake?
23  A.     Well, again, since I haven't read this
24  article, and just looking at this one figure, I
25  can't comment.

Page 97

1  Q.     Okay.  So, let's turn to page 832.  And
2  under Discussion, second paragraph, it says, "It is
3  interesting that the daily doses of SSRIs that are
4  convincingly distinguishable from placebo in the
5  clinical setting, 20 to 40 milligrams of citalopram,
6  20 milligrams for fluoxetine, 50 milligrams for
7  sertraline, 20 milligrams for paroxetine, and 75
8  milligrams for extended release venlafaxine, were
9  also the doses that obtained an 80 percent occupancy
10  in the striatum.  The occupancy data indicate that
11  with these doses, the blockade at the 5HTT is fairly
12  equivalent across SSRIs."  Is that what it says?
13  A.     Yes, it is.
14  Q.     So, would you agree, when comparing minimum
15  starting doses across SSRIs, they are, in a sense,
16  in essence, equally potent inhibitors of 5HT
17  reuptake?
18         MR. FOX:  Objection to form.
19  A.     I can't comment.
20  Q.     You can't comment.  Okay.
21         THE WITNESS:  May I take just a
22  five-minute break?
23         MS. HALPERN:  Absolutely.  Sure.
24         THE VIDEOGRAPHER:  Off the video
25  record, 9:55.

25 (Pages 94 to 97)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 98

1      (Brief recess.)
2      THE VIDEOGRAPHER: Back on the video
3  record, 9:58.
4  BY MS. HALPERN:
5  Q.     You state in paragraph 67 of your general
6  report that the six SSRIs have "unique individual
7  pharmacological profiles of secondary binding
8  properties, and this is a possible explanation for
9  why SSRIs have clinically detectable distinctions,
10  especially at higher doses." Did you write that
11  initial draft of this paragraph?
12  A.     Again, this information would have been
13  extracted from the references that are listed in
14  this paragraph.
15  Q.     And when you say extracted from the
16  references, the abstracts of these references?
17  A.     No.
18  Q.     The articles themselves?
19  A.     I assume so. I don't remember exactly, you
20  know, what section of those articles this
21  information would have come from.
22  Q.     Well, what clinically detectable
23  distinction at higher doses are you referring to?
24  A.     Again, I'd have to go back to the articles
25  and review that information. I don't recall.

Page 99

1  Q.     What secondary binding properties are you
2  referring to?
3  A.     Again, I'd have to review this information
4  from the articles that we consulted in writing this
5  report.
6  Q.     Do you know the difference in sertraline's
7  affinity for the dopamine transporter relative to
8  Paxil; do you have any idea?
9  A.     No, I do not.
10  Q.     Do you have any idea of any other SSRI's
11  relationship to a transporter as opposed to Paxil?
12  A.     No.
13  Q.     Can you name anyone at all?
14  A.     No, I can't.
15  Q.     Can you name any difference in binding
16  properties, anything at all, Dr. Kramer, that you're
17  aware of? You say that there are secondary binding
18  properties that differ. Can you just even tell me
19  what the binding properties you're talking about
20  are?
21  A.     I'd have to go back and review these
22  articles and other -- in other references.
23  Q.     Can you tell me what a secondary binding
24  property is? Just tell me what one is. Give me an
25  example. There are multiple secondary binding

Page 100

1  properties. Give me an example of one binding
2  property?
3  A.     Well, what do you mean by that? I mean --
4  Q.     It's your sentence.
5  A.     These molecules bind to transporters, they
6  bind to receptors and so on, and there are a whole
7  series of receptors for serotonin.
8  Q.     So, tell me what they are.
9  A.     They're -- what do you mean, what they are?
10  The chemical --
11  Q.     What the different serotonin receptors and
12  different serotonin transporters are. Can you tell
13  me what they are?
14  A.     I can't, no, from memory, no.
15  Q.     Now, you're not holding yourself out as an
16  expert on the effects of depression on pregnancy
17  outcome, are you?
18  A.     No.
19  Q.     And am I correct that you won't be offering
20  any opinion about the adequacy of the Paxil label?
21  A.     That's correct.
22  Q.     Or regulatory matters?
23  A.     That's correct.
24  Q.     Or GSK conduct? It's not in your report
25  that I can see, so if you are, I'd like to know

Page 101

1  about it.
2  A.     There may be questions that have to do with
3  GSK's influence on the Louik study that we discussed
4  because that was part of the documentation that I
5  brought today.
6  Q.     Where's --
7  A.     And part of the documents that you have in
8  front of me today.
9  Q.     Where's the documentation on the Louik
10  study? I must have missed it. In the materials you
11  brought today?
12  A.     Some of the e-mail correspondence between
13  GSK --
14  Q.     Oh, that we marked as an exhibit?
15  A.     That's right.
16  Q.     Okay. And that was -- I don't have it
17  here, but I think I know which one -- what is that
18  exhibit number? It's these three pages marked as
19  Exhibit 152?
20  A.     Well, actually, there were more than these
21  pages that were clipped together. So, I don't know
22  where the others are.
23  Q.     Yes, those were the two charts that we
24  separately marked.
25      Do you have them?

26 (Pages 98 to 101)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 102

1      MR. SHEEHAN: I think they went that
2 way. They might be in that pile.
3 Q.    Yes, they're right here. That's Exhibit
4 163 and 162?
5 A.    I imagine. I don't know what -- if there
6 was anything else clipped to this.
7 Q.    That was everything clipped to it.
8 A.    That was everything right here?
9 Q.    Yes.
10     MR. FOX: That was also a list of
11 defects clipped to it in the Louik study.
12     THE WITNESS: It was thicker when I
13 gave it to you.
14     MS. HALPERN: I believe you counted
15 the pages. Is it something else?
16     MR. FOX: Yes, you marked it separate.
17 It's around here somewhere.
18     MS. HALPERN: These were the only two
19 I marked separately, Shawn. So, maybe I -- I think
20 I do recall what you're talking about because you
21 counted the pages.
22     MR. FOX: Yes.
23 Q.    Okay. Other than that, and we'll find it,
24 is there anything else?
25 A.    There was a reference just a few minutes

Page 103

1 ago to a declaration that had do with the Louik
2 study. So, I don't know whether you're expecting to
3 answer -- ask any questions about that declaration,
4 but that also has to do with GSK's and the Louik
5 study correspondence.
6 Q.    So, I do have questions for that, which I
7 didn't know if I had to ask or not, at the end.
8 I'll see if we have time.
9      Did you do the initial research for the
10 section of your general report on the mechanistic
11 support for cardiac teratogenicity of Paxil,
12 paragraphs 119 through 123?
13 A.    Again, same answer as before. I outlined,
14 read all the articles, outlined the sections, and
15 had assistance from my research assistants in
16 filling in some of the numbers and the details.
17 Q.    When you say outlined this section in
18 particular, what did your outline consist of?
19 A.    I outlined both the structure of this
20 report and the content of the various sections that
21 I wanted to be included.
22 Q.    Well, did you tell them which animal
23 studies they were to look at, or did they come up
24 with the animal studies?
25 A.    No, no, I read the articles, and then

Page 104

1 instructed them as to what I wanted to be included.
2 Q.    So, did you read all of the articles cited
3 in this section of your report?
4 A.    Yes.
5 Q.    Okay.
6 A.    I read all the articles in this -- that are
7 referenced in this report.
8 Q.    Okay. Good. Then you can tell me which
9 article demonstrates that Paxil disrupts
10 differentiation of neural crest cells?
11 A.    I wouldn't be able to do that from memory.
12 I'd have to have the articles in front of me.
13 Q.    Is it your opinion that there is an article
14 in here that demonstrates that Paxil disrupts
15 differentiation of neural crest cells?
16 A.    Again, I'd have to look at the articles
17 that are cited in here.
18 Q.    Do you know or don't you know, as you sit
19 here today for your deposition, whether an article
20 exists that you've cited that demonstrates that
21 Paxil disrupts differentiation of neural crest
22 cells?
23 A.    I believe, yes, I have. I certainly have
24 read a number of those articles. They should be
25 cited in this report. There are -- there --

Page 105

1 Q.    You think there are a number of articles
2 that do that?
3 A.    Excuse me, excuse me, excuse me.
4      MR. FOX: Tammy, please don't
5 interrupt the witness.
6 A.    I have 170 articles that are referenced in
7 this report and there are additional articles
8 referenced in the appendix for this particular case.
9 And so, from memory, I cannot tell you specifically
10 what I read and learned from every single article.
11 Q.    So, you believe there's an article that
12 demonstrates that Paxil disrupts differentiation of
13 neural crest cells, but you can't tell me which one?
14 A.    I am sure that I have read articles that
15 have to do with the -- both the differentiation, the
16 migration, differentiation, proliferation of heart
17 cells associated with -- with serotonin.
18 Q.    Okay. That's not my question. Can you
19 tell me if there is an article that demonstrates
20 that Paxil, I'm not talking about serotonin, I'm
21 saying Paxil disrupts differentiation of neural
22 crest cells?
23 A.    Specifically, I can't recall.
24 Q.    You state in paragraph 119 of your general
25 report that Paxil is known to cross the placenta.

27 (Pages 102 to 105)

Page 106

1  Did you do the research on that and read the two
2  articles that are cited there?
3  **A.      Again, I have read the articles. I didn't**
4  **conduct those studies. I abstracted that**
5  **information from other research reports.**
6  Q.     Okay. Do you cite -- one of the studies
7  you cite is an article by Rampono looking at the
8  presence of Paxil in cord blood. Do you recall
9  that?
10  **A.      Again, I'd have to see the article.**
11  Q.     Okay. So, assuming that I'm right and it's
12  about cord blood, do you rely on this study for your
13  belief that Paxil is present and can cause the
14  placenta in the first trimester; is that what it's
15  cited for?
16  **A.      Well, I would have to look at the total**
17  **list of references that I reviewed to support the**
18  **statements that I made in this report in order to**
19  **answer your question. I can't tell you that that's**
20  **the only place that I derived information about**
21  **Paxil or other SSRIs crossing the placenta.**
22  Q.     Do you know when cord blood is drawn from a
23  baby, do you know at what point?
24  **A.      I don't recall, no.**
25  Q.     You have no idea when they take cord blood?

Page 107

1  **A.      I don't recall.**
2  Q.     Do you know if it's in the first trimester?
3  **A.      I don't recall.**
4  Q.     In fact, the second study you cite about
5  amniotic fluid suffers from the same problem. I
6  take it you don't recall if the second study is
7  about amniotic fluid?
8       MR. FOX: Objection to form.
9  **A.      Second --**
10  Q.     I'm sorry, your second reference. It must
11  be the Loughhead article. I think it's 107?
12  **A.      Okay. Again, I'd have to have that**
13  **reference in front of me. I don't recall.**
14  Q.     Do you know when the measurement of
15  amniotic fluid is taken from the baby? First
16  trimester, second trimester, third trimester, after
17  birth?
18  **A.      If you're talking about in an**
19  **amniocentesis?**
20  Q.     Yes.
21  **A.      That would be the second trimester.**
22  Q.     Okay. So, it's not taken during the first
23  trimester?
24  **A.      No, it is not, not -- not normally, no.**
25  Q.     Now, you testified that exposure to -- do

Page 108

1  you know what cord blood is?
2  **A.      Yes.**
3  Q.     What is it?
4  **A.      What do you mean, what is it?**
5  Q.     What is cord blood?
6  **A.      It's blood in the cord of the fetus.**
7  Q.     Okay. And you've testified that exposure
8  to Paxil produces adverse effects in developing
9  animals, right? You wrote that in your report in
10  paragraph 118.
11  **A.      Okay. Can you repeat the question?**
12  Q.     Actually, that's the wrong paragraph cite.
13  I have an error in my -- so, let me skip that.
14       Dr. Kramer, can you point me to a single
15  animal study that demonstrates that giving Paxil to
16  a pregnant animal causes heart malformations in the
17  baby?
18  **A.      In the animal?**
19  Q.     Yes.
20  **A.      Well, there is an animal study that was**
21  **conducted by Weir for GSK that did show in a -- in a**
22  **pup that had died that there was a VSD.**
23  Q.     Other than that one example that you've
24  just given me, can you tell me of any other in all
25  the literature you read?

Page 109

1  **A.      I don't recall, no.**
2  Q.     Now, you've also given the opinion that the
3  way Paxil causes heart malformations is by somehow
4  interfering with serotonin concentrations in the
5  embryo, correct?
6  **A.      That's correct.**
7  Q.     All right. Specifically what you say in
8  your report, and this is paragraph 121, and I think
9  this is right, is that "circulating serotonin has
10  been shown to regulate this development of the
11  outflow tract by --
12  **A.      Could you just hold up and let me find**
13  **where you're reading?**
14  Q.     Sure.
15  **A.      Okay. I see it. Okay. Go ahead.**
16  Q.     "Circulating serotonin has been shown to
17  regulate this development of the outflow tract by
18  affecting neural crest migration in a dose-dependent
19  manner. This process has been shown to be
20  deleteriously perturbed by SSRIs." Is that your
21  opinion?
22  **A.      Okay. I just need a second to read this**
23  **paragraph.**
24       Okay. Now, can you repeat the question?
25  Q.     Sure. Did you write that paragraph?

28 (Pages 106 to 109)

Page 110

1   A.      Yes.
2   Q.      All right.  And is that your opinion?
3   A.      Yes, it is.
4   Q.      All right.  Can you turn --
5   A.      Well, this is my opinion as I understand it
6   from the references that I have read.
7   Q.      Okay.
8   A.      I am depending on the references that I
9   read and the expertise of researchers in this field
10  for supplying this information.
11  Q.      What researchers supplied information?  You
12  mean in the peer-reviewed published literature?
13  A.      In the peer-reviewed published literature,
14  that's correct.
15  Q.      Going back for a minute to the Weir study
16  that you referred to where a septal defect was seen
17  in a rat exposed to Paxil, a baby of a rat that was
18  exposed to Paxil, was there a significant difference
19  in the rate of such defects between Paxil-exposed
20  and control animals?
21  A.      No, and there couldn't possibly have been
22  given the small number of animals that were studied.
23  I believe they were -- well, I'd have to look, but I
24  think there were something like 30 rats studied in
25  each group.

Page 111

1   Q.      So, you can't tell whether there was an
2   increase or not?
3   A.      Well, there couldn't have been given the
4   sample size of the number of rats studied and the
5   number of events.
6   Q.      Fair enough.  Can you point to a single
7   study that demonstrates that administration of Paxil
8   or any other SSRI to a pregnant woman has any effect
9   on levels of circulating serotonin in the embryo?
10  A.      In the human embryo?
11  Q.      Yes.  There is no such study, is there,
12  Doctor?
13  A.      Well, wait a minute, you asked me a
14  question.  So, I'm thinking about the answer.
15  Q.      Okay.
16  A.      I don't recall seeing such a study.
17  Q.      Okay.  Is it in your opinion increasing the
18  concentration of serotonin or decreasing it that you
19  say has a deleterious effect on heart development,
20  or don't you know?
21  A.      It's my understanding that perturbations in
22  serotonin levels have a deleterious effect on
23  cardiac development.
24  Q.      Is it because it's increasing serotonin
25  levels or decreasing it?

Page 112

1   A.      Well, there are -- well, SSRIs increase the
2   serotonin concentration outside of the cells.  They
3   block reuptake.  But I can't say that a decrease
4   would not also have a deleterious effect.  I don't
5   know the answer to that.
6   Q.      Is it your opinion that there is an
7   increasing -- I know what you said about what
8   happens in the synaptic cleft.
9   A.      Right.
10  Q.      But I'm asking you is it increasing the
11  concentration of serotonin or decreasing it that has
12  the deleterious effect on heart development that you
13  claim?  Is it because there's too much or too little
14  serotonin?
15  A.      I can't answer that right now.  I'd have
16  to -- I'd have to go back and review the references.
17  Q.      Can you point to a single scientific study
18  where either an increase or a decrease of
19  circulating serotonin concentration was actually
20  shown to result in any kind of structural heart
21  malformation?
22  A.      Can you repeat that question?
23  Q.      Sure.  Can you point to a single scientific
24  study, anything at all, where either an increase or
25  a decrease in circulating serotonin concentration

Page 113

1   was shown to result in any kind of structural heart
2   malformation?
3   A.      I'd have to go back to my references and
4   look.
5   Q.      Can you point to a single scientific study
6   that showed that disrupting serotonin in any way
7   induced outflow tract defects in an animal embryo?
8   A.      Again, I'd have to go back to my references
9   and look.
10  Q.      Can you point to a single scientific study
11  that showed that disrupting serotonin in any way
12  induced any neural crest cell related heart
13  malformation in any animal embryo?
14  A.      I think in these series of questions, I'd
15  like to have access to some of the studies that I've
16  actually brought with me.
17  Q.      You understand, Dr. Kramer, that this is my
18  opportunity to ask you about these sections in your
19  report, and you're not able to answer any of my
20  questions?
21  A.      Well, I don't agree with that.  I think
22  that I have a right to consult the scientific
23  support and the studies that I relied on in writing
24  about these sections because, as I told you,
25  these -- I didn't write these articles.  This

29 (Pages 110 to 113)

Page 114

1   research, primary research was done by others. And
2   so -- and there's a -- there are literally hundreds
3   of articles that are cited between the two reports.
4   And so, in order to answer specific questions,
5   answers to your questions, I would need to have
6   access to the actual articles and information that I
7   took advantage of in writing this report.
8   Q.    Are they here with you today?
9   A.    Yes, they are.
10   Q.    Okay. And do they have abstracts -- none
11   of them have abstracts attached to them, do they?
12   Do you know?
13   A.    These articles?
14   Q.    These articles.
15   A.    I don't think so.
16   Q.    Okay. So, nobody abstracted them for you,
17   or you didn't bring the abstracts, which is it?
18   A.    I don't know. I can't answer that.
19   Q.    Is it fair to say you won't be offering an
20   opinion in this case as to when GSK knew or should
21   have known Paxil was associated with birth defects?
22   A.    I will not be offering an opinion about
23   that, no.
24   Q.    And, Doctor, you've not gone back to any
25   database available to GSK prior to 2005 to examine

Page 115

1   the available data at that time to determine whether
2   Paxil was associated with statistically significant
3   increased risk of birth defects?
4   A.    No, I have not.
5   Q.    Are you relying on -- strike that.
6       You repeatedly state throughout your
7   general report that by not including data on
8   spontaneous abortion, that the odds ratios for Paxil
9   and cardiac defects are underestimated; is that a
10   fair representation?
11   A.    Are probably underestimated.
12   Q.    Okay. And you believe that this is true
13   because you further state that "studies have shown
14   that exposure to SSRIs, including Paxil, during
15   pregnancy is associated with spontaneous abortion."
16   That's in paragraph 93, the last sentence on page --
17   if you go to the last sentence on page 26, it's a
18   direct quote I just read. Do you see that?
19   "Further studies have shown."
20   A.    I see it. I'm reading it.
21   Q.    Okay.
22   A.    Okay. Now, what is your question again?
23   Q.    Well, I haven't really gotten there.
24   That's a fair rendition of what the report says,
25   though, correct, that you believe --

Page 116

1   A.    That's correct.
2   Q.    And you cite two exhibits, reference 117
3   and 155 for that statement, correct?
4   A.    That's correct.
5   Q.    Now, is it your testimony that these two
6   studies show an association then between Paxil and
7   spontaneous abortion; is that what they're cited
8   for?
9   A.    I'd have to look at these references.
10   Q.    Well, did you read the articles in that
11   paragraph?
12   A.    Yes, I did, but if you're going ask me
13   specific --
14   Q.    117, please.
15       And I'd like to show you the first of your
16   two references, reference 117 is an article by
17   Rahimi. Does that ring a bell?
18   A.    Yes, it does.
19   Q.    Okay. And are you aware that in this
20   Rahimi article that you cite, 117 -- no, that's
21   incorrect. Oh, I'm sorry, I'm sorry. It's Exhibit
22   62 of mine. It's her reference to Exhibit 117.
23       MR. SHEEHAN: Oh, I'm sorry. I've got
24   you. 62.
25   Q.    Okay. Here is the article by Rahimi.

Page 117

1       MS. HALPERN: And why don't you get 63
2   out at the same time.
3       MR. SHEEHAN: Sure.
4   Q.    Is it fair to say that this article that
5   you cite, there is no specific data about Paxil
6   anywhere in this article?
7   A.    I'm going to need a few minutes to look at
8   the article.
9   Q.    All right. Let's get Exhibit 63.
10       Well, Doctor, if you can find any data over
11   the break about Paxil, you'll let me know. Let's
12   look at the second reference, reference --
13   A.    Well, did -- if you want me to look for a
14   specific piece of information in the article, you'll
15   have to give me time to look at it; otherwise, we
16   can go on to something else.
17   Q.    Okay. I'm willing to go on to something
18   else. If you can't see anything at least off the
19   top of your head --
20   A.    Well, I don't memorize articles, especially
21   several hundred of them, and you asked me to look at
22   this article for a particular piece of information,
23   but you haven't given me the time to do so.
24   Q.    Is it your understanding, when you cited
25   that article, that you cited it because it had data

30 (Pages 114 to 117)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 118

1  specific to Paxil?
2  A.    Well, the sentence that you are citing from
3  my report says, "Further, studies have shown that
4  exposure to SSRIs, including Paxil," so we have
5  SSRIs in that sentence, and so I'm assuming that
6  that's what you're referring to here.
7  Q.    Okay.  So, my question to you is, do you
8  have any data specific to Paxil?
9  A.    Well, if I were given time to find it among
10  these references, then, you know, I could answer
11  your question, but I don't have that memorized.
12  Q.    Okay.  So, you would have cited Rahimi even
13  if it was only about SSRIs and not about Paxil; is
14  that correct?
15  A.    Well, among -- among other references as
16  well.
17  Q.    Okay.  Okay.  So, your next reference, and
18  there are only two, this is the other one, this is
19  an abstract, right, reference number 155, correct?
20  A.    That's correct.
21  Q.    And let me ask you this:  Is it fair to say
22  you're relying on this abstract for any of your
23  opinions in this case; is that why you cited it?
24  A.    Well, this opinion -- let me just read this
25  abstract for a minute, please.  And also, this -- I

Page 119

1  don't believe that Vial ever published a full
2  article based on this study.  I believe this is all
3  Vial ever published.  I don't think there is a full
4  study.
5  Q.    But you cite it, correct, in support of
6  this statement?
7  A.    Yes, but it isn't -- it isn't just that I
8  cite an abstract.  This is all that Vial ever
9  reported on this study, was in an abstract form.
10  Q.    So, in your weight of evidence analysis,
11  you would consider this as something you would want
12  to look at, correct?
13  A.    Possibly, possibly.
14  Q.    Okay.  Well, you did.  You included it in
15  your report, correct?
16  A.    Well, then I did.  In any case, let me just
17  take a few minutes to look at this.
18  Q.    Well, I'm going to ask you a question
19  that's specific.  Would you look at the conclusion
20  of the bottom of the page and read it into the
21  record.
22  A.    The conclusion says, "Our results do not
23  suggest that paroxetine increases the rate of major
24  or cardiac malformations," but the data themselves
25  are -- speak for themselves, and that's really what

Page 120

1  you need to look at in these articles.  It's not
2  just the conclusions, overall conclusions that may
3  be based on statistical significance and other
4  issues, but it's very important to look at the data,
5  the relative risks and the odds ratios themselves.
6  So, for instance, in this case --
7  Q.    You have to -- Dr. Kramer there's a
8  question pending --
9  A.    But I'm in the middle -- I'm in the middle
10  of my answer.
11  Q.    Your answer is unresponsive.  I move to
12  strike.  I'm going to ask a new question.
13       Are you relying on data about Paxil and
14  spontaneous abortion for your opinion in this case
15  that Paxil can cause cardiac birth defects?
16  A.    Can you repeat that question?
17  Q.    Yes, certainly.  Are you relying on data
18  about Paxil and spontaneous abortion for your
19  opinion in this case that Paxil can cause cardiac
20  birth defects?
21  A.    The relationship between Paxil and
22  spontaneous abortion?
23  Q.    Right.
24  A.    That it can cause birth defects?  Only to
25  the extent that Paxil causes a spectrum of adverse

Page 121

1  outcomes of reproductive as well as pregnancy
2  outcomes.  So, it's -- this is one of a spectrum of
3  adverse outcomes that have been shown to be related
4  to exposure to Paxil.
5  Q.    Okay.  Fair enough.  Are you offering an
6  opinion, to a reasonable degree of scientific
7  probability, that Paxil causes spontaneous abortion?
8  A.    No, I don't believe so.
9  Q.    Okay.  Is it your opinion that the
10  mechanism by which Paxil allegedly causes or may
11  increase the risk or be associated with spontaneous
12  abortion is the same as the mechanism by which Paxil
13  allegedly causes cardiac defects?
14  A.    I won't be offering opinions on that.
15  Q.    Okay.  Do you think you can extrapolate
16  findings about all SSRIs and spontaneous abortion to
17  Paxil and spontaneous abortion?
18  A.    I -- only to the extent to which the
19  studies that have been done have looked at that
20  issue and have provided information about that.
21  Q.    Okay.  The Teratology Society has stated
22  that causation of one kind of reproductive adverse
23  effect, such as miscarriage, is not proof of
24  causation of a different kind of adverse effect,
25  such as malformations.  Do you agree with that?

31 (Pages 118 to 121)

Page 122

1   A.      Can you repeat that?
2   Q.      Yes, sure. Causation of one kind of
3   reproductive adverse event, such as spontaneous
4   abortion, is not proof of causation of a different
5   kind of adverse effect, such as malformations.
6   A.      In and of itself, that's correct.
7   Q.      Do you know of any published study
8   reporting an increased risk or statistically
9   significant association for Paxil and spontaneous
10  abortion?
11  A.      I'd have to look at the -- at the
12  literature on this issue. I have not done a
13  complete review of the literature on Paxil and
14  spontaneous abortion. So, I cannot say that I have
15  all of the information that's been generated in the
16  literature --
17  Q.      Okay.
18  A.      -- on that -- on that issue.
19  Q.      Fair enough. I'd like to show you an
20  article. This is an article you're familiar with,
21  though, correct? We've marked it as Exhibit 66.
22  A.      Yes.
23  Q.      It's referenced in your general report as
24  reference 46, and it's an article by Diav-Citrin,
25  correct?

Page 123

1   A.      Correct.
2   Q.      All right. Now, you fail to mention
3   anywhere in your section on spontaneous abortion,
4   this peer-reviewed published article, correct?
5   A.      I assume that's correct.
6   Q.      Okay. And if you look at Table 3, there's
7   data for Paxil and spontaneous abortion,
8   miscarriage, and for Paxil and cardiovascular
9   malformations, isn't there? And this is a
10  peer-reviewed article, not an abstract, correct?
11  A.      That's correct.
12  Q.      All right. And they failed to find an
13  increased risk for Paxil and miscarriage. If
14  anything, it goes in a protective direction. The
15  adjusted odds ratio is 0.85, confidence interval
16  0.52 to 1.40.
17          MR. FOX: Objection to form.
18          MS. HALPERN: What's the objection?
19          MR. FOX: What was the question?
20  Q.      The question was, that's what they found,
21  isn't it?
22          MR. FOX: Actually, it was the
23  colloquy, is what I was objecting to, your comment
24  on the document.
25          MS. HALPERN: Fair enough. Let me

Page 124

1   restate my question.
2   Q.      Is it correct that they find an odds ratio,
3   adjusted odds ratio for Paxil and miscarriage of
4   0.85, with a confidence interval, 95 percent
5   confidence interval from 0.52 to 1.40?
6   A.      Yes, that's correct.
7   Q.      You also reference in your report an
8   article by Dr. Kallen; is that right?
9   A.      Where are you?
10  Q.      I'm just asking you, from the SMBR, Dr.
11  Kallen. It's spelled Kallen, K-A-L-L-E-N, it's
12  pronounced Kallen.
13  A.      Oh, that's interesting. I guess that's why
14  I didn't recognize it.
15  Q.      It's Swedish. I guess that's the
16  pronunciation. Okay. You know what, I think I'll
17  skip through this.
18          Coarctation of the aorta -- aorta was first
19  recognized as a distinct kind of heart defect years
20  before Paxil was ever developed; is that a fair
21  statement?
22  A.      Yes, it is.
23  Q.      All right. And you would agree that there
24  are other factors and circumstances completely
25  unrelated to Paxil that cause coarctation of the

Page 125

1   aorta, true?
2   A.      That's true.
3   Q.      There's a background rate. Fair enough?
4   A.      Well, there are other risk factors and
5   other causal agents related to formation of
6   coarctation of the aorta.
7   Q.      Okay. And you would agree there are people
8   exposed to Paxil in the first trimester of pregnancy
9   who develop no birth defects at all, fair enough?
10  A.      That's correct.
11  Q.      All right. And you would also agree that
12  assuming for the moment that Paxil can cause the
13  defects alleged in this case, let's just assume it
14  for a moment, that by chance alone, some women who
15  take Paxil will have a baby born with coarctation of
16  the aorta or another birth defect that has nothing
17  whatsoever to do with Paxil?
18  A.      What do you mean by chance alone?
19  Q.      Well, say Ms. X takes Paxil and she has a
20  baby with a heart defect. It's possible that there
21  are many Ms. X's out there who would have birth
22  defects whether or not they took Paxil, just by
23  chance alone?
24  A.      That's possible. Well, by chance alone is
25  a statement that's undefined, but if you mean

32 (Pages 122 to 125)

USDC, Northern District of OK                McMurray v. GSK                              Monday
No. 08-CV-381-GKF-SAJ          Videotape Deposition of Shira Kramer, Ph.D.        November 2, 2009

Page 126

1  because of other factors that may be known or
2  unknown, that is correct.
3  Q.     But -- you make a very good point. So,
4  someone could have a baby with a birth defect who
5  was exposed to Paxil, but the birth defect would
6  have had nothing to do with Paxil, it would be due
7  to something else?
8  A.     That's possible.
9  Q.     Okay. So, other than the fact that someone
10 develops a birth defect while on Paxil, is there
11 anything distinguishable about what you claim to be
12 a Paxil-induced birth defect as opposed to, I don't
13 want to say chance because I think you're right,
14 something else that caused it, a marker of some
15 kind?
16 A.     Well, there are other well-recognized, both
17 genetic factors and other risk factors that could be
18 identified that could contribute to the risk of
19 formation of that malformation, that malformation or
20 any malformation, for that matter.
21 Q.     So, sometimes you might see another cause
22 and identify it?
23 A.     And I need to qualify that. Because there
24 are other causes and other causal agents doesn't
25 mean that the agent that you are focusing on, in

Page 127

1  this case Paxil, doesn't have a causal role, because
2  we do know that there is is -- there is both
3  multifactorial etiology in birth defects, as in all
4  diseases, and we also know that birth defects, as
5  all diseases, have etiologic heterogeneity in
6  general. So that it is wrong to say that there is
7  only one cause to one disease or one cause and one
8  outcome. We know that there are constellations of
9  causes that interact, and they're each -- each
10 component is considered to be a cause.
11 Q.     But every woman who takes Paxil, their
12 baby's birth defect, if they have one, is not
13 necessarily related to Paxil as a causal factor, as
14 a sole cause, as anything; it can happen in some
15 women just because it's going to happen, for other
16 reasons, for no known reason?
17 A.     It's possible.
18 Q.     Okay. Do you know what percentage of
19 cardiac birth defects have no known cause at all?
20 A.     That percentage really is very, very broad
21 as it's described by different -- different people.
22 Q.     Is it generally accepted, it's at least
23 over 60 percent of unknown cause; would you agree
24 with that?
25 A.     Some have said that it's 60 percent, some

Page 128

1  have said that it's less. It really all depends on
2  who you're reading and who you talk to.
3  Q.     Okay. I really know of no reference of
4  anybody who says it's less than 60 percent. Can you
5  cite to me what you're referring to when you say
6  some say it's less?
7  A.     I can't, as I sit here today, tell you
8  where I might have seen that.
9  Q.     Do you know what percentage of coarctation
10 of the aorta -- aorta has no known cause?
11 A.     No, I don't.
12 Q.     Okay. You state in paragraph 43 of your
13 report, your general report, that, and I'll read it,
14 it's a quote, "There are often multiple interactions
15 of various component causes that create a sufficient
16 cause of a given disease. Certain disease outcomes,
17 especially chronic diseases, often have several
18 independent causes that do not appear individually
19 as necessary and sufficient." Did I read that
20 correctly?
21 A.     Yes.
22 Q.     All right. My question to you is, do you
23 believe that Paxil can cause birth defects by
24 itself, is sufficient on its own?
25 A.     That's unknown.

Page 129

1  Q.     You don't know?
2  A.     That's unknown.
3  Q.     Okay. So, do you believe it requires
4  multiple interactions?
5  A.     I think that's unknown.
6  Q.     Okay. Can you identify who the vulnerable
7  subpopulation of people might be who --
8  A.     I -- sorry. Go ahead.
9  Q.     -- who might be subject to having a baby
10 with a birth defect if they take Paxil?
11 A.     I don't think that information is known.
12 Q.     Okay. Is it your opinion that Isabelle and
13 Melody's birth defects were due to multiple
14 mechanisms or a single mechanism? Do you know if it
15 had a multifactorial cause?
16 A.     I wouldn't know that.
17 Q.     Okay. Do you know what percentage of heart
18 defects are coarctation of the aorta?
19 A.     I know what the prevalence rate is. The
20 prevalence rate is around 6 per 10,000 for
21 coarctation of the aorta. So, if -- among live
22 births. So, if you assume a prevalence rate of 4 to
23 10 per thousand for all cardiac malformations, then
24 you just do the math.
25 Q.     Okay. But do you agree that there is and

33 (Pages 126 to 129)

Page 130

1  has been a stable background rate for coarctation of
2  the aorta?
3           MR. FOX:  Objection to form.
4     A.    I think that I've seen that sort of
5  statement stated by some of the GSK experts.  I
6  think that it's, given the ranges of prevalence
7  rates that are out there and the -- and the rarity
8  of these outcomes, I don't think that that has been
9  studied, so that I don't think one could make a
10  statement about that.
11    Q.    So, you don't know whether the type of
12  defect Isabelle has has increased or decreased since
13  Paxil became available for sale?
14    A.    I don't think anybody can really answer
15  that question accurately.
16    Q.    Would you agree that about 1 percent of all
17  babies in this country are born with a heart defect;
18  is that about right?
19    A.    Are you talking about live births?
20    Q.    Yes.
21    A.    The prevalence rates that I have read range
22  pretty much between 4 to 10 per thousand, so that
23  would be about, at the upper end, about 1 percent.
24    Q.    Okay.  And that number was the same before
25  Paxil and before SSRIs and after SSRIs as far as you

Page 131

1  know, it hasn't changed?
2     A.    Well, that's a big range.  That's a big
3  range given the rarity of, you know, these types of
4  defects.  So, when you look at this range between 4
5  and 10, 4 and 10 per thousand, and you look at the
6  relative risks associated with Paxil, that would be
7  within that range that you would probably, if you
8  don't have any more accuracy in measurement, then
9  you would probably miss it, you would not know it,
10  you would not detect it.
11    Q.    Well, when there's a background rate for
12  disease, would you agree you need controlled studies
13  to tell you if an exposure is causing a particular
14  disease at a greater rate than one would expect from
15  the background rate?
16    A.    Well, controls are incorporated in studies
17  to serve that function.  I mean, that is the
18  function of controls.
19    Q.    Right.  Okay.  So, you agree that there --
20  do you agree that there is no data demonstrating
21  that people exposed to Paxil in the first trimester
22  of pregnancy are more likely to develop coarctation
23  of the aorta than those unexposed to Paxil?
24    A.    No, I wouldn't agree with that.
25    Q.    You believe that there is data specific to

Page 132

1  Paxil and coarctation of the aorta?
2     A.    I think there is data that is specific to
3  Paxil and cardiac defects.  I think that when we get
4  into a discussion of the specific studies -- there
5  is a specific study actually that does show a -- one
6  of the -- one of the cases exposed have exactly the
7  same constellation of heart defects as Isabelle
8  McMurray, but I think that when we get into the
9  discussion of the individual studies, we will see
10  why these studies simply do not have sufficient
11  sample sizes to be able to look at the rates of
12  individual and more rare cardiac defects such as
13  coarctation of the aorta.  They are very, very
14  specifically and I would say deliberately
15  underpowered in the sense that the sample sizes are
16  determined by the investigators.  And so, it would
17  be impossible to really -- to be able to study some
18  of those rarer outcomes.
19    Q.    Dr. Kramer, I've read your report.  I
20  understand everything you said, and you'll have lots
21  of opportunity to describe it.  But my question is,
22  do you agree that there's no data demonstrating that
23  people exposed to Paxil in the first trimester of
24  pregnancy developed a greater risk of coarctation of
25  the aorta than those unexposed?

Page 133

1     A.    No, I would not agree with that.
2     Q.    You think there is specific data on Paxil
3  and coarctation of the aorta?
4     A.    As a subgroup of, you know, of other
5  groupings that have been studied.
6     Q.    What subgroup?  What study?
7     A.    The studies that have looked at, for
8  instance, LVOTO and not only all cardiac
9  malformations, which are relevant as far as that
10  goes, but also there are studies that did break out
11  other subclassifications of cardiac malformations to
12  which -- to which coarctation of the aorta has been
13  assigned.
14    Q.    I understand.  And as I said, we'll get
15  into it later, but my question is, is there any data
16  about Paxil specifically with regard to coarctation
17  of the aorta?
18    A.    What sort of data are you talking about?
19  Rates?
20    Q.    A study.  Is there a study?
21    A.    A study that just looked at Paxil and
22  coarctation of the aorta alone?
23    Q.    Correct, correct.
24    A.    No, there are no studies that just looked
25  at coarctation of the aorta alone.

34 (Pages 130 to 133)

USDC, Northern District of OK                 McMurray v. GSK                         Monday
No. 08-CV-381-GKF-SAJ          Videotape Deposition of Shira Kramer, Ph.D.      November 2, 2009

Page 134

1    Q.    Okay.  And do you agree that FDA's
2  statement that chemically-induced birth defects,
3  including those associated with drug exposure,
4  account for less than 1 percent of all birth
5  defects?
6    A.    **Can you repeat that?**
7    Q.    Sure.  Let me just ask you this:  Do you
8  have any information -- do you disagree with the
9  statement that chemically-induced birth defects,
10 including pharmaceuticals, include -- consist of
11 less than 1 percent of all birth defects?
12   A.    **I don't know that I would agree with that.**
13   Q.    Okay.  Do you have a different number?
14   A.    **I don't have an exact number.  I don't**
15 **think that number is -- is out there.  I just don't**
16 **think one can state a specific number.  But I don't**
17 **know that I would agree with that either.**
18   Q.    Well, if there are approximately 4 million
19 births a year in the U.S., and there's approximately
20 a 3 percent rate of major birth defects, then each
21 year we'd expect about 120,000 babies born with a
22 major birth defect, true?
23   A.    **Correct.**
24   Q.    All right.  And in a 10-year period, that
25 would be about 1.2 million babies born in the U.S.

Page 135

1  with major birth defects, true?
2    A.    **Correct.**
3    Q.    And in paragraph 66 of your general report,
4  you state, "There has been a significant increase in
5  the use of SSRIs among pregnant woman since their
6  introduction in the U.S. market in 1988."  And you
7  go on to say in the same paragraph that between 2001
8  and 2005, SSRIs were estimated to be used in about 6
9  percent of all pregnancies, 5.6 percent.  Did I read
10 that correctly?
11   A.    **That's correct.**
12   Q.    And if 5.6 percent of pregnant women in the
13 U.S. are treated with SSRIs, then simply using the
14 background rate, we would expect about 70,000 babies
15 with major birth defects to be born to mothers
16 exposed to SSRIs just due to the background rate
17 alone, correct?
18   A.    **Wait, wait.  Can you -- I need to follow**
19 **your logic.  Can you speak much more slowly and**
20 **break that down so I can synthesize what you're**
21 **asking me?**
22   Q.    Sure.  So, over 10 years, 1.2 million
23 babies will be born with birth defects, correct?
24   A.    **I'm sorry?**
25   Q.    In 10 years, 1.2 million women will have

Page 136

1  babies with birth defects.
2    A.    **Okay, 10 years.**
3    Q.    And 6 percent of those women, let's just
4  round it up, will have taken Paxil.
5    A.    **No, this is SSRIs, not Paxil.**
6    Q.    Okay.  Paxil or an SSRI.
7    A.    **Okay.  So, which one is it?**
8    Q.    You say SSRIs.  So, I have to use that.
9    A.    **Okay.  So, let's go with that, SSRIs, okay.**
10   Q.    Yes, unless you have a different number for
11 Paxil specifically?
12   A.    **Well, Paxil, those numbers are less.  It's**
13 **less than 1 percent for Paxil.**
14   Q.    Okay.  So, do you want to use the 1 percent
15 for Paxil?
16   A.    **However you want to ask the question.**
17   Q.    Okay.  Let's just use 1 percent, it's more
18 straightforward, who take Paxil.  What --
19   A.    **It's actually, the number that I have read**
20 **is actually something like .5 percent.**
21   Q.    Of Paxil versus all the SSRIs together?
22   A.    **No, it's .5 percent for Paxil alone,**
23 **something close to that, but my memory may be wrong.**
24   Q.    Well, let's use 1 percent and then we can
25 use the half a percent later.  1 percent because

Page 137

1  it's easier.
2    A.    **Okay.**
3    Q.    Okay.  And if 1 percent of those women were
4  treated with Paxil, then simply you doing the math,
5  how many would you expect would have babies born
6  with major birth defects?
7    A.    **Well, that really also depends on the odds**
8  **ratio that -- for Paxil causing major birth defects,**
9  **and I'd have to go back to that.  I mean, that --**
10   Q.    As opposed to cardiac birth defects?
11   A.    **As opposed to cardiac, that's right.**
12   Q.    Well, we were using the rate of 3 percent
13 for major birth defects.
14   A.    **Well, but there's an odds ratio or relative**
15 **risk that has been -- that has been published**
16 **relating Paxil and birth defects.  We have said that**
17 **Paxil exposure doesn't cause birth defects in 100**
18 **percent of the women who take it.  I mean, even**
19 **thalidomide doesn't do that.**
20   Q.    You're misunderstanding.  What I'm looking
21 at, Dr. Kramer, and I won't belabor this very much,
22 is that some women are going to have babies with
23 birth defects just because they got pregnant,
24 because 1.2 million babies are born with major birth
25 defects every year, and some of those women are

35 (Pages 134 to 137)

USDC, Northern District of OK          McMurray v. GSK                    Monday
No. 08-CV-381-GKF-SAJ          Videotape Deposition of Shira Kramer, Ph.D.     November 2, 2009

Page 138

1  going to take Paxil and some of those women are
2  going to have babies with birth defects whether or
3  not they took Paxil, correct?
4  **A.     Well, we've covered that, but that's not**
5  **the question you were asking me.**
6  Q.     Well, I was trying to put a number on it.
7  **A.     Well, the number also depends on the**
8  **relative risk of birth defects that are -- that's**
9  **related to taking this SSRI or Paxil.  So, what I'm**
10  **saying is that in your assumption, the question**
11  **you're asking me, you can't assume that every single**
12  **woman who takes Paxil is going to have a child with**
13  **a major -- with a cardiac malformation or a major**
14  **birth defect.**
15  Q.     Assume for the moment that Paxil doesn't
16  cause birth defects.  Just assume that for a moment.
17  I know you disagree with that.  Assume that for a
18  moment.  How many women who take Paxil are going to
19  have babies with birth defects just because every
20  woman is at risk of having a baby with a birth
21  defect?
22  **A.     Well, the overall background rate, as we**
23  **said, something between 4 to 10 per thousand, or**
24  **let's say a maximum of 1 percent.**
25  Q.     And that has nothing to do with whether or

Page 139

1  not they took Paxil, just background rate?
2  **A.     Well, that, assuming that that number does**
3  **not include anyone who is taking an SSRI or Paxil,**
4  **that's what the rate has been published to be,**
5  **somewhere in that range.**
6  Q.     And if Paxil doesn't cause birth defects,
7  if you assume that for a moment, those women who
8  take Paxil are still going to have babies with birth
9  defects, correct?
10  **A.     There are other causes of birth defects**
11  **outside of Paxil, so that there will be women who**
12  **have children with birth defects who do not take**
13  **Paxil.**
14  Q.     So, would you agree that the fact that a
15  baby is born with a heart defect to a mom who took
16  Paxil does not mean that the Paxil must be what
17  caused that baby's birth defect?
18  **A.     I think we've already covered that.  I**
19  **think --**
20  Q.     Well, would you agree?
21  **A.     I would state that there are possibly other**
22  **causes, either component causes or independent**
23  **causes of birth defects even among women --**
24  Q.     Or known causes?
25  **A.     -- even among women who take Paxil.**

Page 140

1  Q.     So, you mentioned Melody's defect in
2  paragraph 3 of your report where you state she was
3  diagnosed with two atrial septal defects at birth,
4  right?
5  **A.     Paragraph 3 of my report?**
6  Q.     Of your specific report.  It's Exhibit 2.
7  **A.     Okay.  Can you repeat the question?**
8  Q.     Well, in paragraph 3, you state, "Melody's
9  condition is not currently as serious as her sister
10  Isabelle's.  Therefore, this report will focus on
11  the multiple anomalies suffered by Isabelle
12  McMurray."  Did I read that right?
13  **A.     Yes, you did.**
14  Q.     Have you seen Melody's echocardiogram
15  report of May 2009?
16  **A.     I don't recall.  I did review all of the**
17  **medical records that were sent to me by the Tracey**
18  **Law Firm.**
19  Q.     Okay.  You didn't review Melody's medical
20  records, did you?
21  **A.     I don't recall.**
22  Q.     You don't know whether you did or you
23  didn't?
24  **A.     Well, we could check.  I reviewed --**
25  Q.     It's not in your report.

Page 141

1  **A.     Again, I was told not to focus on Melody,**
2  **Melody in this report, and whether I read any**
3  **medical records -- I believe I must have read some,**
4  **it rings a bell, but again, I'd have to look.**
5  Q.     Well, if you read some, then you didn't
6  cite them as having been reviewed.
7  **A.     Well --**
8  Q.     So, you don't know that her heart
9  echocardiogram was totally normal; is that correct?
10  **A.     I can't recall what or if I knew that.**
11  Q.     You say isn't currently as serious.  Do you
12  know if she has any condition at all at this moment?
13  **A.     I don't know.**
14  Q.     So, who told you about her condition?
15  **A.     I'm sure I was both told by the attorneys**
16  **of the Tracey Law Firm as well as I have seen and**
17  **read some of the reports of the pregnancy and**
18  **outcome of pregnancy of the mom, Shauna McMurray,**
19  **and I believe I did read some information about**
20  **Melody that might have been incorporated in**
21  **Isabelle's reports as well.**
22  Q.     Do you know what a PFO is?
23  **A.     I don't recall.**
24  Q.     Do you know what a patent foramen ovale is?
25  **A.     I know it is a heart defect.**

36 (Pages 138 to 141)

Page 142

1   Q.      You think a patent foramen ovale is a heart
2   defect?
3   **A.      I believe it is.**
4   Q.      Are you aware that she was diagnosed with
5   either a patent foramen ovale or an ASD?
6   **A.      I don't recall.**
7   Q.      Do you know which one she has?
8   **A.      Well, what I remember reading is that she
9   was diagnosed with an ASD.**
10  Q.      You don't -- it's fair to say, I guess, you
11  don't know the difference between an ASD and a
12  patent foramen ovale?
13  **A.      No, I don't.**
14  Q.      Okay.  And who told you there were two
15  ASDs, two atrial septal defects?  Do you know where
16  you got that from?
17  **A.      I'm just assuming that we read it in one of
18  the -- in some of the material that was sent to us.**
19  Q.      Who is we?
20  **A.      When we abstracted this information, again,
21  myself and my staff.**
22  Q.      Okay.  Did your staff review the medical
23  records?
24  **A.      I did as well as my staff to help me
25  extract some information from the medical records**

Page 143

1   **for this report.**
2   Q.      Specifically, who reviewed Melody,
3   Isabelle's, or any of the McMurray medical records?
4   **A.      I did.**
5   Q.      Besides you?
6   **A.      Oh, it would have been Zachary.**
7   Q.      And what is his medical training?
8   **A.      He has none.**
9   Q.      Okay.
10  **A.      Other than public health training.**
11  Q.      All right.  If you did not review Melody's
12  medical records, how do you know what cardiac
13  defects she has?
14  **A.      Again, I can't state that I know the full
15  spectrum of cardiac defects that Melody McMurray
16  has, if they're outside of what I've said in this
17  report.**
18  Q.      Do you know if her PFO or ASD closed
19  spontaneously?
20  **A.      I don't recall.**
21  Q.      Do you know if she had any surgical
22  intervention?
23  **A.      I don't believe she did.**
24  Q.      Okay.  Would you know what percentage of
25  all babies are born with an ASD or a PFO that

Page 144

1   spontaneously close with no surgical intervention?
2   **A.      I believe it's a fairly high percentage,
3   but I don't know the percentage.**
4   Q.      Higher than the percentage of cardiac
5   defects overall?
6   **A.      No, I don't believe, but I don't know for
7   sure.**
8   Q.      Do you know if it's 5 percent?
9   **A.      I don't know.**
10  Q.      1 percent?
11  **A.      Again, I don't know.**
12  Q.      10 percent?
13  **A.      I've just answered that.**
14  Q.      You don't know?
15  **A.      I just said I don't know.**
16  Q.      Okay.  Is it fair to say you haven't
17  examined or interviewed the parents of Melody
18  McMurray?
19  **A.      That's correct.**
20  Q.      Okay.  You stated at the Kilker trial that
21  one reason different studies found different results
22  for Paxil and septal defects was because every study
23  is different in the way they classify cardiac
24  malformations in that there's not one standard way
25  to classify cardiac malformations.  Do you remember

Page 145

1   testifying like that?
2   **A.      I'd like to see -- you said septal defects
3   specifically?  Is that what my testimony was?**
4   Q.      Yes.
5   **A.      So, can you read -- are you reading
6   specifically from my testimony?**
7   Q.      You know what, let me make it easier.  Is
8   there, Doctor, in your opinion a different way that
9   Alwan or Louik or Pedersen or Kallen, Kallen, or
10  Davis classified septal defects?
11  **A.      Well, some of the studies didn't break out
12  anything other than just all cardiac defects.  Some
13  of them broke out other subclassifications.  So, I'd
14  have to look at those specific studies to see how
15  they were handled.**
16          MS. HALPERN:  All right.  I think we
17  have to change the tape, so we'll stop.
18          THE WITNESS:  Okay.  I'm going to take
19  a quick bathroom break.
20          MS. HALPERN:  Sure, of course.  You
21  know where it is, Dr. Kramer?
22          THE WITNESS:  Yes.
23          THE VIDEOGRAPHER:  The time is now
24  10:47.  This concludes tape number 2 of the video
25  deposition of Dr. Shira Kramer.

37 (Pages 142 to 145)

USDC, Northern District of OK                    McMurray v. GSK                              Monday
No. 08-CV-381-GKF-SAJ                Videotape Deposition of Shira Kramer, Ph.D.          November 2, 2009

Page 146

1           (Brief recess.)
2           THE VIDEOGRAPHER: The time is now
3    10:57. This begins tape number 3 of the video
4    deposition of Dr. Shira Kramer.
5    BY MS. HALPERN:
6    Q.      Dr. Kramer, is it fair to say you did not
7    perform a differential diagnosis of the cause of
8    Melody's birth defect?
9    A.      That's correct.
10   Q.      And you didn't consider then or rule out
11   alternative possible causes of Melody's birth
12   defect?
13   A.      That's correct.
14   Q.      Yet, in paragraph 41 of Exhibit 2, your
15   specific report, you conclude that Paxil is a
16   "causal factor in Melody McMurray's cardiac defect."
17   Do you see that? Those are the words.
18   A.      That's correct.
19   Q.      Can you tell me what you mean by a causal
20   factor?
21   A.      It's a factor that contributes to the cause
22   or the occurrence of an outcome. As I explained,
23   there is rarely possibly, if ever, just one
24   component that is solely responsible for an outcome,
25   even if we don't understand what all of them are,

Page 147

1    and the fact -- and that is an established causal
2    model for diseases in humans.
3           So that the fact that there is -- there are
4    several component causes means that every component
5    is considered to be a causal factor or a cause of
6    that outcome. There may be and probably almost
7    always are, if not always are, other causes, some of
8    which may not ever be completely understood.
9           There may be interactions between genetic
10   factors and other co-factors, but all of those
11   component causes that exist in a causal model or in
12   that causal component, in that causal web, are
13   considered causes.
14   Q.      Is something that's just associated with a
15   birth defect a causal factor?
16   A.      The consideration of cause means, and the
17   conclusions regarding causation, are always based on
18   more than just one piece of evidence and more than
19   one, just one study.
20           So, words such as association and risk
21   factors usually refer to individual studies and
22   individual pieces of evidence, but when we talk
23   about causation, we talk about the consideration and
24   amalgamation of cumulative evidence, all leading to
25   this decision or conclusion of causation. So,

Page 148

1    association means one piece of evidence, one study,
2    but causation has to do with the cumulative evidence
3    from multiple sources and multiple studies.
4    Q.      So, when you say in paragraph 41 that Paxil
5    is a causal factor, are you saying that Paxil caused
6    Melody McMurray's cardiac defect, or is that
7    something different?
8    A.      Well, it's not really different. A causal
9    factor is a cause, and it's somewhat semantics. In
10   epidemiology and in the science of causation, we
11   understand very clearly that there are multiple
12   factors that interact that lead to an outcome, an
13   adverse outcome. In this case, Melody was exposed
14   to Paxil just as her sister was. And so, Paxil is a
15   causal factor in her congenital cardiac defects as
16   well.
17   Q.      So, I guess what you're saying is, you
18   don't have to do a differential diagnosis to say
19   what caused a specific individual's defect. If it
20   could cause it, you say it did cause it.
21   A.      Well, a differential diagnosis is a
22   diagnosis of her condition. She had whatever, ASD
23   and whatever other specific defects you claim she
24   has. That would be a cardiologist who would make
25   that diagnosis. I don't make that diagnosis. But I

Page 149

1    do opine about causation, and as I expressed before,
2    it is at the purview of epidemiologists who are best
3    able, really, to draw those kinds of conclusions
4    about causation.
5    Q.      Okay. Let me ask this because I'm having a
6    little bit of a hard time understanding. Let's just
7    talk abstractly for a moment. If X can cause a
8    defect and B can cause a defect and C can cause a
9    defect, let's say -- and D can cause a defect, there
10   are four different known causes, one might be
11   genetic, one might be smoking, one might be a drug,
12   one might be an exposure. Let's just say it's been
13   established. And then a baby is born with this
14   defect, and have had all four exposures, all four
15   things are true. Is it your opinion would you
16   say that each and every one of the four caused their
17   birth defect?
18           MR. FOX: Objection to form.
19   Q.      Without any analysis beyond that?
20   A.      I think it's very difficult to really make,
21   for me to make a statement about that without
22   knowing what all of those causal factors are and
23   without knowing more about the interaction of those
24   causal factors because the studies that are done
25   often take account of and adjust for other factors.

38 (Pages 146 to 149)

Page 150

1  Q.     Okay.
2  A.     So, I think we'd have to put that into the
3  context of specific information about not only those
4  individuals, but also the studies that would be
5  cited in support of a causal conclusion.
6  Q.     But you are giving an opinion, it's really
7  a question, are you giving an opinion to a
8  reasonable degree of scientific probability or
9  certainty that Paxil caused Melody McMurray's
10  cardiac defect?
11  A.     I'd like to go off the record for a minute.
12  Q.     You can't while a question is pending.
13  Just answer the question and then we can go off the
14  record.
15  A.     I'm not certain really what the status of
16  my -- of my expert testimony will be with regard to
17  Melody McMurray. That's why I need to ask a
18  question of my -- the attorney who hired me.
19  Q.     Well, it's a problem because this is our
20  opportunity. If you just want to ask him that
21  question on the record, I don't have any objection;
22  otherwise, I want you to answer this question first
23  and then we can break.
24  A.     Well, I think it would help for me to
25  clarify really what I will be asked to testify to.

Page 151

1  Q.     Well, let me ask it this way. Given
2  everything you know about Melody McMurray and
3  everything you've looked at and everything you know
4  about the epidemiology, is it your opinion, as you
5  sit here today, to a reasonable degree of scientific
6  probability, that Paxil caused her defect?
7  A.     Yes. Yes, it is, that Paxil is causally
8  related to her defect.
9  Q.     No, that's not my question.
10  A.     Well, it's really semantics. I've
11  explained that, that Paxil is a causal factor, as I
12  have expressed it here, in the development of her
13  congenital cardiac defects.
14  Q.     Well, is there a difference between being a
15  causal factor and causing her defect?
16  A.     Not really.
17  Q.     Okay.
18  A.     Because we understand, and I need to very
19  clearly explain this so that it's not
20  misinterpreted, that there is never just one
21  individual cause, even if we don't know what the
22  other, other contributing causes are, that we do
23  know in human disease that there are multiple
24  interacting factors that lead to an adverse outcome,
25  and each one of those component causes is considered

Page 152

1  to be a cause. Sometimes they are intrinsic, as in
2  genetic factors, sometimes they are other external
3  co-factors, but each one of them is considered to be
4  a cause.
5  Q.     Well, is it fair to say then that you would
6  opine that Paxil was a causal factor of any baby's
7  septal defect, no matter what, if the mom took Paxil
8  in the first trimester?
9  A.     It would really depend on --
10  Q.     What?
11  A.     -- some other information that I would
12  have. For instance, that we have excluded and
13  discussed here certain genetic syndromes which have
14  been clearly identified as associated with a certain
15  spectrum of certain cardiac defects.
16  Q.     Did you exclude genetic syndromes from
17  Melody McMurray?
18  A.     I don't recall whether we looked at that or
19  not.
20  Q.     But you said you had a -- you said you
21  would have to do that to say whether it was a causal
22  effect or not.
23  A.     Well, you asked me a very, very general
24  question, but my answer with regard to Melody, since
25  we do know that her mother was exposed to Paxil and

Page 153

1  we do know that -- and that we do know the history
2  for both Isabelle and Melody, I feel very
3  comfortable opining that Paxil was a causal factor
4  in Melody's congenital cardiac defects.
5  Q.     Then let me ask you my question again.
6  Would you opine that Paxil was a causal factor in
7  any baby's septal defect if the mom took Paxil in
8  the first trimester? If the answer to that is no,
9  tell me why not, when you wouldn't.
10  A.     In the absence of any other information,
11  and I did have other information about Melody, I
12  would not be able to say that.
13  Q.     To say what?
14  A.     To say that -- can you repeat the question
15  now?
16  Q.     Sure. Would you opine that Paxil was a
17  causal factor of any baby's septal defect if the mom
18  took Paxil in the first trimester?
19  A.     That may be -- I may be in some instances
20  qualifying that statement. For instance, if there
21  were a very, very strong first degree relative
22  pattern of congenital malformations in someone, in
23  that case, my opinion may be different. So, I would
24  not be able to make that statement universally for
25  everyone who had ever taken Paxil without any other

39 (Pages 150 to 153)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 154

1  information about them.
2  Q.     Okay.  You mentioned that.  What else?
3  A.     Again, they would be mainly those, those
4  types of, those types of genetic factors or first
5  degree relative congenital malformations.  There may
6  be -- and even in the case where there had been
7  other drugs, that doesn't exclude Paxil as a causal
8  factor.  So, again, it would have to be on a -- you
9  know, I would have to know more information.
10 Q.     So, is it fair to say that you would opine
11 that Paxil was a causal factor of any baby's septal
12 defect if the mom took Paxil in the first trimester?
13 Because you've already described you can have
14 multiple causal factors.
15 A.     Well, that would really depend.  I would
16 have to have more information.  I can't make a
17 blanket statement yes or no in the absence of any
18 other information.
19 Q.     So, which is it?  I'm just trying to
20 understand which it is.  Would you say it's a causal
21 factor in every single case, or are there instances
22 where you would do what in the law they call a
23 differential diagnosis and look at what the other
24 things are and rule some in and some out?  Which way
25 is it?

Page 155

1  A.     Well, certainly I would want other
2  information.  I do seek other information, so that
3  it is certainly important for me to have other
4  information about the pregnancy and about the
5  families and about other factors.  So, I can't -- I
6  would not make a blanket statement that Paxil is a
7  cause of every single congenital cardiac defect in
8  every single case of a congenital cardiac defect.
9  Q.     So, what's the analysis you did with
10 Melody?
11 A.     The analysis that I did with Melody was
12 that I reviewed the records that were prepared and
13 that were provided to me.
14 Q.     What records?  You didn't review the
15 medical records of Melody?
16        MR. FOX:  Objection to form.
17 A.     No, I didn't say that.  I did not say that.
18 I said I reviewed the records that were provided to
19 me, some of which dealt with Melody, and there was
20 information about Melody included in the mother's
21 medical records, as well as Isabelle's medical
22 records, because they were twins.  So, I did read
23 information about Melody as well.
24 Q.     Okay.  So, you're telling me you did a
25 differential diagnosis?  You ruled in and you ruled

Page 156

1  out what you thought other alternative causes might
2  be?
3  A.     I don't call that a differential diagnosis.
4  What is a differential diagnosis, in your opinion?
5  Q.     Well, let me ask you this:  You testified
6  earlier that anything that can cause a defect is a
7  causal factor, and that you can have multiple causal
8  factors, not just one, correct?
9  A.     That's correct.
10 Q.     All right.  Now you're testifying that you
11 would not opine that Paxil was a causal factor in
12 every single case where a mom was exposed to Paxil
13 because there might be other causal factors that
14 make you think it isn't.
15 A.     Well, there would be a certain subset that
16 I think would be very important to know, and I
17 highlighted the genetic syndromes as well as the
18 first degree relative congenital cardiac
19 malformation picture, and, you know, I will
20 highlight that as an important piece of information
21 that I would want to know and that I know was not
22 the case in the case of this family.
23 Q.     Okay.
24 A.     So --
25 Q.     So, in any case --

Page 157

1  A.     There is certainly a subset of information
2  that would be important for me to know in deciding
3  upon the causal role of Paxil and any other
4  exogenous factor and the occurrence of congenital
5  cardiac defects in a child.
6  Q.     And you didn't review what other drugs
7  Melody was exposed to in utero, did you?
8        MR. FOX:  Objection to form.
9  A.     Well, that's not true because --
10 Q.     Did you do that?
11 A.     Well, to the extent that I knew what other
12 drugs and exposures the mother had during the
13 pregnancy, the pregnancy was the same for both
14 Isabelle and Melody.  They were twins.  So, they
15 were in utero at the same time in the same
16 pregnancy.
17 Q.     So, what other causal factors did you
18 identify for Melody's birth defect, any?
19 A.     No, I did not.
20 Q.     Okay.  So, it's your testimony that Paxil
21 was the causal factor because you couldn't find any
22 other causal factors?
23 A.     Well, it was, as I said, to a reasonable
24 degree of medical probability, Paxil is a causal
25 factor in the occurrence of Melody's congenital

40 (Pages 154 to 157)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 158

1  cardiac defects.
2  Q.     Okay.  All right.  So, how do you deal with
3  the fact, when you make this diagnosis or this
4  causality assessment, when over 60 percent of the
5  known causes of VSD or the causes of VSD are
6  unknown?
7  A.     Well, that's someone's opinion, that over
8  60 percent are unknown.
9  Q.     Do you disagree with that?
10  A.     Well, that's someone opining that in their
11  opinion, 60 percent are unknown.  That has nothing
12  whatsoever to do with the studies that have
13  demonstrated an increased risk of congenital cardiac
14  defects associated with taking Paxil in the first
15  trimester.  That has absolutely nothing to do with
16  it, just as it has nothing to do with the fact that
17  thalidomide causes birth defects, that solvents
18  cause birth defects, and alcohol causes birth
19  defects, and vitamin A and a whole host of other
20  things, that doesn't diminish the causal connection
21  between those factors and congenital defects because
22  someone has opined that 60 percent of cardiac -- of
23  congenital defects are of unknown etiology.  That
24  has nothing to do with it whatsoever.
25  Q.     So, you're saying that in any case where

Page 159

1  you have ruled out a genetic cause or other
2  exposures or other risk hazards, in any case where
3  mom was exposed to Paxil in the first trimester, you
4  would determine Paxil was the cause?
5  A.     I didn't say that.
6  Q.     What are you saying?
7  A.     Well, I explained before, we can repeat my
8  answer, I said that, in particular, where there is
9  strong evidence of a genetic syndrome, as there is
10  none here, in the child, in the family, in first
11  degree relatives, that certainly would have a strong
12  impact on a causal -- on a causal argument or a
13  causal conclusion.
14  Q.     Epidemiology is only one piece of the
15  evidence that's considered, right, in determining
16  causality in an individual case, true?
17  A.     That's correct.
18  Q.     All right.  And, as you say, you need to
19  know what the genetic risks are, right?
20  A.     That's an important piece of information.
21  Q.     What percentage of the genetic causes of
22  VSD or ASD are known, do you know, how much is known
23  and how much is unknown about what is genetically
24  caused?  Do we know all the genetic causes of ASD?
25  A.     No, we don't.

Page 160

1  Q.     And you need to know what other exposures
2  are, correct?
3  A.     Well, that's important information.
4  Q.     Correct.  And you need to know the family
5  history, right?
6  A.     That's correct.
7  Q.     Do you know the father's family history in
8  this case?
9  A.     Well, the family history meaning first
10  degree relatives.
11  Q.     Of the father's side.
12  A.     My reading -- but let me answer -- let me
13  just make sure that I'm clear on my answer to your
14  previous question when you say family history, that
15  it's first degree relatives that really have an
16  issue.
17  Q.     My question is, do you know the father's
18  family history?  I don't need a lecture.  I just
19  need an answer.
20  A.     I'm not lecturing you.  I'm answering you.
21  Q.     Do you know the father's family history?
22          MR. FOX:  You guys are talking over
23  each other.
24  Q.     Question.
25  A.     Now, the father's family, the family, the

Page 161

1  father's family history, as I have read about it,
2  indicates that there is some level of confusion
3  about that.  I have read that the father has a
4  relative, it may be an uncle, who, I'm not sure
5  whether it's a blood relative or by marriage, that
6  may have a heart defect of some kind or a heart
7  condition, and according to the various documents
8  that I read, it's not clear what that condition is
9  and what the level of relationship is.
10  Q.     Did you review that the relative was
11  supposed to have had coarctation of the aorta?
12  A.     Well, I reviewed that as well as other
13  testimony that there was a question about whether it
14  was actually coarctation of the aorta or whether
15  anyone even really knew what it was.
16  Q.     Did you review the medical records of the
17  dad?
18  A.     I believe -- I'm not -- I believe I did,
19  but I'm not certain.  I'm not certain.  I'd have to
20  check.
21  Q.     Do you know if they've even been produced
22  in the litigation?
23  A.     I don't know.  I really don't remember.
24  Q.     But you believe you reviewed them?
25  A.     As I said, I don't remember.  I don't

41 (Pages 158 to 161)

Page 162

1  remember.  I did read testimony about this issue and
2  some of the medical record summaries that did
3  comment on this as well.
4  Q.    And did you interview the dad?
5  A.    No, I did not.
6  Q.    The mom?
7  A.    No, I did not.
8  Q.    Did you read his deposition?
9  A.    I don't believe so.  I think I read the
10 mom's deposition.
11 Q.    Okay.  Do you know when the mom started
12 taking prenatal vitamins or if she took prenatal
13 vitamins?
14 A.    I believe, I'd have to check, I believe
15 that her pregnancy wasn't confirmed until April, so
16 I don't -- I doubt that she took prenatal vitamins
17 before that time, April of --
18 Q.    Do you know when she started taking
19 prenatal vitamins?
20 A.    No, I don't know for sure.
21 Q.    You state in paragraph 34 of your report
22 that she smoked, mom smoked less than 10 cigarettes
23 a day during her pregnancy.
24 A.    That's the report that we read, that's
25 correct.

Page 163

1  Q.    Do you know if dad smoked cigarettes?
2  A.    I don't recall.
3  Q.    Do you know if he smoked marijuana during
4  the pregnancy?
5  A.    I don't know.
6  Q.    Do you know what his occupation is?
7  A.    I don't recall.
8  Q.    Do you know who the family member was who
9  supposedly had this heart defect?
10 A.    Again, I thought it was an uncle of the
11 dad, but I don't recall it specifically.  And there
12 was certainly some confusion in the documents that I
13 read about what the nature of that relationship was.
14 Q.    In paragraph 34 of your specific report,
15 you state that studies on the association between
16 smoking and specific cardiac defects have shown
17 mixed results, some showing a positive association,
18 some no association, and some a protective effect.
19 Do you see that?
20 A.    Yes, I do.
21 Q.    Can you describe for me the criteria of a
22 finding that shows no association?
23 A.    A relative risk that's 1 or very close to
24 1.
25 Q.    What's very close to 1?

Page 164

1  A.    Oh, between 1 and 1.1.
2  Q.    And .9?
3  A.    That would be no association.
4  Q.    So, if it goes beyond .9 or above
5  1.1, then you have an association, either protective
6  or increased risk?
7  A.    Well, again, on a study-by-study basis,
8  that would be an individual study-by-study analysis,
9  but if you're going to be looking at the issue of
10 causation, then you look at all the studies
11 combined.  You don't just look at one study.
12 Q.    So, your definition of no association has
13 solely to do with the odds ratio or relative risk
14 and not the confidence interval?
15 A.    No, not necessarily.  The conclusion about
16 no association -- well, this statement specifically
17 relates to studies.  Are you asking me about this
18 statement?
19 Q.    No, I'm asking you just to describe to me
20 your criteria of a finding that shows no
21 association.  That's all I'm asking.
22 A.    In an individual study or for a body of
23 literature?
24 Q.    Yes, in an individual study.
25 A.    Okay.  So, in an individual study, a study

Page 165

1  that shows no association, is a study that has an
2  odds ratio very close to 1.
3  Q.    Which you've defined as .9 to 1.1?
4  A.    Generally.  I mean, I don't like to have --
5  make hard and fast rules, but generally.
6  Q.    And anything below would show a protective
7  effect and anything above would show an increased
8  risk?
9  A.    Okay.  On an individual study-by-study
10 level?
11 Q.    Yes.
12 A.    I think it's very, very important to
13 differentiate those kinds of overall cumulative
14 study conclusions from an individual -- and we don't
15 make those, draw those kinds of conclusions on an
16 individual study level.
17 Q.    That's my question.
18 A.    Well, we don't do that.  You don't just
19 look at one study in isolation and only one study
20 and draw a causal conclusion.
21 Q.    So, on an individual study basis your
22 answer stands?
23 A.    What answer is that?
24 Q.    That anything between .9 to 1.1, with an
25 odds ratio or relative risk of .9 to 1.1 as a point

42 (Pages 162 to 165)

Page 166

1  estimate shows no association?
2  A.      In general, that's correct.
3  Q.      I'd like to show you, this is a graphic
4  from my trial, I've marked it as Exhibit 8, it's
5  on the second page, and it's the bottom slide, and
6  ask you -- and the slide is called, How is the Odds
7  Ratio or Relative Risk Interpreted, and you left off
8  of this slide what you would say if the odds ratio
9  or relative risk was less than 1.  Would it be fair
10  to say you could include on this slide if the odds
11  ratio or relative risk were less than 1, exposure is
12  associated with a decreased risk of disease?
13  A.      It would not be as simple as that, and for
14  several reasons.
15  Q.      Well, it's simple, Doctor, if you look at
16  your slide, you say if the odds ratio or relative
17  risk is greater than 1, exposure is associated with
18  an increased risk of disease.  I'm asking you if the
19  bullet under that could equally say, if the odds
20  ratio or relative risk were less than 1, exposure is
21  associated with a decreased risk of disease.
22  A.      Yes, one could have put that on the slide.
23  Q.      Okay.  And if an odds ratio or relative
24  risk is equal to .5, now you see -- let me strike
25  that.  Let me start again.  Then you give an

Page 167

1  example.  You say, if the odds ratio or relative
2  risk equals 2.0, exposure doubles the risk of
3  disease, correct?
4  A.      That's correct.
5  Q.      And if we added onto that, if odds
6  ratio/relative risk equals .5, exposure reduces the
7  risk of disease by 50 percent; would that be a fair
8  statement to put right underneath that?
9  A.      One could do that.
10  Q.      Okay.  So, an odds ratio of .5 decreases
11  the risk the same degree as an odds ratio of 2.0
12  increases the risk; is that a fair statement?
13  A.      That's correct.
14  Q.      Okay.  Do any of the studies listed in
15  paragraph 34 of your specific report have data on
16  smoking and septal defects?
17  A.      I'd have to pull the studies.
18  Q.      Exhibit 128, please.  Well, let's look at
19  one of the articles you cite in paragraph 34,
20  reference number 23.  I'll give you a copy.  Have
21  you seen that article before?
22  A.      Yes, I have.
23  Q.      And it's coauthored by another plaintiff
24  expert in this case.  Are you aware of that?
25  A.      Yes, I am.

Page 168

1  Q.      And that's Dr. Gilbert-Barness?
2  A.      That's correct.
3  Q.      And if you turn to page 190, in the first
4  full paragraph that starts, "Although," do you see
5  that paragraph?
6  A.      Yes.
7  Q.      And if we go down two, four, six, eight,
8  nine lines, in the margin is the word -- are the
9  letters "PDA," and if you move your eye over, it
10  says, "Analyzing the data for specific types of
11  congenital heart defects, however, they identified
12  significantly increased risks for the following
13  defects:  Truncus arteriosus, and then atrial septal
14  defects, odds ratio 1.63, 95 percent confidence
15  interval, 1.04 to 2.57."  Do you see that?
16  A.      Yes, I do.
17  A.      Did I read that correctly?
18  A.      Yes, you did.
19  Q.      Are you aware of any studies that are
20  inconsistent, using your definition of consistency,
21  with that data about smoking and atrial septal
22  defects?
23  A.      I'd have to look at all those studies and
24  tell you.  I don't remember them from memory.
25  Q.      Well, you would agree there are multiple

Page 169

1  studies showing a statistically significant
2  increased risk for septal defects where mom smoked
3  any number of cigarettes on a daily basis in the
4  first trimester; would you agree with that?
5  A.      Well, you've just cited this one.
6  Q.      Right, but do you know of any others?
7  A.      Well, I'd have to pull them and look at
8  them.  I don't remember.
9  Q.      So, as you sit here today, you don't know?
10  A.      I didn't say I don't know.  I said I'd have
11  to pull the studies.  I don't have them all
12  memorized.
13  Q.      And is your opinion that mom's smoking was
14  a causal factor in the development of Melody's birth
15  defect?
16  A.      It is my opinion that smoking cannot
17  account for the increased risk associated with Paxil
18  because the studies of Paxil and cardiac defects,
19  including septal defects, adjusted for, of the major
20  studies, adjusted for smoking, and smoking did not,
21  did not take away or did not explain the increased
22  risk of cardiac defects among smokers.
23  Q.      You actually had someone look at which
24  studies adjusted for smoking and which ones didn't,
25  correct?

43 (Pages 166 to 169)

Page 170

1    A.    Pardon me?
2    Q.    You actually had someone, one of your team,
3    look at which studies --
4    A.    Well, I did.
5    Q.    And which studies adjusted for smoking and
6    which ones did not?
7    A.    I'd have to look at my list.  I don't
8    remember.
9    Q.    So, not all the studies adjusted for
10   smoking, correct?
11   A.    That's correct.
12   Q.    And do you know -- okay.  So, on what basis
13   do you attribute Melody's ASD to Paxil instead of
14   either an unknown cause, maternal smoking, dad's
15   family history or dad's exposure, or are you saying
16   there are multiple causal factors?
17   A.    Well, as I said, the family, the first
18   degree relative family history for this family, as
19   far as I understand it, is negative.  The genetic
20   testing on this family, the genetic history and the
21   history of congenital cardiac malformations in the
22   first degree family is negative.  There are no known
23   genetic defects that have been reported.  The fact
24   that the mother smoked is -- may or may not have
25   contributed causally to the occurrence of cardiac

Page 171

1    defects, but is not -- does not explain away or
2    eliminate the causal role of Paxil, and it's not --
3    and certainly the studies that have been done that
4    have adjusted for smoking have demonstrated that.
5    So --
6    Q.    Which study are you talking about that
7    found an increased risk for Paxil and atrial septal
8    defects and controlled for smoking, what study is
9    that?
10   A.    Well, we can take a look at the literature
11   and the ones that actually adjusted for smoking and
12   we can pull them out and see what they found.  But
13   the studies that looked at the relationship between
14   Paxil and congenital cardiac malformations that
15   adjusted for smoking did not find that cigarette
16   smoking eliminated the excess risk attributed --
17   attributable to Paxil.
18   Q.    Doctor, in your opinion, does smoking cause
19   septal defects?
20   A.    That's, that's very controversial, and as I
21   say in my report, there is a great degree of
22   inconsistency in that -- in the literature relating
23   smoking to congenital cardiac defects or any other
24   specific subtype.
25   Q.    I'm asking about septal defects.

Page 172

1    A.    There's a lot of inconsistency in the
2    literature about that.
3    Q.    Now, you've not examined or met with or
4    interviewed the McMurrays, correct?
5    A.    That's what I've testified to.
6    Q.    All right.  And you did review the medical
7    records in this case, along with at least one other
8    EI member for Isabelle McMurray; is that your
9    testimony?
10   A.    That's correct.
11   Q.    Anybody else other than you and Faigen?
12   A.    I don't believe so.
13   Q.    Did you review Isabelle McMurray's learning
14   disability evaluations?
15   A.    I did review information about her
16   neuropsychological status in -- from two sources.
17   One is medical records and the other is expert
18   reports.
19   Q.    Did you review any testing for
20   neurodevelopmental delay?
21   A.    I don't recall.
22   Q.    Do you know if any exist?
23   A.    I don't recall.
24   Q.    Did you review any testing of the learning
25   disabilities of Isabelle McMurray?

Page 173

1    A.    I don't recall that I read anything about,
2    specifically about learning disabilities, no.
3    Q.    Do you know if there was any testing done?
4    A.    I don't.  I don't recall.
5    Q.    What type of learning disabilities does
6    Isabelle McMurray have?
7    A.    I'd have to go back to the records to tell
8    you that.
9    Q.    Do you know?
10   A.    I don't remember what her
11   neuropsychological issues are.  I know that there
12   are some that I believe have been categorized as
13   learning delays and developmental delays, but I
14   don't know that I read anything about specific
15   learning disabilities.
16   Q.    What developmental delay does she have?
17   A.    I don't -- I don't recall all of them.
18   Some of them had to do with motor delays, I believe
19   language as well.
20   Q.    If, in fact, it was established that Mrs.
21   McMurray was not exposed to Paxil during the first
22   trimester of her pregnancy, would you still
23   attribute the children's birth defects to Paxil?
24   A.    No, if she had not taken Paxil at all, no.
25   Q.    From what point on, in your opinion?

44 (Pages 170 to 173)

Case 2:10-cv-02125-HGB-KWR Document 188-20 Filed 09/18/12 Page 46 of 166

USDC, Northern District of OK                    McMurray v. GSK                                Monday
No. 08-CV-381-GKF-SAJ              Videotape Deposition of Shira Kramer, Ph.D.          November 2, 2009

Page 174

1  A.    Pardon me?
2  Q.    From what point on, conception on?
3  A.    Can you repeat the question?
4  Q.    Yes. If, in fact, it was established that
5  Mrs. McMurray was not exposed to Paxil after
6  conception of her pregnancy with the twins, would
7  you still attribute the children's birth defects to
8  Paxil?
9  A.    And I'd really have to -- the answer to
10 that question is, I'd have to consult with someone
11 who could advise about the half-life of Paxil in the
12 mom because there are instances where there are, you
13 know, because of a long half-life, that there can be
14 exposure to a fetus even after the mother has
15 discontinued a drug.
16 Q.    Do you know if Paxil has a long or a half
17 short -- a long or a short half-life?
18 A.    I don't remember what the half-life is.
19 Q.    You state in paragraph 2 of your specific
20 report that Isabelle and Melody were conceived on
21 January 1st, 2004. Are you aware, Doctor, that the
22 medical records show a dating of the pregnancy that
23 was confirmed by ultrasound as occurring on February
24 4th, 2004? Are you aware of that, or didn't you
25 know that?

Page 175

1  A.    I don't recall seeing that.
2  Q.    Are you aware that the medical records
3  report her last menstrual period as January 20th,
4  2004. Are you aware of that?
5  A.    I don't recall that.
6  Q.    You're not offering an opinion, an expert
7  opinion, as to the date of conception here, are you?
8  A.    No, I am -- we are simply paraphrasing the
9  information that we were given.
10 Q.    Who is we?
11 A.    Again, when I say we, myself and my
12 assistant in collating information.
13 Q.    And that's more than one assistant, right?
14 A.    No, that's primarily Zach, Zachary.
15 Q.    Not Julia Chan?
16 A.    No. She was not involved in any of this at
17 all.
18 Q.    You're not an OB/GYN, right? You have no
19 training in obstetrics?
20 A.    That's correct.
21 Q.    And would you defer to Mrs. McMurray's
22 treating OB/GYN as the most likely date of
23 conception in this case?
24 A.    Could you repeat that?
25 Q.    Yes. Would you defer to Mrs. McMurray's

Page 176

1  treating OB/GYN, not an expert in the case, her
2  treating OB/GYN, as the most likely -- as providing
3  the most likely date of conception in this case?
4  A.    Assuming that her treating OB/GYN had the
5  proper information available to her, I would say
6  yes.
7  Q.    Okay. And are you aware that the medical
8  records do not support Mrs. McMurray's statement
9  that she was taking Paxil during her pregnancy?
10       MR. FOX: Objection to form.
11 A.    I am aware that one of GSK's experts has
12 asserted that. However, I have not seen that
13 information myself.
14 Q.    Okay. So, you're not aware that on two
15 separate occasions she reported to her doctors, her
16 treating doctors, that despite claiming conception
17 on January 1st, that she took no medication since
18 conception, you are aware -- you're not aware that
19 that's in the medical records?
20 A.    I don't recall seeing that.
21 Q.    Do you know who her OB/GYN is, her
22 treating?
23 A.    I don't recall that, no.
24 Q.    Do you recall reading Dr. Weinstein's
25 deposition transcript?

Page 177

1  A.    I don't recall.
2  Q.    I don't believe it's referenced in your
3  report. Let's get out Exhibit 12. So, I'm handing
4  both you and your lawyer a copy of Isabelle
5  McMurray's treating OB/GYN, Dr. Weinstein's
6  deposition in this case.
7        I'd ask you to turn to page 77. Actually,
8  if we go up to page 76. Do you see how the pages
9  are numbered? There are four to a page.
10 A.    Yes.
11 Q.    And line 10, page 76, actually, Mr. Fox
12 asks the question: "Where is it in your records --
13 where does it indicate in your records that you
14 asked Mrs. McMurray what medications she took during
15 pregnancy?"
16       Answer, "Specifically, I asked her if she
17 took any medications."
18       Question, "Okay. So where does it indicate
19 that in your records?"
20       Answer, "Page number 0010."
21       Question, "Okay. Oh, I'm sorry about that.
22 Okay. Where are we looking?"
23       Answer, "Past history. She denied
24 traumatic injury, medications, and said she was
25 allergic to Sulfa."

45 (Pages 174 to 177)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 178

1    Question, "Now, when you asked that
2 question, I don't see on here -- does that mean
3 present medications or does that mean any
4 medications she had taken at any time during
5 gestation?"
6    Answer, "It meant any medications she had
7 taken since conception and immediately prior to her
8 pregnancy."
9    Question, "Okay.  Now, do you take this
10 history, or is this secondhand from a nurse or
11 somebody else who may have asked these questions?"
12    Answer, "Again, I'm old school, I do my own
13 histories rather than using other people's."
14    Question, "Okay.  And, Doctor, I apologize,
15 I don't see on here, I'm not seeing on here where
16 you've written no medication.  Can you -- can you
17 point me?"
18    Answer, "Right above allergies, it says
19 med."
20    Question, "Right."
21    Answer, "And then it says negative in the
22 brackets."
23    "Okay.  Okay.  Thank you."
24    Have you ever seen that testimony before?
25 **A.    I don't recall seeing this.**

Page 179

1 **Q.    Okay.  If Dr. Weinstein is, in fact,**
2 correct, would you agree that Paxil could not have
3 been the cause of Isabelle McMurray's birth defects?
4 **A.    Well, if Dr. Weinstein is, in fact, correct**
5 **and it is a correct and actual fact, because Dr.**
6 **Weinstein may be misinterpreting his notes or may**
7 **have written the wrong thing in his record or she**
8 **may have misinterpreted his question, but let me**
9 **just say that if, in fact, it is proven that Shauna**
10 **McMurray never took Paxil, ever took Paxil, then**
11 **obviously Paxil cannot be the cause of the child's**
12 **birth defects.**
13 **Q.    You said ever took Paxil.  We're talking**
14 about ever took Paxil as Dr. Weinstein described it.
15 **A.    Well, as he described it was both the first**
16 **trimester and let's get back to where -- and, let's**
17 **see, some period before.  Where was that?**
18 **Medications, taken at any time during gestation,**
19 **since conception.  So, he's referring specifically**
20 **to or immediately prior to her pregnancy, which**
21 **doesn't define how close to her pregnancy he really**
22 **is -- that's a general term.**
23 **So, again, my prior answer is, I'd have to**
24 **understand the half-life.  I'd have to understand**
25 **when she actually took Paxil and what the risk would**

Page 180

1 be associated with Paxil still being in her
2 bloodstream.
3 **Q.    Do you know at what time coarctation of the**
4 aorta forms?
5 **A.    It's sometime during the, you know,**
6 **embryonic period, which is weeks, say two to seven**
7 **to eight, sometime in that time.**
8 **Q.    Where within that two to seven to eight?**
9 It's a pretty set time that it happens, correct?
10 **A.    I don't recall exactly.**
11 **Q.    Do you know if it happens at a set time,**
12 like three weeks, four weeks, five weeks, six weeks?
13 These things happen --
14 **A.    I'm sure it does, but I don't know off the**
15 **top of my head exactly when.**
16 **Q.    How about when Melody's septal defect**
17 formed, when does that happen?
18 **A.    Again, I can't say exactly when and when**
19 **the, you know, specific periods of susceptibility**
20 **would be during that time frame.**
21 **Q.    So, it's fair to say when you wrote your**
22 report in this case, you were unaware of Mrs.
23 McMurray's OB/GYN's testimony on this, right?
24 **A.    That's correct.**
25 **Q.    Did you review the medical records from**

Page 181

1 Planned Parenthood?  Exhibit 13, please.  Do you
2 know if you reviewed the medical records from
3 Planned Parenthood?
4 **A.    I don't recall.**
5 **Q.    Are you aware that, and let me show it to**
6 you, medical record, if you turn to page 03, shows
7 that on June 24th, 2004, during the second trimester
8 of her pregnancy --
9 **A.    Excuse me.  Can you just tell me where I'm**
10 **looking?**
11 **Q.    Yes, certainly.  Bottom of the page, right,**
12 it says, MED00003.  It's the third page.
13 **A.    Okay.**
14 **Q.    And if you look up to the top right of the**
15 page, it says, let's see, it says, meds since
16 conception.  Do you see that?  It says her name,
17 Shauna Millsap, the number, the birth date, the
18 provider, immunizations, and then underneath it
19 says, meds since conception.  Do you see that?
20 **A.    Right.  And what is the date on this form?**
21 **A.    I believe it's dated June 24th, 2004, but**
22 I'm -- do you see the date?  Yes, the date is by the
23 signature.  Do you see that?
24 **A.    Okay.  Yes, I do.**
25 **Q.    Okay.  And it says zero, right, a big zero?**

46 (Pages 178 to 181)

Page 182

1   A.      Yes, I see that.
2   Q.      Okay. Are you aware that this is the
3   second trimester of her pregnancy and she reports,
4   at least to this person at Planned Parenthood, that
5   she took no medications since conception?
6   A.      That's what it says.
7   Q.      And you weren't aware of this record
8   either?
9   A.      That's correct.
10  Q.      Do you have any reason to believe that Dr.
11  Weinstein or Planned Parenthood was not truthfully
12  reporting what Mrs. McMurray said to them?
13  A.      Well, I don't think it has to do with their
14  veracity or truthfulness. This might have been what
15  she reported to them, but it is in conflict with
16  what was reported to others and was recorded in
17  other records that I reviewed and that I know exist.
18  So, the --
19  Q.      What records --
20  A.      -- it's not a matter of whether or not they
21  are being truthful. It's a matter of the
22  information that they're reporting.
23  Q.      What medical record are you referring to?
24  A.      The records that I recall reviewing about
25  Shauna is -- have to do with certain medical records

Page 183

1   about her pregnancy and about the review of other
2   medical specialists of both Melody and Isabelle, as
3   well as the reports of certain experts who also
4   scrutinized those records.
5   Q.      So, what I'm asking you is, do you know of
6   any other medical record that was created during the
7   pregnancy where she said she was taking Paxil? Is
8   there any such record that exists?
9   A.      I don't recall where exactly, what the
10  source, specific medical record source was where I
11  saw the information on Paxil. I did read in a
12  number of different documents that she had been
13  taking Paxil.
14  Q.      Medical record documents?
15  A.      These were physician records. These were,
16  I believe, physician records, but I'd have to go
17  back to them specifically. If you want specific
18  sources, we're going to have to go back and look at
19  them.
20  Q.      Understood. But as you sit here today, you
21  don't know of any record that was contemporaneously
22  taken, medical record, with her pregnancy that said
23  she was on Paxil?
24  A.      Well, again, I've just answered that
25  question.

Page 184

1   Q.      I believe you said you don't know without
2   looking at the records?
3   A.      That's correct.
4   Q.      Okay. And you have no firsthand knowledge
5   of what medication she took during her pregnancy,
6   correct? You wouldn't have --
7   A.      Are you talking about other medications
8   that she took?
9   Q.      Any medications. You have no firsthand
10  knowledge of it?
11  A.      No, I have none.
12  Q.      You didn't speak to her?
13  A.      No, that's correct.
14  Q.      So, are you offering an opinion as to when
15  Mrs. McMurray took Paxil or whether or not she was
16  taking it during the first trimester?
17  A.      I am assuming -- I am basing my opinion on
18  the information that was provided to me.
19  Q.      By whom?
20  A.      Well, by reading her deposition and by
21  review of the physicians' reports that I read and
22  the other expert reports.
23  Q.      Okay. And again, you can't tell me which
24  physician reports?
25  A.      They will be provided to you and we can

Page 185

1   identify that.
2   Q.      Right. But I'm just saying, you can't tell
3   me right now?
4   A.      Not from memory, no.
5   Q.      And can you tell me which expert reports?
6   A.      Not from memory. I'd have to go back and
7   look.
8   Q.      Do you have any professional training in
9   the assessment of or any of the standard or
10  generally accepted methodologies for assessing
11  developmental delay or learning disabilities?
12  A.      No.
13  Q.      All right. Would you agree that there are
14  people with expertise in this area, but you're not
15  one of them; would you agree with that?
16  A.      That's correct.
17  Q.      And are you offering an opinion in this
18  case as to whether or not Isabelle has a learning
19  disability or are you relying on the ones for that?
20  A.      Relying on others.
21  Q.      Same for developmental delay?
22  A.      That's correct.
23  Q.      Relying on others?
24  A.      Yes, that's correct.
25  Q.      Am I correct that you're not offering an

Page 186

1   opinion to a reasonable degree of scientific
2   probability in this case that Isabelle's learning
3   disability was caused by her cardiac defect?
4   **A.      That's correct.**
5   Q.      And am I also correct that you're not
6   offering an opinion to a reasonable degree of
7   scientific probability in this case that Isabelle's
8   developmental delay was caused by her cardiac
9   defect?
10  **A.      I have opined that her developmental delays**
11  **are related to the conditions that she was born**
12  **with; namely, her congenital cardiac defects and the**
13  **surgeries that are related to those defects, and**
14  **there is evidence in the literature to justify that**
15  **conclusion.  That is an opinion that I gave in my,**
16  **in my report.**
17  Q.      And you're giving that opinion even though
18  you don't know what the developmental delay is that
19  she has, correct?
20  **A.      Well, the developmental delays that were**
21  **described in the records that I read are, you know,**
22  **they're described as I have been provided them.**
23  Q.      What are they?
24  **A.      I don't recall.  I'd have to look.**
25  Q.      You're not qualified to offer such an

Page 187

1   opinion, are you, Dr. Kramer?
2   **A.      I'm qualified to look at the literature and**
3   **to opine about what the literature says in support**
4   **about the relationship between --**
5   Q.      Exhibit 24 --
6   **A.      Between cardiac defects, related surgeries**
7   **and certain developmental outcomes, and that's what**
8   **I did.  I looked at some of that literature.**
9   Q.      Okay.  So, let's look at the six articles
10  you cite.  Paragraph 40 of your specific report.
11  Are these the articles you cite in support of your
12  opinions about the possible cause of Isabelle's
13  learning disabilities and developmental delays?
14  **A.      Okay.  Where are you?**
15  Q.      Paragraph 40 of Exhibit 2, your specific
16  report in this case.  Other than these six articles
17  that you reference, are you relying on anything else
18  for this opinion that you say you are qualified to
19  give about the cause of Isabelle's developmental
20  delay?
21  **A.      No.**
22  Q.      Okay.  And are you the one who searched for
23  and identified these articles, or did Mr. Faigen do
24  that?
25  **A.      We both did.  I asked him to search for**

Page 188

1   **certain articles, and -- of a certain type, and he**
2   **ran the actual search for me.**
3   Q.      Okay.  So, one of the articles you
4   reference here is Exhibit 24.  You reference it as
5   number 35.  It's an article by Levitsky.  Did you
6   read this article?
7   **A.      Yes, I did.**
8   Q.      Now, it's about research on rats, right,
9   not humans?
10  **A.      Well, I'd have to go back and refresh my**
11  **memory.**
12  Q.      You don't know that that's about rats?
13  **A.      Again, I don't -- I didn't memorize the**
14  **specific details of the several hundred articles**
15  **that are cited in my report.  So, if you would like**
16  **me to read this article, I'd be very happy to.**
17  Q.      The authors conclude that although it was
18  historically feared that malnutrition would reduce
19  intelligence and cognitive function, they no longer
20  believe it causes irreversible damage, true?
21  **A.      Okay.  Where are you reading from?**
22  Q.      Let's find the conclusions.  It's pretty
23  easy to find those.  Let's turn to page 2216S.  Do
24  you see, it says, "Our conceptions," bottom line,
25  "Our conceptions of how malnutrition endured early

Page 189

1   in life affects brain development have evolved
2   considerably since the mid-1960s when it was feared
3   that malnutrition endured during certain sensitive
4   periods in early development would produce
5   irreversible brain damage, possibly resulting in
6   mental retardation and an impairment in brain
7   function.  We now know that much of the alterations
8   in the growth of various brain structures caused by
9   malnutrition that concerned early investigators
10  eventually recover."  Is that what it says?
11  **A.      "Although permanent alterations in the**
12  **hippocampus and cerebellum remain."**
13  Q.      And this was conducted, can you see that
14  now, in rats, and not humans?
15  **A.      Well, again, if you want to ask me**
16  **specific --**
17  Q.      Doctor --
18  **A.      This author -- what you're reading me also**
19  **refers to other literature, and he does, he does**
20  **review other literature.**
21  Q.      Do you know if Isabelle received
22  nutritional supplements at any time?  You have no
23  idea?
24  **A.      I believe that she did.**
25  Q.      You believe she did.  Do you know if the

48 (Pages 186 to 189)

Page 190

1   rats received nutritional supplements?
2   **A.    I don't recall.**
3   Q.    Is it fair to say you don't hold yourself
4   out as an expert on the association between
5   malnutrition and developmental delays?
6   **A.    That's correct.**
7   Q.    Is it fair you don't hold yourself out as
8   an expert on the association between learning
9   disabilities and malnutrition?
10   **A.    That's correct.**
11   Q.    Or cardiac surgery and learning
12   disabilities?
13   **A.    That's correct.**
14   Q.    Or cardiac surgery and developmental
15   delays?
16   **A.    That's correct.**
17   Q.    Other than these six articles, did you read
18   anything else?
19   **A.    I'm sure I have read other literature in my**
20   **career that has to do with these issues. These are**
21   **the six articles that we've cited for this report.**
22   Q.    Now, you cite another article by Levitsky,
23   and it's also about rats. In paragraph -- you know
24   what, don't bother. Do you know if any of the six
25   articles you cite are about human beings?

Page 191

1   **A.    I don't recall. I'd have to look at them.**
2   **I believe that there are, but I'd have to look at**
3   **them.**
4   Q.    In paragraph 33 of your report, you state
5   that it is possible that Isabelle McMurray did not
6   receive the proper nutrition in the early stages of
7   her life. Is it fair to say you don't really know
8   one way or the other?
9   **A.    Well, I did read in the documents that were**
10   **provided by physicians who did treat her and review**
11   **her medical records that there were concerns about**
12   **her receiving proper nutrition.**
13   Q.    Is it fair to say you're not offering an
14   opinion to a reasonable degree of scientific
15   probability that Isabelle McMurray failed to receive
16   proper nutrition in the early stages of her life and
17   played a role in her developmental delay and
18   learning disabilities; are you offering that
19   opinion?
20   **A.    I don't think I will be offering an opinion**
21   **about that.**
22   Q.    Okay. In reaching your opinion about the
23   cause of Isabelle's defects, did you consider any
24   potential causes other than Paxil? For example, did
25   you review the literature on twinning and birth

Page 192

1   defects?
2   **A.    Yes, I did.**
3   Q.    And did you rule that out as a cause?
4   **A.    Twinning as an independent and sole cause**
5   **of her birth defects?**
6   Q.    Exactly, yes.
7   **A.    I don't believe and don't consider that**
8   **twinning was the primary cause of her birth defects,**
9   **that's correct.**
10   Q.    Was it a causal factor?
11   **A.    The degree to which twinning in and of**
12   **itself is a causal factor, I don't consider to be a**
13   **primary causal factor in her birth defects.**
14   Q.    That's not my question.
15   **A.    Well, you asked me if I ruled it out or**
16   **ruled it in.**
17   Q.    You just qualified it as primary, so maybe
18   there is a difference. Do you distinguish between a
19   primary causal factor and just a causal factor, or
20   is a causal factor the same whether it's primary or
21   secondary?
22   **A.    No, I really don't. I don't want to draw**
23   **those distinctions.**
24   Q.    So, is twinning one of the causal factors
25   of Isabelle McMurray's birth defects?

Page 193

1   **A.    I don't believe it is.**
2   Q.    Were genetic causes a causal factor?
3   **A.    I don't believe they were.**
4   Q.    Were paternal marijuana use a causal factor
5   you considered?
6   **A.    I am not aware of paternal marijuana use,**
7   **and so I did not have that information and I did not**
8   **consider it, no.**
9   Q.    Was maternal smoking with or without
10   prenatal vitamins a causal factor?
11   **A.    It was certainly -- I was aware of it,**
12   **considered -- and I consider it to have been**
13   **addressed in the studies that have been done of**
14   **Paxil and cardiac birth defects, as well as the fact**
15   **that there is not evidence of it being, consistent**
16   **evidence of it being a causal factor, independent**
17   **factor, risk factor for cardiac birth defect in and**
18   **of itself, but I did consider it.**
19   Q.    Is maternal smoking a causal factor in
20   Isabelle McMurray's birth defect?
21   **A.    The answer is it may be, but it is not a**
22   **factor that impacts the causal role of Paxil in her**
23   **birth defects, and the answer is equivocal because**
24   **the literature is equivocal on that subject, and the**
25   **second reason being that the studies that have**

49 (Pages 190 to 193)

Page 194

1  looked at Paxil and cardiac birth defects have --
2  four of them -- have adjusted for smoking and have
3  shown that smoking does not eliminate the excess
4  risk attributable to Paxil.
5  Q.      For coarctation of the aorta?
6  A.      Well, I think we answered that.
7  Q.      We'll get to that.  I think we'll save
8  that.  Have you reviewed any of the literature on
9  specific risk factors associated with coarctation of
10  the aorta?  Can you tell me what they are?
11  A.      There are studies and there are risk
12  factors that have been associated with coarctation
13  of the aorta, among other cardiac defects.  However,
14  the -- you know, there's a whole range of them, and
15  that may be, they may be, you know --
16  Q.      That's great.  Tell me what they are.
17  A.      I'd have to look, I'd have to look at my --
18  at the literature, because they're not -- well,
19  they're spread across a number of different subject
20  areas.
21  Q.      Okay.  I've asked you a million questions
22  where you've answered the same.  As you sit here
23  today, can you tell me one risk factor, any single
24  risk factor you know of for coarctation of the
25  aorta?

Page 195

1  A.      Well, there are certain genetic syndromes
2  that are associated.
3  Q.      Which ones?
4  A.      I don't remember off the top of my head.
5  Q.      Can you tell me anything as you sit here
6  today, anything at all, that's a risk factor for
7  coarctation of the aorta?
8  A.      Again, I'd have to consult my -- the papers
9  and the documents that I brought with me to be
10  complete.
11  Q.      Did you make a list of them?
12  A.      No, I didn't make a list.
13  Q.      Did you consider each and every one of them
14  and rule them out?
15  A.      Certainly.
16  Q.      Oh, you definitely did?
17  A.      Well, let me --
18  Q.      How many are there?
19  A.      Let me just backtrack.  There are certain
20  genetic factors which we've discussed which have
21  been evaluated in this family and which have been
22  ruled out.  The fact that there may be other factors
23  that are associated with, you know, other exposures
24  of the mom, of the family, doesn't impact the fact
25  that she was -- she took Paxil, this fetus was

Page 196

1  exposed to Paxil, and that Paxil has been shown to
2  be a causal factor in the occurrence of congenital
3  cardiac defects.
4  Q.      Can you tell me of any risk factor
5  associated with septal defects, any one?
6  A.      Well, other than genetic factors, there is
7  a broad range of drugs and environmental factors
8  that have been shown to be associated with heart
9  defects.
10  Q.      Okay.  Tell me what genetic factor is
11  associated with septal defects.
12  A.      Well, there are genetic factors such as the
13  DiGeorge Syndrome and other specific genetic
14  deletion syndromes.
15  Q.      Which deletion syndromes?
16  A.      I think it's the 22, 22 --
17  Q.      22 what?
18  A.      I don't remember exactly, but I'd have to
19  look that up.  I have it cited in my report.
20  Q.      22q11 defect.  You don't cite it
21  specifically.  You talk about the 22 chromosome.
22  A.      Right.
23  Q.      You're telling me that's associated with
24  coarctation of the aorta?
25  A.      I'm not sure.  Again, I'd have to check

Page 197

1  that.
2  Q.      Is it associated with septal defects
3  specifically?
4  A.      Well, it has been associated with
5  congenital cardiac defects, that I know.
6  Q.      Can you mention any risk factor at all
7  associated with coarctation of the aorta with
8  specificity?
9  A.      What do you mean by specificity?
10  Q.      Tell me what it is.
11  A.      Well, what do you mean by specificity?  Is
12  the only risk factor associated --
13  Q.      A risk factor, Dr. Kramer.  You got hung up
14  on the words.  Can you tell me any specific risk
15  factor, any one, for coarctation of the aorta?
16  A.      There are factors, as I said.
17  Q.      I'm asking you to tell me what they are.
18  A.      Well, I'd have to go back.  There's a long
19  list that have been associated with cardiac defects,
20  but you're specifically asking me about coarctation,
21  so I have to go back and take a long.
22  Q.      I am, I am.  How about LVOTO defect?
23  A.      Again, the same thing.  To give you
24  specific information about LVOTO, I'd have to look
25  at the papers.

50 (Pages 194 to 197)

Page 198

1  Q.      What papers are you going to look at to
2  answer that question?
3  A.      Well, there have -- there are some review
4  papers that I brought.
5  Q.      What paper? Tell me what paper.
6  A.      Well, let's pull it out.
7  Q.      Your CV notes you have a master's of health
8  sciences, I think, in human genetics, correct?
9  A.      That's correct.
10  Q.      Are you a geneticist?
11  A.      I don't consider myself a geneticist, no.
12  Q.      And you're not a clinical geneticist, for
13  sure?
14  A.      That's correct.
15  Q.      And you've never counseled women, you told
16  us, on the causes of birth defects, right?
17  A.      That's correct.
18  Q.      And you've never conducted research or
19  published an article about genetic causes of cardiac
20  birth defects, true?
21  A.      That's correct.
22  Q.      In paragraph 7 of your report, your general
23  report, Exhibit Number 1, you state that -- you know
24  what, strike that. That's going to take too much
25  time.

Page 199

1         Have you ever designed an epidemiologic
2  study to look at the causes of a specific cardiac
3  birth defect?
4  A.      No.
5  Q.      Have you ever designed a study to look at
6  the cause of cardiac birth defects?
7  A.      No.
8  Q.      Are you qualified to do a physical exam to
9  identify dysmorphologies?
10  A.      No.
11  Q.      When you got your master's degree in
12  epidemiology of human genetics, did you learn about
13  Kabuki syndrome?
14  A.      Well, I got a master's degree in human
15  genetics.
16  Q.      I'm sorry. So, it wasn't in epidemiology
17  of human genetics?
18  A.      No.
19  Q.      Okay. And did you learn about Kabuki
20  syndrome?
21  A.      I don't recall.
22  Q.      Can you tell me what dysmorphologies are
23  associated with Kabuki syndrome?
24  A.      It was described by one of your experts. I
25  don't recall all of them.

Page 200

1  Q.      Okay. So, that's where you learned it,
2  from reading Dr. Belmont's report?
3  A.      Well, I learned of his opinion about Kabuki
4  syndrome and Isabelle McMurray from reading his
5  report.
6  Q.      Well, do you agree that the cause of Kabuki
7  syndrome is believed to be genetic? Do you know
8  that, or not?
9  A.      Well, my understanding is that the etiology
10  and the cause of Kabuki syndrome is unknown.
11  Q.      Do you agree that no specific genetic
12  abnormalities have yet been found for diagnosing
13  Kabuki? Do you agree with that?
14  A.      That's my understanding.
15  Q.      And would you agree that diagnosis of
16  Kabuki is made by geneticists based on a physical
17  exam; do you agree with that?
18  A.      I can't agree or disagree.
19  Q.      You just don't know?
20  A.      I'm not certain.
21  Q.      Would you agree that all of the genetic
22  causes of coarctation of the aorta are unknown?
23  A.      I think one can say that we don't have a
24  full understanding of all the genetic causes of all
25  diseases at this time.

Page 201

1  Q.      Do you know what percentage of cases of
2  coarctation of the aorta have a known cause?
3  A.      Have a known cause of any kind?
4  Q.      Yes.
5  A.      That percentage has varied depending on the
6  source that you read, but you read numbers ranging
7  from 10 to 30 percent.
8  Q.      Okay. Which would leave 70 to 90 percent
9  unknown?
10  A.      I guess, depending on who you read, those
11  are some of the numbers that I've read.
12  Q.      Okay. In reaching your opinion in this
13  case that Paxil was a causal factor in the
14  congenital cardiac defects of Isabelle, did you rule
15  out a genetic cause?
16  A.      Well, the genetic causes were ruled out by
17  the experts who did the genetic testing, and I'm
18  relying on their testing.
19  Q.      So, to the extent there was a test for it
20  and it was done, it was ruled out?
21  A.      There was extensive, to my understanding,
22  there was extensive genetic testing that was done,
23  and all of the testing was normal.
24  Q.      Do you know if tests for each of the
25  defects involved in this case are clinically

Page 202

1    available?
2    A.    Well, which ones are you talking about?
3    Q.    Well, if you don't know the cause, you
4    can't have a genetically available test, correct?
5    A.    Well, which of the defects are you talking
6    about?
7    Q.    I'm sorry.  Coarctation of the aorta.
8    A.    And you're talking about, you're thinking
9    that there's a genetic test for that?
10   Q.    Well, would you agree there isn't a genetic
11   test for all the genetic causes of coarctation of
12   the aorta, because most of the genes have not been
13   identified?
14         MR. FOX:  Objection to form.
15   A.    I think that question is just unanswerable.
16   I don't think anyone really even can say whether
17   there are specific number of genetic causes of
18   coarctation of the aorta.  That's not known.
19   Q.    So, would you agree there are some unknown
20   genetic causes of coarctation of the aorta?
21   A.    Well, there may be.  I don't think we know.
22   The other thing that we are finding out is that
23   there are genetic predispositions to many diseases,
24   and there are genetic, differential genetic
25   susceptibilities to exogenous agents, including

Page 203

1    drugs, that can heighten susceptibility, and I'm
2    sure that's true in many, if not most, cases.
3    Q.    Did you rule out Kabuki syndrome as a cause
4    of Isabelle's defects?
5    A.    There is no evidence that I read that is
6    strong evidence that she has any genetic syndrome
7    whatsoever from the genetic data that I read.
8    Q.    Well --
9    A.    I understand that GSK has provided an
10   expert who, in their opinion, says that he thinks
11   she has Kabuki syndrome, but there is no evidence
12   that has been proffered that proves that she does.
13   There are others who claim that she doesn't.  There
14   is no genetic support for that conclusion that he
15   draws, but there is a fact that this mother took
16   Paxil.  So, this is, this is, in my opinion,
17   conjecture.
18   Q.    It's your opinion that it's conjecture
19   whether or not she has Kabuki syndrome?
20   A.    Exactly.  I would have no way of -- he has
21   no way of proving it.  There is no proof offered.
22   There is no genetic set of testing or results that
23   he's offered to back up his diagnosis.  So, his
24   diagnosis, as far as what I've read, is, you know,
25   understandably, his opinion, but I haven't seen any

Page 204

1    other proof of any other genetic syndrome that she
2    has that has predisposed her to cardiac defects.
3    Q.    Are you aware of any genetic test for
4    Kabuki syndrome?  Does one exist?
5    A.    I don't know of any.
6    Q.    Has the gene been identified for Kabuki
7    syndrome?
8    A.    I don't know of any.
9    Q.    So, a genetic test cannot rule in or rule
10   out Kabuki syndrome?
11   A.    Well, my understanding of the reading that
12   I have done is that in cases where Kabuki syndrome
13   is suspected, that genetic testing is ordered.  Now,
14   if there were no reason to order genetic tests that
15   are available today, why would they be ordered?
16   That's a question.  You're asking me has genetic
17   testing, you know, been identified that's related to
18   Kabuki syndrome?  Well, I can't imagine why
19   physicians would order genetic tests and where that
20   would be standard procedure if there are no genetic
21   tests.  My reading of the documents and of the
22   summary is that when you suspect Kabuki syndrome,
23   you order a full complement of genetic testing.
24   Q.    And do you think that could be because they
25   have multiple dysmorphologies, so they're looking

Page 205

1    for genetic causes?
2    A.    Oh, I'm sure that's true.
3    Q.    So, the failure to find any abnormalities
4    in the chromosomal microarray analysis doesn't rule
5    out a genetic abnormality, in particular, Kabuki
6    syndrome, in Isabelle's case, correct?
7         MR. FOX:  Objection.  Object to form.
8    A.    Well, I would not know.  Theoretically,
9    anything is possible.
10   Q.    Would you agree that despite negative
11   findings from the CMA testing on Isabelle, you can't
12   rule out deletion duplication type chromosome
13   abnormalities as the cause of her heart defect?
14        MR. FOX:  Objection to form.
15   A.    Again, that's very theoretical.
16   Q.    You don't know?
17   A.    There is no evidence of any genetic
18   abnormalities in this child.
19   Q.    In your opinion, if Mr. and Mrs. McMurray
20   had another child and Mrs. McMurray did not take
21   Paxil, would she still be at increased risk of
22   having another baby with a heart defect greater than
23   the general population risk?
24   A.    On a population level, those are the
25   statistics, that when you have one child or two

52 (Pages 202 to 205)

Page 206

1  children, in this case these were twins, with
2  congenital cardiac defects, that those families are
3  statistically at increased risk.
4  Q.   So, your --
5  A.   But she has -- she has a number of other
6  siblings who are normal.
7  Q.   But my question is, and I think you
8  answered yes, but I can't -- it's hard to find it in
9  there, if in your opinion Mr. and Mrs. McMurray had
10  another child and Mrs. McMurray did not take Paxil,
11  would she still be at increased risk of having
12  another baby with a heart defect greater than the
13  general population?  Am I correct you answered that
14  question yes?
15  A.   My answer to that question is on a
16  statistical basis, the answer is yes.
17  Q.   Okay.  In paragraph 41 of your specific
18  report, which is Exhibit 2, are you offering an
19  opinion to a reasonable degree of scientific
20  probability --
21  A.   Excuse me.  Where, what are we referring
22  to?
23  Q.   You know what, you don't even need to look
24  at it.  I'm just asking -- well, maybe we should.
25  Paragraph 41 of your specific report, which is

Page 207

1  Exhibit 2.  Maybe you should read it to yourself
2  first.  Have you read it?
3  A.   Yes, I have.
4  Q.   Okay.  Are you offering an opinion to a
5  reasonable degree of scientific probability as to
6  what caused Isabelle McMurray's cardiac defects?
7  A.   I am offering an opinion to a reasonable
8  degree of scientific probability that Paxil is a
9  causal factor in Isabelle McMurray's congenital
10  cardiac defects.
11  Q.   Is that the same as saying it is your
12  opinion to a reasonable degree of scientific
13  probability that Paxil caused Isabelle McMurray's
14  coarctation of the aorta?
15  A.   It's equivalent to my saying is a cause,
16  considering the fact that we know that there are
17  always a constellation of causal factors in
18  producing an adverse outcome.
19  Q.   What are her other causative factors?
20  A.   We don't know.  I mean, that's unknown for
21  most people.
22  Q.   And in this particular case, what are the
23  other causal factors?
24  A.   They're unknown.
25  Q.   There are none?

Page 208

1  A.   That's unknown.  She may have, you know, a
2  certain way that she metabolizes drugs and so on and
3  so forth.  So, that's, when I say other causal
4  factors, I am talking about exogenous, endogenous,
5  it could be any number of things, but no disease is
6  just caused by one factor alone.  You know, we know
7  that because not everyone who takes a drug or is
8  exposed to a chemical exhibits an outcome.  We even
9  know that from thalidomide.
10  Q.   In paragraph 37 of your specific report,
11  you state that, "It is reasonable to infer that
12  Paxil during the first trimester of development has
13  the potential to cause cleft palate."  Did I read
14  that right?
15  A.   That's correct.
16  Q.   When you say it has the potential, is that
17  because you believe Paxil is a broad spectrum
18  teratogen, so it has the potential to cause any
19  defect?
20  A.   Well, there is actual epidemiological
21  evidence linking Paxil with an increased risk of
22  craniofacial defects.
23  Q.   So, I guess I'm not clear.  Are you
24  offering an opinion to a reasonable degree of
25  scientific probability that Paxil causes cleft

Page 209

1  palate in some people?  It doesn't say it in your
2  report, so I'm asking you.
3  A.   Well, I'm not certain whether I will be
4  asked to opine on that issue, and I don't believe I
5  was asked to.
6  Q.   I'm asking you if you have an opinion as
7  you sit here today to a reasonable degree of
8  scientific probability that Paxil causes cleft
9  palate?
10  A.   Since I wasn't asked to opine about that, I
11  would have to go back and review all of the
12  literature on that subject in order to answer that
13  specific question.
14  Q.   So, am I correct that as you sit here
15  today, you are not prepared to offer the opinion to
16  a reasonable degree of scientific probability that
17  Paxil causes cleft palate, as you sit here today
18  right now?
19  A.   Without reviewing the literature again, I
20  would not be able to offer that opinion.
21  Q.   Okay.  So, when you say it has the
22  potential, it may or it may not; as you sit here
23  today, you're not sure?
24  A.   Well, there is epidemiological evidence in
25  the literature that I reviewed on Paxil and

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 210

1  congenital malformations that supported a causal
2  role of Paxil in the development of craniofacial
3  defects, and there is biological plausibility to
4  support that.
5  Q.    Well, as I read your report, and you'll
6  have to correct me if I'm wrong, I don't see
7  anywhere, I don't believe you are offering, at least
8  in the report, a specific causation that Paxil, in
9  fact, caused Isabelle's cleft palate.  Am I correct
10  about that?  You don't have the general opinion, you
11  just said, and I'm just asking now, you're not
12  specifically offering it about Isabelle either?  And
13  if you don't think you can do it, you're not going
14  to testify it can do it in anyone, are you going to
15  testify that it did it in Isabelle?
16  A.    I'm sorry.  You're talking and I'm reading.
17  So, if you can just give me one second.
18  Q.    Absolutely.  Take your time.
19  A.    I'm sorry.  Now, can you repeat your
20  question?
21  Q.    Sure.  As I read your report, you're not
22  offering a specific causation opinion that Paxil, in
23  fact, caused Isabelle's cleft palate; is that
24  correct?
25  A.    That's correct.

Page 211

1  Q.    Okay.  So, is it fair to say you don't hold
2  yourself out as an expert in cleft palate?
3  A.    That's correct.
4  Q.    Okay.  And is it fair to say you have no
5  opinion on the epidemiologic data on smoking and
6  cleft palate?
7  A.    That I have no opinion?
8  Q.    Well --
9  A.    What do you mean by that?
10  Q.    As you sit here today, do you have an
11  opinion on whether smoking can cause cleft palate?
12  Have you researched that?  Are you prepared to give
13  me an opinion to a reasonable degree of scientific
14  probability?
15  A.    Not today, no.
16  Q.    Because I'm going to ask you to look at
17  tab, the third tab in that book, which is Exhibit 5,
18  and that's a declaration.  Do you see that?
19  A.    Yes.
20  Q.    And, you know, I asked you to review it as
21  to who wrote it.  I asked you if that has been
22  written by the woman with the hyphenated name,
23  whether that was written by Zambelli-Weiner?
24  A.    No, this was not.
25  Q.    All right.  Who wrote that report?

Page 212

1  A.    I wrote it.
2  Q.    And --
3  A.    Again, I had some research support in
4  pulling some of the quotes and some of the numbers
5  together and some of the references, but I wrote
6  this report.
7  Q.    And that was support from Zachary Faigen
8  again?
9  A.    April Zambelli-Weiner might have assisted
10  in pulling a few of these things as well.
11  Q.    Okay.  Now, there's only five hours here
12  written for general causation.  Is the time spent on
13  that declaration not then on this summary?
14  A.    That's not on this at all because it wasn't
15  done for this case.
16  Q.    Okay.  So, did April Zambelli-Weiner spend
17  time, more than five hours, helping with the
18  declaration, Exhibit 5?
19  A.    I don't know for sure unless I look.
20  Q.    All right.  Now, paragraph 46 of your
21  declaration, it says maternal smoking during
22  pregnancy has been associated with oral clefts,
23  right?
24  A.    Let's see.  Where are you?
25  Q.    Paragraph 46, about eight lines up from the

Page 213

1  bottom.  Maternal spoking during pregnancy.
2  A.    Okay.
3  Q.    You see, has been associated with.  Okay.
4  And you cite to Exhibit 110.
5  A.    Which is 36.
6  Q.    I'm sorry.  That's Exhibit 110, reference
7  36, your reference 36, right, which is an article
8  called Teratogen Update: Smoking and Reproductive
9  Outcomes.  It was published in the Journal of
10  Teratology.  And I would like you to take a look at
11  Table 1 in this article.  Do you see Table 1?  It's
12  near the end.  Do you know if Mrs. McMurray had the
13  TGF alpha allele?
14  A.    I don't know.
15  Q.    You don't know.  Because if she did, there
16  are two statistically significant elevated findings
17  for smoking and cleft palate alone, are there not,
18  if she had it?  But you don't know whether she had
19  it?
20  A.    Well, first of all, I don't know whether
21  she had it.  Now I'm looking at this table.
22  Q.    So, if you look at the Hwang, et al, '95,
23  there's a 2.2 statistically significant elevated
24  risk for cleft palate and smoking if you had the
25  uncommon TGF alpha allele, correct?

54 (Pages 210 to 213)

USDC, Northern District of OK                McMurray v. GSK                                    Monday
No. 08-CV-381-GKF-SAJ          Videotape Deposition of Shira Kramer, Ph.D.          November 2, 2009

Page 214

1   A.   Well, that's for uncommon allele is 2.2.
2   Q.   Okay.
3   A.   That's right.
4   Q.   And you don't know if she had it or not?
5   A.   I don't know.
6   Q.   Okay.  And if you look at -- if we just
7   look at smoking generally and cleft palate, do you
8   see that?
9   A.   Yes, I do.
10  Q.   Okay.  Is that an odds ratio of 0.8?
11  A.   That's correct.
12  Q.   With a confidence interval of 0.4 to 1.3?
13  A.   That's correct.
14  Q.   Do you consider that an increased risk?
15  A.   0.8?
16  Q.   Yes.
17  A.   No.
18  Q.   I'm sorry.  A protective effect.
19  A.   Well, again, from this one article that you
20  cite, that is the result, but I don't draw
21  conclusions about causation or lack thereof or
22  protective effects from one article.
23  Q.   Now, look at the Shaw column for smoking
24  alone.  What's the data?
25  A.   Are you asking me to read you the data?

Page 215

1   Q.   Yes, for smoking and cleft palate.
2   A.   The odds ratio is 1.6.
3   Q.   And is it statistically significant?
4   A.   It would be at this -- given these
5   confidence intervals.
6   Q.   Okay.  You agree Isabelle McMurray didn't
7   have cleft lip, right?
8   A.   Not to my knowledge, that's correct.
9   Q.   Okay.  And if you look at paragraph 21 of
10  your special report, you say, "Even though..."
11  A.   Could you just wait and let me find it?
12  Q.   Sure.  It's Exhibit 2.
13  A.   Okay.
14  Q.   Even though cleft lip with cleft palate
15  includes cleft palate, you agree, at least in this
16  paragraph, that for the purpose of assessing
17  causation, they are "etiologically and
18  pathogenetically distinct," correct?
19  A.   That's correct.
20  Q.   And what do you mean when you say they are
21  etiologically and pathogenetically distinct?
22  A.   Well, cleft palate alone is a different, is
23  a different pathogenetic entity than the combination
24  of both together.  They are formed differently, and
25  when cleft palate alone -- occurs alone, rather than

Page 216

1   occurring with cleft lip, and studies that have been
2   done that have looked at the patterns of occurrence
3   and various factors associated with cleft lip and
4   palate together and then cleft palate alone have
5   found that they are distinct from each other.
6   Q.   So, do you agree, therefore, that the data
7   on Paxil and cleft palate alone is the best data to
8   look at in determining whether Paxil causes cleft
9   palate?
10  A.   Yes, but to the degree that studies don't
11  break it out, you are limited to the data that
12  report cleft lip with or without cleft palate
13  together, and there are some studies that do that.
14  Q.   Okay.  I'd like to show you exhibit -- your
15  reference number 23 in your specific report.  Did
16  you read this article, Dr. Kramer?  We've already
17  looked at it, I believe.  That's why there's only
18  one.
19  A.   Yes, I have.
20  Q.   And this is the one written or at least
21  coauthored by the other plaintiff's expert,
22  Gilbert-Barness, right?
23  A.   That's correct.
24  Q.   And you cite in your report, in paragraph
25  34, that this is one of the studies looking at

Page 217

1   smoking and cardiac defects, I believe, that's the
2   way you reference it, but it also reviews the data
3   on smoking and oral clefts, doesn't it?  If you turn
4   to page 188, the first full paragraph.
5   A.   Okay.
6   Q.   The data on smoking and oral clefts is
7   completely consistent in being either elevated or
8   statistically significantly elevated.
9   A.   Where are you?
10  Q.   Page 188, the first full paragraph.
11  A.   Okay.  Did you start with the first
12  sentence?
13  Q.   Go ahead, why don't you read it.
14  A.   "The association between maternal smoking
15  during pregnancy and an increased risk for oral
16  clefts in the offspring has been the subject of many
17  epidemiologic studies.  Although some investigators
18  have not found statistically significant
19  associations, others have found -- others have
20  identified risks as high as 6 times the prevalence
21  in the general population and, in some instances,
22  have shown a dose-response relationship.  Shaw and
23  colleagues, in a large population-based,
24  case-control study found elevated risks for cleft
25  lip plus or minus cleft palate, odds ratio 2.1, 95

55 (Pages 214 to 217)

USDC, Northern District of OK                McMurray v. GSK                                    Monday
No. 08-CV-381-GKF-SAJ               Videotape Deposition of Shira Kramer, Ph.D.          November 2, 2009

Page 218

1  percent confidence interval, 1.3 to 3.6, and cleft
2  palate, odds ratio 2.2, 95 percent confidence
3  interval, 1.1 to 4.5, when mothers smoked 20 or more
4  cigarettes per day. Wyszynski and colleagues
5  conducted a meta-analysis to estimate the
6  association between maternal cigarette smoking
7  during the first trimester of pregnancy and the risk
8  for having a child with a nonsyndromic oral cleft.
9  The overall odds ratio of the 11 studies that
10 satisfied criteria for inclusion was 1.29, 95
11 percent confidence interval, 1.18 to 1.42, for cleft
12 lip plus or minus cleft palate, and 1.32, 95 percent
13 confidence interval, 1.10 to 1.62 for cleft palate.
14 In an investigation of 2207 infants who had oral
15 clefts in 4414 nonmalformed controls, identified in
16 the 1996 United States Natality database, National
17 Center for Health Statistics, Chung and colleagues
18 found a significant association between maternal
19 cigarette use during pregnancy and the birth of a
20 child who had cleft lip plus or minus cleft palate,
21 adjusted odds ratio of 1.34, 95 percent confidence
22 interval, 1.16 to 1.54. Stratification of cases by
23 level of smoking into three groups, 1 to 10, 11 to
24 20, and 21 or more cigarettes per day, showed a
25 dose-response trend with odds ratios of 1.5, 95

Page 219

1  percent confidence interval, 1.28 to 1.76, 1.55, 95
2  percent confidence interval, 1.23 to 1.95, and 1.78,
3  95 percent confidence interval, 1.22 to 2.95,
4  respectively, compared with the nonsmoking reference
5  group. Two European epidemiologic studies also have
6  confirmed the association between maternal smoking
7  and oral clefts. Lorente and colleagues --
8       MS. HALPERN: I'm sorry. He's out of
9  his tape. So, why don't we stop.
10      THE VIDEOGRAPHER: The time is now
11 1:19. This concludes tape number 3 of the Dr. Shira
12 Kramer.
13      MR. GLANVILLE: 12:19.
14      THE VIDEOGRAPHER: 12:19. Sorry.
15      (Brief recess.)
16      THE VIDEOGRAPHER: The time is now
17 12:31. This begins tape number 4 of the video
18 deposition of Dr. Shira Kramer.
19 BY MS. HALPERN:
20 Q.     Dr. Kramer, would you agree that the data
21 that we have reviewed on smoking and oral clefts in
22 this review article is completely consistent in
23 either being elevated or statistically significantly
24 elevated?
25 A.     Well, I'd have to do my own review.  I

Page 220

1  certainly understand what these authors have written
2  and it is what it is, but in order to draw my own
3  conclusions, I need to do my own review.
4  Q.     And if they were found to be all
5  statistically significantly or at least elevated,
6  would it be a causal factor in Isabelle McMurray's
7  cleft palate?
8  A.     Possibly, but would not explain away or
9  eliminate the causal role of Paxil.
10 Q.     Well, potentially Paxil, since you're not
11 offering an opinion now that Paxil causes it,
12 correct?
13 A.     Well, but you're asking me about -- well,
14 maybe I'm not.
15 Q.     I'm just asking about cleft lip and smoking.
16 That's all I'm asking.
17 A.     Well, if you're asking me about that --
18 Q.     That's what I'm asking you.
19 A.     Okay. Then I would be allowed to answer
20 questions about cleft palate and any subject, I
21 guess, having to do with Paxil; is that not correct?
22 Q.     Well, I'm just asking about cleft palate
23 and smoking. That's what my question is about.
24 A.     Well, I'd have to do my own review in order
25 to answer that question.

Page 221

1  Q.     So, let me ask you this. Look at Table 3
2  in your specific report. And would you agree that,
3  of all the odds ratios you report there, none of
4  them are statistically significantly elevated,
5  whether it's for cleft palate alone or cleft lip
6  with or without cleft palate?
7  A.     That's correct.
8  Q.     Can you name any teratogen known to cause
9  cleft palate where there isn't a single study
10 demonstrating a statistically significant increased
11 risk for cleft palate and the teratogen?
12 A.     I'd have to go back to the literature to
13 answer that question.
14 Q.     So, you don't know whether Paxil would be
15 the first ever, if it were found to be the case,
16 because there's no data on cleft palate alone or
17 cleft lip with or without cleft palate that's
18 statistically significantly elevated for Paxil?
19 A.     I don't understand your question.
20 Q.     Well, I asked you if you know of any other
21 teratogen that's known to cause cleft palate and
22 whether or not you know if that's been demonstrated
23 without a finding of statistical significance and an
24 increased risk?
25 A.     I'd have to go back and look.

56 (Pages 218 to 221)

Page 222

1  Q.      Okay.  One of the studies you cite is
2  Davis, et al.  Can I have Exhibit 57?  And that's an
3  odds ratio of 3.2, correct?
4  **A.      Correct.**
5  Q.      And that's not for cleft palate alone, I
6  take it?  That's for cleft palate and cleft lip?
7  **A.      That's correct.**
8  Q.      And this particular study does not make any
9  adjustment for smoking, correct?  I think you have
10 you have your little sheet there and it's one of the
11 no's.  Given the type of database that it was, I
12 don't even know if it's capable of adjusting for
13 smoking.  I wish I had your little sheet there, but
14 I don't.
15 **A.      That's right.  It doesn't look like it**
16 **adjusted for smoking.**
17 Q.      Okay.  And the data you have for cleft lip
18 and cleft palate comes from Table 1, correct, page
19 1089?  Can you find it?
20 **A.      I'm just looking at one thing.  Actually,**
21 **it's Table 3.**
22 Q.      Table 3.
23 **A.      Table 3.**
24 Q.      I think you're right.  Table 3.  Cleft
25 palate and cleft lip, and it says there's one case,

Page 223

1  correct?
2  **A.      That's correct.**
3  Q.      And there's the odds ratio, 3.26, correct?
4  **A.      That's correct.**
5  Q.      Okay.  And it comes from the ICD9 code, is
6  that correct, ICD9 code 749.  Can I have Exhibit 42?
7  If you look at ICD9 -- I'm sorry.  ICD9 code 749 is
8  entitled Cleft Palate and Cleft Lip, correct?
9  **A.      ICD9, yes.**
10 Q.      And is that the right code for everything
11 that's included there for cleft palate and cleft
12 lip?
13 **A.      Well, I'd have to go back and see exactly**
14 **which code they -- they did say in their methodology**
15 **that they assigned ICD9 code.**
16 Q.      Right, and you can see they said cleft
17 palate and cleft lip and 749.
18 **A.      Right, so I'm assuming that -- I'm**
19 **assuming.  I don't have the ICD9 in front of me, but**
20 **there it is, cleft palate, cleft palate unspecified,**
21 **unilateral.  So, they didn't go into the level of**
22 **detail.**
23 Q.      Right.
24 **A.      Let me just look for a minute.**
25 Q.      Right.  So, would you agree that in the

Page 224

1  category in Davis, it includes cleft lip alone?
2  **A.      Cleft lip alone?**
3  Q.      Correct.
4  **A.      You mean the 749 coding?**
5  Q.      Yes.  In other words, the one case that was
6  found here in Davis could have been cleft lip alone?
7  **A.      We don't -- I don't believe we have**
8  **specific information about that one case.**
9  Q.      So, we don't know what it is, whether it
10 was cleft palate or cleft lip alone?
11 **A.      Again, in order to answer that question**
12 **definitively, I'd have to reread this article.**
13 Q.      So, going back to your Table 3 on page 14
14 of your specific report, do you agree that because
15 the data from Davis may not involve a cleft palate
16 and is confounded by maternal smoking, it should not
17 even be included in the table here?
18 **A.      Can you repeat that, please?**
19 Q.      Sure.  So, the entry here for cleft palate
20 and cleft lip for Davis may, one, not be about cleft
21 palate, it may be about cleft lip, you don't know?
22 **A.      I don't know as I sit here.**
23 Q.      And it's confounded by smoking?
24 **A.      We don't know that for sure.**
25 Q.      Well, it could be confounded by smoking.

Page 225

1  **A.      Well, your statement that it is**
2  **confounding -- confounded by smoking is absolutely**
3  **not established.**
4  Q.      You don't know whether it is or whether it
5  isn't?
6  **A.      Well, that's correct.  They did not adjust**
7  **for smoking in this study.**
8  Q.      All right.  So, do you give the data for
9  Davis here less weight than the data, say, from
10 Louik on cleft palate alone, or from Alwan on cleft
11 palate alone?
12 **A.      Well, it's, you know, certainly, the Louik**
13 **and Alwan data that deal with cleft palate alone are**
14 **more compelling, they're more directly applicable,**
15 **but this is contributory.  It's confirmatory in that**
16 **they found an, you know, an increased risk, but it**
17 **is only based on one case.**
18 Q.      Okay.  So, you still consider it
19 confirmatory.  It's important evidence, you chose to
20 include it in your report?
21 **A.      Right.  It's confirmatory.**
22 Q.      So, smoking is not adjusted for, it's only
23 one case, it may not even be cleft palate, and you
24 think it's of value in your weight of the evidence
25 analysis.

Page 226

1   A.      Well, I would agree with you that the Louik
2   and Alwan data are more, are more directly
3   applicable and bear more weight on this issue.
4           MS. HALPERN: Okay. Thanks. We can
5   break for lunch.
6           THE VIDEOGRAPHER: Off the video
7   record, 12:39.
8           (Luncheon recess.)
9           (Exhibit 164, marked for
10  identification.)
11          MS. HALPERN: Mr. Fox provided us with
12  an additional exhibit marked 164. It's 13 pages of
13  a fax with a cover sheet, a separate cover sheet,
14  and the first page 1 of 1 is a bill or an accounting
15  made by the Tracey Law Firm?
16          MR. FOX: What is it?
17          MS. HALPERN: Is that a bill, an
18  invoice?
19          MR. FOX: That looks like something
20  from our accounting program.
21          MS. HALPERN: That you created?
22          MR. FOX: Yes, but those would have
23  come from invoices that we paid. Those are accounts
24  that have been paid, accounts payable, I guess.
25          MS. HALPERN: Okay. So, you don't

Page 227

1   have the actual detailed invoices?
2           MR. FOX: I'm -- supposedly my office
3   still has invoices and they're supposed to be being
4   sent, and I was just sending an e-mail about that.
5           MS. HALPERN: Okay.
6           (Brief pause.)
7           THE VIDEOGRAPHER: Back on the video
8   record, 1:34.
9   BY MS. HALPERN:
10  Q.      Dr. Kramer, Mr. Fox provided us with
11  something called Tracey Law Firm Vendor Quick
12  Report. It's page 1 of 1 of Exhibit --
13          MR. TATE: 164.
14          MS. HALPERN: Thank you.
15  Q.      -- 164. Does that reflect, to the best of
16  your knowledge, all the money you have been paid by
17  the Tracey Law Firm?
18  A.      I don't know. I'd have to compare. I
19  don't know. Maybe. The records that we gave you
20  came from our accounting office --
21  Q.      Okay.
22  A.      -- but I don't know, you know.
23  Q.      Okay. So, now I'm showing you what's been
24  marked as Exhibit 161, which you say is an
25  accounting that came from your office.

Page 228

1   A.      Yes.
2   Q.      And it has an amount for McMurray and an
3   amount for general causation.
4   A.      Correct.
5   Q.      Were all these monies billed to the Tracey
6   Law Firm?
7   A.      Yes.
8   Q.      Okay. But you're also doing work for the
9   Robinson law firm, correct?
10  A.      And several others as well.
11  Q.      And the Vickery law firm?
12  A.      I believe so.
13  Q.      And the Rice Motley law firm?
14  A.      Yes.
15  Q.      And the Kherkher, K-H-E-R-K-H-E-R, law
16  firm?
17  A.      I believe so, yes.
18  Q.      Any others besides those five law firms?
19  A.      I don't believe so.
20  Q.      Okay. So, when you have here on Exhibit
21  161 under general causation a bill to Mr. Tracey for
22  $72,000, that's speaking to your general report,
23  correct?
24  A.      That's correct.
25  Q.      And that general report is served in cases

Page 229

1   for each of these five law firms, correct?
2   A.      That's correct. There has been some
3   additional time spent on updates to the general
4   causation report that postdate the filing in this
5   case. So, there might be some additional hours that
6   would be billed to others.
7   Q.      All right. Now, did Mr. Tracey's law firm
8   pay for the expert report and none of these other
9   law firms paid a pro rata share, or does this
10  reflect a fifth of the cost of the general report?
11  A.      Oh, no, no. This is the cost of the
12  report, and then the -- anything extra, I think
13  there was some other kind of arrangement for some
14  contribution, but I don't know what that is.
15  Q.      So, you have separate bills from --
16  payments from Robinson, Vickery, Rice and Kherkher
17  for the general report?
18  A.      I can't say that's true.
19  Q.      Okay.
20  A.      I can't say that's true.
21          MS. HALPERN: So, you got stuck with
22  the bill, Mr. Tracey, or did you get reimbursed?
23          MR. FOX: Yes. If you want to go off
24  the record, I'll explain.
25          MS. HALPERN: Okay. Let's do that for

58 (Pages 226 to 229)

Page 230

1 a moment. Stop the clock, please.
2          THE VIDEOGRAPHER: Off the video
3 record, 1:36.
4          (Discussion held off the record.)
5          THE VIDEOGRAPHER: Back on the video
6 record, 1:37.
7 BY MS. HALPERN:
8 Q.     Okay. Dr. Kramer, I know you don't have
9 the bills with you here today, but the bill that
10 seems to have been paid by the Tracey Law Firm for
11 all of your work in the Paxil litigation is about
12 $132,000, according to Exhibit 164.
13 **A.     Right, and whatever we have listed there as**
14 **well.**
15 Q.     Okay.
16 **A.     Yeah.**
17 Q.     Well, this isn't in addition to it?
18 **A.     No, no, no, it's not in addition.**
19 Q.     Right.
20       Okay. And can you estimate for me how much
21 you have received in total from Tracey, Robinson,
22 Vickery, Rice, Kherkher in this litigation?
23 **A.     I don't have that information with me.**
24 Q.     Do you know if that's 50 percent, a fifth?
25 **A.     What I imagine is that this amount is,**

Page 231

1 **since the bulk of the billings on general causation**
2 **have already been covered by the Tracey firm, I can**
3 **only imagine that the invoices for the other firms**
4 **are quite a bit less, but I don't -- I don't know**
5 **for sure.**
6 Q.     Okay. Okay. Doctor, do you agree that
7 finding an association between Paxil and birth
8 defects is not the same thing as Paxil being
9 causally related to birth defects?
10 **A.     Well, associations normally come from**
11 **individual studies or individual pieces of evidence,**
12 **and conclusions and judgments as to causation come**
13 **from consideration of accumulated evidence.**
14 Q.     And when you say a single study finds an
15 association, is it the same thing as when you say a
16 single finding finds -- a single study finds an
17 increased risk; are those two different ways of
18 saying the same thing?
19 **A.     Pretty much.**
20 Q.     Okay. You testified at the Kilker trial
21 that one study can only show an association and not
22 be the basis for a causal inference; is that
23 correct?
24 **A.     In and of itself.**
25 Q.     Okay. And so, you're saying a single study

Page 232

1 might be enough under certain circumstances? You
2 said in and of itself, by itself.
3 **A.     What I mean -- what I mean by that is the**
4 **single study in isolation without consideration of**
5 **any other information would not be normally enough**
6 **to draw causal conclusions.**
7 Q.     Okay. You were asked, and I think it was
8 by Mr. Tracey, Mr. Fox's partner, "But if we have
9 multiple studies, then we can get past association
10 to causation." And your answer was, "That's
11 correct, when you have a body of literature which
12 shows through multiple studies consistently elevated
13 findings, then you move from association in one
14 study to causation, that this factor causes the
15 disease." That was your testimony.
16 **A.     I'm assuming that's it. That sounds like**
17 **it's correct.**
18 Q.     So, if you have one study that's not
19 statistically significantly elevated, but you have
20 one study that shows an association, not
21 statistically significantly, but it's above 1.1, and
22 you have one study going in a protective direction,
23 that wouldn't be enough for you, correct?
24 **A.     Well, you're really mentioning -- you're**
25 **throwing out as examples hypothetically where that's**

Page 233

1 **all you have, you have nothing else, that's all you**
2 **have, just two studies, that's it?**
3 Q.     That's it.
4 **A.     Is that the question you're asking me?**
5 Q.     That's the question.
6 **A.     You have two studies and there's no other**
7 **information out there?**
8 Q.     Right.
9 **A.     I probably would want to see additional**
10 **information --**
11 Q.     Okay.
12 **A.     -- about that entire subject matter.**
13 Q.     All right. So, other than looking at the
14 two studies, what's the additional information, what
15 are the criteria you'd want to look at that might
16 allow you, with those two divergent studies, to
17 still get to a causation opinion? What could --
18 else could you have? There are only the two
19 studies, one goes up, one goes down. Could you get
20 to causation by looking at other data?
21 **A.     Well, there are issues such as biological**
22 **plausibility, information that you might have from**
23 **toxicological animal studies that would help**
24 **establish that biological plausibility**
25 **justification. You would also want to look at**

59 (Pages 230 to 233)

USDC, Northern District of OK                          McMurray v. GSK                                    Monday
No. 08-CV-381-GKF-SAJ                   Videotape Deposition of Shira Kramer, Ph.D.            November 2, 2009

Page 234

1  methodological issues of the two studies that you
2  have.  Are the studies powered sufficiently?
3  Depending on how they're designed and how they're
4  powered to even answer the question, these are
5  important questions that one would ask.
6  Q.      So, you would say under certain
7  circumstances, now you're saying one study could be
8  enough?
9  A.      Generally not.  I would say generally one
10 study to answer a broad question is not normally
11 enough to provide a causation, enough evidence for
12 causation.
13 Q.      Okay.
14 A.      If it's just in isolation of everything
15 else.
16 Q.      Okay.  Well, you put it in some context and
17 you've said it's still generally not enough,
18 correct?  You just did that.
19 A.      Well, as long as I'm clear, and that is if
20 there is no other information available, it's just
21 one study in isolation, then I would say I would
22 seek additional information and I would hopefully
23 have other studies available to me.
24 Q.      Okay.  So, if you had two studies, nothing
25 else, neither of them were statistically

Page 235

1  significantly elevated, both of them were say, you
2  know, 1.2, 1.3, not statistically significant, would
3  the breadth of the confidence interval matter to you
4  in determining whether you had enough; would you
5  look at that?
6  A.      That's one of the considerations in the
7  sense that it's, you know, again, you're mentioning
8  things out of context and in isolation, but that
9  really speaks to the power of the study and the
10 precision of the study and whether or not the study
11 has enough study subjects in order to even answer
12 the question.
13 Q.      But you wouldn't ignore the width of the
14 confidence interval, true?
15 A.      No, you don't ignore the width of the
16 confidence interval.
17 Q.      And you wouldn't ignore the lower bound of
18 the confidence interval, would you?
19 A.      You don't ignore anything.
20 Q.      And could you tell me, do you know of any
21 teratogen known to cause cardiac defects where there
22 was no statistically significant epidemiologic study
23 associating that teratogen with the defects?
24        MR. FOX:  Objection to form.
25 Q.      Do you know if any exists?

Page 236

1  A.      Off the top of my head, I don't remember.
2  Q.      Are you saying that if you have multiple
3  studies with point estimates over 1 even where none
4  of them are statistically significant, you can still
5  get to a causation conclusion?
6  A.      You certainly could.
7  Q.      Okay.  And is it also true that as you sit
8  here today, you can't think of an example of a known
9  teratogen where that's happened?
10 A.      I can't remember any, but there are other
11 instances outside of teratogens where that is known
12 to have happened.
13 Q.      Okay.  I'm asking you about a teratogen
14 known to cause cardiac defects where all the epi
15 studies, not one of them found a statistically
16 significant increased risk for that defect, that
17 cardiac defect.
18 A.      I don't recall.
19 Q.      Okay.  In your general report, and you
20 might want to pull out the binder, section 5.1, it's
21 on page 24, you offered a general causation opinion
22 that Paxil is causally related to an elevated risk
23 of congenital cardiac defects.  Do you see that?
24 A.      Yes, I do.
25 Q.      And you say that again in paragraph 88, if

Page 237

1  you want to turn to that.  You say again that Paxil
2  is causally related.  Do you see that?
3  A.      That's where I thought you were just
4  reading from.
5  Q.      Okay.  All right.  That's under section
6  5.1, sorry.
7         You also state in paragraph 88 that Paxil
8  is associated with a variety of congenital cardiac
9  defects, including conotruncal, septal, ventricular
10 outflow left and right, and all cardiac defects
11 combined, correct?
12 A.      That's correct.
13 Q.      Are you saying Paxil has not been
14 associated with looping defects?
15 A.      No, I'm not saying that.
16 Q.      So, you've just chosen a few as an example
17 here?
18 A.      That's true.
19 Q.      Okay.  Is it your opinion that Paxil has
20 been associated with looping defects?
21 A.      I believe that Paxil is causally related to
22 cardiac, congenital cardiac defects in general, so
23 looping defects would be included in that category.
24 Q.      Okay.  Are you saying, Doctor, that --
25 well, let me stick with this first.  Do you have an

60 (Pages 234 to 237)

USDC, Northern District of OK                    McMurray v. GSK                                Monday
No. 08-CV-381-GKF-SAJ                Videotape Deposition of Shira Kramer, Ph.D.        November 2, 2009

Page 238

1  opinion as to whether Paxil has been associated with
2  say, for example, anomalous pulmonary venous return?
3  **A.      I'm not -- I think that, again, to the**
4  **degree that anomalous pulmonary venous return is a**
5  **congenital cardiac malformation, it is clear that**
6  **the epidemiological studies have shown an**
7  **association, a causal association between Paxil**
8  **exposure and congenital cardiac malformations.**
9  Q.      Okay.  So, I'm trying to understand.
10  You're offering the opinion that Paxil is causally
11  related to congenital cardiac defects as a group?
12  **A.      That's correct.**
13  Q.      Okay.  And as a result of that, are you
14  assuming that there's an association between Paxil
15  with each and every type of cardiac defect?
16  **A.      Yes.**
17  Q.      Okay.
18  **A.      Potentially, yes.**
19  Q.      So, your statement about Paxil being
20  associated with conotruncal, septal, has nothing to
21  do with data on conotruncal, septal particularly,
22  but it has to do with the fact that you're finding a
23  causal connection with all defects?
24          MR. FOX:  Objection to form.
25  **A.      Well, in this case, there are data that**

Page 239

1  **associate conotruncal and septal defects with Paxil**
2  **exposure.  So, I would not agree with your**
3  **statement.**
4  Q.      All right.  So, let me deal with another
5  one where there is no data.  There is no data as far
6  as I know of Paxil with anomalous pulmonary venous
7  return.  So, it's a good example.  When there is no
8  data, you're still willing to say Paxil is
9  associated with each and every defect based on the
10  fact that there's an increased risk for Paxil,
11  causally, you say, increased risk for Paxil and all
12  cardiac defects combined?
13  **A.      That's correct.  And the part of the issue**
14  **is that the studies that have been done, many of**
15  **them don't split out the individual and don't even**
16  **list the individual defects that they have**
17  **discovered.  So, one of the problems is that there**
18  **aren't sufficient data to generate rates or even to**
19  **really know what the distribution of different types**
20  **of defects are.**
21  Q.      Okay.
22  **A.      But there is -- there is, you know, a**
23  **general association between all cardiac defects and**
24  **Paxil exposure as well as some major subtypes of**
25  **cardiac defects as well.**

Page 240

1  Q.      Okay.  All right.  So, we've got to start,
2  and the start is that you think Paxil is causally
3  related to the lumped group of all cardiac defects
4  taken together, correct?
5  **A.      Correct.**
6  Q.      And based on that, you're willing to say is
7  there an association or just a potential association
8  between Paxil and each and every type of cardiac
9  defect?
10  **A.      No, if the -- since the results of these**
11  **studies have shown that there is a relationship**
12  **between Paxil exposure and a very broad variety of**
13  **cardiac defects and the results are reported as**
14  **congenital cardiac defects, and indeed the**
15  **meta-analyses and the FDA labeling requirements all**
16  **deal with these broad -- with a broad category of**
17  **cardiac defects, that is my testimony, that Paxil is**
18  **a causal factor, is causally related to risk of**
19  **cardiac defects, congenital cardiac defects.**
20  Q.      I understand that.  But now I'm asking you,
21  for example, is it your opinion that Paxil can cause
22  each and every type of cardiac defect, say including
23  anomalous pulmonary venous return?
24  **A.      I really can't speak to anomalous pulmonary**
25  **venous return because I'm not very familiar with**

Page 241

1  **that particular defect.  I'd have to look that up**
2  **and see where that -- how that's categorized and how**
3  **that's dealt with in various studies.**
4  Q.      And just so I'm understanding your
5  terminology, is it your opinion that Paxil is a
6  causal factor in the creation of anomalous pulmonary
7  venous return?
8  **A.      Again, I'd have to look up that particular**
9  **defect.**
10  Q.      Okay.
11  **A.      I'm not familiar with it.**
12  Q.      All right.  So, I think I'm understanding
13  you.  I think you're willing to say that Paxil is
14  associated with each and every defect merely because
15  it's one of the cardiac defects in the lumped group
16  that you say is causative, but for a causation
17  opinion for these individual defects, you've got to
18  look at the data in each case?
19  **A.      Well, not necessarily, no.  You've asked me**
20  **about a specific defect, and I would need to verify**
21  **that it falls into the general categories that have**
22  **been evaluated in these studies.**
23  Q.      Well, it certainly has.
24  **A.      Okay.  Very good.**
25  Q.      All cardiac defects have.

61 (Pages 238 to 241)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ
McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.
Monday
November 2, 2009

Page 242

1    A.    Okay.  As long as that's -- as long as
2    that's the case, then my answer is yes.
3    Q.    Now, before I say it certainly has, they've
4    included it in the definition.  Does it matter to
5    you whether it actually occurred or whether they
6    just included it in the definition; in other words,
7    do you need an actual case of anomalous pulmonary
8    venous return happening, or is it enough that they
9    included anomalous pulmonary venous return in their
10   definition of all cardiac defects?
11   A.    No, I think it's enough.  And I think that
12   the warning --
13   Q.    That they included the term?
14   A.    That's exactly right.
15   Q.    Okay.  So, if we look at -- could you give
16   me the Louik supplement?  That's Exhibit 34.
17         Are you familiar with the Louik supplement
18   where they list it?
19   A.    Yes.
20   Q.    Okay.  So, I'm going to show it to you in a
21   minute, but you know what's on it.  It's the
22   subcategories of all the defects and it lists, I
23   don't know how many, 40 or 50, and we've marked it
24   as Exhibit 34.  Here it is.
25         Is it your opinion that each and every

Page 244

1    A.    That's correct.
2    Q.    Okay.  So I understand.  Thank you.
3         So, when you say in paragraph 88 that Paxil
4    is associated with a variety of congenital defects,
5    you're actually telling me that it's your opinion
6    that Paxil is causally related to all of those?
7    A.    That's correct.
8    Q.    And that would be true, Doctor, even if
9    there is no individual study looking at the category
10   of defects that are here?  So, for example, even if
11   there's no data on Paxil and the category anomalous
12   pulmonary venous return, that doesn't matter to you
13   because it was included in that larger category of
14   all defects combined?
15   A.    Well, it's not a matter of don't care,
16   doesn't matter.  It would be nice if the study
17   authors provided more detail.  It would be nice if
18   the study authors had designed larger, more powerful
19   studies, and all that would be very beneficial.  But
20   given the totality of information that we have about
21   Paxil and about the epidemiological studies and the
22   mechanism of action and the biological plausibility,
23   the way it was categorized and dealt with and the
24   power of the studies, I believe that Paxil is
25   associated, causally associated with all congenital

Page 243

1    defect on this list that is the inclusionary list of
2    defects that were looked at in Louik, that Paxil is
3    causally related to an elevated risk of each and
4    every one of these defects on these two pages?
5    A.    I'd like to see the actual entire paper to
6    see how they dealt with all of these.
7    Q.    They were included and they were just
8    categorized --
9    A.    Okay.
10   Q.    -- according to these seven categories.
11   A.    All right.  As long as all of them, in
12   fact, were included, and the only one I'm curious
13   about is anomalous pulmonary venous return, so
14   just to make sure of that.
15   Q.    Okay.  Assuming it was included, to save
16   some time --
17   A.    Okay.
18   Q.    -- and I'm not sure without looking
19   either --
20   A.    Okay.
21   Q.    -- assuming they were all included, you
22   would say that Paxil is causally related to each and
23   every one of the defects that were included in their
24   definition of what could contribute to all cardiac
25   defects combined?

Page 245

1    cardiac defects.
2    Q.    Okay.  And if you turn to tab 5 here of
3    your declaration, which you said you wrote,
4    paragraph 47 --
5    A.    Paragraph?
6    Q.    47 of the declaration.  That's tab 3 -- I
7    mean, I'm sorry, tab 5.  It's the third tab, but
8    it's Exhibit 5.
9    A.    Okay.
10   Q.    It says there, "It is apparent that
11   exposure to Paxil at a relevant time in fetal
12   development has the potential to elicit many
13   different generally cardiac malformations."  So, am
14   I understanding you to say that, in fact, it's your
15   testimony that exposure to Paxil can cause each and
16   every congenital cardiac malformation?
17   A.    Well, what this paragraph is referring to
18   is that the studies have shown that Paxil has been
19   shown to produce a large array of congenital cardiac
20   malformations.
21   Q.    Okay.  So, now you're telling me that your
22   opinion is at least each and every one of them that
23   was included in the Louik study or the Alwan study
24   in their grouped category of all cardiac defects
25   combined?

(856) 983-8484
Tate & Tate, Inc.
(800) 636-8283
180 Tuckerton Road, Suite 5, Medford, NJ  08055

Page 246

1  A.      Could you restate that question?
2  Q.      Yes.  You're telling me now that you have a
3  causal opinion for each and every cardiac defect
4  that was included in either the Louik study or the
5  Alwan study for their assessment of all cardiac
6  defects combined?
7  A.      Well, again, I'm not really following your
8  question.
9  Q.      Well, I think you've said, and I think
10 you've already answered, that each and every cardiac
11 defect that was included in the analysis for Paxil
12 and all cardiac defects combined, for each of those
13 defects, you believe, it's your opinion to a
14 reasonable degree of scientific probability that
15 Paxil causes each and every one of those defects?
16 A.      That's -- that's correct.
17 Q.      Okay.
18 A.      Paxil can cause those defects.
19 Q.      Okay.  Okay.  It is true, though, nowhere
20 in either report, your general or your specific, do
21 you actually say that Paxil is causally related or
22 causes LVOTO.  You say it's associated with it,
23 paragraph 88.  We just looked at it.  It says,
24 "Paxil is associated with a variety of congenital
25 cardiac defects, including conotruncal."

Page 247

1  A.      Are you in the general causation report?
2  Q.      Yes, I am, paragraph 88.  This is the
3  report you served in pretty much every case, or at
4  least this paragraph is in every case.  It says,
5  "Paxil is associated with."  It doesn't say causally
6  related.
7  A.      No, paragraph 88 says causally related.
8  Q.      No, it says, "Paxil is causally related to
9  an elevated risk of generally cardiac defects and is
10 associated with a variety of congenital cardiac
11 defects, including conotruncal, septal?"
12 A.      There is really no differentiation.  That's
13 semantics.
14 Q.      Okay.  By the way, do you know if there is
15 a definition of causative factor?  You talk about it
16 being a causative factor, and I'm still hung up on
17 whether that's the same thing as saying causes or
18 not, whether it's something different.
19 A.      Well, my -- I think the epidemiological
20 context for the word "cause" assumes that there are
21 multiple factors that interact in a causal model.
22 However, each and every one of those components or
23 causal factors is a cause.  So, a causal factor is a
24 cause.  That doesn't mean that it acts alone.  That
25 doesn't mean that it doesn't interact with other

Page 248

1  factors that are also potentially causal factors,
2  but that still is -- those two words are synonymous
3  in an epidemiological context.
4  Q.      Can a teratogen be a causative factor of a
5  defect but not the cause of the defect?
6  A.      We wouldn't differentiate those -- we would
7  not draw that kind of distinction.  If it's a
8  causative factor, then it is a cause.
9  Q.      So, your causation opinion on Paxil appears
10 in every general report pretty much the same
11 regardless of the type of defect?  And I now
12 understand why.  It's because you think it causes
13 Tetralogy of Fallot, for example, in the Gibson
14 case, and atrial ventricular canal in the Alvarez
15 case, and heterotaxy in the Walker case, it applies
16 to all the defects, correct?
17 A.      Correct.
18 Q.      Okay.  So, the defect pretty much made no
19 difference at all in reaching your opinions in the
20 general report, so long as it was included in this
21 list from Slone?
22 A.      Well, not just that list, but there are a
23 number of studies that looked at all cardiac
24 defects --
25 Q.      Right.

Page 249

1  A.      -- as an overarching category.
2  Q.      Okay.  So, did you do a separate causation
3  analysis for say conotruncal defects or LVOTO
4  defects, or did you rely only on your analysis of
5  all defects combined in order to reach your
6  causation opinions?
7  A.      Well, we certainly took into consideration
8  the way that each investigator analyzed their data
9  and reported their data according to not just the
10 larger category of cardiac malformations, but also
11 subcategories, and reported those in those reports.
12 So, the degree to which that information was
13 available and published, that was taken into
14 consideration.
15 Q.      Okay.  So, you state in paragraph 59 of
16 your general report that the goal of your report was
17 to look at Paxil and congenital cardiac defects.
18 A.      In paragraph 59?
19 Q.      Yes.  That that was the goal, and that's I
20 assume what you did your weight of the evidence
21 analysis around.
22 A.      That's correct.
23 Q.      Okay.  And did you also do a weight of the
24 evidence analysis to looking, an independent one, to
25 looking at Paxil and LVOTO defects?

63 (Pages 246 to 249)

Page 250

1   **A.     Well, they're really one and the same.**
2   **It's the same literature.**
3   Q.     No difference if you're reaching an opinion
4   about an LVOTO defect as opposed to Tetralogy of
5   Fallot?
6   **A.     Well, it's all the same literature that we**
7   **reviewed, and we reviewed not just the**
8   **epidemiological literature, but the tox literature**
9   **as well.  And so all of that informed our opinions**
10  **about the larger category and subcategories.**
11  Q.     Well, would you agree that cardiac
12  malformations develop through different biological
13  processes and mechanisms, or are they all the same?
14  **A.     Well, there are some similarities at a very**
15  **early stage.  There are some factors such as**
16  **serotonin signaling that can have a very broad**
17  **and -- a very broad effect because it's so early and**
18  **so important in some basic functions, but there are**
19  **also differences.**
20  Q.     Well, would you agree that different types
21  of heart defects can be caused by different genes?
22  **A.     Yes.**
23  Q.     Would you agree that different types of
24  heart defects can be embryologically different?
25          MR. FOX:  Object to form.

Page 251

1   **A.     In what way?**
2   Q.     Their cell formation, the cells that are
3   involved in their development.
4   **A.     Yes, there can be differences.**
5   Q.     Okay.  And involve different types of
6   embryologic tissue?
7          MR. FOX:  Object to form.
8   **A.     Can you repeat the question?**
9   Q.     Yes.  Would you agree that different types
10  of heart defects involve different types of
11  embryologic tissues?
12          MR. FOX:  Same objection.
13  **A.     They can.**
14  Q.     Okay.  There are many different
15  developmental mechanisms that are at work in the
16  fetal development of the heart, correct?
17  **A.     Yes, that's correct.**
18  Q.     Okay.  And do you know whether there are
19  distinct subsets of cells and molecular events that
20  control the formation of different types of cardiac
21  defects?
22  **A.     Yes, that's true.**
23  Q.     Okay.  So, do you know enough, Dr. Kramer,
24  about cardiac development to tell me whether double
25  inlet left ventricle and truncus arteriosus have the

Page 252

1   same developmental process?
2   **A.     I don't know.**
3   Q.     Okay.  Do you know if double inlet
4   ventricle and truncus arteriosus involve the same
5   types of cells?
6   **A.     I don't know that either.**
7   Q.     Do you know if coarctation of the aorta and
8   truncus arteriosus have the same developmental
9   processes?
10  **A.     That I don't know.**
11  Q.     Involve the same types of cells?
12  **A.     I don't recall.**
13  Q.     Do you know if they involve the same types
14  of tissue?
15  **A.     Again, I don't recall.**
16  Q.     Would you agree that the effect of a drug
17  may differ based on the type of embryologic tissue
18  it impacts?
19          MR. FOX:  Objection to form.
20  **A.     Can you repeat the question, please?**
21  Q.     Sure.  Would you agree that the effect of a
22  drug, teratogenic drug, may differ based on the type
23  of embryologic tissue or the type of cell it
24  impacts?
25          MR. FOX:  Same objection.

Page 253

1   **A.     It's possible.**
2   Q.     Okay.  You don't know for sure either way?
3   **A.     Well, no, it's possible.  It all depends.**
4   **You just asked me a very general question.**
5   Q.     Okay.  Do you know whether -- strike that.
6   Would you agree that even if you think there is
7   evidence that a particular exposure can cause one
8   type of heart defect, it would be wrong to jump to
9   the conclusion that it can, therefore, cause all
10  heart defects?
11  **A.     Sometimes yes, sometimes no.**
12  Q.     Okay.  Ebstein's anomaly, for example, and
13  lithium, are you familiar with that?
14  **A.     Yes.**
15  Q.     Okay.  Has anyone ever said that lithium
16  causes any type of heart defect other than Ebstein's
17  anomaly?
18  **A.     I'm not certain.  I would have to look that**
19  **up.**
20  Q.     Do you agree that finding an elevated risk
21  for all cardiac defects lumped together in an
22  observational epidemiologic study doesn't tell you
23  if there's an elevated risk with any particular type
24  of cardiac defect?
25  **A.     Can you repeat that question, please?**

64 (Pages 250 to 253)

Page 254

1  Q.     Sure.  That a finding of an elevated risk
2  for all cardiac defects lumped together in an
3  observational study doesn't tell you if there's an
4  elevated risk for any particular type of cardiac
5  defect?
6  A.     **That, I may disagree with that.  That would**
7  **depend.  And that would have to be put into context.**
8  Q.     Can you tell me of any teratogen that's
9  known to cause each and every type of cardiac
10 defect?
11 A.     **Each and every type of cardiac defect?**
12 Q.     Well, all the cardiac defects that are
13 included in the Slone grouping for all cardiac
14 defects combined or the Alwan grouping for all
15 cardiac defects combined.
16 A.     **I'd have to look that up.  I know that**
17 **there are teratogens that are related to a spectrum**
18 **of cardiac defects, but I'd have to look that up.  I**
19 **don't know the answer to your question.**
20 Q.     But even the -- and are those teratogens,
21 by the way, that you think are broad spectrum
22 teratogens the ones that were on your exhibit that
23 was used in the Kilker trial?  We can pull it out.
24 It's I think Exhibit 8.  I think we have it here.
25     Do you see --

Page 255

1  A.     **Yes.**
2  Q.     Let's see if we're looking at the right
3  one.  It's on page 6 at the top.  Are those what you
4  call broad spectrum teratogens?
5  A.     **These teratogens have been shown to cause a**
6  **broad range of adverse effects.**
7  Q.     So, are you calling them broad spectrum
8  teratogens?  Do they meet your definition?
9  A.     **I don't know that I would use that word**
10 **"broad spectrum."  They can cause a broad range of**
11 **effects and they've been shown to.**
12 Q.     Do you know of any teratogen you think is a
13 broad spectrum teratogen other than Paxil?  Can you
14 give me an example of one?
15 A.     **Again, there are teratogens such as these**
16 **on -- such as the ones that are listed on this page.**
17 **There are others such as solvents and other**
18 **chemicals that have been shown to cause a spectrum**
19 **of cardiac defects -- not cardiac, excuse me,**
20 **congenital defects.  So, these are not the only**
21 **teratogens that cause a spectrum of congenital**
22 **malformations in various organ systems.**
23 Q.     I understand.  But can you tell me of any
24 defect -- I'm sorry, any teratogen known to man that
25 has been demonstrated to cause each and every type

Page 256

1  of cardiac defect such as those listed on this Louik
2  supplement?
3  A.     **Not as I sit here today.**
4  Q.     Okay.  Now, would you agree that one
5  specific defect, especially a more common one, say
6  like a septal defect, could drive and explain an
7  elevated risk found for all defects lumped together?
8  So, for example, if you lump together five different
9  types of defects and really only causes septal, but
10 it's such a common defect that your odds ratio for
11 all defects lumped together is elevated, but it's
12 being driven by the septal defects because they're
13 so common and it's causing septal defects, could
14 that happen?
15 A.     **Are you talking about a statistical result**
16 **from a study that --**
17 Q.     Correct.
18 A.     **Well, and you do see that in some studies**
19 **where because the studies are underpowered and don't**
20 **include enough study subjects, that they will not**
21 **have enough power to detect some of the rarer, many**
22 **of the rarer defects, and so that the ones that they**
23 **do detect might be heavily weighted by the more**
24 **common ones, and we've seen that to be the case.**
25 Q.     Well, let me ask you if you agree with

Page 257

1  this: Do you agree that to determine if Paxil
2  causes a specific type of cardiac defect, that you
3  can't rely on data that only looks at Paxil and all
4  defects combined?
5  A.     **I don't agree with that.**
6  Q.     Okay.  And is there any known gene, genetic
7  trait or abnormality that you know of that can cause
8  all cardiac defects, that is each and every type of
9  cardiac defect?
10 A.     **I can't say, no.**
11 Q.     Can you name any pharmaceutical drug, any
12 environmental exposure, any gene that's ever been
13 proven to cause each and every type of cardiac
14 defect as those listed on the Slone supplement?
15 A.     **Well, again, similar to the issues relating**
16 **to Paxil, there are -- there have been studies of**
17 **both teratogens and other environmental agents that**
18 **have demonstrated a relationship between broad**
19 **categories of congenital malformations and those**
20 **exposures.**
21 Q.     Okay.  Let's look at paragraph 84 of your
22 general report.  Okay.  And you say that several
23 drugs and exposures have been known to cause
24 congenital cardiac defects, and you list seven
25 drugs, right?

65 (Pages 254 to 257)

Page 258

1  **A.      That's correct.**
2  Q.      And am I correct that none of the drugs
3  listed are known to cause each and every type of
4  cardiac defect that appears on the Slone supplement,
5  or don't you know?
6  **A.      Well, the -- I'd have to go back to the**
7  **literature for each one of these and see how those**
8  **results were presented for all of them, but I know**
9  **that these drugs have been associated with a**
10 **spectrum of cardiac defects, not just one.**
11 Q.      Well, lithium's on your list, isn't it?
12 **A.      Yes.**
13 Q.      What defect other than Ebstein's anomaly?
14 That's just one.
15 **A.      Okay.  Well, but we have a list here of**
16 **seven.**
17 Q.      Okay.  So, do you agree that at least with
18 Ebstein's anomaly, a drug may cause one type of
19 defect, but not any other type of cardiac defect?
20 **A.      Well, I really don't want to answer that**
21 **question unless I have access to that literature.**
22 Q.      Well, you reference 74, the American Heart
23 Association's statement of non-inherited risk
24 factors for cardiac birth defects in your report.
25 **A.      Okay.**

Page 260

1  **A.      Well, first I'd like to find it to see the**
2  **context in which it was written.**
3  Q.      It's on the second page.
4  Well, do you know if -- here it is.  Okay.
5  It's the left-hand column, one, two, three, four,
6  five, six, seven lines up from the bottom, "Although
7  some exposures may be risk factors for specific
8  types of congenital cardiac..."  What does CCVD
9  stand for?  "...congenital cardiovascular defects
10 and not others, quantified measures of overall
11 relative risk such as RR and odds ratios are given."
12 Do you see that?
13 **A.      Yes, I do.**
14 Q.      Okay.  Do you agree with that statement,
15 that some exposures may be risk factors for specific
16 types of congenital cardiac birth defects and not
17 others?
18 **A.      Yes, but I also need to qualify this in**
19 **that we have seen and we know that with continuing**
20 **study of many agents, particularly for rarer**
21 **outcomes, that new information is generated all the**
22 **time.  And so, you know, this is a statement at a**
23 **point in time, and often is expanded and modified**
24 **with further study.**
25 Q.      Well, I guess I really want to know, maybe

Page 259

1  Q.      Okay.  And you're not a member of the
2  American Heart Association?
3  **A.      That's correct.**
4  Q.      And you're not a member of the American
5  Academy of Pediatrics, correct?
6  **A.      Correct.**
7  Q.      And both those organizations, Exhibit 25,
8  have endorsed this paper, correct?
9  **A.      Which paper?**
10 Q.      I'm sorry.  The American Heart Association
11 Scientific Statement, your reference 74.  Okay?
12 **A.      So, which reference is that, 74?**
13 Q.      74.
14 **A.      Okay.  So let's see if we can get that.**
15 Q.      Here it is, it's right here.
16 And if I ask you if you would turn to page
17 2996, which is the second page, they say, "Some
18 exposures may be risk factors for specific types of
19 congenital cardiac birth defects and not others."
20 **A.      Where are you?**
21 Q.      Well, Tom is going to find it for us in
22 just a minute, but can I ask you -- we'll find it --
23 do you agree with that statement, that some
24 exposures may be risk factors for specific types of
25 congenital cardiac birth defects and not others?

Page 261

1  this is what you believe.  So, you believe any
2  teratogen that can cause one type of heart defect,
3  and if you know it can really cause that one, is
4  capable of causing all cardiac defects, is that your
5  opinion?
6  **A.      No.  In the case of Paxil, it is my**
7  **opinion, and in some other cases, depending on the**
8  **information that's available on the biological**
9  **plausibility, the toxicology, the mechanism of**
10 **action, and so on, then that could be my opinion.**
11 Q.      Okay.  Is there any other drug you know of
12 that that's your opinion for, or is Paxil the only
13 one?
14 **A.      I can't say that there wouldn't be.**
15 Q.      Okay.  So, is this the first time that you
16 ever recall finding a teratogen that could cause all
17 cardiac birth defects in your career?  I mean, have
18 you ever come up against another teratogen that was
19 so powerful it could cause every type of cardiac
20 birth defect?
21 **A.      I haven't really looked at that issue.  So,**
22 **I can't -- I really can't make the judgment.**
23 Q.      And is it fair to say that as you sit here
24 today, you don't know if that opinion may be the
25 first time in the world that any teratogen or

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 262

1  chemical has been discovered to be able to cause
2  each and every type of cardiac defect?
3  **A.      Well, it's clearly not just my opinion**
4  **because the --**
5  Q.      I'm not asking you only about your opinion.
6  I'm asking you, Doctor, if in your opinion this is
7  the first time ever, as far as you know, that
8  someone has said that a teratogen can cause each and
9  every type of cardiac defect?
10 **A.      Well, I would say I don't think so because**
11 **if you look at the history of labeling of drugs,**
12 **which may be teratogenic, the labels, as we can see**
13 **on the Paxil label, doesn't specify specific cardiac**
14 **defects.  The labeling in the warning has to do with**
15 **congenital malformations and the overall category of**
16 **congenital cardiac defects; indeed, does not break**
17 **out, does not limit and does not exclude anything**
18 **whatsoever.**
19 Q.      Have you read the Paxil label?
20 **A.      I have read the warning box on the Paxil**
21 **label.**
22 Q.      And is it your opinion -- are you relying
23 on the Paxil label in part for your opinion in this
24 case?
25 **A.      No, no.  But you just asked me a question**

Page 263

1  **about --**
2  Q.      All right.  So, are you aware that the
3  Paxil label, whether it does or doesn't say it
4  causes cardiac defects?  Do you know if it does or
5  if it does not say that?
6  **A.      I'd like to actually have a copy of it.  I**
7  **don't remember exactly how it's phrased.**
8  Q.      Okay.  I'm asking you as you sit here today
9  because, Lord, if you had to look at every single
10 document we talked about, we would be here forever.
11 So as you sit here today, it's the best we can do,
12 do you know if the Paxil label says it can cause?
13 **A.      I think it warns that it can increase the**
14 **risk of congenital malformations, especially cardiac**
15 **defects.**
16 Q.      And as we already discussed, that does not
17 mean cause?
18 **A.      Oh, I disagree.**
19 Q.      So, you think if the Paxil label says it
20 can cause -- strike that -- if the Paxil label says
21 it increases the risk, in your mind that is the same
22 thing as them saying it can cause?
23 **A.      Yes.**
24 Q.      Okay.  Are you familiar with the regs that
25 guide what goes into the Paxil label or any label?

Page 264

1  **A.      I'm sure I've read, I've read them, but --**
2  Q.      Do you know if they say anything about
3  causation and what it means in a label?
4  **A.      I don't recall.**
5  Q.      Would you be surprised to know that it
6  specifically says it doesn't mean cause?
7  **A.      That's possible.**
8  Q.      Okay.  But you don't know?
9  **A.      I don't recall.**
10 Q.      Okay.  Now, you list three antiepileptic
11 drugs in paragraph 84 as well, and if we look back
12 at the American Heart Association paper, and this
13 time -- do you still have it there?
14 **A.      Oh, yes.**
15 Q.      Page 3001, right column, there's a section
16 there for anticonvulsants.  Is that the same as
17 antiepileptic medications?
18 **A.      There's an overlap, yes.**
19 Q.      Okay.  And they say, let's see, first
20 sentence under it, "Although many large
21 epidemiologic studies of the offspring of epileptic
22 women have been published, currently available data
23 are incapable of resolving the controversy as to
24 whether the malformations are due to the epilepsy or
25 the anticonvulsant therapy."  Do you have any reason

Page 265

1  to disagree with the American Heart Association and
2  the American Academy of Pediatrics' assessment of
3  the antiepileptic drugs and its ability to cause
4  cardiac defects?
5  **A.      I'd have to look at that literature.**
6  Q.      Well, is it your opinion that valproate
7  causes all cardiac defects?  That's one of the ones.
8  **A.      Again, I'd have to look at the literature.**
9  Q.      All right.  Exhibit 26 is one of the
10 articles that you reference for valproate.  Do you
11 see that?
12 **A.      Yes.**
13 Q.      Okay.  So, I'm going to give you a copy of
14 Exhibit 26, which is an article that you cite,
15 Principles of Human Teratology, and ask you to turn
16 to Table 1, which appears at about the third page,
17 and ask you to drop down to near the bottom of the
18 page on the left-hand side, it says valproic acid.
19 Do you see that?
20 **A.      Uh-huh.**
21 Q.      It does not list any cardiac defect as a
22 fetal effect, does it, not one?
23 **A.      Again, I'd have to look at the rest of this**
24 **article.**
25 Q.      Well, I'm just asking you what this article

67 (Pages 262 to 265)

Page 266

1  that you cite shows.  It doesn't -- it doesn't list
2  a cardiac defect, does it?
3  A.      Not on this table, no.
4  Q.      Okay.  The one right under it is another
5  one you list, it's another antiepileptic drug,
6  trimethadione or dione, T-R-I-M-E-T-H-A-D-I-O-N-E.
7  Do you see that?
8  A.      Yes, I do.
9  Q.      In fact, looking at the article you
10  reference here, there are no cardiac defects listed
11  as associated with this drug either, correct?
12  A.      Not on this table, no.
13  Q.      Do you know of any other table where it
14  does?
15  A.      Well, again, I'd have to look at the rest
16  of the literature.
17  Q.      Well, this is the article you cited in
18  support of your statement.
19  A.      Well, this is one of them, that's right.
20  Q.      You agree that normal fetal development is
21  highly dependent on a tightly controlled succession
22  of cellular differentiation and migration.  You
23  wrote that in your report, true?
24  A.      That's correct.
25  Q.      Okay.  And are you saying that each of the

Page 267

1  defects in this Slone supplement that we've been
2  looking at are formed or caused by interference with
3  the same types of tissues?
4  A.      Well, not necessarily.  They may be --
5  Q.      Not necessarily or isn't the answer no?
6  A.      Well --
7  Q.      Do you know if the answer is no?
8  A.      Can you repeat the question?
9  Q.      Sure.  Are you saying that each of the
10  defects listed on this supplement, these 50 or 80
11  cardiac defects, are formed or caused by
12  interference with the same types of tissue?
13  A.      Well, when you go back early enough in
14  terms of the development of the heart and look at
15  the effect of serotonin on that process, which is
16  very, very broad spectrum and very broad in its
17  effect, it's not simply a matter of the cell type,
18  but it has to do with the breadth of the effect on
19  the entire developmental process, which is the issue
20  with serotonin perturbation and serotonin levels.
21  Q.      So, are you proposing a theory here as to
22  how Paxil can cause every single cardiac defect?  Is
23  this your theory?
24  A.      I'm not proposing any theory.  This is a --
25  this is based on research that's been done over many

Page 268

1  years by many, many other researchers.  I'm not
2  proposing anything.  I'm basing my opinion and the
3  information on biological plausibility on work
4  that's been done by many other investigators.
5          And I also need to point out, since you are
6  really honing in on very specific mechanism, that
7  it's not necessary for us to understand, nor is it
8  even expected that we would necessarily understand
9  every single mechanistic step in the process.
10  Q.      Absolutely agree with you.  But when you
11  don't have data on all of these defects in the Slone
12  listing and you make this huge jump from all
13  defects combined to all these specific defects, it
14  makes it a lot harder argument if you don't know
15  what the mechanism is, agreed?
16  A.      Well, I don't agree with that.
17  Q.      You don't need a mechanism?
18  A.      Well, it's not a matter of don't need.  One
19  would like to have, but actually not very often that
20  we do understand or even fully understand the
21  mechanism.  And the points that you're driving at in
22  this line of questioning about lumping and about
23  large categories, if you look at the standard
24  practice in causation, you will see that this is
25  standard practice in causation.  For instance, when

Page 269

1  substances are labeled as carcinogens, they are
2  labeled as broad -- as carcinogens, not as just a
3  carcinogen for one organ.
4  Q.      Okay.  Let's look at paragraph 72 of your
5  general report.  Okay.  It says, I believe, let me
6  get it right, "The embryologic origin of birth
7  defects has long been recognized to be
8  heterogeneous."  Did you write that sentence?
9  A.      Yes.
10  Q.      Okay.  Tell me what heterogeneous means,
11  when you say the cause of different heart defects is
12  heterogeneous.
13  A.      No, I didn't say the cause.  I said the
14  embryologic origin.  So, the embryological processes
15  involved in birth defects has many different
16  factors, is heterogeneous, has many different
17  facets.
18  Q.      You say in the next paragraph, "Etiologic
19  heterogeneity, inclusion of infants with different
20  causes in the study of the birth defect, may cause
21  the observed association to be biased towards the
22  null."
23  A.      Where are you now?
24  Q.      Next paragraph, where you're talking about
25  disease classification.  You say, "Misclassification

68 (Pages 266 to 269)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ
McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.
Monday
November 2, 2009

Page 270

1  of cardiac defects by category may also bias risk
2  estimates in epidemiologic studies, the ultimate
3  impact thereof depending on whether error is
4  systematic or differential."  Do you see that?
5  A.    Yes.
6  Q.    Okay.
7  A.    If you wouldn't mind, I'd just like to take
8  a second to read it.  Okay.
9  Q.    Doctor, do you have a sufficient
10 understanding of the embryology of the heart to tell
11 me the similarities and differences in the types of
12 cells and tissues involved in the development of
13 Tetralogy of Fallot versus hypoplastic left heart?
14 A.    No.
15 Q.    Do you have sufficient understanding of the
16 embryology of the heart to tell me the similarities
17 and differences in the types of cells and tissues
18 involved in heterotaxy versus double outlet right
19 ventricle?
20 A.    No.
21 Q.    How about the differences between
22 coarctation of the aorta and Ebstein's anomaly?
23 A.    No.
24 Q.    How about coarctation of the aorta and
25 Tetralogy of Fallot?

Page 271

1  A.    No.
2  Q.    How about coarctation of the aorta and
3  septal defects?
4  A.    No.
5  Q.    Do you know if any of the defects we just
6  mentioned share similar pathogenetic or causal
7  pathways?
8  A.    Well, yes, we do.
9  Q.    You know that?
10 A.    We do know that, yes.
11 Q.    And how do you know that?
12 A.    We know that.  I know that from reading a
13 lot of literature that points to the very
14 overarching and fundamental role of serotonin in
15 cell signaling, in migration, proliferation,
16 differentiation of the heart and mesenchyme tissues
17 that relate to the vessels of the heart.
18 Q.    So, it's your opinion that Paxil somehow
19 perturbs serotonin to cause each and every possible
20 kind of a heart defect, that's the common mechanism?
21 A.    I believe that that is a fundamental
22 foundation of biological plausibility.
23 Q.    Okay.  And is that belief that you hold at
24 the core of your willingness to extrapolate from all
25 cardiac defects defined to each and every one?

Page 272

1  A.    I would not --
2        MR. FOX:  Objection to form.
3  A.    I would not say it's the core.  The core of
4  my opinion is the epidemiological literature and the
5  data that I have reviewed.  However, it has -- the
6  toxicological literature and the studies in terms of
7  teratology and mechanism of action have informed my
8  opinion.
9  Q.    All right.  How much weight in your opinion
10 do you give to your belief that they share common
11 mechanistic cause?
12 A.    I couldn't assign a number.
13 Q.    You can't assign a number?
14 A.    No.
15 Q.    So, you didn't weight how much weight you
16 put on, relative weight you put on the epidemiologic
17 data versus the mechanistic data?
18 A.    Well, I always put more weight on the
19 epidemiological data.
20 Q.    Okay.  Is there any study done by anyone
21 showing Paxil taken by a pregnant woman at normal
22 therapeutic doses alters the serotonin levels to
23 which the fetus is exposed during embryogenesis?
24 A.    Studies in humans?  I couldn't cite such a
25 study right now.

Page 273

1  Q.    Okay.  Is there any study done by anyone
2  showing Paxil administered to animals at --
3  A.    Can you excuse me?  Can you go back?  Can
4  you repeat that prior question?
5  Q.    Sure, absolutely.  Is there any study done
6  by anyone that you know of showing Paxil taken by a
7  pregnant woman at normal therapeutic doses alters
8  the serotonin levels to which the fetus is exposed
9  during embryogenesis?
10 A.    Well, I think it's been established that
11 the reason that Paxil has the effect that it has is
12 because it does alter serotonin levels.  So, one can
13 assume that whether you're pregnant or not, it
14 alters serotonin levels.  That's number one.
15       The second point is whether or not Paxil
16 crosses the placenta, and the literature that I have
17 read indicates that Paxil does cross the placenta.
18 Therefore, it is reasonable to conclude that that
19 would have an impact on fetal serotonin levels as
20 well.
21 Q.    Do you know of any study that has looked at
22 whether Paxil crosses the placenta based on
23 examination during the first trimester?
24 A.    I have read a number of reports about the
25 fact that Paxil crosses the placenta, but I don't

69 (Pages 270 to 273)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 274

1    recall when those studies were done.
2    Q.    Well, you cited two earlier.  One was cord
3    blood, which you didn't seem to know occurred after
4    birth when they take the cord blood, and the other
5    study was during amniocentesis, which occurs in the
6    second trimester.  So, given -- taken for the moment
7    that I'm correct about the two studies you cited, do
8    you know of any other study or any study that looks
9    at Paxil crossing the placenta during the first
10   trimester?
11   A.    In humans you're referring to specifically?
12   Q.    Well, let's start with humans.
13   A.    Well, again, I'd have to go back to that
14   literature.  I don't recall.
15   Q.    How about in animals?
16   A.    I'd have to go back to the literature.
17   Q.    Does Paxil alter plasma serotonin levels in
18   the mother at all at therapeutic doses?
19   A.    I'd have to go back and look.  I don't
20   know.
21   Q.    Is there anything about serotonin you can
22   tell me today?
23   A.    What do you mean by anything?
24         MR. FOX:  Objection to form.
25   Q.    I've asked tons of questions and you each

Page 275

1    time say you have to go back to the literature.  It
2    makes it very difficult for me to take your
3    deposition.
4    A.    I can't answer that question.
5    Q.    Do you know what the therapeutic doses of
6    Paxil are?
7    A.    Yes.
8    Q.    What are they?
9    A.    They range between let's say 10 to 40
10   milligrams a day.
11   Q.    Would you say that it's very important, in
12   fact critical, when doing a study of birth defects,
13   to properly group or classify the defects in a
14   meaningful way for examination?
15   A.    Can you repeat that question?
16   Q.    Yes.  Maybe I should ask it another way
17   given your answers.
18         To you it doesn't matter, I take it, what
19   defects you look at because you think all defects
20   are caused by Paxil?
21         MR. FOX:  Objection to form.
22   Q.    So, it doesn't matter to you whether you're
23   looking at a study with Paxil and septal defects or
24   Paxil and conotruncal defects or Paxil and all
25   defects; it's all the same to you because you think

Page 276

1    it causes all defects?
2         MR. FOX:  Objection to form.
3    A.    Are you talking about all defects of any
4    kind, not just cardiac defects?
5    Q.    Cardiac, no, cardiac, I'm talking about
6    cardiac.
7    A.    Okay.  Well, could you rephrase that
8    question in terms of cardiac?
9    Q.    Yes.  I guess the question is, is disease
10   classification of cardiac defects important to you
11   in assessing Paxil, or doesn't it matter because you
12   think it causes all cardiac defects?
13   A.    Well, I wouldn't say it doesn't matter
14   because I think it's -- it is something that would
15   be important to try to generate, but most of these
16   studies did not and could not generate enough cases
17   to analyze the specific defects or they specifically
18   excluded defects for one reason or another.  So,
19   it's not that it doesn't matter, but it's not
20   absolutely necessary.
21   Q.    Now I understand that's your opinion.  Can
22   you tell me how serotonin leads to Tetralogy of
23   Fallot?
24         MR. FOX:  Objection to form.
25   Q.    The mechanism by which that happens.

Page 277

1    A.    Again, other than in very general terms --
2    Q.    Well, the best you know how given what you
3    know about it.
4    A.    Given what I know about it, serotonin has
5    the ability and does perturb serotonin -- I'm sorry.
6    Paxil has the ability to perturb serotonin levels,
7    and serotonin is a very early stage signaling
8    molecule which affects cellular migration, cellular
9    differentiation and proliferation, and has been
10   shown to actually do that, and has a specific
11   effect, therefore, on the development of the heart
12   and in very, very fundamental ways at early stages,
13   not just late stages and not in very, just very
14   specific and narrow categories.
15         As a very early signaling molecule, it has
16   then a broad effect on the developing structure, the
17   development of that organ.  And as far as the
18   specifics of how it does that, I would have to
19   depend on other experts.
20   Q.    Okay.  Do you know -- you say it affects
21   cellular migration.  What type of cells are you
22   talking about?
23   A.    Neural crest cells.
24   Q.    Any other types or only neural crest?
25   A.    Well, I know neural crest cells.  There may

70 (Pages 274 to 277)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 278

1  be other cells as well, but I know neural crest
2  cells.
3      Q.     Okay.  And when you say it affects the
4  proliferation, again, is that what type of cells?
5      A.     Fetal heart cells.
6      Q.     When you say --
7      A.     And proliferation of cells of neural crest
8  origin.
9      Q.     Okay.  Other than neural crest cells, are
10 you talking about serotonin impacting any other
11 specific type of cell that you can name for me
12 today?
13     A.     No.  I probably couldn't name, although
14 serotonin does have an effect on, in terms of
15 stimulating receptors and other, many other effects
16 as well.
17     Q.     All right.  What receptors are you talking
18 about that serotonin can stimulate that's going to
19 cause a heart defect?
20     A.     Well, they're -- you know, I can't explain
21 the specific mechanisms.  That's not my expertise.
22     Q.     Okay.  I'm giving you the Slone appendix
23 here and I'm going to ask you, which particular
24 cardiac structures, first which particular cardiac
25 structures are derived from neural crest cells and

Page 279

1  impacted either by migration or proliferation of
2  neural crest cells?
3          MR. FOX:  Objection to form.
4      A.     From what I understand, the neural crest
5  impacts the development of just about all major
6  aspects of the heart and the great vessels.
7      Q.     So, as far as you're concerned, neural
8  crest cells are involved in the formation of each
9  and every one of those cardiac defects in the Slone
10 appendix you're looking at?
11         MR. FOX:  Objection to form.
12     A.     And mesenchyme cells.
13     Q.     And mesenchyme cells?
14     A.     That's right.
15     Q.     So, when I asked you before what cells and
16 tissues these different heart defects have in
17 common, do you want to revise it and say, oh, it's
18 all neural crest cells and mesenchyme cells, now
19 they have them all in common, every one of the
20 defects?
21     A.     Can you repeat that question?
22     Q.     Yes.  Every defect on that list is
23 mesenchyme cells and neural crest are involved in
24 the formation, each and every one of those defects?
25         MR. FOX:  Objection to form.

Page 280

1      A.     Not necessarily.  I don't know the answer
2  to that.
3      Q.     Can you tell me one on that list you are
4  certain involves mesenchyme cells?
5          MR. FOX:  Objection to form.
6      A.     I'd really have to check with -- check my
7  references.  That's not my particular area of
8  expertise.
9      Q.     Dr. Kramer, I'm just asking to you mention
10 one out of that list of 50 or 60.  Tell me one.
11     A.     I understand your question, but again, if
12 I'm going to be asked a question like that, I would
13 need to refer to references that I have.
14     Q.     So, can you tell me one?  Let's eliminate
15 conotruncal defects from the question.  Other than
16 conotruncal defects, can you tell me one defect on
17 that list that's in front of you from the Slone
18 appendix that's impacted by neural crest cell
19 migration or proliferation in the formation of that
20 defect?
21         MR. FOX:  Objection to form.
22     A.     Are you asking about neural crest?
23     Q.     Yes, neural crest cells.
24     A.     Well, I think I've already discussed that.
25     Q.     Well, what's the answer?

Page 281

1      A.     Do you want me to choose an individual
2  defect?
3      Q.     Absolutely.
4      A.     Well, then I would need to go back to my
5  references.
6      Q.     So, you can't name one for me other -- you
7  can't name one for me?
8      A.     I wouldn't do that, no.
9      Q.     Okay.  And within conotruncal, do you know
10 which ones do and do not involve neural crest cells?
11     A.     Not off the top of my head.  I would need
12 to go to my references.
13     Q.     Other than neural crest cells and
14 mesenchymal cells, are there any other cells that
15 you believe Paxil perturbs in the formation of a
16 cardiac defect?
17     A.     Again, I'd have to go back to references.
18     Q.     And what references are going to tell you
19 the answer to these questions?  Those cited in your
20 report?
21     A.     Those cited in my report and expert
22 references as well.
23     Q.     What expert references?
24     A.     Expert, expert reports.
25     Q.     Other experts in the litigation?

71 (Pages 278 to 281)

Page 282

1   A.      No.
2   Q.      What experts are you talking about?
3   A.      Other experts then in the litigation are
4   you talking about?
5   Q.      Well, what experts are you saying you would
6   have to go back to expert reports?  What are you
7   talking about?
8   A.      There have -- I have reviewed expert
9   reports in this litigation that have explained the
10  effect of neural crest cells and the development of
11  the heart.
12  Q.      And on that bill we were looking at before,
13  where it is, it says something about experts.  Not
14  that one, the other one, from the fax.  We just
15  marked it.  Here it is.  There are multiple entries
16  that say Paxil experts, Paxil experts, Paxil
17  experts.  It's Exhibit 164, page 1.
18          MR. FOX:  Remember, that's from our
19  ledger.
20          MS. HALPERN:  Oh, it's from your
21  ledger.  So, she doesn't know what that means?
22          MR. FOX:  No.
23  Q.      Is that what you're talking about, though,
24  reviewing Paxil expert reports in this litigation?
25  A.      Yes.

Page 283

1   Q.      Did you contact or hire any experts in this
2   case?
3   A.      No.
4   Q.      Okay.  So, if a teratogen causes one type
5   of defect, say defect A, but not defect B and C,
6   let's just assume that, it's a hypothetical
7   question.  Okay?
8   A.      Uh-huh.
9   Q.      All right.  And if you classify them all
10  together as cardiac defects, you might show no
11  association because defect A gets lost in the lump,
12  right?
13  A.      Possibly.
14  Q.      Okay.  And similarly, if a teratogen causes
15  defect B and C, but not defect A, and you do a study
16  and you find an association by lumping them all
17  together, you've made an error in saying the
18  teratogen can cause defect A because you lumped it
19  in there improperly?
20  A.      Possibly, possibly not.  It all depends on
21  how the studies were conducted and what other
22  information you have from other studies.
23  Q.      So, in both cases, it may or may not happen
24  that way, correct?
25  A.      Well, in isolation from one study, anything

Page 284

1   is possible.  That's why you always look at the
2   cumulative data and cumulative information.
3   Q.      Okay.  Now, you said classification errors
4   can bias you to fail to find an association where
5   one really exists, right?  You've said that?
6   A.      That's correct.  Where are you now?
7   Q.      No, no, I'm just -- just from having read
8   your report, I know that what's you've said.
9   A.      Okay.
10  Q.      Okay?  But improper classification can also
11  create a false finding that something is a teratogen
12  when, in fact, it's not, correct?
13  A.      Okay.  Are you reading from my report?
14  Q.      No.  You didn't write this.  I'm asking you
15  this.
16  A.      Okay.  Could you repeat this?
17  Q.      Yes.  What I said is you wrote that
18  classification errors can bias you to fail to find
19  an association where one really exists?
20  A.      If it's not -- if it's differential
21  misclassification --
22  Q.      Okay.  But I'm just asking, improper
23  classification can also result in a false finding
24  that something is a teratogen when, in fact, it's
25  not, correct?

Page 285

1   A.      Possibly.
2   Q.      So, it's a type 1 and a type 2 error, can
3   go either way?
4   A.      Possibly.
5   Q.      It's possible?
6   A.      Uh-huh.
7   Q.      Okay.  So, how you classify cardiac defects
8   to study epidemiologically is important, right?
9   A.      Yes.
10  Q.      Okay.  All right.  Let's go back to the
11  beginning of this whole --
12          MS. HALPERN:  Let's take a break for a
13  minute because I've lost my spot.
14          THE VIDEOGRAPHER:  Okay.  The time is
15  now 2:38.  This concludes tape number 4 of the video
16  deposition of Dr. Shira Kramer.
17          (Brief recess.)
18          THE VIDEOGRAPHER:  The time is now
19  2:49.  This begins tape number 5 of the video
20  deposition of Dr. Shira Kramer.
21  BY MS. HALPERN:
22  Q.      Dr. Kramer, do you know of a single
23  published case report on Paxil and coarctation of
24  the aorta?
25  A.      A case report?

72 (Pages 282 to 285)

USDC, Northern District of OK                McMurray v. GSK                        Monday
No. 08-CV-381-GKF-SAJ           Videotape Deposition of Shira Kramer, Ph.D.    November 2, 2009

Page 286

1    Q.    Yes.  You know what a case report is?  You
2    know what a case report is?
3    A.    Sure.
4    Q.    Sure.  So, do you know of any?
5    A.    There -- I have seen among the studies
6    coarctation of the aorta listed among the congenital
7    cardiac defects.
8    Q.    Do you know what a case, a published case
9    report is?
10   A.    Yes, I do.
11   Q.    Okay.  Do you know of a published case
12   report on Paxil and coarctation of the aorta?
13   A.    I couldn't name one right now.
14   Q.    Okay.  How about Paxil and LVOTO type
15   defects?
16   A.    A case report?
17   Q.    A case report.
18   A.    Again, I -- I just couldn't name that right
19   now.
20   Q.    Could you name a case series of Paxil and
21   coarctation of the aorta or Paxil and LVOTO defects
22   that's been published in the peer-reviewed
23   literature?
24   A.    I couldn't name that now.
25   Q.    Okay.  Do you know of any animal data

Page 287

1    looking at Paxil and coarctation of the aorta
2    specifically or Paxil and LVOTO defects
3    specifically?
4    A.    No, I don't -- I don't recall anything like
5    that, no.
6    Q.    Do you know of any professional
7    organization or regulatory agency statement about
8    Paxil and coarctation of the aorta or Paxil and
9    LVOTO type defects specifically?
10   A.    Just restricted to those two?
11   Q.    Yes, ma'am.
12   A.    No, not just restricted to those two.  They
13   are usually much more general to the overall
14   category of congenital cardiac defects.
15   Q.    Have you done an analysis of the
16   epidemiologic data for specific defects, in
17   particular for coarctation of the aorta?
18   A.    Well, certainly we've looked at the
19   entirety of the Paxil literature, and all of the
20   different subclassifications that have been
21   published, and whatever they are, we have considered
22   them.
23   Q.    So, what data are you relying on to say
24   Paxil is a causal factor in coarctation of the
25   aorta?

Page 288

1    A.    All of the epidemiological literature that
2    I cite in my report.
3    Q.    Okay.  And without exception, all of it,
4    everything about Paxil and whatever the defects are?
5    A.    Well, well, let me just, of course,
6    clarify.  As you know from the report, that not
7    every single result is -- has an odds ratio and
8    relative risk over 1.  So, when you say all of it,
9    I'm looking at the cumulative evidence.  Not every
10   single one of the results is elevated, but most of
11   them are.
12   Q.    Now, you're extrapolating from data on all
13   cardiac defects combined to Paxil and coarctation of
14   the aorta, correct?  You're extrapolating?
15   A.    Well, I'm not only extrapolating from that
16   large category, but there are also other studies
17   that look at subcategories as well.
18   Q.    Okay.  So, is it fair to say you're
19   extrapolating from data about Paxil and overall
20   cardiac birth defects lumped together as part of
21   your opinion on Paxil's ability to cause
22   coarctation?
23   A.    That's correct.
24   Q.    And are you extrapolating from data about
25   Paxil and overall birth defects, not just cardiac,

Page 289

1    to conclude that Paxil can cause coarctation of the
2    aorta?
3    A.    That wasn't the basis of my opinion.
4    Q.    Okay.  Fair enough.  Are you extrapolating
5    from data about RVOTO defects to reach your
6    conclusion about Paxil's ability to cause
7    coarctation of the aorta?
8    A.    Not specifically.
9    Q.    Are you extrapolating from data about
10   septal defects to reach your conclusion about
11   Paxil's ability to cause coarctation of the aorta?
12   A.    Septal defects?
13   Q.    Yes, ma'am.
14   A.    Not specifically.
15   Q.    Okay.  So, are you extrapolating from data
16   about LVOTO defects to reach your conclusion about
17   whether Paxil can cause coarctation of the aorta?
18   A.    Yes.
19   Q.    Are you extrapolating from data about
20   conotruncal defects to reach your conclusion that
21   Paxil can cause coarctation of the aorta?
22   A.    Yes.
23   Q.    Okay.  Is there any other specific defect
24   or specific subgrouping of defects that you're
25   relying on to reach your conclusion that Paxil can

73 (Pages 286 to 289)

Page 290

1  cause coarctation of the aorta?  The two you've
2  mentioned or the three you've mentioned are all
3  cardiac defects lumped together, LVOTO and
4  conotruncal.  Is there anything else?
5  **A.      No, I don't believe so.**
6  Q.      Okay.  What methodologic principle are you
7  relying on to extrapolate from all cardiac defects
8  combined to coarctation of the aorta?
9  **A.      The biological plausibility and mechanistic**
10 **information that has been generated by other**
11 **researchers, and in that supports the broad effect**
12 **of this drug on a -- on a very broadly acting**
13 **signaling molecule, and in addition, the**
14 **epidemiological data that show that Paxil causes a**
15 **broad spectrum of cardiac defects, not just one**
16 **specific type of defect.**
17 Q.      Can I have exhibit, I think it's 48?
18        Has your methodology for supporting
19 extrapolation from all cardiac defects to
20 coarctation of the aorta, what you've just described
21 as your basis, is it written anywhere, is it an
22 accepted methodology for extrapolating from all
23 cardiac defects to a specific one, or is it
24 something that's subjectively or uniquely done by
25 you in this litigation?

Page 291

1  **A.      No, I don't think it's uniquely done by me.**
2  Q.      Okay.
3  **A.      But I haven't necessarily written it down**
4  **myself.**
5  Q.      Okay.  But can you send me to someplace in
6  the peer-reviewed scientific literature or textbooks
7  where it's been laid out that it's appropriate to
8  extrapolate from all cardiac defects lumped together
9  to a specific defect based on the principles you
10 just enumerated?
11 **A.      I don't know that there are, you know,**
12 **there are such, necessarily such overarching**
13 **principles that are accepted by everyone.  There may**
14 **be individuals or groups that have published**
15 **opinions about this, but --**
16 Q.      Can you cite to any?
17 **A.      Not off the top of my head.**
18 Q.      Do you know of anyone who has ever done it
19 with something other than Paxil, extrapolated from
20 all cardiac defects to a specific defect based on
21 the principles you just laid out?
22 **A.      For cardiac defects specifically?**
23 Q.      Well, let's start with cardiac, yeah.
24 **A.      Not off the top of my head, no.**
25 Q.      Can you quantify the rate of error in your

Page 292

1  extrapolation from all cardiac defects to
2  coarctation of the aorta?  Do you know how much risk
3  is involved in making that kind of extrapolation?
4  **A.      I don't understand your question.**
5  Q.      Well, it's not foolproof, right, when you
6  extrapolate?  It's something of a gamble; is that
7  fair?  It's an informed gamble for you.  You think
8  you have a basis for doing it, but you may be wrong,
9  correct?  It's possible you're wrong in
10 extrapolating from all defects?
11       MR. FOX:  Objection.
12 Q.      I'm just asking you what the known rate of
13 error would be for making that type of
14 extrapolation.
15       MR. FOX:  Objection to form.
16 **A.      I wouldn't have any way of quantifying**
17 **that.**
18 Q.      Is it your statement that this type of
19 extrapolation is generally accepted in the
20 scientific birth defect community?
21 **A.      I don't know whether it's generally**
22 **accepted or not.**
23 Q.      Can you cite to a writing, a scientific
24 treatise, a professional organization, a regulatory
25 agency that states it's appropriate to extrapolate a

Page 293

1  finding of causation from all cardiac birth defects
2  combined to a particular cardiac defect?
3  **A.      In general, no.**
4  Q.      Can you cite to any writing or scientific
5  treatise that says it's appropriate to extrapolate a
6  finding of causation from one type of birth defect
7  to another type of birth defect?
8  **A.      It's possible that I could find such --**
9  **such a writing.  I don't have those citations right**
10 **here with me.**
11 Q.      Well, would you agree to extrapolate the
12 finding from one cardiac birth defect to another
13 specific type of cardiac birth defect, you have to
14 have a scientific basis to hypothesize that the
15 effects of the agent being studied could be so
16 varied as to apply to each defect?
17       MR. FOX:  Objection to form.
18 **A.      Well, you would want to -- I'm sorry.  You**
19 **would want to have various lines of evidence that**
20 **support that, support that conclusion.**
21 Q.      Okay.  And do you have such a hypothesis in
22 this case for extrapolating from all defects or
23 another defect to Paxil and coarctation of the
24 aorta?
25 **A.      Can you repeat that?**

74 (Pages 290 to 293)

Page 294

1  Q.      Yes.  Do you have a hypothesis as to why
2  it's appropriate?  Is it the hypothesis you told us
3  earlier about serotonin?
4  A.      Well, that's one of them.  And also the
5  epidemiological literature and data themselves show
6  that Paxil causes a spectrum of cardiac
7  malformations in these studies, not just one.
8  Q.      Okay.  And which cardiac malformations in
9  your opinion does the epidemiologic data show Paxil
10  causes?
11  A.      Well, we can pull out the literature and I
12  can read you.
13  Q.      I'm just asking you.
14  A.      Well, I haven't memorized the studies or
15  the results.  So, we'd need to look at the specific
16  studies.
17  Q.      So, is it your opinion that the
18  epidemiologic literature and data support Paxil causing LVOTO
19  defects?
20  A.      Yes.
21  Q.      The data on Paxil and LVOTO defects is
22  sufficient in and of itself?
23  A.      I think that there is evidence that Paxil
24  causes LVOTO defects, yes.
25  Q.      We're making a distinction here.  You're

Page 295

1  saying Paxil can cause all these defects on the
2  Slone sheet because you think it's a broad spectrum
3  and it causes all defects combined, correct?
4  A.      That's correct.
5  Q.      Okay.  Now, I think you're saying you can
6  say it with regard to these defects because you're
7  also seeing that it causes, at least some
8  individually, in addition to the whole lumped group
9  at the top, there are some pockets where you think
10  there's sufficient data in and of itself?
11  A.      Well, the studies which are limited by
12  their statistical power and their analytical
13  approaches, which are somewhat limited, actually, in
14  terms of the actual subgroups and subtypes that they
15  report.  However, they do report a spectrum of
16  abnormalities in, not necessarily odds ratio format,
17  because there may not have been enough cases to do
18  that, and in other cases a number of the studies
19  didn't even include large groupings because they had
20  exclusion criteria, such as not allowing any defect
21  that had fewer than 200 mothers who were interviewed
22  and so on and so forth.  So, there were some very,
23  very large categories of defects that would have
24  been excluded just by study design alone.
25  Q.      You know, I've heard you say this before,

Page 296

1  and I believe it's in error, if I'm understanding
2  you.  Is it your belief that those defects were not
3  included in the analysis of all the cardiac defects
4  combined, or are you just saying they weren't looked
5  at as their own subgroup?
6  A.      Well, we could look at the individual
7  studies.
8  Q.      No, no, I understand that.  But I believe
9  I've heard you say, both at the Kilker trial and
10  here today, that you believe they were excluded from
11  the analysis in their entirety, so they're not part
12  of all SSRI -- I'm sorry, all cardiac defects and
13  Paxil.  Is that --
14  A.      No, not necessarily, but I'd have to go
15  back and review.  But I know they were excluded from
16  any specific category.
17  Q.      Okay.  But you're not saying they were
18  excluded from the analysis of all cardiac defects
19  combined, are you?
20  A.      I'd have to go back and check.
21  Q.      I mean, that's a pretty big
22  misunderstanding if you think they were excluded.
23  A.      Not necessarily.  I'd have to go back and
24  check.
25  Q.      Well, as you sit here today, do you believe

Page 297

1  they were included or not included?
2  A.      Before I would state so, I'd need to look.
3  Q.      Wait a minute, Doctor.  You've already
4  written your report.  You've given your opinion.
5  You're here for a deposition.  As you sit here
6  today, do you believe those defects were included or
7  excluded in the analyses you're relying on for all
8  cardiac defects combined and Paxil?
9  A.      Well, we can look and see.
10  Q.      So, you don't know, is the answer?
11  A.      Well, I don't remember whether they were
12  included in the overall category or not.
13  Q.      You repeatedly testified that they were
14  excluded, haven't you?
15  A.      Well, I'd have to look at my testimony.  I
16  knew -- I know that there were exclusion criteria in
17  two of the studies that excluded certain defects
18  based on the number of women who were interviewed
19  with -- with children with those defects.
20  Q.      This is a document I've created, and I put
21  the title up there that says broad spectrum
22  teratogen list of things Dr. Kramer says Paxil can
23  cause, and what I would like you to do is look at
24  this list and tell me, and we can circle them, and
25  here's a red pen, if you can tell me which of these

75 (Pages 294 to 297)

Page 298

1 defects you say Paxil can cause and -- and -- you
2 know, based on your views in this case? Or maybe
3 the simpler thing is to say is there anything on
4 this list you think Paxil can't cause? That might
5 be easier.
6 A.    Again, I've -- since this is a very long
7 list, I will need to go back to the literature.
8 Some of it has nothing to do with Pax -- with
9 cardiac defects. Quite a bit -- quite a bit of it
10 doesn't. So, if you want me to render an opinion on
11 every single one of these, I would have to go back
12 and look at the literature.
13 Q.    I'm sorry. This is Exhibit Number 48. So,
14 everything on here that comes off of the Slone
15 supplement, you think Paxil can cause? We've
16 already been through that.
17 A.    That's correct.
18 Q.    So, if I match those up.
19 A.    With the cardiac, congenital cardiac
20 defect, the answer is yes.
21 Q.    Okay. There are very few things on here
22 that are on -- there's cleft palate and cleft lip.
23 Do you -- you think -- you've already told me that
24 you have no opinion on those. If we go to the last
25 page, the second page, there's omphalocele and

Page 299

1 craniosynostosis. Do you have an opinion about
2 those?
3 A.    I have not rendered an opinion about those
4 Q.    Okay. What about low birth weight and
5 neurodevelopmental delay?
6 A.    Again, there is evidence, but I have not
7 done a full causation analysis on those two -- on
8 those two issues.
9 Q.    How about PPHN, do you have an opinion
10 about that?
11 A.    I have not done a full analysis.
12 Q.    Okay. How about hypospadias?
13 A.    No, same answer.
14 Q.    Anencephaly?
15 A.    Same answer.
16 Q.    Spina bifida?
17 A.    Same answer.
18 Q.    Gastroschisis?
19 A.    Same answer.
20 Q.    Poor neonatal adaption?
21 A.    Same answer.
22 Q.    Same answer being you don't know, you
23 haven't analyzed it?
24 A.    I have not done a full analysis.
25 Q.    Cancer?

Page 300

1 A.    Same answer.
2 Q.    Esophageal atresia?
3 A.    Same answer.
4 Q.    Intestinal atresia?
5 A.    Same answer.
6 Q.    Anorectal atresia?
7 A.    Same answer.
8 Q.    Anything else on that list to the end,
9 transverse limb deficiency, web neck, spinal vessel
10 anomaly, lower limb vessel anomaly?
11 A.    Again, I haven't looked at those specific
12 anomalies.
13 Q.    So, in particular, you didn't look at web
14 neck?
15 A.    No.
16 Q.    Convulsions?
17 A.    Same answer.
18 Q.    I think that covers pretty much everything
19 that's not on the Slone list, but I'm not certain.
20 Okay. Thank you.
21      Would you agree that currently scientific
22 evidence does not exist as to what -- at what
23 exposure of Paxil, what dose, coarctation of the
24 aorta could occur if it's caused by Paxil?
25 A.    There are no evidence -- there is no strong

Page 301

1 scientific evidence that establishes a floor. There
2 is -- there is a paper, the Berard paper, that does
3 show that increased -- that higher doses of Paxil
4 are associated with a higher odds ratio. But there
5 are no studies that determine the lowest dose that
6 would have such an effect.
7 Q.    Would you agree that none of the authors of
8 the scientific references or journal articles cited
9 in your report come to the conclusion that Paxil can
10 cause cardiac birth defects?
11 A.    I wouldn't necessarily agree with that.
12 Q.    Can you tell me what article does say it?
13 A.    There was a review by Alwan and Friedman.
14 I believe the GSK meta-analysis concludes that Paxil
15 increases the risk of cardiac defects. That's
16 equivalent to cause in my opinion.
17 Q.    So, you're saying that in your opinion, the
18 Glaxo meta-analysis and the article by Alwan and
19 Friedman say that Paxil can cause cardiac birth
20 defects?
21 A.    Well, I think instead of my paraphrasing,
22 it would be appropriate, if you're going to ask me
23 questions about those articles, that we get them out
24 and look at them.
25 Q.    To your knowledge, has the FDA or any

76 (Pages 298 to 301)

Page 302

1 regulatory authority anywhere in the world reached
2 the conclusion that Paxil causes cardiac birth
3 defects?
4 **A.     Again, the FDA has put on -- has required**
5 **that GSK put on their label that Paxil increases the**
6 **risk of congenital malformations and cardiac,**
7 **congenital cardiac defects.**
8 Q.     Again, it's the language you're referring
9 to increases the risk, not cause?
10 **A.     Well, I think we could look at that**
11 **language.  I believe that's what it says.**
12 Q.     Let's take a look at it, and I'll show you
13 a copy of the Paxil, current Paxil label, and it's
14 highlighted in yellow.  Do you want to read what the
15 language says?  And this is Exhibit 98.
16 **A.     Okay.  "Epidemiological studies have shown**
17 **that infants born to women who had first trimester**
18 **exposure" -- excuse me -- "trimester paroxetine**
19 **exposure had an increased risk of cardiovascular**
20 **malformations."  Do you want me to keep reading?**
21 Q.     Is that -- is that the language you're
22 referring to where you said the label says Paxil can
23 cause cardiac birth defects?
24 **A.     There's also a label in a box which gives**
25 **you the category D.  It's the same thing.**

Page 303

1 Q.     Is this the label you're talking about, the
2 black box you're talking about?
3 **A.     No.  This is suicide.  That's the suicide.**
4 Q.     It's your opinion there's another black box
5 in the label?
6 **A.     Well, it may be the same as that.  I'm not**
7 **sure.  I can't be sure.**
8 Q.     To your knowledge, is it taught as part of
9 the curriculum in any medical school in the world
10 that Paxil causes birth defects?
11 **A.     I would have no idea.**
12 Q.     Can you cite a single general textbook on
13 medicine, psychiatry, pharmacology or
14 psychopharmacology stating that Paxil causes cardiac
15 birth defects?
16 **A.     I would have no idea.**
17 Q.     Do you know of any professional
18 organization, AHA, APA, Teratology Association,
19 epidemiology that has taken the position that Paxil
20 causes cardiac birth defects?
21 **A.     Again, I think that we can refer to the**
22 **paper by the -- by the American Association of**
23 **Obstetricians and Gynecologists who put out a**
24 **position paper and made a statement about the**
25 **increased risk of cardiac congenital malformations**

Page 304

1 and Paxil.
2 Q.     So, you're talking about the current ACOG
3 statement, correct?
4 **A.     That's right, yes.**
5 Q.     Can we have Exhibit 20?
6        This is a joint statement from the American
7 Pediatric Association and the American College of
8 Obstetricians and Gynecologists.  Is that what
9 you're referring to?
10 **A.     That's correct.**
11 Q.     I'm going to show you a copy of that
12 statement and ask you where it says Paxil can cause
13 cardiac birth defects?  Maybe I can help you find
14 it.  On page 706, 3.4.2.
15 **A.     I see it, I see it.**
16 Q.     And it says, "While some linked databases
17 reports find that compared to unexposed offspring,
18 those exposed to paroxetine during the first
19 trimester at higher risk of cardiac malformations,
20 these results are disputed by other reports
21 including several large case cohort studies.
22 Another group failed to find an association between
23 maternal paroxetine use and cardiac defects in a
24 study that included 1,170 women who took paroxetine
25 early in pregnancy.  However, they did find a

Page 305

1 difference between their risk estimates derived from
2 teratogen information services and those derived
3 from database studies.  The tendency of linked
4 database studies to report all malformations and
5 include those that are clinically insignificant may
6 account for differences.  Specific defects found by
7 some groups include ventricular outflow defects,
8 craniosynostosis and omphalocele.  Again, these
9 risks are extremely small and not replicated by
10 other studies."
11        Are you telling me that language is
12 equivalent to saying Paxil causes cardiac defects,
13 or is there some other language you're referring to?
14 **A.     No, that language does not, obviously.  I**
15 **need to review the rest of this paper.  It may be**
16 **that this is not the paper that I'm referring to.**
17 Q.     Okay.  Now, is it fair to say you did not
18 do --
19 **A.     Excuse me.  Did you want me to continue to**
20 **review this?**
21 Q.     No, because we don't have time.  I would
22 like you to, but there's just no time.  I believe it
23 must be another paper because there was no such
24 statement in this one.
25        You did or did not do a separate weight of

Page 306

1  the evidence analysis to assess whether Paxil can
2  cause left ventricular outflow tract obstructive
3  defects as a subcategory?
4  **A.      That was all part of our -- of my overall**
5  **review.**
6  Q.      So, you didn't do a separate one saying,
7  okay, now I'm going to look at coarctation of the
8  aorta and LVOTO defects without regard to the rest
9  of the data and say, let me look at this data that's
10  specific to LVOTO and coarctation of the aorta?
11  **A.      Well, certainly, when I did the literature**
12  **review, looked at the epidemiological literature on**
13  **cardiac defects that were associated with Paxil**
14  **exposure, I looked at all of the results and all of**
15  **the subclassifications and was interested in not**
16  **just the overall larger category, but every**
17  **subcategory that had been reported. So, to that**
18  **extent, of course, I considered every single**
19  **subcategory that was either reported or could have**
20  **been possible.**
21  Q.      If I asked you to look at these seven Slone
22  categories, and I'm giving you the appendix to the
23  Slone Louik article again, and asked you if you
24  looked at the data for that category and not
25  considered all defects combined or other categories,

Page 307

1  but just say I looked at conotruncal or just at
2  RVOTO, would you still opine that Paxil can cause
3  any one of those subcategories?
4  **A.      Yes.**
5  Q.      Okay. Which ones?
6  **A.      Well, again, since the -- since clearly**
7  **Paxil has a very broad effect on serotonin,**
8  **serotonin has a very broad effect on the development**
9  **of the heart and these -- and the literature in**
10  **totality reports a broad spectrum of cardiac**
11  **malformations, I believe that Paxil can cause all**
12  **major cardiac malformations and associated**
13  **malformations of the great vessels.**
14  Q.      So, talking about looping defects, for
15  example, for a moment, the data that you would rely
16  on to say that looping defects are caused by Paxil
17  are the mechanistic data?
18  **A.      No, the epidemiological data as well.**
19  Q.      On what, though?
20  **A.      On --**
21  Q.      There's no data -- looping data.
22  **A.      I know you're -- I know you're asserting**
23  **that there are no specific data on looping defects,**
24  **and, indeed, the Louik article excluded looping**
25  **defects so that you wouldn't even be able to see**

Page 308

1  **specific looping defects, they just excluded them**
2  **from their analysis because they didn't have five --**
3  **five SSRI-exposed study subjects. So, they were**
4  **excluded from their analysis.**
5  Q.      This is the same question. But they were
6  included or excluded when they looked at all SSRIs?
7  **A.      Well, but they weren't included as a**
8  **specific subcategory. So, when you asked me did I**
9  **look for that, they excluded it, I couldn't have**
10  **looked for that, even though it's possible that that**
11  **one exposed individual could have been supposed to**
12  **Paxil. We won't know that.**
13  Q.      So, in the absence of specific data, you're
14  willing to say that Paxil causes the subcategory
15  based on data from other defect categories, correct?
16  **A.      From all of the literature and all of the**
17  **data combined, yes, I feel comfortable making that**
18  **statement.**
19  Q.      Okay. And do you know of anyone in the
20  world that's ever implicated a group of cardiac
21  defects to a teratogen where there was no data
22  published?
23  **A.      Well, I wouldn't agree that there's no data**
24  **published.**
25  Q.      I didn't finish the question. No data

Page 309

1  published on that defect showing an elevated risk
2  for that defect?
3  **A.      And are you also considering a -- that**
4  **there would have been an analysis of the -- of a**
5  **subcategory in which that defect was contained, or**
6  **are you just talking about that specific defect?**
7  Q.      That specific defect.
8  **A.      I don't know. I can't answer that.**
9  Q.      Okay. Let's look at your last category in
10  paragraph 118(d) of your general report. It's what
11  you call ventricular outflow tract obstructions. Do
12  you see that?
13  **A.      Yes.**
14  Q.      And you group together LVOT and RVOT
15  defects together, right?
16  **A.      Right.**
17  Q.      Can you give me a reference or a citation
18  to any peer-reviewed published article that combines
19  those defects for the purpose of shared mechanism or
20  being embryologically developmentally small enough
21  to group together?
22  **A.      No. As a matter of fact, I know that there**
23  **was one reference that I saw where they were --**
24  **where they were grouped like that, but they should**
25  **be split, and in further and later versions of this**

78 (Pages 306 to 309)

Page 310

1    report, I split this out from LVO and RVO.
2    Q.     Okay.  So, that's -- that's -- you would
3    rather eliminate section 118(d) from your report?
4    A.     Well, no, it's not a matter of eliminate,
5    but I did clarify in later versions LVO and RVO.
6    Q.     Well, we can only deal with what we have in
7    this case.  And you have it presently in paragraph
8    118(d).  Do any of the studies --
9    A.     Well, we can go back and look at the
10   individual studies which will study LVO and right
11   ventricular outflow tract obstruction.
12   Q.     So, are you saying that that section 118(d)
13   is not informative for your opinion in this case, at
14   least the way it's configured in 118(d) currently?
15   A.     Right.  I changed it in later versions of
16   the report.
17   Q.     And so, we shouldn't be looking at the risk
18   range you provide for what you say are ventricular
19   outflow tract obstruction defects, correct?
20   A.     No, it would be more informative to go back
21   and look at the individual risk ranges for LVOTO.
22   Q.     Okay.  So, we can skip that.  Is it your
23   understanding that Dr. Abdulla thinks you can
24   extrapolate from RVOTO defects to coarctation of the
25   aorta?

Page 311

1    A.     From RVO?
2    Q.     Yes.
3    A.     I don't believe so.  But I don't know for
4    sure.  I don't think so.
5    Q.     All right.  So, now I think we won't look
6    at 118(d), but instead let's look at, in your
7    specific report, let's look at Table 1.
8    A.     What page is that?
9    Q.     Page 14.
10   A.     Page 14?  Oh, specific report, I'm sorry.
11   Q.     Your specific report, Table 1.  Okay.
12   Exhibit 35.  That's the Alwan study.
13         Now, you say here that in Table 1, you show
14   the ICD9 codes for Isabelle's defects, correct?
15   A.     That's correct.
16   Q.     And you come up with two codes, 745.4 for
17   ventricular septal defect, and 747.1 for coarctation
18   of the aorta, right?
19   A.     That's correct.
20   Q.     And you treat, at least in Table 1, these
21   two defects as if they are separate and unrelated,
22   correct?
23   A.     For the purposes of the odds ratios, that's
24   how they were reported in these papers, that's
25   correct.

Page 312

1    Q.     Okay.  Well, let's look again at the Slone
2    categorization system which we've been going back
3    to.  Do you see under left ventricular outflow tract
4    obstructions they list coarctation of the aorta?  Do
5    you see that?
6    A.     Yes.
7    Q.     And they list the coarctation of the aorta
8    with VSD as an LVOTO defect?
9    A.     Correct.
10   Q.     They treat it as one defect.  Is that a
11   yes?
12   A.     Yes.
13   Q.     Okay.  They didn't categorize Isabelle as a
14   coarctation of the aorta and then a separate VSD,
15   correct?
16   A.     According to this, that's correct.
17   Q.     All right.  So, Isabelle didn't have an
18   isolated VSD, did she?
19   A.     No, she didn't.
20   Q.     Okay.  Let's get Exhibit 39.
21         Are you aware that the Alwan study used the
22   NBDPS Abstractor guideline for the categorization of
23   their defects?
24   A.     Yes.
25   Q.     Okay.  And I'm going to give you a copy of

Page 313

1    the abstractor guidelines.  It's Exhibit 39.  You
2    know what, it might be easier to use Exhibit 30.  It
3    might be faster.  That's the Botto article itself.
4         MR. SHEEHAN:  Do you want to take 39
5    back?
6         MS. HALPERN:  No, that's okay.  We'll
7    come back to it.  Just Exhibit 30.
8    Q.     Okay.  If you turn to page 717 of the Botto
9    article, which is the NBDPS classification scheme,
10   and ask you to look at the category LVOTO, and
11   coarctation with a VSD is included in LVOTO,
12   correct?
13   A.     I just need to find it.
14   Q.     It's on the left-hand side, VSD, non-inlet,
15   plus coarctation of the aorta.  It goes up to
16   coarctation and over to LVOTO.  Do you see that?  If
17   you go to the -- it's the third, sixth row down,
18   C-O-A -- I'm sorry, seventh one down, VSD
19   non-inlet --
20   A.     Am I on the right --
21         MR. FOX:  Oh, yeah, it's over here.
22   It's the right-hand side.
23   A.     So, it's in the wrong --
24   Q.     I'm sorry.  Okay.  I misspoke.  VSD.  Do you
25   see that, coarctation?

Page 314

1   A.      All right.  I see it, yes.
2   Q.      So, in fact, coarctation with any VSD is
3   also listed as an LVOTO, correct?
4   A.      That's correct.
5   Q.      All right.  You list two other studies in
6   your Table 1 that you claim to provide an associated
7   risk relevant to coarctation of the aorta in
8   addition to Alwan and Louik, correct?
9   A.      That's correct.
10  Q.      You list Davis and Kallen.  Okay.  Let's
11  start with Alwan, which is Exhibit 35.  Turning to
12  the supplemental Table 3, which we've been looking
13  at repeatedly here.  Here it is, okay.  There are
14  separate and distinct odds ratios as we've already
15  noted for LVOTO and RVOTO, correct?
16  A.      Are you referring to this?
17  Q.      Yes, LVOTO and RVOTO are separate
18  categories.
19  A.      Okay.  Yes.
20  Q.      I'm sorry.  I'm confusing myself.  We're
21  looking at Alwan now, Exhibit 35, the Alwan study.
22  And if you turn to the supplementary table -- that's
23  the wrong one.  That's confusing me.  I need the
24  supplementary table, which is 37.  Sorry.
25          So, I'm going to show you Exhibit 37, which

Page 315

1   is the supplementary table to the Alwan study.  Are
2   you familiar with that?
3   A.      Yes.
4   Q.      Okay.  And I'm going to ask you to look at
5   Table 3.  Okay.  And could you tell me what the odds
6   ratio is for Paxil and left ventricular outflow
7   tract obstruction?
8   A.      It's 1.3.
9   Q.      Right.  With a lower bound of 0.4 and an
10  upper bound of 3.8, correct?
11  A.      That's correct.
12  Q.      Okay.  And could you tell me if that
13  finding is statistically significant?
14  A.      No, it is not.
15  Q.      Okay.  And can you describe for us what a
16  lower bound of 0.4 means?
17  A.      It means that the lowest plausible value,
18  given a 95 percent confidence interval, would be an
19  odds ratio of 0.4, which would mean that Paxil would
20  cause less LVOTO --
21  Q.      In 60 percent of the time?
22  A.      -- in 60 percent of the time compared to
23  controls.
24  Q.      Okay.  So, it could range from being
25  potentially 60 percent protective to being

Page 316

1   significantly increased?
2   A.      Correct, according to these 95 percent
3   confidence intervals.
4   Q.      Now, in your opinion, does an odds ratio of
5   1.3 with a confidence interval that spans 0.4 to 3.8
6   establish an association between Paxil and LVOTO
7   defects?
8   A.      In isolation, by itself, with no other
9   data, I would not, but this is -- this, I did not do
10  a causation analysis in isolation with one data
11  point.
12  Q.      Well, let's look at how you categorized
13  that type of data when you were writing in the
14  peer-reviewed published literature.  Okay?
15          Can I have Exhibit 123?
16          I'm going to show you an article you wrote,
17  and on page 128 --
18          MR. FOX:  Do you have another copy?
19          MS. HALPERN:  Yes.  I think this is
20  it.
21  A.      That's the wrong page.
22  Q.      Page 778, sorry.  On page 778, left column,
23  second full paragraph -- well, first of all, let me
24  ask, is this an article that you are a coauthor of?
25  A.      Yes.

Page 317

1   Q.      Okay.  It says, "Spitz and Johnson observed
2   an association with job cluster 7 and with
3   occupations with potential EMF exposure, especially
4   workers in electronics.  We found no associations
5   for these groupings."  Do you see that?
6   A.      Yes.
7   Q.      Okay.  And you cite to Table 2.  So, let's
8   look to Table 2.  You, in fact, reported no
9   association, an odds ratio of 1.3 with a lower bound
10  of .4 and an upper bound of 4.1, correct?
11  A.      Correct.
12  Q.      You even said there was no association per
13  an odds ratio of 1.6 with a lower bound of 0.5,
14  true?
15  A.      Let me just take a look at this.
16          Okay.  Go ahead.
17  Q.      So, there you were saying an odds ratio of
18  1.3 with a lower bound of .4 was not an association
19  for the purpose of a single study, correct?
20  A.      Well, that's what the -- that's what this
21  article says about this finding.
22  Q.      Okay.  So, the Alwan study collected data
23  specifically on coarctation of the aorta, didn't it?
24  A.      Yes, it did.
25  Q.      And if you go back to Table 2 in the actual

80 (Pages 314 to 317)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 318

1  article, not the supplement now, which is exhibit --
2  **A.    Can you repeat that question?  The Alwan**
3  **study did what?**
4  Q.    Actually collected data on coarctation of
5  the aorta specifically.  Do you have the Alwan study
6  in front of you?
7  **A.    Yes, yes.**
8  Q.    I'll show you.
9  **A.    Okay.**
10  Q.    It's Exhibit 35, and if you would turn to
11  Table 2 on page 2690.
12  **A.    Okay.**
13  Q.    And in -- if you look down the left-hand
14  column under left ventricular outflow tract
15  obstructions, there is a sub-analysis for
16  coarctation of the aorta.  Do you see that?
17  **A.    Yes, I do.**
18  Q.    And they looked at it for all SSRIs,
19  correct?
20  **A.    That's correct.**
21  Q.    And there's an adjusted odds ratio there of
22  0.8 with a lower bound of 0.3 to an upper bound of
23  2.0, correct?
24  **A.    Correct.**
25  Q.    All right.  In fact, there was no

Page 319

1  association.  If anything, it went in a protective
2  direction between SSRIs generally and coarctation of
3  the aorta, correct?
4  **A.    For this one finding, that's correct.**
5  Q.    Well, do you know of any other finding
6  anywhere in the peer-reviewed literature that looked
7  specifically at coarctation of the aorta with
8  anything, all SSRIs or any particular SSRI?
9  **A.    And specifically split it out, I don't**
10  **believe so.**
11  Q.    This is the only one as far as I know.
12  **A.    I think that's true.**
13  Q.    And it's going in a protective direction,
14  correct?
15  **A.    This one finding, that's correct.**
16  Q.    Now --
17  **A.    Now, understand, there are seven exposed**
18  **people in this study.  It's a very, very**
19  **underpowered --**
20  Q.    In this subcategory?
21  **A.    In this subcategory, seven exposed, that's**
22  **correct.**
23  Q.    So, you're saying seven is not enough?
24  **A.    Well, it's very -- it's a very small**
25  **number.**

Page 320

1  Q.    And when it's a small number like that, the
2  data could be fragile, correct?
3  **A.    They could be.**
4  Q.    And in fact, the authors performed over 265
5  tests and made no adjustment for multiple
6  comparisons, true?
7  **A.    That's true.**
8  Q.    So, some of which, maybe 14 or 15 percent,
9  could be expected to have been due to chance alone?
10  **A.    No, I don't agree with that.**
11  Q.    So, you reject the notion of multiple
12  comparisons?
13  **A.    I reject the notion of having to adjust for**
14  **multiple comparisons, that's correct.  I'm not the**
15  **only one.  There's literature on that.  And one**
16  **of the GSK-funded Centers for Excellence directors has**
17  **published on that issue and agrees with me.**
18  Q.    Okay.
19  **A.    As a matter of fact, none of the articles**
20  **adjusted for multiple comparisons, not one.  And I**
21  **haven't read an article that adjusted for multiple**
22  **comparisons in many years.**
23  Q.    Exhibit 132.  Is that the one we just had?
24  No.
25        MR. SHEEHAN:  No.

Page 321

1        MS. HALPERN:  Let's get Exhibit 132.
2  Q.    This is an article authored by you, Dr.
3  Kramer, correct?
4  **A.    That's right.**
5  Q.    Gestational Risk Factors for Wilms' Tumor:
6  Results of a Case-Control Study?
7  **A.    That's correct.**
8  Q.    And if you turn to page 2976, left-hand
9  column, at the top it says, "Because of the largely
10  exploratory nature of the study, many case-control
11  comparisons were made.  In addition to the
12  hypothesized risk factors, approximately 40 other
13  factors were analyzed.  About two odds ratios
14  significantly different from 1 may have occurred by
15  chance; five such odds ratios were observed.  In
16  light of the multiple comparisons issue, the true
17  significance of the findings from the exploratory
18  analyses is unknown."  You wrote that?
19  **A.    Yes, I wrote that.  I wrote that in 1987.**
20  Q.    Okay.  So, you're telling me that's no
21  longer your opinion?
22  **A.    That's correct.**
23  Q.    Okay.  And in another article, Exhibit 131,
24  you wrote the same thing.  Page 726, left column,
25  first paragraph.  726, left column, first paragraph.

81 (Pages 318 to 321)

Page 322

1    It says, "As multiple comparisons produce
2    significant associations by chance, this report
3    presents the number of analyses performed and
4    significant associations observed."  Do you no
5    longer believe that multiple comparisons can produce
6    significant associations by chance?
7    **A.      Can you just wait a minute?  I just want to**
8    **read this paragraph.**
9    Q.      That's a simple question.  That has nothing
10   to do with the article.
11   **A.      Well, if you give me an article with a**
12   **quote, I do reserve the right to read it.**
13   Q.      My only question has nothing to do with the
14   article really.  Are multiple comparisons, do they
15   produce significant associations by chance?
16   **A.      No.**
17   Q.      You believe --
18   **A.      I don't -- right, and I have actually**
19   **literature here that's published by some of the, you**
20   **know, best known and highly respected**
21   **biostatisticians in the country, Ken Rothman,**
22   **Charles Poole, who is a GSK funded investigator,**
23   **investigator at UNC and others, David Savitz, and**
24   **others, who have all written that it is not**
25   **necessary to adjust for multiple comparisons, and**

Page 323

1    **the justification for that is very clearly laid out**
2    **in that binder.**
3    Q.      I'm not asking you about adjustment.  I'm
4    asking you if multiple comparisons produce
5    significant associations by chance?
6    **A.      In general, no, in these instances.  And**
7    **the rationale for that, the justification for that**
8    **statement is clearly laid out in the articles that I**
9    **brought.**
10   Q.      Okay.  And those are articles you reference
11   in your report?
12   **A.      I'm not sure if they're referenced in my**
13   **report.  They may be.**
14   Q.      You state up front in your general report
15   that there are general methodological issues that
16   are of concern in the Alwan study.  It's in
17   paragraph 95, the first sentence.  And one of the
18   problems you note is potential recall bias; is that
19   right?  Do you see that?
20   **A.      Yes, I see that statement.**
21   Q.      Okay.  Do you still agree with that
22   statement?
23   **A.      Well, I'd like to look at the Alwan study**
24   **and I'd like to have a chance to comment on this.**
25   Q.      Right now I just asked you if that's what

Page 324

1    you wrote in your general report?
2    **A.      Well, it is.  I agree that I wrote that.**
3    **But if you want me to comment on it --**
4    Q.      Well, you have to wait to hear the
5    question.
6    **A.      Okay.**
7    Q.      Did you write that paragraph?
8    **A.      Yes, I did.**
9    Q.      All right.  One of the problems you note is
10   potential recall bias, right?
11   **A.      Yes.**
12   Q.      And would you agree with me that recall
13   bias, if it occurs, can serve to cause an
14   overestimation of risk?
15   **A.      Only if it's differential.  If it's --**
16   Q.      Of course.  That's what makes it bias.
17   **A.      Right, right.**
18   Q.      So --
19   **A.      So, if there is evidence of recall bias and**
20   **it's shown to be a differential -- well, not**
21   **necessarily, that's true, but -- so, the answer is**
22   **potentially, yes.**
23   Q.      Okay.  So that if data here were fragile in
24   our case either way, it could make a difference, one
25   case either way could make a difference, recall bias

Page 325

1    could potentially be a serious flaw?
2    **A.      Potentially.**
3    Q.      Okay.  And would you also agree that bias
4    by indication or bias due to underlying depression
5    was not controlled for in this study?
6    **A.      Again, I'd have to look at the particulars**
7    **of this study.  I know that bias by indication was**
8    **controlled for in many of the studies, and were**
9    **shown not to be an issue because of the inclusion of**
10   **either depressed women or women on other**
11   **antidepressants or other SSRIs in their reference**
12   **groups.**
13   Q.      Okay.  And the controls in this particular
14   study were largely, mostly not women on other
15   antidepressants, true?
16   **A.      That's true.**
17   Q.      Okay.
18   **A.      But I believe the study did discuss this**
19   **issue and I think went through a discussion of how**
20   **it might have impacted or not impacted the results.**
21   **So, if you want me to comment on that --**
22   Q.      Sure.  Well, why don't you look at page
23   2691, the left-hand column.
24   **A.      Okay.**
25   Q.      All right.  The left-hand column, it says,

USDC, Northern District of OK                McMurray v. GSK                                Monday
No. 08-CV-381-GKF-SAJ            Videotape Deposition of Shira Kramer, Ph.D.        November 2, 2009

Page 326

1  "An important limitation," do you see this?
2  A.    Yes.
3  Q.    "An important limitation of this study is
4  our inability to separate the effect of maternal
5  SSRI use from that of the underlying depression."
6  Do you see that?
7  A.    Yes, I do.
8  Q.    So, they did comment on that.  So, do you
9  agree controlling for psychiatric disorders is
10 important in birth defect research?
11 A.    Well, and it was done, yes.  It was done in
12 other -- in other studies.
13 Q.    I'm talking about Alwan.  They're saying
14 that it was an important limitation of their study.
15 A.    In their opinion, that's what they're
16 saying.
17 Q.    And did you look to see what the response
18 rate is in this study?  Would that be important to
19 you, by the way, what the response rate is?
20 A.    Possibly, possibly.
21 Q.    What would you consider an optimal response
22 rate, I mean, as an epidemiologist in any study?
23 A.    Well, response rates really vary by study
24 design, and response rates have gone down over time
25 So, many of these studies had non-response rates

Page 327

1  that were significant, but were not shown to cause
2  any kind of demonstrable bias, and they were
3  analyses that looked at all kinds of factors that
4  would indicate this kind of bias.  So, if you want
5  me to comment on that for this study, we can do
6  that.
7  Q.    Do you know what the response rate was in
8  this study?
9  A.    We can find it.  I don't remember from
10 memory.
11 Q.    Do you know if it was demonstrably low?
12 A.    Well, the participation rates among case
13 and control mothers were 71.1 percent and 68.6
14 percent respectively, which actually in modern times
15 is a very respectable response rate given this type
16 of interview study.
17 Q.    Let's look back at the Louik study now.
18 Let me see if I can find it here.
19        Do you see it in your pile?  Is this it
20 right here or is that Alwan?
21        MR. FOX:  That's Alwan.
22        MS. HALPERN:  They look a lot alike.
23 Here's the supplement.
24        Do you have another one there, Tom?
25        MR. SHEEHAN:  What exhibit was it, do

Page 328

1  you recall?
2        MS. HALPERN:  Louik is Exhibit 33.
3  Q.    Looking back at your Table 1 in your
4  specific report, we've already discussed Alwan and
5  the odds ratio of 1.3.  Now I'm turning my attention
6  to the Louik entry that you have under coarctation
7  of the aorta for left ventricular outflow tract.  Do
8  you see that?
9  A.    Yes.
10 Q.    Okay.  And the Louik study reported a
11 finding for LVOTO of 0.5 with a lower bound of 0.1
12 and an upper bound of 3.9, correct?
13 A.    That's correct.
14 Q.    All right.  Can you tell me what a relative
15 risk of an odds ratio of 0.5 means?
16 A.    That means that the risk among exposed is
17 50 percent lower than among the control group.
18 Q.    So, as opposed to being an increased risk,
19 it's a protective effect?
20 A.    That's correct.
21 Q.    All right.  Do you agree that if an odds
22 ratio or relative risk is less than 1, the risk in
23 exposed individuals is less than the risk in the
24 unexposed people?
25 A.    In that particular study, yes.

Page 329

1  Q.    Okay.  So, if a study of Paxil and birth
2  defects yielded a relative risk of 0.5, it could
3  mean that the risk of taking Paxil and having a baby
4  with a birth defect was actually lower than for
5  people who didn't take Paxil?
6  A.    Well, in isolation I would never draw that
7  conclusion, especially since this relative risk of
8  0.5 was based on one case subject in that category.
9  Q.    All right.  But I'm just asking you
10 generally.
11 A.    Well, you're asking me a causation
12 question.
13 Q.    No, I didn't.  I asked you what a relative
14 risk of 0.5 could mean.  That's all.
15 A.    Well, from this one study, all it means is
16 in this study, under the circumstances of this
17 study, given that sample size, that's the result,
18 but I wouldn't extrapolate that beyond one study.
19 Q.    And it's what's called a negative
20 association, which could reflect a protective or
21 curative effect of the agent on a risk of disease,
22 true?
23 A.    Potentially.
24 Q.    Okay.  And an odds ratio of 0.5 means that
25 mothers whose children had LVOTO defects were 50

83 (Pages 326 to 329)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 330

1  percent less likely to have taken Paxil, right?
2  That's just straight up what it means?
3  **A.    Well, again, in this study, there was**
4  **actually one case subject. So, when you say**
5  **mothers, I think it's one person.**
6  Q.    Okay. Now, let's look at the confidence
7  interval. What does it mean if the lower bound of
8  the confidence interval, as it is here, is 0.1?
9  **A.    It means that the individuals who were in**
10 **the -- in the case group were -- had a lower risk of**
11 **disease compared to -- had a lower risk of exposure,**
12 **actually, compared to the control group.**
13 Q.    The authors of this article defined an
14 association as a risk estimate that had a lower
15 bound that exceeded 1. In other words, they only
16 considered an association something that was
17 statistically significant, correct?
18 **A.    That's correct.**
19 Q.    And Louik specifically looked at the group
20 of cardiac defects, which we've just looked at, to
21 which coarctation of the aorta belongs, right, LVOTO
22 defects?
23 **A.    Correct.**
24 Q.    He looked specifically. And I notice that
25 you did not include the LVOTO findings in your

Page 332

1  Q.    So, Doctor, you have two odds ratios here
2  for LVOTO, and only two, correct, Alwan and Louik,
3  in Table 3 -- in Table 1, sorry, correct?
4  **A.    In Table 1?**
5  Q.    Yes. For coarctation of the aorta --
6  **A.    That's correct.**
7  Q.    -- you have four studies, but only two
8  looked at LVOTO?
9  **A.    Right, one of them from Alwan and one of**
10 **them from Louik, that's correct.**
11 Q.    And you left out the data on all SSRIs and
12 coarctation of the aorta, correct?
13 **A.    We didn't look at all SSRIs. We didn't**
14 **consider that in -- I didn't look at that in my**
15 **review.**
16 Q.    So, you found it non-informative to see
17 what data there was on all SSRIs and cardiac defect
18 to draw your conclusion about Paxil and a cardiac
19 defect?
20 **A.    We -- right. I did not review all of the**
21 **literature on all SSRIs and cardiac congenital**
22 **malformations. I confined my review to Paxil.**
23 Q.    Okay. So, let me see if I understand your
24 analysis of coarctation of the aorta. You looked at
25 data on LVOTO, correct?

Page 331

1  discussion of Louik in paragraphs 96 and 97 of your
2  general report. You excluded that data.
3  **A.    Well, it's listed in the table. It's not**
4  **that we excluded them from our report. We certainly**
5  **didn't hide it and it is included in the report and**
6  **in the table.**
7  Q.    Only in the specific report, not in the
8  general report, correct?
9  **A.    I'd have to go back to the general report.**
10 Q.    And you don't mention LVOTO data in
11 paragraph 11 of your specific report where you talk
12 about the Louik study. You only mention it in this
13 table, correct?
14 **A.    Well, what I say here is that -- I say**
15 **LVO -- we talk about LVO and the various categories**
16 **that Louik looked at. Let me just make sure I'm on**
17 **the right paragraph. Yes.**
18       **And we say, Isabelle McMurray's -- we talk**
19 **about VSD, and then we say is included in the LVO**
20 **obstruction category, the odds ratios for the**
21 **association of maternal use of paroxetine during the**
22 **first trimester of pregnancy in these two cardiac**
23 **defect categories, which are the septal defects and**
24 **the LVO, were not elevated. So, we did mention**
25 **that.**

Page 333

1  **A.    Well, I looked at data on all cardiac**
2  **malformations.**
3  Q.    Right.
4  **A.    On LVOTO.**
5  Q.    Right.
6  **A.    And on the way Dr. Abdulla categorized it,**
7  **which is conotruncal defects.**
8  Q.    All right. So, let's look on your table to
9  the next one you have, which is -- well, let me ask
10 you this: Do you think that the data on all cardiac
11 defects shares the same rate of error when you
12 extrapolate your findings to coarctation of the
13 aorta as extrapolating from LVOTO defects to
14 coarctation of the aorta?
15 **A.    I didn't quantify any error rate to you. I**
16 **told you I could not do that.**
17 Q.    So, is it fair to say there's only one
18 study on coarctation of the aorta, and that's with
19 all SSRIs?
20 **A.    Well, I wouldn't -- no.**
21 Q.    Specifically on coarctation of the aorta?
22 **A.    Just that reports an odds ratio for**
23 **coarctation of the aorta alone, that's the only one**
24 **I'm aware of.**
25 Q.    Yes. Okay. And you have one study with

84 (Pages 330 to 333)

USDC, Northern District of OK                    McMurray v. GSK                                Monday
No. 08-CV-381-GKF-SAJ          Videotape Deposition of Shira Kramer, Ph.D.          November 2, 2009

Page 334

1   LVOTO with a non-statistically significant finding,
2   correct?
3   **A.      That's true.**
4   Q.     And there's one study with a
5   non-statistically decreased risk?
6   **A.      They're both non-statistically significant,**
7   **that's correct.**
8   Q.     Okay.  And you have -- the only data
9   specific for coarctation of the aorta is the one
10  studies is the one we just said about all SSRIs
11  combined, but that also goes in a protective
12  direction.  You just mentioned it.
13  **A.      Okay.**
14  Q.     Okay.  Do you know of any other finding on
15  Paxil and coarctation of the aorta or Paxil and
16  LVOTO, anything at all?
17  **A.      Well, I reviewed the studies in this -- in**
18  **this report that deal with Paxil and all cardiac**
19  **malformations as well as LVOTO and other**
20  **subgroupings as those studies examined them, and**
21  **that's all, that's really all that there is in the**
22  **literature, and they're all reviewed in this report.**
23  Q.     Okay.  Are you aware that there are other
24  huge studies that found no association for
25  coarctation of the aorta or LVOTO because there were

Page 335

1   no Paxil-exposed cases?
2   **A.      In -- in --**
3   Q.     In all of Sweden, for example, in all of
4   Denmark.
5   **A.      Okay.  So, why don't we pull up those**
6   **studies and we can comment on them.**
7   Q.     Okay.  We can do that.
8   **A.      I mean, you're calling them huge, and I**
9   **would take issue with that.  So, I think we need to**
10  **look at them specifically.**
11  Q.     So, you don't think the Kallen study which
12  looked at all the babies born in Sweden is a huge
13  study?
14  **A.      Well, I'd like to pull out my sample size**
15  **and power calculations and explain to you why these**
16  **studies are not as huge as you're describing.**
17  Q.     Okay.  Fine.  We'll get back to it.  Okay?
18      In paragraph 6 of your specific report you
19  state that Isabelle's cardiac defects are consistent
20  with defects reported in the epidemiologic
21  literature with Paxil, right?  That's what you say.
22  **A.      That's correct.**
23  Q.     Okay.  Okay.  Can we get Exhibit 57,
24  please?
25      And I'm turning your attention now to the

Page 336

1   entry about the Davis study.  That's one of your
2   four studies on coarctation of the aorta in Table 1,
3   correct?  Do you see that?  You say other congenital
4   anomalies of circulatory system relative risk 1.58?
5   **A.      Where are you now?**
6   Q.     Okay.  In Table 1, Dr. Kramer, you have a
7   section on Isabelle McMurray's defect coarctation of
8   the aorta, correct?
9   **A.      Uh-huh, yes.**
10  Q.     And you cite four data points from four
11  studies.
12  **A.      That's correct.**
13  Q.     Okay.  And we've already talked about Alwan
14  and we've already talked about Louik.
15  **A.      Uh-huh.**
16  Q.     Now let's look at Davis.  Okay?  And it's
17  Exhibit 57.
18      MR. SHEEHAN:  And Davis is already out
19  there, by the way.
20  Q.     Okay.
21  **A.      Let's pull that.**
22  Q.     Well, you can use this one.  It will be
23  faster.  And there you're referring to the ICD9
24  grouping of other congenital anomalies of the
25  circulatory system as a group, right?

Page 337

1   **A.      That's correct.**
2   Q.     That's the data you're relying on?
3   **A.      That's the category that I believe we**
4   **matched to the study.**
5   Q.     Okay.  And on the conclusions in the
6   abstract of the Davis paper which you're holding in
7   your hand, Exhibit 57, the authors start off by
8   noting that paroxetine exposure was not linked with
9   an increased risk of cardiovascular anomalies,
10  although our study powered to detect a moderate
11  increased risk was limited, true?
12  **A.      That's what the study -- that's what the**
13  **authors say.**
14  Q.     And they state that due to funding
15  limitations and the screening nature of the
16  analysis, their assessment of outcomes was limited
17  to assigned ICD9 codes?
18  **A.      And that's -- you find that in the body of**
19  **their paper?**
20  Q.     Page 3, left column, first sentence of the
21  second paragraph under outcome assessment.
22  **A.      Page -- okay.  Right.  Right.  Okay.**
23  Q.     Now, the data you cite in Table 1 that you
24  believe is relevant for Isabelle McMurray's
25  coarctation of the aorta is an odds ratio of 1.58

85 (Pages 334 to 337)

Page 338

1  with a lower bound of 0.39 and an upper bound of
2  6.39.
3  A.    That's correct.
4  Q.    And can you tell us what a lower bound of
5  .39 means?
6  A.    Again, that's a -- that indicates a lower
7  relative risk of disease among exposed individuals
8  compared to unexposed.
9  Q.    And how low is it?
10  A.    That's approximately 60 percent lower.
11  Q.    Okay.  I'm looking for the ICD9 coding.  Do
12  you still have that there?
13       And how many cases, is it, Dr. Kramer, for
14  the odds ratio of 1.58, can you tell?
15  A.    I'm going to have to find it.
16  Q.    It's Exhibit 42.
17       MR. FOX:  Here it is.
18  Q.    All right.  So, there are two cases that
19  might have been given the ICD9 code for the odds
20  ratio you are citing here in Table 1, correct?
21  A.    Two exposed cases, that's correct.
22  Q.    Correct.  Okay.  And they're using ICD9
23  code 747, correct?
24  A.    747.1.
25  Q.    Right.  Okay.  So, let's look at the ICD9

Page 339

1  for 747.
2  A.    .1.
3  Q.    Well, did the authors use 747.1 or did the
4  authors use 747 for their analysis in Davis?
5  A.    Well, I'm going to have to look.
6  Q.    That's the issue, because if it's 747.1,
7  then this is data on coarctation of the aorta.  If
8  it's 747, it's other congenital anomalies of the
9  circulatory system.  Which is it?  You note it as
10  other congenital anomalies of the circulatory
11  system.
12  A.    Well, that's the name of the overarching
13  category.  So, I'm going to have to look.
14  Q.    So, that means --
15  A.    Well, I just have to see how they
16  categorized it.
17  Q.    Well, it's on the table, Doctor, where you
18  pulled out the odds ratio.
19  A.    I know that.
20  Q.    Okay.
21  A.    I just want to see something.  The ICD9
22  code is not on this table.
23  Q.    Well, Doctor, they say other congenital
24  anomalies of the circulatory system.  That's how you
25  found coarctation of the aorta.

Page 340

1  A.    Well, that's true.  That's how I matched it
2  up.
3  Q.    So, the coding, the data is not for
4  coarctation of the aorta.  It's for other congenital
5  anomalies of the circulatory system.
6  A.    No, that's the category, that's the only
7  category into which it could have gone.
8  Q.    Doctor, on the table that you're looking at
9  for odds ratio 1.58, what is it for?  What's the
10  category?
11  A.    Other congenital anomalies of the --
12  Q.    Yes, thank you.
13  A.    Excuse me.  Let me just -- let me find it.
14  Other -- where are we?  I'm lost.  Here.  Other
15  congenital anomalies of the circulatory system,
16  that's it.
17  Q.    Okay.  And they use the ICD9 code 747,
18  other congenital anomalies of the circulatory
19  system?
20  A.    That's right.  That's right.
21  Q.    All right.  And they found two cases,
22  correct?
23  A.    That's correct.
24  Q.    All right.  And there are over 20 different
25  possible types of birth defects that fall under 747,

Page 341

1  correct?
2  A.    That's correct.  Well, I don't know how
3  many, but there are a number of.
4  Q.    Well, let's take a look.  Why don't you
5  take a look at 747.  One of the defects that could
6  have been included in this odds ratio that you quote
7  for Isabelle's coarctation of the aorta is spinal
8  vessel anomaly.  That's not even a cardiac defect,
9  is it?
10  A.    Well, the 747 category includes, these are
11  congenital anomalies of the circulatory system.
12  Q.    Doctor, if you would just answer my
13  question.  Is one of the defects that could have
14  been included in this odds ratio that you quote for
15  Isabelle's coarctation of the aorta is spinal vessel
16  anomaly?
17  A.    Again, it's under other specified anomalies
18  of the circulatory system.  It is a circulatory
19  system anomaly.  I don't know specifically about
20  spinal vessel anomaly.
21  Q.    It's right there, Doctor?  Can't you find
22  it?
23  A.    I can see it.
24  Q.    It's 747.82.
25  A.    I can read.

USDC, Northern District of OK                                    McMurray v. GSK                                          Monday
No. 08-CV-381-GKF-SAJ                               Videotape Deposition of Shira Kramer, Ph.D.                  November 2, 2009

Page 342

1  Q.      Does that come within other congenital
2  anomalies of the circulatory system as reported in
3  Davis's study?
4  **A.      It's under the -- this 747 rubric in the**
5  **ICD9, that's correct.**
6  Q.      Okay.  So, this odds ratio could have
7  actually been generated by two cases of spinal
8  vessel anomaly.  I'm not saying it was, but it could
9  have been.
10  **A.      We don't know, we don't know.  Now --**
11  Q.      And that's not a cardiac defect, is it?
12  **A.      Well, I don't know.  All I know is it's a**
13  **circulatory defect because that's how the ICD9**
14  **categorizes it.**
15  Q.      Hold it.  You're telling me you don't know
16  if a spinal vessel anomaly is a heart defect or not?
17  **A.      Well, I have to just go by -- I'm not**
18  **really -- I'm not a doctor, and I'm not the one who**
19  **is the expert to tell you how this should be**
20  **categorized.  The ICD9 put it under other cardiac**
21  **anomaly -- other congenital anomalies of the**
22  **circulatory system.  That's where they placed it.**
23  Q.      Let me ask it again.  In Table 1 of your
24  specific report you list four pieces of information
25  about coarctation of the aorta, correct, in Table 1?

Page 343

1  **A.      Correct.**
2  Q.      One of them is this study by Davis,
3  correct?
4  **A.      That's correct.**
5  Q.      And it's an odds ratio of 1.58 with a lower
6  bound of 0.39 and an upper bound of 6 something,
7  correct?
8  **A.      Correct.**
9  Q.      And it comes from 747 category in the ICD9,
10  other congenital anomalies of the circulatory
11  system?
12  **A.      That's correct.**
13  Q.      And one of the defects that could have been
14  included in this odds ratio is lower limb vessel
15  anomaly, correct?
16  **A.      I -- I can't -- I really can't comment on**
17  **what spinal vessel anomaly is.**
18  Q.      I didn't ask you to, Doctor.  I asked you
19  if lower limb vessel anomaly, 747.64, is included
20  within other congenital anomalies of the circulatory
21  system?
22  **A.      Yes, it is.**
23  Q.      And that's not a cardiac defect, is it?
24  **A.      No, it is not.**
25  Q.      Okay.  It also could have been due to a

Page 344

1  finding of gastrointestinal vessel anomaly, true?
2  **A.      Well, you know, since you're asking me**
3  **about the way they categorized this, I'd like to**
4  **reserve the right to read this paper and to review**
5  **their discussion about their -- these larger**
6  **categories.**
7  Q.      Dr. Kramer, this is your table.  You're the
8  one who cited Davis.
9  **A.      I understand that, but I did not come up**
10  **with the way they categorized their -- their cardiac**
11  **defects.**
12  Q.      But in your report, you cited four pieces
13  of information and this is one of them.
14  **A.      That's correct.**
15  Q.      And I'm suggesting that this odds ratio may
16  not even be due to heart defects, and you can't
17  answer that.
18  **A.      Well, if you're going to ask me a question**
19  **like that, I need to read this paper to see what**
20  **commentary there is on any of their -- any of the**
21  **ICD9 categories that they used.**
22  Q.      Did you draft Table 1?
23  **A.      Yes, I did.**
24  Q.      Are you a careful epidemiologist?
25  **A.      Yes, I am.**

Page 345

1  Q.      And you put this odds ratio down for
2  coarctation of the aorta, correct?
3  **A.      Well, that's how this would have been**
4  **categorized in their paper.**
5  Q.      Yes.
6  **A.      That wasn't up to me.**
7  Q.      Absolutely.  And as you sit here today, you
8  don't even know if the odds ratio you reported could
9  relate to a heart defect, you don't know?
10  **A.      Oh, I can't say that.  I would not be**
11  **willing to say that to you.**
12  Q.      Well, you don't know?
13  **A.      I think it's -- you know, I can only say**
14  **that if you want me to comment on that, I need to**
15  **read this paper.**
16  Q.      So, you're sitting here and you don't know
17  if those two defects couldn't be a renal vessel
18  anomaly and an upper limb vessel anomaly and nothing
19  to do with the heart; you can't answer that?
20  **A.      Not until I read this paper, so I can't say**
21  **for sure.  I used their classification system.**
22  Q.      Okay.  Let's go to the fourth one.  Kallen,
23  which you wanted to take a look at earlier anyway.
24  That's the fourth piece of evidence you put down on
25  this table for coarctation of the aorta.

87 (Pages 342 to 345)

USDC, Northern District of OK                    McMurray v. GSK                                    Monday
No. 08-CV-381-GKF-SAJ          Videotape Deposition of Shira Kramer, Ph.D.             November 2, 2009

Page 346

1      Can we get out Exhibit 58?
2          Now, this is referred to as the Swedish
3  Medical Birth Registry, the SMBR study; is that
4  right?
5  **A.    Hold on. I'm not sure this is the same.**
6  Q.     You know what, that's a different one about
7  the same data.
8          Let's look at 56. I think this is the one
9  you are more familiar with. Correct?
10  **A.    That's correct.**
11  Q.     Okay. Let's look at the first -- well, for
12  relationship between the specific defect coarctation
13  of the aorta and Paxil, you list an odds ratio of
14  1.63 with a lower bound of 1.05, or after
15  exclusions, you list two other odds ratios.
16  **A.    Well, after adjustment for confounding**
17  **factors.**
18  Q.     Right. So, this is all the same data just
19  adjusted differently, correct? You have three odds
20  ratios listed here in Table 1, but it's all the same
21  data, just adjusted differently, correct?
22  **A.    It's adjusted for different factors, that's**
23  **correct.**
24  Q.     Okay. But it's not three different studies
25  and three different findings?

Page 347

1  **A.    That's true.**
2  Q.     It's one finding, okay. And this odds
3  ratio included every single possible type of cardiac
4  defect, correct?
5  **A.    Any cardiac defect, that's correct.**
6  Q.     And the authors write about this particular
7  odds ratio on page 307, left column, fourth
8  paragraph down.
9  **A.    Okay.**
10  Q.     "When the analysis was restricted to
11  cardiac defects, the pattern changed markedly. A
12  significantly increased risk was seen after
13  paroxetine use, but not after the use of any other
14  SSRI, and this difference is statistically
15  significant." Correct?
16  **A.    Correct.**
17  Q.     That's what you're relying on. "And it's
18  made up of an increased risk for ventricular and/or
19  atrial septal defects. There were few serious
20  cardiac defects after paroxetine exposure." Do you
21  do you have any reason to disagree with what the
22  authors write there?
23  **A.    What are you asking me about specifically?**
24  Q.     Well, that it was driven, made up of an
25  increased risk for ventricular and atrial septal

Page 348

1  defects and there were few serious cardiac defects
2  after paroxetine exposure.
3  **A.    Well, I understand that's what the authors**
4  **said. Go to Table 8. There were, of the 13 with**
5  **any cardiac defect, there were, eight of the 13 were**
6  **VSD and ASD, as you would expect because they are**
7  **the most prevalent types of cardiac defects;**
8  **however, there are five others which are not listed**
9  **here.**
10  Q.     Okay.
11  **A.    So that you would expect in a small sample**
12  **size, in a study like this, which has very limited**
13  **power, that the most prevalent cardiac defects would**
14  **be the ones that would be detected.**
15  Q.     Are you familiar with what Dr. Michael
16  Greene wrote in an editorial in the New England
17  Journal about Dr. Kallen's odds ratio of 1.6 that
18  we're talking about here?
19  **A.    I don't -- I don't recall whether I read**
20  **it. And also, I think we need to point out that**
21  **when Dr. Kallen adjusted for key confounding**
22  **factors, those odds ratios went up to 2.63 and 2.93.**
23  Q.     All right. And this is an editorial that
24  accompanied the publication of the Alwan and Louik
25  papers in the New England Journal. Are you familiar

Page 349

1  with that?
2  **A.    I don't recall reading this.**
3  Q.     Okay. In the right-hand column, he talks
4  about, "A large Swedish retrospective cohort study
5  of 6,481 women exposed to SSRIs in early pregnancy,"
6  and this is the Kallen study, "showed no increase in
7  risk for malformations overall after exposure to
8  SSRIs as a group, but showed that exposure to
9  paroxetine was associated with an increased risk of
10  cardiac malformations, 1.6 odds ratio, 95 percent
11  confidence interval, 1.05 to 2.53. Of note, women
12  in this study who were exposed to SSRIs differed in
13  several respects from women who were unexposed; they
14  were older, had higher body mass index, were more
15  likely to smoke and to use anticonvulsant agents,
16  neuroleptic agents, sedatives, and hypnotic agents
17  than the women who were not exposed. Moreover, the
18  authors performed many comparisons and acknowledged
19  that their finding might well have arisen by
20  chance." You disagree with that analysis, I take
21  it?
22  **A.    Well, I agree -- I disagree with the need**
23  **to adjust for multiple comparisons. I have also**
24  **noted that four of the major studies did adjust for**
25  **smoking, and what I might ask to do is see the notes**

88 (Pages 346 to 349)

USDC, Northern District of OK                McMurray v. GSK                              Monday
No. 08-CV-381-GKF-SAJ           Videotape Deposition of Shira Kramer, Ph.D.        November 2, 2009

Page 350

1   that I made on these studies myself, which would
2   help me bring out some of these points.  Where are
3   they?
4   Q.      I have no idea.
5   A.      Well, they were put on the table.  It's not
6   in there.  It's in my -- it's in my binder.
7   Q.      Well, let me ask my question.  You don't
8   list in Table 1 any data relevant to coarctation of
9   the aorta that comes from studies looking at
10  conotruncal defects, do you?
11  A.      In Table 1?
12  Q.      In Table 1.
13  A.      No.
14  Q.      And isn't that because there are no
15  published studies that have been conducted where
16  coarctation of the aorta has been included in the
17  category referred to as conotruncal defects, true?
18  A.      I believe that's true.
19  Q.      Okay.  And there's no published
20  peer-reviewed article that says coarctation of the
21  aorta should be grouped with conotruncal defects,
22  true?
23  A.      I can't speak to that.
24  Q.      Well, Alwan doesn't do it, correct?
25  A.      Well, Alwan doesn't do it, no.  But I can't

Page 351

1   speak -- you asked me a general question and I can't
2   say that that's true.
3   Q.      So, you just don't know if there's anything
4   in the peer-reviewed literature that groups
5   coarctation of the aorta and conotruncal defects?
6   A.      I know that Dr. Abdulla has that opinion
7   and that opinion must be based on something.
8   Q.      Okay.  But Alwan doesn't do it and Slone
9   doesn't do it, correct?
10  A.      That's correct.
11  Q.      All right.  And the National Birth Defect
12  Prevention Study, both those categories don't do it,
13  correct?
14  A.      That's correct.
15  Q.      And the Abstractors guidelines, the NBDPS
16  don't do that, do they?
17  A.      That's correct.
18  Q.      And the Baltimore-Washington Infant Study
19  doesn't do that, correct?
20  A.      I would assume so, although I can't speak
21  from memory.  I don't know.
22  Q.      Do you know Clark's categories of defects
23  that Dr. Barness puts in her book?
24  A.      I don't remember the details.
25  Q.      So, you don't know that they do that

Page 352

1   either?
2   A.      I don't recall.
3   Q.      The ICD9 code doesn't put coarctation under
4   conotruncal or even with conotruncal defects, does
5   it?
6   A.      That's correct.
7   Q.      All right.  Only Dr. Abdulla in his expert
8   report in this litigation does it, as far as you
9   know?
10  A.      I really couldn't speak to that.
11  Q.      You can't point to anything else?
12  A.      No, I can't.
13  Q.      Okay.  Do you know what the odds ratio
14  would be if Kallen had looked just at LVOTO defects
15  as Slone and Alwan had done?  Do you have any idea?
16  Did you try and calculate it?
17  A.      I don't recall.  I don't think so.  No.
18  And I don't even know if I could have.  I'm not
19  really sure.  I'd have to go back and look at that
20  paper.
21  Q.      Now, by signing the Kallen data, the SMBR
22  data, you've moved away from looking at the next
23  best data for coarctation, which would be the LVOTO
24  subgrouping, true?
25          MR. FOX:  Objection to form.

Page 353

1   Q.      Well, let me ask you that.
2   A.      I don't understand.
3   Q.      I don't think I have asked you that.  Would
4   you agree, in a perfect world, if you had enough
5   data to study Paxil and coarctation of the aorta,
6   you would have a study on Paxil and coarctation of
7   the aorta, that would be the best, if you could do
8   it?
9   A.      If you could do it and if you had enough
10  power and enough studies, that would certainly be
11  very informative.
12  Q.      That would be better than studying Paxil
13  and anything else to reach a conclusion --
14  A.      Well, it would be --
15  Q.      Let me finish the question.  It would be
16  better to study Paxil and coarctation of the aorta,
17  better than anything else, to reach a conclusion
18  about Paxil and its effect on coarctation of the
19  aorta, correct?
20  A.      If there were sufficient --
21          MR. FOX:  Objection to form.
22  A.      If there were a sufficient number and size
23  and power of studies to do that, that certainly
24  would be very informative.
25  Q.      Okay.  And if you couldn't do that and you

89 (Pages 350 to 353)

Page 354

1  needed more power, you would want to group it with
2  defects most similar to it in terms of its etiologic
3  and pathogenetic causal pathway, true?
4  A.     Well, that's again, I think that's a matter
5  of some significant debate as to how that's done.
6  Q.     Okay.  But assuming you could answer that
7  question, that would be the best way to go next,
8  right?
9  A.     That is one way, assuming that -- that
10  draws -- that makes certain assumptions that you
11  know how the actual agent that you're looking at, in
12  this case Paxil, would affect the development of
13  that organ.  So, that makes -- that makes --
14  Q.     True.
15  A.     Because there are various and differing
16  assumptions that underlie every single one of these
17  classification schemes.
18  Q.     Understood.  And there's a large literature
19  on how to classify cardiac birth defects for the
20  purpose of causation analysis, true?
21  A.     True, but again, they all have their
22  assumptions which may or may not apply to a specific
23  etiologic agent that you're looking at.
24  Q.     Okay.  But given a perfect world, if you
25  could find a group or that the experts in the

Page 355

1  country on embryology and physiology could agree on
2  were more pathogenetically related to coarctation of
3  the aorta, that would be the next best thing to
4  looking at coarctation alone?
5        MR. FOX:  Objection to form.
6  A.     Possibly.
7  Q.     Okay.  And the third step would be looking
8  at all defects lumped together.  That wouldn't be as
9  good, correct?
10  A.     Well --
11  Q.     It would be what you might have, but that
12  wouldn't be as good?
13  A.     Well, that's normally what is done.  That's
14  normally what is done.
15  Q.     I'm not debating with you whether it is or
16  it isn't.  I'm just saying, that's not as good as a
17  homogeneous grouping based on pathogenetically
18  similar defects?
19  A.     I think that since so often we don't
20  understand the mechanism and pathogenesis of these
21  outcomes associated with these factors, all of it is
22  important.  That's why we look at all of it.
23  Q.     Okay.
24  A.     Because all of these analyses and all of
25  these studies look at the larger category as well as

Page 356

1  other subcategories that are classified in various
2  ways.  And that's true in the birth defects
3  literature as well as the cancer literature, the
4  cardiovascular literature and so on.
5  Q.     Okay.  Would you agree that to draw
6  conclusions about whether Paxil can cause
7  coarctation of the aorta, studies generating data on
8  coarctation of the aorta itself or a subgroup of
9  defects thought to be mechanistically or
10  embryologically similar to coarctation of the aorta
11  is more meaningful and more scientifically reliable
12  than drawing conclusions from all cardiac defects
13  lumped together?
14  A.     That depends.  I can't give you a simple
15  yes or no answer to that.
16  Q.     You can't answer that question?
17  A.     I didn't say I can't answer.  I said that
18  would depend because there are so many different
19  considerations that go into and so many different
20  assumptions that go into the way these -- these
21  malformations are classified that -- and there is no
22  agreement and there is no standardization.  So
23  that --
24  Q.     Go ahead, finish.
25  A.     Well, do you want me to answer my

Page 357

1  question -- your question?
2  Q.     I sure would.
3  A.     Okay.  So, I -- my opinion is that it's not
4  a matter of better.  It's a matter of in addition
5  to.
6  Q.     So, in your mind, what subgroup is the best
7  subgroup to look at for coarctation of the aorta?
8  If you can't look at coarctation, what's your next
9  best subgroup?
10  A.     Well, I would look at, as they do, as these
11  studies do, the overall category of congenital
12  cardiac malformations, and then I would like at the
13  category of LVOTO, and if it's a appropriate,
14  according to other experts, that there are other
15  categories to look at where they believe, such as
16  Dr. Abdulla does, that coarctation of the aorta
17  belongs in the category of conotruncal defects, then
18  I think that's important, but that's not my
19  expertise.
20  Q.     Okay.  Fair enough.  Is it --
21        MS. HALPERN:  Oh, we've got to stop?
22  Okay.
23        THE VIDEOGRAPHER:  The time is now
24  4:09.  This concludes tape number 5 of the video
25  deposition of Dr. Shira Kramer.

90 (Pages 354 to 357)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 358

1     (Brief recess.)
2     THE VIDEOGRAPHER:  The time is now
3  4:18.  This begins tape number 6 of the video
4  deposition of Dr. Shira Kramer.
5  BY MS. HALPERN:
6     Q.     Dr. Kramer, would you agree there's no
7  statistically significant association in the
8  peer-reviewed literature for Paxil and coarctation
9  of the aorta?
10    A.     Specifically?
11    Q.     Yes.  There's no association for Paxil and
12  coarctation of the aorta specifically?
13    A.     Named specifically, no, that's correct.
14    Q.     And there is no statistically significant
15  association in the peer-reviewed literature for
16  Paxil and LVOTO defects, correct?
17    A.     That's correct, not statistically
18  significant.
19    Q.     Nor is there one statistically significant
20  association for Paxil and conotruncal defects?
21    A.     I'd have to look at that.
22    Q.     Nor is there a statistically significant
23  association for coarctation of the aorta and any
24  SSRI?  In fact, the only data, and we've already
25  discussed, goes in a protective direction?

Page 360

1  we already discussed, is 1.3 with a lower bound of
2  .4, correct?
3     A.     That's correct.
4     Q.     If the data related to Paxil and
5  coarctation of the aorta doesn't point to an
6  increased risk, and if the data on Paxil and LVOTO
7  data don't point to increased risk, can you
8  nevertheless conclude that Paxil causes coarctation
9  of the aorta based on all cardiac defects combined?
10    A.     Well, I think we need to break this
11  compound question up.
12    Q.     Okay.
13    A.     The first part of your question, the data
14  don't point to increased risk, I wouldn't agree.  I
15  think we have one study, the Alwan study, that does
16  have an elevated odds ratio.  The compelling -- for
17  left ventricular outflow tract obstruction.  The
18  compelling --
19    Q.     I'm sorry.  You're saying the odds ratio of
20  1.3 with the lower bound of .4, which in your
21  peer-reviewed article you said wasn't even an
22  association, is compelling evidence of an
23  association?
24    A.     In and of itself, I think I've already told
25  you that one data point in and of itself is not

Page 359

1     A.     I believe that's correct.
2     Q.     And there's no statistically significant
3  association for LVOTO and any SSRI?
4     A.     I can't answer that.
5     Q.     And there's no statistically significant
6  association for LVOTO and all SSRIs?
7     A.     Any or all?
8     Q.     Either way, either Prozac and sertraline
9  alone or all grouped together.
10    A.     I can't tell you off the top of my head.
11    Q.     Your conclusion about Paxil and coarctation
12  of the aorta is inconsistent with the only studies
13  that exist that looked at Paxil and LVOTO, correct?
14          MR. FOX:  Objection to form.
15    A.     I wouldn't agree with that.
16    Q.     You wouldn't agree with that?
17    A.     No.
18    Q.     And the data on LVOTOs specifically are two
19  studies, one going in an increased risk direction
20  and one going in a decreased risk direction,
21  correct?
22    A.     That's correct, with the caveat that the
23  odds ratio from the Louik study was based on one,
24  one exposed case.
25    Q.     And the odds ratio for the Alwan study, as

Page 361

1  sufficient to draw conclusions about causation, and
2  I did not do that in my weight of evidence analysis.
3  I look at all of the data.
4     Q.     So, the only other study on LVOTO goes in a
5  protective direction?
6     A.     Well, but I didn't just look at LVOTO.  As
7  you know, these studies were underpowered and did
8  not break out LVOTO, so that the data on LVOTO were
9  largely missing from most of these studies, and most
10 of them just analyzed the data for all cardiac
11 malformations together.  So, that is a body of
12 literature in that right there, and then there just
13 were, there were two other studies that looked at
14 LVOTO as specific subcategories, but most of them
15 did not.
16    Q.     Okay.  So, based on the epidemiologic data
17 that exists on Paxil and coarctation of the aorta,
18 and the only data could be from that one study that
19 looked at all SSRIs, and that doesn't point to an
20 increased risk, correct?
21    A.     That one study in and of itself would not
22 be sufficient.
23    Q.     Right.  And you only have one study that is
24 above your 1.1 for LVOTO and Paxil, correct?
25    A.     There is one study with one elevated risk,

91 (Pages 358 to 361)

USDC, Northern District of OK                                    McMurray v. GSK                                    Monday
No. 08-CV-381-GKF-SAJ                    Videotape Deposition of Shira Kramer, Ph.D.                    November 2, 2009

Page 362

1  odds ratio, and one study which had one exposed case
2  that had a decreased odds ratio.
3  Q.    Okay.  Is that data consistent, by the way?
4  A.    No.
5  Q.    Do those two studies -- that's not
6  consistent?
7  A.    Well, but, you know, I think you also have
8  to put it into context with -- in terms of what the
9  sample sizes are and what the power is, particularly
10  for the Louik data.
11  Q.    So, we have only one study which you said
12  isn't enough to assess causation.
13  A.    In of and itself.
14  Q.    That goes up.  And then to the extent
15  there's another study, even if it only has one odds
16  ratio -- I'm sorry, one exposed subject, it goes in
17  the other direction, and you agree that those two
18  studies are not consistent, correct?
19  A.    That's correct.
20  Q.    So, when you have inconsistent data
21  on Paxil and LVOTO, are you nonetheless willing to
22  conclude that Paxil can cause coarctation of the
23  aorta based on data from all cardiac defects
24  combined?
25  A.    Well, and not only that, I mean, we have,

Page 363

1  we have cited the Kallen, the Alwan and the Davis
2  studies that are all supportive of that conclusion.
3  Q.    The Alwan is one of the ones we already
4  talked about.  So, you're saying Alwan, which is
5  about all defects combined, you can't use that
6  because I'm asking you if you can rely on the data
7  that LVOTO to -- oh, sorry.  Okay.  So, I'm asking
8  about the data on Paxil and LVOTO and whether if
9  that is inconsistent data, you can still rely on
10  data from all cardiac defects combined to reach a
11  conclusion about Paxil and LVOTO?
12  A.    I think you can, yes.
13  Q.    Okay.  And what are you basing that
14  methodologic jump on?  Is there anything in the
15  scientific literature about cardiac birth defect
16  epidemiology that says, when you have inconsistent
17  data about a particular defect, you can rely on all
18  cardiac defects combined to draw a causal conclusion
19  about the inconsistent data?
20          MR. FOX:  Objection to form.
21  A.    Well, as I explained, there are -- the
22  studies that were done have been consistent in terms
23  of showing an increased risk of any cardiac defect.
24  Most of them do not break out the subclassifications
25  of cardiac defects.  We do have very strong

Page 364

1  biological plausibility and we have evidence from
2  the spectrum of individual defects that have been
3  reported, although since the studies are too
4  underpowered to generate enough cases of the rarer
5  defects to generate actual odds ratios and relative
6  risks for those categories, we still know that Paxil
7  is associated with a spectrum of cardiac defects,
8  and so I think that the convergence of all of that
9  information supports this causal conclusion.
10  Q.    Doctor, did I understand you earlier when
11  you said that if a particular cardiac defect was not
12  included in the analysis for all cardiac defects
13  combined, if they didn't include them, excluded it,
14  in fact, you wouldn't extrapolate from all cardiac
15  defects combined to that specific cardiac defect?
16  A.    No, I don't -- I don't understand your
17  question.
18  Q.    Okay.  I believe you testified earlier that
19  if the data from Louik on all cardiac defects
20  excluded say anomalous pulmonary venous return in
21  its grouping of all cardiac defects, let's just say
22  it did, that you would not extrapolate the data from
23  all cardiac defects combined to that particular
24  defect?
25  A.    I don't believe I said that.  And if I did,

Page 365

1  I didn't mean that.  If that's what you thought I
2  meant, I don't think I said that.
3  Q.    Okay.  I thought we were describing -- you
4  didn't have to have the defect occur, I think you
5  said that.
6  A.    Well, if they excluded it, for instance,
7  they excluded looping defects, that doesn't mean
8  that --
9  Q.    We're missing each other.  Let me try it
10  again.  I think what you said, and I want to be
11  corrected if I'm wrong, that they defined the 20,
12  30, 40 defects that they were going to include in
13  their analysis to assess all cardiac defects.  It
14  doesn't matter if it actually occurred or not, but
15  when they did their analysis of all cardiac defects
16  combined, they defined which defects would qualify
17  for inclusion.  Okay?
18  A.    Okay.
19  Q.    And if one of those defects, if a defect
20  was not included, it was excluded from the analysis,
21  the analysis didn't include that type of defect,
22  would you still extrapolate from all cardiac defects
23  combined in that study to a defect that had been
24  excluded in the definition, your inclusion criteria?
25  A.    But understand, in doing a causation

92 (Pages 362 to 365)

Page 366

1  analysis, you don't just concentrate on one study.
2  You look at all of the data from all of the studies.
3  Q.    Well, let's say it was excluded from all
4  the studies.
5  A.    Well, I don't -- if it was excluded from
6  all the studies?
7  Q.    Right.
8  A.    Well, it may not, it may not be
9  inappropriate to -- it may still be, let me put this
10  in the affirmative, it may still be appropriate to
11  extrapolate to all cardiac defects, depending
12  on what you --
13  Q.    Even if they weren't all included?
14  A.    Even if they weren't all included.
15  Q.    Okay.  All right.  So, let me ask you this:
16  Dr. Abdulla classifies this defect as a conotruncal
17  defect, correct?
18  A.    Correct.
19  Q.    All right.  And so, you said you were
20  looking at the data on conotruncal defects, correct?
21  A.    We cited that data, yes, I did.
22  Q.    And the data we're talking about is the
23  data from the Alwan and the Louik studies on
24  conotruncal defects, correct?  That's what you cite.
25  A.    Correct.

Page 367

1  Q.    Okay.  It's a fact, isn't it, that
2  coarctation of the aorta was excluded from any
3  analysis in Alwan or Louik on conotruncal defects,
4  excluded?
5  A.    I'd have to check that.
6  Q.    Well, it was included in LVOTO.  Are you
7  saying it was included in both?
8  A.    Okay.  Meaning that -- would you please
9  restate it.  I may have misunderstood.
10  Q.    Yes.  When Alwan did its analysis of
11  conotruncal defects and ended up with an odds ratio
12  that you cite in your report in paragraph 18 of the
13  specific report -- let's turn to paragraph 18.  You
14  say, "Using Dr. Abdulla's classification, Isabelle
15  McMurray's coarctation of the aorta falls under the
16  conotruncal heart defects category in the study
17  conducted by Alwan and colleagues."
18  A.    That's correct.
19  Q.    But that's not a correct statement, is it,
20  Doctor?  Coarctation of the aorta did not fall under
21  the conotruncal heart defect category in the study
22  conducted by Alwan.
23  A.    I understand that.
24  Q.    So, that's a misstatement there?
25  A.    Well, it's a -- I think you're -- it's

Page 368

1  misinterpreted.  If you were to use Dr. Abdulla's
2  classification and put it into the conotruncal heart
3  defect category, that's where, well, that's where he
4  put it.  He put it into the conotruncal heart defect
5  category.  I'm not saying that that's what Alwan
6  did.
7  Q.    Alwan did not do that, in fact?
8  A.    Right.  I am not saying that that's what
9  Alwan did.
10  Q.    So, the odds ratio that you're giving from
11  Alwan for conotruncal defects is totally unrelated
12  to any analysis of coarctation of the aorta because
13  they excluded coarctation of the aorta.
14  A.    I understand that, I understand that.
15  Q.    So, are you saying this odds ratio about
16  coarctation -- strike that.
17        Are you saying this odds ratio you cite of
18  1.6 with a confidence interval of 0.7 to 4 has any
19  relevance to an analysis of coarctation of the aorta
20  when coarctation of the aorta was explicitly
21  excluded from this analysis?
22  A.    I understand that Alwan excluded it.
23  However, this paragraph is just to say that if it
24  had been included in the conotruncal heart defect
25  category, the odds ratio was reported to be 1.6.

Page 369

1  Q.    Well, hold it here because you're an
2  epidemiologist.  So, if I know this, you're going to
3  know this.  If you included coarctation of the aorta
4  in the Alwan analysis, you wouldn't have an odds
5  ratio of 1.6 with a lower bound of 0.7 and an upper
6  bound of 4.0.  It would be different because your
7  numerators would be different and your denominators
8  would be different, correct?
9  A.    Well, the denominators would not have been
10  different.
11  Q.    It wouldn't be same odds ratio, would it?
12  A.    It --
13  Q.    Come on.
14  A.    It probably wouldn't have, although they're
15  not that -- let me just take a look.  I don't think
16  they're all that different.
17  Q.    What's not all that different?
18  A.    No, this -- I readily acknowledge that
19  Alwan did not classify coarctation of the aorta as a
20  conotruncal heart defect, and that's readily
21  acknowledged in this report.
22  Q.    And it's also acknowledged that the odds
23  ratio you cite here has nothing to do with an
24  analysis of coarctation of the aorta because it was
25  excluded from this analysis?

93 (Pages 366 to 369)

USDC, Northern District of OK                              McMurray v. GSK                                    Monday
No. 08-CV-381-GKF-SAJ              Videotape Deposition of Shira Kramer, Ph.D.             November 2, 2009

Page 370

1   A.      In this particular case, that is true.
2   However, if one were to classify coarctation as a
3   conotruncal defect, this is the odds ratio that
4   Alwan generated for conotruncal defects.  That's all
5   this says.
6   Q.      But that's a nonsensical statement because
7   if you categorize coarctation of the aorta as a
8   conotruncal defect, this wouldn't be the odds ratio
9   because the data would change?
10          MR. FOX:  Objection to form.
11  Q.      True?
12  A.      Possibly.
13          MR. FOX:  Form.
14  Q.      Well, it's more likely than not true, isn't
15  it?
16  A.      Possibly.
17  Q.      Because the data would change?
18  A.      Possibly, correct.
19  Q.      Then it says, "Using Dr. Abdulla's
20  classification, Isabelle McMurray's coarctation of
21  the aorta, ICD9 code 747.1, falls under
22  conotruncal."  You're not saying that the ICD9 code
23  for coarctation of the aorta falls under conotruncal
24  heart defects, are you?
25  A.      No.  I think this could have been stated

Page 371

1   more clearly.  We could have, I could have done a
2   better job of expressing this.  I'm just saying that
3   Dr. Abdulla has classified this as a conotruncal
4   heart defect.
5   Q.      Now, you state that Paxil has been
6   associated with septal defects, true?
7   A.      Correct.
8   Q.      And you list what you call a risk range for
9   septal defects in paragraph, well, 118 of the
10  general report, 118(b) of the general report.  Do
11  you see that?
12  A.      Yes.
13  Q.      And also in paragraph 30(b) of the specific
14  report, you list the same risk range for septal
15  defects of 1.7 to 3.23, correct?
16  A.      That's right.
17  Q.      And you also do an analysis in Table 1 of
18  septal defects in the specific report on page 14.
19  Right?
20  A.      That's correct.
21  Q.      Okay.  And you say in paragraph 30 of the
22  specific report, 118 of the general report, that the
23  risk range for septal defects is 1.7 to 3.23,
24  correct?
25  A.      That's correct.

Page 372

1   Q.      And you seem to be saying that every study
2   that looked at Paxil and septal defects resulted in
3   an odds ratio or relative risk between 1.7 and 3.23,
4   correct?
5   A.      No, that's not correct.
6   Q.      What is the basis of your risk range then?
7   It's not just statistically significantly findings,
8   right?
9   A.      No, we are illustrating the risk range for
10  increased risks for septal defects, but I very
11  clearly in this table did list all of the specific
12  odds ratios and relative risks and we did, I did
13  list the septal defect odds ratio for Louik, which
14  was .8, and for Davis, which was .5.  So, it's not
15  that I didn't include it in the report.  It just
16  wasn't included in this risk range.
17  Q.      In paragraph 118, you have eliminated,
18  removed any risk range that was below 1.
19  A.      Right.  The risk ranges that are summarized
20  in paragraph 118 and the risk ranges that are
21  summarized in paragraph 30 of the specific report
22  are risks that were elevated, that were increased.
23  This is the risk range, and that's what I said.
24  Q.      Okay.  So then I think we need to look at
25  Table 1 as opposed to these risk ranges which are

Page 373

1   totally one-sided because they only look at data
2   that you like that are consistent with an elevated
3   risk and don't report data you don't like that's
4   consistent with a decreased risk, correct?
5           MR. FOX:  Objection to form.
6   A.      Well, the tables, the tables speak for
7   themselves.
8   Q.      Okay.  But the tables eliminate any odds
9   ratios of Paxil showing an inconsistent finding with
10  what you say is consistently an increased risk; you
11  just don't list them?
12  A.      No, the table does --
13  Q.      Not the tables.  The risk ranges.
14  A.      The risk ranges illustrate the increased
15  risks associated with these particular defect
16  classifications.
17  Q.      Okay.  You know, I thought in a weight of
18  evidence analysis you're supposed to look at all of
19  the data.
20  A.      Certainly did.
21  Q.      Okay.  But that's not in your risk ranges?
22  A.      Well, I don't agree.  I show this in the
23  tables.  In these tables, they're reported.
24  Q.      I said they're not in the your risk ranges
25  in paragraph 30 and in paragraph 118.

94 (Pages 370 to 373)

USDC, Northern District of OK | McMurray v. GSK | Monday
No. 08-CV-381-GKF-SAJ | Videotape Deposition of Shira Kramer, Ph.D. | November 2, 2009

Page 374

1  A.    Well, that's true.  But they're very
2  clearly mentioned in the report in paragraph 1 and
3  in the tables.
4  Q.    Table form.
5  A.    That's right.
6  Q.    Are there, by the way, any epi studies you
7  have ever seen that included coarctation of the
8  aorta as a conotruncal defect; have you ever seen
9  anyplace anywhere included?
10  A.    I don't recall.
11  Q.    Dr. Abdulla is the only time that you can
12  recall?
13  A.    I just don't recall.
14  Q.    Okay.  So, all right, we're looking at
15  Table 1 now, and you cite again four studies for
16  VSD, Kallen, Alwan, Davis and Louik, same four
17  studies, right?
18  A.    Correct.
19  Q.    And let's look at the Louik study.  It has
20  data on Paxil and septal defects, correct?  And you
21  report it in Table 1 as an odds ratio of 0.5 with a
22  low -- I'm sorry, of 0.8 with a lower bound of 0.3
23  and an upper bound of 2.2.
24  A.    Do you want me to look at that Louik study?
25  Q.    Yes.

Page 375

1  A.    So, let's pull that out.  Where is that?
2  Q.    You know what, you may not need to.  You
3  may be able to answer my questions without it, but
4  we can pull it on out if we need to.  These finding
5  of 0.8, what is the -- maybe you do need it.
6  A.    Oh, I have it right here.
7  Q.    Okay.  I think, though, you need -- is that
8  the one with the data, the supplemental table?  I
9  think it's here.
10       So, that data is, it's based on four
11  exposed cases, right?
12  A.    Let me just go back and find that table.
13  Paroxetine has six study subjects with septal
14  defects.
15  Q.    In Louik?
16  A.    In -- I think I'm looking in Louik.  Louik.
17  Q.    Do you know how many cases there were of
18  septal defects in the Louik study?
19  A.    1,161.
20  Q.    No, exposed septal defects.
21  A.    Oh, exposed?
22  Q.    Yes.
23  A.    Six.
24  Q.    37.  And do you know how many cases of
25  LVOTO there were in the Alwan study for Paxil?

Page 376

1  There were five, weren't there?  Do you know that?
2  A.    Again, I don't remember.  I'd have to look
3  at it.
4  Q.    Okay.  So that the increased risk you found
5  for LVOTO in Alwan involved five cases, if you take
6  a look at the supplement.  It's not in the article,
7  it's in the supplement, which is right here.  Oh,
8  you've got the supplement right in front of you, I
9  think.
10  A.    No, this is Louik.
11  Q.    Okay.  So, that's the Alwan supplement,
12  which is Exhibit 37, and there were five cases of
13  LVOTO in the Alwan study and Paxil, right?
14  A.    Correct.
15  Q.    And you say there are six cases in the
16  Louik study of VSD and septal defects.  That's what
17  you just told me, correct?
18  A.    That's correct.
19  Q.    Okay.  And the odds ratio in Louik for
20  septal defects was 0.8 with a lower bound of 0.3,
21  correct?
22  A.    I'm sorry.  I'm just getting -- you're
23  getting ahead of me.  So --
24  Q.    The findings for Paxil and septal defects
25  in the Louik study go in a protective direction; the

Page 377

1  relative risk is 0.8, lower bound, 0.3, upper bound,
2  2.2, correct?
3  A.    That's correct.
4  Q.    And that's an adjusted odds ratio, right?
5  A.    That's correct.
6  Q.    And what does an odds ratio of 0.8 mean to
7  you?
8  A.    It means that the cases had a lower
9  prevalence of exposure compared to controls.
10  Q.    By how much, by 20 percent?
11  A.    20 percent.
12  Q.    And the lower bound of 0.3 means that there
13  was a, at least a possibility of a 70 percent
14  decreased risk, correct?
15  A.    That's true.
16  Q.    Okay.  Now, Paxil is found to be associated
17  with a decreased risk in septal defects in this
18  particular study, correct?
19  A.    That's correct.
20  Q.    Now, you mentioned the Pedersen study,
21  Exhibit 61.  So, you have now seen the Pedersen
22  study because you mentioned it just earlier today.
23  You've seen that, right?
24  A.    Where is my binder with my studies?
25  Q.    I think it's in there because I did see it.

95 (Pages 374 to 377)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 378

1    I'll give you a copy of it.  So, this is Exhibit 61
2    and this is the Pedersen study.
3    A.      Before we discuss this, I would like to get
4    my notes on that.
5               MS. HALPERN:  Let's stop and take a
6    break.
7               THE VIDEOGRAPHER:  Off the video
8    record, 4:43.
9    (Brief recess.)
10              THE VIDEOGRAPHER:  Back on the video
11   record, 4:44.
12   BY MS. HALPERN:
13   Q.      Okay.  So, in your Table 1, you don't list
14   Pedersen.  Would you revise it to include Pedersen
15   now?
16   A.      I would not, because of the extremely low
17   power of this cohort study.  Pedersen had such a
18   severely underpowered study.  This is a cohort study
19   which a cohort study is based on the construction of
20   an exposed and unexposed group, and his exposed
21   group for paroxetine is 299 total exposed.  So, if
22   you know the prevalence rate of coarctation of the
23   aorta, which is 6 per 10,000, there is no chance
24   that Pedersen could ever have detected any cases of
25   coarctation of the aorta or any other, probably any

Page 379

1    other subclass of cardiac defect, and indeed even
2    any cardiac defect would be very rarely detected.
3               The power of his study was basically -- let
4    me see if I calculated it.  Pedersen would have
5    needed a sample size of, for these odds ratios, of
6    over a million people or more.  So, this was just a
7    study that I think is uninterpretable because of 299
8    exposed in a cohort study.
9    Q.      Are you aware that the Pedersen data was
10   updated with more data?
11   A.      No, I'm not.  How much more data was that?
12   Q.      Well, let's look at the exhibit I just
13   handed you, which is the Pedersen study, and online,
14   through the journal, the last three pages are an
15   update of the data, and if you turn to Table B, they
16   are the odds ratios.
17   A.      Well, I need, first of all, I need to see
18   how many are exposed to Paxil.
19   Q.      539 exposed.
20   A.      That's still -- again, remember the math, 6
21   per 10,000.
22   Q.      I understand your position.
23   A.      Well, it's just plain arithmetic.  Pedersen
24   has no chance of detecting even one case of a
25   coarctation of the aorta with 600 or 599 or whatever

Page 380

1    the number is of exposed to paroxetine.  It's not
2    possible.
3    Q.      Doctor, we're not talking about coarct --
4    A.      I mean, if they do --
5    Q.      We're not talking about coarctation of the
6    aorta.  We're talking about the data of all cardiac
7    malformations, and they come up with an odds ratio
8    of 0.72, with a lower bound of 0.23 and an upper
9    bound of 2.23, and for septal defects, they come up
10   with an odds ratio, an adjusted odds ratio of 0.41,
11   with a lower bound of 0.06 to 2.91.  Do you see
12   that?
13   A.      I do.
14   Q.      And with fewer subjects for sertraline,
15   they found an odds ratio -- strike that.
16              And with fewer subjects for sertraline,
17   they found an odds ratio of 2.01, with a lower bound
18   of 0.83 and an upper bound of 4.86, correct?
19   A.      I just want to take a minute to look at the
20   updated data that you've just given me.
21   Q.      Okay.
22   A.      So, where do we have in numbers of exposed
23   by --
24   Q.      At the top of the column.
25   A.      By top --

Page 381

1    Q.      It's at the top, right at the top, right
2    here, Exhibit B at the top.
3    A.      Oh, okay.  I'm sorry.  I apologize.
4    Q.      Well, can you tell me what an adjusted odds
5    ratio of 0.41 means?
6    A.      Yes.  Again, that's, that odds ratio
7    indicates that exposed individuals have a lower risk
8    of, in this case, cardiac malformations compared to
9    unexposed.
10   Q.      So, with all the caveats you said, Paxil is
11   associated in this study with a decreased risk of
12   septal defects, correct?
13   A.      That's correct.
14   Q.      All right.  And there's also the Davis
15   study, correct, which you report here with an odds
16   ratio for septal defects of 0.50, with a lower bound
17   of 0.07 to 3.54, correct?  It's in your Table 1.
18   It's one of your four studies.
19   A.      I understand.  So, again, Davis was a
20   cohort study which had an extremely small number of
21   individuals exposed to paroxetine.  182 exposed to
22   paroxetine in a cohort study, that is an extremely
23   underpowered study.  It's even lower than Pedersen.
24   Q.      It's lower than Pedersen, yet you put it in
25   your Table 1.

96 (Pages 378 to 381)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 382

1  **A.     I'm just mentioning that the power of these**
2  **studies is very, very low.**
3        MS. HALPERN:  Do we have Exhibit 57?
4        MR. SHEEHAN:  It's out, all of them
5  are currently out on the table.
6  Q.     Do you have the Davis study there?  Okay.
7  And the authors of the Davis study which you cite in
8  Table 1, look just on the abstract, it's the last
9  sentence in the Results, it says, there were 182
10 infants exposed to paroxetine.
11 **A.     Excuse me.  Where are you reading from?**
12 Q.     The Davis study.  The abstract in front.
13 **A.     Okay.  All right.  I have it.**
14 Q.     The last sentence in Results, there were
15 182 infants exposed to paroxetine and these infants
16 did not have an increased risk of cardiac septal
17 defects.  That's what they report, right?
18 **A.     That's correct.**
19 Q.     And on page 7, the paragraph right above
20 the discussion.
21 **A.     Page 7?**
22 Q.     7.  You just have to count them, I think,
23 I'm not sure the pages are numbered, but if you see
24 where it says discussion.
25 **A.     Yes.**

Page 383

1  Q.     And you look to the paragraph right above
2  it, they state, "While there was one cardiac septal
3  defect among infants exposed to paroxetine, we found
4  no evidence of an increased risk for cardiac septal
5  defects among exposed infants compared to infants
6  not exposed to paroxetine, relative risk 0.50,
7  confidence interval, 95 percent confidence interval
8  of .07 to 3.54, correct?
9  **A.     That's correct.**
10 Q.     And are you familiar with an article that
11 was just published out of the Mayo Clinic by Wichman
12 in 2009?
13 **A.     Yes, I am.**
14 Q.     All right.  And they found a their study of
15 SSRI-treated mothers who took paroxetine, that none
16 of the paroxetine-exposed newborns were diagnosed as
17 having a VSD.  Are you aware of that?
18 **A.     I don't have that study in front of me, so**
19 **I need to see it in order to comment on it again.  I**
20 **don't believe I brought it.**
21 Q.     Let's look at Exhibit 52.  And while he's
22 pulling that out, you reference the Alwan study
23 which found an odds ratio for Paxil and septal
24 defects of 1.7, lower bound, 0.8, correct?
25 **A.     That's correct.**

Page 384

1  Q.     And that's not statistically significant,
2  correct?
3  **A.     That's correct.**
4  Q.     Do you have the study now in front of you?
5        MR. FOX:  Got it.
6  Q.     Okay.  And if you turn to page 25, the
7  right column, the second paragraph, do you see where
8  they say in there --
9  **A.     I just need to take a second.**
10 Q.     Sure.
11 **A.     So, we have 134 exposed women in this**
12 **study.**
13 Q.     And they say none of the
14 paroxetine-exposed --
15 **A.     I just want to finish looking at this for**
16 **one moment, please.**
17 Q.     Well, my question is that none of the
18 paroxetine-exposed newborns were diagnosed as having
19 a VSD; is that correct?
20 **A.     Well, again, again, the math, you have 134**
21 **exposed, those numbers are, when you look at the**
22 **prevalence rates of any cardiac defects, you would**
23 **likely not observe any increase or any perhaps at**
24 **all cases among such a small number of exposed.**
25 Q.     So, we see three studies --

Page 385

1  **A.     And there's no discussion of any of these**
2  **things.  I think that's the issue that is most**
3  **surprising to me, is that you've got studies that**
4  **have power less than 10 percent, with this cohort**
5  **design utilizing very, very small, limited numbers**
6  **of exposed individuals, knowing what the prevalence**
7  **rates of any congenital cardiac defects are, and**
8  **very, very low power.**
9  Q.     Doctor, we've looked at three studies that
10 showed a protective association for Paxil and septal
11 defects, correct?
12 **A.     That's correct.**
13 Q.     And one that showed a statistically
14 significant increased risk, Kallen?
15 **A.     Correct.**
16 Q.     And one that showed an increased risk that
17 wasn't statistically significant?
18 **A.     That's correct.**
19 Q.     And then one which had no data at all
20 because none of the Paxil moms had VSDs?
21 **A.     That's correct.**
22 Q.     The only statistically significant finding
23 was for Kallen, correct?
24 **A.     That is correct.**
25 Q.     And would you agree that the data is more

97 (Pages 382 to 385)

USDC, Northern District of OK                          McMurray v. GSK                                    Monday
No. 08-CV-381-GKF-SAJ                    Videotape Deposition of Shira Kramer, Ph.D.              November 2, 2009

Page 386

1  consistently protective than it is anything else?
2  A.    No, I would not, and for the reasons that
3  I've given.
4  Q.    So, you're -- are you saying the Louik
5  study wasn't properly powered when you find that the
6  Alwan study for LVOTO is?
7  A.    I'm saying that these studies are all
8  underpowered, that's number one.  Number two --
9  Q.    All of them, you're talking about every
10 study we've discussed?
11 A.    I think every study has low power, and the
12 fact that some of them are yielding excess risks and
13 some statistically significant in light of all of
14 this is really quite alarming.  I have calculated
15 the power of each one of these studies and the
16 sample sizes that would be needed to detect odds
17 ratios of 2 or greater as statistically significant,
18 and those sample sizes are multiple times the
19 numbers of individuals who are included in these
20 studies.  That's number one.
21        The second point that you just brought up
22 and the question about protective effects, the lack
23 of a statistically significant finding and even the
24 generation of odds ratios or relative risks that are
25 less than 1 does not prove the null hypothesis, it

Page 387

1  does not prove no exposure, and it does not prove a
2  protective effect, particularly in underpowered
3  studies.  And that is very, very well established
4  and is accepted, very well accepted in our field.
5        So, the fact that we've got underpowered
6  studies that have, some of which have generated
7  results which -- with relative risks less than 1
8  does not establish a protective effect, not at all.
9  Q.    Okay.
10 A.    There is much, much stronger pressure for
11 null results in these types of studies than to
12 generate positive results.
13 Q.    Are you done?
14 A.    Yes.
15 Q.    Thanks.  You repeatedly reference whether
16 the studies were powered sufficiently to find a
17 statistically significant increased risk, right?
18 A.    That's correct.
19 Q.    And you also state that the more rare the
20 disease and the smaller the exposed population, the
21 less likely it is that a particular study will find
22 a statistically significant elevation, right?
23 A.    That's correct.
24 Q.    Okay.  Is it also true, Dr. Kramer, that in
25 the same scenario, rare disease and small exposed

Page 388

1  population, the likelihood of a substantially
2  increased relative risk could be observed, that is,
3  in fact, in error and spurious?  It goes both ways?
4  A.    Not, no, not nearly to the same degree.  I
5  would disagree with that.
6  Q.    So, one or two misclassified cases could
7  make an odds ratio go from less than 1 to greater
8  than 1, correct?
9  A.    Well, certainly the precision of the
10 estimate with small sample sizes is less.  There is
11 less precision.  But the issue is much, much more --
12 Q.    My question is, one or two misclassified
13 cases could make an odds ratio go from greater than
14 1 to less than 1, true?
15 A.    And it really all depends on whether the
16 misclassification is differential or
17 non-differential.  I'd have to give you a
18 qualification and say perhaps, perhaps.  I can't
19 give you a blanket yes or no.  Because the answer to
20 that question depends, depends upon whether there is
21 differential or non-differential misclassification
22 in that study.
23 Q.    Irrespective of whether it's differential
24 or not differential, one or two misclassified cases
25 could make an odds ratio go from less than 1 to

Page 389

1  greater than 1?
2  A.    It certainly could.
3  Q.    And one or two misclassified cases could
4  make an odds ratio go from greater than 1 to less
5  than 1?
6  A.    Possibly, yes.
7  Q.    Do you agree that if perinatal
8  complications are more prevalent in the
9  Paxil-exposed group than a control group, it could
10 lead to a doctor ordering an echocardiogram?
11 A.    Would you please repeat that.
12 Q.    Sure.  If there were more perinatal
13 complications in Paxil-exposed babies than in
14 control group babies, it could lead to a doctor
15 ordering an echo more often for Paxil-exposed babies
16 than for the control babies, true?
17 A.    Are you asking me a hypothetical question,
18 if?
19 Q.    Yes, hypothetical.
20 A.    Possibly.
21 Q.    Okay.  Do you agree that identification of
22 clinically asymptomatic and self-correcting septal
23 defects are precisely the type of defect that could
24 be vulnerable to unequal collection of data or
25 collection -- or detection bias?

98 (Pages 386 to 389)

Page 390

1   A.      Under what circumstances?
2   Q.      Under the circumstances that it's an
3   asymptomatic and self-correcting septal defect, so
4   it might miss being caught.
5   A.      Well, can you repeat the question?
6   Q.      Sure.  Are you familiar with studies that
7   have been done that have shown that when you
8   ascertain, when you echo every single baby that's
9   born, the rate of septal defects is much higher than
10  is generally reported?
11  A.      Yes.
12  Q.      Okay.  So, do you agree that identification
13  of clinically asymptomatic septal defects are
14  precisely the type of defect that could be
15  vulnerable to unequal collection between cases and
16  controls for detection bias purposes?
17  A.      Theoretically.
18  Q.      Okay.  And this, in fact, is specifically
19  noted, Exhibit 32, in one of the studies you rely on
20  for your opinion in this case, the Diav-Citrin
21  abstract.  Let me show it to you.  The authors state
22  in this -- this is the wrong article.  This is the
23  wrong one.  That's Exhibit 32.
24          MR. SHEEHAN:  That's 32.
25          MS. HALPERN:  Then she made a mistake.

Page 391

1   That's the wrong one.  That's too bad.
2           MR. SHEEHAN:  What are we looking for,
3   Diav-Citrin?
4           MS. HALPERN:  Diav-Citrin abstract.
5   Yes, it's wrong.  It's not 32.  I don't see it here.
6   It's just mislabeled.  I don't know if I have it.
7   Oh, 95.  Try 95.
8   Q.      The authors state that newborn
9   Paxil-exposed babies should be carefully followed up
10  for a discontinuation syndrome.
11  A.      Would you mind waiting until I get a copy
12  of that?
13  Q.      Sure.  I have to make sure I have it.  Let
14  me see if this is right.
15          MR. SHEEHAN:  I think this is it.
16          MS. HALPERN:  I'm not sure if this is
17  where they say it.  It isn't.  It's 2005.  It's just
18  wrong.  That's all right.  It's not that big a deal.
19  Q.      Well, let me ask it this way then.  Would
20  you agree that if doctors routinely echoed babies
21  exposed in utero to Paxil, but not other babies,
22  there would be an over-ascertainment of septal
23  defects?
24  A.      Possibly.
25  Q.      And did you consider whether moms who

Page 392

1   ingested Paxil were any more likely to have their
2   babies echoed than moms who were unexposed; did you
3   consider that?
4   A.      Well, that issue was considered in many of
5   the articles that were published and was discussed
6   in many of those articles.  Certainly, the articles
7   that included women who took other antidepressants
8   or who had depression and were treated with other
9   antidepressants I think address that issue.  So, I
10  think that factor has been adequately dealt with and
11  taken account of.
12  Q.      Well, would you agree that if exposure to
13  Paxil increased the likelihood of clinical detection
14  of a defect such as a septal defect, the increased
15  risk reported in the Kallen study could be biased
16  upwards?
17  A.      Well, I think what you're -- you're
18  mentioning all kinds of hypotheticals.  The authors
19  of these papers have all mentioned -- not all, many
20  of them have discussed this potential issue, have
21  dealt with it.  I believe that the overall
22  conclusion is that this is not a sufficient issue to
23  explain or eliminate the increased risks that have
24  been observed.
25  Q.      Well, in paragraph 105 of your general

Page 393

1   report talking about the Bar-Oz study, you state
2   that detection bias might cause an overestimation of
3   risk for Paxil and cardiac defects in studies where
4   the control group is either not or largely not
5   exposed to other antidepressants, correct?
6   A.      Let's see.  Where are you?  We're referring
7   to Bar-Oz's meta-analysis.
8   Q.      You state that the detection bias, when
9   you're talking about --
10  A.      So, you're in paragraph 105?
11  Q.      105, it might cause an overestimation of
12  risk for Paxil and cardiac defects in studies.  Do
13  you see that?
14  A.      Where are you?
15  Q.      In your paragraph, 105.  Have I got the
16  wrong spot again in your general report?
17  A.      Well, they did a sub-analysis that
18  indicated a detection bias may occur in
19  comparison -- okay.  There was no difference in
20  these diagnostic procedures between the paroxetine
21  group and the other antidepressant groups.
22  Therefore, if a study uses a control group that is
23  exposed to antidepressants other than paroxetine,
24  they may effectively control for detection bias.
25  Q.      Exactly, and that's exactly my point.

99 (Pages 390 to 393)

Page 394

1   Okay.  So, you note in paragraph 105 that detection
2   bias might cause an overestimation of risk for Paxil
3   and cardiac defects in studies where a control group
4   is not composed of people exposed to other
5   antidepressants?
6   A.     Not necessarily, because it really all
7   depends on the way that the cases are ascertained,
8   cases and controls are ascertained, and the way the
9   information on exposure is ascertained.  So, I would
10  not make that global statement.  I would not agree
11  with that.
12  Q.     Do you know if the, of the 41,000 babies
13  born with congenital birth defects in the Kallen
14  study, how many of them, the moms were taking, in
15  the controls, the non-Paxil-exposed, were taking
16  other antidepressants, do you know what percentage
17  of them were?
18  A.     I don't recall.  We can look it up.
19  Q.     It was 269.  It was less than 1 percent.
20  Is that a study where you think detection bias was
21  controlled because the controls were all on other
22  antidepressants?
23  A.     Well --
24  Q.     1 percent was exposed to antidepressants
25  and 99 percent weren't.  That's exactly the kind of

Page 395

1   study where detection bias for septal defects was
2   not controlled for by the control group.
3   A.     I understand what you're asking me.  I'd
4   have to look at that study.  My recollection is that
5   this issue was addressed even in those studies where
6   the control group did not include women who were on
7   antidepressants.  There were analyses and
8   discussions of these issues which concluded that
9   this was not a major factor in generation of
10  results.  So, if we want to discuss the Kallen
11  study --
12  Q.     Well, you're the one who raised it.  You
13  raised it in paragraph 105.
14  A.     Certainly, it's raised, and it was raised
15  as a potential issue, and I believe adequately dealt
16  with.
17  Q.     And are you aware if the authors in the
18  Kallen study agree with you that it was adequately
19  dealt with?  Do you know if they have made a comment
20  about that?
21  A.     Well, I need to look at that study then.
22  Do you want to do that?
23  Q.     No, I'm just asking if you're aware of it.
24  A.     I don't recall specifically.
25  Q.     Okay.  In the Alwan study, there were 1,931

Page 396

1   babies born with septal defects, but only 43 were
2   exposed to SSRIs.  The rest were only.  Is this a
3   study where detection bias can't be ruled out?
4   A.     I can't answer that without looking at the
5   study.
6   Q.     Is Kallen a study where detection bias
7   can't be ruled out?
8   A.     Again, I won't comment on a study that I
9   don't have a chance to look at and review.
10  Q.     Now, are you relying on Table 1 for your
11  opinions about Isabelle's septal defect or Melody's
12  septal defect?  Table 1 is your data on septal
13  defects and coarctation.  So, that data, based on
14  isolated septal defect analysis, derived from cases
15  of isolated septal defects, correct?
16  A.     I'm sorry.  Can you repeat the question?
17  Q.     Sure.  The data you report in Table 1 on
18  septal defects is limited to isolated septal
19  defects, correct?
20  A.     That's correct.
21  Q.     And are you relying on that data for your
22  opinions about Melody's septal defect or Isabelle's
23  septal defect?
24  A.     Well, this particular table refers to
25  Isabelle McMurray and her cardiac malformations.

Page 397

1   Q.     But you know she didn't have an isolated
2   septal defect?
3   A.     I'm aware of that.
4   Q.     And are you considering the septal defect
5   that Isabelle had an isolated septal defect?
6   A.     No.
7   Q.     So, why is this data relevant?
8   A.     I'm aware that that was not the only defect
9   that she had.  However, some of the studies did
10  classify multiple defects in different -- in
11  different categories.
12  Q.     So, you have one statistically significant
13  unreplicated finding from Kallen and three
14  protective studies and one study with an elevated
15  risk that's not statistically significant.  Do you
16  consider that data consistent?
17  A.     I think that the overall data on the risk
18  of congenital cardiac malformations, including
19  septal defects, is consistent and supports a
20  conclusion of causation.
21  Q.     So, do you find the findings from Pedersen,
22  with an odds ratio of 0.4, Louik with an odds
23  ratio of 0.8, and Davis with an odds ratio of 0.5,
24  and Cole with no septal defects -- strike that --
25  and Wichman with no septal defects, consistent with

Page 398

1 the finding on septal defects and Paxil that you
2 report in the Kallen study?
3 A.     Yes, I do.
4 Q.     Do you find that --
5 A.     Because, because of the issues that I
6 brought up before having to do with the power of
7 these studies.
8 Q.     And that includes the Louik study, you find
9 Louik consistent with Kallen?
10 A.     Well, as I said, Louik's results are not
11 consistent with Kallen, I can see that. I
12 acknowledge that. But, in general, these studies
13 are underpowered, and I believe that the evidence
14 supports a causal association between Isabelle
15 McMurray's congenital cardiac defects and exposure
16 to Paxil.
17 Q.     Okay. This data on septal defects alone,
18 if you take it on its face, these five studies, are
19 you saying there's sufficient data here to reach a
20 causal conclusion about Paxil's ability to cause
21 septal defects?
22 A.     Which five studies are you referring to?
23 Q.     The Louik study with an odds ratio of 0.8,
24 the Pedersen study with an odds ratio of 0.4, the
25 Davis study with an odds ratio of 0.5, the Alwan

Page 399

1 study with a not statistically significant elevated
2 risk of 1.7, and the Kallen study with a
3 statistically significant increased risk.
4 A.     I believe that all of the data combined
5 from all of these studies supports a causal
6 association.
7 Q.     Well, let me ask you something. Lack of
8 consistency across findings with respect to specific
9 malformations and specific drugs makes it difficult
10 to translate the findings into clinical practice if
11 there's a lack of consistency, true? Do you agree
12 with that?
13 A.     Sometimes.
14 Q.     Okay. And one of the fundamental
15 principles of teratology is that teratogenic
16 exposures induce specific patterns of malformation
17 and not an increase in the incidence of every
18 defect; do you agree with that?
19 A.     Well, there's a difference between every
20 defect and a spectrum of many defects within an
21 organ system. So, we're not talking about that.
22 That's not relevant in this case.
23 Q.     You keep talking about a spectrum. Does
24 that mean each and every or some?
25 A.     It could be each and every in this

Page 400

1 instance. I have already expressed that opinion.
2 Also, I disagree with the -- with the principle of
3 specificity of effect. I think that's been amply
4 disproven.
5 Q.     So --
6 A.     There are, there are -- there is
7 significant etiologic heterogeneity involved in
8 these defects, and we also know that there are --
9 there is a significant list of well known teratogens
10 that cause a spectrum of effects in different organ
11 systems.
12 Q.     So, you disagree with the teratologists who
13 believe birth defects have specificity?
14 A.     Oh, I think that's been amply disproven.
15 Q.     You think it's been disproven?
16 A.     Sure, and I've given you the examples of
17 thalidomide and alcohol and other solvents and
18 certain other drugs.
19 Q.     I think we're discussing two different
20 things. Clearly, there is a pattern of certain
21 defects that are unified, say, with thalidomide, or
22 with Accutane, with a consistent mechanistic action,
23 correct?
24 A.     Well, I don't know that I would agree.
25 Thalidomide is associated with limb reduction

Page 401

1 defects, but also with cardiac defects.
2 Q.     Do you agree that consistency requires that
3 an association uncovered in one study persist on
4 testing under other circumstances with other study
5 populations and with different study methods; do you
6 agree with that?
7 A.     Not all the time, not necessary, and that's
8 a pretty well recognized fact, that it's not
9 necessary, in order to draw conclusions about
10 causation, that every study be consistently positive
11 and that every piece of evidence support the
12 association.
13 Q.     Those were your own words in your textbook.
14 Are you aware of that?
15 A.     I am aware of that, yes, I am.
16 Q.     And you disagree with that?
17 A.     Well, if you want to discuss my textbook,
18 I'd like to have a copy of the textbook so I can
19 point out some discussion and the fact that you're
20 taking things out of context, so we can do that.
21 Q.     And you also write, the more often the
22 association appears under diverse circumstances, the
23 more likely it is to be causal in nature. Do you
24 agree with that sentence?
25 A.     Can I have a copy of my textbook?

101 (Pages 398 to 401)

USDC, Northern District of OK                                                                    McMurray v. GSK                                                                         Monday
No. 08-CV-381-GKF-SAJ                                               Videotape Deposition of Shira Kramer, Ph.D.                                                         November 2, 2009

Page 402

1   Q.    I'm just asking if you agree with the
2   sentence?
3   A.    Well, if you're going to take things out of
4   context from my textbook, then I reserve the right
5   to look at the textbook.
6   Q.    Doctor, I'm asking you, very simply, do you
7   agree with this sentence: The more often an
8   association appears under diverse circumstances, the
9   more likely it is to be causal in nature?
10  A.    Well, the more often it appears under
11  diverse circumstances, the more and more evidence is
12  accumulating, that's correct, but that doesn't mean
13  that there is any particular litmus test for that
14  issue.  It's a matter of convergence of the evidence
15  that you have at hand.
16  Q.    Would you agree that one should be aware
17  that the same bias of systematic error occurring in
18  multiple studies can produce an apparent but
19  spurious consistency?
20  A.    It's theoretically possible, but this --
21  this type of bias would have to be, as you know,
22  very -- well, let me just back up.  It's potential,
23  potentially possible.  However, carefully designed
24  studies will consider various sources of bias and
25  try to prevent them from occurring in studies and in

Page 403

1   a body of literature that's consistent, as in this
2   case.  Normally, these biases can be eliminated or
3   explained, discounted.
4   Q.    When asked at the Kilker trial if it was
5   your opinion that Paxil causes IAA type A, a very
6   specific type of cardiac defect, you stated, quote,
7   and I'll show you the page -- it's page 76, line 24,
8   but there are multiple pages 76.  They're at the
9   top, they're at the bottom.  See if you can find it.
10  I'll read you what I have, and really I just want to
11  ask if that's still your answer.  So, you can reject
12  it or not.
13        The answer you gave, according to my notes,
14  is that because if Paxil is generally accepted as it
15  is, as a general and broad spectrum cardiac
16  teratogen, then that would include its potential to
17  increase the risk of any type of cardiac
18  malformation, and we have actually seen that
19  establish the studies that we have presented, that
20  there's a broad spectrum of cardiac defects.  I'm
21  not asking you to tell me that's what you said or
22  not.  I just want to know, if I asked you the same
23  question about Paxil causes coarctation of the
24  aorta, would your answer be, in essence, the same?
25  A.    Yes.

Page 404

1   Q.    Okay.  And is it your opinion that Paxil is
2   a broad spectrum teratogen?
3   A.    It's a broad spectrum cardiac teratogen,
4   yes.
5   Q.    Okay.  And is it your opinion that a broad
6   spectrum cardiac teratogen has the potential to
7   cause each and every cardiac defect?  That's your
8   opinion?
9   A.    That's correct.
10  Q.    But having the potential to do something is
11  different from saying it does it, isn't it?
12  A.    Well, when I'm asked to evaluate a body of
13  evidence, a body of literature along with biological
14  plausibility and mechanistic information as well,
15  and am asked to draw a conclusion to a --
16  Q.    I'm sorry.  Go ahead.  I'm listening.
17  A.    -- draw a conclusion according to a level
18  of scientific probability, I believe that there is
19  sufficient evidence to support causation.
20  Q.    All right.  When asked further at the trial
21  about what specific cardiac defects Paxil can cause,
22  you further answered, and I think you testified to
23  this earlier today, "Throughout my entire career, I
24  can tell you that when we talk about teratogens, we
25  look at their effect on organ systems, and we don't

Page 405

1   label them as teratogenic for IAA or carcinogenic
2   for neuroblastoma, we call them teratogens,
3   carcinogen, because it's recognized that they have
4   that a broad spectrum of effects on the organ
5   system."  Is that your testimony as well?
6   A.    In this case it is my testimony.
7   Q.    And, in fact, Dr. Kramer, just last year,
8   you published an abstract entitled Elevated
9   Incidence of Neuroblastoma in a Community Exposed to
10  Carcinogens, and you wrote that elevated risks of
11  specific cancer subtypes were observed with the most
12  consistent association seen for non-Hodgkin's
13  lymphoma.  Does that -- it's Exhibit 85.
14  A.    I'd have to see that.
15  Q.    So, you wrote specifically about a
16  carcinogen and its ability to increase the risk of
17  this specific cancer, neuroblastoma, and analyses
18  were actually restricted to neuroblastoma, true?
19  A.    Well, I'd have to look at the study.
20  Q.    Okay.  Exhibit 79 and Exhibit 85.
21        MR. SHEEHAN:  That's 85.
22  Q.    Here is 85.  That's what you wrote?
23  A.    Okay.  So, which -- if you're going to ask
24  me, I reserve the right to read it.  So, which one?
25  Q.    The question is -- I'm sorry, which one?

102 (Pages 402 to 405)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 406

1  A.     Are you going to ask me the non-Hodgkin's
2  lymphoma question first or the neuroblastoma
3  question?
4  Q.     Well, that exhibit I believe is an elevated
5  incidence of neuroblastoma, correct?
6  A.     No, it isn't. This is -- this should be
7  non-Hodgkin's lymphoma. Let me just make sure.
8  Q.     That's the title. Do you see --
9  A.     Yeah, that's NHL.
10  Q.     Is this your abstract?
11      MS. HALPERN: Do you have 79?
12      MR. SHEEHAN: Yes.
13      MS. HALPERN: Which one is that?
14      MR. SHEEHAN: That's neuroblastoma.
15  Q.     Okay. So, let's look. Here's Exhibit 79.
16  Look at abstract 026. Is that an abstract about
17  elevated risks of specific cancer subtypes with the
18  most consistent association seen for non-Hodgkin's
19  lymphoma?
20  A.     I'm going to have to read it.
21  Q.     It's a simple question, Doctor.
22  A.     Well, this doesn't have anything to do with
23  non-Hodgkin's lymphoma. You're asking me about
24  non-Hodgkin's lymphoma. This has to do with
25  neuroblastoma.

Page 407

1  Q.     Did you look at a specific cancer subtype?
2  A.     In this case, yes, although the -- in the
3  case of this abstract, the answer is yes, and there
4  was a reason for it, although we recognized that the
5  chemicals involved were much more broad spectrum
6  carcinogens. There was a particular reason that we
7  focused on neuroblastoma in this community and not
8  adult cancers because of issues of latency. This
9  was a new community.
10  Q.     Doctor, look at the bottom of 406 that
11  you're looking at now on Exhibit 85, six lines up
12  from the bottom. Elevated risks of --
13      MR. FOX: She's looking at 79. Do you
14  want her to look at 85?
15  Q.     Do you have 85 in front of you as well?
16      MR. FOX: Here's 85.
17  Q.     Look at 85, abstract 406, six lines up from
18  the bottom, "Elevated risks of specific cancer
19  subtypes were observed across all three referenced
20  populations with the most consistent association
21  seen for non-Hodgkin's lymphoma in adults." And
22  then you state that your odds ratio, your SIR range,
23  was 3.88 to 4.62, confidence intervals not including
24  1. So, you give a risk range only for those
25  findings that you found to be statistically

Page 408

1  significant at the 95 percent confidence interval,
2  true?
3  A.     No, I don't believe so.
4  Q.     What does that mean? What does that mean
5  then, the confidence intervals not included?
6  A.     Well, I need to read the rest of it. Well,
7  I gave a risk range, in the sentence above that, for
8  99 cases of cancer for men and women of all ages, 31
9  percent increase, and we just reported the
10  confidence interval there for what it was.
11  Q.     And it's statistically significant?
12  A.     Well, it just happened to be that that's
13  what it was.
14  Q.     Doctor --
15      MR. FOX: Stop talking over the
16  witness.
17  A.     Excuse me. Excuse me.
18  Q.     Let me ask my question.
19  A.     I did not --
20  Q.     There's a question pending.
21      MR. FOX: Wait.
22  A.     Well, but you also --
23      MR. FOX: Let her finish her answer,
24  please.
25  A.     You also have a habit of cutting me off.

Page 409

1  So, if you want me to answer the question, I have to
2  be allowed some time to answer the question. Do you
3  want me to answer the question?
4  Q.     We're going to have to be here for another
5  day, go ahead, for sure. We'll come back.
6  A.     I did not selectively report risk ratios
7  and confidence limits in this abstract based on
8  their statistical significance or lack thereof.
9  Okay? There was an SIR reported here of 1.31 with
10  the confidence limits as they were calculated.
11  Q.     Okay. Is there anything reported here
12  that's not statistically significant at the 95
13  percent confidence interval?
14  A.     In this particular abstract, no.
15  Q.     Okay. How about the other one you have in
16  front of you? The SIR ranges range from 4.27 to
17  12.52. None of the 95 percent confidence intervals
18  included the null value.
19  A.     That's what it says, that's correct.
20  Q.     So, is the answer that they all reported in
21  these two abstracts only statistically significant
22  findings that were significant at the 95 percent
23  confidence interval?
24  A.     Well, that's what these two abstracts
25  reported. Is that what you're asking me, or are you

103 (Pages 406 to 409)

Page 410

1 asking me if I cherry-picked rates to report? **What**
2 **are you asking me?**
3 Q.    Well, listen to the question.  Did you look
4 at a specific subtype of cancer here rather than all
5 cancer?
6 **A.    Oh, well, in one instance, we did.  In one**
7 **instance, we looked at more than one subtype.**
8 Q.    Okay.  But you looked at subtypes?
9 **A.    Yes, we did.**
10 Q.    Okay.
11 **A.    We did.  And in another instance, we looked**
12 **at all subtypes, all cases of cancer combined, as I**
13 **read to you.**
14 Q.    All right.
15 **A.    We had 99 cases of cancer, all types**
16 **combined.**
17 Q.    Okay.  Are you done?
18 **A.    Yes, I'm done.**
19 Q.    Okay.  Good.  You understand there's a
20 lawsuit about whether Paxil caused this specific
21 defect in this case, right?
22 **A.    That's true.**
23 Q.    And not about whether Paxil just causes any
24 defect, correct?  We're interested in whether it
25 causes Isabelle defect, coarctation of the aorta,

Page 411

1 and Melody's defect of VSD, true?
2 **A.    That's correct.  She, well, Melody had an**
3 **ASD.**
4 Q.    An ASD, or maybe not, maybe a PFO.  You've
5 given sworn testimony that it's your opinion that
6 Paxil is a broad spectrum teratogen, correct?
7 **A.    Cardiac teratogen.**
8 Q.    Okay.  And at the Kilker trial, you were
9 asked if you have seen anything in the peer-reviewed
10 literature that has ever stated the words that Paxil
11 is a broad spectrum teratogen, and now I'll ask you,
12 have you ever seen it written that Paxil is a broad
13 spectrum cardiac teratogen?
14 **A.    I don't recall.**
15 Q.    Do you know if any regulatory agency or
16 peer-reviewed published article or medical text has
17 ever said that Paxil is a broad spectrum cardiac
18 teratogen?
19 **A.    I don't know.**
20 Q.    Are there any defined criteria in the field
21 of teratology or reproductive toxicology for
22 anything called a broad spectrum teratogen or a
23 broad spectrum cardiac teratogen, have you ever seen
24 that in writing anywhere?
25 **A.    I don't recall.**

Page 412

1 Q.    Is it your testimony that, I believe as you
2 sit here today, you don't know of any teratogen
3 that's a broad spectrum cardiac teratogen?
4 **A.    Well, there are teratogens that cause a**
5 **spectrum of cardiac birth defects and other birth**
6 **defects.**
7 Q.    Well, let's be clear about this.  Are you
8 saying Paxil causes a broad spectrum of cardiac
9 defects, or are you saying Paxil causes each and
10 every cardiac defect?
11 **A.    I'm saying that Paxil causes cardiac**
12 **defects in general.  It is a causal agent for**
13 **cardiac defects.**
14 Q.    And you've said to me that that means it
15 causes each and every cardiac defect?
16 **A.    That it potentially could cause each and**
17 **every cardiac defect, that's right.**
18 Q.    That means, in your opinion, it can cause
19 each and every cardiac defect, true?
20 **A.    That's true.**
21 Q.    All right.  Do you know of any other
22 teratogen that can cause each and every cardiac
23 defect?
24 **A.    I'd have to review literature in order to**
25 **answer that question.**

Page 413

1 Q.    Okay.  So, let's look at the slides that
2 you used at the Kilker trial, which are here.  It's
3 Exhibit 8.  And I'll ask you to look at the top of
4 page 6.  And I think we've already looked at this
5 graphic.  And Mr. Tracey, the plaintiff's counsel,
6 asked you to comment on that slide at the top of
7 page 6, and you were asked that you have Accutane
8 under cardiac defects, and he asked you if you had
9 an understanding whether Accutane can cause a
10 variety of different cardiac defects, and you
11 said --
12         MS. HALPERN:  Do you have the
13 transcript there?  Page 54, 17.
14         MR. SHEEHAN:  It's out there already.
15         MS. HALPERN:  No, we never used it.
16 Here it is.  Okay.
17 Q.    It's on direct.  Page 54.  Okay.  If you
18 look at page 54, line 17, question, "And you have
19 got under Accutane," on that slide we just looked at
20 at the top of page 6 of Exhibit 8, "And you have got
21 under Accutane 'cardiac defects.'  Do you have an
22 understanding of whether Accutane can cause a
23 variety of different cardiac defects?"
24         And your answer was, "Yes, epidemiologists
25 do study the spectrum of effects of teratogens and

104 (Pages 410 to 413)

Page 414

1  organ systems and..."
2  A.     Wait.  Let me just --
3  Q.     You've probably gone to the wrong page.  Do
4  you see?
5  A.     Page 54?
6  Q.     I'll find it for you.  There's an
7  objection.  I see what confused you.  Okay.  What
8  there is that's confusing you, is there's an
9  objection interposed by counsel, but you end up
10  answering the question.
11  A.     Okay.
12  Q.     Question, "And you have got under Accutane
13  'cardiac defects.'  Do you have an understanding of
14  whether Accutane can cause a variety of different
15  cardiac defects?"
16         And if you follow through, your answer is,
17  "Yes, epidemiologists do study the spectrum of
18  effects of teratogens in organ systems, and in this
19  particular case, cardiac defects.  Epidemiologists
20  have demonstrated a spectrum of cardiac defects
21  associated with exposure to Accutane."  Right,
22  that's what you said?
23  A.     That's correct.
24  Q.     But, in fact, Dr. Kramer, would you agree
25  that Accutane has not been associated with each and

Page 415

1  every type of cardiac defect, or don't you know
2  that?
3  A.     I don't remember.  I'd have to look at that
4  literature again.
5  Q.     So, you think it's possible Accutane is
6  like Paxil, in your opinion, and it causes every
7  single type of cardiac defect?
8  A.     I can't answer that.
9  Q.     You have no idea?
10  A.     I can't answer that without going back to
11  the literature and studying that.
12  Q.     Exhibit 41.  Do you know who Dr. Robert
13  Brent is?
14  A.     No.
15  Q.     He's a world renowned teratologist,
16  according to Dr. Anick Berard, and he created a set
17  of criteria to be applied specifically for assessing
18  whether there was a causal relationship when dealing
19  with a teratogen, and if you look at his -- if this
20  is the right one -- on Table 1, do you see on the
21  second page, characteristics of an environmental
22  agent that is teratogenic in humans?  It's Exhibit
23  41.  Do you see that?
24  A.     I'm sorry.  Can you tell me where to find
25  it again?

Page 416

1  Q.     Yes, it's the second page of the article,
2  Table 1, lower left-hand corner, characteristics of
3  an environmental agent that is teratogenic in
4  humans.  Do you see that?
5  A.     Yes, I do.
6  Q.     And his principle number 1 is epidemiology
7  studies consistently demonstrate an increase in
8  frequency of congenital malformations and especially
9  a recognizable syndrome in the exposed population.
10  Do you disagree with that?
11  A.     And it's not that I disagree.  I think that
12  when you talk about consistently, that doesn't mean
13  every single study.  That's never observed.  So that
14  I need to clarify that, consistently doesn't mean
15  every single study demonstrates an increase in
16  frequency of congenital malformations.
17  Q.     But at the Kilker trial, you said
18  specificity is not only not required, you said, it's
19  just wrong?
20  A.     Specificity of association, in general, has
21  been recognized as not appropriate to invoke in
22  issues of causation because it's been disproven time
23  and time again.
24  Q.     And are you speaking specifically about the
25  world of teratology when you say that?  Are you

Page 417

1  aware that there are teratologic principles of how
2  you assess causation that are unique to the world of
3  teratology?
4  A.     Of course, but we can also -- we can also
5  produce examples of nonspecific associations that
6  are well recognized in the field of teratology, and
7  that no one would refute represents a causal
8  association in terms of birth defects, so that the
9  principle of specificity is not necessary and is
10  most often not the case.
11  Q.     Is there a teratology text or reproductive
12  teratology text or reproductive toxicology test that
13  you consider authoritative?
14  A.     I wouldn't name any one particular text as
15  authoritative.
16  Q.     Can you name a teratology textbook for me,
17  any one?
18  A.     Not one that I -- not that I -- as I sit
19  here right now, I can't name one.
20  Q.     Do you own one?
21  A.     I'm sure we do.
22  Q.     Which one do you own?
23  A.     I don't remember.
24  Q.     Did you ever look in the textbook to see
25  what they say about specificity?

105 (Pages 414 to 417)

| USDC, Northern District of OK | McMurray v. GSK | Monday |
|---|---|---|
| No. 08-CV-381-GKF-SAJ | Videotape Deposition of Shira Kramer, Ph.D. | November 2, 2009 |

Page 418

1    A.    Certainly, and I've read many, many
2  articles, and I know what some researchers -- what
3  some researchers consider to be important in terms
4  of specificity. I don't agree with it. And I think
5  it's been -- it's been shown that specificity is not
6  a requirement for causation. It's been disproven.
7    Q.    In a teratology context, you're saying
8  specificity is not required and it's been disproven?
9    A.    Well, it's been disproven, absolutely. You
10 can't have a requirement for specificity when you
11 have etiologic heterogeneity, when you've got agents
12 that can and have been recognized to cause defects
13 in multiple organ systems, and where you have
14 defects that are caused by, the same defects, by
15 different agents in combinations of causal factors.
16 That is a, right there, in and of itself disproves
17 the requirement for specificity.
18   Q.    Doctor, do you agree or disagree that it's
19 generally accepted in the teratology community that
20 teratogens operate to create specific patterns of
21 mechanistically related defects; do you agree with
22 that statement, first of all, and do you know if
23 it's generally accepted in the teratology community?
24   A.    Well, I agree that there are specific
25 patterns that are recognized. However, what we also

Page 419

1  know is that what may start off as a specific
2  pattern of recognized defects, such as DES and
3  adenocarcinoma of the vagina with further study is
4  expanded to other types of defects, and the same has
5  happened with thalidomide and other agents as well.
6  So, they are not restricted to those syndromes.
7  They are not restricted to those defects.
8    Q.    Do you agree or disagree that finding a
9  characteristic pattern of malformations is an
10 important tenet in establishing teratogenicity?
11   A.    Sure, it is. It is certainly an important
12 tenet, but it is not required to have specificity of
13 association in order to impute causation.
14   Q.    Are you talking again in the world of
15 teratology, or as a Bradford Hill criterion in
16 epidemiology generally?
17   A.    Well, I think it's a false and artificial
18 kind of separation of agents that can cause birth
19 defects from agents that can cause a broad spectrum
20 of adverse effects because the same agent, the same
21 agent can cause birth defects as can cause other
22 kinds of adverse effects, including cancer.
23   Q.    Do you know who Tina Chambers is?
24   A.    Yes. I don't know her personally.
25   Q.    She used to be the president of the

Page 420

1  Teratology Society. Did you read her editorial in
2  the BMJ?
3    A.    Yes, I did.
4    Q.    Okay. And she says, "One of the
5  fundamental principles of teratology is that
6  teratogenic exposures induce specific patterns of
7  malformations and not an increase in the incidence
8  of every defect." Do you disagree with her?
9    A.    I would agree that it would be very
10 unusual, it would be very unusual, and I don't know
11 of any cases where a teratogen is associated with an
12 increased risk of every possible defect of any kind.
13 However, I think that in this case, in particular,
14 where you have an effect on a very, very early stage
15 and broadly-acting signaling molecule, you can see
16 and we do see a broad spectrum of effects in certain
17 organ systems.
18   Q.    Are you familiar with the textbook General
19 Principles of Teratology?
20   A.    I may have. I don't know.
21   Q.    Have you ever heard of Wilson's Principles
22 of Teratology?
23   A.    Yes, I have.
24   Q.    Okay. And his principle 3 is teratogenic
25 agents act in specific ways, mechanisms on

Page 421

1  developing cells and tissues, to initiate abnormal
2  embryogenesis. Do you agree with that statement?
3    A.    Yes, I would agree with that.
4    Q.    So, you're not just saying that this
5  principle of teratology is wholly invalid or just
6  wrong, are you?
7    A.    I'm not -- I think what we may be doing is,
8  we may be at cross purposes in terms of the
9  interpretation of this issue of specificity, which I
10 think has been -- has been posited in a much too
11 narrow framework.
12   Q.    Are you familiar with the book Teratogenic
13 Effect of Drugs: A Resource For Clinicians. I know
14 you're not a clinician, but are you familiar with
15 the book?
16   A.    I don't know.
17   Q.    It says, "Teratogenic exposures typically
18 produce qualitative distinct patterns of congenital
19 anomalies in affected children." Do you agree with
20 that statement?
21   A.    I think often they do.
22   Q.    Precisely what defects do you claim are in
23 the spectrum of defects, the distinct pattern of
24 defects that Paxil can cause?
25   A.    Very broadly, cardiac defects, there are

106 (Pages 418 to 421)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 422

1 craniofacial defects, and there are a range of other
2 defects that have been reported in the literature
3 associated with exposure to Paxil.
4 Q.     Okay.  Are you familiar with the Teratology
5 Society Public Affairs Committee Position Paper on
6 causation and teratology?
7 A.     I may have read it.  I don't recall.
8 Q.     You're not a member of the Teratology
9 Society?
10 A.     No, I'm not.
11 Q.     Okay.  I'd like you to look at Table 3 in
12 the paper.
13         MS. HALPERN:  Exhibit 22.
14         MR. SHEEHAN:  No, it's Exhibit 64.
15         MS. HALPERN:  Exhibit 64.
16 Q.     Have you ever seen this paper before?
17 A.     I don't recall.
18 Q.     Okay.  Turn to Table 3.  Could you read
19 principle number 3?
20 A.     "Determination of a causal relationship
21 between a chemical and an outcome is specific to the
22 chemical at issue."
23 Q.     Now, you agree with that, don't you?
24 A.     I think I need to look at this in the
25 context.  "Determination of a causal relationship

Page 423

1 between a chemical and an outcome is specific to the
2 chemical at issue."
3 Q.     So, if you're studying Paxil, it's limited
4 to Paxil?
5 A.     Maybe not.  It also may be informed by the
6 action of other agents in the same class.  We
7 certainly have examples of that, not just in terms
8 of drugs, but in terms of chemicals.  We know that
9 for a fact.  So, the determination of a causal
10 relationship is very much informed not only by that
11 specific chemical, but by other chemicals or agents
12 in the same class.  That would be my opinion about
13 that.
14 Q.     So, you disagree with number 3?
15 A.     Well, I would expand it.  I think that
16 that, it is both specific to the chemical and may
17 also include other chemicals in the same class.
18 Q.     All right.  Let's look at principle 4 under
19 Table 3.  "Determination of a causal relationship
20 between a chemical and an outcome is specific to the
21 outcome at issue."  You disagree with that one, too?
22 A.     Well, again, I would say if there is a
23 specific syndrome or effect that's been noted, that
24 can -- consistently noted, that can, obviously, it
25 would be indicative of a causal relationship, but

Page 424

1 that doesn't mean that that is the only outcome that
2 one might see, and that if there are other outcomes
3 or other organ systems that are affected, that there
4 is not a causal relationship just because it's not
5 specific.
6 Q.     Doctor, there are four different models for
7 assessing causation in this Teratology Society
8 statement, right?  Tables 1, there are two in Table
9 2, and one in Table 3, right?
10 A.     I take your word for it.
11 Q.     Okay.  And the one thing they all have in
12 common is they require specificity of defect, don't
13 they?
14 A.     I'd have to read it.
15 Q.     Well, let's look at Table 1, which is
16 Wilson's principles, item 3.  It says, "Teratogenic
17 agents act in specific ways, mechanism on developing
18 cells and tissues to initiate abnormal
19 embryogenesis."  Correct?
20 A.     Well, in that case, the way Wilson defines
21 specificity, I think it's very consistent with my
22 opinion.
23 Q.     Do you agree with that one?
24 A.     They act in specific ways and mechanisms,
25 but that doesn't mean that there is only one effect

Page 425

1 that one might observe.
2 Q.     Okay.  Look at Table 2 for Brent on the
3 left side, the first point.  "Epidemiology studies
4 consistently demonstrate an increase in the
5 frequency of congenital malformations and especially
6 a recognizable syndrome in exposed population."  Do
7 you agree with that one?
8 A.     I agree that consistency is an important
9 factor, but does not mean that every epidemiological
10 study needs to show that association or that
11 increased risk, and if studies are not designed to
12 show -- to be able to demonstrate a recognizable
13 syndrome, then that needs to be taken into account,
14 and that certainly is the case here.
15 Q.     Let me just ask you this then, Dr. Kramer.
16 Do you agree that anyone claiming they can assess
17 whether Paxil causes a specific type of cardiac
18 defect without any data on that specific cardiac
19 defect would be speculating?
20 A.     No, I don't think so.
21 Q.     You disagree with that?
22 A.     Well, and I also don't agree with the words
23 "any data."  I think that's the trap, is the "any
24 data."  Any data means no data whatsoever on this
25 subject?  I don't think anybody would render an

107 (Pages 422 to 425)

Page 426

1  opinion about something on which they had no data
2  whatsoever of any kind from any source.
3  Q.      Let's look again at Exhibit 8.
4  A.      Which one is that?
5  Q.      Which is the trial graphics.
6          MS. HALPERN:  You need to change the
7  tape?  Okay.
8          THE WITNESS:  I'm sorry?
9          MS. HALPERN:  He has to change the
10 tape, so we have to stop for a minute.
11         THE VIDEOGRAPHER:  The time is now
12 5:42.  This concludes tape number 6 of the video
13 deposition of Dr. Shira Kramer.
14         (Brief recess.)
15         THE VIDEOGRAPHER:  The time is now
16 5:52.  This begins tape number 7 of the video
17 deposition of Dr. Shira Kramer.
18 BY MS. HALPERN:
19 Q.      Dr. Kramer, are the power calculations you
20 gave me earlier based on coarctation of the aorta?
21 A.      I'd have to look at them.
22 Q.      Do you know what you based them on?
23 A.      I'd have to look at them.  Again, I don't
24 recall.  I mean, I did a lot of power calculations
25 for a lot of the relative risks.

Page 427

1  Q.      Did you do any power calculation based on
2  LVOTO?
3  A.      Well, before we pursue this, I'd like to
4  take a look at -- I don't think that's the one.  Oh,
5  wait a minute, yes, it is, yes, it is.  Let me just
6  take a look.  All right.  So, we did sample size
7  calculations.  I looked at -- so, we did -- I did
8  Alwan, coarctation of the aorta.  No, I'm sorry,
9  LVO.
10 Q.      What were the power calculations based on?
11 A.      The power calculations were based on
12 certain assumptions of the same case-control ratio
13 as in the study.  They were based on 80 percent
14 power and detecting an odds ratio or relative risk
15 of -- well, let me back up.  The power calculation
16 was based on the actual number of cases exposed or
17 exposed, the number of controls or the number of
18 unexposed, and then I calculated the percent exposed
19 of cases or percent risk of disease among the
20 exposed, and then I calculated the percent of
21 exposed controls or the percent risk of disease
22 among the unexposed, and then I calculated the power
23 of that study to detect the relative risk or the
24 odds ratio that they reported in the study.
25         So, for instance, if Cole, in the Cole

Page 428

1  study, Cole reported an odds ratio of 1.46, and it
2  was not statistically significant, that study had a
3  power of about 27 percent to detect that odds ratio
4  as statistically significant.
5          Now, I also did a corollary analysis where
6  I looked at the number of individuals that Cole
7  would have had to have included in his study in
8  order to detect an odds ratio or relative risk of 2
9  as statistically significant.  So, I did it both
10 ways.
11 Q.      Let me ask you this:  Would you agree that
12 increasing the power of a study does not mean that
13 the direction of any risk will remain in the same
14 direction?  It could go up or it could go down?
15 A.      It could change.
16 Q.      Okay.  So, when you say the studies aren't
17 powered properly, you don't know what would happen?
18 A.      Well, I'm going to give you -- there are
19 two answers to that.  First of all, if you don't
20 have enough people in the study to detect any cases
21 or if you -- or even one case, then I think it's
22 fair to say that a failure to detect cases tells you
23 nothing, and in that case, if you were to have
24 included enough individuals in the study to have --
25 to enable the study to detect at least, you know,

Page 429

1  three to 10 cases, then it's highly likely that the
2  actual point estimate would be different.
3  Q.      It would be different.
4  A.      Well, it would be different.  And it
5  wouldn't just be a matter of tightening up the
6  confidence limits, which is where you're headed with
7  this.  It's really that the odds ratio would
8  probably change, highly likely would change.  If you
9  have a study like Pedersen where you have 299
10 exposed to paroxetine, you're looking at coarctation
11 of the aorta, there's almost no chance that that
12 study has of detecting any cases of coarctation of
13 the aorta.
14 Q.      All that I'm asking you, Dr. Kramer, is
15 that if you increase the power of the study,
16 anything could happen.  The data could go up, it
17 could go down, true?
18 A.      Potentially, yes.
19 Q.      The odds ratio from not statistically
20 significant could become statistically significant,
21 or a statistically significant finding could become
22 protective?
23 A.      Possibly.
24 Q.      Okay.  Now, you say in paragraph 50 of your
25 general report that the process of causation and the

Page 430

1  tools that scientists and epidemiologists use to
2  arrive at causation are widely agreed upon and
3  employed every day by scientists, right?
4  A.    That's correct.
5  Q.    Okay. So, there are some biostatistical
6  tools, some rules that you follow, right, that you
7  have to follow or the study won't be good or your
8  analysis won't be good, right?
9  A.    Where are you referring -- what are you
10 referring to?
11 Q.    I'm just asking you. That's just a
12 question.
13 A.    Okay. Can you rephrase the question?
14 Q.    You have some rules that you follow in
15 terms of --
16 A.    For what?
17 Q.    -- designing a study, interpreting the
18 data, reaching your conclusions.
19 A.    Generally, yes.
20 Q.    Okay. And in that article that you wrote
21 on epidemiology in the law, you said for a complex
22 process such as toxic tort litigation, that
23 awareness of the role of epidemiology in litigation,
24 that you need the appropriate utilization of
25 standard epidemiologic tools. That's what you said.

Page 431

1  You said it's essential for good practice in the
2  administration of justice. You would agree with
3  that, right?
4  A.    Well, I'd have to see the article. I
5  don't --
6  Q.    No, no. I'm not asking if you said it.
7  I'm just asking if you agree that, especially
8  epidemiology in litigation, you need standard
9  epidemiologic tools to apply, right?
10 A.    I think you need standard epidemiologic
11 tools no matter what.
12 Q.    Okay. Fine. That's all that I'm asking.
13 So, is it fair to say that in any study, there will
14 almost always be some difference between what
15 happens to people exposed to a drug and those not
16 exposed, right? In any study you're going to find
17 some difference? It's not going to always be
18 identical?
19 A.    Of course.
20 Q.    Okay. And you would agree that statistical
21 significance, at least, is a standard way of
22 determining which of those differences is worth
23 paying attention to?
24 A.    No, I would not agree with that.
25 Q.    You don't accept it, but you agree others

Page 432

1  do?
2  A.    Increasingly, I would say that is not the
3  case. The reliance on statistical significance has
4  been rejected in general in the field of
5  epidemiology.
6  Q.    Do you agree that statistical significance
7  testing is still commonly used by epidemiologists?
8  A.    It is still commonly done, but it is also
9  recognized that it is a mistake and can be very
10 misleading to rely on statistical significance
11 testing for judgments as to the value or
12 contributory value of epidemiological data.
13 Q.    Okay. And is it fair to say that most of
14 the study results on which you rely for your
15 opinions in this case do not meet the conventional
16 generally accepted threshold for statistical
17 significance?
18 A.    When you talk about generally --
19 Q.    The .05 level, the 95 percent confidence.
20 A.    Well, that's historically -- that's the
21 historical sort of cut-off point, which I have
22 explained in testimony before, really has no place
23 in issues that we deal with in epidemiology.
24 Q.    Okay. And for -- you would agree that when
25 the confidence interval includes 1, the results

Page 433

1  generally in that study may be due to random
2  variation? Let's look at your general report, if
3  you have it in front of you, paragraph 32. Did you
4  write that? That's one of the ones you said you
5  wrote, correct?
6  A.    Well, let me read what you're -- I wrote
7  this report. I just want to read what you're
8  quoting.
9  Q.    You said you wrote that page, is what you
10 testified to earlier.
11 A.    Yes.
12 Q.    And what I'm referring to is, "A confidence
13 interval that does not include 1 indicates that the
14 observed risk ratio is inconsistent with the
15 conclusion that there is no association between
16 exposure and disease. In other words, when a risk
17 ratio is above 1 and the confidence limits include
18 1, the results generated in that study may be due to
19 random variation."
20 A.    That's correct.
21 Q.    You wrote that?
22 A.    Yes.
23 Q.    Okay. And you would agree that when the
24 confidence interval includes the null value of 1,
25 that particular result is considered a negative

109 (Pages 430 to 433)

Page 434

1 finding?
2 **A.     Well, according to the practice of**
3 **statistical hypothesis testing using p-values with a**
4 **cut-off point of .05, that would be an accurate**
5 **statement.**
6 Q.     Well, in your report on page 34, you write,
7 in fact, you define a negative finding --
8      MR. FOX:  Right here.
9 **A.     I'm sorry.**
10 Q.     Your report.  I'm tired, too.  There you
11 define a negative finding as a risk ratio with a
12 non-statistically significant p-value or a
13 confidence interval that includes the value of 1.
14 **A.     Well, again, I'm sorry, because I am**
15 **getting tired, I qualify this by saying by**
16 **definition of hypothesis testing.  Okay?  That's**
17 **what we talk about in that paragraph.  Okay?  So,**
18 **now, I'm sorry, I'm asking you to repeat the**
19 **question again.**
20 Q.     Well, you say a negative finding, in
21 paragraph 34, you say a negative finding is a risk
22 ratio with a non-statistically significant p-value
23 or a confidence interval that includes the value of
24 1.  That's how you define it in paragraph 34.
25 **A.     Does not prove the null hypothesis.**

Page 435

1 Q.     That's what you said, right.
2 **A.     That's right.**
3 Q.     Okay.  So, if you say a finding
4 statistically significant at the .05 level is the
5 same as saying that a 95 percent confidence interval
6 did not include the null value, correct?
7 **A.     Correct.**
8 Q.     All right.  So, you've testified that
9 utilizing statistical significance testing is,
10 quote, dangerous, and, quote, damaging, quote, leads
11 to gross misinterpretation of information, quote,
12 causes huge mistakes, and because of that, the
13 epidemiological community, the profession has,
14 quote, roundly rejected reliance on it, correct?
15 **A.     I believe that that's true, that it is very**
16 **ill-advised to rely on statistical significance**
17 **testing.**
18 Q.     Okay.  And you stated in the field, I think
19 you just said that epidemiology has moved away from
20 and has rejected overreliance and dependence on
21 p-values and significance testing as a crutch and as
22 a yes/no criterion for the acceptability of
23 meaning -- I'm sorry, as a yes/no criterion for the
24 acceptability or meaningfulness of data?
25 **A.     Correct.**

Page 436

1 Q.     That's what you say as an expert in this
2 case, right?
3 **A.     That's correct.**
4 Q.     Okay.  Does the weight of evidence
5 methodology you apply permit you to reach a causal
6 conclusion even if none of the results of
7 epidemiologic studies find a statistically
8 significant association --
9 **A.     Yes.**
10 Q.     -- or increased risk at the conventional 95
11 percent level of significance?
12 **A.     Yes.  As a matter of fact, there's an**
13 **excellent example of that in Ken Rothman's textbook,**
14 **which I brought with me today, where he shows that a**
15 **large series of clinical trials that did not attain**
16 **statistical significance and were, therefore,**
17 **rejected on that basis, actually were done so in**
18 **great error because, taken in total, they indicated**
19 **a positive effect of the drug, and he actually**
20 **devotes a significant section of that textbook to**
21 **discussion of this, exactly the same issue.**
22 Q.     Okay.  I just want to understand your
23 position.  And, in fact, in your declaration in
24 paragraph 14, you write with regard to significance
25 testing that it is neither necessary nor appropriate

Page 437

1 as a requirement for drawing inferences from
2 epidemiologic data, correct?
3 **A.     Paragraph 14?**
4 Q.     In your declaration.  It's neither
5 necessary --
6 **A.     Oh, in my declaration?**
7 Q.     Yes.  It's Exhibit 5.
8      MR. FOX:  Tab 5.
9 **A.     I'm sorry.  Just give me a second.**
10 Q.     Paragraph 14.  You state that it is neither
11 necessary nor appropriate as a requirement for
12 drawing inferences from epidemiologic data.
13 **A.     Okay.  Well, these are quotes from other**
14 **people.  This is not -- this is the -- this is a**
15 **quote from Ken Rothman, Noel Weiss and James**
16 **Robbins, Ray Neutra and Steve Stellman.**
17 Q.     From their amicus brief, right?
18 **A.     From their amicus brief.**
19 Q.     And do you agree with that statement?
20 **A.     That's correct.**
21 Q.     All right.  And in paragraph 10, I don't
22 know if it's a quote, but you say that it is
23 inappropriate and ill-conceived to rely on
24 statistical testing when one should really measure
25 or quantify the effect and to specify the precision

Page 438

1    of the parameter of effect, right?
2    A.    Okay. You're reading from paragraph 10?
3    Q.    Paragraph 10. It's inappropriate and
4    ill-conceived, do you see that, to rely on
5    statistical testing?
6    A.    Some researchers have developed an
7    inappropriate and ill-conceived reliance on
8    statistical significance testing, yes, I say that.
9    Q.    And that instead one should rely -- really
10   measure or quantify the effect to specify the
11   precision of the parameter of effect, right?
12   A.    Well, that means you generate the actual
13   point estimate and an odds -- and a confidence
14   limit.
15   Q.    So, you look at the lower bound and the
16   upper bound and the width of the confidence
17   interval?
18   A.    Correct.
19   Q.    That's what it means to specify the
20   precision of the parameter?
21   A.    That's correct.
22   Q.    Meaning you should consider the confidence
23   interval, right?
24   A.    That's correct.
25   Q.    Okay. And in your textbook, which I know

Page 440

1    2007, right?
2    A.    That's correct.
3    Q.    This is years after the amicus brief was
4    filed by Greenland, right?
5    A.    I assume so, yes.
6    Q.    Okay. And Rothman, whoever was on it. And
7    it was published in a supplement to the American
8    Journal of Epidemiology, right?
9    A.    That's correct.
10   Q.    And it evaluated whether there were higher
11   rates of neuroblastoma in children located near a
12   munitions factory compared to control children,
13   correct?
14   A.    That's correct.
15   Q.    And neuroblastoma is a rare and specific
16   kind of cancer, right?
17   A.    That's correct.
18   Q.    So, you evaluated and reported results
19   specific to neuroblastoma and you didn't lump all
20   cancers together; we talked about that earlier,
21   right?
22   A.    That's correct.
23   Q.    Now, turning your attention to the results,
24   you state that the observed number of neuroblastoma
25   cases significantly exceeded the expected value with

Page 439

1    you say was written a long time ago, you say the
2    first question to ask about a difference between
3    groups and frequency of disease is whether it's
4    statistically significant. You no longer agree with
5    that?
6    A.    I no longer subscribe to that.
7    Q.    Well, let's see what you do in practice
8    outside of testing. In your own studies -- by the
9    way, is that SIR, standardized incidence ratio,
10   generally similar to an odds ratio or relative risk?
11   A.    It's generally interpreted the same way.
12   Q.    I think you have Exhibit 79. I think we've
13   looked at that.
14         MR. FOX: Are those abstracts?
15         MS. HALPERN: It's the abstracts, yes.
16   Over there, if you take a look.
17   Q.    Okay. If you look at Exhibit 79, this is
18   that abstract entitled Elevated Incidence of
19   Neuroblastoma in a Community, and you conducted this
20   study, correct?
21   A.    Correct.
22   Q.    And an EI employee is a coauthor, right?
23   A.    That's correct.
24   Q.    And the abstract was presented at the
25   Society for Epidemiologic Research Annual Meeting in

Page 441

1    standardized incidence ratios ranging from 4.47 to
2    12.52, and then you state none of the 95 percent
3    confidence intervals included the null value.
4    Right?
5    A.    That's correct.
6    Q.    So, you stated to the scientific community
7    of epidemiologists that you were sharing this with,
8    that the results were statistically significant at
9    the conventional .05 level of significance, and you
10   didn't report anything about the confidence
11   interval, correct?
12   A.    Well, that's not true. In the actual
13   presentation we did.
14   Q.    I'm asking what's in the abstract.
15   A.    Well, in this abstract, that's correct, but
16   we were, you know, we were somewhat restricted in
17   terms of space, but the actual presentation
18   presented the confidence limits in all of the
19   results.
20   Q.    And directing your attention to the last
21   sentence of the abstract, you write, "When the
22   initial 10-year time frame was analyzed, the
23   standardized incidence ratios were attenuated but
24   remained elevated and statistically significant."
25   You wrote that, right?

111 (Pages 438 to 441)

Page 442

1    **A.**      **That's correct.**
2    Q.      Okay. I'd like to show you another
3   abstract, I don't think you've seen this one before,
4   Exhibit 92, that you presented entitled Association
5   Between Hazardous Waste from a Munitions Factory and
6   Neuroblastoma, and this appears to be an abstract of
7   the same study we just discussed, correct? And this
8   time it was presented to another group of
9   epidemiologists, the Society for Pediatric and
10   Perinatal Epidemiology Research, and this was done
11   just last year, correct?
12   **A.**      **I believe it was the same time that this**
13   **was.**
14   Q.      Well, turn the page and you'll see the
15   cover.
16   **A.**      **2007.**
17   Q.      It's a different presentation, right?
18   **A.**      **It's 2007, the same time frame.**
19   Q.      Okay. All right. And again, you present
20   no information about the confidence interval, right?
21   **A.**      **In this abstract, that's correct.**
22   Q.      So, there's no information about what you
23   call the precision of your estimates, right? You
24   only report on the statistical significance in that
25   abstract?

Page 443

1    **A.**      **In this abstract, that's correct.**
2    Q.      Exhibit 96. This is another abstract you
3   wrote entitled Elevated Rates of Neuroblastoma
4   Associated with Exposure to Coal Tar from a Former
5   Manufacturing Gas Plant, MGP Site, and you are the
6   first named author of this abstract, correct?
7   **A.**      **That's correct.**
8   Q.      And you have two coauthors. There's both
9   employees at Epidemiology International, right?
10   **A.**      **They were, yes.**
11   Q.      Has this study been submitted for
12   publication?
13   **A.**      **Not yet.**
14   Q.      All right. This was presented at the
15   annual meeting of the American College of
16   Epidemiology in 2007, right?
17   **A.**      **That's correct.**
18   Q.      And the study evaluated standardized
19   incidence ratios between various comparison groups
20   looking at the incidence of neuroblastoma in
21   relation to gas plant sites, right?
22   **A.**      **Manufactured gas plant sites, that's**
23   **correct.**
24   Q.      Okay. And directing your attention to the
25   results section, you write, "In all comparison

Page 444

1   groups, the SIR," the standardized incidence ratio,
2   "for neuroblastoma ranged from 9.9 to 2.43."
3   **A.**      **24.3.**
4   Q.      I'm sorry, you're right, "24.3, with a
5   lower bounded 95 percent confidence interval that
6   did not include 1." Correct?
7   **A.**      **That's correct.**
8   Q.      You're telling your audience that it was
9   statistically significant at the 95 percent
10   confidence rate?
11   **A.**      **Well, I think in all of these cases, I need**
12   **to make it very clear that the audience was provided**
13   **with a much more detailed summary of the results,**
14   **which included the 95 percent confidence intervals,**
15   **and my position about statistical significance**
16   **testing holds, and that is, that I do not believe**
17   **and did not believe here, do not believe now, that**
18   **it is appropriate to rely on statistical**
19   **significance testing. If -- I do routinely**
20   **calculate 95 percent confidence intervals and**
21   **present them, and I still do not believe that it is**
22   **appropriate to rely on the statistical significance**
23   **or lack thereof, which I don't do.**
24   Q.      Doctor, in the space that you wrote with a
25   lower bounded 95 percent confidence interval that

Page 445

1   did not include 1, you could have easily put in the
2   confidence interval. It would have taken up less
3   space. But you chose to put those words in, did you
4   not?
5   **A.**      **Yes, we did.**
6   Q.      So, you said statistical significance,
7   yes/no, when you could have said, here's the
8   confidence interval, and this is the provision, the
9   lower bound and the upper bound, and you chose to
10   say statistical significance, yes/no; that's what
11   you put in the abstract?
12         MR. FOX: Objection to form.
13   **A.**      **Well, in this abstract, we just simply said**
14   **that the lower bound of the confidence interval did**
15   **not include 1. That's what we said.**
16   Q.      Well, in the conclusion, you write, "There
17   was a significantly elevated incidence rate of
18   neuroblastoma in children during a time period of
19   heightened ambient exposure to coal-tar-related
20   contaminant relative to all comparison populations."
21   You wrote that, right?
22   **A.**      **That's correct.**
23   Q.      So, you thought it was important to stress
24   that the incidence rate was significantly elevated?
25   **A.**      **I don't agree that it's really, that's the**

112 (Pages 442 to 445)

Page 446

1  critical message here.  I think the critical message
2  is that these SIRs were very, very high, and as I
3  said, we presented the confidence intervals when we
4  presented the presentations, and I still don't think
5  that this indicates any kind of inconsistency with
6  my testimony.
7  Q.    You do not write that the gas plant sites
8  cause neuroblastoma, correct?
9  A.    In this abstract -- wait a minute.
10 Q.    You write at the end of the results
11 section, it may imply an effect of the gas plant
12 sites and cancer incidence, that's what you wrote,
13 it may imply an effect.  Those were your words,
14 right?
15 A.    Well, in the conclusion?  That's not what
16 I'm reading.
17 Q.    In the results section.  Do you see that?
18 You write that the elevated incidence rates may
19 imply an effect of the gas plant sites and cancer
20 incidence.
21 A.    That's what we wrote, that's correct.
22 Q.    You don't write that it causes
23 neuroblastoma, correct?
24 A.    That's right, in this document, that's not
25 what we wrote.

Page 447

1  Q.    And you have multiple statistically
2  significant elevated incidence rates, so you need
3  more than just that before you conclude that it's a
4  cause of neuroblastoma, right?
5  A.    I don't agree.  I did conclude that it is a
6  cause of neuroblastoma.
7  Q.    That's not what you put in the abstract,
8  right?
9  A.    That's not what was written, but I
10 certainly did conclude that.
11 Q.    Exhibit 120, please.  I'd like to show you
12 another abstract you coauthored entitled A
13 Persistent Worldwide Environmental Hazard: Former
14 Manufactured Gas Plant Sites, Association of an FMPG
15 Site with Childhood Neuroblastoma, and you have
16 three coauthors.  Again, all them are employees at
17 EI, true?  Are they all employees of EI?
18 A.    Except for one.  One is no longer working
19 for EI.
20 Q.    But they were at the time of the abstract?
21 A.    Yes, that's correct.
22 Q.    Okay.  And it was presented at the 20th
23 conference of the International Society for
24 Environmental Epidemiology in 2008, right?
25 A.    That's correct.

Page 448

1  Q.    So, this one was presented last year?
2  A.    That's correct.
3  Q.    Correct?  And, Dr. Kramer, this article was
4  written years after the amicus brief, correct?
5  A.    That's correct.
6  Q.    Now, directing your attention to the
7  Results section, you write that, "In all comparison
8  groups, the SIR for neuroblastoma ranged from 9.9 to
9  24.3, with a lower-bounded 95 percent confidence
10 interval that did not include 1."  Did I read that
11 right?
12 A.    That's correct.
13 Q.    So, to this group, again, you thought it
14 was more important to note that the lower bound did
15 not include 1 and that it was statistically
16 significant than to provide the confidence interval,
17 true?
18 A.    No, I think you're misrepresenting, and
19 that is not the case.  That's the way this was
20 written.  As a matter of fact, it does not in any
21 way contradict my position that it is dangerous and
22 inappropriate to rely on statistical significance.
23 None of these examples contradict that point of
24 view.
25 Q.    Do you have any findings in any of your

Page 449

1  abstracts where you didn't use a 95 percent
2  confidence interval, where you used some other?
3         MS. HALPERN:  85, Tom.
4         MR. SHEEHAN:  85 is out there.  We've
5  looked at it.
6         MS. HALPERN:  Okay.  Let's see if we
7  can find 85.
8         THE WITNESS:  85 is right here.
9  Q.    Okay.  Great.  Thank you.  That is another
10 abstract -- I'm sorry.  Did you answer that
11 question, whether you ever used in any of your
12 publications anything other than a 95 percent
13 confidence interval?
14 A.    I might have used 90 percent, I believe.
15 Q.    Okay.  I haven't seen any.
16 A.    I don't know.
17 Q.    Okay.
18 A.    I believe I have in the past, but I don't
19 recall.
20 Q.    I'd like to show you Exhibit 85, which is
21 an abstract entitled Excess Cancer Risk Among a
22 Population Exposed to Environmental Carcinogens, and
23 you're the last named author on this abstract,
24 right?
25 A.    That's correct.

USDC, Northern District of OK                    McMurray v. GSK                                          Monday
No. 08-CV-381-GKF-SAJ              Videotape Deposition of Shira Kramer, Ph.D.              November 2, 2009

Page 450

1    Q.       And this was also presented last year at
2  the Society for Epidemiologic Research, 41st Annual
3  Meeting, correct?
4    A.       Correct.
5    Q.       And all your coauthors, at least at the
6  time of the abstract, were employees of EI?
7    A.       That's correct.
8    Q.       Now, this study looked at exposure to
9  various chemicals and rates of various kinds of
10 cancer, right?
11   A.       That's correct.
12   Q.       So, it was not exposure to one
13 chemical, but many chemicals, right?
14   A.       That's correct.
15   Q.       And these various chemicals all have
16 different toxicological effects on the body,
17 correct?
18   A.       That's correct.
19   Q.       Now, directing your attention to the bottom
20 third of the abstract, you write that in communities
21 exposed to environmental carcinogens, there was a 31
22 percent increase in risk of all cancer, and now you
23 actually do present the 95 percent confidence
24 interval, right?
25   A.       Correct.

Page 451

1    Q.       And in this study, you report the entire
2  confidence interval for all cancers combined, true?
3    A.       True.
4    Q.       So, you demonstrate that the finding in
5  your report is statistically significant at the 0.05
6  level of significance, correct?
7    A.       Are you asking me if that's what those
8  confidence intervals show?
9    Q.       Yes, yes, that's what I'm asking.
10   A.       That is consistent with what those
11 confidence intervals show.
12   Q.       So, you go on to write that elevated risks
13 of specific cancer subtypes were observed across all
14 three referenced populations with the most
15 consistent association seen for non-Hodgkin's
16 lymphoma in adults aged 40 to 64, and now you give
17 an SIR range and just say confidence intervals not
18 including 1, right?
19   A.       And that was because we really didn't have
20 space.  We had a range of four confidence
21 intervals -- of four sets of confidence intervals in
22 addition to those SIRs.
23   Q.       All right.  So, you reported the risk range
24 as you did in paragraph 118 of your general report,
25 but here you restricted your risk range to those

Page 452

1  findings that were statistically significant at the
2  95 percent confidence interval, true?
3    A.       Can you restate that?
4    Q.       Yes.  The risk range you provide here are a
5  risk range only for findings that were statistically
6  significant at the 95 percent level; that's your
7  risk range?
8    A.       I wouldn't say that.
9    Q.       It says it right there.
10   A.       The highest, the most consistent
11 association, and this was the one that we
12 highlighted for this summary, but that doesn't mean
13 that we did not report the other risks in this or
14 the other SIRs in the presentation.
15   Q.       No, but you give a risk range here and you
16 limit it to statistically significant findings.
17   A.       No, we limit it to non-Hodgkin's lymphoma
18 in adults aged 40 to 64, because the elevated risk
19 of specific cancer subtypes were most consistent for
20 NHL in adults in this age range and that in fact was
21 the SIR range.
22   Q.       So, everything that you found was
23 statistically significant?
24   A.       Well, this was the most consistent finding
25 and we highlighted it in this abstract.

Page 453

1    Q.       But all the risk ranges that are within
2  3.88 and 4.62 were statistically significant?
3    A.       That's correct.
4    Q.       Okay.  Did you have other findings where
5  the 95 percent confidence interval included 1?
6    A.       I don't recall.
7    Q.       But you chose not to report them if they
8  were there?
9    A.       Well, that's not true either.
10   Q.       Well, if they're there, they're not
11 reported.
12   A.       They're not in this abstract, but that
13 doesn't mean we didn't report them.
14   Q.       Okay.  All right.  You state in your
15 general report that the level of significance
16 indicates the degree of tolerated uncertainty.  Is
17 that true?  That's right in paragraph 26 of your
18 general report.
19         MR. FOX:  Last sentence.
20   Q.       Do you see it there?
21   A.       I am quoting from someone else who states,
22 "Dr. Upshur states," that's a quote from this
23 individual.
24   Q.       Well, the important thing is, do you agree
25 with it?  Is that why you quoted it?

114 (Pages 450 to 453)

USDC, Northern District of OK                    McMurray v. GSK                              Monday
No. 08-CV-381-GKF-SAJ              Videotape Deposition of Shira Kramer, Ph.D.              November 2, 2009

Page 454

1   A.    Well, this is -- I quoted it to explain
2   what -- how this is used and how it may be
3   interpreted when statistical significance is
4   actually utilized in the analysis.
5   Q.    Can you, Dr. Kramer, tell me of any drug or
6   chemical where there's a generally accepted causal
7   association with an adverse effect that's based on
8   findings that were not found to be statistically
9   significant at the .05 level of significance?
10  A.    I would -- I cannot cite specific examples
11  now, but I would be very surprised if, in the body
12  of a literature of established or recognized
13  teratogens, that there weren't results that did not
14  meet the threshold for statistical significance.
15  Q.    Dr. Kramer, does the weight of the evidence
16  methodology that you apply permit you to reach a
17  causal conclusion even if none of the Bradford Hill
18  criteria for causation are met, with the one
19  exception of temporality?
20  A.    Temporality is absolutely required, and I
21  would say that even Bradford Hill himself recognized
22  that these were just some guidelines that he was
23  offering, but that none were -- none, absolutely
24  none represented a sine qua non.  So, I would say
25  it's not absolutely required.  In my own weight of

Page 455

1   evidence analysis, I look for and certainly do
2   recognize the value of certain criteria.  Others, I
3   reject completely.  Consistency in terms of a, you
4   know, a body of literature that, articles that do
5   show an elevation in risk.  It's helpful to have
6   biological plausibility, but not necessary.
7   Q.    Okay.  So, let me ask my question again.
8   Does your weight of the evidence methodology allow
9   you to reach a causal conclusion even if none of the
10  Bradford Hill criteria for causation are met, with
11  the one exception of temporality?
12      MR. FOX:  Objection to form.
13  A.    I would say that in general, when I form
14  causal -- when I conclude that there is a causal
15  relationship between a factor and an outcome, there,
16  in addition to temporality, there are some
17  modifications of some of the Bradford Hill suggested
18  guidelines that I normally do.
19  Q.    What are they?
20  A.    As I just mentioned, consistency, there
21  obviously needs to be evidence in the, in studies
22  that have been done that demonstrate an elevation in
23  risk, more than one study, and, you know, although
24  not necessary, it's very helpful if you see
25  biological plausibility.

Page 456

1   Q.    In your declaration, which is Exhibit 5, in
2   paragraph 30, you say that Bradford Hill is an
3   inappropriate and outdated approach to the
4   interpretation of a body of evidence.
5   A.    That's right.  The strict, in the way the
6   GSK experts, many of them strictly apply all of the
7   Bradford Hill guidelines, which they call criteria,
8   I believe inappropriate.
9   Q.    And if you turn to paragraph 35 of the same
10  declaration, you say Bradford Hill criteria to have
11  specificity is wholly invalid when assessing if an
12  association between Paxil and birth defects is
13  causative, true?
14  A.    That's true, as it is interpreted by most
15  epidemiologists and as Bradford Hill actually
16  states, and we can, we can -- I think it's important
17  to make sure that we understand what specificity
18  means, because there's been a bit of I think
19  confusion about that, that word.  But specificity of
20  effect has been rejected in epidemiology as a
21  criterion for causality.
22  Q.    Are you familiar with the Manual on
23  Scientific Evidence?
24  A.    Yes.
25  Q.    And they state these very same Bradford

Page 457

1   Hill criteria should be the factors that guide
2   epidemiologists in making judgments about causation.
3   Do you disagree with that?
4   A.    Well, not only do I disagree with it, Dr.
5   Rothman does in his textbook, which I brought today,
6   goes through a very lengthy description and
7   rejection of every Bradford Hill criterion except
8   for temporality.
9   Q.    Okay.  So, in addition to rejecting the
10  traditional Bradford Hill epidemiologic causation
11  criteria, you use instead this weight of evidence
12  approach, true?
13  A.    That's true.
14  Q.    Okay.  And you also use the weight of
15  evidence approach instead of the traditional
16  toxicology or teratology criteria we looked at in
17  the teratology statement?
18  A.    The traditional?  What are you referring
19  to?
20  Q.    Well, we looked at the Teratology Society's
21  list.
22  A.    So, you're calling those the traditional --
23  Q.    It does appear in the Teratology Society's
24  position statement.
25  A.    Okay.  So, these are the ones you referring

(856) 983-8484                              Tate & Tate, Inc.                              (800) 636-8283
180 Tuckerton Road, Suite 5, Medford, NJ  08055

Page 458

1  to.
2  Q.      Right.  And you prefer the weight of
3  evidence approach to using those criteria as well,
4  is that fair?
5  A.      Well, which ones are you specifically,
6  because we didn't really read all of them.
7  Q.      Well, look at the upper right, and there
8  are eight criteria there.  Do you see that?
9  A.      Yes, I do.
10 Q.      In that table?  I think that's Table 3.
11 And is it fair to say that you would use, instead of
12 those criteria, your weight of the evidence
13 approach?
14 A.      Well, I'd have to take some time to read
15 this.  I don't agree with all of the principles that
16 are outlined in Table 3.
17 Q.      Okay.  So, you would use your weight of
18 evidence methodology instead of them?
19 A.      Some of these I agree with and some I
20 don't.
21 Q.      Okay.  And you state in paragraph 1 of your
22 declaration that your weight of evidence methodology
23 is both standard and accepted in the field of
24 epidemiology as well as other scientific
25 disciplines.  It's right in the first paragraph of

Page 459

1  that declaration which is Exhibit 5.
2  A.      That's correct.
3  Q.      Okay.  What health endpoint were you
4  concerned with in your causal weight of the evidence
5  assessment?  Was it all cardiac defects together?
6  Is that how you approached it?
7  A.      Well, it was both all cardiac defects and
8  as well as the effect of SS -- the effect of Paxil
9  on the spectrum of cardiac defects as well.
10 Q.      You know, in trial you talked about the
11 spectrum of cardiac defects, and again, do you think
12 it's a spectrum, or do you think it's each and every
13 cardiac defect?  I keep getting hung up on that
14 because you keep talking about a spectrum of cardiac
15 defects.
16 A.      Well, I think I've expressed my opinion
17 about that.  I believe that Paxil --
18 Q.      Do you think it's each and every one?
19 A.      -- that Paxil can cause all cardiac
20 defects.
21 Q.      Okay.  What was your causal hypothesis
22 about coarctation of the aorta for your weight of
23 the evidence analysis?  What, how would you
24 articulate what your causal hypothesis was?
25 A.      What do you mean by that?

Page 460

1  Q.      Well, you come up with a conclusion that
2  Paxil causes coarctation of the aorta.  So, did you
3  have a causal hypothesis that you set up before you
4  applied your weight of evidence methodology?
5  A.      Well, when you do a review of the
6  literature and also consider toxicological and other
7  related fields, it's not so much a causal hypothesis
8  as you're weighing all of the converging and
9  accumulated evidence either for or against a
10 particular relationship, causal relationship.
11 Q.      Okay.
12 A.      That is an increase in risk of this
13 particular outcome.
14 Q.      So, what were your criteria for your weight
15 of the evidence analysis?
16 A.      My criteria included a body of literature
17 which -- which consistently reported, particularly
18 in studies that had at least some level of
19 statistical power, increased risks of cardiac
20 malformations and -- overall, or all cardiac
21 malformations, and then certain subgroups of
22 malformations where they reported these
23 malformations, the -- a consideration of the
24 methodological strengths and weaknesses and
25 characteristics of these studies, consideration of

Page 461

1  the power of these studies, consideration of the
2  mechanistic and biological plausibility issues and
3  literature, and consideration of any other relevant
4  experimental data that was provided, and a synthesis
5  of all of this information and then conclusion.
6  Q.      In all these materials that you have
7  brought with you, have you described your weight of
8  the evidence methodology anywhere, the one that you
9  applied?  Is it written down?
10 A.      I don't know whether we wrote it down.  I
11 mean, it's basically as I've just described it.
12 Q.      It's not in your report exactly what your
13 criteria were and how you went about it?
14 A.      Well, I think what we -- you know, I think
15 it's clear that I have reviewed, and I'm sure I
16 stated this, I reviewed the literature and the
17 associated toxicological and experimental literature
18 and considered all the literature that was available
19 and drew a conclusion.
20 Q.      Did you do a qualitative or quantitative
21 weighting scheme?
22 A.      I did not do a meta-analysis or anything
23 like that, although I took into consideration the
24 meta-analyses that were done.
25 Q.      I don't think you understand the question.

116 (Pages 458 to 461)

Page 462

1  I'm talking about your different criteria.  Did you
2  weight them in some way?  Did you consider some
3  evidence more important than others?  Was there any
4  weight given to the different criteria?  So, for
5  example, did you give a higher weight to mechanistic
6  information or epidemiologic information?
7  **A.       The basis for, you know, the review was the
8  epidemiological data, and that is the most important
9  aspect of my own review and the most important
10  aspect of my causation analysis, but then
11  conclusions about causation were informed by all of
12  the other information that I read and that I
13  received.**
14  Q.      Well, can you give me any criteria for how
15  you included one abstract, but not another abstract?
16  Because some are in your report and some you leave
17  out.  What did you -- what were your criteria?
18  **A.       Right.  Certain of the abstracts just did
19  not provide enough information to interpret the
20  study that was done.  They were so brief and so
21  scant in terms of details that they provided no
22  information.**
23  Q.      Well, is there any weighting system you
24  used, or was it just how it struck you when you read
25  the article and you looked at it?  I mean, is there

Page 463

1  anything anywhere I can go to to say, okay, this
2  article was given more weight than that one because
3  of the power or because of this or that?
4  **A.       No, and that's normally not done in a
5  weight of evidence analysis.  I'm not aware of
6  anyone that conducts a weight of evidence or
7  causation analysis where they actually put a weight
8  on a study, unless you're talking about a
9  meta-analysis.**
10  Q.      So, if I wanted to know how you did your
11  weight of evidence, what your criteria were for a
12  study being powered sufficiently or whether the
13  description in the abstract was complete or not, to
14  be included or not, or whether you considered one
15  study more informative than the other, I can't find
16  that in writing anywhere?
17  **A.       Well, certainly, that's -- you just asked
18  me a very complex, compound question.  Could you
19  break it up?**
20  Q.      Well, is there anywhere where this is
21  written down?  That's what I'm asking.
22  **A.       Well, I think we need to break it up.  The
23  issue of statistical power is provided.  If you want
24  to take a look at that, that's just simple math and
25  that's provided here.**

Page 464

1  Q.      And did you weight the study's value based
2  on your power calculation?
3  **A.       Well, it's accepted that, first of all,
4  it's recognized that most of these studies are
5  underpowered, but in some of them much more severely
6  so than others, but in face, in the face of
7  underpowered studies, results that indicate an
8  increased risk are even more striking and even more
9  important, and that's pretty well recognized,
10  that --**
11  Q.      Look at -- I'm sorry, go ahead.
12  **A.       Okay.  So, in terms of the importance of
13  results in light of low power, certainly there is,
14  you know, documentation of those power calculations.
15  And I've expressed my opinion on that.  The issues
16  of methodological aspects and characteristics such
17  as bias and confounding and so on have both been
18  dealt with in great length by the authors themselves
19  and in the meta-analytical papers that have been
20  done, as well as in our own consideration.  So,
21  they've also been -- they've also been addressed.
22          The issue of confounding has been very
23  clearly addressed.  Each one of the authors had a
24  list of, a lengthy list of confounding factors that
25  were adjusted for, which did not materially change**

Page 465

1  **the results in most cases.  So, you know, it's
2  not -- and it's not normally a situation where you
3  put a numerical weight on these issues.  You just
4  have to go through a process of evaluation and
5  interpretation.**
6  Q.      So, you didn't assign a weight to each
7  criterion?
8  **A.       No.  You don't normally do that.**
9  Q.      Okay.  Paragraph 5, last sentence of your
10  declaration, you state that your weight of evidence
11  methodology is the same as the weight of evidence
12  methodology employed by federal and international
13  agencies.  That's what you wrote, right?  That's the
14  last sentence, paragraph 5.
15  **A.       I think.  Let me just read it.  That's
16  correct.**
17  Q.      And you state in paragraph 3 of that same
18  declaration, Exhibit 5, that in assessing whether
19  exposure to a particular pharmaceutical agent may
20  cause a particular health endpoint, "Application of
21  individual causal criteria to a particular causal
22  hypothesis and the relative weight assigned to each
23  criterion is both context-dependent and subject to
24  the independent judgment of the scientist reviewing
25  the available data."  Right?

117 (Pages 462 to 465)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 466

1  A.    And that's really in a qualitative sense.
2  That's not in a quantitative sense.
3  Q.    So, there's some subject -- some ability,
4  room here for independent judgment, right?  There's
5  a subjective aspect to this?
6  A.    Well, there's not only room for independent
7  judgment, but this issue of assigning a weight was
8  not meant to convey that I put a numerical weight.
9  For instance, you've asked me do I concentrate more
10  heavily on the human epidemiological data compared
11  to some other source of data, and the answer is yes.
12  Q.    Now, you also state in support of your
13  weight of the evidence approach that federal and
14  international agencies also use a weight of evidence
15  approach to assess causality.  That's what you say,
16  right?
17  A.    That's correct.
18  Q.    And you state that they often use this
19  approach when a large body of well-conducted,
20  adequately-powered human epidemiologic studies does
21  not exist, right?
22  A.    That's correct.
23  Q.    And is that similar here, that there's not
24  in your opinion a large body of well-conducted,
25  adequately-powered human epidemiologic studies for

Page 467

1  Paxil and coarctation of the aorta, LVOTO and
2  cardiac birth defects?
3        MR. FOX:  Objection to form.
4  A.    No, I wouldn't say that.  For instance --
5  Q.    So, you do think there's a large body of
6  well-conducted, adequately-powered --
7  A.    Well, I'm going to say that there is a body
8  of studies which have their strengths, they have
9  their weaknesses.  I think that they are strong
10  enough to be able to provide very meaningful data,
11  particularly in cases where the power is at least
12  somewhat sufficient.  There are studies which I
13  believe really can't contribute very much at all
14  because they have power that's less than 10 percent.
15  But I'm also referring here to instances where there
16  are cases of evaluations that are done where there
17  are no human epidemiological studies.  I am not
18  saying that is the case with Paxil.
19  Q.    Okay.  And in declaration paragraph 4, you
20  go on to say that this methodology works, weight of
21  evidence works because, "Expert multi-disciplinary
22  panels evaluate all the available and relevant
23  scientific evidence in reaching your overall
24  conclusions."  Right?
25  A.    Correct.

Page 468

1  Q.    And you state in the declaration, paragraph
2  5, that, "these panels are comprised of scientists
3  and experts from various backgrounds whose explicit
4  purpose is to review the body of scientific
5  literature relating to the adverse health effects of
6  certain chemicals."  Did I read that right?
7  A.    More or less, yes.
8  Q.    And you say, to do this, the
9  multi-disciplinary panel members can't be partisan,
10  correct?  You say they must have no, "no specific
11  bias" for any purpose, true?
12  A.    Where are you reading?
13  Q.    I believe that's still on paragraph 5 in
14  your declaration.
15  A.    I see where you are.  Okay.  No specific
16  bias towards regulatory action or any other purpose.
17  I read that.
18  Q.    All right.  And that's because the weight
19  of evidence approach can be subjective, true?
20  A.    There is obviously an opportunity for
21  subjectivity.
22  Q.    Okay.  And you, Dr. Kramer, reached your
23  opinions using the weight of evidence approach as a
24  paid expert in litigation?
25  A.    Yes, I have been paid.

Page 469

1  Q.    And you researched -- you reached your
2  opinions without other panel members, true?
3  A.    I reached -- I formed my opinions myself.
4  However, they are informed by research and by
5  expertise of others.
6  Q.    Well, there's no toxicologist on your
7  panel, your weight of evidence?
8  A.    Well, I don't have a panel per se, but I
9  did read the expert reports in this case that were
10  generated by other experts.
11  Q.    And what toxicology report are you relying
12  on?
13  A.    I'm not naming or specifically calling out
14  any one toxicology report.  I read all of the expert
15  reports --
16  Q.    Is there --
17  A.    -- that were generated in this case by
18  dysmorphologists, by embryologists and so on, and
19  the toxicological studies.
20  Q.    You didn't have a toxicologist as part of
21  your weight of evidence methodology.  You read
22  stuff.  You read all sorts of stuff.  But you didn't
23  have a toxicologist review the data and chime in on
24  a panel, correct?
25  A.    With me, that's correct.

Page 470

1  Q.      And you didn't have a geneticist other than
2  your own genetic experience and your own reading of
3  genetic material, right?
4  A.      That's correct.
5  Q.      And you didn't have a cardiologist?
6  A.      That's correct.
7  Q.      You relied on your own reading of
8  cardiologic material?
9  A.      Well, not necessarily.  No, no.  As I said,
10 I have -- I was informed in those other disciplines
11 by the expert reports of other experts.
12 Q.      I totally agree, but you're a panel of one
13 who did a lot of reading, right?
14 A.      That's correct.
15 Q.      And you read about embryology?
16 A.      Correct.
17 Q.      And you read about molecular biology?
18 A.      Correct.
19 Q.      And you read about cardiology?
20 A.      Uh-huh.
21 Q.      Yes?
22 A.      Yes.
23 Q.      And you read about teratology?
24 A.      Correct.
25 Q.      But it's still a panel of one, correct?

Page 471

1  A.      That's correct.  I was the primary -- I was
2  the key person who made -- drew these conclusions.
3  Q.      Is it your opinion that you, not a
4  cardiologist, not a physician, not a teratologist or
5  a reproductive toxicologist, not an embryologist, a
6  single individual can substitute for that of a
7  multi-disciplinary panel of experts?
8  A.      Well, when I am asked to draw my own
9  conclusions about causation, it is perfectly
10 appropriate for me to do so.
11 Q.      By the way, is it your testimony that none
12 of these panels rely on statistical significance
13 testing to reach their decisions?
14 A.      I can't -- I don't know.
15 Q.      Is it your testimony that none of these
16 panels rely on Bradford Hill criteria to reach their
17 causation opinions?
18 A.      I wouldn't be able to state that as a -- an
19 absolute.  I don't know for sure.
20 Q.      Is it your opinion that none of these
21 panels adjust for multiple comparisons when they do
22 their causation analysis?
23 A.      I don't know if none of them ever do.
24 Q.      Do you know if the Cancer Institute, the
25 National Cancer Institute uses a weight of the

Page 472

1  evidence approach?  Exhibit 130, please.
2  A.      In what way, and in what discipline, and in
3  what function?
4  Q.      I just wanted to know if you know whether
5  they do or not.
6  A.      Well, when you refer to the National Cancer
7  Institute, what are you referring to specifically?
8  Q.      Well, let me ask you this instead.  Do
9  Greenland and Rothman in their textbook that you
10 like to rely on, Modern Epidemiology, do they even
11 mention the causation methodology you refer to as
12 weight of the evidence?
13 A.      I'm not sure.
14 Q.      I'd like to show you an article written by
15 Douglas Weed at the National Cancer Institute.  He's
16 commenting on the weight of the evidence
17 methodology.  And if you look at the abstract, the
18 conclusion in the abstract, he concludes, "Lack of
19 definition of the term 'weight of evidence,'
20 multiple uses of the term and a lack of consensus
21 about its meaning, and the many different kinds of
22 weights, both qualitative and quantitative, which
23 can be used in risk assessment," and because of that
24 the weight of the evidence concept and its
25 associated methods should be fully described when

Page 473

1  used.
2  A.      I'd have to read this article to understand
3  the context upon which these statements are made.
4  He's referring to risk assessment at regulatory
5  agencies, and that's very different from the context
6  of my causation analysis.
7  Q.      Have you ever served on a weight of the
8  evidence panel like the ones you've described?
9  A.      No, I have not.
10 Q.      Have you ever done a weight of the evidence
11 analysis for a regulatory body?
12 A.      No.
13 Q.      Would you agree that -- do you know if
14 regulatory agencies have a different standard than
15 that which is required in a court of law to prove
16 causation?
17 A.      I can't say.  I don't know.
18 Q.      Have you submitted your weight of the
19 evidence analysis on Paxil and cardiac defects for
20 publication or peer review?
21 A.      No.
22 Q.      To support your weight of the evidence
23 approach, you reference an article by a Dr. Krimsky.
24 Exhibit 49.  Do you recall that?  If you look at --
25 A.      Where are you?

119 (Pages 470 to 473)

Page 474

1  Q.     I'm not sure. It's your reference number
2  20, I believe in Exhibit 5, an article by Dr.
3  Krimsky.
4  A.     **Are you reading from a particular**
5  **paragraph?**
6  Q.     Here's the article. Let me look at your
7  weight of the evidence piece. Let's see where you
8  reference Dr. Krimsky. Why don't you try and find
9  it for me, if you would. It's in the weight of the
10 evidence documents. It's I believe reference 20.
11       So, have you seen this article before? You
12 certainly have probably read it, correct? The
13 Weight of Scientific Evidence in Policy and Law by
14 Sheldon Krimsky.
15 A.     **Yes.**
16       MR. FOX: Do you have another one?
17       MS. HALPERN: I don't think so. It's
18 Exhibit 49. If I can find mine, you can have this
19 one.
20 Q.     Is it reference 20 in your declaration?
21 A.     **Yes, it is. I found it.**
22 Q.     You found it? Okay. Do you see where you
23 reference it in your report?
24       MS. HALPERN: Here, Shawn, you can
25 have mine.

Page 475

1        MR. FOX: Okay. Thanks.
2  Q.     Let's look at some of the things that Dr.
3  Krimsky says about the weight of the evidence
4  methodology. Turn to page 130, left-hand column,
5  first left-hand column, one, two, three paragraphs
6  down, he says, "I begin with the observation that
7  there is virtually no discussion in the scientific
8  literature of the epistemic meaning of weight of the
9  evidence. We cannot tell whether it is used as a
10 methodology, a heuristic, a ranking system, or
11 simply a subjective process of setting a causal
12 threshold for cumulative indirect evidence." Do you
13 agree with Dr. Krimsky?
14 A.     **I think that there is -- I agree that there**
15 **is no hard and fast definition of a weight of**
16 **evidence analysis and what it entails, and one of**
17 **the reasons is that it's used for various purposes**
18 **under various conditions. But I agree that there is**
19 **no, there is very little discussion in the**
20 **scientific literature, that I agree with.**
21 Q.     Have you ever written anything in the
22 peer-reviewed scientific literature about weight of
23 evidence methodology?
24 A.     **I don't believe so.**
25 Q.     Have you only used it in the litigation

Page 476

1  context?
2  A.     **No.**
3  Q.     If you turn to page 131 of Krimsky's
4  article, middle paragraph, three lines down, he
5  says, "Without an explication of how evidence is
6  weighed or weighted, the claim weight of evidence
7  seems to be coming out of a black box of scientific
8  judgment." Do you agree with that?
9  A.     **No, I don't.**
10 Q.     Turn to page 1 --
11 A.     **I think this weighting, the whole weighting**
12 **would be very subjective in any case.**
13 Q.     Okay. You picked this article.
14 A.     **Well, there were other aspects of this**
15 **article and other points that Dr. Krimsky made that**
16 **I agree with.**
17 Q.     All right. So, let's turn to page 133, the
18 right-hand column. It's one, two -- it's the second
19 full paragraph. He says, "One of the key factors
20 behind the reliability of science is the accuracy
21 and replicability of measurement. The term weight
22 of evidence may suggest that a measurement is
23 involved, but that is a false implication of the
24 term. Weighing the evidence, in the way it is
25 carried out by regulatory bodies, is based on human

Page 477

1  judgment. Such judgments are rarely, if ever,
2  tested for interrater reliability." Do you agree
3  with that?
4  A.     **I think when he's talking about regulatory**
5  **bodies basing on it human judgment, there is a,**
6  **certainly a certain amount of human judgment that**
7  **goes into weighing evidence, as is obvious in cases**
8  **like this where experts disagree.**
9  Q.     Okay. And if you turn to page 134, middle
10 paragraph, middle column, I'm sorry, down at the
11 very bottom, it says, "Studies that have measured
12 the variance in expert judgments on the use of
13 weight of evidence in evaluating the hypothesis
14 demonstrate that the application of weight of
15 evidence is not strictly a science, but depends on
16 experience, as well as other tacit factors
17 associated with the expert, such as their
18 familiarity with or financial connection to the
19 substance being evaluated."
20       And that is consistent with your statement
21 that you think people involved should be free of
22 bias, true?
23 A.     **That's true.**
24 Q.     And, Doctor, you agree with that statement
25 then, don't you?

120 (Pages 474 to 477)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 478

1   A.      With this statement?
2   Q.      Yes.  The one I just read.
3   A.      That certainly can be the fact, can be
4   true, yes.
5   Q.      Okay.  If we can go back to Table 2 in your
6   specific report.  That's the second tab in the book
7   in front of you.  You look at studies of all cardiac
8   defects combined into one category.
9   A.      Let me just find this.
10  Q.      I think this may be the only one of the
11  tables we haven't yet talked about.  Have you got
12  Table 2 in front of you?
13  A.      Yes, I do.
14  Q.      Okay.  And you list three studies, Cole,
15  Berard and Diav-Citrin, correct?
16  A.      That's correct.
17  Q.      And I think you have already told us that
18  Cole and Berard, according to Exhibit 163, did not
19  control for smoking, correct?
20  A.      That's correct.
21  Q.      So, the only one of the three that's there
22  that did control for smoking is, what, Diav-Citrin?
23  A.      That's correct.
24  Q.      And did you prepare this list, by the way?
25  A.      This list of what?

Page 479

1   Q.      Of studies in Table 2, Table 2.
2   A.      Yes.  I had, I had actually had some
3   assistance from Zach in actually putting this table
4   together.
5   Q.      Okay.  And in -- did he do the first draft
6   of this table?
7   A.      I don't recall.
8   Q.      Okay.  You don't say in your Table 2 why
9   there are two entries for the Diav-Citrin data, do
10  you?
11  A.      I'm sure this has to do with adjustment,
12  but I'd have to look it up.
13  Q.      Okay.
14  A.      This might be an adjusted and an unadjusted
15  odds ratio.
16  Q.      And, in fact, I believe it is, Doctor.  One
17  is a crude odds ratio and one is an adjusted odds
18  ratio.  Do you know which is which and why you
19  didn't note it?
20  A.      Just because of space.  No.  And it's easy
21  to find out.  If you want to find out, we can find
22  out.
23  Q.      You just have to add an A to say it's
24  adjusted.
25  A.      Well, it's irrelevant.  It really -- I

Page 480

1   mean, it doesn't matter.  We list them both.
2   They're not hidden.  It's a very simple matter to
3   look it up.
4   Q.      Well, do you rely on adjusted odds ratios
5   more than unadjusted odds ratios?  Since Diav-Citrin
6   is the only one that adjusted for smoking, and you
7   say that's important, wouldn't you say that the
8   adjusted odds ratio has more value to you than the
9   unadjusted?
10  A.      Well, I think the point about smoking
11  was --
12  Q.      Not just about smoking, just --
13  A.      Well, you bring up smoking, and the point
14  about adjusting for smoking or other factors is
15  severalfold.  One is to show that adjustment does
16  not eliminate the excess risk, which it did not
17  here.  I would like to get that paper.  I don't like
18  to talk about a paper when I'm not --
19  Q.      Sure.  Let's look at Exhibit 66, please.
20  Now, the adjusted odds ratio, according to the
21  table, considered smoking, age, dose, psychiatric
22  condition, other medications.
23  A.      Excuse me.  But I really don't want to talk
24  about it until I have the paper in front of me.
25          MR. SHEEHAN:  It's out on the table.

Page 481

1           MR. FOX:  Hold on a second.  I thought
2   I remember seeing it.
3   Q.      Got it?  Okay.  If you look at Table 3 on
4   page 698, and you look underneath, it tells you that
5   the adjusted odds ratio considered smoking, natural
6   age, dose, psychiatric condition and other
7   medications, and the crude odds ratio did not.
8   Actually, you say this in your own report in
9   paragraph 103.
10  A.      Uh-huh.
11  Q.      Okay.  So, would you rely on the adjusted
12  odds ratio in this instance or the crude odds ratio?
13  A.      I think the adjusted odds ratio is -- I
14  don't think you need to make a choice.  I normally
15  would concentrate on the adjusted odds ratio because
16  it takes account of other factors.  So, if I were
17  going to give more weight to it, I would concentrate
18  on the adjusted odds ratio.
19  Q.      Okay.  And the adjusted odds ratio is in
20  fact the one that's not statistically significant.
21  It's the first one, odds ratio equal to 2.66, lower
22  bound, 0.80, upper bound, 8.90, correct?
23  A.      That's correct.
24  Q.      And the Diav-Citrin authors conclude that
25  their study suggests a possible association between

121 (Pages 478 to 481)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 482

1 cardiac defects and Prozac, but not Paxil.  They
2 write this at --
3 **A.      Where are you?**
4 Q.      Page 699, right column, six lines down.
5 **A.      Which column?**
6 Q.      Right column.
7 **A.      Okay.**
8 Q.      On page 699, under Risk of Cardiovascular
9 Anomalies, do you see that?  If you go six lines
10 down.
11 **A.      Yes.**
12 Q.      Specifically -- let's see.  All right.  The
13 authors write on page 699, right column, six lines
14 down that, as can be seen in Table 4.  Do you see
15 that, as can be seen in Table 4?
16 **A.      Yes, I see it.**
17 Q.      The anomalies reported in the
18 cardiovascular anomaly -- let's see.  The anomalies
19 reported in the cardiovascular section in the SSRI
20 groups are quite varied.
21 **A.      Yes.**
22 Q.      This diversity of cardiovascular anomalies
23 argues against a possible common underlying
24 mechanism.  Do you see that?
25 **A.      Well, it says a plausible common underlying**

Page 483

1 **mechanism, but one cannot rule it out with**
2 **certainty.**
3 Q.      Yes.  All right.  And the conclusion on the
4 very first page of the article in the abstract says,
5 "This study suggests a possible association between
6 cardiovascular anomalies and first trimester
7 exposure to paroxetine."  Right?
8 **A.      That's what the authors say, that's**
9 **correct.**
10 Q.      If you eliminate the crude odds ratio of
11 Diav-Citrin in your Table 2, none of the odds ratios
12 you cite is statistically significantly elevated,
13 correct?
14 **A.      In Table 2?**
15 Q.      Yes.
16 **A.      That's correct.**
17 Q.      And is it your opinion that the data you've
18 compiled in Table 2 can be used to reach a
19 conclusion that Paxil can cause coarctation of the
20 aorta?
21 **A.      Excuse me.  I just need to take a second to**
22 **read something.**
23 Q.      Sure.
24 **A.      They make the point here, they talk about,**
25 **in the Diav-Citrin paper, that preliminary data, and**

Page 484

1 **they're talking about paroxetine and pregnancy,**
2 **however, recent large epidemiological studies with**
3 **different methodologies support such an association,**
4 **especially with paroxetine.  Preliminary data of the**
5 **present study did not show a significant difference,**
6 **but turned significant when the number of cases was**
7 **increased.  I just want to make that point.**
8 Q.      Okay.  In fact, my question was --
9 **A.      Can I make one other point?**
10 Q.      Go ahead.
11 **A.      In Table 4, interesting that among the**
12 **eight cases of cardiovascular anomalies associated**
13 **with paroxetine, the first one is ASD, VSD and**
14 **coarctation of the aorta, exactly what Isabelle**
15 **McMurray had.**
16 Q.      And that's one of the eight cases that you
17 say there?
18 **A.      That's correct.**
19 Q.      Okay.  And is it your opinion that the data
20 you've compiled in Table 2 can be used to reach a
21 conclusion that Paxil can cause coarctation of the
22 aorta?
23 **A.      It's part of the evidence that I used to**
24 **reach that conclusion.**
25 Q.      Do you know if there was any case of Paxil

Page 485

1 and coarctation of the aorta in the Berard study?
2 **A.      I don't recall.**
3 Q.      Do you know if there was a single case of
4 Paxil and coarctation of the aorta in the Cole
5 study?
6 **A.      Again, I don't recall and I don't know that**
7 **it was -- you know, in some of these studies, they**
8 **didn't each publish that detail.  I'd have to look.**
9 **There are some studies that did not publish the**
10 **actual congenital, cardiac congenital malformations**
11 **that they observed.**
12 Q.      And weren't you given phenotype data that
13 was produced in the litigation for the Berard study?
14 Nobody gave that to you?
15 **A.      I don't believe so.**
16 Q.      Were you given phenotype data that was
17 produced in the Louik study?
18 **A.      I was for Louik, but not -- I don't think**
19 **for Berard.  I'd have to check that.**
20 Q.      And how about in the Ingenix and the Cole
21 study?
22 **A.      I believe I have that as well.**
23 Q.      And in the Kallen study?
24 **A.      Again, I'd have to check.  I don't recall.**
25 **I know there were a number of studies for which we**

(856) 983-8484
Tate & Tate, Inc.
180 Tuckerton Road, Suite 5, Medford, NJ  08055
(800) 636-8283

Page 486

1  did not have that information.
2  Q.     So, you have the data on Berard and Cole,
3  but you didn't look to see if there were any cases
4  of coarctation of the aorta reported?
5  A.     Well, that's not true.
6  Q.     Well, do you know?
7  A.     I don't recall, but that's not accurate to
8  say that I didn't look.  Of course I looked.
9  Q.     So, it wasn't significant for you in terms
10  of extrapolating from this data to coarctation of
11  the aorta to know whether or not there were actually
12  any cases of coarctation of the aorta?
13  A.     Well, as I said, I'd have to go back and
14  see what level of detail was provided.
15  Q.     What's the basis for drawing any conclusion
16  about coarctation of the aorta from any of the data
17  noted in Table 2?
18  A.     I think we've reviewed that.  The basis is
19  not only the relationships and the increased risks
20  that have been reported associated with all
21  congenital malformations, but also the observation
22  of a spectrum of many different types of
23  cardiovascular malformations that have been
24  reported, including in Diav-Citrin, as well as the
25  biological plausibility and mechanistic data that

Page 487

1  support that conclusion.
2  Q.     In the Cole study, there's no statistically
3  significant association between Paxil and cardiac
4  defects overall or Paxil and any particular group of
5  cardiac defects, true, in the Cole study?
6  A.     Cole only, I believe, looked at all cardiac
7  defects.
8  Q.     Were you aware that the authors note that
9  not all of the medical charts of the infants with
10  suspected cardiac defects could be obtained; are you
11  familiar with that?
12  A.     Well, that's also true of the controls in
13  that study as well.  I mean, it was a -- you know,
14  there was a non-differential lack of ascertainment
15  in that study, which would drive the odds ratio
16  towards 1.
17  Q.     Well, actually, I'm surprised you say that,
18  Dr. Kramer, because in fact only 8 percent of the
19  Paxil charts for suspected cardiac defects were
20  missing and 15 percent of the control charts of
21  suspected cardiac defects were missing.  You're
22  saying that's not a significant difference?
23  A.     Probably not, especially in a records-based
24  study of administrative claims databases.  I think
25  that it's recognized and they recognize that

Page 488

1  there -- since these databases are not set up to
2  track or detect birth defects, they are -- there is,
3  you know, going to be a certain non-differential
4  lack of ascertainment.
5  Q.     Now, you would agree that this could --
6  A.     Pardon me one minute.
7          THE WITNESS: We're after 7:00.
8          MR. FOX: All right.  How much time
9  have we billed?
10          MS. HALPERN: You know what, why don't
11  I just finish this section, it's just a few more
12  pages, and I think it will take more than
13          MR. FOX: How long will that take?
14          MS. HALPERN: It depends on her
15  answers.  I have to go on the record to say that
16  there are 100 pages left.
17          MR. FOX: I understand.  But we've
18  been here for 11 hours.
19          MS. HALPERN: Why don't we just finish
20  this section.  I don't think it will take more than
21  10 minutes tops.
22          MR. FOX: Are you okay with that?
23          THE WITNESS: I'm fine with that.
24          MS. HALPERN: Okay.  Thank you.
25  Q.     Would you agree that this -- that the

Page 489

1  medical charts that are missing could, it's
2  possible, could have made the odds ratio inflated or
3  deflated?
4  A.     I think that's very speculative.  I
5  wouldn't want to speculate.
6  Q.     You don't know that?
7  A.     I think it's very clear that there is a
8  possibility and a probability that there is a --
9  that there is a lack of ascertainment on both sides,
10  cases and controls.
11  Q.     Now, you cite in reference paragraph 118 a
12  whole batch of studies on Paxil and what you say is
13  Paxil, 118 of your general report, in your risk
14  range for all cardiac defects combined.  Do you see
15  that?
16  A.     Uh-huh.
17  Q.     And one of them is the Rahimi study.
18  A.     That was an error.
19  Q.     That was an error?
20  A.     That was corrected in a later version.
21  Rahimi didn't look at Paxil.
22  Q.     Exactly.  Okay.  And reference 135 is an
23  article by Simon, et al, right?
24  A.     135?  Let me take a look.  Correct.
25  Q.     Okay.  And there's no data in this study

123 (Pages 486 to 489)

Page 490

1  either about Paxil and all cardiac defects combined,
2  is there?
3  A.     Well, I probably corrected that.  There
4  were some, a few errors and omissions in this that
5  were corrected in later versions.
6  Q.     Okay.  So, you are eliminating both of
7  those now?
8  A.     Well, I know that Rahimi didn't look at
9  Paxil.  I'm going to have to refresh my memory on
10 Simon.  I don't recall.
11 Q.     Okay.  So, if in fact I'm correct and Simon
12 doesn't have any data about Paxil and all cardiac
13 defects combined, you would eliminate from your list
14 there both the reference to Rahimi and the reference
15 to Simon?
16 A.     Well, Rahimi certainly was taken out.  And
17 I'm going to have to accept your description of the
18 Simon article.  But I don't know.
19 Q.     Did you write paragraph 118(a)?
20 A.     Yes, I did.
21 Q.     Did you read these articles?
22 A.     Yes, I did.
23 Q.     And you included in --
24 A.     You know, in a report this lengthy,
25 sometimes there are, you know, there are things that

Page 491

1  are inadvertently I may have read, and especially
2  since they dealt with SSRIs, and may have snuck in
3  and that I took out in later versions.
4  Q.     Exhibit 46.  And Exhibit 46 is the O'Brien
5  meta-analysis, correct?
6  A.     I don't know.
7  Q.     Okay.  Let's show you.  Now, the authors
8  conclude here that first trimester exposure to
9  paroxetine does not appear to be associated with
10 increased risk of cardiac malformations.  This is
11 the third, another one of the references you have in
12 paragraph 118(a).
13         MR. FOX:  You're saying this -- hold
14 on a second.  You're saying this is which reference?
15         MS. HALPERN:  This is O'Brien, Exhibit
16 46.
17         MR. FOX:  Oh, Exhibit 46.
18         MS. HALPERN:  Yes.
19         MR. FOX:  And which reference number?
20         MS. HALPERN:  It's her reference 108.
21         MR. FOX:  Okay.
22         MS. HALPERN:  In paragraph 118(a).
23         MR. FOX:  Sorry.
24 Q.     And they say, "First trimester exposure to
25 paroxetine does not appear to be associated with

Page 492

1  increased risk of cardiac malformations.  This
2  information should be reassuring to prescribing
3  physicians and women who require treatment with
4  paroxetine in pregnancy."  Did I read that right?
5  A.     Yes, you did, but I just want to look at
6  this.  So, the actual results are an odds ratio for
7  case-control studies of 1.18 and for cohort studies
8  of 1.14.
9  Q.     And you --
10 A.     Wait a minute.  No, no, no, no, no, no.
11 I'm sorry.  Am I misinterpreting this?  Odds ratio
12 of 1.18 for case-control studies.  Let me see where
13 they list this.  Didn't report their odds ratio in
14 this paragraph.
15 Q.     I don't know what you're looking for,
16 Doctor, because I have a question pending.
17 A.     Well, you read a statement.  This is the
18 author's interpretation of the data.  However, the
19 odds ratio was elevated.
20 Q.     Okay.  So, we have 12 references here for
21 all cardiac defects combined, and we've talked about
22 135, which you are taking out, which was Rahimi, and
23 you may take out reference 117 once you take a look
24 at the Simon abstract, and reference 108 is the
25 O'Brien study where they concluded that there was no

Page 493

1  association with cardiac malformations and Paxil,
2  right?
3  A.     Well, let me just again reiterate that an
4  elevated odds ratio is an elevated odds ratio
5  whether or not the author decides to discard it
6  because it doesn't meet their criterion for
7  statistical significance.  An elevated odds ratio is
8  what it is.  And I understand you're quoting from
9  the author, but that doesn't change what the
10 estimate of the odds ratio is.
11         I mean, the GSK odds ratio in their
12 meta-analysis was also elevated, and we can read
13 their conclusions, which are that paroxetine is
14 associated with an increased risk of congenital
15 malformations.  That's what GSK itself concluded.
16 And in a prior version of that, an unpublished of
17 that meta-analysis, they also calculated elevated
18 odds ratios for certain other subtypes in addition
19 to overall cardiac malformations.
20 Q.     Exhibit 36.  You published a peer-reviewed
21 article about the patterns and the trends in
22 diagnostic classification of cerebrovascular
23 disease, right?
24 A.     I'm sorry.  Can you repeat that?
25 Q.     You published a peer-reviewed article about

124 (Pages 490 to 493)

Page 494

1   the patterns and trends in diagnostic classification
2   of cerebrovascular disease, right?  It's Exhibit 36
3   here.  The paper is about stroke and hypertension?
4   A.      Right.
5   Q.      And you state that a goal is to be able to
6   separate types of stroke into pathologic subtypes,
7   page 399, the bottom of the left-hand column.  You
8   say, "Difficulties in distinguishing the relative
9   frequency of cerebral embolism and thrombosis, and
10  the large proportion of cerebrovascular disease that
11  is listed as 'unspecified' type impedes a clear
12  separation of the disease into pathologic subtypes."
13  True?
14  A.      Well, let me state, this article was
15  published in 1982.  I have very little recollection
16  of the details of the writing of this article, and
17  it was now what, 40, almost 40 years ago.  So, I
18  can't agree or disagree with anything I wrote in
19  this article based on the state of the science today
20  as well as what I would have written then.  I just,
21  I can't and won't comment on something written
22  almost 40 years ago.
23  Q.      All right.  Well, your expert report that
24  you wrote just a little while ago states that
25  disease classification is a crucial consideration in

Page 495

1   all epidemiologic studies of birth defects.
2   A.      Okay.  Where are you reading from?
3   Q.      Paragraph 73 of your report.
4   A.      Okay.  Now, what is the question?
5   Q.      The question is, is that your statement; do
6   you agree that disease classification is a crucial
7   consideration in all epidemiologic studies of birth
8   defects?
9   A.      That's correct.
10  Q.      Okay.  And you go on to state in that same
11  paragraph, etiologic heterogeneity, inclusion of
12  infants with different causes in the studied birth
13  defects, may cause the observed association to be
14  bias towards the result?
15  A.      The null.
16  Q.      I'm sorry, to be bias towards the null,
17  correct.
18  A.      That's correct.
19  Q.      And is that called a type 1 error?
20  A.      That's correct.
21  Q.      Can it also cause a type 2 error?
22  A.      Misclassification can cause both type 1 and
23  type 2.  However, specifically, etiologic
24  heterogeneity is most often associated with a type 1
25  error.

Page 496

1   Q.      Now, you cite two articles by Julian
2   Hoffman for the notion that cardiac birth defects
3   can be classified by severity.
4   A.      Okay.  Where are you?
5   Q.      I'm nowhere in particular other than I
6   remember that that's what you say.  You say that
7   there's no gold standard and there are a number of
8   ways to classify cardiac defects, and you give a
9   couple of examples, the ICD9 code, by severity, and
10  by severity, you cite two articles by --
11  A.      Well, I would like to know where you're
12  reading from.
13          MR. FOX:  Hold on.
14  Q.      Let's get it.  Paragraph 16 of your
15  specific report, you say there is no gold standard
16  for classification of heart defects, and you list
17  what you say are four different ways to classify
18  cardiac defects.
19  A.      Well, what I do here is I list some of the
20  various classification schemes that have been used
21  in the literature.
22  Q.      Okay.  You're not saying these various
23  classification schemes are used when one is trying
24  to assess risk factors for causation, are you?
25  A.      Well, certainly the classification schemes

Page 497

1   based on severity would not be.
2   Q.      Okay.  Thank you.  That was my point.
3   Okay.  And the ICD9 codes are the ultimate
4   splitting, aren't they?  They categorize defects
5   individually?
6   A.      Are the ultimate what?
7   Q.      Splitting.
8   A.      Ultimate splitting.
9   Q.      It's for hospital guidelines --
10  A.      Well, I understand that.  I'm not sure that
11  it splits any more than certain other
12  classifications that are out there.
13  Q.      Well, the ICD9 groupings were never meant
14  to be a grouping by mechanism of action or
15  pathogenesis, were they?
16  A.      Well, there is, certainly in successive
17  versions of the ICD, there is, and in modifications
18  of the ICD, there is more and more customization of
19  that system to serve the purpose of medical
20  research.
21  Q.      Dr. Kramer, it's for hospital diagnostic
22  and disease incidence purposes, isn't it?
23  A.      Well, I would disagree.
24  Q.      That's what you say in your textbook.
25  A.      Okay.  That's true, but in addition,

125 (Pages 494 to 497)

Page 498

1  whether I say that or not, I can state for a fact
2  that there have been modifications of ICD that are
3  used both in birth defect research and
4  carcinogenicity research and other areas of
5  biomedical research that have been modified and have
6  been customized for biomedical research purposes.
7  Q.     I've just shown something off the web site
8  for ICD.  The CDC has stated, this is the CDC, has
9  stated that the classification scheme for the ICD9
10  code was developed and designed to promote
11  international comparability in the collection,
12  processing, classification and presentation of
13  mortality statistics.  That's what it says, right?
14  A.     Originally, that's correct, but what I
15  said, just said, stands.  Very clearly, there are,
16  particularly within the ninth and 10th revisions,
17  there are research and biomedical sort of field
18  specific modifications of the ICD that have been
19  made and are employed for the purposes of effective
20  biomedical research, so that there are versions that
21  have been customized and have been modified to make
22  them more amenable to meaningful biomedical
23  research.
24  Q.     In paragraph 50 of your declaration, you
25  write, and it's the last sentence, "If it were

Page 499

1  inappropriate to group or lump cardiac malformations
2  for the purpose of epidemiologic study, the ICD
3  would not do so, given that enabling such study is
4  one of its primary purposes."  What do you base that
5  on?  Where in the world does it say that anywhere?
6  A.     Well, I have a quote here from the ICD that
7  says -- and I can tell you throughout my years of
8  research that the ICD is very broadly used in
9  biomedical research, not just for the administrative
10  classification of disease.  It has also been, as I
11  said, customized in a very meaningful way for use in
12  various biomedical research fields, including birth
13  defects, and it is in fact an international standard
14  diagnostic system.
15       MS. HALPERN:  Well, for the record, I
16  must have, I would say three -- two hours, I'll say
17  two hours more of questioning, and I reserve my
18  right, and I intend to go to the magistrate to ask
19  for more time.  I appreciate your willingness to
20  stay this late and your willingness to extend the
21  time.
22       MR. FOX:  For the record, how much
23  time has been spent?
24       THE VIDEOGRAPHER:  Can I go off?
25  Because the tape is about to end.

Page 500

1       MR. FOX:  Yes.
2       THE VIDEOGRAPHER:  The time is now
3  7:15.  This concludes tape number 7 of the video
4  deposition of Dr. Shira Kramer.  Nine hours and
5  three minutes.
6           -  -  -  -  -

Page 501

1       C E R T I F I C A T E
2  I, ROBERT T. TATE, a Certified Court
3  Reporter, Certified Realtime Reporter and Notary
4  Public, do hereby certify that prior to the
5  commencement of the examination,
6       SHIRA KRAMER, Ph.D.
7  was duly sworn by me to testify to the truth,
8  the whole truth and nothing but the truth.
9  I do further certify that the foregoing is
10  a true and accurate transcript of the stenographic
11  notes of testimony taken by me at the time, place
12  and on the date hereinbefore set forth.
13  I do further certify that I am neither a
14  relative nor employee nor attorney nor counsel of
15  any of the parties to this action, and that I am
16  neither a relative nor employee of such attorney or
17  counsel and that I am not financially interested in
18  this action.
19
20  _____
21  ROBERT T. TATE, C.C.R., C.R.R.
22  Certificate No. XI00887
23  Date:  November 3, 2009
24
25

126 (Pages 498 to 501)

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 502

---

**A**

**Abdulla** 310:23
333:6 351:6 352:7
357:16 366:16
371:3 374:11
**Abdulla's** 367:14
368:1 370:19
**ability** 265:3 277:5,6
288:21 289:6,11
398:20 405:16
466:3
**able** 66:14 104:11
113:19 132:11,17
149:3 153:12,24
209:20 262:1
307:25 375:3
425:12 467:10
471:18 494:5
**abnormal** 421:1
424:18
**abnormalities** 7:9
200:12 205:3,13
205:18 295:16
**abnormality** 205:5
257:7
**abortion** 115:8,15
116:7 120:14,18
120:22 121:7,12
121:16,17 122:4
122:10,14 123:3,7
**absence** 153:10
154:17 308:13
**absolute** 471:19
**absolutely** 12:17
31:17 39:13 97:23
158:15 210:18
225:2 268:10
273:5 276:20
281:3 345:7 418:9
454:20,23,25
**abstract** 4:18,21,22
4:23,24,25 14:1
42:11 56:21,22,25
57:1,2,4,7,13 58:3
58:4,8,13,14,15
62:14 94:22 95:11
118:19,22,25
119:8,9 123:10
337:6 382:8,12
390:21 391:4
405:8 406:10,16
406:16 407:3,17
409:7,14 439:18
439:24 441:14,15
441:21 442:3,6,21
442:25 443:1,2,6
445:11,13 446:9
447:7,12,20
449:10,21,23

450:6,20 452:25
453:12 462:15,15
463:13 472:17,18
483:4 492:24
**abstracted** 13:10
55:6,19 56:8 59:1
59:13 94:1 106:4
114:16 142:20
**abstracting** 54:16
**abstractly** 149:7
**abstractor** 312:22
313:1
**Abstractors** 351:15
**Abstractor's** 4:4
**abstracts** 13:3 25:7
42:17,22 43:1,2,4
43:5,10 56:20
57:24 94:6 98:16
114:10,11,17
409:21,24 439:14
439:15 449:1
462:18
**academic** 18:9 39:9
**Academy** 259:5
265:2
**accept** 431:25
490:17
**acceptability** 435:22
435:24
**acceptable** 12:9
17:14
**accepted** 127:22
185:10 290:22
291:13 292:19,22
387:4,4 403:14
418:19,23 432:16
454:6 458:23
464:3
**access** 63:14 113:15
114:6 258:21
**accompanied** 348:24
**account** 134:4
149:25 169:17
305:6 392:11
425:13 481:16
**accounting** 226:14
226:20 227:20,25
**accounts** 226:23,24
**accumulated** 231:13
460:9
**accumulating** 402:12
**accumulation** 40:3,4
**accuracy** 131:8
476:20
**accurate** 23:7 434:4
486:7 501:10
**accurately** 130:15
**Accutane** 400:22
413:7,9,19,21,22
414:12,14,21,25

415:5
**acid** 265:18
**acknowledge** 369:18
398:12
**acknowledged**
349:18 369:21,22
**ACOG** 304:2
**acquisition** 29:7
30:18
**act** 86:23,24 87:5,6
420:25 424:17,24
**acting** 290:12
**action** 1:2 81:9
244:22 261:10
272:7 400:22
423:6 468:16
497:14 501:15,18
**active** 32:20
**actively** 30:3
**activities** 35:16,17
**activity** 18:22 93:19
**acts** 247:24
**actual** 11:14 12:14
12:15 13:23 38:19
55:6 58:5 59:14
92:6 114:6 179:5
188:2 208:20
227:1 242:7 243:5
295:14 317:25
354:11 364:5
427:16 429:2
438:12 441:12,17
485:10 492:6
**Adam** 2:9 15:19
**adaption** 299:20
**add** 479:23
**added** 58:3,4 60:11
167:5
**adding** 21:17
**addition** 9:22 36:11
45:24 89:23
230:17,18 290:13
295:8 314:8
321:11 357:4
451:22 455:16
457:9 493:18
497:25
**additional** 9:23 54:15
105:7 226:12
229:3,5 233:9,14
234:22
**address** 392:9
**addressed** 193:13
395:5 464:21,23
**adenocarcinoma**
419:3
**adequacy** 100:20
**adequately** 392:10
395:15,18
**adequately-powered**

466:20,25 467:6
**adjust** 149:25 225:6
320:13 322:25
349:23,24 471:21
**adjusted** 123:15
124:3 169:19,20
169:24 170:5,9
171:4,11,15 194:2
218:21 222:16
225:22 318:21
320:20,21 346:19
346:21,22 348:21
377:4 380:10
381:4 464:25
479:14,17,24
480:4,6,8,20 481:5
481:11,13,15,18,19
**adjusting** 222:12
480:14
**adjustment** 222:9
320:5 323:3
346:16 479:11
480:15
**administered** 273:2
**administration** 111:7
431:2
**administrative** 21:11
487:24 499:9
**adult** 407:8
**adults** 407:21 451:16
452:18,20
**advantage** 114:7
**adverse** 76:22 77:19
78:17,17 108:8
120:25 121:3,22
121:24 122:3,5
148:13 151:24
207:18 255:6
419:20,22 454:7
468:5
**advertise** 20:2,6
23:17
**Advertises** 19:24
**advertising** 20:3
23:24
**advise** 174:11
**Affairs** 422:5
**affect** 354:12
**affiliated** 32:16
**affinity** 92:10 99:7
**affirmative** 366:10
**aforementioned**
93:18
**age** 452:20 480:21
481:6
**aged** 451:16 452:18
**agencies** 465:13
466:14 473:5,14
**agency** 30:14 287:7
292:25 411:15

**agent** 76:15 126:25
293:15 329:21
354:11,23 412:12
415:22 416:3
419:20,21 465:19
**agents** 18:14 19:12
76:5 125:5 126:24
202:25 257:17
260:20 349:15,16
349:16 418:11,15
419:5,18,19
420:25 423:6,11
424:17
**ages** 408:8
**ago** 18:1 22:20 23:1
35:11 103:1 439:1
494:17,22,24
**agreed** 39:10 268:15
430:2
**agreement** 356:22
**agrees** 320:17
**AHA** 3:21 303:18
**ahead** 52:10 109:15
129:8 217:13
317:16 356:24
376:23 404:16
409:5 464:11
484:10
**akin** 39:5
**al** 3:18,19,20,22,23
3:24 4:1,2,8,12,13
4:14,16,17,18,20
4:21,22,23,25 5:3
5:4,6,8,10,11
58:20 23:22
222:2 489:23
**alarming** 386:14
**alcohol** 158:18
400:17
**alike** 327:22
**alleged** 125:13
**allegedly** 121:10,13
**allele** 213:13,25
214:1
**allergic** 177:25
**allergies** 178:18
**allow** 233:16 455:8
**allowed** 23:16
220:19 409:2
**allowing** 295:20
**alpha** 213:13,25
**alter** 273:12 274:17
**alterations** 189:7,11
**alternative** 146:11
156:1
**alters** 272:22 273:7
273:14
**Alvarez** 248:14
**Alwan** 4:1,3 145:9
225:10,13 226:2

---

Case 2:10-cv-02125-HGB-KWR  Document 188-20  Filed 09/18/12  Page 129 of 166

USDC, Northern District of OK                McMurray v. GSK                                Monday
No. 08-CV-381-GKF-SAJ          Videotape Deposition of Shira Kramer, Ph.D.          November 2, 2009

Page 503

245:23 246:5
254:14 301:13,18
311:12 312:21
314:8,11,21,21
315:1 317:22
318:2,5 323:16,23
326:13 327:20,21
328:4 332:2,9
336:13 348:24
350:24,25 351:8
352:15 359:25
360:15 363:1,3
366:23 367:3,10
367:17,22 368:5,7
368:9,11,22 369:4
369:19 370:4
374:16 375:25
376:5,11,13
383:22 386:6
395:25 398:25
427:8
**amalgamation**
147:24
**ambient** 445:19
**amenable** 498:22
**American** 23:13,19
258:22 259:2,4,10
264:12 265:1,2
303:22 304:6,7
440:7 443:15
**amicus** 437:17,18
440:3 448:4
**amniocentesis**
107:19 274:5
**amniotic** 107:5,7,15
**amount** 11:8,9 228:2
228:3 230:25
477:6
**amply** 400:3,14
**analyses** 297:7
321:18 322:3
327:3 355:24
395:7 405:17
**analysis** 20:22 68:8
119:10 149:19
155:9,11 164:8
205:4 225:25
246:11 249:3,4,21
249:24 287:15
296:3,11,18 299:7
299:11,24 306:1
308:2,4 309:4
316:10 332:24
337:16 339:4
347:10 349:20
354:20 361:2
364:12 365:13,15
365:20,21 366:1
367:3,10 368:12
368:19,21 369:4

369:24,25 371:17
373:18 396:14
428:5 430:8 454:4
455:1 459:23
460:15 462:10
463:5,7 471:22
473:6,11,19
475:16
**analytical** 295:12
**analyze** 276:17
**analyzed** 249:8
299:23 321:13
361:10 441:22
**analyzing** 70:25
168:10
**and/or** 347:18
**anecdotal** 26:16
**Anencephaly** 299:14
**Anick** 74:9 415:16
**animal** 5:20 9:4 74:3
78:5 85:16 87:10
103:22,24 108:15
108:16,18,20
113:7,13 233:23
286:25
**animals** 108:9 110:20
110:22 273:2
274:15
**Anne** 33:10,11,21
**announced** 27:23
**annual** 22:10 23:14
24:1 439:25
443:15 450:2
**anomalies** 140:11
300:12 336:4,24
337:9 339:8,10,24
340:5,11,15,18
341:11,17 342:2
342:21 343:10,20
421:19 482:9,17
482:18,22 483:6
484:12
**anomalous** 61:3 62:4
238:2,4 239:6
240:23,24 241:6
242:7,9 243:13
244:11 364:20
**anomaly** 73:18
253:12,17 258:13
258:18 270:22
300:10,10 341:8
341:16,19,20
342:8,16,21
343:15,17,19
344:1 345:18,18
482:18
**Anorectal** 300:6
**answered** 65:12
144:13 183:24
194:6,22 206:8,13

246:10 404:22
**answering** 48:6
63:11 75:19
160:20 414:10
**answers** 114:5
275:17 428:19
488:15
**anticonvulsant**
264:24 349:15
**anticonvulsants**
264:16
**antidepressant**
393:21
**antidepressants**
93:23 325:11,15
392:7,9 393:5,23
394:5,16,22,24
395:7
**antiepileptic** 264:10
264:17 265:3
266:5
**Antimicrobial** 27:21
**anybody** 13:19 128:4
130:14 172:11
425:25
**anyplace** 374:9
**anyway** 345:23
**APA** 303:18
**apologize** 51:4
178:14 381:3
**apparent** 245:10
402:18
**apparently** 9:10
**appear** 46:20 54:21
56:7,12 128:18
457:23 491:9,25
**APPEARANCES**
2:1
**appears** 248:9 258:4
265:16 401:22
402:8,10 442:6
**append** 53:20
**appended** 53:12,19
**appendix** 3:25 4:3
54:11 105:8
278:22 279:10
280:18 306:22
**applicable** 225:14
226:3
**application** 465:20
477:14
**applications** 31:7
**applied** 415:17 460:4
461:9
**applies** 248:15
**apply** 37:20 39:16
293:16 354:22
431:9 436:5
454:16 456:6
**appreciate** 499:19

**approach** 456:3
457:12,15 458:3
458:13 466:13,15
466:19 468:19,23
472:1 473:23
**approached** 459:6
**approaches** 295:13
**appropriate** 60:11
291:7 292:25
293:5 294:2
301:22 357:13
366:10 416:21
430:24 436:25
437:11 444:18,22
471:10
**approve** 91:17
**approximately** 58:15
134:18,19 321:12
338:10
**April** 162:15,17
212:9,16
**area** 30:13 31:8
68:14 74:7,12,14
81:18 88:19
185:14 280:7
**areas** 30:12 44:14
74:16,20 194:20
498:4
**argues** 482:23
**argument** 159:12
268:14
**arguments** 27:5
**arisen** 349:19
**arithmetic** 379:23
**arrangement** 229:13
**array** 245:19
**arrive** 430:2
**arsenal** 26:12
**arteriosus** 168:13
251:25 252:4,8
**articles** 5:23 9:23
10:5 13:4,10,24
43:17 54:15 62:12
62:13 94:7,7,8,21
95:7 98:18,20,24
99:4,22 103:14,25
104:2,6,12,16,24
105:1,6,7,14 106:2
106:3 113:25
114:3,6,13,14
116:10 117:20
120:1 167:19
187:9,11,16,23
188:1,3,14 190:17
190:21,25 265:10
301:8,23 320:19
323:8,10 392:5,6,6
418:2 455:4
490:21 496:1,10
**articulate** 459:24

**artificial** 419:17
**ascertain** 390:8
**ascertained** 394:7,8
394:9
**ascertainment**
487:14 488:4
489:9
**ASD** 142:5,9,11
143:18,25 148:22
159:22,24 170:13
348:6 411:3,4
484:13
**ASDs** 142:15
**asked** 12:4 35:10
47:15 50:14 53:5
53:18,23 54:22
55:11 58:6,21
59:13 60:23 69:12
79:20 82:8 83:17
111:13 117:21
150:25 152:23
177:14,16 178:1
178:11 187:25
192:15 194:21
209:4,5,10 211:20
211:21 221:20
232:7 241:19
253:4 262:25
274:25 279:15
280:12 306:21,23
308:8 323:25
329:13 343:18
351:1 353:3 403:4
403:22 404:12,15
404:20 411:9
413:6,7,8 463:17
466:9 471:8
**asking** 29:14 35:12
35:25 37:9,10
43:16 45:5 47:5
51:2 57:19 82:4
86:6 88:2,6,10
112:10 124:10
135:21 138:5,11
164:17,19,21
166:18 171:25
183:5 197:17,20
204:16 206:24
209:2,6 210:11
214:25 220:13,15
220:16,17,18,22
233:4 236:13
240:20 262:5,6
263:8 265:25
280:9,22 284:14
284:22 292:12
294:13 323:3,4
329:9,11 344:2
347:23 363:6,7
389:17 395:3,23

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 504

402:1,6 403:21
406:23 409:25
410:1,2 429:14
430:11 431:6,7,12
434:18 441:14
451:7,9 463:21
asks 177:12
aspect 46:3 47:25
55:22 462:9,10
466:5
aspects 58:4 60:10
92:12 279:6
464:16 476:14
assemble 46:6
assembled 9:11
48:10,20
assembling 55:8
67:25
asserted 176:12
asserting 307:22
assess 306:1 362:12
365:13 417:2
425:16 466:15
496:24
assessing 185:10
215:16 276:11
415:17 424:7
456:11 465:18
assessment 26:7
77:5 158:4 185:9
246:5 265:2
337:16,21 459:5
472:23 473:4
assign 272:12,13
465:6
assigned 133:13
223:15 337:17
465:22
assigning 466:7
assist 62:10
assistance 41:22
47:3 60:1,23 89:11
89:12 93:9 103:15
479:3
assistant 17:22 18:3
41:23 46:5,11 47:4
47:7 50:14 60:23
63:18 95:25
175:12,13
assistants 103:15
assisted 55:7 56:8,14
62:12 67:25 212:9
associate 239:1
associated 9:24
105:17 114:21
115:2,15 121:11
131:6 134:3
147:14 152:14
158:14 166:12,17
166:21 169:17

180:1 194:9,12
195:2,23 196:5,8
196:11,23 197:2,4
197:7,12,19
199:23 212:22
213:3 216:3 237:8
237:14,20 238:1
238:20 239:9
241:14 244:4,25
244:25 246:22,24
247:5,10 258:9
266:11 301:4
306:13 307:12
314:6 349:9
355:21 364:7
371:6 373:15
377:16 381:11
400:25 414:21,25
420:11 422:3
443:4 461:17
472:25 477:17
484:12 486:20
491:9,25 493:14
495:24
associating 235:23
association 23:13,20
90:22 116:6 122:9
147:20 148:1
163:15,17,18,22
164:3,5,12,16,21
165:1 166:1 190:4
190:8 217:14
218:6,18 219:6
231:7,15,21 232:9
232:13,20 238:7,7
238:14 239:23
240:7,7 259:2,10
264:12 265:1
269:21 283:11,16
284:4,19 303:18
303:22 304:7,22
316:6 317:2,9,12
317:18 319:1
329:20 330:14,16
331:21 334:24
358:7,11,15,20,23
359:3,6 360:22,25
385:10 398:14
399:6 401:3,12,22
402:8 405:12
406:18 407:20
416:20 417:8
419:13 425:10
433:15 436:8
442:4 447:14
451:15 452:11
454:7 456:12
481:25 483:5
484:3 487:3 493:1
495:13

associations 217:19
231:10 317:4
322:2,4,6,15 323:5
417:5
Association's 24:1
258:23
assume 17:8 54:2
66:11 98:19 123:5
125:13 129:22
138:11,15,16,17
139:7 249:20
273:13 283:6
351:20 440:5
assumes 247:20
assuming 106:11
118:5 125:12
139:2 142:17
176:4 184:17
223:18,19 232:16
238:14 243:15,21
354:6,9
assumption 138:10
assumptions 354:10
354:16,22 356:20
427:12
asymptomatic
389:22 390:3,13
atresia 72:20 73:10
300:2,4,6
atrial 62:21,22 140:3
142:15 168:13,21
171:7 248:14
347:19,25
atrium 61:6
attached 114:11
attain 436:15
attention 328:5
335:25 431:23
440:23 441:20
443:24 448:6
450:19
attenuated 441:23
attorney 49:7 150:18
501:14,16
attorneys 1:18 2:5
9:11 49:6 141:15
attributable 171:17
194:4
attribute 170:13
173:23 174:7
attributed 171:16
audience 444:8,12
August 40:21 51:4
author 27:2 189:18
443:6 449:23
493:5,9
authored 321:2
authoritative 417:13
417:15
authority 302:1

authors 93:25 188:17
220:1 244:17,18
301:7 320:4
330:13 337:7,13
339:3,4 347:6,22
348:3 349:18
382:7 390:21
391:8 392:18
395:17 464:18,23
481:24 482:13
483:8 487:8 491:7
author's 492:18
available 92:5 93:22
114:25 115:1
130:13 176:5
202:1,4 204:15
234:20,23 249:13
261:8 264:22
461:18 465:25
467:22
Ave 15:24
Avenue 1:14
award 34:21
aware 20:11,12
23:23 53:11,19,22
99:17 116:19
142:4 167:24
168:19 174:21,24
175:2,4 176:7,11
176:14,18,18
181:5 182:2,7
193:6,11 204:3
263:2 312:21
333:24 334:23
379:9 383:17
395:17,23 397:3,8
401:14,15 402:16
417:1 463:5 487:8
awareness 430:23
a.m 1:14

_____B_____

B 3:7 149:8 283:5,15
379:15 381:2
babies 130:17 134:21
134:25 135:14,23
136:1 137:5,22,24
138:2,19 139:8
143:25 335:12
389:13,14,15,16
391:9,20,21 392:2
394:12 396:1
baby 106:23 107:15
108:17 110:17
125:15,20 126:4
129:9 138:20
139:15 149:13
205:22 206:12
329:3 390:8
baby's 127:12

139:17 152:6
153:7,17 154:11
back 8:20 9:22 14:12
14:16 44:6 50:18
52:15 55:11,24
63:12 75:20 90:7
98:2,24 99:21
110:15 112:16
113:3,8 114:24
137:9 173:7
179:16 183:17,18
185:6 188:10
197:18,21 203:23
209:11 221:12,25
223:13 224:13
227:7 230:5 258:6
264:11 267:13
273:3 274:13,16
274:19 275:1
281:4,17 282:6
285:10 296:15,20
296:23 298:7,11
310:9,20 312:2
313:5,7 317:25
327:17 328:3
331:9 335:17
352:19 375:12
378:10 402:22
409:5 415:10
427:15 478:5
486:13
background 64:1
125:3 130:1
131:11,15 135:14
135:16 138:22
139:1
backgrounds 468:3
backtrack 195:19
bad 391:1
Baltimore 34:25 35:1
Baltimore-Washin...
351:18
Barness 351:23
barrier 85:10,18
Bar-Oz 393:1
Bar-Oz's 393:7
base 94:18 499:4
based 58:19 91:17
119:2 120:3
147:17 200:16
225:17 239:9
240:6 252:17,22
267:25 273:22
291:9,20 297:18
298:2 308:15
329:8 351:7
355:17 359:23
360:9 361:16
362:23 375:10
378:19 396:13

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 505

409:7 426:20,22
427:1,10,11,13,16
454:7 464:1
476:25 494:19
497:1
**basic** 250:18
**basically** 65:18 379:3
461:11
**basing** 184:17 268:2
363:13 477:5
**basis** 55:3 92:24
164:7 165:21
169:3 170:12
206:16 231:22
289:3 290:21
292:8 293:14
372:6 436:17
462:7 486:15,18
**batch** 489:12
**bathroom** 145:19
**bear** 226:3
**Beecham** 1:7 16:2
**beer** 28:10
**beginning** 76:1
285:11
**begins** 66:23 146:3
219:17 285:19
358:3 426:16
**behalf** 20:17 22:17
23:9,9 24:11,17
25:20
**beings** 190:25
**belabor** 137:21
**belief** 106:13 271:23
272:10 296:2
**believed** 200:7
**bell** 116:17 141:4
**Belmont's** 200:2
**belong** 68:23
**belongs** 330:21
357:17
**beneficial** 244:19
**benefit** 66:12
**Berard** 74:9 301:2
415:16 478:15,18
485:1,13,19 486:2
**best** 34:22 149:2
216:7 227:15
263:11 277:2
322:20 352:23
353:7 354:7 355:3
357:6,9
**better** 353:12,16,17
357:4 371:2
**beyond** 149:19 164:4
329:18
**bias** 270:1 284:4,18
323:18 324:10,13
324:16,19,25
325:3,4,7 327:2,4

389:25 390:16
393:2,8,18,24
394:2,20 395:1
396:3,6 402:17,21
402:24 464:17
468:11,16 477:22
495:14,16
**biased** 269:21 392:15
**biases** 403:2
**bibliographic** 54:15
**bibliography** 64:8
**bifida** 299:16
**big** 131:2,2 181:25
296:21 391:18
**bill** 54:1 226:14,17
228:21 229:22
230:9 282:12
**billed** 11:8,9,9 12:6
54:8 67:23 228:5
229:6 488:9
**billing** 50:13
**billings** 231:1
**bills** 11:3,12,14 12:14
229:15 230:9
**bind** 100:5,6
**binder** 5:14,19,20,21
5:22,23,24 7:4,14
8:23 9:3,9,16,22
10:4,10,13 14:4
48:4,5,10 57:10
65:23 93:1 236:20
323:2 350:6
377:24
**binders** 54:18 57:3
**binding** 98:7 99:1,15
99:17,19,23,25
100:1
**biological** 81:12
82:10 83:20 86:4
210:3 233:21,24
244:22 250:12
261:8 268:3
271:22 290:9
364:1 404:13
455:6,25 461:2
486:25
**biologist** 85:21 86:1
**biology** 72:13,15,16
80:2,3,7,8,14,15,16
80:18 86:2,3,5,7
470:17
**biomedical** 498:5,6
498:17,20,22
499:9,12
**biostatistical** 25:12
27:5 430:5
**biostatistician** 27:3
**biostatisticians**
322:21
**births** 129:22 130:19

134:19
**bit** 87:19 149:6 231:4
298:9,9 456:18
**black** 33:6,12,13
34:5 303:2,4 476:7
**blanket** 154:17 155:6
388:19
**block** 112:3
**blockade** 97:11
**blood** 86:18 106:8,12
106:22,25 108:1,5
108:6 161:5 274:3
274:4
**bloodstream** 180:2
**BMJ** 420:2
**board** 68:24
**Bob** 16:16
**bodies** 476:25 477:5
**body** 80:1,6,9 95:11
95:12,14 164:22
232:11 337:18
349:14 361:11
403:1 404:12,13
450:16 454:11
455:4 456:4
460:16 466:19,24
467:5,7 468:4
473:11
**bolded** 44:15
**book** 46:16 47:1,2,16
58:13 211:17
351:23 421:12,15
478:6
**books** 56:24
**born** 125:15 130:17
134:21,25 135:15
135:23 137:5,24
139:15 143:25
149:13 186:11
302:17 335:12
390:9 394:13
396:1
**bother** 190:24
**Botto** 3:23 313:3,8
**bottom** 119:20 166:5
181:11 188:24
213:1 260:6
265:17 403:9
407:10,12,18
450:19 477:11
494:7
**bound** 235:17 315:9
315:10,16 317:9
317:10,13,18
318:22,22 328:11
328:12 330:7,15
338:1,1,4 343:6,6
346:14 360:1,20
369:5,6 374:22,23
376:20 377:1,1,12

380:8,9,11,17,18
381:16 383:24
438:15,14 445:19
445:14 448:14
481:22,22
**bounded** 444:5,25
**box** 262:20 302:24
303:2,4 476:7
**brackets** 178:22
**Bradford** 419:15
454:17,21 455:10
455:17 456:2,7,10
456:15,25 457:7
457:10 471:16
**brain** 189:1,5,6,8
**breadth** 235:3
267:18
**break** 14:10 17:2
66:17 97:22
117:11 133:10
135:20 145:11,19
150:23 216:11
226:5 262:16
285:12 360:10
361:8 363:24
378:6 463:19,22
**Brent** 4:5 415:13
425:2
**brief** 14:15 15:16
52:14 66:21 98:1
146:1 219:15
227:6 285:17
358:1 378:9
426:14 437:17,18
440:3 448:4
462:20
**bring** 114:17 350:2
480:13
**broad** 74:15 127:20
196:7 208:17
234:10 240:12,16
240:16 250:16,17
254:21 255:4,6,7
255:10,10,13
257:18 267:16,16
269:2 277:16
290:11,15 295:2
297:21 307:7,8,10
403:15,20 404:2,3
404:5 405:4 407:5
411:6,11,12,17,22
411:23 412:3,8
419:19 420:16
**broadly** 290:12
421:25 499:8
**broadly-acting**
420:15
**broke** 145:13
**broken** 11:24 12:16
**brought** 10:25 13:19

48:22 49:25,25
90:19 101:5,11
113:16 195:9
198:4 323:9
383:20 386:21
398:6 436:14
457:5 461:7
**Buffalo** 2:3
**bulk** 231:1
**bullet** 166:19
**Bunin** 5:6,10,11
**business** 18:7 29:19
34:25
**businesses** 35:6,7,9
36:2
**Butterfly** 32:19 34:8

---
**C**
---

**C** 149:8 283:5,15
501:1,1
**calculate** 352:16
444:20
**calculated** 379:4
386:14 409:10
427:18,20,22
493:17
**calculation** 427:1,15
464:2
**calculations** 50:15
58:19 59:5 335:15
426:19,24 427:7
427:10,11 464:14
**call** 19:22 20:3 42:7
68:8 76:12 82:17
154:22 156:3
255:4 309:11
371:8 405:2
442:23 456:7
**called** 7:19 8:17 19:1
19:15 20:7 27:24
28:4 166:6 213:8
227:11 329:19
411:22 495:19
**calling** 255:7 335:8
457:22 469:13
**campaign** 30:11
**canal** 248:14
**cancer** 74:25 75:1
76:21 78:18
299:25 356:3
405:11,17 406:17
407:1,18 408:8
410:4,5,12,15
419:22 440:16
446:12,19 449:21
450:10,22 451:13
452:19 471:24,25
472:6,15
**cancers** 407:8
440:20 451:2

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 506

**capable** 222:12
261:4
**carcinogen** 269:3
405:3,16
**carcinogenic** 405:1
**carcinogenicity**
498:4
**carcinogens** 75:9
269:1,2 405:10
407:6 449:22
450:21
**cardiologic** 470:8
**cardiologist** 63:3,11
63:14 64:5,13
68:10 148:24
470:5 471:4
**cardiology** 64:6
470:19
**cardiovascular** 123:8
260:9 302:19
337:9 356:4 482:8
482:18,19,22
483:6 484:12
486:23
**care** 244:15
**career** 75:6 76:5
190:20 261:17
404:23
**careers** 74:13
**careful** 344:24
**carefully** 391:9
402:23
**Carolina** 23:25
**carpet** 28:16
**carpets** 28:25
**carried** 56:17 476:25
**cases** 11:20 26:25
42:19 54:5 93:14
132:6 201:1 203:2
204:12 218:22
228:25 261:7
276:16 283:23
295:17,18 335:1
338:13,18,21
340:21 342:7
364:4 375:11,17
375:24 376:5,12
376:15 377:8
378:24 384:24
388:6,13,24 389:3
390:15 394:7,8
396:14 408:8
410:12,15 420:11
427:16,19 428:20
428:22 429:1,12
440:25 444:11
465:1 467:11,16
477:7 484:6,12,16
486:3,12 489:10
**case-control** 217:24

321:6,10 427:12
492:7,12
**categories** 241:21
243:10 257:19
268:23 277:14
295:23 306:12,25
308:15 314:18
331:15,23 344:6
344:21 351:12,22
357:15 364:6
397:11
**categorization** 312:2
312:22
**categorize** 312:13
370:7 497:4
**categorized** 173:12
241:2 243:8
244:23 316:12
333:6 339:16
342:20 344:3,10
345:4
**categorizes** 342:14
**category** 224:1
237:23 240:16
244:9,11,13
245:24 249:1,10
250:10 262:15
270:1 287:14
288:16 296:16
297:12 302:25
306:16,24 309:9
313:10 329:8
331:20 337:3
339:13 340:6,7,10
341:10 343:9
350:17 355:25
357:11,13,17
367:16,21 368:3,5
368:25 478:8
**caught** 390:4
**causality** 158:4
159:16 456:21
466:15
**causally** 89:22,25
90:6,10 151:7
170:25 231:9
236:22 237:2,21
238:10 239:11
240:2,18 243:3,22
244:6,25 246:21
247:5,7,8
**causation** 11:8,24
37:19 39:4,17 40:2
54:2,3,10 69:24
70:5,8 71:17,25
72:1 77:5 121:22
121:24 122:2,4
147:17,23,25
148:2,10 149:1,4
164:10 210:8,22

212:12 214:21
215:17 228:3,21
229:4 231:1,12
232:10,14 233:17
233:20 234:11,12
236:5,21 241:16
247:1 248:9 249:2
249:6 264:3
268:24,25 293:1,6
299:7 316:10
329:11 354:20
361:1 362:12
365:25 397:20
401:10 404:19
416:22 417:2
418:6 419:13
422:6 424:7
429:25 430:2
454:18 455:10
457:2,10 462:10
462:11 463:7
471:9,17,22
472:11 473:6,16
496:24
**causative** 39:14
40:14 207:19
241:16 247:15,16
248:4,8 456:13
**caused** 69:20 70:2
126:14 139:17
148:5,19 149:16
150:9 151:6
159:24 186:3,8
189:8 207:6,13
208:6 210:9,23
250:21 267:2,11
275:20 300:24
307:16 410:20
418:14
**causes** 88:22 108:16
109:3 120:25
121:7,10,13
126:24 127:9
128:15,18 139:10
139:22,22,23,24
146:11 147:4,7,11
147:13 149:10
151:22,25 156:1
158:5,5,17,18
159:21,24 188:20
191:24 193:2
198:16,19 199:2
200:22,24 201:16
202:11,17,20
205:1 208:25
209:8,17 216:8
220:11 232:14
246:15,22 247:17
248:12 253:16
256:9 257:2 263:4

265:7 269:20
276:1,12 283:4,14
290:14 294:6,10
294:24 295:3,7
302:2 303:10,14
303:20 305:12
308:14 360:8
403:5,23 410:23
410:25 412:8,9,11
412:15 415:6
425:17 435:12
446:22 460:2
495:12
**causing** 81:13 131:13
137:8 151:15
256:13 261:4
294:18
**caveat** 359:22
**caveats** 381:10
**CCVD** 260:8
**CDC** 4:7 79:16 498:8
498:8
**cell** 80:3,8,14,15,16
80:18 81:10 86:23
86:25 87:5,7
113:12 251:2
252:23 267:17
271:15 278:11
280:18
**cells** 72:17 73:1,6,13
73:20 80:20,25
81:5,8,23 82:7,22
83:14,23 84:3,8,11
84:14,19 87:17,22
88:1,3,11 104:10
104:15,22 105:13
105:17,22 112:2
251:2,19 252:5,11
270:12,17 277:21
277:23,25 278:1,2
278:4,5,7,9,25
279:2,8,12,13,15
279:18,18,23
280:4,23 281:10
281:13,14,14
282:10 421:1
424:18
**cellular** 266:22 277:8
277:8,21
**center** 2:3 8:3 34:18
49:5 53:8 79:1
218:17
**Centers** 320:16
**central** 93:20
**cerebellum** 189:12
**cerebral** 494:9
**cerebrovascular**
493:22 494:2,10
**certain** 22:18 23:18
42:24,25 49:16

60:24 88:3 95:24
128:16 150:15
152:13,14,15
156:15 161:19,19
182:25 183:3
187:7 188:1,1
189:3 195:1,19
200:20 208:2
209:3 232:1 234:6
253:18 280:4
297:17 300:19
354:10 400:18,20
420:16 427:12
455:2 460:21
462:18 468:6
477:6 488:3
493:18 497:11
**certainly** 38:13,15,16
47:20 75:5 76:4
104:23 120:17
155:1,3 157:1
159:11 163:12
171:3 181:11
193:11 195:15
220:1 225:12
236:6 241:23
242:3 249:7
287:18 306:11
331:4 353:10,23
373:20 388:9
389:2 392:6
395:14 418:1
419:11 423:7
425:14 447:10
464:13 474:12
477:6 478:3
490:16 496:25
497:16
**certainty** 36:20,24
38:2,4,22,23 39:6
39:20 40:12 80:23
81:4,22 82:6,21
150:9 483:2
**Certificate** 501:22
**Certified** 1:23 501:2
501:3
**certify** 501:4,9,13
**Chambers** 5:7
419:23
**Chan** 67:20 175:15
**chance** 52:18 53:2
125:14,18,23,24
126:13 320:9
321:15 322:2,6,15
323:5,24 349:20
378:23 379:24
396:9 429:11
**change** 19:19 56:4
145:17 370:9,17

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 507

426:6,9 428:15
429:8,8 464:25
493:9
**changed** 131:1
310:15 347:11
**channels** 30:5
**characteristic** 419:9
**characteristics**
415:21 416:2
460:25 464:16
**Charles** 322:22
**charts** 101:23 487:9
487:19,20 489:1
**check** 28:1 48:21
140:24 161:20
162:14 196:25
280:6,6 296:20,24
367:5 485:19,24
**chemical** 18:14 19:12
30:23 31:1,5,9,10
31:11,15 76:16
86:22 87:4 100:10
208:8 262:1
422:21,22 423:1,2
423:11,16,20
450:13 454:6
**chemically-induced**
134:2,9
**chemicals** 75:8 76:5
76:19 255:18
407:5 423:8,11,17
450:9,13,15 468:6
**cherry-picked** 410:1
**chief** 36:12 65:19
**child** 138:12 157:5
159:10 205:18,20
205:25 206:10
218:8,20
**Childhood** 447:15
**children** 1:5 76:20
139:12 206:1
297:19 329:25
421:19 440:11,12
445:18
**children's** 173:23
174:7
**child's** 179:11
**chime** 469:23
**choice** 481:14
**choose** 37:15 281:1
**chose** 225:19 445:3,9
453:7
**chosen** 237:16
**chromosomal** 205:4
**chromosome** 196:21
205:12
**chronic** 128:17
**Chung** 218:17
**cigarette** 171:15
218:6,19

**cigarettes** 162:22
163:1 169:3 218:4
218:24
**circle** 297:24
**circulating** 109:9,16
111:9 112:19,25
**circulatory** 336:4,25
339:9,10,24 340:5
340:15,18 341:11
341:18,18 342:2
342:13,22 343:10
343:20
**circumstances**
124:24 232:1
234:7 329:16
390:1,2 401:4,22
402:8,11
**citalopram** 97:5
**citation** 309:17
**citations** 293:9
**cite** 106:6,7 107:4
108:12 116:2,20
117:5 119:5,8
128:5 141:6
167:19 187:10,11
190:22,25 196:20
213:4 214:20
216:24 222:1
265:14 266:1
272:24 288:2
291:16 292:23
293:4 303:12
317:7 336:10
337:23 366:24
367:12 368:17
369:23 374:15
382:7 454:10
483:12 489:11
496:1,10
**cited** 64:17 104:2,17
104:20,25 106:2
106:15 114:3
116:7 117:24,25
118:12,23 150:5
169:5 188:15
190:21 196:19
266:17 274:2,7
281:19,21 301:8
344:8,12 363:1
366:21
**citing** 65:6 118:2
338:20
**CIVIL** 1:2
**claim** 68:3 112:13
126:11 148:23
203:13 314:6
421:22 476:6
**claiming** 176:16
425:16
**claims** 487:24

**clarify** 29:18 41:18
41:19 150:25
288:6 310:5
416:14
**Clark's** 351:22
**class** 88:21,24 90:15
91:23 92:8 423:6
423:12,17
**classification** 65:5
77:3 269:25
276:10 284:3,10
284:18,23 313:9
345:21 354:17
367:14 368:2
370:20 493:22
494:1,25 495:6
496:16,20,23,25
498:9,12 499:10
**classifications**
373:16 497:12
**classified** 145:10
356:1,21 371:3
496:3
**classifies** 366:16
**classify** 144:23,25
275:13 283:9
285:7 354:19
369:19 370:2
397:10 496:8,17
**Cleaner** 27:24 28:4
**cleaning** 27:20
**clear** 37:12 160:13
161:8 208:23
234:19 238:5
412:7 444:12
461:15 489:7
494:11
**clearly** 38:6 148:11
151:19 152:14
262:3 307:6 323:1
323:8 371:1
372:11 374:2
400:20 464:23
498:15
**cleft** 112:8 208:13,25
209:8,17 210:9,23
211:2,6,11 213:17
213:24 214:7
215:1,7,14,14,15
215:22,25 216:1,3
216:4,7,8,12,12
217:24,25 218:1,8
218:11,12,13,20,20
220:7,15,20,22
221:5,5,6,9,11,16
221:17,17,21
222:5,6,6,17,18,24
222:25 223:8,8,11
223:11,16,17,20,20
224:1,2,6,10,10,15

224:19,20,20,21
225:10,10,13,23
298:22,22
**clefts** 212:22 217:3,6
217:16 218:15
219:7,21
**clerical** 22:6 46:4
**Clinic** 383:11
**clinical** 64:2 69:8
97:5 198:12
392:13 399:10
436:15
**clinically** 98:9,22
201:25 305:5
389:22 390:13
**clinician** 421:14
**Clinicians** 421:13
**clipped** 13:23 101:21
102:6,7,11
**clock** 52:11 230:1
**clogged** 28:17,25
**close** 136:23 144:1
163:23,25 165:2
179:21
**closed** 143:18
**cluster** 317:2
**CMA** 205:11
**Coal** 443:4
**coal-tar-related**
445:19
**coarct** 380:3
**coauthor** 316:24
439:22
**coauthored** 7:20
26:2 167:23
216:21 447:12
**coauthors** 443:8
447:16 450:5
**code** 223:5,6,7,10,14
223:15 338:19,23
339:22 340:17
352:3 370:21,22
496:9 498:10
**codes** 311:14,16
337:17 497:3
**coding** 224:4 338:11
340:3
**coffee** 66:17,18
**cognitive** 188:19
**cohort** 304:21 349:4
378:17,18,19
379:8 381:20,22
385:4 492:7
**Cole** 397:24 427:25
427:25 428:1,6
478:14,18 485:4
485:20 486:2
487:2,5,6
**collating** 175:12
**colleagues** 217:23

218:4,17 219:7
367:17
**collected** 317:22
318:4
**collection** 7:5 389:24
389:25 390:15
498:11
**College** 304:7
443:15
**colloquy** 123:23
**column** 214:23 260:5
264:15 316:22
318:14 321:9,24
321:25 325:23,25
337:20 347:7
349:3 380:24
384:7 475:4,5
476:18 477:10
482:4,5,6,13 494:7
**combination** 35:23
215:23
**combinations** 418:15
**combined** 54:10
164:11 237:11
239:12 243:25
244:14 245:25
246:6,12 249:5
254:14,15 257:4
268:13 288:13
290:8 293:2 295:3
296:4,19 297:8
306:25 308:17
334:11 360:9
362:24 363:5,10
363:18 364:13,15
364:23 365:16,23
399:4 410:12,16
451:2 478:8
489:14 490:1,13
492:21
**combines** 309:18
**come** 19:3 98:21
103:23 226:23
231:10,12 261:18
301:9 311:16
313:7 342:1 344:9
369:13 380:7,9
409:5 460:1
**comes** 222:18 223:5
298:14 343:9
350:9
**comfortable** 153:3
308:17
**coming** 50:18 476:7
**commencement**
501:5
**commencing** 1:14
**comment** 21:7,8,10
21:23 22:1,5 66:6
96:11,25 97:19,20

USDC, Northern District of OK                McMurray v. GSK                              Monday
No. 08-CV-381-GKF-SAJ        Videotape Deposition of Shira Kramer, Ph.D.         November 2, 2009

Page 508

123:23 162:3
323:24 324:3
325:21 326:8
327:5 335:6
343:16 345:14
383:19 395:19
396:8 413:6
494:21
**commentary** 3:12
53:6 344:20
**commenting** 472:16
**commercialized** 19:8
**Committee** 34:25
35:2 422:5
**common** 72:18 91:25
256:5,10,13,24
271:20 272:10
279:17,19 424:12
482:23,25
**commonly** 432:7,8
**communities** 450:20
**community** 292:20
405:9 407:7,9
418:19,23 435:13
439:19 441:6
**companies** 18:19
32:7,14,17 35:15
36:9,9,12
**company** 18:17,24
19:9,15,18 22:9,12
27:11 28:16,24
29:21 31:25 32:22
33:2,7,8,17,22,24
51:24
**company's** 29:8
**comparability** 498:11
**compare** 96:20
227:18
**compared** 92:18
219:4 304:17
315:22 330:11,12
338:8 377:9 381:8
383:5 440:12
466:10
**comparing** 96:6
97:14
**comparison** 393:19
443:19,25 445:20
448:7
**comparisons** 320:6
320:12,14,20,22
321:11,16 322:1,5
322:14,25 323:4
349:18,23 471:21
**compelling** 225:14
360:16,18,22
**compile** 46:12
**compiled** 483:18
484:20
**complement** 204:23

**complete** 20:20 89:6
122:13 195:10
463:13
**completely** 41:24
124:24 147:8
217:7 219:22
455:3
**complex** 430:21
463:18
**complications** 389:8
389:13
**component** 127:10
128:15 139:22
146:24 147:4,4,11
147:12 151:25
**components** 247:22
**composed** 394:4
**compound** 360:11
463:18
**comprised** 468:2
**compute** 50:14
**computerized** 89:13
**computerizing** 54:17
**conceived** 174:20
**concentrate** 366:1
466:9 481:15,17
**concentration**
111:18 112:2,11
112:19,25
**concentrations** 109:4
**concept** 472:24
**conception** 174:2,6
175:7,23 176:3,16
176:18 178:7
179:19 181:16,19
182:5
**conceptions** 188:24
188:25
**concern** 323:16
**concerned** 189:9
279:7 459:4
**concerning** 80:2,7
**concerns** 191:11
**conclude** 146:15
188:17 273:18
289:1 360:8
362:22 447:3,5,10
455:14 481:24
491:8
**concluded** 395:8
492:25 493:15
**concludes** 145:24
219:11 285:15
301:14 357:24
426:12 472:18
500:3
**conclusion** 119:19,22
147:25 150:5
159:13 164:15
165:20 186:15

203:14 236:5
253:9 289:6,10,16
289:20,25 293:20
301:9 302:2 329:7
332:18 353:13,17
359:11 363:2,11
363:18 364:9
392:22 397:20
398:20 404:15,17
433:15 436:6
445:16 446:15
454:17 455:9
460:1 461:5,19
472:18 483:3,19
484:21,24 486:15
487:1
**conclusions** 21:5
22:8 91:9 120:2,2
147:17 149:3
165:14,15 188:22
214:21 220:3
231:12 232:6
337:5 356:6,12
361:1 401:9
430:18 462:11
467:24 471:2,9
493:13
**condition** 69:21 70:3
70:7 140:9 141:12
141:14 148:22
161:7,8 480:22
481:6
**conditions** 64:2
186:11 475:18
**conduct** 20:14,19
29:9 77:7 100:24
106:4
**conducted** 9:5 20:16
87:10 91:17
108:21 189:13
198:18 218:5
283:21 350:15
367:17,22 439:19
**conducts** 463:6
**conference** 447:23
**confidence** 37:21
123:15 124:4,5
164:14 168:14
214:12 215:5
218:1,2,11,13,21
219:1,2,3 235:3,14
235:16,18 315:18
316:3,5 330:6,8
349:11 368:18
383:7,7 407:23
408:1,5,10 409:7
409:10,13,17,23
429:6 432:19,25
433:12,17,24
434:13,23 435:5

438:13,16,22
441:3,10,18
442:20 444:5,10
444:14,20,25
445:2,8,14 446:3
448:9,16 449:2,13
450:23 451:2,8,11
451:17,20,21
452:2 453:5
**configured** 310:14
**confined** 332:22
**confirmatory** 225:15
225:19,21
**confirmed** 162:15
174:23 219:6
**conflict** 182:15
**confounded** 224:16
224:23,25 225:2
**confounding** 55:20
58:5 225:2 346:16
348:21 464:17,22
464:24
**confused** 414:7
**confusing** 81:25 82:1
314:20,23 414:8
**confusion** 161:2
163:12 456:19
**congenital** 7:11 9:25
10:7 89:17 148:15
151:13 153:4,22
154:5 155:7,8
156:18 157:25
158:13,21,23
168:11 170:21
171:14,23 186:12
196:2 197:5
201:14 206:2
207:9 210:1
236:23 237:8,22
238:5,8,11 240:14
240:19 244:4,25
245:16,19 246:24
247:10 249:17
255:20,21 257:19
257:24 259:19,25
260:8,9,16 262:15
262:16 263:14
286:6 287:14
298:19 302:6,7
303:25 332:21
336:3,24 339:8,10
339:23 340:4,11
340:15,18 341:11
342:1,21 343:10
343:20 357:11
385:7 394:13
397:18 398:15
416:8,16 421:18
425:5 485:10,10
486:21 493:14

**congenital** 157:4
**conjecture** 203:17
203:18
**connection** 158:20
238:23 477:18
**conotruncal** 61:19
64:20 237:9
238:20,21 239:1
246:25 247:11
249:3 275:24
280:15,16 281:9
289:20 290:4
307:1 333:7
350:10,17,21
351:5 352:4,4
357:17 358:20
366:16,20,24
367:3,11,16,21
368:2,4,11,24
369:20 370:3,4,8
370:22,23 371:3
374:8
**consensus** 472:20
**consider** 35:3 67:18
74:2 76:8,12 83:2
119:11 146:10
191:23 192:7,12
193:8,12,18
195:13 198:11
214:14 225:18
326:21 332:14
391:25 392:3
397:16 402:24
417:13 418:3
438:22 460:6
462:2
**considerably** 189:2
**consideration** 71:24
81:12,14 82:9
147:16,23 231:13
232:4 249:7,14
460:23,25 461:1,3
461:23 464:20
494:25 495:7
**considerations** 235:6
356:19
**considered** 29:8
30:18 81:9 127:10
147:5,13 151:25
152:3 159:15
193:5,12 287:21
306:18,25 330:16
392:4 433:25
461:18 463:14
480:21 481:5
**considering** 68:10
207:16 309:3
397:4
**consist** 55:18,19
103:18 134:10

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 509

consistency 168:20
   399:8,11 401:2
   402:19 425:8
   455:3,20
consistent 193:15
   217:7 219:22
   335:19 362:3,6,18
   363:22 373:2,4
   397:16,19,25
   398:9,11 400:22
   403:1 405:12
   406:18 407:20
   424:21 451:10,15
   452:10,19,24
   477:20
consistently 232:12
   373:10 386:1
   401:10 416:7,12
   416:14 423:24
   425:4 460:17
consortium 23:20
constellation 132:7
   207:17
constellations 127:8
construction 378:19
consult 79:22 113:22
   174:10 195:8
consulted 99:4
contact 283:1
contained 309:5
containing 5:25
contains 8:23 9:3,9
   9:16 10:4,13,20
contaminant 445:20
contemporaneously
   183:21
content 21:5 42:12
   93:8,11 103:20
contents 42:17
context 39:25 51:6
   150:3 234:16
   235:8 247:20
   248:3 254:7 260:2
   362:8 401:20
   402:4 418:7
   422:25 473:3,5
   476:1
context-dependent
   465:23
continue 305:19
CONTINUED 2:1
continuing 260:19
contract 17:20
contradict 448:21,23
contribute 55:21
   126:18 243:24
   467:13
contributed 56:14
   57:2 65:14 170:25
contributes 146:21

contributing 151:22
contribution 229:14
contributory 225:15
   432:12
control 15:10 41:24
   110:20 251:20
   327:13 328:17
   330:12 389:9,14
   389:16 393:4,22
   393:24 394:3
   395:2,6 440:12
   478:19,22 487:20
controlled 131:12
   171:8 266:21
   325:5,8 394:21
   395:2
controlling 326:9
controls 131:16,18
   218:15 315:23
   325:13 377:9
   390:16 394:8,15
   394:21 427:17,21
   487:12 489:10
controversial 171:20
controversy 264:23
convention 23:14,17
   24:1
conventional 432:15
   436:10 441:9
convergence 364:8
   402:14
converging 460:8
convey 466:8
convincingly 97:4
Convulsions 300:12
copies 8:24 9:4 10:14
copy 7:18 8:16 24:18
   167:20 177:4
   263:6 265:13
   302:13 304:11
   312:25 316:18
   378:1 391:11
   401:18,25
cord 106:8,12,22,25
   108:1,5,6 274:2,4
core 271:24 272:3,3
corner 416:2
corollary 428:5
corporation 1:7,8
   19:2 27:15,19 29:5
   31:19
corrected 365:11
   489:20 490:3,5
correctly 128:20
   135:10 168:17
correspondence 49:4
   101:12 103:5
corroborate 28:2
cost 229:10,11
counsel 6:7 16:8

413:5 414:9
   501:14,17
counseled 78:22
   198:15
count 8:4 382:22
counted 102:14,21
country 130:17
   322:21 355:1
couple 496:9
course 72:14 145:20
   288:5 306:18
   324:16 417:4
   431:19 486:8
court 1:1,23 16:3,15
   16:16 83:3 473:15
   501:2
cover 13:23 226:13
   226:13 442:15
covered 64:8 138:4
   139:18 231:2
covers 89:7 300:18
co-factors 147:10
   152:3
co-founder 29:5
   30:16
co-owned 34:9
co-owner 32:24,25
craft 21:3
crafting 41:20
craniofacial 7:9
   208:22 210:2
   422:1
craniosynostosis
   299:1 305:8
create 42:11 47:17
   128:15 284:11
   418:20
created 42:17 51:21
   59:9 183:6 226:21
   297:20 415:16
creating 18:13
creation 241:6
crest 73:1,6,13,20
   80:20,24 81:5,8,10
   81:23 82:7,22
   83:14,23 84:3,13
   84:19 104:10,15
   104:21 105:13,22
   109:18 113:12
   277:23,24,25
   278:1,7,9,25 279:2
   279:4,8,18,23
   280:18,22,23
   281:10,13 282:10
criteria 163:21
   164:20 218:10
   233:15 295:20
   297:16 365:24
   411:20 415:17
   454:18 455:2,10

456:7,10 457:1,11
   457:16 458:3,8,12
   460:14,16 461:13
   462:1,4,14,17
   463:11 465:21
   471:16
criterion 419:15
   435:22,23 456:21
   457:7 465:7,23
   493:6
critical 26:6,19 27:9
   275:12 446:1,1
criticism 26:23 27:6
cross 85:10,18
   105:25 273:17
   421:8
crosses 273:16,22,25
crossing 106:21
   274:9
cross-examination
   5:21 9:11
crucial 494:25 495:6
crude 479:17 481:7
   481:12 483:10
Cruise 27:25 28:5
crutch 435:21
cumulative 147:24
   148:2 165:13
   284:2,2 288:9
   475:12
cup 66:17,18
curative 329:21
curious 243:12
current 302:13 304:2
currently 19:14 32:7
   93:22 140:9
   141:11 264:22
   300:21 310:14
   382:5
curriculum 303:9
cushion 63:8
customer 28:23
customers 28:16
   29:2
customization
   497:18
customized 498:6,21
   499:11
cutting 408:25
cut-off 432:21 434:4
CV 68:17 198:7
C-O-A 313:18
C.C.R 501:21
C.R.R 501:21

──────── D ────────

D 3:1 149:9 302:25
dad 161:17 162:4
   163:1,11
dad's 170:14,15

daily 5:5 29:5 97:3
   169:3
damage 188:20
   189:5
damaging 435:10
dangerous 435:10
   448:21
database 20:6
   114:25 218:16
   222:11 305:3,4
databases 304:16
   487:24 488:1
date 1:14 28:23
   175:7,22 176:3
   181:17,20,22,22
   501:12,23
dated 40:21 41:1
   51:4 181:21
dates 28:1
dating 174:22
David 322:23
Davis 4:14 145:10
   222:2 224:1,6,15
   224:20 225:9
   314:10 336:1,16
   336:18 337:6
   339:4 343:2 344:8
   363:1 372:14
   374:16 381:14,19
   382:6,7,12 397:23
   398:25
Davis's 342:3
day 50:18 162:23
   218:4,24 275:10
   409:5 430:3
deal 158:2 225:13
   239:4 240:16
   310:6 334:18
   391:18 432:23
dealing 415:18
dealt 155:19 241:3
   243:6 244:23
   392:10,21 395:15
   395:19 464:18
   491:2
debate 354:5
debating 355:15
decided 40:14
decides 493:5
deciding 157:2
decision 70:6 147:25
decisions 40:5
   471:13
declaration 3:11
   103:1,3 211:18
   212:13,18,21
   245:3,6 436:23
   437:4,6 456:1,10
   458:22 459:1
   465:10,18 467:19

USDC, Northern District of OK                McMurray v. GSK                              Monday
No. 08-CV-381-GKF-SAJ        Videotape Deposition of Shira Kramer, Ph.D.        November 2, 2009

Page 510

468:1,14 474:20
498:24
**decline** 31:22
**decontaminating**
18:14 19:11
**decontamination**
31:8,11
**decrease** 112:3,18
112:25
**decreased** 130:12
166:12,21 334:5
359:20 362:2
373:4 377:14,17
381:11
**decreases** 167:10
**decreasing** 111:18
111:25 112:11
**dedicated** 68:25 69:2
69:4 79:14
**defendant** 1:9 2:5
22:22
**defense** 26:6,11,19
26:23 27:7 40:20
**defer** 175:21,25
**deficiency** 300:9
**define** 38:6 40:1 73:8
179:21 434:7,11
434:24
**defined** 165:3 271:25
330:13 365:11,16
411:20
**defines** 424:20
**definitely** 195:16
**definition** 37:13
164:12 168:20
242:4,6,10 243:24
247:15 255:8
365:24 434:16
472:19 475:15
**definitively** 224:12
**deflated** 489:3
**defunct** 33:2 34:13
**degree** 36:24,25
37:21 38:1,2,9,14
38:22,24 39:5,6,18
39:20 40:11,12
56:13 60:16 70:4
80:23 81:3,21 82:5
82:13,20 83:12
85:2,3 91:21 121:6
150:8 151:5
153:21 154:5
156:18 157:24
159:11 160:10,15
167:11 170:18,22
171:21 186:1,6
191:14 192:11
199:11,14 206:19
207:5,8,12 208:24
209:7,16 211:13

216:10 238:4
246:14 249:12
388:4 453:16
**delay** 172:20 173:16
185:11,21 186:8
186:18 187:20
191:17 299:5
**delays** 173:13,13,18
186:10,20 187:13
190:5,15
**deleterious** 111:19
111:22 112:4,12
**deleteriously** 109:20
205:12
**deliberately** 132:14
**demands** 35:22
**demonstrable** 327:2
**demonstrably** 327:11
**demonstrate** 416:7
425:4,12 451:4
455:22 477:14
**demonstrated**
158:13 171:4
221:22 255:25
257:18 414:20
**demonstrates** 104:9
104:14,20 105:12
105:19 108:15
111:7 416:15
**demonstrating**
131:20 132:22
221:10
**denied** 177:23
**Denmark** 335:4
**denominators** 369:7
369:9
**Dental** 28:8
**depend** 39:25 91:21
152:9 154:15
254:7 277:19
356:18
**dependence** 435:20
**dependent** 266:21
**depending** 94:3
110:8 201:5,10
234:3 261:7 270:3
366:11
**depends** 35:21 36:6
36:22 128:1 137:7
138:7 253:3
283:20 356:14
388:15,20,20
394:7 477:15
488:14
**depict** 44:18
**depicted** 44:12,22
**depiction** 44:4
**depicts** 43:25 44:1
**deposition** 1:13 5:17

8:12 10:25 12:24
15:19,22 16:7
47:15 51:2 54:22
66:24 90:4,13 91:8
104:19 145:25
146:4 162:8,10
176:25 177:6
184:20 219:18
275:3 285:16,20
297:5 357:25
358:4 426:13,17
500:4
**depressed** 325:10
**depression** 100:16
325:4 326:5 392:8
**derived** 106:20
278:25 305:1,2
396:14
**DES** 419:2
**describe** 7:1 92:12
132:21 163:21
164:19 315:15
**described** 22:5 24:21
54:7 56:13 127:21
154:13 179:14,15
186:21,22 199:24
290:20 461:7,11
472:25 473:8
**describing** 37:25
335:16 365:3
**description** 12:19
457:6 463:13
490:17
**descriptions** 11:16
12:4 55:20
**design** 20:14,21 78:2
295:24 326:24
385:5
**designed** 57:25 60:22
199:1,5 234:3
244:18 402:23
425:11 498:10
**designing** 41:20
430:17
**despite** 176:16
205:10
**detail** 12:11 223:22
244:17 485:8
486:14
**detailed** 11:15 60:24
227:1 444:13
**details** 12:4 86:15
93:10 95:24
103:16 188:14
351:24 462:21
494:16
**detect** 131:10 256:21
256:23 337:10
386:16 427:23
428:3,8,20,22,25

488:2
**detectable** 98:9,22
**detected** 348:14
378:24 379:2
**detecting** 379:24
427:14 429:12
**detection** 389:25
390:16 392:13
393:2,8,18,24
394:1,20 395:1
396:3,6
**determination**
422:20,25 423:9
423:19
**determine** 69:19
70:1 72:7 95:8
115:1 159:4 257:1
301:5
**determined** 132:16
**determining** 159:15
216:8 235:4
431:22
**develop** 30:23 125:9
131:22 250:12
**developed** 19:7
124:20 132:24
438:6 498:10
**developing** 19:11
76:7 108:8 277:16
421:1 424:17
**development** 53:10
56:14 73:2,7,13
109:10,17 111:19
111:23 112:12
151:12 169:14
189:1,4 208:12
210:2 245:12
251:3,16,24
266:20 267:14
270:12 277:11,17
279:5 282:10
307:8 354:12
**developmental** 7:13
44:1,19 173:13,16
185:11,21 186:8
186:10,18,20
187:7,13,19 190:5
190:14 191:17
251:15 252:1,8
267:19
**developmentally**
309:20
**develops** 126:10
**devising** 18:13 19:11
**devotes** 436:20
**diagnose** 69:17 70:11
**diagnosed** 140:3
142:4,9 383:16
384:18
**diagnosing** 200:12

**diagnosis** 71:9,12
72:4 146:7 148:18
148:21,22,25,25
154:23 155:25
156:3,4 158:3
200:15 203:23,24
**diagnostic** 393:20
493:22 494:1
497:21 499:14
**diagrams** 5:12 44:17
**Diav-Citrin** 4:20,24
122:24 390:20
391:3,4 478:15,22
479:9 480:5
481:24 483:11,25
486:24
**died** 108:22
**differ** 41:11 86:18
91:13 92:7 99:18
252:17,22
**differed** 349:12
**difference** 37:2,5,6
37:10,24 40:9 99:6
99:15 110:18
142:11 151:14
192:18 248:19
250:3 305:1
324:24,25 347:14
393:19 399:19
431:14,17 439:2
484:5 487:22
**differences** 41:6
46:23 250:19
251:4 270:11,17
270:21 305:6
431:22
**different** 61:18
62:22 63:1 72:19
74:15,20,23 76:18
84:7,11 87:6,24
92:14 100:11,12
121:24 122:4
127:21,21 134:13
136:10 144:21,21
144:23 145:8
148:7,8 149:10
153:23 183:12
194:19 215:22,23
231:17 239:19
245:13 247:18
250:12,20,21,23,24
251:5,9,10,14,20
256:8 269:11,15
269:16,19 279:16
287:20 321:14
340:24 346:6,22
346:24,25 356:18
356:19 369:6,7,8
369:10,16,17
397:10,11 400:10

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 511

400:19 401:5
404:11 413:10,23
414:14 418:15
424:6 429:2,3,4
442:17 450:16
462:1,4 472:21
473:5,14 484:3
486:22 495:12
496:17
**differential** 71:9,12
72:4 146:7 148:18
148:21 154:23
155:25 156:3,4
202:24 270:4
284:20 324:15,20
388:16,21,23,24
**differentiate** 165:13
248:6
**differentiation** 80:24
81:11,22 82:6,21
83:14,22 104:10
104:15,21 105:12
105:15,16,21
247:12 266:22
271:16 277:9
**differently** 215:24
346:19,21
**differing** 354:15
**differs** 85:23 86:13
**difficult** 38:6,21
39:23 40:1 82:15
149:20 275:2
399:9
**Difficulties** 494:8
**DiGeorge** 196:13
**Dimes** 77:11 79:12
**diminish** 158:20
**dione** 266:6
**direct** 11:2 31:2
33:23 35:23 47:23
89:15 115:18
413:17
**directed** 55:3
**directing** 441:20
443:24 448:6
450:19
**direction** 41:24
46:12 55:2 58:7
89:15 123:14
232:22 319:2,13
334:12 358:25
359:19,20 361:5
362:17 376:25
428:13,14
**directly** 57:10 61:5
225:14 226:2
**directors** 320:16
**disabilities** 7:13
172:25 173:2,5,15
185:11 187:13

190:9,12 191:18
**disability** 172:14
185:19 186:3
**disagree** 69:25 134:8
138:17 158:9
200:18 254:6
263:18 265:1
347:21 349:20,22
388:5 400:2,12
401:16 416:10,11
418:18 419:8
420:8 423:14,21
425:21 457:3,4
477:8 494:18
497:23
**discard** 493:5
**discipline** 472:2
**disciplines** 74:18
458:25 470:10
**disclose** 32:1,4
**discontinuation**
391:10
**discontinued** 174:15
**discounted** 403:3
**discovered** 239:17
262:1
**discuss** 7:7 29:2,19
40:1,6 91:6 325:18
378:3 395:10
401:17
**discussed** 49:3,3,5
101:3 152:13
195:20 263:16
280:24 328:4
358:25 360:1
386:10 392:5,20
442:7
**discussing** 10:6
400:19
**discussion** 97:2 132:4
132:9 230:4
325:19 331:1
344:5 382:20,24
385:1 401:19
436:21 475:7,19
**discussions** 395:8
**disease** 70:11,13
71:18 127:7
128:16,16 131:12
131:14 151:23
166:12,18,21
167:3,7 208:5
232:15 269:25
276:9 329:21
330:11 338:7
387:20,25 427:19
427:21 433:16
439:3 493:23
494:2,10,12,25
495:6 497:22

499:10
**diseases** 69:17 127:4
127:5 128:17
147:2 200:25
202:23
**disinfectant** 27:20,24
28:4
**dismiss** 26:18
**disorders** 93:18
326:9
**display** 42:6
**disproven** 400:4,14
400:15 416:22
418:6,8,9
**disproves** 418:16
**disputed** 304:20
**disrupting** 84:2 113:6
113:11
**disrupts** 80:24 81:4
81:22 82:6,21
83:13,22 104:9,14
104:21 105:12,21
**distinct** 124:19
215:18,21 216:5
251:19 314:14
421:18,23
**distinction** 98:23
248:7 294:25
**distinctions** 98:9
192:23
**distinguish** 192:18
**distinguishable** 97:4
126:11
**distinguishing** 494:8
**distribution** 30:5
239:19
**District** 1:1,1 16:3,4
**divergent** 233:16
**diverse** 401:22 402:8
402:11
**diversity** 482:22
**divisions** 35:14
**doctor** 20:13 29:24
51:12 66:5,9 72:18
74:6 94:23 111:12
114:24 117:10
145:8 166:15
171:18 174:21
178:14 189:17
231:6 237:24
244:8 262:6 270:9
297:3 332:1
339:17,23 340:8
341:12,21 342:18
343:18 364:10
367:20 380:3
385:9 389:10,14
402:6 406:21
407:10 408:14
418:18 424:6

444:24 477:24
479:16 492:16
**doctors** 176:15,16
391:20
**document** 6:1,2,3
14:21 15:2,8 49:11
49:17 50:21,23
51:4,21 52:5,8,19
66:1,2,7 123:24
263:10 297:20
446:24
**documentation** 10:10
101:4,9 464:14
**documents** 6:4 7:23
12:18 14:17,20
48:21 49:4 51:8
101:7 161:7
163:12 183:12,14
191:9 195:9
204:21 474:10
**doing** 35:15,19 47:20
62:11 74:13 77:4
137:4 228:8
275:12 292:8
365:25 421:7
**Dominici** 5:4
**dopamine** 99:7
**dose** 95:19 96:2
300:23 301:5
480:21 481:6
**doses** 96:7,20 97:3,9
97:11,15 98:10,23
272:22 273:7
274:18 275:5
301:3
**dose-dependent**
109:18
**dose-response**
217:22 218:25
**double** 251:24 252:3
270:18
**doubles** 167:2
**doubt** 162:16
**Douglas** 472:15
**draft** 45:7,8,13 59:21
60:5,6 98:11
344:22 479:5
**drafts** 93:2
**drain** 61:5
**draw** 40:4 91:9 149:3
165:15,20 192:22
214:20 220:2
232:6 248:7 329:6
332:18 356:5
361:1 363:18
401:9 404:15,17
471:8
**drawing** 356:12
437:1,12 486:15
**drawn** 62:7 106:22

**draws** 203:15 354:10
**drew** 461:19 471:2
**drive** 256:6 487:15
**driven** 256:12 347:24
**driving** 268:21
**drop** 265:17
**drug** 30:23,25 31:1,9
86:22 87:4,9,12,14
92:6,7 134:3
149:11 174:15
208:7 252:16,22
252:22 257:11
258:18 261:11
266:5,11 290:12
431:15 436:19
454:5
**drugs** 76:19 92:8
154:7 157:6,12
196:7 203:1 208:2
257:23,25 258:2,9
262:11 264:11
265:3 399:9
400:18 421:13
423:8
**due** 126:6 129:13
135:16 264:24
320:9 325:4
337:14 343:25
344:16 433:1,18
**duly** 16:18 501:7
**duplication** 205:12
**dysmorphologies**
199:9,22 204:25
**dysmorphologists**
469:18
**d/b/a** 1:7

──────── E ────────

**E** 2:4 3:1,7 501:1,1
**earlier** 40:24 41:7
53:24 156:6 274:2
294:3 345:23
364:10,18 377:22
404:23 426:20
433:10 440:20
**early** 31:7 188:25
189:4,9 191:6,16
250:15,17 267:13
277:7,12,15
304:25 349:5
420:14
**earnings** 32:2
**ease** 50:17
**easier** 65:24 137:1
145:7 298:5 313:2
**Easiest** 24:25
**easily** 445:1
**East** 2:10 15:21
**easy** 188:23 479:20
**Ebstein's** 73:18

Case 2:10-cv-02125-HGB-KWR   Document 188-20   Filed 09/18/12   Page 138 of 166

USDC, Northern District of OK                McMurray v. GSK                        Monday
No. 08-CV-381-GKF-SAJ          Videotape Deposition of Shira Kramer, Ph.D.      November 2, 2009

Page 512

253:12,16 258:13
258:18 270:22
**echo** 389:15 390:8
**echocardiogram**
140:14 141:9
389:10
**echocardiograms**
69:9
**echoed** 391:20 392:2
**editor** 68:18
**editorial** 4:11 5:7
68:18 348:16,23
420:1
**effect** 76:19 81:10
88:24 89:17 90:15
90:21 91:23 111:8
111:19,22 112:4
112:12 121:23,24
122:5 152:22
163:18 165:7
214:18 250:17
252:16,21 265:22
267:15,17,18
273:11 277:11,16
278:14 282:10
290:11 301:6
307:7,8 326:4
328:19 329:21
353:18 387:2,8
400:3 404:25
420:14 421:13
423:23 424:25
436:19 437:25
438:1,10,11
446:11,13,19
454:7 456:20
459:8,8
**effective** 498:19
**effectively** 393:24
**effects** 76:7 100:16
108:8 214:22
255:6,11 278:15
293:15 386:22
400:10 405:4
413:25 414:18
419:20,22 420:16
450:16 468:5
**efficacy** 93:17
**effort** 58:7
**EI** 13:3,8,20 19:20
19:22 20:8 22:9
23:12,23 26:3
32:10 42:10,16
49:18 57:15 65:11
65:20 172:8
439:22 447:17,17
447:19 450:6
**eight** 168:7 180:7,8
212:25 348:5
458:8 484:12,16

**either** 40:13 51:19
72:12 89:17
112:18,24 134:17
139:22 142:5
164:5 170:14
182:8 210:12
217:7 219:23
243:19 246:4,20
252:6 253:2
266:11 279:1
285:3 306:19
324:24,25 325:10
352:1 359:8,8
393:4 453:9 460:9
490:1
**either/or** 40:16
**EI's** 23:17
**electronics** 317:4
**elevated** 213:16,23
217:7,8,24 219:23
219:24 220:5
221:4,18 232:12
232:19 235:1
236:22 243:3
247:9 253:20,23
254:1,4 256:7,11
288:10 309:1
331:24 360:16
361:25 372:22
373:2 397:14
399:1 405:8,10
406:4,17 407:12
407:18 439:18
441:24 443:3
445:17,24 446:18
447:2 451:12
452:18 483:12
492:19 493:4,4,7
493:12,17
**elevation** 387:22
455:5,22
**elicit** 245:12
**eliminate** 171:2
194:3 220:9
280:14 310:3,4
373:8 392:23
480:16 483:10
490:13
**eliminated** 171:16
372:17 403:2
**eliminating** 490:6
**embolism** 494:9
**embryo** 85:6 109:5
111:9,10 113:7,13
**embryogenesis**
272:23 273:9
421:2 424:19
**embryologic** 86:24
251:6,11 252:17
252:23 269:6,14

**embryological**
269:14
**embryologically**
250:24 309:20
356:10
**embryologist** 471:5
**embryologists**
469:18
**embryology** 72:13
270:10,16 355:1
470:15
**embryonal** 75:9
77:21
**embryonic** 180:6
**embryos** 76:7
**Emergency** 30:14
**EMF** 317:3
**employed** 430:3
465:12 498:19
**employee** 36:14 54:8
439:22 501:14,16
**employees** 26:3
42:10,16 443:9
447:16,17 450:6
**enable** 428:25
**enabling** 499:3
**ended** 367:11
**endocardial** 63:8
**endogenous** 208:4
**endorsed** 259:8
**endpoint** 459:3
465:20
**endured** 188:25
189:3
**England** 348:16,25
**English** 94:22
**entails** 475:16
**entire** 36:7 41:15
45:11 60:12 61:11
61:16 74:13
233:12 243:5
267:19 404:23
451:1
**entirely** 21:4 61:21
61:24
**entirety** 287:19
296:11
**entitled** 25:23 223:8
405:8 439:18
442:4 443:3
447:12 449:21
**entity** 215:23
**entrepreneur** 35:3
**entrepreneurial**
34:22
**entries** 282:15 479:9
**entry** 224:19 328:6
336:1
**enumerated** 291:10
**Environ** 19:15

**environmental** 196:7
257:12,17 415:21
416:3 447:13,24
449:22 450:21
**epi** 5:22 236:14
374:6
**epidemiologic** 26:12
199:1 211:5
217:17 219:5
235:22 253:22
264:21 270:2
272:16 287:16
294:9,18 335:20
361:16 430:25
431:9,10 436:7
437:2,12 439:25
450:2 457:10
462:6 466:20,25
495:1,7 499:2
**epidemiological** 9:17
21:23 67:12 71:25
76:11 85:12,17
208:20 209:24
238:6 244:21
247:19 248:3
250:8 272:4,19
288:1 290:14
294:5 302:16
306:12 307:18
425:9 432:12
435:13 462:8
466:10 467:17
484:2
**epidemiologically**
285:8
**epidemiologist** 65:19
67:18,20 68:13
74:10 76:13
326:22 344:24
369:2
**epidemiologists**
69:12 71:23 74:14
74:21 149:2
413:24 414:17,19
430:1 432:7 441:7
442:9 456:15
457:2
**epidemiology** 5:15
5:18 7:19 8:2,17
17:23 19:15,17,21
25:24 50:8,22
51:21 53:8 68:3
69:23 74:7,8,25
75:1,4,7,12,18
76:3,10 86:9
148:10 151:4
159:14 199:12,16
303:19 363:16
416:6 419:16
425:3 430:21,23

**431:8** 432:5,23
435:19 440:8
442:10 443:9,16
447:24 456:20
458:24 472:10
**epilepsy** 264:24
**epileptic** 264:21
**epistemic** 475:8
**equal** 166:24 481:21
**equally** 96:7,21
97:16 166:19
**equals** 167:2,6
**equipment** 28:17,25
**equivalent** 97:12
207:15 301:16
305:12
**equivocal** 193:23,24
**error** 21:13,15,20
61:7,25 108:13
270:3 283:17
285:2 291:25
292:13 296:1
333:11,15 388:3
402:17 436:18
489:18,19 495:19
495:21,25
**errors** 284:3,18
490:4
**Esophageal** 300:2
**especially** 98:10
117:20 128:17
256:5 263:14
317:3 329:7 416:8
425:5 431:7 484:4
487:23 491:1
**ESQ** 1:18 2:4,4,5
**essence** 97:16
403:24
**essential** 431:1
**establish** 16:25
233:24 316:6
387:8 403:19
**established** 147:1
149:13 173:20
174:4 225:3
273:10 387:3
454:12
**establishes** 301:1
**establishing** 419:10
**estate** 33:17 34:14
**estimate** 166:1 218:5
230:20 330:14
388:10 429:2
438:13 493:10
**estimated** 135:8
**estimates** 236:3
270:2 305:1
442:23
**et** 3:18,19,20,22,23
3:24 4:1,2,8,12,13

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 513

4:14,16,17,18,20
4:21,22,23,25 5:3
5:4,6,8,10,11
58:20 213:22
222:2 489:23
**etiologic** 127:5
269:18 354:2,23
400:7 418:11
495:11,23
**etiologically** 215:17
215:21
**etiology** 127:3
158:23 200:9
**European** 219:5
**evaluate** 404:12
467:22
**evaluated** 195:21
241:22 440:10,18
443:18 477:19
**evaluating** 477:13
**evaluation** 465:4
**evaluations** 172:14
467:16
**Evelyn** 1:3 16:2
**event** 122:3
**events** 111:5 251:19
**eventually** 19:7
189:10
**everybody** 20:8
**everyday** 37:8
**evolved** 189:1
**Ex** 3:9,10,11,12,13
3:14,15,16,17,18
3:19,20,21,22,23
3:24,25 4:1,2,3,4,5
4:6,7,8,9,10,11,12
4:13,14,15,16,17
4:18,19,20,21,22
4:23,24,25 5:1,2,3
5:4,5,6,7,8,9,10,11
5:12,13,14,15,16
5:17,18,19,20,21
5:22,23,24,25 6:1
6:1,2,2,3,3,4
**exact** 134:14
**exactly** 38:6 48:20
49:16 50:11 98:19
132:6 180:10,15
180:18 183:9
192:6 196:18
203:20 223:13
242:14 263:7
393:25,25 394:25
436:21 461:12
484:14 489:22
**exam** 199:8 200:17
**examination** 3:4
273:23 275:14
501:5
**examine** 70:19

114:25
**examined** 16:19
144:17 172:3
334:20
**examining** 84:12
**example** 11:13 20:15
21:13 61:18 64:10
65:7 68:10 99:25
100:1 108:23
167:1 191:24
236:8 237:16
238:2 239:7
240:21 244:10
248:13 253:12
255:14 256:8
307:15 335:3
436:13 462:5
**examples** 232:25
400:16 417:5
423:7 448:23
454:10 496:9
**exceed** 26:15
**exceeded** 330:15
440:25
**Excellence** 320:16
**excellent** 436:13
**exception** 288:3
454:19 455:11
**excess** 54:8 171:16
194:3 386:12
449:21 480:16
**exclude** 152:16
154:7 262:17
**excluded** 152:12
276:18 295:24
296:10,15,18,22
297:7,14,17
307:24 308:1,4,6,9
331:2,4 364:13,20
365:6,7,20,24
366:3,5 367:2,4
368:13,21,22
369:25
**exclusion** 295:20
297:16
**exclusions** 346:15
**excuse** 75:11 105:3,3
105:3 181:9
206:21 255:19
273:3 302:18
305:19 340:13
382:11 408:17,17
480:23 483:21
**exhibits** 6:6 116:2
208:8
**exist** 147:11 172:22
182:17 204:4
300:22 359:13
466:21
**existence** 19:4

**exists** 104:20 183:8
235:25 284:5,19
361:17
**exogenous** 157:4
202:25 208:4
**expand** 30:4 423:15
**expanded** 260:23
419:4
**expanding** 30:2
**expect** 17:7 131:14
134:21 135:14
137:5 348:6,11
**expected** 268:8
320:9 440:25
**expecting** 103:2
**experience** 25:12
26:25 74:15,20
470:2 477:16
**experimental** 461:4
461:17
**expert** 2:9 4:15 5:19
5:24 8:24 10:14
15:20 19:25 24:11
24:17 25:15 40:25
53:12 65:5,10 68:3
68:4,7,11 72:12,15
74:2 79:10,23
80:14,20 81:7,18
82:19 83:15,25
86:3,7,8 88:16,19
100:16 150:16
167:24 172:17
175:6 176:1
184:22 185:5
190:4,8 203:10
211:2 216:21
229:8 281:21,23
281:24,24 282:6,8
282:24 342:19
352:7 436:1
467:21 468:24
469:9,14 470:11
477:12,17 494:23
**expertise** 68:4,15
69:23 70:4,23 71:3
71:5 74:8,19 75:4
75:17 76:2 86:5
110:9 185:14
278:21 280:8
357:19 469:5
**experts** 20:8 26:11
26:20,24 27:7
130:5 176:11
183:3 199:24
201:17 277:19
281:25 282:2,3,5
282:13,16,16,17
283:1 354:25
357:14 456:6
468:3 469:10

470:11 471:7
477:8
**explain** 92:23 151:19
169:21 171:1
220:8 229:24
256:6 278:20
335:15 392:23
454:1
**explained** 146:22
151:11 159:7
282:9 363:21
403:3 432:22
**explanation** 98:8
**explication** 476:5
**explicit** 468:3
**explicitly** 368:20
**exploratory** 321:10
321:17
**exposed** 110:17,18
125:8 126:5
131:21 132:6,23
135:16 148:13
152:25 156:12
157:7 159:3
173:21 174:5
196:1 208:8
272:23 273:8
304:18 308:11
319:17,21 328:16
328:23 338:7,21
349:5,12,17
359:24 362:1,16
375:11,20,21
378:20,20,21
379:8,18,19 380:1
380:22 381:7,21
381:21 382:10,15
383:3,5,6 384:11
384:21,24 385:6
387:20,25 391:21
393:5,23 394:4,24
396:2 405:9 416:9
425:6 427:16,17
427:18,20,21
429:10 431:15,16
449:22 450:21
**exposure** 77:21
107:25 108:7
115:14 118:4
121:4 131:13
134:3 137:17
149:12 166:11,17
166:20 167:2,6
170:15 174:14
238:8 239:2,24
240:12 245:11,15
253:7 257:12
300:23 302:18,19
306:14 317:3
330:11 337:8

347:20 348:2
349:7,8 377:9
387:1 392:12
394:9 398:15
414:21 422:3
433:16 443:4
445:19 450:8,12
465:19 483:7
491:8,24
**exposures** 71:18
149:14 157:12
159:2 160:1
195:23 257:20,23
259:18,24 260:7
260:15 399:16
420:6 421:17
**expressed** 149:1
151:12 400:1
459:16 464:15
**expressing** 371:2
**extend** 499:20
**extended** 97:8
**extensive** 201:21,22
**extent** 120:25
121:18 157:11
201:19 306:18
362:14
**external** 152:2
**extra** 229:12
**extract** 58:22 142:25
**extracted** 59:4 98:13
98:15
**extrapolate** 121:15
271:24 290:7
291:8 292:6,25
293:5,11 310:24
329:18 333:12
364:14,22 365:22
366:11
**extrapolated** 291:19
**extrapolating** 288:12
288:14,15,19,24
289:4,9,15,19
290:22 292:10
293:22 333:13
486:10
**extrapolation** 290:19
292:1,3,14,19
**extremely** 305:9
378:16 381:20,22
**eye** 168:9
**e-mail** 5:16 101:12
227:4
**e-mails** 7:24 49:4

**F**

**F** 501:1
**face** 398:18 464:6,6
**facets** 269:17
**fact** 20:13 41:9

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 514

| | | | |
|---|---|---|---|
| 107:4 126:9 | 195:22 196:6,7,12 | 86:17 122:20 | **figure** 43:22 44:12 |
| 139:14 147:1,3 | 197:16 207:17,19 | 240:25 241:11 | 96:16,24 |
| 158:3,16 170:23 | 207:23 208:4 | 242:17 253:13 | **figures** 44:15 |
| 173:20 174:4 | 216:3 247:21,23 | 263:24 315:2 | **filed** 16:3 440:4 |
| 179:1,4,5,9 193:14 | 248:1,1 250:15 | 346:9 348:15,25 | **filing** 229:4 |
| 195:22,24 203:15 | 258:24 259:18,24 | 383:10 390:6 | **fill** 14:5 56:20 61:20 |
| 207:16 210:9,23 | 260:7,15 269:16 | 420:18 421:12,14 | **filled** 57:16 59:9,11 |
| 238:22 239:10 | 321:5,12,13 327:3 | 422:4 456:22 | 61:20 93:13 95:24 |
| 243:12 245:14 | 346:17,22 348:22 | 487:11 | **filling** 60:24 93:10 |
| 266:9 273:25 | 355:21 418:15 | **familiarity** 477:18 | 103:16 |
| 275:12 284:12,24 | 457:1 464:24 | **families** 155:5 206:2 | **final** 22:1 53:10 |
| 309:22 314:2 | 476:19 477:16 | **family** 33:14,23 | **finalize** 21:8,9 |
| 317:8 318:25 | 480:14 481:16 | 156:22 159:10 | **financial** 33:25 34:5 |
| 320:4,19 358:24 | 496:24 | 160:4,7,9,14,18,21 | 34:10,15 477:18 |
| 364:14 367:1 | **factory** 440:12 442:5 | 160:25,25 161:1 | **financially** 501:17 |
| 368:7 386:12 | **facts** 21:22 | 163:8 170:15,17 | **find** 65:24 102:23 |
| 387:5 388:3 | **faculty** 36:15 | 170:18,18,20,22 | 109:12 117:10 |
| 390:18 401:8,19 | **Faigen** 47:9,16 54:7 | 195:21,24 | 118:9 123:12 |
| 405:7 414:24 | 57:8 67:1,25 93:6 | **far** 130:25 133:9 | 124:2 157:21 |
| 423:9 434:7 | 93:9 172:11 | 170:19 203:24 | 171:15 188:22,23 |
| 436:12,23 448:20 | 187:23 212:7 | 239:5 262:7 | 205:3 206:8 |
| 452:20 478:3 | **Faigen's** 47:15 | 277:17 279:7 | 215:11 222:19 |
| 479:16 481:20 | **fail** 123:2 284:4,18 | 319:11 352:8 | 259:21,22 260:1 |
| 484:8 487:18 | **failed** 123:12 191:15 | **Farms** 34:11,16 | 283:16 284:4,18 |
| 490:11 498:1 | 304:22 | **fast** 165:5 475:15 | 293:8 304:13,17 |
| 499:13 | **failure** 205:3 428:22 | **faster** 25:15 313:3 | 304:22,25 313:13 |
| **factor** 127:13 146:16 | **fair** 22:9 26:6 31:18 | 336:23 | 327:9,18 337:18 |
| 146:20,21 147:5 | 41:2 42:15 43:9,11 | **father** 33:21 34:14 | 338:15 340:13 |
| 147:15 148:5,9,15 | 44:12 69:7 72:2 | 161:3 | 341:21 354:25 |
| 151:11,15 152:6 | 79:22 85:20,24 | **father's** 160:7,11,17 | 375:12 386:5 |
| 153:3,6,17 154:8 | 90:14 95:11 111:6 | 160:21,25 161:1 | 387:16,21 397:21 |
| 154:11,21 156:7 | 114:19 115:10,24 | **fax** 226:13 282:14 | 398:4,8 403:9 |
| 156:11 157:4,21 | 117:4 118:21 | **faxed** 13:1 | 414:6 415:24 |
| 157:25 169:14 | 121:5 122:19 | **FDA** 91:16 240:15 | 431:16 436:7 |
| 192:10,12,13,19,19 | 123:25 124:20 | 301:25 302:4 | 449:7 463:15 |
| 192:20 193:2,4,10 | 125:3,9 142:10 | **FDA's** 134:1 | 474:8,18 478:9 |
| 193:16,17,17,19,22 | 144:16 146:6 | **feared** 188:18 189:2 | 479:21,21,21 |
| 194:23,24 195:6 | 152:5 154:10 | **February** 174:23 | **finding** 163:22 |
| 196:2,4,10 197:6 | 166:9 167:7,12 | **federal** 30:14 83:3 | 164:20 202:22 |
| 197:12,13,15 | 180:21 190:3,7 | 465:12 466:13 | 221:23 231:7,16 |
| 201:13 207:9 | 191:7,13 211:1,4 | **feel** 83:21,24 84:1 | 238:22 253:20 |
| 208:6 220:6 | 261:23 288:18 | 153:2 308:17 | 254:1 261:16 |
| 232:14 240:18 | 289:4 292:7 | **fellow** 96:13 | 284:11,23 293:1,6 |
| 241:6 247:15,16 | 305:17 333:17 | **fetal** 245:11 251:16 | 293:12 315:13 |
| 247:23 248:4,8 | 357:20 428:22 | 265:22 266:20 | 317:21 319:4,5,15 |
| 287:24 392:10 | 431:13 432:13 | 273:19 278:5 | 328:11 334:1,14 |
| 395:9 425:9 | 458:4,11 | **fetus** 108:6 174:14 | 344:1 347:2 |
| 455:15 | **fairly** 67:17 97:11 | 195:25 272:23 | 349:19 373:9 |
| **factors** 7:12 9:24 | 144:2 | 273:8 | 375:4 385:22 |
| 55:20 58:5 71:15 | **fall** 340:25 367:20 | **fewer** 295:21 380:14 | 386:23 397:13 |
| 71:17 124:24 | **fallacies** 26:12 | 380:16 | 398:1 419:8 |
| 125:4 126:1,17,17 | **fallacy** 26:17 | **field** 37:17 110:9 | 429:21 434:1,7,11 |
| 147:10,21 148:12 | **Fallot** 72:21 73:18 | 387:4 411:20 | 434:20,21 435:3 |
| 149:22,24,25 | 248:13 250:5 | 417:6 432:4 | 451:4 452:24 |
| 151:24 152:2 | 270:13,25 276:23 | 435:18 458:23 | **findings** 26:18 40:1 |
| 154:4,14 155:5 | **falls** 241:21 367:15 | 498:17 | 121:16 205:11 |
| 156:8,13 157:17 | 370:21,23 | **fields** 69:6 460:7 | 213:16 232:13 |
| 157:22 158:21 | **false** 284:11,23 | 499:12 | 321:17 330:25 |
| 170:16 192:24 | 419:17 476:23 | **fifth** 26:10 229:10 | 333:12 346:25 |
| 194:9,12 195:20 | **familiar** 43:23 86:11 | 230:24 | 372:7 376:24 |
| | | | 397:21 399:8,10 |
| | | | 407:25 409:22 |
| | | | 448:25 452:1,5,16 |
| | | | 453:4 454:8 |
| | | | **finds** 231:14,16,16 |
| | | | **fine** 25:2 75:25 88:15 |
| | | | 335:17 431:12 |
| | | | 488:23 |
| | | | **finish** 75:14,22 |
| | | | 308:25 353:15 |
| | | | 356:24 384:15 |
| | | | 408:23 488:11,19 |
| | | | **firm** 1:16 6:4 20:20 |
| | | | 48:14,15,16,18,23 |
| | | | 48:24 49:6,19 67:9 |
| | | | 67:11 140:18 |
| | | | 141:16 226:15 |
| | | | 227:11,17 228:6,9 |
| | | | 228:11,13,16 |
| | | | 229:7 230:10 |
| | | | 231:2 |
| | | | **firms** 20:17 228:18 |
| | | | 229:1,9 231:3 |
| | | | **first** 14:21 18:7 |
| | | | 29:10 45:7,8,12 |
| | | | 46:16 47:1,16 |
| | | | 50:24 52:9 54:3 |
| | | | 59:21 60:5,6 85:22 |
| | | | 85:25 86:12,19 |
| | | | 87:13 96:16 |
| | | | 106:14 107:2,15 |
| | | | 107:22 116:15 |
| | | | 124:18 125:8 |
| | | | 131:21 132:23 |
| | | | 150:22 152:8 |
| | | | 153:8,18,21 154:4 |
| | | | 154:12 156:18 |
| | | | 158:14 159:3,10 |
| | | | 160:9,15 168:3 |
| | | | 169:4 170:17,22 |
| | | | 173:21 179:15 |
| | | | 184:16 202:7 |
| | | | 208:12 213:20 |
| | | | 216:2,10,11 218:7 |
| | | | 221:15 226:14 |
| | | | 237:25 260:1 |
| | | | 261:15,25 262:7 |
| | | | 264:19 273:23 |
| | | | 274:9 278:24 |
| | | | 302:17 304:18 |
| | | | 316:23 321:25,25 |
| | | | 323:17 331:22 |
| | | | 337:20 346:11 |
| | | | 360:13 379:17 |
| | | | 406:2 418:22 |
| | | | 425:3 428:19 |
| | | | 439:2 443:6 |
| | | | 458:25 464:3 |
| | | | 475:5 479:5 |
| | | | 481:21 483:4,6 |

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 515

484:13 491:8,24
**firsthand** 184:4,9
**five** 180:12 212:11
212:17 228:18
229:1 256:8 260:6
308:2,3 321:15
348:8 376:1,5,12
398:18,22
**five-minute** 97:22
**flaw** 325:1
**flood-prone** 30:12
**floor** 1:17 301:1
**flow** 86:18
**fluent** 94:24
**fluid** 107:5,7,15
**fluoxetine** 97:6
**FMPG** 447:14
**focus** 77:24 90:3
140:10 141:1
**focused** 90:13 91:3,5
91:7 407:7
**focusing** 126:25
**folder** 5:25 10:20
11:5 53:25
**follow** 135:18 414:16
430:6,7,14
**followed** 391:9
**following** 15:18
168:12 246:7
**follows** 16:19
**Food** 33:5
**Foods** 32:19 34:8
**foolproof** 292:5
**footnote** 94:11
**foramen** 141:24
142:1,5,12
**foregoing** 91:12
**forest** 10:21
**forever** 263:10
**forgotten** 52:25 53:1
**form** 14:5 26:21
31:21 39:22 44:5
44:13,23 54:24
57:13,19 58:13
59:9 62:24 63:2,9
63:22 65:3 72:24
73:3,21 84:1 87:1
92:2 96:10 97:18
107:8 119:9
123:17 130:3
149:18 155:16
157:8 176:10
181:20 202:14
205:7,14 235:24
238:24 250:25
251:7 252:19
272:2 274:24
275:21 276:2,24
279:3,11,25 280:5
280:21 292:15

293:17 352:25
353:21 355:5
359:14 363:20
370:10,13 373:5
374:4 445:12
455:12,13 467:3
**format** 295:16
**formation** 72:19
81:15 84:8 88:4,5
88:8 125:5 126:19
251:2,20 279:8,24
280:19 281:15
**formatting** 21:11
22:6
**formed** 180:17
215:24 267:2,11
469:3
**former** 83:18 443:4
447:13
**forms** 56:21,22,24
57:1,2,4,7 58:9,14
58:15 59:2,3,3
180:4
**forth** 208:3 295:22
501:12
**found** 21:13 123:20
144:21 171:7,12
200:12 216:5
217:18,19,24
218:18 220:4
221:15 224:6
225:16 236:15
256:7 305:6 317:4
332:16 334:24
339:25 340:21
376:4 377:16
380:15,17 383:3
383:14,23 407:25
452:22 454:8
474:21,22
**foundation** 271:22
**founded** 27:11
**founder** 32:23
**four** 149:10,14,14,16
168:7 177:9
180:12 194:2
260:5 332:7 336:2
336:10,10 342:24
344:12 349:24
374:15,16 375:10
381:18 424:6
451:20,21 496:17
**fourth** 345:22,24
347:7
**four-page** 6:2 15:2
**Fox's** 48:16,16 232:8
**fragile** 320:2 324:23
**frame** 180:20 441:22
442:18
**framework** 421:11

**free** 477:21
**frequency** 416:8,16
425:5 439:3 494:9
**Frias** 5:8
**Friedman** 301:13,19
**Fromm** 53:16
**front** 13:25 24:22
41:11 58:10 93:1
95:15 101:8
104:12 107:13
223:19 280:17
318:6 323:14
376:8 382:12
383:18 384:4
407:15 409:16
433:3 478:7,12
480:24
**full** 25:6 89:6 119:1,3
143:14 168:4
200:24 204:23
217:4,10 299:7,11
299:24 316:23
476:19
**fully** 268:20 472:25
**function** 131:17,18
188:19 189:7
472:3
**functions** 250:18
**fundamental** 271:14
271:21 277:12
399:14 420:5
**funded** 322:22
**funding** 77:7 337:14
118:3 260:24
309:25 404:20,22
419:3 501:9,13

_____
**G**
_____
**gamble** 292:6,7
**gas** 443:5,21,22
446:7,11,19
447:14
**gastrointestinal**
344:1
**Gastroschisis** 299:18
**geared** 30:11
**gene** 204:6 257:6,12
**general** 3:9,15 11:8
11:22,24 39:8
40:21 41:5 42:21
43:13 45:2,24
50:18 54:1,3,4,10
54:21 59:19 65:15
65:17 69:23 70:5,8
71:19,22 72:10
80:12 98:5 103:10
105:24 115:7
122:23 127:6
128:13 135:3

152:23 166:2
179:22 198:22
205:23 206:13
210:10 212:12
217:21 228:3,21
228:22,25 229:3
229:10,17 231:1
236:19,21 237:22
239:23 241:21
246:20 247:1
248:10,20 249:16
253:4 257:22
269:5 277:1
287:13 293:3
303:12 309:10
323:6,14,15 324:1
331:2,8,9 351:1
371:10,10,22
392:25 393:16
398:12 403:15
412:12 416:20
420:18 429:25
432:4 433:2
451:24 453:15,18
455:13 489:13
**generalists** 74:17,19
**generalized** 26:23
**generally** 78:20
93:12 127:22
165:4,5 185:10
214:7 234:9,9,17
245:13 247:9
292:19,21 319:2
329:10 390:10
403:14 418:19,23
419:16 430:19
432:16,18 433:1
439:10,11 454:6
**generate** 239:18
276:15,16 364:4,5
387:12 438:12
**generated** 48:6,9
122:15 260:21
290:10 342:7
370:4 387:6
433:18 469:10,17
**generating** 356:7
**generation** 23:6
386:24 395:9
**genes** 202:12 250:21
**genetic** 9:24 126:17
147:9 149:11
152:2,13,16 154:4
156:17 159:1,9,19
159:21,24 170:19
170:20,23 193:2
195:1,20 196:6,10
196:12,13 198:19
200:7,11,21,24
201:15,16,17,22

202:9,10,11,17,20
202:23,24,24
203:6,7,14,22
204:1,3,9,13,14,16
204:19,20,23
205:1,5,17 257:6
470:2,3
**genetically** 159:23
202:4
**geneticist** 198:10,11
198:12 470:1
**geneticists** 200:16
**genetics** 80:16 198:8
199:12,15,17
**German** 94:23,24,24
95:1,16
**gestation** 178:5
179:18
**Gestational** 321:5
**getting** 60:2 82:16
82:18 85:2,3
376:22,23 434:15
459:13
**Gibson** 248:13
**Gilbert-Barness**
168:1 216:22
**give** 20:20 24:18
49:22 56:15,16
65:11 86:15 99:24
100:1 117:15
166:25 167:20
187:19 197:23
210:17 211:12
225:8 242:15
255:14 265:13
272:10 309:17
312:25 322:11
356:14 378:1
388:17,19 407:24
428:18 437:9
451:16 452:15
462:5,14 481:17
496:8
**given** 23:2 108:24
109:2 110:22
111:3 117:23
118:9 128:16
130:6 131:3 151:1
175:9 215:4
222:11 244:20
260:11 274:6
275:17 277:2,4
297:4 315:18
327:15 329:17
338:19 354:24
380:20 386:3
400:16 411:5
462:4 463:2
485:12,16 499:3
**gives** 302:24

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 516

**giving** 108:15 150:6
150:7 186:17
278:22 306:22
368:10
**Glanville** 2:4 16:13
16:13 219:13
**Glaxo** 301:18
**GLAXOSMITHK...**
1:8
**global** 394:10
**go** 14:7,16 15:14
25:15 52:10,10
90:7 98:24 99:21
109:15 112:16
113:3,8 115:17
117:16,17 129:8
135:7 136:9 137:9
150:11,13 168:7
173:7 177:8
183:16,18 185:6
188:10 197:18,21
209:11 217:13
221:12,25 223:13
223:21 229:23
258:6 267:13
273:3 274:13,16
274:19 275:1
281:4,12,17 282:6
285:3,10 296:14
296:20,23 298:7
298:11,24 310:9
310:20 313:17
317:16,25 331:9
342:17 345:22
348:4 352:19
354:7 356:19,20
356:24 375:12
376:25 388:7,13
388:25 389:4
404:16 409:5
428:14,14 429:16
429:17 451:12
463:1 464:11
465:4 467:20
478:5 482:9
484:10 486:13
488:15 495:10
499:18,24
**goal** 249:16,19 494:5
**goes** 123:14 133:10
164:4 233:19,19
263:25 313:15
334:11 358:25
361:4 362:14,16
388:3 457:6 477:7
**going** 7:7 17:8,10
31:22 40:23 45:5
50:17,24 52:1,10
66:3,17 82:4,17
91:2 96:12 110:15

116:12 117:7
119:18 120:12
127:15 137:22
138:1,2,12,18
139:8 145:18
164:9 183:18
198:1,24 210:13
210:14 211:16
224:13 232:22
242:20 259:21
265:13 278:18,23
280:12 281:18
301:22 304:11
306:7 312:2,25
314:25 315:4
316:16 319:13
338:15 339:5,13
344:18 359:19,20
365:12 369:2
402:3 405:23
406:1,20 409:4
415:10 428:18
431:16,17 467:7
481:17 488:3
490:9,17
**gold** 496:7,15
**good** 16:21,22 87:15
104:8 126:3 239:7
241:24 355:9,12
355:16 410:19
430:7,8 431:1
**gotten** 77:10 93:5
115:23
**governments** 30:15
**graduate** 85:1 86:2
**grant** 77:10,16,24
**grants** 77:19
**graphic** 166:3 413:5
**graphical** 10:22
**graphics** 426:5
**great** 171:21 194:16
279:6 307:13
436:18 449:9
464:18
**greater** 34:24 35:1
38:10 131:14
132:24 166:17
205:22 206:12
386:17 388:7,13
389:1,4
**Greene** 4:11 348:16
**Greenland** 8:18
440:4 472:9
**gross** 31:18 435:11
**ground** 17:1
**group** 7:23 33:19,25
47:6 50:8 110:25
219:5 238:11
240:3 241:15
275:13 295:8

304:22 308:20
309:14,21 328:17
330:10,12,19
336:25 349:8
354:1,25 378:20
378:21 389:9,9,14
393:4,21,22 394:3
395:2,6 442:8
448:13 487:4
499:1
**grouped** 245:24
309:24 350:21
359:9
**grouping** 254:13,14
336:24 355:17
364:21 497:14
**groupings** 133:5
295:19 317:5
497:13
**groups** 69:14 218:23
291:14 305:7
325:12 351:4
393:21 439:3
443:19 444:1
448:8 482:20
**growth** 29:6 30:17
189:8
**GSK** 5:19,20 8:2 9:5
16:11,12,14,24
49:5 53:7 100:24
101:13 108:21
114:20,25 130:5
203:9 301:14
302:5 322:22
456:6 493:11,15
**GSK's** 8:24 9:11
101:3 103:4
176:11
**GSK-funded** 320:16
**guess** 38:3 40:8
124:13,15 142:10
148:17 201:10
208:23 220:21
226:24 260:25
276:9
**guide** 263:25 457:1
**guideline** 312:22
**guidelines** 313:1
351:15 454:22
455:18 456:7
497:9
**Gunpowder** 34:11,16
**guys** 160:22
**Gynecologists**
303:23 304:8

**H**

**H** 3:7
**habit** 408:25
**Haddonfield** 2:10

15:21
**half** 136:25 174:16
**half-life** 174:11,13
174:17,18 179:24
**hand** 26:6 47:1,17,22
48:3 337:7 402:15
**handed** 379:13
**handing** 177:3
**handled** 53:9 145:15
**hand-waving** 26:18
**happen** 127:14,15
180:13,17 256:14
283:23 428:17
429:16
**happened** 48:7 55:1
236:9,12 408:12
419:5
**happening** 242:8
**happens** 112:8 180:9
180:11 276:25
431:15
**happy** 66:9 188:16
**hard** 37:12 38:19
149:6 165:5 206:8
475:15
**harder** 268:14
**Harvard** 27:3
**Hazard** 447:13
**Hazardous** 442:5
**hazards** 159:2
**head** 84:11 117:19
180:15 195:4
236:1 281:11
291:17,24 359:10
**headed** 15:3 429:6
**health** 67:2 69:13
76:22,23 143:10
198:7 218:17
459:3 465:20
468:5
**hear** 324:4
**heard** 34:20 295:25
296:9 420:21
**heart** 5:12 7:13 9:25
44:1,2,4,11,11,18
44:22 73:14,14,17
87:25 105:16
108:16 109:3
111:19 112:12,20
113:1,12 124:19
125:20 129:17
130:17 132:7
139:15 141:8,25
142:1 161:6,6
163:9 168:11
196:8 205:13,22
206:12 250:21,24
251:10,16 253:8
253:10,16 258:22
259:2,10 261:2

264:12 265:1
267:14 269:11
271:16,17,20
277:11 278:5,19
279:6,16 282:11
307:9 342:16
344:16 345:9,19
367:16,21 368:2,4
368:24 369:20
370:24 371:4
496:16
**heavily** 256:23
466:10
**heighten** 203:1
**heightened** 445:19
**held** 79:9 230:4
**help** 29:8 30:18
142:24 150:24
233:23 304:13
350:2
**helped** 46:6,12 60:13
**helpful** 455:5,24
**helping** 47:4 212:17
**hereinbefore** 501:12
**heterogeneity** 127:5
269:19 400:7
418:11 495:11,24
**heterogeneous** 269:8
269:10,12,16
**heterotaxy** 248:15
270:18
**heuristic** 475:10
**he'll** 7:2
**hidden** 480:2
**hide** 331:5
**Hiemke** 5:13
**high** 37:21 144:2
217:20 446:2
**higher** 36:15 38:18
67:8 92:18 98:10
98:23 144:4 301:3
301:4 304:19
349:14 390:9
440:10 462:5
**highest** 452:10
**highlight** 156:20
**highlighted** 44:15
156:17 302:14
452:12,25
**highly** 266:21 322:20
429:1,8
**Highway** 2:10 15:21
**Hill** 419:15 454:17
454:21 455:10,17
456:2,7,10,15
457:1,7,10 471:16
**hippocampus** 189:12
**hire** 20:8 283:1
**hired** 67:4 150:18

Case 2:10-cv-02125-HGB-KWR   Document 188-20   Filed 09/18/12   Page 143 of 166

USDC, Northern District of OK                    McMurray v. GSK                                Monday
No. 08-CV-381-GKF-SAJ              Videotape Deposition of Shira Kramer, Ph.D.              November 2, 2009

Page 517

**historical** 432:21
**historically** 188:18
    432:20
**histories** 178:13
**history** 153:1 160:5,7
    160:9,14,18,21
    161:1 170:15,18
    170:20,21 177:23
    178:10 262:11
**Hoffman** 496:2
**hold** 37:25 38:1
    39:17 68:23 72:11
    80:13,19 86:6
    88:15 109:12
    190:3,7 211:1
    271:23 342:15
    346:5 369:1 481:1
    491:13 496:13
**holding** 26:5 68:2,14
    100:15 337:6
**holds** 74:9 444:16
**homogeneous** 355:17
**honestly** 45:14 82:1
**honing** 268:6
**Honor** 15:17
**hopefully** 234:22
**Hopkins** 27:3
**hospital** 36:16 497:9
    497:21
**host** 158:19
**hourly** 11:11
**hours** 54:9,13 67:23
    212:11,17 229:5
    488:18 499:16,17
    500:4
**Houston** 1:17
**HSBC** 2:7
**huge** 268:12 334:24
    335:8,12,16
    435:12
**human** 111:10
    151:23 190:25
    198:8 199:12,14
    199:17 265:15
    466:10,20,25
    467:17 476:25
    477:5,6
**humans** 147:2 188:9
    189:14 272:24
    274:11,12 415:22
    416:4
**hundred** 117:21
    188:14
**hundreds** 95:7 114:2
**hung** 197:13 247:16
    459:13
**hurricane** 30:11
**husband** 32:23
**Hwang** 213:22
**hydroxytryptamine**

42:3
**hypertension** 494:3
**hyphenated** 211:22
**hypnotic** 349:16
**hypoplastic** 270:13
**hypospadias** 299:12
**hypothesis** 26:13
    293:21 294:1,2
    386:25 434:3,16
    434:25 459:21,24
    460:3,7 465:22
    477:13
**hypothesize** 293:14
**hypothesized** 321:12
**hypothetical** 283:6
    389:17,19
**hypothetically**
    232:25
**hypotheticals** 392:18

**I**

**IAA** 403:5 405:1
**ICD** 497:17,18 498:2
    498:8,18 499:2,6,8
**ICD9** 4:6,7 223:5,6,7
    223:7,9,15,19
    311:14 336:23
    337:17 338:11,19
    338:22,25 339:21
    340:17 342:5,13
    342:20 343:9
    344:21 352:3
    370:21,22 496:9
    497:3,13 498:9
**idea** 22:13 31:14
    51:9 58:17 99:8,10
    106:25 189:23
    303:11,16 350:4
    352:15 415:9
**identical** 431:18
**identification** 7:17
    7:22 8:10,15,22
    9:2,8,15 10:3,12
    10:18 14:14,25
    15:6,13 226:10
    389:21 390:12
**identified** 62:8
    126:18 152:14
    168:11 187:23
    202:13 204:6,17
    217:20 218:15
**identify** 126:22
    129:6 157:18
    185:1 199:9
**identifying** 62:13
**ignore** 235:13,15,17
    235:19
**illustrate** 373:14
**illustrating** 372:9
**ill-advised** 435:16

**ill-conceived** 437:23
    438:4,7
**imagine** 102:5
    204:18 230:25
    231:3
**immediately** 178:7
    179:20
**immunizations**
    181:18
**impact** 69:14 70:5,7
    76:6 84:13 159:12
    195:24 270:3
    273:19
**impacted** 279:1
    280:18 325:20,20
**impacting** 278:10
**impacts** 69:24
    193:22 252:18,24
    279:5
**impairment** 189:6
**impedes** 494:11
**implicated** 308:20
**implication** 476:23
**imply** 446:11,13,19
**importance** 464:12
**important** 120:4
    155:3 156:16,20
    157:2 159:20
    160:3 165:12
    225:19 234:5
    250:18 275:11
    276:10,15 285:8
    326:1,3,10,14,18
    355:22 357:18
    418:3 419:10,11
    425:8 445:23
    448:14 453:24
    456:16 462:3,8,9
    464:9 480:7
**impossible** 35:11
    132:17
**improper** 284:10,22
**improperly** 283:19
**impute** 71:25 419:13
**inability** 326:4
**inadvertently** 491:1
**inappropriate** 366:9
    437:23 438:3,7
    448:22 456:3,8
    499:1
**incapable** 264:23
**inception** 27:15
**incidence** 399:17
    405:9 406:5 420:7
    439:9,18 441:1,23
    443:19,20 444:1
    445:17,24 446:12
    446:18,20 447:2
    497:22
**include** 12:1,5,6,8

134:10 139:3
    166:10 225:20
    256:20 295:19
    305:5,7 330:25
    364:13 365:12,21
    372:15 378:14
    395:6 403:16
    423:17 433:13,17
    435:6 444:6 445:1
    445:15 448:10,15
    included 6:7 11:21
    20:4 55:7 58:1
    77:19,22 103:21
    104:1 119:14
    155:20 223:11
    224:17 237:23
    242:4,6,9,13 243:7
    243:12,15,21,23
    244:13 245:23
    246:4,11 248:20
    254:13 296:3
    297:1,1,6,12
    304:24 308:6,7
    313:11 331:5,19
    341:6,14 343:14
    343:19 347:3
    350:16 364:12
    365:20 366:13,14
    367:6,7 368:24
    369:3 372:16
    374:7,9 386:19
    392:7 408:5
    409:18 428:7,24
    441:3 444:14
    453:5 460:16
    462:15 463:14
    490:23
**includes** 215:15
    224:1 341:10
    398:8 432:25
    433:24 434:13,23
**including** 6:6 10:14
    10:21 115:7,14
    118:4 134:3,10
    169:19 202:25
    237:9 240:22
    246:25 247:11
    304:21 397:18
    407:23 419:22
    451:18 486:24
    499:12
**inclusion** 218:10
    269:19 325:9
    365:17,24 495:11
**inclusionary** 243:1
**inconsistency** 171:22
    172:1 446:5
**inconsistent** 17:12
    168:20 359:12
    362:20 363:9,16

363:19 373:9
    433:14
**incorporate** 84:5
**incorporated** 19:18
    131:16 141:20
**incorrect** 30:20
    116:21
**increase** 111:2 112:1
    112:18,24 121:11
    135:4 263:13
    349:6 384:23
    399:17 403:17
    405:16 408:9
    416:7,15 420:7
    425:4 429:15
    450:22 460:12
**increased** 115:3
    122:8 123:13
    130:12 158:13
    164:6 165:7
    166:18 168:12
    169:2,17,21 171:7
    205:21 206:3,11
    208:21 214:14
    217:15 221:10,24
    225:16 231:17
    236:16 239:10,11
    301:3 302:19
    303:25 316:1
    328:18 337:9,11
    347:12,18,25
    349:9 359:19
    360:6,7,14 361:20
    363:23 372:10,22
    373:10,14 376:4
    382:16 383:4
    385:14,16 387:17
    388:2 392:13,14
    392:23 399:3
    420:12 425:11
    436:10 460:19
    464:8 484:7
    486:19 491:10
    492:1 493:14
**increases** 119:23
    167:12 263:21
    301:15 302:5,9
**increasing** 30:10
    111:17,24 112:7
    112:10 428:12
**Increasingly** 432:2
**independence** 20:20
**independent** 128:18
    139:22 192:4
    193:16 249:24
    465:24 466:4,6
**independently** 15:11
**index** 349:14
**indicate** 97:10
    177:13,18 327:4

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 518

464:7
**indicated** 393:18
   436:18
**indicates** 161:2
   273:17 338:6
   381:7 433:13
   446:5 453:16
**indication** 325:4,7
**indicative** 423:23
**indirect** 475:12
**individual** 29:2 69:24
   71:20 72:8 98:6
   132:9,12 147:21
   147:22 151:21
   159:16 164:8,22
   164:24,25 165:9
   165:14,16,21
   231:11,11 239:15
   239:16 241:17
   244:9 281:1 296:6
   308:11 310:10,21
   364:2 453:23
   465:21 471:6
**individually** 1:4
   128:18 295:8
   497:5
**individuals** 50:12
   60:14 69:16,18
   72:1,9 74:11 150:4
   291:14 328:23
   330:9 338:7 381:7
   381:21 385:6
   386:19 428:6,24
**individual's** 69:20
   70:2,6 148:19
**induce** 399:16 420:6
**induced** 113:7,12
**Infant** 351:18
**infants** 218:14
   269:19 302:17
   382:10,15,15
   383:3,5,5 487:9
   495:12
**infer** 208:11
**inference** 231:22
**inferences** 437:1,12
**inflated** 489:2
**influence** 53:7 101:3
**influences** 82:14
**info** 5:25
**informative** 310:13
   310:20 353:11,24
   463:15
**informed** 81:15
   250:9 272:7 292:7
   423:5,10 462:11
   469:4 470:10
**informs** 83:19
**Ingenix** 485:20
**ingested** 392:1

**inhibition** 93:20
**inhibitor** 93:17,22
**inhibitors** 96:8,21
   97:16
**initial** 68:8 93:2
   95:19 96:2 98:11
   103:9 441:22
**initials** 59:8
**initiate** 421:1 424:18
**injury** 177:24
**inlet** 251:25 252:3
**input** 21:4 57:10,17
   57:18 58:4
**inserted** 13:14
**insignificant** 305:5
**instance** 36:23 120:6
   133:8 152:12
   153:20 268:25
   365:6 400:1 410:6
   410:7,11 427:25
   466:9 467:4
   481:12
**instances** 43:9
   153:19 154:21
   174:12 217:21
   236:11 323:6
   467:15
**Institute** 471:24,25
   472:7,15
**institution** 36:15
**institutions** 79:13
**instructed** 104:1
**instruction** 41:25
**Instructions** 4:4
**intact** 72:20 73:10
**intelligence** 188:19
**intend** 53:20 499:18
**intention** 44:18
**inter** 36:21
**interact** 127:9
   148:12 247:21,25
**interacting** 151:24
**interaction** 149:23
**interactions** 128:14
   129:4 147:9
**interchange** 8:1
   17:11 42:8
**interchangeable**
   37:18,18
**interest** 30:2 33:25
   34:6,10,15,19
   74:25
**interested** 306:15
   410:24 501:17
**interesting** 97:3
   124:13 484:11
**interests** 74:22
**interference** 267:2
   267:12
**interfering** 109:4

**international** 19:16
   19:17,21 50:9,22
   51:21 443:9
   447:23 465:12
   466:14 498:11
   499:13
**interposed** 414:9
**interpret** 462:19
**interpretation** 20:22
   69:8 421:9 456:4
   465:5 492:18
**interpreted** 166:7
   439:11 454:3
   456:14
**interpreting** 71:7
   430:17
**interrater** 477:2
**interrupt** 105:5
**interval** 123:15
   124:4,5 164:14
   168:15 214:12
   218:1,3,11,13,22
   219:1,2,3 235:3,14
   235:16,18 315:18
   316:5 330:7,8
   349:11 368:18
   383:7,7 408:1,10
   409:13,23 432:25
   433:13,24 434:13
   434:23 435:5
   438:17,23 441:11
   442:20 444:5,25
   445:2,8,14 448:10
   448:16 449:2,13
   450:24 451:2
   452:2 453:5
**intervals** 215:5 316:3
   407:23 408:5
   409:17 441:3
   444:14,20 446:3
   451:8,11,17,21,21
**intervention** 143:22
   144:1
**interview** 162:4
   327:16
**interviewed** 144:17
   172:4 295:21
   297:18
**Intestinal** 300:4
**intrinsic** 152:1
**introduce** 16:8
**introduction** 135:6
**Introductory** 5:15
   7:19
**invalid** 421:5 456:11
**investigation** 218:14
**investigator** 249:8
   322:22,23
**investigators** 132:16
   189:9 217:17

268:4
**invoice** 226:18
**invoices** 12:15
   226:23 227:1,3
   231:3
**invoke** 416:21
**involve** 21:19 88:11
   224:15 251:5,10
   252:4,11,13
   281:10
**involved** 18:12,22
   19:10 20:17 27:1
   46:3 73:2,7,13,20
   84:8 87:10,17 88:3
   92:14 93:6 175:16
   201:25 251:3
   269:15 270:12,18
   279:8,23 292:3
   376:5 400:7 407:5
   476:23 477:21
**involvement** 18:16
   35:24
**involves** 280:4
**involving** 79:21
   84:19
**irrelevant** 479:25
**Irrespective** 388:23
**irreversible** 188:20
   189:5
**Isabelle** 64:2 129:12
   130:12 132:7
   140:11 153:2
   157:14 172:8,13
   172:25 173:6
   174:20 177:4
   179:3 183:2
   185:18 189:21
   191:5,15 192:25
   193:20 200:4
   201:14 205:11
   207:6,9,13 210:12
   210:15 215:6
   220:6 312:13,17
   331:18 336:7
   337:24 367:14
   370:20 396:25
   397:5 398:14
   410:25 484:14
**Isabelle's** 140:10
   141:21 143:3
   155:21 186:2,7
   187:12,19 191:23
   203:4 205:6 210:9
   210:23 311:14
   335:19 341:7,15
   396:11,22
**isolated** 312:18
   396:14,15,18
   397:1,5
**isolation** 165:19

232:4 234:14,21
   235:8 283:25
   316:8,10 329:6
**issue** 18:6 25:12
   38:17 79:21 81:10
   81:17 83:20
   121:20 122:12,18
   160:16 162:1
   164:9 209:4 226:3
   239:13 261:21
   267:19 320:17
   321:16 325:9,19
   335:9 339:6 385:2
   388:11 392:4,9,20
   392:22 395:5,15
   402:14 421:9
   422:22 423:2,21
   436:21 463:23
   464:22 466:7
**issued** 13:15
**issues** 7:6 10:6 27:5
   40:2,7 53:6 69:13
   74:23 92:14,16
   120:4 173:11
   190:20 233:21
   234:1 257:15
   299:8 323:15
   395:8 398:5 407:8
   416:22 432:23
   461:2 464:15
   465:3
**issuing** 41:21
**item** 424:16
**i.e** 26:12
**I.KM** 1:4

**J**

**J** 2:5
**James** 437:15
**January** 174:21
   175:3 176:17
**jargon** 26:16
**Jennifer** 49:8
**Jersey** 1:24 15:21
**job** 18:9 317:2 371:2
**Johnson** 317:1
**joint** 18:18 34:11,16
   58:7 304:6
**journal** 39:3,9,11,15
   40:15 213:9 301:8
   348:17,25 379:14
   440:8
**journals** 40:2 68:19
**judge** 82:17
**judgment** 261:22
   465:24 466:4,7
   476:8 477:1,5,6
**judgments** 231:12
   432:11 457:2
   477:1,12

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 519

**Julia** 67:20 175:15
**Julian** 496:1
**jump** 253:8 268:12
  363:14
**June** 181:7,21
**Jury** 15:18
**justice** 23:13,20
  431:2
**justification** 233:25
  323:1,7
**justify** 186:14

**K**

**Kabuki** 199:13,19,23
  200:3,6,10,13,16
  203:3,11,19 204:4
  204:6,10,12,18,22
  205:5
**Kallen** 4:13 124:8,11
  124:11,12 145:9,9
  314:10 335:11
  345:22 348:21
  349:6 352:14,21
  363:1,4 374:16
  385:14,23 392:15
  394:13 395:10,18
  396:6 397:13
  398:2,9,11 399:2
  485:23
**Kallen's** 348:17
**keep** 50:17 89:9
  302:20 399:23
  459:13,14
**Ken** 322:21 436:13
  437:15
**key** 348:21 471:2
  476:19
**Kherkher** 228:15
  229:16 230:22
**Kilker** 5:21 9:12,12
  11:13,19 13:4,11
  24:8,14 25:11 41:1
  41:7,14 42:21
  65:13,15 69:11
  144:20 231:20
  254:23 296:9
  403:4 411:8 413:2
  416:17
**kind** 35:19 39:9
  85:13,13 112:20
  113:1 121:22,24
  122:2,5 124:19
  126:15 161:6
  201:3 229:13
  248:7 271:20
  276:4 292:3 327:2
  327:4 394:25
  419:18 420:12
  426:2 440:16
  446:5

**kinds** 40:6 54:18
  149:3 165:13,15
  327:3 392:18
  419:22 450:9
  472:21
**Kings** 2:10 15:21
**knew** 114:20 141:10
  157:11 161:15
  297:16
**knowing** 52:7 63:24
  149:22,23 385:6
**knowledge** 80:1,6,10
  184:4,10 215:8
  227:16 301:25
  303:8
**known** 94:2 105:25
  114:21 126:1
  127:16,19 128:10
  129:11 139:24
  149:10 158:5
  159:22,22 170:22
  201:2,3 202:18
  221:8,21 235:21
  236:8,11,14 254:9
  255:24 257:6,23
  258:3 292:12
  322:20 400:9
**Kramer** 1:13 3:3,11
  4:2,25 13:3 16:7
  16:18,21 30:15
  33:11,21 36:18
  41:4 42:2 47:18
  51:10 52:3,18
  56:10 57:12 66:24
  67:1 83:21 86:3
  95:1 99:16 108:14
  113:17 120:7
  132:19 137:21
  145:21,25 146:4,6
  187:1 197:13
  216:16 219:12,18
  219:20 227:10
  230:8 251:23
  280:9 285:16,20
  285:22 297:22
  321:3 336:6
  338:13 344:7
  357:25 358:4,6
  387:24 405:7
  414:24 425:15
  426:13,17,19
  429:14 448:3
  454:5,15 468:22
  487:18 497:21
  500:4 501:6
**Krimsky** 4:10 473:23
  474:3,8,14 475:3
  475:13 476:15
**Krimsky's** 476:3
**K-A-L-L-E-N**

124:11
**K-H-E-R-K-H-E-R**
  228:15
**K-I-L-K-E-R** 9:12

**L**

**label** 5:1 79:4 100:20
  262:13,19,21,23
  263:3,12,19,20,25
  263:25 264:3
  302:5,13,22,24
  303:1,5 405:1
**labeled** 269:1,2
**labeling** 240:15
  262:11,14
**labels** 262:12
**lack** 214:21 386:22
  399:7,11 409:8
  444:23 472:18,20
  487:14 488:4
  489:9
**laid** 291:7,21 323:1,8
**language** 173:19
  302:8,11,15,21
  305:11,13,14
**large** 28:16 217:23
  245:19 264:20
  268:23 288:16
  295:19,23 304:21
  349:4 354:18
  436:15 466:19,24
  467:5 484:2
  494:10
**largely** 321:9 325:14
  361:9 393:4
**larger** 244:13,18
  249:10 250:10
  306:16 344:5
  355:25
**largest** 28:16,23
**late** 277:13 499:20
**latency** 407:8
**law** 1:13,16 6:4
  20:17,19 25:24
  48:14,15,16,18
  49:18 140:18
  141:16 154:22
  226:15 227:11,17
  228:6,9,11,13,15
  228:18 229:1,7,9
  230:10 430:21
  473:15 474:13
**lawsuit** 410:20
**lawyer** 177:4
**lawyers** 20:15 23:21
  23:25 24:4 26:6
  27:9
**lead** 148:12 151:24
  389:10,14
**leading** 147:24

**leads** 276:22 435:10
**learn** 199:12,19
**learned** 105:10 200:1
  200:3
**learning** 36:15
  172:13,24 173:2,5
  173:13,15 185:11
  185:18 186:2
  187:13 190:8,11
  191:18
**leave** 201:8 462:16
**lecture** 160:18
**lectured** 77:13
**lecturing** 160:20
**ledger** 282:19,21
**left** 18:6,8 64:10
  65:1,7 166:7
  237:10 251:25
  270:13 306:2
  312:3 315:6
  316:22 318:14
  321:24,25 328:7
  332:11 337:20
  347:7 360:17
  425:3 488:16
**left-hand** 15:9 260:5
  265:18 313:14
  318:13 321:8
  325:23,25 416:2
  475:4,5 494:7
**Legal** 2:9 15:20
**length** 464:18
**lengthy** 457:6 464:24
  490:24
**lettered** 44:17
**letters** 168:9
**let's** 12:6 39:3 58:8
  61:1 75:23,23
  76:25 83:10 93:15
  94:20 97:1 117:9
  117:11 125:13
  136:3,9,17,24
  138:24 149:6,9,12
  167:18 177:3
  179:16,16 181:15
  187:9 188:22,23
  198:6 212:24
  229:25 255:2
  257:21 259:14
  264:19 269:4
  274:12 275:9
  280:14 283:6
  285:10,12 291:23
  302:12 309:9
  311:6,7 312:1,20
  314:10 316:12
  317:7 321:1
  327:17 330:6
  333:8 336:16,21
  338:25 341:4

345:22 346:8,11
  364:21 366:3
  367:13 374:19
  375:1 378:5
  379:12 383:21
  393:6 406:15
  412:7 413:1
  423:18 424:15
  426:3 433:2 439:7
  449:6 474:7 475:2
  476:17 480:19
  482:12,18 491:7
  496:14
**level** 26:16 38:18
  41:23 67:2 87:12
  161:2,9 165:10,16
  205:24 218:23
  223:21 404:17
  432:19 435:4
  436:11 441:9
  451:6 452:6
  453:15 454:9
  460:18 486:14
**levels** 84:3 86:18
  111:9,22,25
  267:20 272:22
  273:8,12,14,19
  274:17 277:6
**Levitsky** 3:20 188:5
  190:22
**Liakos** 49:8
**life** 189:1 191:7,16
**light** 321:16 386:13
  464:13
**likelihood** 388:1
  392:13
**limb** 300:9,10 343:14
  343:19 345:18
  400:25
**limit** 262:17 438:14
  452:16,17
**limitation** 326:1,3,14
**limitations** 337:15
**limited** 24:4 60:16
  216:11 295:11,13
  337:11,16 348:12
  385:5 396:18
  423:3
**limits** 409:7,10 429:6
  433:17 441:18
**line** 26:11 177:11
  188:24 268:22
  403:7 413:18
**lines** 28:8 39:12
  168:8 212:25
  260:6 293:19
  407:11,17 476:4
  482:4,9,13
**linked** 93:18 304:16
  305:3 337:8

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 520

**linking** 208:21
**lip** 215:7,14 216:1,3
  216:12 217:25
  218:12,20 220:15
  221:5,17 222:6,17
  222:25 223:8,12
  223:17 224:1,2,6
  224:10,20,21
  298:22
**list** 4:9 64:19,20
  65:11 102:10
  106:17 170:7
  195:11,12 197:19
  239:16 242:18
  243:1,1 248:21,22
  257:24 258:11,15
  264:10 265:21
  266:1,5 279:22
  280:3,10,17
  297:22,24 298:4,7
  300:8,19 312:4,7
  314:5,10 342:24
  346:13,15 350:8
  371:8,14 372:11
  372:13 373:11
  378:13 400:9
  457:21 464:24,24
  478:14,24,25
  480:1 490:13
  492:13 496:16,19
**listed** 32:24 33:15,22
  50:12 59:15,16
  64:15,22 94:5,13
  98:13 167:14
  230:13 255:16
  256:1 257:14
  258:3 266:10
  267:10 286:6
  314:3 331:3
  346:20 348:8
  494:11
**listen** 410:3
**listening** 404:16
**listing** 268:12
**lists** 20:8 242:22
**literally** 95:6 114:2
**literature** 49:24
  62:11,12 83:25
  85:22 86:12 89:21
  90:2,8 108:25
  110:12,13 122:12
  122:13,16 164:23
  171:10,22 172:2
  186:14 187:2,3,8
  189:19,20 190:19
  191:25 193:24
  194:8,18 209:12
  209:19,25 221:12
  232:11 250:2,6,8,8
  258:7,21 265:5,8

266:16 271:13
  272:4,6 273:16
  274:14,16 275:1
  286:23 287:19
  288:1 291:6 294:5
  294:11,18 298:7
  298:12 306:11,12
  307:9 308:16
  316:14 319:6
  320:15 322:19
  332:21 334:22
  335:21 351:4
  354:18 356:3,3,4
  358:8,15 361:12
  363:15 403:1
  404:13 411:10
  412:24 415:4,11
  422:2 454:12
  455:4 460:6,16
  461:3,16,17,18
  468:5 475:8,20,22
  496:21
**lithium** 253:13,15
**lithium's** 258:11
**litigation** 19:25 20:5
  20:15,18 22:16
  23:9,24 24:12,18
  25:16,24 26:20,24
  39:19 68:12 86:7,8
  161:22 230:11,22
  281:25 282:3,9,24
  290:25 352:8
  430:22,23 431:8
  468:24 475:25
  485:13
**litmus** 402:13
**little** 87:19 112:13
  149:6 222:10,13
  475:19 494:15,24
**live** 129:21 130:19
**LLP** 1:13 2:2 15:23
**located** 15:20,23
  440:11
**logic** 135:19
**logo** 50:22 51:22,23
**long** 17:3 18:1 22:19
  22:25 23:1 174:13
  174:16,17 197:18
  197:21 234:19
  242:1,1 243:11
  248:20 269:7
  298:6 439:1
  488:13
**longer** 43:8 188:19
  321:21 322:5
  439:4,6 447:18
**looked** 76:19,21
  90:20,21 121:19
  133:7,21,24 151:3
  152:18 171:13

187:8 194:1 216:2
  216:17 243:2
  246:23 248:23
  261:21 273:21
  287:18 296:4
  300:11 306:12,14
  306:24 307:1
  308:6,10 318:18
  319:6 327:3
  330:19,20,24
  331:16 332:8,24
  333:1 335:12
  352:14 359:13
  361:13,19 372:2
  385:9 410:7,8,11
  413:4,19 427:7
  428:6 439:13
  449:5 450:8
  457:16,20 462:25
  486:8 487:6
**looking** 14:4 25:3
  29:14,17 30:4 40:3
  58:12 59:19 66:12
  91:10 96:24 106:7
  137:20 164:9
  177:22 181:10
  184:2 204:25
  213:21 216:25
  222:20 233:13,20
  243:18 244:9
  249:24,25 255:2
  266:9 267:2
  275:23 279:10
  282:12 287:1
  288:9 310:17
  314:12,21 328:3
  338:11 340:8
  350:9 352:22
  354:11,23 355:4,7
  366:20 374:14
  375:16 384:15
  391:2 396:4
  407:11,13 429:10
  443:20 492:15
**looks** 14:4 226:19
  257:3 274:8
**looping** 73:17 237:14
  237:20,23 307:14
  307:16,21,23,24
  308:1 365:7
**Lord** 263:9
**Lorente** 219:7
**lost** 75:21 283:11
  285:13 340:14
**lot** 36:13 58:14 74:12
  172:1 268:14
  271:13 327:22
  426:24,25 470:13
**lots** 12:1 132:20
**Loughhead** 107:11

**Louik** 3:12,24,25 8:1
  15:3 53:8 101:3,9
  102:11 103:1,4
  145:9 225:10,12
  226:1 242:16,17
  243:2 245:23
  246:4 256:1
  306:23 307:24
  314:8 327:17
  328:2,6,10 330:19
  331:1,12,16 332:2
  332:10 336:14
  348:24 359:23
  362:10 364:19
  366:23 367:3
  372:13 374:16,19
  374:24 375:15,16
  375:16,18 376:10
  376:16,19,25
  386:4 397:22
  398:8,9,23 485:17
  485:18
**Louik's** 398:10
**Louisiana** 1:17
**low** 299:4 327:11
  338:9 374:22
  378:16 382:2
  385:8 386:11
  464:13
**lower** 235:17 300:10
  315:9,16 317:9,13
  317:18 318:22
  328:11,17 329:4
  330:7,10,11,14
  338:1,4,6,10 343:5
  343:14,19 346:14
  360:1,20 369:5
  374:22 376:20
  377:1,8,12 380:8
  380:11,17 381:7
  381:16,23,24
  383:24 416:2
  438:15 444:5,25
  445:9,14 448:14
  481:21
**lower-bounded** 448:9
**lowest** 301:5 315:17
**LP** 33:6
**lump** 256:8 283:11
  440:19 499:1
**lumped** 240:3 241:15
  253:21 254:2
  256:7,11 283:18
  288:20 290:3
  291:8 295:8 355:8
  356:13
**lumping** 268:22
  283:16
**lunch** 226:5
**Luncheon** 226:8

**lung** 61:5
**LVO** 310:1,5,10
  331:15,15,19,24
  427:9
**LVOT** 309:14
**LVOTO** 133:8
  197:22,24 246:22
  249:3,25 250:4
  286:14,21 287:2,9
  289:16 290:3
  294:18,21,24
  306:8,10 310:21
  312:8 313:10,11
  313:16 314:3,15
  314:17 315:20
  316:6 328:11
  329:25 330:21,25
  331:10 332:2,8,25
  333:4,13 334:1,16
  334:19,25 352:14
  352:23 357:13
  358:16 359:3,6,13
  360:6 361:4,6,8,8
  361:14,24 362:21
  363:7,8,11 367:6
  375:25 376:5,13
  386:6 427:2 467:1
**LVOTOs** 359:18
**lymphoma** 405:13
  406:2,7,19,23,24
  407:21 451:16
  452:17
**LYTLE** 2:2

---

**M**

**magistrate** 499:18
**mail** 48:25
**major** 119:23 134:20
  134:22 135:1,15
  137:6,8,13,24
  138:13,13 169:19
  239:24 279:5
  307:12 349:24
  395:9
**majority** 41:16
**making** 292:3,13
  294:25 308:17
  457:2
**malformation** 112:21
  113:2,13 126:19
  126:19,20 138:13
  156:19 238:5
  245:16 399:16
  403:18
**malformations** 7:11
  10:8 89:17 108:16
  109:3 119:24
  121:25 122:5
  123:9 129:23
  133:9,11 144:24

USDC, Northern District of OK                           McMurray v. GSK                                 Monday
No. 08-CV-381-GKF-SAJ              Videotape Deposition of Shira Kramer, Ph.D.              November 2, 2009

Page 521

144:25 153:22
154:5 170:21
171:14 210:1
238:8 245:13,20
249:10 250:12
255:22 257:19
262:15 263:14
264:24 294:7,8
302:6,20 303:25
304:19 305:4
307:11,12,13
332:22 333:2
334:19 349:7,10
356:21 357:12
361:11 380:7
381:8 396:25
397:18 399:9
416:8,16 419:9
420:7 425:5
460:20,21,22,23
485:10 486:21,23
491:10 492:1
493:1,15,19 499:1
**malnutrition** 188:18
188:25 189:3,9
190:5,9
**man** 255:24
**manage** 32:8,13 36:9
**managed** 36:10
**management** 30:14
35:23 36:13 65:17
65:22,22
**managing** 35:5,15
36:1
**manner** 22:2,3,4,6
109:19
**manners** 21:12
**Manual** 456:22
**Manufactured**
443:22 447:14
**manufacturing** 28:17
28:25 443:5
**manuscript** 53:10
**March** 77:10 79:12
**margin** 168:8
**marijuana** 163:3
193:4,6
**mark** 7:15 8:7,13,19
9:6,13 10:1,9
14:17,20,22 15:4
15:10 48:23 49:8
49:13
**marked** 7:16,21 8:9
8:14,21 9:1,7,14
10:2,11,17 14:13
14:18,24 15:3,5,8
15:10,12 24:19
25:4 40:24 44:8
52:19 53:24,24
66:2 96:14 101:14

101:18,24 102:16
102:19 122:21
166:4 226:9,12
227:24 242:23
282:15
**markedly** 347:11
**marker** 126:14
**market** 135:6
**marketed** 28:10,13
**marketing** 30:2,11
**marriage** 161:5
**Maryland** 1:14 15:25
**mass** 349:14
**master's** 67:1 85:2,3
87:11 198:7
199:11,14
**match** 298:18
**matched** 337:4 340:1
**material** 49:22 53:25
56:9 142:18 470:3
470:8
**materially** 464:25
**materials** 10:21,24
101:10 461:6
**maternal** 170:14
193:9,19 212:21
213:1 217:14
218:6,18 219:6
224:16 304:23
326:4 331:21
**math** 129:24 137:4
379:20 384:20
463:24
**matter** 11:13 16:24
63:24 95:9 126:20
152:7 182:20,21
233:12 235:3
242:4 244:12,15
244:16 267:17
268:18 275:18,22
276:11,13,19
309:22 310:4
320:19 354:4
357:4,4 365:14
402:14 429:5
431:11 436:12
448:20 480:1,2
**matters** 80:2,7
100:22
**maximum** 138:24
**Mayo** 383:11
**ma'am** 287:11
289:13
**McMURRAY** 1:3
11:10,20,25 16:2
41:5,10 45:5,22
54:1,11 64:3 67:22
132:8 140:12
141:18 143:3,15
144:18 150:17

151:2 152:17
172:8,25 173:6,21
174:5 177:14
179:10 182:12
184:15 191:5,15
200:4 205:19,20
206:9,10 213:12
215:6 228:2
396:25 484:15
**McMurrays** 172:4
**McMurray's** 146:16
148:6 150:9
172:13 175:21,25
176:8 177:5 179:3
180:23 192:25
193:20 207:6,9,13
220:6 331:18
336:7 337:24
367:15 370:20
398:15
**mean** 11:14,19 17:13
21:20 38:11 63:21
63:25 64:4 68:6
80:11 85:11 100:3
100:3,9 108:4
110:12 125:18,25
126:25 131:17
137:9,18 139:16
146:19 165:4
178:2,3 197:9,11
207:20 211:9
215:20 224:4
232:3,3 245:7
247:24,25 261:17
263:17 264:6
274:23 296:21
315:19 326:22
329:3,14 330:7
335:8 362:25
365:1,7 377:6
380:4 399:24
402:12 408:4,4
416:12,14 424:1
424:25 425:9
426:24 428:12
452:12 453:13
459:25 461:11
462:25 480:1
487:13 493:11
**meaning** 93:17 160:9
367:8 435:23
438:22 472:21
475:8
**meaningful** 26:16
275:14 356:11
467:10 498:22
499:11
**meaningfulness**
435:24
**means** 38:15 61:12

61:13 92:21,23
147:4,16 148:1
264:3 269:10
282:21 315:16,17
328:15,16 329:15
329:24 330:2,9
338:5 339:14
377:8,12 381:5
412:14,18 425:24
438:12,19 456:18
**meant** 26:22 27:6
38:7 178:6 365:2
466:8 497:13
**measure** 437:24
438:10
**measured** 477:11
**measurement** 107:14
131:8 476:21,22
**measures** 260:10
**mechanism** 81:8
91:24 121:10,12
129:14 244:22
261:9 268:6,15,17
268:21 271:20
272:7 276:25
309:19 355:20
424:17 482:24
483:1 497:14
**mechanisms** 78:10
78:19 92:17
129:14 250:13
251:15 278:21
420:25 424:24
**mechanistic** 92:23
103:10 268:9
272:11,17 290:9
307:17 400:22
404:14 461:2
462:5 486:25
**mechanistically**
356:9 418:21
**med** 178:19
**Medford** 1:24
**medical** 5:17 69:20
70:2,23 71:1,4,6,9
71:23 140:17,19
141:3 142:22,25
143:3,7,12 155:15
155:21,21 157:24
161:16 162:2
172:6,17 174:22
175:2 176:7,19
180:25 181:2,6
182:23,25 183:2,6
183:10,14,22
191:11 303:9
346:3 411:16
487:9 489:1
497:19
**medication** 176:17

178:16 184:5
**medications** 70:17
177:14,17,24
178:3,4,6 179:18
182:5 184:7,9
264:17 480:22
481:7
**medicine** 17:18
303:13
**meds** 181:15,19
**MED00003** 181:12
**meet** 255:8 432:15
454:14 493:6
**meeting** 49:9 439:25
443:15 450:3
**Melody** 141:1,2,20
143:2,15 144:17
146:16 148:6,13
150:9,17 151:2
152:17,24 153:2
153:11 155:10,11
155:15,19,20,23
157:7,14 174:20
183:2 411:2
**Melody's** 129:13
140:1,8,14,19
143:11 146:8,11
153:4 157:18,25
169:14 170:13
180:16 396:11,22
411:1
**member** 33:15,23
163:8 172:8 259:1
259:4 422:8
**members** 15:18
468:9 469:2
**memberships** 68:23
**memorize** 117:20
188:13
**memorized** 118:11
169:12 294:14
**memory** 100:14
104:11 105:9
136:23 168:24
185:4,6 188:11
327:10 351:21
490:9
**men** 408:8
**menstrual** 175:3
**mental** 189:6
**mention** 123:2 197:6
280:9 331:10,12
331:24 472:11
**mentioned** 140:1
154:2 271:6 290:2
290:2 334:12
374:2 377:20,22
392:19 455:20
**mentioning** 232:24
235:7 382:1

Case 2:10-cv-02125-HGB-KWR   Document 188-20   Filed 09/18/12   Page 148 of 166

USDC, Northern District of OK                   McMurray v. GSK                                    Monday
No. 08-CV-381-GKF-SAJ              Videotape Deposition of Shira Kramer, Ph.D.              November 2, 2009

Page 522

392:18
**merely** 241:14
**merger** 29:7,9,14,17
  30:17
**mesenchymal** 281:14
**mesenchyme** 271:16
  279:12,13,18,23
  280:4
**message** 446:1,1
**met** 55:2 172:3
  454:18 455:10
**metabolizes** 208:2
**meta-analyses**
  240:15 461:24
**meta-analysis** 218:5
  301:14,18 393:7
  461:22 463:9
  491:5 493:12,17
**meta-analytical**
  464:19
**methodologic** 290:6
  363:14
**methodological** 5:23
  7:6 10:6 234:1
  323:15 460:24
  464:16
**methodologies** 21:24
  185:10 484:3
**methodology** 10:10
  55:20 56:9 66:1
  95:9,10 223:14
  290:18,22 436:5
  454:16 455:8
  458:18,22 460:4
  461:8 465:11,12
  467:20 469:21
  472:11,17 475:4
  475:10,23
**methods** 401:5
  472:25
**Meyer** 3:19 96:14
**MGP** 443:5
**Michael** 348:15
**microarray** 205:4
**middle** 120:9,9 476:4
  477:9,10
**mid-1960s** 189:2
**migration** 81:4,11,23
  82:7,22 83:14,23
  105:16 109:18
  266:22 271:15
  277:8,21 279:1
  280:19
**milligrams** 95:20
  97:5,6,6,7,8
  275:10
**million** 22:10 31:19
  134:18,25 135:22
  135:25 137:24
  194:21 379:6

**Millsap** 181:17
**mind** 37:24 40:10
  75:20 263:21
  270:7 357:6
  391:11
**mine** 41:22,22
  116:22 474:18,25
**minimum** 96:6,20
  97:14
**minor** 1:5 41:5
**minus** 217:25 218:12
  218:20
**minute** 14:10 110:15
  111:13 118:25
  150:11 223:24
  242:21 259:22
  285:13 297:3
  322:7 380:19
  426:10 427:5
  446:9 488:6
  492:10
**minutes** 102:25
  117:7 119:17
  488:21 500:5
**miscarriage** 121:23
  123:8,13 124:3
**miscellaneous** 5:25
  10:21
**misclassification**
  269:25 284:21
  388:16,21 495:22
**misclassified** 388:6
  388:12,24 389:3
**misinterpretation**
  435:11
**misinterpreted**
  151:20 179:8
  368:1
**misinterpreting**
  179:6 492:11
**mislabeled** 391:6
**misleading** 432:10
**misrepresenting**
  448:18
**missed** 101:10
**missing** 13:2 361:9
  365:9 487:20,21
  489:1
**misspoke** 313:24
**misstatement** 367:24
**mistake** 67:7 390:25
  432:9
**mistakes** 435:12
**misunderstanding**
  37:22 137:20
  296:22
**misunderstood** 367:9
**mixed** 163:17
**model** 147:2,11
  247:21

**models** 424:6
**moderate** 337:10
**modern** 5:18 8:17
  327:14 472:10
**modifications** 455:17
  497:17 498:2,18
**modified** 260:23
  498:5,21
**molecular** 72:12,15
  72:15 80:2,7
  251:19 470:17
**molecule** 277:8,15
  290:13 420:15
**molecules** 100:5
**Moller** 60:16
**mom** 139:15 141:18
  152:7 153:7,17
  154:12 156:12
  159:3 162:6,11,22
  169:2 174:12
  195:24
**moment** 125:12,14
  138:15,16,18
  139:7 141:12
  149:7 230:1 274:6
  307:15 384:16
**moms** 385:20 391:25
  392:2 394:14
**mom's** 162:10
  169:13
**Monday** 1:11
**money** 227:16
**monies** 228:5
**morning** 16:21,22
**mortality** 498:13
**mother** 33:9,10,21
  34:14 152:25
  157:12 170:24
  174:14 203:15
  274:18
**mothers** 135:15
  218:3 295:21
  327:13 329:25
  330:5 383:15
**mother's** 155:20
**Motley** 228:13
**motor** 173:18
**move** 120:11 168:9
  232:13
**moved** 352:22
  435:19
**MPH** 67:2
**multifactorial** 127:3
  129:15
**multiple** 99:25
  128:14 129:4,13
  140:11 148:3,3,11
  151:23 154:14
  156:7 168:25
  170:16 204:25

232:9,12 236:2
  247:21 282:15
  320:5,11,14,20,21
  321:16 322:1,5,14
  322:25 323:4
  349:23 386:18
  397:10 402:18
  403:8 418:13
  447:1 471:21
  472:20
**multi-disciplinary**
  467:21 468:9
  471:7
**municipal** 30:15
**munitions** 440:12
  442:5
**M.A.M** 1:4

---

### N

**N** 3:1
**name** 15:19 16:23
  19:19 49:8 51:14
  79:15 88:13,14
  99:13,15 181:16
  211:22 221:8
  257:11 278:11,13
  281:6,7 286:13,18
  286:20,24 339:12
  417:14,16,19
**named** 96:13 358:13
  443:6 449:23
**naming** 469:13
**narrow** 277:14
  421:11
**Natality** 218:16
**National** 218:16
  351:11 471:25
  472:6,15
**natural** 1:4 481:5
**nature** 163:13
  321:10 337:15
  401:23 402:9
**NBDPS** 4:4 312:22
  313:9 351:15
**near** 213:12 265:17
  440:11
**nearly** 388:4
**necessarily** 127:13
  164:15 241:19
  267:4,5 268:8
  280:1 291:3,12
  295:16 296:14,23
  301:11 324:21
  394:6 470:9
**necessary** 128:19
  268:7 276:20
  322:25 401:7,9
  417:9 436:25
  437:5,11 455:6,24
**neck** 300:9,14

**need** 8:19 14:11
  28:19 36:10 41:18
  43:7 52:1 66:7,14
  71:3 81:6 109:22
  114:5 117:7 120:1
  126:23 131:12
  135:18 150:17
  151:18 159:18
  160:1,4,18,19
  206:23 220:3
  241:20 242:7
  260:18 268:5,17
  268:18 280:13
  281:4,11 294:15
  297:2 298:7
  305:15 313:13
  314:23 335:9
  344:19 345:14
  348:20 349:22
  360:10 372:24
  375:2,4,5,7 379:17
  379:17 383:19
  384:9 395:21
  408:6 416:14
  422:24 426:6
  430:24 431:8,10
  444:11 447:2
  463:22 481:14
  483:21
**needed** 58:1 80:18
  354:1 379:5
  386:16
**needs** 425:10,13
  455:21
**negative** 170:19,22
  178:21 205:10
  329:19 433:25
  434:7,11,20,21
**neither** 234:25
  436:25 437:4,10
  501:13,16
**neonatal** 299:20
**nervous** 93:20
**neural** 73:1,6,12,20
  80:20,24 81:4,8,10
  81:23 82:7,22
  83:14,23 84:3,13
  84:19 104:10,15
  104:21 105:13,21
  109:18 113:12
  277:23,24,25
  278:1,7,9,25 279:2
  279:4,7,18,23
  280:18,22,23
  281:10,13 282:10
**neuroblastoma** 405:2
  405:9,17,18 406:2
  406:5,14,25 407:7
  439:19 440:11,15
  440:19,24 442:6

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 523

443:3,20 444:2
445:18 446:8,23
447:4,6,15 448:8
**neurodevelopmental**
172:20 299:5
**neuroleptic** 349:16
**neuronal** 93:21
**neuropsychological**
172:16 173:11
**Neutra** 437:16
**never** 13:12 18:4
21:12 23:3 31:9
34:20 51:18 68:20
75:10 91:17
151:20 179:10
198:15,18 329:6
413:15 416:13
497:13
**nevertheless** 360:8
**new** 1:24 15:21
27:23 67:17
120:12 260:21
348:16,25 407:9
**newborn** 391:8
**newborns** 383:16
384:18
**newspaper** 28:15
29:25 31:2
**NHL** 406:9 452:20
**nice** 244:16,17
**NIH** 77:16 79:12,16
79:18,19
**nine** 44:21 168:8
500:4
**ninth** 498:16
**NJ** 2:10
**Noel** 437:15
**non** 454:24
**nonmalformed**
218:15
**nonsensical** 370:6
**nonsignificant** 26:13
**nonsmoking** 219:4
**nonspecific** 417:5
**nonsyndromic** 218:8
**non-differential**
388:17,21 487:14
488:3
**non-genetic** 9:24
**non-Hodgkin's**
405:12 406:1,7,18
406:23,24 407:21
451:15 452:17
**non-informative**
332:16
**non-inherited** 258:23
**non-inlet** 313:14,19
**non-Paxil-exposed**
394:15
**non-response** 326:25

**non-statistically**
334:1,5,6 434:12
434:22
**normal** 44:22 141:9
201:23 206:6
266:20 272:21
273:7
**normally** 21:19 40:3
40:5 107:24
231:10 232:5
234:10 355:13,14
403:2 455:18
463:4 465:2,8
481:14
**Northern** 1:1 16:4
**Notary** 501:3
**note** 6:6 68:17
323:18 324:9
339:9 349:11
394:1 448:14
479:19 487:8
**noted** 30:13 314:15
349:24 390:19
423:23,24 486:17
**notes** 179:6 198:7
349:25 378:4
403:13 501:11
**notice** 5:17 8:12
330:24
**noting** 337:8
**notion** 320:11,13
496:2
**November** 1:11
15:22 501:23
**no's** 222:11
**null** 26:13 269:22
386:25 387:11
409:18 433:24
434:25 435:6
441:3 495:15,16
**number** 7:2 14:18
16:4 32:16 35:10
38:11,13,20 49:3
64:18 66:23 74:20
74:22 76:18,20
90:20 92:14
101:18 104:24
105:1 110:22
111:4,5 118:19
130:24 134:13,14
134:15,16 136:10
136:19 138:6,7
139:2 145:24
146:3 167:20
169:3 177:20
181:17 183:12
188:5 194:19
198:23 202:17
206:5 208:5
216:15 219:11,17

248:23 272:12,13
273:14,24 285:15
285:19 295:18
297:18 298:13
319:25 320:1
322:3 341:3
353:22 357:24
358:3 380:1
381:20 384:24
386:8,8,20 416:6
422:19 423:14
426:12,16 427:16
427:17,17 428:6
440:24 474:1
484:6 485:25
491:19 496:7
500:3
**numbered** 177:9
382:23
**numbers** 21:18 45:17
46:6,12 55:19 56:9
58:5 103:16
136:12 201:6,11
212:4 380:22
384:21 385:5
386:19
**numerators** 369:7
**numerical** 465:3
466:8
**nurse** 178:10
**nutrition** 191:6,12,16
**nutritional** 189:22
190:1
**NY** 2:3

---

## O

**Object** 205:7 250:25
251:7
**objecting** 123:23
**objection** 26:21
31:20,20 39:22
44:5,13,23 54:24
55:15 56:2 62:24
63:2,9,22 65:3
72:24 73:3,21 87:1
92:2 96:10 97:18
107:8 123:17,18
130:3 149:18
150:21 155:16
157:8 176:10
202:14 205:7,14
235:24 238:24
251:12 252:19,25
272:2 274:24
275:21 276:2,24
279:3,11,25 280:5
280:21 292:11,15
293:17 352:25
353:21 355:5
359:14 363:20

370:10 373:5
414:7,9 445:12
455:12 467:3
**observation** 475:6
486:21
**observational** 253:22
254:3
**observe** 384:23
425:1
**observed** 269:21
317:1 321:15
322:4 388:2
392:24 405:11
407:19 416:13
433:14 440:24
451:13 485:11
495:13
**Obstetricians** 303:23
304:8
**obstetrics** 175:19
**obstruction** 64:11
65:2,8 310:11,19
315:7 331:20
360:17
**obstructions** 309:11
312:4 318:15
**obstructive** 362:22
**obtained** 97:9 487:10
**obvious** 477:7
**obviously** 51:24
179:11 305:14
423:24 455:21
468:20
**OB/GYN** 175:18,22
176:1,2,4,21 177:5
**OB/GYN's** 180:23
**occasions** 176:15
**occupancy** 97:9,10
**occupation** 163:6
**occupations** 317:3
**occur** 21:10 300:24
365:4 393:18
**occurred** 242:5
274:3 321:14
365:14
**occurrence** 146:22
157:4,25 170:25
196:2 216:2
**occurring** 174:23
216:1 402:17,25
**occurs** 215:25 274:5
324:13
**offer** 82:4 83:17,21
186:25 209:15,20
**offered** 203:21,23
236:21
**offering** 80:22 81:2
81:20 82:19 83:11
83:15 91:2 100:19
114:19,22 121:5

121:14 175:6
184:14 185:17,25
186:6 191:13,18
191:20 206:18
207:4,7 208:24
210:7,12,22
220:11 238:10
454:23
**office** 12:20 15:23
49:19 227:2,20,25
**officer** 33:7,15,22
65:20
**officers** 36:12
**offices** 1:13
**offspring** 217:16
264:21 304:17
**oh** 8:20 11:23 59:23
67:7 101:14
116:21,23 124:13
143:6 144:1
177:21 195:16
205:2 229:11
263:18 264:14
279:17 282:20
311:10 313:21
345:10 357:21
363:7 375:6,21
376:7 381:3 391:7
400:14 410:6
427:4 437:6
491:17
**Oklahoma** 1:1 16:4
**old** 178:12
**older** 349:14
**omissions** 490:4
**omphalocele** 298:25
305:8
**once** 492:23
**ones** 42:24,25 169:24
170:6 171:11
185:19 195:3
202:2 254:22
255:16 256:22,24
265:7 281:10
307:5 348:14
363:3 433:4
457:25 458:5
473:8
**One-Page** 6:3
**one-sided** 373:1
**online** 379:13
**open** 7:13
**operate** 91:24
418:20
**operating** 36:12
65:19
**opine** 92:16 149:1
152:6 153:6,16
154:10 156:11
187:3 209:4,10

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 524

307:2
**opined** 158:22
  186:10
**opining** 153:3 158:10
**opinions** 41:21 70:5,8
  71:25 84:6 118:23
  121:14 187:12
  248:19 249:6
  250:9 291:15
  396:11,22 432:15
  468:23 469:2,3
  471:17
**opportunities** 30:13
**opportunity** 66:7
  113:18 132:21
  150:20 468:20
**opposed** 35:15 99:11
  126:12 137:10,11
  250:4 328:18
  372:25
**optimal** 326:21
**oral** 1:13 212:22
  217:3,6,15 218:8
  218:14 219:7,21
**order** 51:7 63:5
  106:18 114:4
  204:14,19,23
  209:12 220:2,24
  224:11 235:11
  249:5 383:19
  401:9 412:24
  419:13 428:8
**ordered** 204:13,15
**ordering** 389:10,15
**orders** 30:10
**organ** 255:22 269:3
  277:17 354:13
  399:21 400:10
  404:25 405:4
  414:1,18 418:13
  420:17 424:3
**organization** 24:4
  287:7 292:24
  303:18
**organizations** 68:23
  68:25 79:13 259:7
**organize** 30:10
**organizing** 54:17
**origin** 269:6,14 278:8
**originally** 14:22
  86:10 498:14
**outcome** 100:17
  127:8 141:18
  146:22,24 147:6
  148:12,13 151:24
  207:18 208:8
  337:21 422:21
  423:1,20,21 424:1
  455:15 460:13
**outcomes** 76:22,22

76:23 77:20,20
  78:17,17 121:1,2,3
  128:16 130:8
  132:18 187:7
  213:9 260:21
  337:16 355:21
  424:2
**outdated** 456:3
**outflow** 64:10 65:1,7
  109:11,17 113:7
  237:10 305:7
  306:2 309:11
  310:11,19 312:3
  315:6 318:14
  328:7 360:17
**outlet** 270:18
**outline** 17:12 61:12
  103:18
**outlined** 44:16 60:6,9
  60:12,21 61:11,16
  61:17 93:8,11
  95:23 103:13,14
  103:17,19 458:16
**outside** 29:20 112:2
  139:11 143:16
  236:11 439:8
**ovale** 141:24 142:1,5
  142:12
**overall** 26:23 27:6
  120:2 138:22
  144:5 165:13
  218:9 260:10
  262:15 287:13
  288:19,25 297:12
  306:4,16 349:7
  357:11 392:21
  397:17 460:20
  467:23 487:4
  493:19
**overarching** 249:1
  271:14 291:12
  339:12
**overestimation**
  324:14 393:2,11
  394:2
**overlap** 264:18
**overreliance** 435:20
**overseeing** 35:13
**over-ascertainment**
  391:22
**owned** 18:8,24 33:8
  33:20 34:14
**oxygen** 86:18
**O'Brien** 4:8 491:4,15
  492:25

_____

**P**

**P** 2:4
**pages** 5:16 8:5,6
  13:23 14:18 41:10

101:18,21 102:15
  102:21 177:8
  226:12 243:4
  379:14 382:23
  403:8 488:12,16
**paid** 20:14 24:11,17
  25:15 36:14
  226:23,24 227:16
  229:9 230:10
  468:24,25
**PAIVS** 72:19 73:2,7
  73:8
**palate** 208:13 209:1
  209:9,17 210:9,23
  211:2,6,11 213:17
  213:24 214:7
  215:1,14,15,22,25
  216:4,4,7,9,12
  217:25 218:2,12
  218:13,20 220:7
  220:20,22 221:5,6
  221:9,11,16,17,21
  222:5,6,18,25
  223:8,11,17,20,20
  224:10,15,19,21
  225:10,11,13,23
  298:22
**panel** 468:9 469:2,7
  469:8,24 470:12
  470:25 471:7
  473:8
**panels** 467:22 468:2
  471:12,16,21
**paper** 4:19 15:9
  46:25 47:8,17 48:3
  58:18,23,24,25
  77:1 198:5,5 243:5
  259:8,9 264:12
  301:2,2 303:22,24
  305:15,16,23
  337:6,19 344:4,19
  345:4,15,20
  352:20 422:5,12
  422:16 480:17,18
  480:24 483:25
  494:3
**papers** 5:14 7:5,8
  10:5 42:11,16
  43:10 80:17 195:8
  197:25 198:1,4
  311:24 348:25
  392:19 464:19
**paragraphs** 41:11
  54:20 55:18,22
  60:4 63:16,17,20
  63:25 93:2,9
  103:12 331:1
  475:5
**parameter** 438:1,11
  438:20

**paraphrasing** 175:8
  301:21
**Pardon** 170:1 174:1
  488:6
**Parent** 1:4
**Parenthood** 181:1,3
  182:4,11
**parents** 144:17
**paroxetine** 9:18,20
  17:11 89:23 93:4,7
  97:7 119:23
  302:18 304:18,23
  304:24 331:21
  337:8 347:13,20
  348:2 349:9
  375:13 378:21
  380:1 381:21,22
  382:10,15 383:3,6
  383:15 393:20,23
  429:10 483:7
  484:1,4,13 491:9
  491:25 492:4
  493:13
**paroxetine-exposed**
  383:16 384:14,18
**part** 14:22 19:8
  48:21 51:17 61:4
  81:11,14,14 82:9
  101:4,7 239:13
  262:23 288:20
  296:11 303:8
  306:4 360:13
  469:20 484:23
**partial** 89:5
**participated** 49:9
**participation** 327:12
**particular** 37:20
  50:10 60:4 61:15
  71:16 76:10 79:21
  103:18 105:8
  117:22 131:13
  159:8 205:5
  207:22 222:8
  241:1,8 253:7,23
  254:4 278:23,24
  280:7 287:17
  293:2 300:13
  319:8 325:13
  328:25 347:6
  363:17 364:11,23
  370:1 373:15
  377:18 387:21
  396:24 402:13
  407:6 409:14
  414:19 417:14
  420:13 433:25
  460:10,13 465:19
  465:20,21 474:4
  487:4 496:5
**particularly** 238:21

260:20 362:9
  387:2 460:17
  467:11 498:16
**particulars** 325:6
**parties** 501:15
**partisan** 468:9
**partner** 232:8
**patent** 141:24 142:1
  142:5,12
**paternal** 193:4,6
**pathogenesis** 355:20
  497:15
**pathogenetic** 215:23
  271:6 354:3
**pathogenetically**
  215:18,21 355:2
  355:17
**pathologic** 494:6,12
**pathway** 354:3
**pathways** 271:7
**patient** 69:16
**pattern** 153:22
  347:11 400:20
  419:2,9 421:23
**patterns** 216:2
  399:16 418:20,25
  420:6 421:18
  493:21 494:1
**PAUL** 1:18
**pause** 14:15 15:16
  227:6
**Pax** 298:8
**Paxil's** 288:21 289:6
  289:11 398:20
**Paxil-exposed**
  110:19 335:1
  389:9,13,15 391:9
**Paxil-induced** 126:12
**pay** 229:8
**payable** 226:24
**paying** 431:23
**payments** 229:16
**PDA** 168:9
**Pedersen** 4:16 58:19
  145:9 377:20,21
  378:2,14,14,17,24
  379:4,9,13,23
  381:23,24 397:21
  398:24 429:9
**pediatric** 75:8 304:7
  442:9
**pediatrics** 17:23
  259:5 265:2
**peer** 473:20
**peer-reviewed** 39:3
  40:15 49:23 96:13
  110:12,13 123:4
  123:10 286:22
  291:6 309:18
  316:14 319:6

Case 2:10-cv-02125-HGB-KWR   Document 188-20   Filed 09/18/12   Page 151 of 166

USDC, Northern District of OK                    McMurray v. GSK                              Monday
No. 08-CV-381-GKF-SAJ            Videotape Deposition of Shira Kramer, Ph.D.              November 2, 2009

Page 525

350:20 351:4
358:8,15 360:21
411:9,16 475:22
493:20,25
**pen** 297:25
**pending** 17:4 37:23
55:12,25 82:13
120:8 150:12
408:20 492:16
**Pennsylvania** 1:8,14
15:24 17:18
**people** 13:8 57:15
59:8 65:21 68:5,7
69:14 125:7
127:21 129:7
131:21 132:23
185:14 207:21
209:1 319:18
328:24 329:5
379:6 394:4
428:20 431:15
437:14 477:21
**people's** 178:13
**Pepsi-Cola** 35:12
**percentage** 127:18
127:20 128:9
129:17 143:24
144:2,3,4 159:21
201:1,5 394:16
**perfect** 353:4 354:24
**perfectly** 471:9
**perform** 146:7
**performed** 320:4
322:3 349:18
**perinatal** 389:7,12
442:10
**period** 134:24 175:3
179:17 180:6
445:18
**periods** 180:19 189:4
**permanent** 189:11
**permit** 436:5 454:16
**persist** 401:3
**Persistent** 447:13
**person** 67:2 70:19
71:16 182:4 330:5
471:2
**personal** 32:2
**personally** 419:24
**perturb** 277:5,6
**perturbation** 267:20
**perturbations** 111:21
**perturbed** 109:20
**perturbs** 271:19
281:15
**PFO** 141:22 143:18
143:25 411:4
**pharmaceutical**
22:24 76:16 79:3
257:11 465:19

**pharmaceuticals**
76:6 134:10
**pharmacodynamic...**
91:14
**pharmacodynamics**
88:17
**pharmacokinetically**
91:14
**pharmacokinetics**
88:16 92:7,15
**pharmacological**
98:7
**pharmacology**
303:13
**phase** 29:7 30:17
**phenotype** 485:12,16
**PHILLIPS** 2:2
**Philly** 83:4
**phone** 49:9,14
**phrase** 36:24,25
**phrased** 263:7
**phrases** 37:3,11,13
**physical** 199:8
200:16
**physician** 71:6 85:21
183:15,16 184:24
471:4
**physicians** 184:21
191:10 204:19
492:3
**physiology** 355:1
**Ph.D** 1:13 3:3,11
16:18 501:6
**pick** 59:22
**picked** 476:13
**picture** 156:19
**pictures** 442:22
**piece** 46:25 47:8,17
117:14,22 147:18
148:1 156:20
159:14,20 345:24
401:11 474:7
**pieces** 147:22 231:11
342:24 344:12
**pigmentosum** 85:1
**pile** 102:2 327:19
**place** 106:20 432:22
501:11
**placebo** 97:4
**placed** 342:22
**placenta** 85:22,23
86:12,13,18
105:25 106:14,21
273:16,17,22,25
274:9
**placental** 85:10,18
**plain** 379:23
**plaintiff** 1:5 23:20
27:9 167:23
**plaintiffs** 1:18 16:10

20:14 22:17 23:3
23:10 24:4,12,17
25:20
**plaintiff's** 5:24 10:14
216:21 413:5
**Planned** 181:1,3
182:4,11
**plant** 443:5,21,22
446:7,11,19
447:14
**plasma** 274:17
**plausibility** 81:12
82:10 83:20 210:3
233:22,24 244:22
261:9 268:3
271:22 290:9
364:1 404:14
455:6,25 461:2
486:25
**plausible** 315:17
482:25
**played** 191:17
**please** 24:14 29:22
42:14 55:11,23
73:5,9 75:15,24
87:20 88:25 94:20
105:4 116:14
118:25 167:18
181:1 224:18
230:1 252:20
253:25 335:24
367:8 384:16
389:11 408:24
447:11 472:1
480:19
**plots** 10:22
**plus** 217:25 218:12
218:20 313:15
**pocket** 15:9
**pockets** 295:9
**point** 17:25 41:6
62:17 92:15
106:23 108:14
111:6 112:17,23
113:5,10 126:3
165:25 173:25
174:2 178:17
236:3 260:23
268:5 273:15
316:11 348:20
352:11 360:5,7,14
360:25 361:19
386:21 393:25
401:19 425:3
429:2 432:21
434:4 438:13
448:23 480:10,13
483:24 484:7,9
497:2
**points** 26:14 268:21

271:13 336:10
350:2 476:15
**poised** 29:6 30:17
**Policy** 474:13
**Poole** 322:22
**Poor** 299:20
**population** 71:19,22
205:23,24 206:13
217:21 387:20
388:1 416:9 425:6
449:22
**populations** 69:14
72:8 401:5 407:20
445:20 451:14
**population-based**
217:23
**posited** 421:10
**position** 4:19 17:17
17:22,24 29:8
303:19,24 379:22
422:5 436:23
444:15 448:21
457:24
**positive** 26:18 30:9
163:17 387:12
401:10 436:19
**possibility** 377:13
489:8
**possible** 43:24 46:5
98:8 125:20,24
126:8 127:17
146:11 187:12
191:5 205:9 253:1
253:3 264:7
271:19 284:1
285:5 292:9 293:8
306:20 308:10
340:25 347:3
380:2 402:20,23
415:5 420:12
481:25 482:23
483:5 489:2
**possibly** 87:8 110:21
119:13,13 139:21
146:23 189:5
220:8 283:13,20
283:20 285:1,4
326:20,20 355:6
370:12,16,18
389:6,20 391:24
429:23
**postdate** 229:4
**potency** 92:6,9,13,14
92:18,21
**potent** 92:5 93:21,23
94:10,19 96:7,21
97:16
**potential** 17:24
30:19 191:24
208:13,16,18

209:22 240:7
245:12 317:3
323:18 324:10
392:20 395:15
402:22 403:16
404:6,10
**potentially** 220:10
238:18 248:1
315:25 324:22
325:1,2 329:23
402:23 412:16
429:18
**potentiation** 93:19
**Powder** 28:7
**power** 50:15 235:9
244:24 256:21
295:12 335:15
348:13 353:10,23
354:1 362:9
378:17 379:3
382:1 385:4,8
386:11,15 398:6
426:19,24 427:1
427:10,11,14,15,22
428:3,12 429:15
460:19 461:1
463:3,23 464:2,13
464:14 467:11,14
**powered** 234:2,4
337:10 386:5
387:16 428:17
463:12
**powerful** 244:18
261:19
**PPHN** 299:9
**practice** 37:9 268:24
268:25 399:10
431:1 434:2 439:7
**precisely** 389:23
390:14 421:22
**precision** 235:10
388:9,11 437:25
438:11,20 442:23
**precursor** 19:6
**predisposed** 204:2
**predispositions**
202:23
**prefer** 458:2
**pregnancies** 135:9
**pregnancy** 85:24
86:14 100:16
115:15 121:1
125:8 131:22
132:24 141:17,18
155:4 157:13,13
157:16 162:15,23
163:4 173:22
174:6,22 176:9
177:15 178:8
179:20,21 181:8

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 526

182:3 183:1,7,22
184:5 212:22
213:1 217:15
218:7,19 304:25
331:22 349:5
484:1 492:4
**pregnant** 108:16
111:8 135:5,12
137:23 272:21
273:7,13
**preliminary** 20:25
483:25 484:4
**premarked** 40:19
50:3
**prenatal** 162:12,12
162:16,19 193:10
**preparation** 13:9
**prepare** 42:22 46:13
47:14 48:2 53:18
57:4 58:20 478:24
**prepared** 13:3,9 43:2
43:4 45:6,22 46:2
46:9,25 47:7 48:12
49:24 50:6,9,10,16
50:22 51:3 52:4
57:8,14,19,20
58:16 59:8 92:16
155:12 209:15
211:12
**preparing** 47:24 91:7
**prescribe** 70:16
**prescribing** 492:2
**presence** 106:8
**present** 1:15 2:7
16:6 49:13 106:13
178:3 442:19
444:21 450:23
484:5
**presentation** 441:13
441:17 442:17
452:14 498:12
**presentations** 446:4
**presented** 258:8
403:19 439:24
441:18 442:4,8
443:14 446:3,4
447:22 448:1
450:1
**presently** 310:7
**presents** 322:3
**president** 18:10
19:14 27:14,17
29:4 30:16 35:12
36:8 419:25
**press** 29:24 30:6
**pressure** 387:10
**pretty** 82:2 130:22
180:9 188:22
231:19 247:3
248:10,18 296:21

300:18 401:8
464:9
**prevalence** 59:14
129:19,20,22
130:6,21 217:20
377:9 378:22
384:22 385:6
**prevalent** 348:7,13
389:8
**prevent** 402:25
**Prevention** 351:12
**previous** 160:14
**previously** 15:2,8
**pre-set** 14:5
**primarily** 27:19
60:15 68:13 77:24
79:14 175:14
**primary** 74:24 114:1
192:8,13,17,19,20
471:1 499:4
**primum** 62:21
**principal** 27:1
**principle** 290:6 400:2
416:6 417:9
420:24 421:5
422:19 423:18
**principles** 265:15
291:9,13,21
399:15 417:1
420:5,19,21
424:16 458:15
**printer** 48:9
**prior** 75:14 114:25
178:7 179:20,23
273:4 493:16
501:4
**privilege** 29:25
**pro** 229:9
**probability** 36:19
37:1 38:1,5,9,15
38:20,24 39:6,18
40:6,11 83:13
121:7 150:8 151:6
157:24 186:2,7
191:15 206:20
207:5,8,13 208:25
209:8,16 211:14
246:14 404:18
489:8
**probable** 70:6
**probably** 17:11 22:24
32:23 33:2,15
34:13 37:5 38:15
45:4 47:9 115:11
131:7,9 147:6
233:9 278:13
369:14 378:25
414:3 429:8
474:12 487:23
490:3

**problem** 107:5
150:19
**problems** 239:17
323:18 324:9
**procedure** 204:20
**procedures** 393:20
**process** 109:19 252:1
267:15,19 268:9
429:25 430:22
465:4 475:11
**processes** 44:2,19
250:13 252:9
269:14
**processing** 498:12
**produce** 189:4
245:19 322:1,5,15
323:4 402:18
417:5 421:18
**produced** 11:4 43:1,3
161:21 485:13,17
**producers** 28:11
**produces** 27:19
108:8
**producing** 207:18
**product** 13:5,19
19:11 28:3,4,10,18
30:24,25 31:1,6,9
31:10,11,12,13
**Productions** 2:9
15:20
**products** 27:20,21,23
29:1 33:5
**profession** 71:23
435:13
**professional** 39:11
68:5,19,24 185:8
287:6 292:24
303:17
**professor** 17:22 18:3
**proffered** 203:12
**profiles** 98:7
**program** 226:20
**project** 18:18,18
34:14 56:18 65:17
65:22
**projects** 35:22
**proliferation** 105:16
271:15 277:9
278:4,7 279:1
280:19
**promote** 498:10
**prompting** 30:10
**pronounced** 124:12
**pronunciation** 124:16
**proof** 121:23 122:4
203:21 204:1
**proper** 64:24 176:5
191:6,12,16
**properly** 275:13
386:5 428:17

**properties** 98:8 99:1
99:16,18,19 100:1
**property** 99:24 100:2
**proportion** 494:10
**proposed** 84:13
**proposing** 267:21,24
268:2
**proprietary** 29:3
**protective** 123:14
163:18 164:5
165:6 214:18,22
232:22 315:25
319:1,13 328:19
329:20 334:11
358:25 361:5
376:25 385:10
386:1,22 387:2,8
397:14 429:22
**prove** 386:25 387:1,1
434:25 473:15
**proven** 179:9 257:13
**provide** 59:13 72:3,6
234:11 310:18
314:6 448:16
452:4 462:19
467:10
**provided** 121:20
155:13,18 184:18
184:25 186:22
191:10 203:9
226:11 227:10
244:17 444:12
461:4 462:21
463:23,25 486:14
**provider** 181:18
**providing** 63:25
176:2
**proving** 203:21
**provision** 445:8
**Prozac** 89:24 91:18
96:4 359:8 482:1
**psychiatric** 326:9
480:21 481:6
**psychiatry** 303:13
**psychopharmacology**
303:14
**public** 67:2 69:13
143:10 422:5
501:4
**publication** 348:24
443:12 473:20
**publications** 449:12
**publicly** 32:1
**publish** 485:8,9
**published** 24:9,10,16
25:5,7 27:8 49:23
76:25 89:3 96:13
110:12,13 119:1,3
122:7 123:4

137:15 139:4
198:19 213:9
249:13 264:22
285:23 286:8,11
286:22 287:21
291:14 308:22,24
309:1,18 316:14
320:17 322:19
350:15,19 383:11
392:5 405:8
411:16 440:7
493:20,25 494:15
**PubMed** 89:2,5,6,7
**pull** 167:17 169:7,11
171:12 198:6
236:20 254:23
294:11 335:5,14
336:21 375:1,4
**pulled** 64:14 339:18
**pulling** 54:14 62:11
212:4,10 383:22
**pulmonary** 61:3 62:4
72:19 73:10 238:2
238:4 239:6
240:23,24 241:6
242:7,9 243:13
244:12 364:20
**pup** 108:22
**purpose** 53:3 77:4,23
215:16 309:19
317:19 354:20
468:4,11,16
497:19 499:2
**purposes** 68:11 74:3
311:23 390:16
421:8 475:17
497:22 498:6,19
499:4
**pursue** 427:3
**purview** 149:2
**put** 7:2,2 37:12 38:11
38:19 47:4 48:4,5
57:15 59:8 95:15
138:6 150:2
166:22 167:8
234:16 254:7
272:16,16,18
297:20 302:4,5
303:23 342:20
345:1,24 350:5
352:3 362:8 366:9
368:2,4,4 381:24
445:1,3,11 447:7
463:7 465:3 466:8
**puts** 351:23
**putting** 54:18 60:1
479:3
**p-value** 434:12,22
**p-values** 434:3
435:21

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 527

**Q**

qua 454:24
qualification 388:18
qualified 70:10,13,16
 70:19 71:9,15
 81:24 83:18,21,24
 84:1,4 186:25
 187:2,18 192:17
 199:8
qualifier 36:23
qualify 43:5 69:22
 81:6 83:18 126:23
 260:18 365:16
 434:15
qualifying 153:20
qualitative 38:3
 421:18 461:20
 466:1 472:22
qualitatively 39:1
quantified 260:10
quantify 38:9 291:25
 333:15 437:25
 438:10
quantifying 292:16
quantitative 461:20
 466:2 472:22
questioning 268:22
 499:17
questions 11:2 14:12
 25:14 51:25 57:13
 63:12 81:7 101:2
 103:3,6 113:14,20
 114:4,5 178:11
 194:21 220:20
 234:5 274:25
 281:19 301:23
 375:3
quick 145:19 227:11
quickly 17:5
quite 231:4 298:9,9
 386:14 482:20
quote 29:10,12,13
 31:2 41:16 115:18
 128:14 322:12
 341:6,14 403:6
 435:10,10,10,11,14
 437:15,22 453:22
 499:6
quoted 29:4 30:3
 453:25 454:1
quotes 212:4 437:13
quoting 433:8 453:21
 493:8

**R**

R 501:1
Rahimi 4:17 116:17
 116:20,25 118:12
 489:17,21 490:8

490:14,16 492:22
raindancer 26:17
raised 395:12,13,14
 395:14
Rampono 106:7
ran 188:2
random 433:1,19
range 130:21 131:2,3
 131:4,7 139:5
 194:14 196:7
 255:6,10 275:9
 310:18 315:24
 371:8,14,23 372:6
 372:9,16,18,23
 407:22,24 408:7
 409:16 422:1
 451:17,20,23,25
 452:4,5,7,15,20,21
 489:14
ranged 444:2 448:8
ranges 130:6 310:21
 372:19,20,25
 373:13,14,21,24
 409:16 453:1
ranging 201:6 441:1
ranking 475:10
rare 132:12 387:19
 387:25 440:15
rarely 146:23 379:2
 477:1
rarer 132:18 256:21
 256:22 260:20
 364:4
rarity 130:7 131:3
rat 110:17,17
rata 229:9
rate 110:19 119:23
 125:3 129:19,20
 129:22 130:1
 131:11,14,15
 134:20 135:14,16
 137:12 138:22
 139:1,4 291:25
 292:12 326:18,19
 326:22 327:7,15
 333:11,15 378:22
 390:9 444:10
 445:17,24
rates 11:11 130:7,21
 132:11 133:19
 239:18 326:23,24
 326:25 327:12
 384:22 385:7
 410:1 440:11
 443:3 446:18
 447:2 450:9
rationale 323:7
ratios 59:15 115:8
 120:5 218:25
 221:3 260:11

311:23 314:14
321:13,15 331:20
332:1 346:15,20
348:22 364:5
372:12 373:9
379:5,16 386:17
386:24 409:6
441:1,23 443:19
480:4,5 483:11
493:18
ratio/relative 167:6
rats 110:24 111:4
 188:8,12 189:14
 190:1,23
Ray 437:16
reach 249:5 289:5,10
 289:16,20,25
 353:13,17 363:10
 398:19 436:5
 454:16 455:9
 471:13,16 483:18
 484:20,24
reached 302:1
 468:22 469:1,3
reaching 191:22
 201:12 248:19
 250:3 430:18
 467:23
readily 369:18,20
reading 30:8 52:7
 66:13 70:23 71:3,6
 75:20 92:4 109:13
 115:20 128:2
 142:8 145:5
 160:12 176:24
 184:20 188:21
 189:18 200:2,4
 204:11,21 210:16
 237:4 271:12
 284:13 302:20
 349:2 382:11
 438:2 446:16
 468:12 470:2,7,13
 474:4 495:2
 496:12
reads 10:10
ready 91:6
real 33:17 34:14
realize 29:8 30:18
really 18:1 19:6
 20:10 22:23 25:10
 27:4 33:16 35:21
 36:6,22 37:12,17
 38:17 39:12,24
 44:6 56:4 75:1
 82:15 90:7 115:23
 119:25 127:20
 128:1,3 130:14
 132:17 137:7
 148:8 149:3,20

150:6,15,25
151:10,16 152:9
154:15 160:15
161:15,23 174:9
179:21 191:7
192:22 202:16
232:24 235:9
239:19 240:24
246:7 247:12
250:1 256:9
258:20 260:25
261:3,21,22 268:6
280:6 284:5,19
322:14 326:23
334:21 342:18
343:16 352:10,19
386:14 388:15
394:6 403:10
429:7 432:22
437:24 438:9
445:25 451:19
458:6 466:1
467:13 479:25
480:23
Realtime 501:3
reason 127:16
 144:21 182:10
 193:25 204:14
 264:25 273:11
 276:18 347:21
 407:4,6
reasonable 36:24,25
 37:25 38:2,8,14,22
 38:24 39:4,5,6,16
 39:17,20 40:11,11
 80:23 81:3,21 82:5
 82:20 83:7,12
 121:6 150:8 151:5
 157:23 186:1,6
 191:14 206:19
 207:5,7,12 208:11
 208:24 209:7,16
 211:13 246:14
 273:18
reasons 127:16
 166:14 386:2
 475:17
reassuring 492:2
recall 27:10 29:11
 32:24 33:1 45:10
 45:11,14 48:13,19
 61:14,23 95:6
 98:25 102:20
 105:23 106:8,24
 107:1,3,6,13 109:1
 111:16 140:16,21
 141:10,23 142:6
 143:20 152:18
 163:2,7,11 172:21
 172:23 173:1,4,17

175:1,5 176:20,23
176:24 177:1
178:25 180:10
181:4 182:24
183:9 186:24
190:2 191:1
199:21,25 236:18
252:12,15 261:16
264:4,9 274:1,14
287:4 323:18
324:10,12,19,25
328:1 348:19
349:2 352:2,17
374:10,12,13
394:18 395:24
411:14,25 422:7
422:17 426:24
449:19 453:6
473:24 479:7
485:2,6,24 486:7
490:10
receive 191:6,15
received 7:25 9:10
 48:14,22 77:7,16
 189:21 190:1
 230:21 462:13
receiving 191:12
receptors 79:7 92:15
 100:6,7,11 278:15
 278:17
recess 52:14 66:21
 98:1 146:1 219:15
 226:8 285:17
 358:1 378:9
 426:14
recite 86:20
recognizable 416:9
 425:6,12
recognize 124:14
 455:2 487:25
recognized 124:19
 269:7 401:8 405:3
 407:4 416:21
 417:6 418:12,25
 419:2 432:9
 454:12,21 464:4,9
 487:25
recollection 24:20
 49:20 395:4
 494:15
recommended 95:19
 96:1
Reconstructive
 34:18
record 5:5 7:2 8:5
 11:3 13:18 14:8,17
 16:8 29:6 52:11,13
 52:16 61:2 66:20
 71:1,4 81:20 96:15
 97:25 98:3 119:21

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 528

150:11,14,21
162:2 179:7 181:6
182:7,23 183:6,8
183:10,14,21,22
226:7 227:8
229:24 230:3,4,6
378:8,11 488:15
499:15,22
**recorded** 182:16
**records** 3:17 70:23
71:6 140:17,20
141:3 142:23,25
143:3,12 155:12
155:14,15,18,21,22
161:16 172:7,17
173:7 174:22
175:2 176:8,19
177:12,13,19
180:25 181:2
182:17,19,24,25
183:4,15,16 184:2
186:21 191:11
227:19
**records-based**
487:23
**recover** 189:10
**red** 297:25
**reduce** 188:18
**reduces** 167:6
**reduction** 400:25
**refer** 44:6 147:21
280:13 303:21
472:6,11
**reference** 42:20
43:12,13,15 45:16
46:6 50:17 62:6,9
62:15 63:4 64:15
64:18 65:6,9 94:12
102:25 107:10,13
116:2,16,22
117:12,12 118:17
118:19 122:24
124:7 128:3
167:20 187:17
188:4,4 213:6,7
216:15 217:2
219:4 258:22
259:11,12 265:10
266:10 309:17,23
323:10 325:11
383:22 387:15
473:23 474:1,8,10
474:20,23 489:11
489:22 490:14,14
491:14,19,20
492:23,24
**referenced** 63:13
64:6,7 94:17 95:7
104:7 105:6,8
122:23 177:2

323:12 407:19
451:14
**references** 55:7 56:9
58:6 94:1,2,3,4
98:13,16,16 99:22
106:17 110:6,8
112:16 113:3,8
116:9,16 118:10
118:15 212:5
280:7,13 281:5,12
281:17,18,22,23
301:8 491:11
492:20
**referred** 13:14 27:4
63:4 110:16 346:2
350:17
**referring** 13:6 21:15
31:13 32:18 35:18
46:19 47:13 53:14
56:23 98:23 99:2
118:6 128:5
179:19 182:23
206:21 245:17
274:11 302:8,22
304:9 305:13,16
314:16 336:23
393:6 398:22
430:9,10 433:12
457:18,25 467:15
472:7 473:4
**refers** 189:19 396:24
**reflect** 227:15
229:10 329:20
**refresh** 188:10 490:9
**refute** 417:7
**regard** 62:20 76:17
133:16 150:16
152:24 295:6
306:8 436:24
**regarding** 147:17
**regardless** 248:11
**Registry** 346:3
**regs** 263:24
**regular** 55:3
**regulate** 109:10,17
**regulatory** 100:22
287:7 292:24
302:1 411:15
468:16 473:4,11
473:14 476:25
477:4
**reimbursed** 229:22
**reiterate** 47:11
493:3
**reject** 320:11,13
403:11 455:3
**rejected** 432:4
435:14,20 436:17
456:20
**rejecting** 457:9

**rejection** 457:7
**relate** 271:17 345:9
**related** 36:21 73:14
89:22,25 90:6,10
113:12 121:3
125:5 127:13
138:9 151:8
186:11,13 187:6
204:17 231:9
236:22 237:2,21
238:11 240:3,18
243:3,22 244:6
246:21 247:6,7,8
254:17 355:2
360:4 418:21
460:7
**relates** 164:17
**relating** 7:6 10:7
71:17 137:16
171:22 257:15
468:5
**relation** 443:21
**relationship** 7:10
9:18 53:7 99:11
120:21 161:9
163:13 171:13
187:4 217:22
240:11 257:18
346:12 415:18
422:20,25 423:10
423:19,25 424:4
455:15 460:10,10
**relationships** 29:19
486:19
**relative** 26:14 88:16
99:7 120:5 131:6
137:14 138:8
153:21 154:5
156:18 161:4,5,10
163:23 164:13
165:25 166:7,9,11
166:16,20,23
167:1 170:18
260:11 272:16
288:8 328:14,22
329:2,7,13 336:4
338:7 364:5 372:3
372:12 377:1
383:6 386:24
387:7 388:2
426:25 427:14,23
428:8 439:10
445:20 465:22
494:8 501:14,16
**relatives** 159:11
160:10,15
**release** 22:11,15
97:8
**relevance** 368:19
**relevant** 40:7 62:11

64:1,2 133:9
245:11 314:7
337:24 350:8
397:7 399:22
461:3 467:22
**reliability** 476:20
477:2
**reliable** 95:8 356:11
**reliance** 432:3
435:14 438:7
**relied** 113:23 470:7
**rely** 26:11 71:23
79:25 80:5 106:12
249:4 257:3
307:15 363:6,9,17
390:19 432:10,14
435:16 437:23
438:4,9 444:18,22
448:22 471:12,16
472:10 480:4
481:11
**relying** 13:10 81:18
94:9 115:5 118:22
120:13,17 185:19
185:20,23 187:17
201:18 262:22
287:23 289:25
290:7 297:7 337:2
347:17 396:10,21
469:11
**remain** 189:12
428:13
**remained** 441:24
**remember** 22:25
28:21 98:19 142:8
144:25 161:23,25
162:1 168:24
169:8 170:8
173:10 174:18
195:4 196:18
236:1,10 263:7
282:18 297:11
327:9 351:24
376:2 379:20
415:3 417:23
481:2 496:6
**removed** 372:18
**renal** 345:17
**render** 298:10
425:25
**rendered** 299:3
**rendition** 54:3
115:24
**renowned** 415:15
**repeat** 24:13 42:13
73:5 75:15 80:4
87:2,19 88:25
108:11 109:24
112:22 120:16
122:1 134:6 140:7

153:14 159:7
174:3 175:24
210:19 224:18
251:8 252:20
253:25 267:8
273:4 275:15
279:21 284:16
293:25 318:2
389:11 390:5
396:16 434:18
493:24
**repeatedly** 115:6
297:13 314:13
387:15
**rephrase** 9:13
276:7 430:13
**replicability** 476:21
**replicated** 305:9
**reported** 119:9
170:23 176:15
182:15,16 240:13
249:9,11 306:17
306:19 311:24
317:8 328:10
335:20 342:2
345:8 364:3
368:25 373:23
390:10 392:15
408:9 409:9,11,20
409:25 422:2
427:24 428:1
440:18 451:23
453:11 460:17,22
482:17,19 486:4
486:20,24
**reporter** 16:15,17
55:12,25 501:3,3
**Reporters** 1:23
**reporting** 16:16
20:22 21:17 122:8
182:12,22
**reports** 5:19,24 8:24
10:14 12:2 13:15
21:2,3,6 22:8
53:12 59:17 83:25
106:5 114:3
141:17,21 172:18
182:3 183:3
184:21,22,24
185:5 249:11
273:24 281:24
282:6,9,24 304:17
304:20 307:10
333:22 469:9,15
470:11
**represent** 15:20 16:9
16:24 64:4
**representation**
115:10
**representations**

USDC, Northern District of OK                McMurray v. GSK                                    Monday
No. 08-CV-381-GKF-SAJ          Videotape Deposition of Shira Kramer, Ph.D.            November 2, 2009

Page 529

10:22
represented 454:24
represents 417:7
reproductive 69:5
74:3 76:22 77:20
78:17 79:21,23
121:1,22 122:3
213:8 411:21
417:11,12 471:5
request 13:24
requested 10:24
12:18 68:1
require 424:12 492:3
required 302:4
416:18 418:8
419:12 454:20,25
473:15
requirement 418:6
418:10,17 437:1
437:11
requirements 240:15
requires 129:3 401:2
reread 224:12
research 5:14 7:5
17:21,22 18:2
35:24 41:23 46:4
46:11 47:3,7 50:14
54:19 60:23 63:18
67:13 74:12,13,22
75:6 77:8 78:5,13
79:6 85:9,11,12,13
85:16,17 89:5,7,12
103:9,15 106:1,5
114:1,1 188:8
198:18 212:3
267:25 326:10
439:25 442:10
450:2 469:4
497:20 498:3,4,5,6
498:17,20,23
499:8,9,12
researched 211:12
469:1
researchers 110:9,11
268:1 290:11
418:2,3 438:6
reserve 322:12
344:4 402:4
405:24 499:17
resolving 264:23
Resource 421:13
respect 399:8
respectable 327:15
respected 322:20
respectively 219:4
327:14
respects 349:13
response 326:17,19
326:21,23,24
327:7,15

responsibilities 36:8
responsible 41:20
45:10 65:20
146:24
rest 60:2 265:23
266:15 305:15
306:8 396:2 408:6
restate 124:1 246:1
367:9 452:3
restricted 287:10,12
347:10 405:18
419:6,7 441:16
451:25
result 112:20 113:1
214:20 238:13
256:15 284:23
288:7 329:17
433:25 495:14
resulted 372:2
resulting 93:20 189:5
results 40:4 119:22
144:21 163:17
203:22 240:10,13
258:8 288:10
294:15 304:20
306:14 321:6
325:20 382:9,14
387:7,11,12
395:10 398:10
432:14,25 433:18
436:6 440:18,23
441:8,19 443:25
444:13 446:10,17
448:7 454:13
464:7,13 465:1
492:6
retain 43:7
retained 6:7
retardation 189:6
retrospective 349:4
return 61:3 62:5
238:2,4 239:7
240:23,25 241:7
242:8,9 243:13
244:12 364:20
reuptake 93:17,21
93:22 96:8,22
97:17 112:3
revenue 22:10,12
revenues 22:13,14
31:18,25
review 4:15 68:18
80:17 81:15 98:25
99:3,21 112:16
122:13 140:16,19
142:22 143:11
155:14 157:6
161:10,16 172:6
172:13,15,19,24
180:25 183:1

184:21 189:20
191:10,25 198:3
209:11 211:20
219:22,25 220:3
220:24 296:15
301:13 305:15,20
306:5,12 332:15
332:20,22 344:4
396:9 412:24
460:5 462:7,9
468:4 469:23
473:20
reviewed 58:3
106:17 140:24
141:6 143:2
155:12,18 161:12
161:24 181:2
182:17 194:8
209:25 219:21
250:7,7 272:5
282:8 334:17,22
461:15,16 486:18
reviewing 70:23
182:24 209:19
282:24 465:24
reviews 30:9 217:2
revise 279:17 378:14
revisions 4:7 498:16
Rice 228:13 229:16
230:22
RidgeCom 18:10,12
18:17,22 19:10,18
36:7
Ridgely 33:6,13,19
33:25 34:5
right-hand 313:22
349:3 476:18
ring 116:17
rings 141:4
rise 19:8
risks 120:5 131:6
159:19 168:12
217:20,24 305:9
364:6 372:10,12
372:22 373:15
386:12,24 387:7
392:23 405:10
406:17 407:12,18
426:25 451:12
452:13 460:19
486:19
Road 1:23
Robbins 437:16
Robert 2:4 16:13
415:12 501:2,21
Robinette 20:15
Robinson 48:23 49:6
49:9,13 228:9
229:16 230:21
Rock 33:6,13 34:5

role 25:23 33:12,14
33:23 47:20,23
55:8 65:22 67:24
81:13 84:2 127:1
157:3 171:2
191:17 193:22
210:2 220:9
271:14 430:23
rolled 27:23
room 466:4,6
Rothman 8:17
322:21 437:15
440:6 457:5 472:9
Rothman's 436:13
round 136:4
roundly 435:14
routinely 391:20
444:19
RR 260:11
rubric 342:4
rule 146:10 154:24
192:3 195:14
201:14 203:3
204:9,9 205:4,12
483:1
ruled 155:25,25
159:1 192:15,16
195:22 201:16,20
396:3,7
rules 17:1 165:5
430:6,14
running 54:15 89:12
RVO 310:1,5 311:1
RVOT 309:14
RVOTO 289:5 307:2
310:24 314:15,17

_____
S
_____

S 3:7
sale 130:13
sales 30:2,4
sample 50:15 58:19
59:5 111:4 132:11
132:15 329:17
335:14 348:11
362:9 379:5
386:16,18 388:10
427:6
satisfied 218:10
satisfy 13:24
save 194:7 243:15
Savitz 322:23
saw 183:11 309:23
saying 12:10 28:20
30:20 39:14 48:1
64:24 65:2,4 71:14
72:3 81:7 83:6
88:3 89:9 105:21
138:10 148:5,17
158:25 159:6

170:15 185:2
207:11,15 231:18
231:25 234:7
236:2 237:13,15
237:24 247:17
263:22 266:25
267:9 282:5
283:17 295:1,5
296:4,17 301:17
305:12 306:6
310:12 317:17
319:23 326:13,16
342:8 355:16
360:19 363:4
367:7 368:5,8,15
368:17 370:22
371:2 372:1 386:4
386:7 398:19
404:11 412:8,9,11
418:7 421:4
434:15 435:5
467:18 487:22
491:13,14 496:22
says 20:7 30:1,9
58:19 97:2,12
115:24 118:3
119:22 128:4
168:10 178:18,21
181:12,15,15,16,19
181:25 182:6
187:3 188:24
189:10 203:10
212:21 222:25
245:10 246:23
247:4,7,8 263:12
263:19,20 264:6
265:18 269:5
282:13 293:5
297:21,22 302:11
302:15,22 304:12
304:16 317:1,21
321:9 322:1
325:25 350:20
363:16 370:5,19
382:9,24 409:19
420:4 421:17
424:16 452:9
475:3,6 476:5,19
477:11 482:25
483:4 498:13
499:7
scant 462:21
scenario 387:25
scheme 313:9 461:21
498:9
schemes 354:17
496:20,23,25
497:12
school 17:18 67:5,15
178:12 303:9

Case 2:10-cv-02125-HGB-KWR Document 188-20 Filed 09/18/12 Page 156 of 166

USDC, Northern District of OK                 McMurray v. GSK                              Monday
No. 08-CV-381-GKF-SAJ          Videotape Deposition of Shira Kramer, Ph.D.          November 2, 2009

Page 530

science 148:10
    476:20 477:15
    494:19
sciences 198:8
scientific 3:21 36:24
    36:25 38:14 40:15
    42:11,16 68:19
    80:23 81:3,21 82:5
    82:20 83:13
    112:17,23 113:5
    113:10,22 121:6
    150:8 151:5 186:1
    186:7 191:14
    206:19 207:5,8,12
    208:25 209:8,16
    211:13 246:14
    259:11 291:6
    292:20,23 293:4
    293:14 300:21
    301:1,8 363:15
    404:18 441:6
    456:23 458:24
    467:23 468:4
    474:13 475:7,20
    475:22 476:7
scientifically 356:11
scientist 465:24
scientists 430:1,3
    468:2
screening 337:15
scrutinized 183:4
se 469:8
search 89:2,6,7,16
    187:25 188:2
searched 187:22
searches 54:16 62:11
    89:13
second 19:9 85:23
    86:13,19 87:14
    97:2 107:4,6,9,10
    107:16,21 109:22
    117:12 166:5
    181:7 182:3
    193:25 210:17
    259:17 260:3
    270:8 273:15
    274:6 298:25
    316:23 337:21
    384:7,9 386:21
    415:21 416:1
    437:9 476:18
    478:6 481:1
    483:21 491:14
secondary 98:7 99:1
    99:17,23,25
    192:21
secondhand 178:10
secretary 18:9
section 60:7,12,18,22
    93:7 95:24 98:20

103:10,17 104:3
123:3 236:20
237:5 264:15
310:3,12 336:7
436:20 443:25
446:11,17 448:7
482:19 488:11,20
sections 103:14,20
    113:18,24
sedatives 349:16
seeing 111:16 175:1
    176:20 178:15,25
    295:7 481:2
seek 155:2 234:22
seen 13:12 43:15,16
    43:22 51:18 52:8
    110:16 128:8
    130:4 140:14
    141:16 167:21
    176:12 178:24
    203:25 256:24
    260:19 286:5
    347:12 374:7,8
    377:21,23 403:18
    405:12 406:18
    407:21 411:9,12
    411:23 422:16
    442:3 449:15
    451:15 474:11
    482:14,15
selective 93:16
selectively 409:6
self-correcting
    389:22 390:3
semantics 148:9
    151:10 247:13
send 20:25 21:2
    291:5
sending 227:4
senior 65:18
sense 38:4 57:25
    86:1 97:15 132:15
    235:7 466:1,2
sensitive 189:3
sent 140:17 142:18
    227:4
sentence 61:8,10,13
    61:15,22,24 62:1,9
    100:4 115:16,17
    118:2,5 217:12
    264:20 269:8
    323:17 337:20
    382:9,14 401:24
    402:2,7 408:7
    441:21 453:19
    465:9,14 498:25
sentences 56:6,12
separate 102:16
    176:15 226:13
    229:15 249:2

305:25 306:6
311:21 312:14
314:14,17 326:4
494:6
separately 14:18,20
    101:24 102:19
separation 419:18
    494:12
septal 62:21,22
    110:16 140:3
    142:15 144:22
    145:2,10 152:7
    153:7,17 154:11
    167:16 168:13,21
    169:2,19 171:7,19
    171:25 180:16
    196:5,11 197:2
    237:9 238:20,21
    239:1 247:11
    256:6,9,12,13
    271:3 275:23
    289:10,12 311:17
    331:23 347:19,25
    371:6,9,14,18,23
    372:2,10,13
    374:20 375:13,18
    375:20 376:16,20
    376:24 377:17
    380:9 381:12,16
    382:16 383:2,4,23
    385:10 389:22
    390:3,9,13 391:22
    392:14 395:1
    396:1,11,12,12,14
    396:15,18,18,22,23
    397:2,4,5,19,24,25
    398:1,17,21
septum 72:20 73:11
series 7:24 100:7
    113:14 286:20
    436:15
serious 140:9 141:11
    325:1 347:19
    348:1
serotonergic 93:19
serotonin 42:4,7 79:6
    79:7 81:9 84:3
    92:10 93:16 100:7
    100:11,12 105:17
    105:20 109:4,9,16
    111:9,18,22,24
    112:2,11,14,19,25
    113:6,11 250:16
    267:15,20,20
    271:14,19 272:22
    273:8,12,14,19
    274:17,21 276:22
    277:4,5,6,7 278:10
    278:14,18 294:3
    307:7,8

serotonin's 81:10
sertraline 96:2 97:7
    359:8 380:14,16
sertraline's 99:6
serve 54:4 131:17
    324:13 497:19
served 41:1,7 53:11
    53:21 65:15
    228:25 247:3
    473:7
service 79:1
services 20:4 23:17
    23:25 305:2
set 23:24 180:9,11
    203:22 415:16
    460:3 488:1
    501:12
sets 451:21
setting 97:5 475:11
seven 180:6,8 243:10
    257:24 258:16
    260:6 306:21
    319:17,21,23
seventh 313:18
severalfold 480:15
severely 378:18
    464:5
severity 496:3,9,10
    497:1
share 87:16,22,25
    229:9 271:6
    272:10
shared 309:19
shares 333:11
sharing 441:7
sharpshooter 26:17
Shauna 1:3 16:1
    141:18 179:9
    181:17 182:25
Shaw 214:23 217:22
Shawn 1:18 11:3
    16:9 48:16 102:19
    474:24
Sheehan 2:5 16:12
    16:12 58:10 102:1
    116:23 117:3
    313:4 320:25
    327:25 336:18
    382:4 390:24
    391:2,15 405:21
    406:12,14 413:14
    422:14 449:4
    480:25
sheet 15:9 48:2
    58:18,24,25
    222:10,13 226:13
    226:13 295:2
Sheldon 474:14
Ships 27:25 28:5
Shira 1:13 3:3,11

16:7,18 30:15
    47:18 51:10 66:24
    145:25 146:4
    219:11,18 285:16
    285:20 357:25
    358:4 426:13,17
    500:4 501:6
short 19:22 174:17
    174:17
show 29:25 40:19,23
    43:21 48:11 59:20
    90:22 96:12
    108:21 116:6,15
    122:19 132:5
    165:6,7 166:3
    174:22 181:5
    216:14 231:21
    242:20 283:10
    290:14 294:5,9
    301:3 302:12
    304:11 311:13
    314:25 316:16
    318:8 373:22
    390:21 403:7
    425:10,12 442:2
    447:11 449:20
    451:8,11 455:5
    472:14 480:15
    484:5 491:7
showed 113:6,11
    218:24 349:6,8
    385:10,13,16
showing 163:17
    169:1 227:23
    272:21 273:2,6
    309:1 363:23
    373:9
shown 44:16 109:10
    109:16,19 112:20
    113:1 115:13,19
    118:3 121:3
    163:16 194:3
    196:1,8 217:22
    238:6 240:11
    245:18,19 255:5
    255:11,18 277:10
    302:16 324:20
    325:9 327:1 390:7
    418:5 498:7
shows 163:22 164:20
    165:1 166:1 181:6
    232:12,20 266:1
    436:14
siblings 206:6
side 160:11 265:18
    313:14,22 425:3
sides 489:9
signaling 250:16
    271:15 277:7,15
    290:13 420:15

USDC, Northern District of OK                    McMurray v. GSK                                      Monday
No. 08-CV-381-GKF-SAJ              Videotape Deposition of Shira Kramer, Ph.D.                November 2, 2009

Page 531

signature 181:23
significance 120:3
  221:23 321:17
  409:8 431:21
  432:3,6,10,17
  435:9,16,21
  436:11,16,24
  438:8 441:9
  442:24 444:15,19
  444:22 445:6,10
  448:22 451:6
  453:15 454:3,9,14
  471:12 493:7
significant 26:15
  29:6 30:17 76:4
  110:18 115:2
  122:9 135:4 169:1
  213:16,23 215:3
  217:18 218:18
  221:10 235:2,22
  236:4,16 315:13
  322:2,4,6,15 323:5
  327:1 330:17
  334:1,6 347:15
  354:5 358:7,14,18
  358:19,22 359:2,5
  384:1 385:14,17
  385:22 386:13,17
  386:23 387:17,22
  397:12,15 399:1,3
  400:7,9 408:1,11
  409:12,21,22
  428:2,4,9 429:20
  429:20,21 434:12
  434:22 435:4
  436:8,20 439:4
  441:8,24 444:9
  447:2 448:16
  451:5 452:1,6,16
  452:23 453:2
  454:9 481:20
  484:5,6 486:9
  487:3,22
significantly 168:12
  217:8 219:23
  220:5 221:4,18
  232:19,21 235:1
  316:1 321:14
  347:12 372:7
  440:25 445:17,24
  483:12
signing 352:21
silver 23:12
similar 257:15 271:6
  354:2 355:18
  356:10 439:10
  466:23
similarities 250:14
  270:11,16
similarly 283:14

Simon 489:23 490:10
  490:11,15,18
  492:24
simple 48:2 51:20
  166:13,15 322:9
  356:14 406:21
  463:24 480:2
simpler 70:10 298:3
simply 8:11 43:7
  64:17 132:10
  135:13 137:4
  175:8 267:17
  402:6 445:13
  475:11
sine 454:24
single 57:9,10 58:3
  60:21 61:15 76:8
  105:10 108:14
  111:6 112:17,23
  113:5,10 129:14
  138:11 154:21
  155:7,8 156:12
  194:23 221:9
  231:14,16,16,25
  232:4 263:9
  267:22 268:9
  285:22 288:7,10
  298:11 303:12
  306:18 317:19
  347:3 354:16
  390:8 415:7
  416:13,15 471:6
  485:3
SIR 407:22 409:9,16
  439:9 444:1 448:8
  451:17 452:21
SIRs 446:2 451:22
  452:14
sister 140:9 148:14
sit 44:10 53:15,17
  63:10 68:24 90:14
  90:24 104:18
  128:7 151:5 169:9
  183:20 194:22
  195:5 209:7,14,17
  209:22 211:10
  224:22 236:7
  256:3 261:23
  263:8,11 296:25
  297:5 345:7 412:2
  417:18
site 20:1,4,9 443:5
  447:15 498:7
sites 443:21,22 446:7
  446:12,19 447:14
sitting 345:16
situation 465:2
six 98:6 168:7
  180:12 187:9,16
  190:17,21,24

260:6 375:15,23
  376:15 407:11,17
  482:4,9,13
sixth 26:10 313:17
size 58:19 59:5
  111:4 329:17
  335:14 348:12
  353:22 379:5
  427:6
sizes 50:15 132:11
  132:15 362:9
  386:16,18 388:10
skip 45:19 108:13
  124:17 310:22
slide 166:5,6,8,10,16
  166:22 413:6,19
slides 3:13 413:1
Slone 8:2 49:5 53:8
  248:21 254:13
  257:14 258:4
  267:1 268:11
  278:22 279:9
  280:17 295:2
  298:14 300:19
  306:21,23 312:1
  351:8 352:15
slow 17:6
slowly 87:20 135:19
small 110:22 305:9
  309:20 319:24
  320:1 348:11
  381:20 384:24
  385:5 387:25
  388:10
smaller 387:20
SMBR 124:10 346:3
  352:21
SmithKline 1:7 16:2
smoke 349:15
smoked 162:22,22
  163:1,3 169:2
  170:24 218:3
smokers 169:22
smoking 7:10 15:10
  149:11 163:16
  167:16 168:21
  169:13,16,20,20,24
  170:5,10,14 171:4
  171:8,11,15,16,18
  171:23 193:9,19
  194:2,3 211:5,11
  212:21 213:8,17
  213:24 214:7,23
  215:1 217:1,3,6,14
  218:6,23 219:6,21
  220:15,23 222:9
  222:13,16 224:16
  224:23,25 225:2,7
  225:22 349:25
  478:19,22 480:6

480:10,12,13,14,21
  481:5
snuck 491:2
societies 68:24
Society 4:19 121:21
  420:1 422:5,9
  424:7 439:25
  442:9 447:23
  450:2
Society's 457:20,23
sole 127:14 192:4
solely 57:14,17 69:2
  69:6 78:1 146:24
  164:13
solvents 158:17
  255:17 400:17
somebody 45:8,12
  68:7 93:5 178:11
someone's 158:7
someplace 291:15
somewhat 148:9
  295:13 441:16
  467:12
sonograms 69:9
sorry 8:20 11:23
  44:8 45:4,19,19
  96:16 107:10
  116:21,21,23
  129:8 135:24
  177:21 199:16
  202:7 210:16,19
  213:6 214:18
  219:8,14 223:7
  237:6 245:7
  255:24 259:10
  277:5 293:18
  296:12 298:13
  311:10 313:18,24
  314:20,24 316:22
  332:3 360:19
  362:16 363:7
  374:22 376:22
  381:3 396:16
  404:16 405:25
  415:24 426:8
  427:8 434:9,14,18
  435:23 437:9
  444:4 449:10
  464:11 477:10
  491:23 492:11
  493:24 495:16
sort 21:15 22:5,6
  31:13 75:21 130:4
  133:18 432:21
  498:17
sorts 469:22
sound 41:12
sounds 232:16
source 183:10,10
  201:6 426:2

466:11
sources 148:3 172:16
  183:18 402:24
South 23:25
southeastern 30:12
space 441:17 444:24
  445:3 451:20
  479:20
spans 316:5
Spas 27:25 28:5
speak 95:1 119:25
  135:19 184:12
  240:24 350:23
  351:1,20 352:10
  373:6
speaking 228:22
  416:24
speaks 235:9
special 64:5 68:15
  70:22 74:7 75:3,17
  76:2 215:10
specialist 64:5 76:9
specialists 183:2
specialize 74:11
specializes 19:24
specialty 44:7,20
specifically 97:2,15
  78:2 81:17 90:3,8
  105:9,23 109:7
  132:14 133:16
  136:11 143:2
  145:3,6 163:11
  164:16 173:2
  177:16 179:19
  183:17 196:21
  197:3,20 210:12
  264:6 274:11
  276:17 287:2,3,9
  289:8,14 291:22
  317:23 318:5
  319:7,9 330:19,24
  333:21 335:10
  341:19 347:23
  358:10,12,13
  359:18 390:18
  395:24 405:15
  415:17 416:24
  458:5 469:13
  472:7 482:12
  495:23
specificity 197:8,9
  197:11 400:3,13
  416:18,20 417:9
  417:25 418:4,5,8
  418:10,17 419:12
  421:9 424:12,21
  456:11,17,19
specifics 60:3 93:13
  277:18
specified 57:25

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 532

341:17
**specify** 262:13
  437:25 438:10,19
**spectrum** 120:25
  121:2 143:15
  152:15 208:17
  254:17,21 255:4,7
  255:10,13,18,21
  258:10 267:16
  290:15 294:6
  295:2,15 297:21
  307:10 364:2,7
  399:20,23 400:10
  403:15,20 404:2,3
  404:6 405:4 407:5
  411:6,11,13,17,22
  411:23 412:3,5,8
  413:25 414:17,20
  419:19 420:16
  421:23 459:9,11
  459:12,14 486:22
**speculate** 489:5
**speculating** 425:19
**speculative** 489:4
**spelled** 124:11
**spend** 35:5,8,15 36:1
  65:21 66:3 74:13
  212:16
**spends** 35:13
**spent** 76:4 212:12
  229:3 499:23
**Spina** 299:16
**spinal** 300:9 341:7,15
  341:20 342:7,16
  343:17
**spirit** 34:22
**Spitz** 317:1
**split** 239:15 309:25
  310:1 319:9
**splits** 497:11
**splitting** 497:4,7,8
**spoking** 213:1
**sponsor** 23:12
**sponsorship** 23:16
**spontaneous** 115:8
  115:15 116:7
  120:14,18,22
  121:7,11,16,17
  122:3,9,14 123:3,7
**spontaneously**
  143:19 144:1
**spot** 285:13 393:16
**spread** 194:19
**spurious** 388:3
  402:19
**SS** 459:8
**SSRI** 88:21 90:9,16
  90:25 91:11 92:8
  111:8 136:6 138:9
  139:3 296:12

319:8 326:5
347:14 358:24
359:3 482:19
**SSRIs** 9:20 88:17
  89:2,8,16,19,22
  90:21,22 91:11,13
  92:1,5,19 93:24
  94:11 96:7,21 97:3
  97:12,15 98:6,9
  106:21 109:20
  112:1 115:14
  118:4,5,13 121:16
  130:25,25 135:5,8
  135:13,16 136:5,8
  136:9,21 308:6
  318:18 319:2,8
  325:11 332:11,13
  332:17,21 333:19
  334:10 349:5,8,12
  359:6 361:19
  396:2 491:2
**SSRI's** 99:10
**SSRI-exposed** 308:3
**SSRI-treated** 383:15
**stable** 130:11
**staff** 50:14 60:11,13
  60:24 62:10 63:19
  89:12 142:21,22
  142:24
**stage** 250:15 277:7
  420:14
**stages** 191:6,16
  277:12,13
**stand** 64:12 260:9
**standard** 37:20,24
  39:3,7,15,16,18,21
  40:10 82:25 83:2,6
  83:10 144:24
  185:9 204:20
  268:23,25 430:25
  431:8,10,21
  458:23 473:14
  496:7,15 499:13
**standardization**
  356:22
**standardized** 439:9
  441:1,23 443:18
  444:1
**standards** 40:12
**stands** 165:22 498:15
**start** 75:25 166:25
  217:11 240:1,2
  274:12 291:23
  314:11 337:7
  419:1
**started** 14:10 18:8
  93:5 162:11,18
**starting** 96:2,7,20
  97:15
**starts** 168:4

**state** 64:10 72:14
  95:18 98:5 105:24
  115:6,13 128:12
  134:16 135:4
  139:21 140:2,8
  143:14 162:21
  163:15 174:19
  191:4 198:23
  208:11 237:7
  249:15 297:2
  323:14 335:19
  337:14 371:5
  383:2 387:19
  390:21 391:8
  393:1,8 407:22
  437:10 440:24
  441:2 453:14
  456:25 458:21
  465:10,17 466:12
  466:18 468:1
  471:18 494:5,14
  494:19 495:10
  498:1
**stated** 121:21 130:5
  144:20 370:25
  403:6 411:10
  435:18 441:6
  461:16 498:8,9
**statement** 3:21 41:2
  50:13 63:24 64:12
  64:14 69:25 94:10
  94:18 116:3 119:6
  124:21 125:25
  130:5,10 134:2,9
  149:21 153:20,24
  154:17 155:6
  164:16,18 167:8
  167:12 176:8
  225:1 238:19
  239:3 258:23
  259:11,23 260:14
  260:22 266:18
  287:7 292:18
  303:24 304:3,6,12
  305:24 308:18
  323:8,20,22
  367:19 370:6
  394:10 418:22
  421:2,20 424:8
  434:5 437:19
  457:17,24 477:20
  477:24 478:1
  492:17 495:5
**statements** 29:23
  64:7 106:18 473:3
**states** 1:1 16:3 30:12
  65:6 218:16
  292:25 453:21,22
  456:16 494:24
**stating** 303:14

**statistical** 120:3
  206:16 221:23
  256:15 295:12
  409:8 431:20
  432:3,6,10,16
  434:3 435:9,16
  436:16 437:24
  438:5,8 442:24
  444:15,18,22
  445:6,10 448:22
  454:3,14 460:19
  463:23 471:12
  493:7
**statistically** 26:15
  115:2 122:8 169:1
  206:3 213:16,23
  215:3 217:8,18
  219:23 220:5
  221:4,10,18
  232:19,21 234:25
  235:2,22 236:4,15
  315:13 330:17
  347:14 358:7,14
  358:17,19,22
  359:2,5 372:7
  384:1 385:13,17
  385:22 386:13,17
  386:23 387:17,22
  397:12,15 399:1,3
  407:25 408:11
  409:12,21 428:2,4
  428:9 429:19,20
  429:21 435:4
  436:7 439:4 441:8
  441:24 444:9
  447:1 448:15
  451:5 452:1,5,16
  452:23 453:2
  454:8 481:20
  482:12 487:2
**statistics** 205:25
  218:17 498:13
**status** 150:15 172:16
**stay** 499:20
**Stellman** 437:16
**stenographic** 501:10
**step** 268:9 355:7
**Stephanie** 60:16
**Sterilex** 19:1,3,7
  27:12,19,22,24
  29:5,20 30:10
  31:19 32:10,16
  35:6 36:8
**Sterilex's** 30:16
**Steve** 437:16
**stick** 237:25
**stimulate** 278:18
**stimulating** 278:15
**stop** 52:11 145:17
  219:9 230:1

357:21 378:5
  408:15 426:10
  488:12
**stopped** 29:17
**straight** 25:1 330:2
**straightforward**
  57:12 82:2 136:18
**strategies** 29:20
**Stratification** 218:22
**Street** 1:17
**strengths** 460:24
  467:8
**stress** 445:23
**striatum** 97:10
**strict** 456:5
**strictly** 456:6 477:15
**strike** 65:12 74:1
  87:3 115:5 120:12
  166:24 198:24
  253:5 263:20
  368:16 380:15
  397:24
**striking** 464:8
**stroke** 494:3,6
**strong** 153:21 159:9
  159:11 203:6
  300:25 363:25
  467:9
**stronger** 38:4 387:10
**struck** 462:24
**structural** 112:20
  113:1
**structure** 103:19
  277:16
**structures** 87:25
  189:8 278:24,25
**stuck** 229:21
**student** 85:1 87:12
**studied** 69:13 76:16
  76:18 78:10,19
  110:22,24 111:4
  130:9 133:5
  293:15 495:12
**studying** 76:5 353:12
  415:11 423:3
**study's** 464:1
**study-by-study** 164:7
  164:8 165:9
**stuff** 12:21 469:22
  469:22
**sub** 76:10
**subcategories**
  242:22 249:11
  250:10 288:17
  307:3 356:1
  361:14
**subcategory** 306:3
  306:17,19 308:8
  308:14 309:5
  319:20,21

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 533

subclass 379:1
subclassifications
133:11 145:13
287:20 306:15
363:24
subgroup 76:10
133:4,6 296:5
356:8 357:6,7,9
subgrouping 64:25
289:24 352:24
subgroupings 334:20
subgroups 295:14
460:21
subject 25:16,20
74:16 76:9 129:9
193:24 194:19
209:12 217:16
220:20 233:12
329:8 330:4
362:16 425:25
465:23 466:3
subjective 38:17
466:5 468:19
475:11 476:12
subjectively 290:24
subjectivity 468:21
subjects 235:11
256:20 308:3
375:13 380:14,16
submitted 443:11
473:18
subpopulation 129:7
subscribe 439:6
subset 7:24 79:17
156:15 157:1
subsets 251:19
substance 22:7 85:10
85:18 477:19
substances 269:1
substantially 388:1
substitute 471:6
subtype 171:24
407:1 410:4,7
subtypes 239:24
295:14 405:11
406:17 407:19
410:8,12 451:13
452:19 493:18
494:6,12
sub-analysis 318:15
393:17
succession 266:21
successive 497:16
suffered 140:11
suffers 107:5
sufficient 128:15,19
128:24 132:10
239:18 270:9,15
294:22 295:10
353:20,22 361:1

361:22 392:22
398:19 404:19
467:12
sufficiently 234:2
387:16 463:12
suggest 119:23
476:22
suggested 455:17
suggesting 344:15
suggests 481:25
483:5
suicide 303:3,3
Suite 1:23 15:24
Sulfa 177:25
summaries 162:2
summarize 58:23
summarized 59:18
372:19,21
summarizing 42:12
42:17 45:16
summary 204:22
212:13 444:13
452:12
sun 73:17
supplement 242:16
242:17 256:2
257:14 258:4
267:1,10 298:15
318:1 327:23
376:6,7,8,11 440:7
supplemental 43:14
314:12 375:8
supplementary
314:22,24 315:1
supplements 189:22
190:1
supplied 55:4 110:11
supplying 110:10
support 19:25 20:5
46:5 54:19 63:18
92:13 103:11
106:17 113:23
119:5 150:5 176:8
187:3,11 203:14
210:4 212:3,7
266:18 293:20,20
294:18 401:11
404:19 466:12
473:22 484:3
487:1
supported 210:1
supporting 290:18
supportive 55:9
363:2
supports 84:2 290:11
364:9 397:19
398:14 399:5
supposed 161:11
227:3 308:11
373:18

supposedly 163:9
227:2
sure 9:20 12:25
24:14 33:16 50:11
53:15 73:6,22 80:5
86:16 87:3 89:1
95:4,5 97:23
105:14 109:14,25
112:23 117:3
122:2 134:7
135:22 141:15
144:7 145:20
153:16 160:13
161:4 162:20
180:14 190:19
196:25 198:13
203:2 205:2
209:23 210:21
212:19 215:12
224:19,24 231:5
243:14,18 252:21
253:2 254:1 264:1
267:9 273:5 286:3
286:4 303:7,7
311:4 323:12
325:22 331:16
345:21 346:5
352:19 357:2
382:23 384:10
389:12 390:6
391:13,13,16
396:17 400:16
406:7 409:5
417:21 419:11
456:17 461:15
471:19 472:13
474:1 479:11
480:19 483:23
497:10
surgeries 186:13
187:6
surgery 7:13 34:19
190:11,14
surgical 143:21
144:1
surprised 264:5
454:11 487:17
surprising 385:3
susceptibilities
202:25
susceptibility 180:19
203:1
suspect 204:22
suspected 204:13
487:10,19,21
swear 16:17
Sweden 335:3,12
Swedish 124:15
346:2 349:4
sworn 1:13 16:19

23:2 411:5 501:7
synaptic 112:8
syndrome 159:9
196:13 199:13,20
199:23 200:4,7,10
203:3,6,11,19
204:1,4,7,10,12,18
204:22 205:6
391:10 416:9
423:23 425:6,13
syndromes 152:13,16
156:17 195:1
196:14,15 419:6
synonymous 248:2
synthesis 461:4
synthesize 80:1,6
135:20
system 18:13 93:20
312:2 336:4,25
339:9,11,24 340:5
340:15,19 341:11
341:18,19 342:2
342:22 343:11,21
345:21 399:21
405:5 462:23
475:10 497:19
499:14
systematic 270:4
402:17
systems 255:22
400:11 404:25
414:1,18 418:13
420:17 424:3

---

**T**

T 3:7 501:1,1,2,21
tab 50:20,20 58:18
65:23 93:1 211:17
211:17 245:2,6,7,7
437:8 478:6
tables 46:9,13,17,18
46:20 47:12 373:6
373:6,8,13,23,23
374:3 424:8
478:11
tacit 477:16
take 8:20 14:9,11,19
15:2,7 17:2 24:23
45:2 50:24 52:18
66:16 71:24,24
97:21 106:25
107:6 119:17
125:15 129:10
136:18 137:18
138:1,18 139:8,2
139:25 145:18
149:25 169:21
171:10 178:9
197:21 198:24
205:20 206:10

210:18 213:10
222:6 270:7 274:4
275:2,18 285:12
302:12 313:4
317:15 329:5
335:9 341:4,5
345:23 349:20
369:15 376:5
378:5 380:19
384:9 398:18
402:3 424:10
427:4,6 439:16
458:14 463:24
483:21 488:13,20
489:24 492:23,23
taken 1:13 6:1,2,3
15:22 16:1 94:4
107:15,22 136:4
153:25 173:24
178:4,7 179:18
183:22 240:4
249:13 272:21
273:6 274:6
303:19 330:1
392:11 425:13
436:18 445:2
490:16 501:11
takes 125:19 127:11
138:12 208:7
481:16
talk 17:5 26:10
37:19 71:15 72:8,9
80:9 128:2 147:22
147:23 149:7
196:21 247:15
331:11,15,18
404:24 416:12
432:18 434:17
480:18,23 483:24
talked 263:10 336:13
336:14 363:4
440:20 459:10
478:11 492:21
talking 38:10 46:17
51:13 57:18,20
80:10 85:15 88:7
92:9 93:4 99:19
102:20 105:20
107:18 130:19
133:18 160:22
171:6 179:13
184:7 202:2,5,8
208:4 210:16
256:15 269:24
276:3,5 277:22
278:10,17 282:2,4
282:7,23 303:1,2
304:2 307:14
309:6 326:13
348:18 366:22

---

USDC, Northern District of OK                McMurray v. GSK                                    Monday
No. 08-CV-381-GKF-SAJ          Videotape Deposition of Shira Kramer, Ph.D.              November 2, 2009

Page 534

380:3,5,6 386:9
393:1,9 399:21,23
408:15 419:14
459:14 462:1
463:8 477:4 484:1
**talks** 349:3
**Tamar** 2:4 16:11,23
51:14
**Tammy** 105:4
**tape** 66:23 145:17,24
146:3 219:9,11,17
285:15,19 357:24
358:3 426:7,10,12
426:16 499:25
500:3
**Tar** 443:4
**tasks** 54:13,14
**Tate** 1:22,22 16:16
16:16,16 55:10
227:13 501:2,21
**taught** 77:13 303:8
**team** 42:10,16 46:5
65:14 170:2
**technical** 64:7
**technologies** 27:21
**technology** 19:6 31:8
**tell** 17:7 35:14 37:6
43:25 44:3,11,17
44:21 45:6 46:2,9
52:21 53:16 61:18
61:19 62:21 63:1,5
64:9 65:15 66:11
66:13 72:17 76:15
76:24 84:7,10
86:17 87:9,15,21
95:16 99:18,23,24
100:8,12 103:22
104:8 105:9,13,19
106:19 108:24
111:1 128:7
131:13 146:19
153:9 168:24
173:7 181:9
184:23 185:2,5
194:10,16,23
195:5 196:4,10
197:10,14,17
198:5 199:22
235:20 251:24
253:22 254:3,8
255:23 269:10
270:10,16 274:22
276:22 280:3,10
280:14,16 281:18
297:24,25 301:12
315:5,12 328:14
338:4,14 342:19
359:10 381:4
403:21 404:24
415:24 454:5

475:9 499:7
**telling** 55:1 155:24
196:23 244:5
245:21 246:2
305:11 321:20
342:15 444:8
**tells** 428:22 481:4
**temporality** 454:19
454:20 455:11,16
457:8
**tend** 17:5
**tendency** 305:3
**tenet** 419:10,12
**tenure** 17:17,24 18:4
**teratogen** 78:25
84:13 86:23,24
87:5,6 208:18
213:8 221:8,11,21
235:21,23 236:9
236:13 248:4
254:8 255:12,13
255:24 261:2,16
261:18,25 262:8
283:4,14,18
284:11,24 297:22
305:2 308:21
403:16 404:2,3,6
411:6,7,11,13,18
411:22,23 412:2,3
412:22 415:19
420:11
**teratogenic** 252:22
262:12 399:15
405:1 415:22
416:3 420:6,24
421:12,17 424:16
**teratogenicity**
103:11 419:10
**teratogens** 75:8
236:11 254:17,20
254:22 255:4,5,8
255:15,21 257:17
400:9 404:24
405:2 412:4
413:25 414:18
418:20 454:13
**teratologic** 417:1
**teratologist** 73:24
415:15 471:4
**teratologists** 400:12
**teratology** 4:19 69:4
121:21 213:10
265:15 272:7
303:18 399:15
411:21 416:25
417:3,6,11,12,16
418:7,19,23
419:15 420:1,5,19
420:22 421:5
422:4,6,8 424:7

457:16,17,20,23
470:23
**term** 38:5 179:22
242:13 472:19,20
476:21,24
**terminology** 39:9
241:5
**terms** 20:21 21:22
37:8 45:16 55:5
56:8 78:18 267:14
272:6 276:8 277:1
278:14 295:14
354:2 362:8
363:22 417:8
418:3 421:8 423:7
423:8 430:15
441:17 455:3
462:21 464:12
486:9
**test** 47:14 201:19
202:4,9,11 204:3,9
402:13 417:12
**tested** 477:2
**testified** 13:4 16:19
16:25 22:16,22
23:3,9 24:8,15
25:10,19 27:4
41:14 65:13 72:11
79:20 107:25
108:7 156:5 172:5
231:20 297:13
364:18 404:22
433:10 435:8
**testify** 24:21 65:10
150:25 210:14,15
501:7
**testifying** 24:11,17
25:13 81:17 145:1
156:10
**testimony** 12:7 13:11
13:13 19:25 23:2,5
23:7 24:22,24
41:19 43:12,19
94:15 116:5 145:3
145:6 150:16
157:20 161:13
162:1 172:9
178:24 180:23
232:15 240:17
245:15 297:15
405:5,6 411:5
412:1 432:22
446:6 471:11,15
501:11
**testing** 74:3 170:20
172:19,24 173:3
201:17,18,22,23
203:22 204:13,17
204:23 205:11
401:4 432:7,11

434:3,16 435:9,17
435:21 436:25
437:24 438:5,8
439:8 444:16,19
471:13
**tests** 201:24 204:14
204:19,21 320:5
**Tetralogy** 72:20
73:18 248:13
250:4 270:13,25
276:22
**Texas** 26:16
**text** 5:15 7:19 63:13
411:16 417:11,12
417:14
**textbook** 7:19,20
8:17 303:12
401:13,17,18,25
402:4,5 417:16,24
420:18 436:13,20
438:25 457:5
472:9 497:24
**textbooks** 291:6
**texts** 44:7
**TGF** 213:13,25
**thalidomide** 137:19
158:17 208:9
400:17,21,25
419:5
**thank** 17:16 30:22
51:16 58:12
178:23 227:14
244:2 300:20
340:12 449:9
488:24 497:2
**Thanks** 226:4 387:15
475:1
**theoretical** 205:15
**theoretically** 205:8
390:17 402:20
**theory** 267:21,23,24
**therapeutic** 272:22
273:7 274:18
275:5
**therapy** 264:25
**thereof** 214:21 270:3
409:8 444:23
**thicker** 102:12
**thing** 12:10 13:2
17:13 22:7 24:25
57:9 179:7 197:23
202:22 222:20
231:8,15,18
247:17 263:22
298:3 302:25
321:24 355:3
424:11 453:24
**things** 4:9 14:18
18:13 38:14
149:15 154:24

158:20 180:13
208:5 212:10
235:8 297:22
298:21 385:2
400:20 401:20
402:3 475:2
490:25
**thinking** 111:14
202:8
**thinks** 203:10 310:23
**third** 39:20 86:14,19
107:16 181:12
211:17 245:7
265:16 313:17
355:7 450:20
491:11
**THOMAS** 2:5
**thought** 75:21 156:1
163:10 237:3
356:9 365:1,3
373:17 445:23
448:13 481:1
**thousand** 129:23
130:22 131:5
138:23
**three** 41:11 67:16,17
101:18 180:12
218:23 260:5
264:10 290:2
346:19,24,25
379:14 384:25
385:9 397:13
407:19 429:1
447:16 451:14
475:5 476:4
478:14,21 499:16
500:5
**three-page** 50:20
**threshold** 432:16
454:14 475:12
**thrombosis** 494:9
**throwing** 232:25
**tightening** 429:5
**tightly** 266:21
**time** 11:16 12:6 17:2
17:4 18:2,25 22:19
22:25 23:1 29:15
34:16 35:5,8,13,14
36:1,5 43:18 54:2
62:17 65:21 66:3
66:22 75:24 76:5
82:18,19 103:8
115:1 117:2,15,23
118:9 145:23
146:2 149:6
157:15 162:17
178:4 179:18
180:3,7,9,11,20
189:22 198:25
200:25 210:18

USDC, Northern District of OK     McMurray v. GSK     Monday
No. 08-CV-381-GKF-SAJ     Videotape Deposition of Shira Kramer, Ph.D.     November 2, 2009

Page 535

212:12,17,17
219:10,16 229:3
243:16 245:11
260:22,23 261:15
261:25 262:7
264:13 275:1
285:14,18 305:21
305:22 315:21,22
326:24 357:23
358:2 374:11
401:7 409:2
416:22,23 426:11
426:15 439:1
441:22 442:8,12
442:18 445:18
447:20 450:6
458:14 488:8
499:19,21,23
500:2 501:11
**times** 93:23 94:10,19
217:20 327:14
386:18
**Tina** 419:23
**tired** 434:10,15
**tissue** 86:24 251:6
252:14,17,23
267:12
**tissues** 72:17 84:8
87:17,23 88:1
251:11 267:3
270:12,17 271:16
279:16 421:1
424:18
**title** 18:2 297:21
406:8
**today** 7:7 10:6,25
12:23 27:17 35:14
35:20 44:10 48:22
50:1,13 53:17
63:10 90:12,15,18
90:20,24 91:3,6
101:5,8,11 104:19
114:8 128:7 151:5
169:9 183:20
194:23 195:6
204:15 209:7,15
209:17,23 211:10
211:15 230:9
236:8 256:3
261:24 263:8,11
274:22 278:12
296:10,25 297:6
345:7 377:22
404:23 412:2
436:14 457:5
494:19
**today's** 8:12 91:8
**told** 30:5 113:24
141:1,14,15
142:14 198:15

294:2 298:23
333:16 360:24
376:17 478:17
**tolerated** 453:16
**Tom** 16:12 259:21
327:24 449:3
**tons** 274:25
**tools** 430:1,6,25
431:9,11
**top** 84:10 117:19
180:15 181:14
195:4 236:1 255:3
281:11 291:17,24
295:9 321:9
359:10 380:24,25
381:1,1,2 403:9
413:3,6,20
**tops** 488:21
**tort** 25:24 430:22
**total** 8:6 11:7,9
106:16 230:21
378:21 436:18
**totality** 244:20
307:10
**totally** 55:2,9 141:9
368:11 373:1
470:12
**Towson** 1:14 15:24
**tox** 5:22 250:8
**toxic** 25:24 430:22
**toxicity** 74:4 79:22
79:23
**toxicological** 9:17,19
233:23 272:6
450:16 460:6
461:17 469:19
**toxicologist** 73:23
469:6,20,23 471:5
**toxicology** 69:5
87:11,13 261:9
411:21 417:12
457:16 469:11,14
**Tracey** 1:16 6:4
140:17 141:16
226:15 227:11,17
228:5,21 229:22
230:10,21 231:2
232:8 413:5
**Tracey's** 229:7
**track** 17:17,21 488:2
**tract** 64:11 65:1,8
109:11,17 113:7
306:2 309:11
310:11,19 312:3
315:7 318:14
327:7 360:17
**traditional** 457:10,15
457:18,22
**train** 75:21
**trained** 69:8,19 70:1

70:24
**training** 75:3,17 76:2
80:15,16 86:2,4
143:7,10 175:19
185:8
**trait** 257:7
**transcript** 3:14,16
6:8 176:25 413:13
501:10
**translate** 399:10
**translation** 95:3
**transporter** 92:11
99:7,11
**transporters** 100:5
100:12
**transverse** 300:9
**trap** 425:23
**traumatic** 177:24
**treasurer** 18:9
**treat** 70:13 191:10
311:20 312:10
**treated** 135:13 137:4
392:8
**treating** 175:22
176:1,2,4,16,22
177:5
**treatise** 292:24
293:5
**treatment** 93:18
492:3
**trend** 218:25
**trends** 493:21 494:1
**trial** 3:14 12:7 13:4
23:21,25 24:8,15
25:11,13,19 41:14
65:13 69:11 90:4
144:20 166:4
231:20 254:23
296:9 403:4
404:20 411:8
413:2 416:17
426:5 459:10
**trials** 436:15
**Trialsmith** 20:7
**tried** 30:23
**trimester** 85:23,24
86:13,14,19
106:14 107:2,16
107:16,16,21,23
125:8 131:21
132:23 152:8
153:8,18 154:12
158:15 159:3
169:4 173:22
179:16 181:7
182:3 184:16
208:12 218:7
273:23 274:6,10
302:17,18 304:19
331:22 483:6

491:8,24
**trimethadione** 266:6
**truncus** 168:13
251:25 252:4,8
**truth** 501:7,8,8
**truthful** 182:21
**truthfully** 182:11
**truthfulness** 182:14
**try** 80:13 82:18
83:10 276:15
352:16 365:9
391:7 402:25
474:8
**trying** 40:8 138:6
154:19 238:9
496:23
**Tuckerton** 1:23
**Tumor** 321:5
**turn** 45:5 50:19
65:23 68:5 97:1
110:4 168:3 177:7
181:6 188:23
217:3 237:1 245:2
259:16 265:15
313:8 314:22
318:10 321:8
367:13 379:15
384:6 422:18
442:14 456:9
475:4 476:3,10,17
477:9
**turned** 484:6
**turning** 314:11 328:5
335:25 440:23
**twinning** 191:25
192:4,8,11,24
**twins** 155:22 157:14
174:6 206:1
**two** 14:20 17:1 18:18
32:9 36:20 37:2,11
37:13 81:7 101:23
102:18 106:1
114:3 116:2,5,16
118:18 140:3
142:14,15 168:7
172:16 176:14
180:6,8 205:25
213:16 219:5
231:17 233:2,6,14
233:16,18 234:1
234:24 243:4
248:2 260:5 274:2
274:7 287:10,12
290:1 297:17
299:7,8 311:16,21
314:5 321:13
331:22 332:1,2,7
338:18,21 340:21
342:7 345:17
346:15 359:18

361:13 362:5,17
386:8 388:6,12,24
389:3 400:19
409:21,24 424:8
428:19 443:8
475:5 476:18
479:9 496:1,10
499:16,17
**two-page** 6:1 14:21
**TX** 1:17
**type** 39:16,18 62:21
67:11 86:23,25
87:5,6 130:11
173:5 188:1
205:12 222:11
238:15 240:8,22
248:11 252:17,22
252:23 253:8,16
253:23 254:4,9,11
255:25 257:2,8,13
258:3,18,19 261:2
261:19 262:2,9
267:17 277:21
278:4,11 283:4
285:2,2 286:14
287:9 290:16
292:13,18 293:6,7
293:13 316:13
327:15 347:3
365:21 389:23
390:14 402:21
403:5,6,17 415:1,7
425:17 494:11
495:19,21,22,23,24
**types** 21:12 63:11
84:7,11 87:16,22
87:25 131:3 154:4
154:4 168:10
239:19 250:20,23
251:5,9,10,20
252:5,11,13 256:9
259:18,24 260:8
260:16 267:3,12
270:11,17 277:24
340:25 348:7
387:11 410:15
419:4 486:22
494:6
**typically** 421:17
**T-R-I-M-E-T-H-A...**
266:6

U

**Uh-huh** 265:20 283:8
285:6 336:9,15
470:20 481:10
489:16
**ultimate** 270:2 497:3
497:6,8
**ultimately** 54:21

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 536

**Ultra** 27:24 28:4,7
**ultrasound** 174:23
**ultrasounds** 69:9
**unadjusted** 479:14
  480:5,9
**unanswerable**
  202:15
**unaware** 180:22
**UNC** 322:23
**uncertainty** 453:16
**uncle** 161:4 163:10
**unclog** 28:18
**uncommon** 213:25
  214:1
**unconventional**
  26:14
**uncovered** 401:3
**undated** 50:21
**undefined** 125:25
**underestimated**
  115:9,11
**undergraduate** 86:2
**underlie** 92:18
  354:16
**underlying** 325:4
  326:5 482:23,25
**underneath** 167:8
  181:18 481:4
**underpowered**
  132:15 256:19
  319:19 361:7
  364:4 378:18
  381:23 386:8
  387:2,5 398:13
  464:5,7
**understand** 16:24
  17:6 19:20 35:25
  40:9 47:5 48:1
  70:9 80:1,6,16
  81:19 82:15 83:24
  84:4 110:5 113:17
  132:20 133:14
  146:25 148:11
  151:18 154:20
  170:19 179:24,24
  203:9 220:1
  221:19 238:9
  240:20 244:2
  248:12 255:23
  268:7,8,20,20
  276:21 279:4
  280:11 292:4
  296:8 319:17
  332:23 344:9
  348:3 353:2
  355:20 364:10,16
  365:25 367:23
  368:14,14,22
  379:22 381:19
  395:3 410:19

436:22 456:17
461:25 473:2
488:17 493:8
497:10
**understandably**
  203:25
**understanding** 24:7
  73:12 92:3 111:21
  117:24 149:6
  200:9,14,24
  201:21 204:11
  241:4,12 245:14
  270:10,15 296:1
  310:23 413:9,22
  414:13
**understood** 17:8 19:3
  147:8 183:20
  354:18
**unequal** 389:24
  390:15
**unexposed** 131:23
  132:25 304:17
  328:24 338:8
  349:13 378:20
  381:9 392:2
  427:18,22
**unfamiliar** 85:21
**Unfortunately** 52:3
**unified** 400:21
**unilateral** 223:21
**uninterpretable**
  379:7
**unique** 88:21 98:6
  417:2
**uniquely** 290:24
  291:1
**Unit** 28:8
**United** 1:1 16:3
  30:12 218:16
**universally** 153:24
**University** 17:18
**unknown** 126:2
  127:23 128:25
  129:2,5 158:6,8,11
  158:23 159:23
  170:14 200:10,22
  201:9 202:19
  207:20,24 208:1
  321:18
**unpublished** 493:16
**unrelated** 124:25
  311:21 368:11
**unreplicated** 397:13
**unresponsive** 120:11
**unsigned** 50:21
**unspecified** 223:20
  494:11
**unusual** 74:21 420:10
  420:10
**update** 213:8 379:15

**updated** 379:10
  380:20
**updates** 229:3
**upper** 130:23 315:10
  317:10 318:22
  328:12 338:1
  343:6 345:18
  369:5 374:23
  377:1 380:8,18
  438:16 445:9
  458:7 481:22
**Upshur** 453:22
**upwards** 392:16
**use** 17:12 20:2 28:17
  36:20 37:14,15
  39:4,15,19 40:13
  69:8 92:20 135:5
  136:8,14,17,24,25
  193:4,6 218:19
  255:9 304:23
  313:2 326:5
  331:21 336:22
  339:3,4 340:17
  347:13,13 349:15
  363:5 368:1 430:1
  449:1 457:11,14
  458:11,17 466:14
  466:18 477:12
  499:11
**uses** 29:1 393:22
  471:25 472:20
**usually** 147:21
  287:13
**utero** 157:7,15
  391:21
**utilization** 430:24
**utilized** 454:4
**utilizing** 385:5 435:9
**U.S** 79:13 134:19,25
  135:6,13

_____

**V**

**vagina** 419:3
**valproate** 265:6,10
**valproic** 265:18
**value** 225:24 315:17
  409:18 432:11,12
  433:24 434:13,23
  435:6 440:25
  441:3 455:2 464:1
  480:8
**variance** 477:12
**variation** 433:2,19
**varied** 201:5 293:16
  482:20
**varies** 35:21
**variety** 237:8 240:12
  244:4 246:24
  247:10 413:10,23
  414:14

**various** 7:6 13:15
  44:14 50:15
  103:20 128:15
  161:7 189:8 216:3
  241:3 255:22
  293:19 331:15
  354:15 356:1
  402:24 443:19
  450:9,9,15 468:3
  475:17,18 496:20
  496:22 499:12
**vary** 326:23
**vasculature** 73:14
**veins** 61:4
**Venable** 1:13 15:23
**Vendor** 227:11
**venlafaxine** 97:8
**venous** 61:3 62:4
  238:2,4 239:6
  240:23,25 241:7
  242:8,9 243:13
  244:12 364:20
**ventricle** 251:25
  252:4 270:19
**ventricular** 64:10
  65:1,7 72:20 73:10
  237:9 248:14
  305:7 306:2
  309:11 310:11,18
  311:17 312:3
  315:6 318:14
  328:7 347:18,25
  360:17
**Venture** 34:11,16
**veracity** 182:14
**verify** 241:20
**version** 40:25 489:20
  493:16
**versions** 309:25
  310:5,15 490:5
  491:3 497:17
  498:20
**versus** 16:2 38:1
  40:11 88:17
  136:21 270:13,18
  272:17
**vessel** 300:9,10
  341:8,15,20 342:8
  342:16 343:14,17
  343:19 344:1
  345:17,18
**vessels** 271:17 279:6
  307:13
**Vial** 4:18 119:1,3,8
**Vickery** 228:11
  229:16 230:22
**video** 2:9 15:18,20
  16:6 52:12,15
  66:19,23 97:24
  98:2 145:24 146:3

219:17 226:6
227:7 230:2,5
285:15,19 357:24
358:3 378:7,10
426:12,16 500:3
**Videographer** 2:9
  15:17 16:15 52:12
  52:15 66:19,22
  97:24 98:2 145:23
  146:2 219:10,14
  219:16 226:6
  227:7 230:2,5
  285:14,18 357:23
  358:2 378:7,10
  426:11,15 499:24
  500:2
**videotape** 1:13
**view** 26:14 92:15
  448:24
**views** 298:2
**virtually** 475:7
**vitamin** 158:19
**vitamins** 162:12,13
  162:16,19 193:10
**vitro** 84:18,21 85:16
**vs** 1:6
**VSD** 108:22 158:5,5
  159:22 312:8,14
  312:18 313:11,14
  313:18,24 314:2
  331:19 348:6
  374:16 376:16
  383:17 384:19
  411:1 484:13
**VSDs** 385:20
**vulnerable** 129:6
  389:24 390:15

_____

**W**

**wait** 111:13 135:18
  135:18 215:11
  297:3 322:7 324:4
  408:21 414:2
  427:5 446:9
  492:10
**waiting** 391:11
**Walker** 248:15
**want** 8:4 12:15 17:2
  17:5 24:23 42:13
  66:6 94:20 117:13
  119:11 126:13
  136:14,16 150:20
  150:22 155:1
  156:21 183:17
  189:15 192:22
  229:23 233:9,15
  233:25 236:20
  237:1 243:14
  258:20 260:25
  279:17 281:1

USDC, Northern District of OK                McMurray v. GSK                              Monday
No. 08-CV-381-GKF-SAJ          Videotape Deposition of Shira Kramer, Ph.D.        November 2, 2009

Page 537

293:18,19 298:10
302:14,20 305:19
313:4 322:7 324:3
325:21 327:4
339:21 345:14
354:1 356:25
365:10 374:24
380:19 384:15
395:10,22 401:17
403:10,22 407:14
409:1,3 433:7
436:22 463:23
479:21 480:23
484:7 489:5 492:5
**wanted** 55:4 93:12
103:21 104:1
345:23 463:10
472:4
**warfare** 18:14 19:12
30:23 31:1,5,9,10
31:11,15
**warning** 242:12
262:14,20
**warns** 263:13
**wasn't** 17:24 21:25
49:2,23 53:19
77:23,24 86:9
87:13 162:15
199:16 209:10
212:14 289:3
345:6 360:21
372:16 385:17
386:5 486:9
**Waste** 442:5
**Water** 28:8
**way** 24:21 30:4 43:6
48:6 52:4 53:9
56:17 65:24 76:25
80:13 83:10 102:2
109:3 113:6,11
144:23,24 145:8
151:1 154:24
191:8 203:20,21
208:2 217:2
244:23 247:14
249:8 251:1 253:2
254:21 275:14,16
283:24 285:3
292:16 310:14
324:24,25 326:19
333:6 336:19
344:3,10 354:7,9
356:20 359:8
362:3 374:6
391:19 394:7,8
424:20 431:21
439:9,11 448:19
448:21 456:5
462:2 471:11
472:2 476:24

478:24 499:11
**ways** 231:17 277:12
356:2 388:3
420:25 424:17,24
428:10 496:8,17
**weaknesses** 460:24
467:9
**web** 20:1,4,9 147:12
300:9,13 498:7
**Weed** 5:9 472:15
**weeks** 180:6,12,12
180:12,12
**weighed** 476:6
**weighing** 460:8
476:24 477:7
**weight** 66:1 119:10
225:9,24 226:3
249:20,23 272:9
272:15,15,16,18
299:4 305:25
361:2 373:17
436:4 454:15,25
455:8 457:11,14
458:2,12,17,22
459:4,22 460:4,14
461:7 462:2,4,5
463:2,5,6,7,11
464:1 465:3,6,10
465:11,22 466:7,8
466:13,14 467:20
468:18,23 469:7
469:21 471:25
472:12,16,19,24
473:7,10,18,22
474:7,9,13 475:3,8
475:15,22 476:6
476:21 477:13,14
481:17
**weighted** 256:23
476:6
**weighting** 461:21
462:23 476:11,11
**weights** 472:22
**Weinstein** 3:16
179:1,4,6,14
182:11
**Weinstein's** 176:24
177:5
**Weir** 108:21 110:15
**Weiss** 437:15
**well-conducted**
466:19,24 467:6
**well-recognized**
126:16
**well-respected** 27:2
**went** 41:19 54:3
102:1 319:1
325:19 348:22
461:13
**weren't** 32:25 182:7

296:4 308:7
366:13,14 376:1
394:25 454:13
485:12
**Werler** 5:2
**West** 1:14 15:24
**we'll** 7:2,15 8:7,13
9:6,13 10:1,6
13:17 14:7,12
15:14 102:23
133:14 145:17
194:7,7 259:22
313:6 335:17
409:5
**we're** 7:7 14:3 30:3
31:4 40:3 46:17
48:11 50:17 52:10
82:17 83:4 179:13
183:18 255:2
294:25 314:20
348:18 365:9
366:22 374:14
380:3,5,6 393:6
399:21 400:19
409:4 410:24
488:7
**we've** 20:18 24:19
25:4 30:13 59:17
122:21 138:4
139:18 190:21
195:20 216:16
240:1 242:23
256:24 267:1
287:18 298:15
312:2 314:12,14
328:4 330:20
336:13,14 357:21
358:24 385:9
386:10 387:5
413:4 439:12
449:4 486:18
488:17 492:21
**whatsoever** 21:5
125:17 158:12,24
203:7 262:18
425:24 426:2
**wholly** 421:5 456:11
**Wichman** 4:12
383:11 397:25
**widely** 430:2
**width** 235:13,15
438:16
**willing** 117:17 239:8
240:6 241:13
308:14 345:11
362:21
**willingness** 271:24
499:19,20
**Wilms** 321:5
**Wilson** 3:22 424:20

**Wilson's** 420:21
424:16
**wineries** 28:13
**wish** 222:13
**witness** 3:2 7:4,18,23
8:11,16,23 9:3,9
9:16 10:4,13,20
13:6,13,22 14:2,6
16:7,17 19:25
97:21 102:12
105:5 145:18,22
408:16 426:8
449:8 488:7,23
**woman** 111:8 127:11
135:5 138:12,20
211:22 272:21
273:7
**women** 78:22 125:14
127:15 135:12,25
136:3 137:3,18,22
137:25 138:1,18
139:7,11,23,25
198:15 264:22
297:18 302:17
304:24 325:10,10
325:14 349:5,11
349:13,17 384:11
392:7 395:6 408:8
492:3
**won** 34:21
**word** 17:13 20:2
37:19 57:16 61:15
92:13,20,24 168:8
247:20 255:9
424:10 456:19
**words** 18:5 36:20
55:18 56:16,16
57:22,23,24 58:25
59:10,11 88:12
93:16 146:17
147:20 197:14
224:5 242:6 248:2
330:15 401:13
411:10 425:22
433:16 445:3
446:13
**work** 11:9,10 12:4,7
12:19 13:5,19 19:5
19:6,8 20:18,21,23
30:14 35:19 47:25
58:22 72:14 228:8
230:11 251:15
268:3
**worked** 46:14 47:24
55:2 57:5 59:6
65:21 78:25 84:25
**workers** 317:4
**working** 31:4,5 35:22
47:12 67:9 447:18
**works** 51:11 52:4

467:20,21
**world** 73:19 261:25
302:1 303:9
308:20 353:4
354:24 415:15
416:25 417:2
419:14 499:5
**Worldwide** 447:13
**worth** 431:22
**wouldn't** 20:2 21:19
21:21 39:8 85:25
104:11 129:16
131:24 153:9
184:6 232:23
235:13,17 248:6
261:14 270:7
276:13 281:8
292:16 301:11
307:25 308:23
329:18 333:20
355:8,12 359:15
359:16 360:14
364:14 369:4,11
369:14 370:8
417:14 429:5
452:8 467:4
471:18 480:7
489:5
**write** 39:2 41:15
42:5,6,6 53:5,5
54:20 56:6,11,19
61:10,13,22 65:25
66:5 93:16,24,25
95:20 98:10
109:25 113:25
269:8 284:14
324:7 347:6,22
401:21 433:4
434:6 436:24
441:21 443:25
445:16 446:7,10
446:18,22 448:7
450:20 451:12
482:2,13 490:19
498:25
**writing** 41:20 53:3
55:17,22 99:4
113:23 114:7
292:23 293:4,9
316:13 411:24
463:16 494:16
**written** 27:8 63:5,17
75:10 77:3 79:3
84:16 178:16
179:7 211:22,23
212:12 216:20
220:1 260:2
290:21 291:3
297:4 322:24
411:12 439:1

| USDC, Northern District of OK | McMurray v. GSK | Monday |
|---|---|---|
| No. 08-CV-381-GKF-SAJ | Videotape Deposition of Shira Kramer, Ph.D. | November 2, 2009 |

Page 538

447:9 448:4,20
461:9 463:21
472:14 475:21
494:20,21
**wrong** 108:12 127:6
136:23 179:7
210:6 253:8 292:8
292:9 313:23
314:23 316:21
365:11 390:22,23
391:1,5,18 393:16
414:3 416:19
421:6
**wrote** 41:16 52:21
52:23 57:22,23,23
57:24,24 58:24,25
59:21 60:2,5,8,18
61:14,23 63:15
66:10 83:6 93:2
94:1,16 95:22
108:9 180:21
211:21,25 212:1,5
245:3 266:23
284:17 316:16
321:18,19,19,24
324:1,2 348:16
405:10,15,22
430:20 433:5,6,9
433:21 441:25
443:3 444:24
445:21 446:12,21
446:25 461:10
465:13 494:18,24
www.tate-tate.com
1:25
**Wyszynski** 218:4

**X**

**X** 3:1,7 125:19 149:7
**xeroderma** 84:25
**XI00887** 501:22
**X's** 125:21

**Y**

**yeah** 230:16 291:23
313:21 406:9
**year** 22:10 31:19
134:19,21 137:25
405:7 442:11
448:1 450:1
**years** 18:23 24:10,16
25:5 32:21 33:3
35:11 36:16 67:14
67:17 124:19
135:22,25 136:2
268:1 320:22
440:3 448:4
494:17,22 499:7
**year-to-year** 17:20

**yellow** 302:14
**yes/no** 435:22,23
445:7,10
**yielded** 329:2
**yielding** 386:12
**Yonkers** 3:18

**Z**

**Zach** 175:14 479:3
**Zachary** 47:9 54:7
58:21 59:12 60:15
60:17 67:24 143:6
175:14 212:7
**Zambelli-Weiner**
4:21,22,23 5:3
65:14,25 211:23
212:9,16
**zero** 181:25,25
**Zimmerman** 2:9
15:19
**Zoloft** 90:5 91:18

**$**

**$10** 22:10
**$132,000** 230:12
**$15** 31:19
**$72,000** 228:22

**0**

**0.05** 451:5
**0.06** 380:11
**0.07** 381:17
**0.1** 328:11 330:8
**0.23** 380:8
**0.3** 318:22 374:22
376:20 377:1,12
**0.39** 338:1 343:6
**0.4** 214:12 315:9,16
315:19 316:5
397:22 398:24
**0.41** 380:10 381:5
**0.5** 317:13 328:11,15
329:2,8,14,24
374:21 397:23
398:25
**0.50** 381:16 383:6
**0.52** 123:16 124:5
**0.7** 368:18 369:5
**0.72** 380:8
**0.8** 214:10,15 318:22
374:22 375:5
376:20 377:1,6
383:24 397:23
398:23
**0.80** 481:22
**0.83** 380:18
**0.85** 123:15 124:4
**0010** 177:20
**026** 406:16

**03** 181:6
**05** 26:15 432:19
434:4 435:4 441:9
454:9
**07** 383:8
**08-CV-381-GKF-S...**
1:2 16:5
**08033** 2:10
**08055** 1:24

**1**

**1st** 174:21 176:17
**1,161** 375:19
**1,170** 304:24
**1,931** 395:25
**1.04** 168:15
**1.05** 346:14 349:11
**1.1** 164:1,5 165:3,24
165:25 218:3
232:21 361:24
**1.10** 218:13
**1.14** 492:8
**1.16** 218:22
**1.18** 218:11 492:7,12
**1.2** 134:25 135:22,25
137:24 235:2
**1.22** 219:3
**1.23** 219:2
**1.28** 219:1
**1.29** 218:10
**1.3** 214:12 218:1
235:2 315:8 316:5
317:9,18 328:5
360:1,20
**1.31** 409:9
**1.32** 218:12
**1.34** 218:21
**1.40** 123:16 124:5
**1.42** 218:11
**1.46** 428:1
**1.5** 218:25
**1.54** 218:22
**1.55** 219:1
**1.58** 336:4 337:25
338:14 340:9
343:5
**1.6** 215:2 317:13
348:17 349:10
368:18,25 369:5
**1.62** 218:13
**1.63** 168:14 346:14
**1.7** 371:15,23 372:3
383:24 399:2
**1.76** 219:1
**1.78** 219:2
**1.95** 219:2
**1/09** 4:12
**1:19** 219:11
**1:34** 227:8
**1:36** 230:3

**1:37** 230:6
**10** 5:22,23,24 45:18
46:1 59:24 129:23
130:22 131:5,5
135:22,25 136:2
138:23 144:12
162:22 177:11
201:7 218:23
275:9 385:4 429:1
437:21 438:2,3
467:14 488:21
**10th** 498:16
**10,000** 129:20
378:23 379:21
**10-year** 134:24
441:22
**10:47** 145:24
**10:57** 146:3
**100** 35:8 137:17
488:16
**103** 481:9
**105** 392:25 393:10
393:11,15 394:1
395:13
**107** 107:11
**108** 491:20 492:24
**1089** 222:19
**11** 3:15 40:18,24
59:24 218:9,23
331:11 488:18
**11/07** 3:22
**11/4/95** 4:5
**110** 5:2 213:4,6
**116** 4:17
**117** 4:18 116:2,14,16
116:20,22 492:23
**118** 45:7 108:10
371:9,22 372:17
372:20 373:25
451:24 489:11,13
**118(a)** 490:19
491:12,22
**118(b)** 371:10
**118(d)** 309:10 310:3
310:8,12,14 311:6
**119** 103:12 105:24
**12** 3:16 59:25 177:3
492:20
**12.52** 409:17 441:2
**12:19** 219:13,14
**12:31** 219:17
**12:39** 226:7
**120** 5:3 447:11
**120,000** 134:21
**121** 5:4 24:14,19
25:4 109:8
**122** 4:20 5:5 29:22
64:18 65:9
**123** 5:6 103:12
316:15

**124** 5:7
**128** 5:8 167:18
316:17
**13** 3:17 5:16 8:6
59:15,25 181:1
226:12 348:4,5
**130** 5:9 472:1 475:4
**131** 5:10 321:23
476:3
**132** 5:11 320:23
321:1
**133** 5:12 44:8 476:17
**134** 5:13 59:24
384:11,20 477:9
**135** 489:22,24
492:22
**14** 5:25 6:1 46:8,21
46:22,24 51:4
59:25 224:13
311:9,10 320:8
371:18 436:24
437:3,10
**14203-2887** 2:3
**15** 6:2,3 33:2 59:25
320:8 487:20
**150** 5:14 6:6 7:15,16
**151** 5:15 7:21
**152** 5:16 6:1,2 8:8,9
14:19,22 15:3
101:19
**153** 5:17 8:13,14
**154** 5:18 8:20,21
**155** 5:19 8:25 9:1
116:3 118:19
**156** 5:20 9:6,7
**157** 5:21 9:13,14
**158** 5:22 6:3 10:1,2
14:4 15:8 46:15
47:1,16 58:13
**159** 5:23 10:9,11
**16** 3:4 59:25 496:14
**16th** 1:17
**160** 5:24 10:16,17
**161** 5:25 11:1,6
14:13 53:25
227:24 228:21
**162** 6:1 14:23,24
50:3,5 102:4
**163** 6:2,3,6 15:4,5,11
15:12 48:12 102:4
478:18
**164** 6:4 226:9,12
227:13,15 230:12
282:17
**166** 3:13
**167** 5:8
**17** 59:25 413:13,18
**170** 105:6
**177** 3:16
**18** 60:3 367:12,13

USDC, Northern District of OK                McMurray v. GSK                                    Monday
No. 08-CV-381-GKF-SAJ          Videotape Deposition of Shira Kramer, Ph.D.            November 2, 2009

Page 539

| | | | | |
|---|---|---|---|---|
| **180** 1:23 | **200** 295:21 | 222:21,22,23,24 | **39** 4:4 45:1,6 312:20 | **49** 4:10 473:24 |
| **181** 3:17 | **2001** 135:7 | 224:13 245:6 | 313:1,4 338:5 | 474:18 |
| **182** 381:21 382:9,15 | **2004** 3:19 174:21,24 | 314:12 315:5 | **391** 4:24 | **491** 4:8 |
| **188** 3:20 217:4,10 | 175:4 181:7,21 | 332:3 337:20 | **399** 494:7 | **493** 4:2 |
| **19** 24:10,16 25:5 | **2005** 5:9 114:25 | 420:24 422:11,18 | | **498** 4:7 |
| **190** 168:3 | 135:8 391:17 | 422:19 423:14,19 | **4** | |
| **1975** 4:6 | **2006** 4:17 29:4 | 424:9,16 458:10 | **4** 59:23 129:22 | **5** |
| **1982** 4:2 494:15 | **2007** 3:23,25 4:3,13 | 458:16 465:17 | 130:22 131:4,5 | **5** 1:23 3:11 42:2 |
| **1985** 18:8 | 4:14,15 5:4 23:13 | 481:3 501:23 | 134:18 138:23 | 59:24 65:23,24 |
| **1987** 5:11 321:19 | 27:22 440:1 | **3.2** 222:3 | 219:17 285:15 | 66:2 136:20,22 |
| **1988** 135:6 | 442:16,18 443:16 | **3.23** 371:15,23 372:3 | 317:10,18 360:2 | 144:8 166:24 |
| **1989** 5:10 | **2008** 4:20 5:8 32:3 | **3.26** 223:3 | 360:20 368:18 | 167:6,10 211:17 |
| **1990** 5:6 | 447:24 | **3.4.2** 304:14 | 423:18 467:19 | 212:18 245:2,7,8 |
| **1994** 5:13 | **2008.447** 5:3 | **3.54** 381:17 383:8 | 482:14,15 484:11 | 285:19 357:24 |
| **1995** 3:20 19:4 27:11 | **2009** 1:11 15:23 32:5 | **3.6** 218:1 | **4th** 174:24 | 372:14 437:7,8 |
| 27:15 | 41:1 51:5 58:20 | **3.8** 315:10 316:5 | **4.0** 369:6 | 456:1 459:1 465:9 |
| **1996** 218:16 | 140:15 383:12 | **3.88** 407:23 453:2 | **4.1** 317:10 | 465:14,18 468:2 |
| **1997** 5:2 | 501:23 | **3.9** 328:12 | **4.27** 409:16 | 468:13 474:2 |
| | **21** 3:19 62:15 96:12 | **30** 3:23 46:2 85:24 | **4.47** 441:1 | **5HT** 42:7 92:10 |
| **2** | 96:14 215:9 | 110:24 201:7 | **4.5** 218:3 | 93:21,22 96:8,21 |
| **2** 1:11 3:10 26:15 | 218:24 | 313:2,7 365:12 | **4.62** 407:23 453:2 | 97:16 |
| 45:20 46:9,20 | **210** 1:13 15:24 | 371:21 372:21 | **4.86** 380:18 | **5HTT** 97:11 |
| 58:18 66:23 93:23 | **213** 5:2 | 373:25 456:2 | **4.09** 357:24 | **5.1** 236:20 237:6 |
| 94:10,18,18 140:6 | **22** 61:2 196:16,16,17 | **30(b)** 371:13 | **4.18** 358:3 | **5.6** 135:9,12 |
| 145:24 146:14 | 196:21 422:13 | **3001** 264:15 | **4.43** 378:8 | **5/29/09** 3:15 |
| 174:19 187:15 | **22q11** 196:20 | **302** 5:1 | **4.44** 378:11 | **5:42** 426:12 |
| 206:18 207:1 | **2207** 218:14 | **304** 3:18 | **40** 3:9,15 97:5 | **5:52** 426:16 |
| 215:12 285:2 | **2216S** 188:23 | **307** 347:7 | 187:10,15 242:23 | **50** 3:12 97:6 167:7 |
| 317:7,8,25 318:11 | **222** 4:14 | **31** 26:10 408:8 | 275:9 321:12 | 230:24 242:23 |
| 386:17 424:9 | **223** 4:6 | 450:21 | 365:12 451:16 | 267:10 280:10 |
| 425:2 428:8 478:5 | **226** 6:4 | **31st** 27:22 | 452:18 494:17,17 | 328:17 329:25 |
| 478:12 479:1,1,8 | **23** 93:23 94:10,19 | **311** 4:1 | 494:22 | 429:24 498:24 |
| 483:11,14,18 | 167:20 216:15 | **312** 4:4 | **405** 4:21,22 | **500** 15:24 |
| 484:20 486:17 | **24** 3:20 5:4 36:16 | **313** 3:23 | **406** 407:10,17 | **51** 4:11 38:11,16 |
| 495:21,23 | 94:2 187:5 188:4 | **314** 4:3 | **41** 4:5 146:14 148:4 | **52** 4:12 383:21 |
| **2nd** 15:23 | 236:21 403:7 | **316** 5:6 | 206:17,25 415:12 | **539** 379:19 |
| **2.0** 167:2,11 318:23 | **24th** 181:7,21 | **32** 390:19,23,24 | 415:23 | **54** 413:13,17,18 |
| **2.01** 380:17 | **24.3** 444:3,4 448:9 | 391:5 433:3 | **41st** 450:2 | 414:5 |
| **2.1** 217:25 | **242** 3:25 | **320** 5:11 | **41,000** 394:12 | **55** 3:11 |
| **2.2** 213:23 214:1 | **25** 3:21 259:7 384:6 | **321** 5:10 | **413** 3:14 | **56** 4:13 346:8 |
| 218:2 374:23 | **259** 3:21 | **328** 3:24 | **415** 4:5 | **57** 4:14 222:2 335:23 |
| 377:2 | **26** 3:22 115:17 265:9 | **33** 3:24 191:4 328:2 | **42** 4:6 223:6 338:16 | 336:17 337:7 |
| **2.23** 380:9 | 265:14 453:17 | 163:14 167:15,19 | **420** 5:7 | 382:3 |
| **2.43** 444:2 | **265** 3:22 320:4 | 216:25 242:16,24 | **422** 4:19 | **58** 4:15 346:1 |
| **2.53** 349:11 | **269** 394:19 | 434:6,21,24 | **43** 4:7 128:12 396:1 | **59** 60:4 93:2,6 |
| **2.57** 168:15 | **2690** 318:11 | **3400** 2:3 | **44** 5:12 | 249:15,18 |
| **2.63** 348:22 | **2691** 325:23 | **346** 4:13,15 | **440** 1:17 | **599** 379:25 |
| **2.66** 481:21 | **27** 428:3 | **348** 4:11 | **4414** 218:15 | |
| **2.91** 380:11 | **29** 5:5 41:1 | **35** 4:1 188:5 311:12 | **442** 4:23 | **6** |
| **2.93** 348:22 | **290** 4:9 | 314:11,21 318:10 | **443** 4:25 | **6** 2:10 3:12 15:21 |
| **2.95** 219:3 | **2976** 321:8 | 456:9 | **45** 3:10 | 40:21 50:20,20,20 |
| **2/17/06** 5:5 | **299** 378:21 379:7 | **354-6000** 2:11 | **46** 4:8 122:24 212:20 | 52:19 59:24 96:16 |
| **2:38** 285:15 | 429:9 | **36** 4:2 213:5,7,7 | 212:25 491:4,4,16 | 129:20 135:8 |
| **2:49** 285:19 | **2996** 259:17 | 493:20 494:2 | 491:17 | 136:3 217:20 |
| **20** 3:18 33:2 95:19 | | **37** 4:3 208:10 314:24 | **47** 245:4,6 | 255:3 335:18 |
| 97:5,6,7 218:3,24 | **3** | 314:25 375:24 | **470** 54:8,13 | 343:6 358:3 |
| 304:5 340:24 | **3** 46:10 59:23 123:6 | 376:12 | **472** 5:9 | 378:23 379:20 |
| 365:11 377:10,11 | 134:20 137:12 | **377** 4:16 | **473** 4:10 | 413:4,7,20 426:12 |
| 474:2,10,20 | 140:2,5,8 146:3 | **383** 4:12 | **48** 4:9 67:23 290:17 | **6,481** 349:5 |
| **20th** 175:3 447:22 | 219:11 221:1 | | 298:13 | |

(856) 983-8484                       Tate & Tate, Inc.                       (800) 636-8283
180 Tuckerton Road, Suite 5, Medford, NJ  08055

USDC, Northern District of OK
No. 08-CV-381-GKF-SAJ

McMurray v. GSK
Videotape Deposition of Shira Kramer, Ph.D.

Monday
November 2, 2009

Page 540

| | | |
|---|---|---|
| **6.39** 338:2 | 405:20 406:11,15 | 436:10 441:2 |
| **6/12/07** 3:21 | 407:13 439:12,17 | 444:5,9,14,20,25 |
| **6/28/07** 3:24 4:1,11 | | 448:9 449:1,12 |
| **60** 127:23,25 128:4 | ——————— | 450:23 452:2,6 |
| 158:4,8,11,22 | **8** | 453:5 |
| 280:10 315:21,22 | **8** 3:13 5:16,17,18 | **96** 3:19 4:25 331:1 |
| 315:25 338:10 | 59:24 166:4 | 443:2 |
| **600** 379:25 | 254:24 348:4 | **97** 331:1 |
| **61** 4:16 95:18,20 | 372:14 413:3,20 | **98** 5:1 302:15 |
| 377:21 378:1 | 426:3 487:18 | **983-8484** 1:24 |
| **62** 4:17 116:22,24 | **8.90** 481:22 | **99** 394:25 408:8 |
| **63** 4:18 93:15 94:16 | **8/08** 4:8 | 410:15 |
| 117:1,9 | **8/13/09** 3:10 | |
| **636-8283** 1:24 | **8/14/09** 3:12 | |
| **64** 4:19 422:14,15 | **8/6/09** 3:9 | |
| 451:16 452:18 | **8:00** 1:14 | |
| **66** 4:20 122:21 135:3 | **8:53** 52:13 | |
| 480:19 | **8:59** 52:16 | |
| **67** 60:4 93:3,7 98:5 | **80** 60:18 61:1,22 | |
| **68** 60:18 | 97:9 267:10 | |
| **68.6** 327:13 | 427:13 | |
| **69** 94:2,11,12 | **800** 1:24 | |
| **698** 481:4 | **83** 96:15 | |
| **699** 482:4,8,13 | **831** 96:16 | |
| | **832** 96:15 97:1 | |
| ——————— | **84** 63:16 257:21 | |
| **7** | 264:11 | |
| **7** 5:14,15 59:24 | **85** 4:22 405:13,20,21 | |
| 198:22 317:2 | 405:22 407:11,14 | |
| 382:19,21,22 | 407:15,16,17 | |
| 426:16 500:3 | 449:3,4,7,8,20 | |
| **7/22/09** 3:16 | **856** 1:24 2:11 | |
| **7:00** 488:7 | **88** 236:25 237:7 | |
| **7:15** 500:3 | 244:3 246:23 | |
| **70** 201:8 377:13 | 247:2,7 | |
| **70,000** 135:14 | | |
| **706** 304:14 | ——————— | |
| **71.1** 327:13 | **9** | |
| **717** 313:8 | **9** 3:14 5:19,20,21 | |
| **72** 269:4 | 59:24 164:2,4 | |
| **726** 321:24,25 | 165:3,24,25 | |
| **73** 495:3 | **9.9** 444:2 448:8 | |
| **74** 258:22 259:11,12 | **9/09** 3:18 5:7 | |
| 259:13 | **9/1/05** 4:10 | |
| **745.4** 311:16 | **9/21/09** 3:13,14 | |
| **747** 338:23 339:1,4,8 | **9:16** 66:20 | |
| 340:17,25 341:5 | **9:23** 66:23 | |
| 341:10 342:4 | **9:55** 97:25 | |
| 343:9 | **9:58** 98:3 | |
| **747.1** 311:17 338:24 | **90** 201:8 449:14 | |
| 339:3,6 370:21 | **92** 4:23 442:4 | |
| **747.64** 343:19 | **93** 115:16 | |
| **747.82** 341:24 | **94** 5:13 | |
| **749** 223:6,7,17 224:4 | **95** 4:24 124:4 168:14 | |
| **75** 63:16 97:7 | 213:22 217:25 | |
| **76** 62:20 177:8,11 | 218:2,10,12,21,25 | |
| 403:7,8 | 219:1,3 315:18 | |
| **77** 64:20,23 177:7 | 316:2 323:17 | |
| **77002** 1:17 | 349:10 383:7 | |
| **778** 316:22,22 | 391:7,7 408:1 | |
| **79** 4:21 64:9 65:1,7 | 409:12,17,22 | |
| | 432:19 435:5 | |