IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ANDREA FRISCHHERTZ, wife of/and BRAD FRISCHHERTZ, individually and on behalf of the minor child, E.F.<br><br>Plaintiffs,<br><br>vs.<br><br>SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE<br><br>Defendant. | Civil Action No.: 10-2125<br><br>JUDGE BERRIGAN<br><br>MAGISTRATE ROBY<br><br>JURY TRIAL DEMANDED |

**DEFENDANT GLAXOSMITHKLINE LLC'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE THE TESTIMONY OF SHIRA KRAMER, Ph.D.**

## I.     INTRODUCTION

Plaintiffs' Opposition either entirely fails to address GSK's arguments or addresses them in a way that directly contradicts Dr. Kramer's sworn testimony about her methodology and the factual basis she claims underlies it. This is hardly surprising given that Dr. Kramer's methodology is unreliable under Fifth Circuit *Daubert* law, contrary to the generally accepted methodology for evaluating teratologic causation (*i.e.,* birth defect causation), and undermined by Plaintiffs' own expert, Dr. Trapido, who plainly attested to the unreliability of the methodological approach actually taken by Dr. Kramer. For these and other reasons enumerated below, as well as in GSK's opening memorandum, Dr. Kramer's testimony should be excluded.

## II.     ARGUMENT AND CITATION OF AUTHORITIES

**A.     PLAINTIFFS' ATTEMPTS TO RE-WRITE DR. KRAMER'S OPINIONS SHOULD BE REJECTED.**

In the face of Dr. Kramer's testimony that epidemiological evidence on Paxil and limb

defects is "*more or less noncontributory*" and "really *absent*,"[1] Plaintiffs argue that there are, in fact, epidemiological studies "that show an increased risk in limb malformation."[2] Plaintiffs are plainly wrong. Dr. Kramer admitted that there are no such epidemiology studies. (GSK's Memo. at 10.) Moreover, Plaintiffs' claims about the three studies that they reference (1) misrepresent the results of those studies and/or (2) are specifically contradicted by the testimony of Dr. Kramer and/or Dr. Trapido:

- Plaintiffs cite to the Louik study's 5.8 odds ratio ("OR") for club foot. At her deposition, Dr. Kramer admitted that club foot is not a limb reduction defect[3] and that she "did not focus on issues that were -- that are causally related to clubfoot specifically."[4]

- Plaintiffs claim that there were "nine cases of limb-reduction deficits" in the Louik study. The Louik study, however, reported *one* limb reduction defect on Paxil. The study reported an OR of 1.0 (CI 0.1-8.3) for Paxil and limb-reduction defects, consistent with no increased risk. As Dr. Kramer admitted, this finding *"really does not contribute"* and *"those standalone risk ratio of 1.0 indicates no association in this particular study."*[5] Dr. Trapido agrees that "[a] finding of 1.0 would be *no association*."[6]

- Plaintiffs claim that "[i]n the Alwan study, there were cases of limb deficiencies noted in the Paxil group with an odds ratio of 1.5." In fact, the Alwan study *does not report an OR for Paxil and limb deficiencies at all.* Rather, it reports a non-statistically significant (CI 0.9-2.7) OR of 1.5 for Paxil and all non-cardiac birth defects combined.[7] Similarly, Dr. Trapido admitted the following about Dr. Kramer's discussion of the Alwan study in her expert report:

    Q. Let's look at the Alwan study now . . . Is there any data here informative about the association or the relationship between limb defects and the Paxil?

    A. *No. There is none about -- there's nothing in here about limb defects. No information is presented*.[8]

These facts and admissions show that Plaintiffs' Opposition resorts to representations about the

---

[1] Kramer Dep. (attached as Ex. 2 to GSK's Memo.) at 117-118 (emphasis added).
[2] Pls.' Opp. Br. at 4.
[3] Kramer Dep. at 289.
[4] *Id.* at 66.
[5] *Id.* at 288 (emphasis added).
[6] Trapido Dep. (attached as Ex. 1) at 194 (emphasis added).
[7] Alwan S, *et al.* Maternal use of selective serotonin re-uptake inhibitors and risk for birth defects. *NEJM* 2007;356:2684-92 (attached as Ex. 2) at 2691.
[8] Trapido Dep. at 194-195.

2

epidemiology studies on Paxil and limb defects that are demonstrably wrong and directly contradicted by the testimony of their own experts.

Moreover, Plaintiffs' attempt to re-write the basis for Dr. Kramer's opinion is not surprising since Dr. Trapido, who was supposed to vouch for the reliability of Dr. Kramer's methodology, actually gave testimony attesting to its *un*reliability.  For example, Dr. Kramer testified that when she opined in her expert report that "[c]ompelling bases for causation in this case include consistency of elevated risk ratios across epidemiologic literature, biological plausibility and temporality," she actually meant that the "epi[demiological] literature really refers primarily to the cardiac defects and my opinion about the cardiac defects.  ***The biological plausibility and temporality really supports the limb defects***."[9]  When GSK put the question to Dr. Trapido about whether temporality and biologic plausibility alone could support a methodology on causation, Dr. Trapido testified as follows:

> Q. So if you had temporality and biological plausibility but none of the other things, you don't necessarily have enough to make a causal inference?
>
> A. I would be reluctant with only two of the criteria being true to make a causal assessment.
>
> * * *
>
> Q. Do you know of any instance where it's been done?
>
> A. Not off the top of my head.[10]

### B. PLAINTIFFS MISREPRESENT THE SCIENCE ON PAXIL AND BIRTH DEFECTS GENERALLY.

Plaintiffs continue to misrepresent the science arguing that other studies and regulatory statements show that Paxil causes cardiac defects or birth defects generally.[11]  As an initial matter, nowhere do Plaintiffs contest that Dr. Kramer is not an expert in teratology or anything

---

[9] Kramer Dep. at 118-19 (emphasis added).
[10] Trapido Dep. at 38-39; *see also id.* at 39 ("If only two [criteria] were found to be positive, I would be disinclined to call it causality.").
[11] Pls.' Opp. Br. at 2-4.

having to do with reproductive toxicity studies; animal studies; or serotonin and how it acts within the body.  (*See* GSK's Memo. at 13.)  That omission alone means that Dr. Kramer cannot offer opinions in the areas upon which Plaintiffs' Opposition relies.

Setting that omission aside, Plaintiffs attempt to use the Sloot study to argue that "Paxil is a 'clear teratogen.'"[12]  Yet, nowhere do they explain how the Sloot study is in anyway relevant, given that it found no limb defects of any kind as a result of exposing animal embryos to extremely high doses of Paxil.  Moreover, in two letters to the editor responding to criticisms of their article by other scientists, the Sloot authors acknowledged that their conclusions about Paxil were based on a Whole Embryo Culture ("WEC") test in which Paxil was applied to embryos in a test tube, as opposed to administering Paxil to a live, pregnant animal, and further clarified that the distinction they made in their article concerning teratogenicity "is not intended as a definition of *in vivo* teratogenicity, either in animals or in humans.  In other words, WEC may aid the prediction of potential teratogenicity rather than 'identify teratogens.'"[13]  As Plaintiffs' expert Dr. Goldstein admitted, WEC studies cannot be used to predict human risk; can only develop a "hypothesis"; and do not represent what happens in live subjects because "everything is different."[14]  Thus, neither the Sloot study nor any other WEC study can establish that Paxil is a teratogen, much less one that causes limb reduction defects.

Similarly misplaced is Plaintiffs' reliance on the GSK animal studies.  After reviewing all the preclinical animal studies of Paxil, even FDA concluded that they provided no evidence of teratogenicity.[15]  Again, Dr. Goldstein's admissions refute Plaintiffs' reliance on these studies

---

[12] *Id.* at 2.
[13] *See* Brent RL.  Reproductive toxicology.  *Reprod Toxicol* 2010;29(2):251-3; author reply 254-5 (attached as Ex. 3).  *See also*, Scialli AR, Iannucci AR.  Whole embryo culture and the identification of "teratogenicity'.  *Reprod Toxicol* 2010;29(2):247-8; author reply 249-50 (attached as Ex. 4).
[14] Goldstein Dep. at 137-139.
[15] Paxil Label PXL-AP:3MG, July 2011, section entitled "Animal Studies" at 15 (attached as Ex. 5).

given that he admitted that these studies showed no evidence that Paxil resulted in upper limb defects.[16]

Finally, Plaintiffs contort FDA's activities regarding the risk of birth defects with gestational Paxil exposure. As clearly stated in the Public Health Advisory cited by Plaintiffs, FDA merely found that gestational Paxil exposure "*may* increase the risk for congenital malformations, particularly cardiovascular malformations."[17] FDA did not determine that Paxil, in fact, causes any type of congenital malformation and did not conclude that Paxil is teratogenic. Nor does the Paxil's labeling mention anything about Paxil being associated with, much less causing, limb reduction defects of any kind. As emphasized by the Fifth Circuit, "[t]he agencies' threshold of proof is reasonably lower than that appropriate in tort law, which 'traditionally make[s] more particularized inquiries into cause and effect' and requires a plaintiff to prove 'that it is more likely than not that another individual has caused him or her harm.'"[18] Thus, FDA's activities concerning Paxil's labeling cannot help Plaintiffs meet their burden of proof to establish *causation* in this case.

### C. PLAINTIFFS ENTIRELY FAIL TO RESPOND TO GSK'S SHOWING THAT IT IS NOT RELIABLE TO EXTRAPOLATE FROM DATA FOR ALL DEFECTS OR OTHER DEFECTS TO *LIMB DEFECTS* SPECIFICALLY.

In any event, even if Paxil did increase the risk of cardiac defects or all congenital defects as a group (which it does not), this would not be a reliable basis to conclude that it increases the risk of *limb* defects for several reasons.

*First*, Plaintiffs entirely fail to even respond to the long line of Fifth Circuit decisions showing that this Circuit uniformly rejects expert opinions based on extrapolation from data

---

[16] Goldstein Dep. at 149.
[17] Public Health Advisory: Paroxetine. December 8, 2005 (attached as Ex. 6) (emphasis added).
[18] *Allen v. PA Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir. 1996).

relating to different diagnoses or outcomes.[19]

***Second***, Plaintiffs remain similarly silent in the face of *Daubert* decisions in teratology-related litigation holding that (1) teratogens produce specific types of defects; and (2) that it is unreliable to opine that a claimed teratogen can therefore produce any type of defect.[20]

***Third***, Plaintiffs do not respond to the statements of GSK's experts -- who, unlike Plaintiffs' experts, specifically study the etiology of birth defects -- that even if a substance increases the risk of some defects, it is not reliable to opine that the substance increases the risk of all defects. Indeed, Plaintiffs' expert Dr. Goldstein conceded that there is no known human teratogen that increases the risk of each and every birth defect or every category of birth defects.[21]

Fourth, Dr. Trapido agreed that data for Paxil and all congenital malformations are not informative with respect to Paxil and limb defects:

> Q. Okay. Do you agree that finding an elevated risk for all congenital defects lumped together in an epidemiologic study won't tell you if there's an elevated risk for any particular type of limb defect?
> A. That's a reasonable statement to make.[22]
>
> * * *
>
> Q. And what is it that you wrote in the margin there?
> A. Teratogenic, but not necessarily towards limbs.
> Q. And what did you mean by that?
> A. That they're talking about congenital cardiovascular defects and all congenital defects. And that doesn't necessarily tell me one way or another because they haven't talked about limbs in that statement.[23]

These omissions, taken individually or collectively, establish that Dr. Kramer utilized a methodology that is not reliable, generally accepted, relevant, or admissible.

---

[19] GSK's Memo. at 9.
[20] *Id.* at 16.
[21] Goldstein Memo. (Doc. 187-1) at 13-14.
[22] Trapido Dep. at 88 (objection omitted).
[23] Trapido Dep. at 90.

6

### E. PLAINTIFFS' CONCESSIONS REGARDING THE PURPORTED MECHANISM OF ACTION ARE FATAL TO DR. KRAMER'S OPINION.

Plaintiffs do not respond to GSK's argument that Dr. Kramer -- by her own admission -- is unqualified to testify regarding a purported mechanism of action based on perturbation of serotonin. Nor do Plaintiffs respond to GSK's argument that there is no reliable scientific basis for Dr. Kramer's mechanism theory. Implicitly conceding these points,[24] Plaintiffs instead argue that "Biological Plausibility/ Mechanism of Action is not needed in a causal analysis."[25] Dr. Kramer, however, made it amply clear throughout her deposition that she would *not* reach her causation opinion in this case absent her mechanism theory:[26]

> Q. So you're not extrapolating findings on all congenital malformations to reach conclusions about limb defects, correct?
>
> A. In isolation of the biological plausibility information is that what you're asking me?
>
> Q. Correct.
>
> A. In isolation, with no other information available --
>
> Q. Um-hmm. Yes, that's my question.
>
> A. ***I didn't do that, so I can't make that judgment. I looked at -- very clearly considered the strong evidence based on biological plausibility and limb defects.***
>
> Q. So you would consider it as part of your weight of the evidence but you would not base a causation opinion solely upon that; is that what you are saying?
>
> A. For limb defects?
>
> Q. Correct.
>
> A. Is that what you are asking?
>
> Q. For limb defects, correct.
>
> A. ***I didn't do that in this case***.[27]

---

[24] *See e.g., Lucarelli v. DVA Renal Healthcare Inc.*, 2006 WL 6206923, at * 2 (attached as Ex. 7) (W.D. La. March 22, 2006) ("By failing to respond to [defendant's] arguments. . . the Court assumes that Plaintiffs have conceded these points.").
[25] Pls.' Opp. Br. at 9.
[26] GSK's Memo. at 12.
[27] Kramer Dep. at 123 (emphasis added).

Importantly, if Plaintiffs are taken at their word and consideration of biological plausibility/mechanism were removed from Dr. Kramer's causal analysis, then all that would be left is temporality (*i.e.*, that following the alleged exposure to Paxil, E.F. was born with an upper limb reduction defect).  Temporality alone is not enough to reach any opinions about the cause of any birth defect (much less any other outcome).[28]  This means that Dr. Kramer's methodology again collapses like a house of cards.

### E.  PLAINTIFFS' ARGUMENT THAT EPIDEMIOLOGICAL STUDIES ARE NOT REQUIRED IS MERITLESS.

Plaintiffs' claim that epidemiological studies are not required to prove general causation in this case is meritless and ignores a host of Fifth Circuit precedent.  (*See* GSK's Memo. at 7-11.)  Confronted with this robust case law, Plaintiffs attempt to rely on this Court's decision in *Pick v. American Med. Systems, Inc.*, 958 F. Supp. 1151 (E.D. La. 1997).  Yet, that reliance is misplaced for several reasons.  First, in *Pick*, this Court did not rule on the issue of general causation at all, stating that "since summary judgment will be granted as to specific causation, it is not necessary to rule on the matter of general causation."[29]  Rather, the Court stated (in *dicta*) that epidemiological evidence is not necessarily required in all cases.  Moreover, the *Pick* decision also made clear that an expert cannot ignore relevant epidemiologic data simply because they are not supportive of the expert's opinion.[30]  Thus, it is not surprising that Plaintiffs are

---

[28] *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009) (holding that courts must not allow evidence of temporal correlation to serve as a substitute for science-based causation evidence: "[S]imply because a person takes drugs and then suffers an injury does not show causation. Drawing such a conclusion from temporal relationships leads to the blunder of the *post hoc ergo propter hoc* fallacy. The *post hoc ergo propter hoc* fallacy assumes causality from temporal sequence. It literally means 'after this, because of this.'  Black's Law Dictionary 1186 (7th ed.1999).  It is called a fallacy because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship.") (quoting *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005) (internal quotations omitted)).

[29] *Pick*, 958 F. Supp. at 1163.

[30] *See also Norris v. Baxter Healthcare Corp.*, 397 F. 3d 878, 882 (10th Cir. 2005) ("While the presence of epidemiology does not necessarily end the inquiry, where epidemiology is available, it cannot be ignored.  As the best evidence of general causation, it must be addressed.").

unable to cite to any case from any jurisdiction allowing general causation testimony in the absence of epidemiology under similar circumstances.

Moreover, the *Pick* decision was issued before the Supreme Court's seminal decision in *General Electric Co. v. Joiner*, 522 U.S. 136 (1997). In *Joiner*, the Supreme Court affirmed the exclusion of expert testimony based on non-statistically significant epidemiological data, modifying its earlier statement in *Daubert* that "the focus, of course, must be solely on principles and methodology, not on the conclusions that they generate":

> Respondent points to *Daubert*'s language that the "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." He claims that because the District Court's disagreement was with the conclusion that the experts drew from the studies, the District Court committed legal error and was properly reversed by the Court of Appeals. But conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.[31]

Post-*Joiner*, Fifth Circuit *Daubert* decisions routinely exclude causation opinions unsupported by statistically-significant epidemiological data.[32] Significantly, Plaintiffs do not even attempt to distinguish ***any*** of these decisions in their Opposition.

### III.    CONCLUSION

For all of the reasons stated in GSK's initial motion papers and in this reply memorandum, Dr. Kramer's opinions should be excluded.

---

[31] *Id.* at 146. As the *Advisory Committee Notes* to the 2000 Amendments to Rule 702 state: "The Court in *Daubert* declared that the 'focus, of course, must be solely on the principles and methodology, not on the conclusions that they generate.' Yet, as the Court later recognized, 'conclusions and methodology are not entirely distinct from one another.' . . . The amendment specifically provides that the trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case. As the court noted in *Paoli R.R. Yard PCB Litig.*, "***any*** step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. ***This is true whether the step completely changes a reliable methodology or merely misapplies that methodology***." (emphasis in the original; citations omitted).

[32] GSK's Memo. at 7-8.

9

| | |
|---|---|
| Respectfully submitted by: | Dated:   October 1, 2012 |

/s/ Bethany L. Schneider

| | |
|---|---|
| James B. Irwin (La. Bar No. 7172) | Andrew T. Bayman (Admitted Pro Hac Vice) |
| Stephanie L. Irwin (La. Bar No. 22493) | Halli D. Cohn (Admitted Pro Hac Vice) |
| Brian P. Quirk (La. Bar No. 19748) | Meredith B. Redwine (Admitted Pro Hac Vice) |
| IRWIN FRITCHIE URQUHART & MOORE LLC | Bethany L. Schneider (Admitted Pro Hac Vice) |
| 400 Poydras Street, Suite 2700 | KING & SPALDING LLP |
| New Orleans, LA 70130 | 1180 Peachtree Street, N.E. |
| Telephone: (504) 310-2100 | Atlanta, GA 30309 |
| Facsimile: (504) 310-2101 | Telephone: (404) 572-4600 |
| | Facsimile: (404) 572-5100 |

Tamar Halpern (Admitted Pro Hac Vice)
Eva Canaan (Admitted Pro Hac Vice)          ATTORNEYS FOR DEFENDANT
PHILLIPS LYTLE LLP                                       GLAXOSMITHKLINE LLC
Suite 3400, One HSBC Center
Buffalo, New York  14203
Telephone:  (716) 847-8400
Facsimile:  (716) 852-6100

## **CERTIFICATE OF SERVICE**

　　I certify that on October 1, 2012, a copy of the foregoing Reply Memorandum was served via ECF filing on all counsel of record.

　　　　　　　　　　　　　　　　　　　　　　　　　　/s/ Bethany L. Schneider